# Exhibit 48

**<u>Index of Retraction Demand Letters from Dominion to OANN</u>**

1.   December 18, 2020 Ltr. from T. Clare and M. Meier to R. Herring, C. Herring, and B. Littman

2.   December 22, 2020 Ltr. from T. Clare and M. Meier to R. Herring and C. Herring

3.   February 4, 2021 Ltr. from M. Meier & T. Clare to E. Early

4.   April 16, 2021 Ltr. from S. Shackelford to E. Early

5.   My 12, 2021 Ltr. from S. Shackelford to E. Early

6.   June 18, 2021 Ltr. from S. Shackelford to B. Rhodes

7.   July 13, 2021 Ltr. from S. Shackelford to B. Rhodes

8.   August 4, 2021 Ltr. from S. Shackelford to B. Rhodes





**THOMAS A. CLARE, P.C.**                                                    **MEGAN L. MEIER**

December 18, 2020

*Via Email*

Robert Herring
Chief Executive Officer, OANN
Email: bobby@awetv.com

Bruce Littman
Executive Vice President, OANN
Email: bruce.littman@oann.com

Charles Herring
President, OANN
Email: charles.herring@oann.com

> **Re:** *OANN's Publication of False Accusations About Dominion*

Dear Messrs. Herring and Mr. Littman:

We represent US Dominion Inc. and its wholly owned subsidiaries, Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation (collectively, "Dominion").

We understand that OANN is planning to broadcast an "exclusive investigation" into the 2020 election—titled "Dominion-izing The Vote" at 10:00 pm EST on Saturday, December 19, 2020. We write for two reasons: (1) to put OANN on formal written notice of the facts so that there is absolutely no doubt at a future date about the information that was known to OANN before that program is broadcast; and (2) to demand retraction, pursuant to all applicable law, of OANN's previous false accusations about Dominion.

**I.     Facts about Dominion and the 2020 U.S. Presidential Election.**

1.     <u>Dominion plays a very limited role in elections</u>.

Dominion provides tools such as voting machines that accurately tabulate votes for the thousands of bipartisan poll workers, poll watchers, and local election officials across the country who work tirelessly to run elections and ensure accurate results. Dominion's machines count votes from county-verified voters using a durable paper ballot.

2.     <u>The vote counts from Dominion's machines have been verified by independent audits and recounts of paper ballots</u>.

There are mountains of hard evidence conclusively debunking claims of vote manipulation and election rigging against Dominion—namely, the mountains of paper ballots that local election officials and volunteers recounted by hand, proving beyond any shadow of a doubt that the vote counts from Dominion's machines were accurate.



*Poll workers count paper ballots while poll watchers observe in Gwinnett County, Georgia on November 14, 2020.*

3. <u>Dominion did not pay kickbacks to secure a "no-bid" contract in Georgia and claims to the contrary are based on doctored "evidence" submitted by a facially unreliable source with a powerful financial motive to lie</u>.

After Trump-supporting Republicans in Georgia debunked Sidney Powell's election-rigging claims by announcing the results of the paper ballot recount and refusing to overturn Georgia's election results, Ms. Powell attempted to discredit them by falsely accusing Dominion of paying them kickbacks to get a "no-bid" contract for the use of its systems in the 2020 election. As set forth in our demand letter to her (which is attached for your review as Exhibit 1), Ms. Powell is an unreliable source who has misrepresented and manufactured evidence to support her false accusations, which she uses to solicit millions of dollars. Ms. Powell has never put forward any evidence—except for a ***doctored*** Secretary of State certificate—in support of these false accusations. No such evidence exists because her accusations are categorically false. Indeed, public records show that there ***was*** a bid process for the contract in Georgia and that Dominion offered Georgia the lowest-cost system among three companies that submitted bids, one of which—as explained below—was Smartmatic, an entirely separate company and competitor to Dominion.[1]

---

[1] Georgia Secretary of State, *Elections Security Is Our Top Priority: Security-Focused Tech Company, Dominion Voting to Implement New Verified Paper Ballot System*, available at, https://sos.ga.gov/securevoting/.

4.  Dominion's founder never claimed he could "change a million votes, no problem at all" and he cannot, in fact, do so.

Sidney Powell has also claimed that there is a video of Dominion's founder admitting that he "can change a million votes, no problem at all." She promised to tweet out the video, but she never did. Nor has anyone else ever produced any video of Dominion's founder making such a claim. This is because no such video exists. Dominion's founder never made such a claim because Dominion cannot change votes. Its machines simply tabulate the paper ballots that remain in the custody of the local election officials—nothing more, nothing less.

5.  Dominion is not Smartmatic and it has no connection to Hugo Chavez, Venezuela, China, or George Soros.

As is readily apparent from documents in the public domain, **Hugo Chavez's elections were not handled by Dominion**, but by an entirely different company—Smartmatic. Dominion and Smartmatic are entirely separate companies who compete against each other. Indeed, as reflected in records from the Georgia Secretary of State, Dominion and Smartmatic competed against each other for the contract to provide vote counting machines for the 2020 election.

Dominion was not created in or for Venezuela, has never been located there, and is not owned by Smartmatic or Venezuelan or Chinese investors. Dominion has never provided machines or any of its software or technology to Venezuela, nor has it ever participated in any elections in Venezuela. It did not receive $400 million from the Chinese in the weeks before the 2020 election or otherwise. It has no ties to the Chinese government, the Venezuelan government, Hugo Chavez, Malloch Brown, or George Soros. And Dominion does not use Smartmatic's software or machines, nor was there Smartmatic technology in any of Dominion's voting machines in the 2020 election.

## II.    There is no reliable evidence to support the defamatory falsehoods about Dominion.

Numerous credible sources have uniformly confirmed that there is no reliable evidence to support accusations of vote manipulation or election rigging against Dominion. By way of example:

- By November 10, 2020, a spokesperson for the Michigan Secretary of State confirmed, "We have not seen any evidence of fraud or foul play in the actual administration of the election. What we have seen is that it was smooth, transparent, secure and accurate."[2]

- On November 12, 2020, the Elections Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Executive Committees released a joint statement confirming that there is "**no evidence** that any voting system

---

[2] Nick Corasaniti, Reid J. Epstein & Jim Rutenberg, *The Times Called Officials in Every State: No Evidence of Voter Fraud*, The N. Y. Times (Nov. 10, 2020), available at, https://www.nytimes.com/2020/11/10/us/politics/voting-fraud.html.

deleted or lost votes, changed votes, or was in any way compromised" and that the 2020 election was the most secure in American history.[3]

- On November 16, 2020, fifty-nine specialists in election security issued a statement that "***no credible evidence*** has been put forth that supports a conclusion that the 2020 election outcome in any state has been altered through technical compromise."[4]

- On November 17, 2020, the Chairman of the Maricopa County Board of Supervisors released a statement explaining, "The evidence overwhelmingly shows the system used in Maricopa County is accurate and provided voters with a reliable election ... The Dominion tabulation equipment met mandatory requirements during logic and accuracy testing before the Presidential Preference Election, the Primary Election and the General Election. And after each of these 2020 elections, the hand count audit showed the machines generated an accurate count."[5]

- On November 19, 2020, the Trump-supporting Republican Secretary of State Brad Raffensperger explained that "Georgia's historic first statewide audit reaffirmed that the state's new secure paper ballot voting system accurately counted and reported results."[6] And, Georgia's Trump-supporting Republican Governor Brian Kemp likewise refused to overturn the state's election results.

---

[3] Cybersecurity & Infrastructure Security Agency, *Joint Statement From Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees* (Nov. 12, 2020), available at https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election (emphasis added).

[4] *See Scientists say no credible evidence of computer fraud in the 2020 election outcome, but policymakers must work with experts to improve confidence* (Nov. 16, 2020), available at, https://www.mattblaze.org/papers/election2020.pdf.

[5] Letter from Clint Hickman to Maricopa Cty. Voters (Nov. 17, 2020), available at, https://www.maricopa.gov/DocumentCenter/View/64676/PR69-11-17-20-Letter-to-Voters#:~:text=Here%20are%20the%20facts%3A&text=The%20evidence%20overwhelmingly%2 0shows%20the,voters%20with%20a%20reliable%20election.&text=As%20required%20by%20la w%20(A.R.S,used%20in%20any%20Arizona%20elections.

[6] Georgia Secretary of State, *Historic First Statewide Audit of Paper Ballots Upholds Result of Presidential Race*, available at, https://sos.ga.gov/index.php/elections/historic_first_statewide_audit_of_paper_ballots_upholds_ result_of_presidential_race#:~:text=2020%20Qualifying%20Packet- ,Historic%20First%20Statewide%20Audit%20of%20Paper%20Ballots%20Upholds%20Result%2 0of,machine%20tally%20of%20votes%20cast.

- On December 1, 2020, Trump loyalist U.S. Attorney General Bill Barr issued a statement that "we haven't seen **anything** to substantiate" allegations that "machines were programmed essentially to skew the election results."[7]

- On December 7, 2020, after Ms. Powell submitted her "evidence" to a federal judge in Michigan, the judge observed that she had submitted "**nothing but speculation and conjecture** that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden." Op. & Order Den. Pl.'s Emer. Motion. for Decl., Emer., and Inj. Relief at 34, *King v. Whitmer*, No. 20-cv-12134 (E.D. Mich. Dec. 7, 2020) [Dkt. 62].

Ms. Powell, on the other hand, has not presented a shred of actual evidence in support of any of her accusations against Dominion. But OANN was not alone in failing to obtain any evidence from Ms. Powell: Fox News was equally unsuccessful in persuading Ms. Powell to reveal the "evidence" she claimed to have in support of her outlandish accusations. Tucker Carlson called her out publicly for failing to do so.[8] Nor, apparently, has Ms. Powell disclosed her top-secret evidence to Trump loyalist and U.S. Attorney General Bill Barr, who issued a statement that "we haven't seen **anything** to substantiate" allegations that "machines were programmed essentially to skew the election results."[9] With no real evidence to support her claims, Ms. Powell's team deliberately misrepresented that a person who had **never** worked in military intelligence was actually a "military intelligence expert."[10] And, from the near-verbatim manifestos in the Venezuelan declarations attached to her court filings, it is painfully obvious to even a casual observer that those witnesses did not write their declarations independently.

## III. Proven liars, conspiracy theorists, and anonymous sources are not reliable sources of information.

To be sure, some people have claimed that Dominion was created in Venezuela with Chinese money to rig elections for the now-deceased Venezuelan dictator Hugo Chavez and that Dominion rigged the 2020 U.S. Presidential Election by manipulating votes from a control room in Spain or Germany, all as part of a decades-long international conspiracy involving George Soros, President

---

[7] Michael Malsmo, *Disputing Trump, Barr says no widespread election fraud*, Associated Press (Dec. 1, 2020), available at, https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d.

[8] *Tucker Carlson SLAMS Sidney Powell for not Providing Evidence Election was Taken from Trump*, YouTube (Nov. 19, 2020), available at, https://www.youtube.com/watch?v=57l56J47xhk.

[9] Michael Malsmo, *Disputing Trump, Barr says no widespread election fraud*, Associated Press (Dec. 1, 2020), available at, https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d.

[10] Emma Brown, Aaron C. Davis & Alice Crites, *Sidney Powell's secret 'military intelligence expert,' key to fraud claims in election lawsuits, never worked in military intelligence*, Washington Post (Dec. 11, 2020), available at, https://www.washingtonpost.com/investigations/sidney-powell-spider-spyder-witness/2020/12/11/0cd567e6-3b2a-11eb-98c4-25dc9f4987e8_story.html.

George H.W. Bush's father, the Muslim Brotherhood, leftists, Republican state officials in Georgia, and thousands of bipartisan local election volunteers across the United States.

Some people will say anything for their fifteen minutes of fame. But proven liars, conspiracy theorists, and anonymous sources are not reliable sources of information about anything—let alone something as important as the legitimacy of American democracy. So we write to make sure there is no dispute whatsoever that you are aware of the below information, all of which we expect you are already aware of because it is readily available in the public domain.

- **Sidney Powell**. As detailed extensively in our December 16 letter to her (Ex. 1), Ms. Powell is a proven liar who has actively misrepresented and manufactured evidence and lied about having recordings that do not exist.

- **Rudy Giuliani**. Mr. Giuliani's assertions about Dominion are based on what Sidney Powell told him. Enough said.

- **Mellissa Carone**. OANN has published the false claims of Mr. Giuliani's star witness, Mellissa Carone, who notoriously went viral—in the bad way—when Mr. Giuliani had to "shush" her for leveling unhinged accusations at Republican officials in Michigan who asked her follow-up questions about her dubious claims. A judge determined that her accusations were "simply not credible."[11]

- **Purported "Experts" Put Forward by Sidney Powell**. After Ms. Powell submitted the declarations of so-called "experts" in her "Kraken" litigation in Arizona, the federal judge observed that the attachments to Ms. Powell's complaint were "only impressive for their volume" and included "expert reports" that "reach implausible conclusions, often because they are derived from *wholly unreliable sources*." Order at 24-25, *Bowyer v. Ducey*, No. 2-20-cv-02321 (D. Ariz. Dec. 9, 2020) [Dkt. 84] (Ex. 2). Ms. Powell's sources in that litigation included Harri Hursti, Alex Halderman, William Briggs, Russell Ramsland, and Josh Merritt aka "Spyder."

- **Josh Merritt aka "Spyder"**. Josh Merritt, a top-secret witness code-named "Spyder" by Sidney Powell, knowingly signed, under penalty of perjury, an admittedly "misleading" declaration falsely claiming he was a "military intelligence expert" even though he has *never* worked in military intelligence and even though a spokesperson for the U.S. Army Intelligence Center of Excellence says he "kept washing out" of courses.[12]

---

[11] *See Mich. Fraud Witness Debunks Dominion CEO Testimony, Says Poulos Falsely Denied Internet Connection & Ballot Dumps*, OANN (Dec. 16, 2020), available at https://www.oann.com/mich-fraud-witness-debunks-dominion-ceo-testimony-says-poulos-falsely-denied-internet-connection-ballot-dumps/; Op. & Order at 7, *Constantino v. City of Detroit*, No. 20-014780 (Mich. 3d Jud. Dist. Ct. Nov. 13, 2020).

[12] Emma Brown, Aaron C. Davis & Alice Crites, *Sidney Powell's secret 'military intelligence expert,' key to fraud claims in election lawsuits, never worked in military intelligence*, Washington Post (Dec. 11, 2020),

- **Russell Ramsland**. Russell Ramsland is a failed Republican congressional candidate and a deep-state conspiracy theorist who claimed, among other facially ludicrous and inherently improbable things, that George Soros, while less than 10 years old, helped form the "Deep State" in Nazi Germany in the 1930s—along with President George H.W. Bush's father, the Muslim Brotherhood, and leftists.[13] Not only has Mr. Ramsland been called out for referencing and citing to locations in Minnesota when alleging voter fraud in Michigan,[14] but his report on voting results in Antrim County was deemed by Antrim County's own bi-partisan election officials as "riddled with false and unsupported claims, baseless attacks, and incorrect use of technical terms."[15] And the former acting director of the Election Assistance Commission's Voting System Testing and Certification program—who is **actually** an expert in in election voting systems—said that the report showed "a grave misunderstanding" of Antrim County's voting system and "a lack of knowledge of election technology and process," resulting in "a preposterous conclusion."[16] Proving just how baseless Mr. Ramsland's report is, a hand recount of Antrim County completed on December 17, 2020 "confirmed the truth and affirmed the facts: Dominion's voting machines accurately tabulated the votes cast for president in Antrim County."[17]

- **William Briggs and Matt Braynard**. William Briggs's claims are based on a list—compiled by Matt Braynard—of allegedly ineligible Georgia voters who allegedly voted illegally. In fact, Mr. Braynard's list included voters who were, in fact, eligible to vote and was rejected by a federal judge for its "sheer unreliability."[18]

---

available at, https://www.washingtonpost.com/investigations/sidney-powell-spider-spyder-witness/2020/12/11/0cd567e6-3b2a-11eb-98c4-25dc9f4987e8_story.html.

[13] John Savage, *Texas Tea Partiers Are Freaking Out Over 'Deep State' Conspiracy Theories*, Vice (Sept. 30, 2018), available at, https://www.vice.com/en/article/mbwgxx/texas-tea-partiers-are-freaking-out-over-deep-state-conspiracy-theories.

[14] Clara Hendrickson, *Affidavit in Michigan lawsuit seeking to overturn election makes wildly inaccurate claims about vote*, PolitiFact (Dec. 4, 2020), available at, https://www.politifact.com/factchecks/2020/dec/04/russell-james-ramsland-jr/affidavit-michigan-lawsuit-seeking-overturn-electi/.

[15] *See Report spreads debunked claims about Dominion machines in Michigan county*, AP News (Dec. 15 2020), available at, https://apnews.com/article/fact-checking-afs:Content:9847904839.

[16] *See Former election security chief for Trump knocks down Antrim County report*, The Detroit Free Press (Dec. 16, 2020), available at https://www.freep.com/story/news/politics/elections/2020/12/16/antrim-county-report-debunked-by-former-trump-election-official/3923499001/.

[17] *See Trump still wins small Michigan county after hand recount*, AP News (Dec. 18, 2020), available at https://apnews.com/article/election-2020-joe-biden-donald-trump-michigan-elections-07e52e643d682c8033a0f26b0d863387.

[18] Order at 26, *Bowyer v. Ducey*, No. 2-20-cv-02321 (D. Ariz. Dec. 9, 2020) [Dkt. 84] (Ex. 2); Michelle Ye Hee Lee, *Here's what happened when a Georgia lawmaker scrutinized the Trump campaign's list of allegedly illegal votes*, Washington Post (Dec. 10, 2020), available at,

- **Navid Keshavarz-Nia**.  Navid Keshavarz-Nia's claims about the 2020 election were described by then-CISA director and Trump-appointee Chris Krebs as "nonsense."[19] That description is bolstered by the fact that Mr. Keshavarz-Nia declared, under penalty of perjury, that there was a pattern of improbable vote reporting in "Edison County, Michigan"—a county that does not exist in the state of Michigan.

- **Ana Mercedes Diaz Cardozo and Sidney Powell's Anonymous Venezuelan Source Claiming to Have Been Selected for the "National Security Guard Detail of the President of Venezuela."**  Above and beyond the fact that Ms. Powell's anonymous Venezuelan witness refuses to publicly stand by his wild accusations of a decades-old international conspiracy, his explanation for why he purportedly came forward is nearly word-for-word identical to the explanation in the declaration signed by Ana Mercedes Diaz Cardozo, proving that they did not write the declarations independently.[20]

- **Ronald Watkins**.  OANN has previously given airtime and credence to known conspiracy theorist Ronald Watkins, calling him a "cyber analyst."[21]  Mr. Watkins is the 33-year-old former administrator of 8chan (now 8kun) and son of Jim Watkins, who is widely considered to be the "Q" of QAnon[22]—whose proponents believe that Trump is battling a cabal of Satanic pedophiles that originated in a D.C. pizza parlor—and who has himself been accused of hosting "child porn domains."[23]

- **Joe Oltmann**.  Joe Oltmann is a Twitter-banned "political activist" who lives in Colorado, where it is perfectly legal to record your phone calls without the knowledge of the other people on the line.  He would have people believe that he went to the trouble of "infiltrating Antifa" but didn't bother to record his "conference call" with them, instead electing to take "notes" of a Dominion employee supposedly assuring "Antifa" that he would rig the election.  Of course, except for that Dominion employee—who received death threats after OANN identified him by name to a global internet

---

https://www.washingtonpost.com/politics/heres-what-happened-when-a-georgia-lawmaker-scrutinized-the-trump-campaigns-list-of-allegedly-illegal-votes/2020/12/10/1400d628-3b06-11eb-bc68-96af0daae728_story.html.

[19] Zach Montellaro and Kyle Cheney, *Pro-Trump legal crusade peppered with bizarre blunders*, Politico (Dec. 3, 2020), available at, https://www.politico.com/news/2020/12/03/sidney-powell-trump-election-lawsuit-442472.

[20] *Compare Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-2 at ¶ 4] *with Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-3 at ¶ 3].

[21] *See Cyber Analyst On Dominion Voting: Shocking Vulnerabilities*, OANN (Nov. 15, 2020), available at, https://www.oann.com/cyber-analyst-on-dominion-voting-shocking-vulnerabilities/.

[22] *See The men behind QAnon*, ABC (Sept. 22, 2020), available at, https://abcnews.go.com/Politics/men-qanon/story?id=73046374.

[23] *See QAnon Is Supposed to Be All About Protecting Kids. Its Primary Enabler Appears to Have Hosted Child Porn Domains*, MotherJones (Oct. 29, 2020), available at https://www.motherjones.com/politics/2020/10/jim-watkins-child-pornography-domains/.

audience—Mr. Oltmann has not identified any of the other "Antifa members" who he claims were on the call.[24]

We have no doubt that you can find other people who are upset about the results of the election and will say anything to get on television. But OANN's job—as a media organization—is to vet the credibility of sources before relying on them and publishing their claims to a global internet audience, especially when—as here—their claims put people's lives in danger, are inherently improbable, and have already been conclusively debunked by a mountain of paper ballots, bipartisan public servants, election volunteers, and people who actually have expertise in election security.

**IV.    OANN recklessly disregarded the truth, evidence, and reliable sources when it pursued a preconceived narrative and published the inherently improbable and debunked claims of facially unreliable sources.**

In reckless disregard of the evidence and facts set forth above—which are readily available in the public domain—OANN set out to make the facts conform to the false, preconceived (and profitable) narrative that the election was illegitimate. It then repeatedly published the inherently improbable and debunked claims of facially unreliable sources, recklessly disregarding that those statements were false and that publishing them would endanger Dominion's business and the lives of its employees.

OANN did not simply publish the claims of its facially unreliable sources; it adopted their claims as its own and held them out as credible, both through the words of OANN personalities themselves and through the title "Dominion-izing the Vote," which falsely conveys that Dominion had tampered with and rigged the vote.[25]

In so doing, OANN acted with actual malice. *See St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) (the publication of allegations that are "inherently improbable" is strong evidence of actual malice); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 46 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003) ("evidence that the story was so inherently improbable that only a reckless person would have put it in circulation" is "likely [to] support a finding of actual malice"); *St. Amant*, 390 U.S. at 732 ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant."); *Wells v. Liddy*, 186 F.3d 505, 542-43 (4th Cir. 1999) (actual malice may be shown where publisher had reason to believe a source might not be credible); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016) (relying on a facially unreliable source is evidence of actual malice); *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 124 (2d Cir. 2013) ("'evidence of an intent to avoid the truth ... [can be] sufficient to satisfy the [actual malice standard]'") (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 693 (1989)); *Parsi v. Daioleslam*, 595 F. Supp. 2d 99, 106 (D.D.C. 2009) ("Purposeful avoidance of truth can constitute actual malice"); *Harris v. City of Seattle*, 152 F.

---

[24] *See Dominion Executive: Trump Is Not Going To Win. I Made F\*\*\*Ing Sure Of That*, OANN (Nov. 24, 2020), available at https://www.oann.com/dominion-executive-trump-is-not-going-to-win-i-made-fing-sure-of-that/.

[25] *See Dominion-izing The Vote*, YouTube (Nov. 21, 2020) https://www.youtube.com/watch?v=746HTjhFifA

App'x 565, 568 (9th Cir. 2005) (quoting 1 Rodney Smolla, Law of Defamation § 3:71 (2d ed.)) ("[E]vidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful evidence."); *Brown v. Petrolite Corp.*, 965 F.2d 38, 47 (5th Cir. 1992) (financial motive is evidence of actual malice).

We therefore demand, pursuant to all applicable law, that OANN retract the falsehoods identified in this letter that were published by OANN in the following broadcasts:

- *Clinton Ties To Dominion Voting System, Which 'Glitched' For Biden* (Nov. 11, 2020), available at https://www.oann.com/clinton-ties-to-dominion-voting-system-which-glitched-for-biden/;

- *Cyber Analyst On Dominion Voting: Shocking Vulnerabilities* (Nov. 15, 2020), available at https://www.oann.com/cyber-analyst-on-dominion-voting-shocking-vulnerabilities/;

- *Dominion Scandal Goes Worldwide With Michael Johns* (Nov. 18, 2020), available at https://www.oann.com/dominion-scandal-goes-worldwide-with-michael-johns/;

- *Dominion Voting Systems Under Scrutiny For Security* (Nov. 18, 2020), available at https://www.oann.com/dominion-voting-systems-under-scrutiny-for-security/.

- *Dominion Executive: Trump Is Not Going To Win. I Made F\*\*\*Ing Sure Of That* (Nov. 24, 2020), available at https://www.oann.com/dominion-executive-trump-is-not-going-to-win-i-made-fing-sure-of-that/;

- *Reports: Ga. Gov. Kemp Awarded Dominion Voting Contract After Meeting With Chinese Consulate Official In Atlanta* (Dec. 10, 2020), available at https://www.oann.com/reports-ga-gov-kemp-awarded-dominion-voting-contract-after-meeting-with-chinese-consulate-official-in-atlanta/;

- *Mich. Fraud Witness Debunks Dominion CEO Testimony, Says Poulos Falsely Denied Internet Connection & Ballot Dumps* (Dec. 16, 2020), available at https://www.oann.com/mich-fraud-witness-debunks-dominion-ceo-testimony-says-poulos-falsely-denied-internet-connection-ballot-dumps/; and

- *Dominion Falsely Claims QR Codes Protect Against Fraud* (Dec. 16, 2020), available at https://www.oann.com/dominion-falsely-claims-qr-codes-protect-against-fraud/.

- *Dominion-izing' the Vote with Chanel Rion* (Nov. 21, 2020), available at https://www.youtube.com/watch?v=746HTjhFifA.

A refusal to retract these defamatory falsehoods will be viewed as additional evidence of actual malice. *See Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987) ("[r]efusal to retract an exposed error tends to support a finding of actual malice.").

**V.  Going forward, if OANN repeats or republishes any of the falsehoods identified in this letter, there will be no question that it is doing so with <u>actual</u> knowledge that those statements are false.**

As a media organization, we expect that you were already well aware of the facts set forth in this letter, which are readily available in the public domain.  Now that we have sent you this letter, there can be no dispute that you are in full possession of the facts.  As such, if OANN elects to repeat or republish any of the falsehoods identified in this letter—whether in tomorrow's "exclusive investigation" or otherwise—it will be doing so with actual knowledge that those statements are false.

*       *       *

We expect that OANN will treat this matter with the seriousness it deserves.  Indeed, OANN has made it very clear that it believes that libel suits play an important role in holding the media accountable—and that when a member of the media commits "false and malicious libel," they should "answer for it in a court of law."[26]  We could not agree more.

Until these claims are resolved, please ensure that you preserve and retain all emails, text messages, audiovisual recordings, voice mails, drafts, notes, communications, documents, data, and electronically stored information of any kind that relates in any way to these matters.  Please confirm receipt of this letter and that you intend to adhere to our request to retain documents as set forth above.

This is not a complete recitation of our client's rights and remedies, all of which are expressly reserved.

We look forward to your prompt response.

Regards,

Thomas. A. Clare, P.C.

Megan L. Meier

Enclosures

---

[26] *One America News Fires Back Against Rachel Maddow, MSNBC And Comcast With A Defamation Lawsuit*, OANN (Sept. 9, 2019), available at https://www.oann.com/rachel-maddow-lawsuit/.

Case 1:21-cv-02900-CJN Document 1-78 Filed 06/10/21 Page 14 of 118

# Exhibit 1



THOMAS A. CLARE, P.C.          C L A R E   L O C K E          MEGAN L. MEIER
                                      L  L  P

December 16, 2020

*Via Email, Federal Express, & Hand Delivery*

Sidney Powell, P.C.                        Sidney Powell
2911 Turtle Creek Blvd, Suite 300          Defending the Republic
Dallas, Texas 75219                        10130 Northlake Blvd. #214342
Email: sidneypowell@federalappeals.com     West Palm Beach, Florida 34412

### Re:     *Defamatory Falsehoods About Dominion*

Dear Ms. Powell:

We represent US Dominion Inc. and its wholly owned subsidiaries, Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation (collectively, "Dominion"). We write regarding your wild, knowingly baseless, and false accusations about Dominion, which you made on behalf of the Trump Campaign as part of a coordinated media circus and fundraising scheme featuring your November 19 press conference in Washington, D.C. and including your "Stop the Steal" rally and numerous television and radio appearances on—and statements to—Fox News, Fox Business, Newsmax, and the Rush Limbaugh Radio Show, among others.





I.    **Your reckless disinformation campaign is predicated on lies that have endangered Dominion's business and the lives of its employees.**

Given the sheer volume and ever-expanding set of lies that you have told and are continuing to tell about Dominion as part of your multi-media disinformation "Kraken" fundraising campaign, it would be impractical to address every one of your falsehoods in this letter. Without conceding the truth of any of your claims about Dominion, we write to demand that you retract your most serious false accusations, which have put Dominion's employees' lives at risk and caused enormous harm to the company.

For example, you falsely claimed that Dominion and its software were created in Venezuela for the purpose of rigging elections for the now-deceased Venezuelan dictator Hugo Chavez, that Dominion paid kickbacks to Georgia officials in return for a "no-bid" contract to use Dominion systems in the 2020 election, and that Dominion rigged the 2020 U.S. Presidential Election by manipulating votes, shifting votes, installing and using an algorithm to modify or "weight" votes such that a vote for Biden counted more than a vote for Trump, trashing Trump votes, adding Biden votes, and training election workers to dispose of Trump votes and to add Biden votes.

By way of example only, just last week, you made the following false assertions about Dominion to Jan Jekielek at *The Epoch Times*:[1]

> Effectively what they did with the machine fraud was to, they did everything from injecting massive quantities of votes into the system that they just made up, to running counterfeit ballots through multiple times in multiple batches to create the appearance of votes that weren't really there.  They trashed votes.

These statements are just the tip of the iceberg, which includes similar and other false claims you made at your Washington, D.C. press conference and to other media outlets with global internet audiences.

Your outlandish accusations are demonstrably false.  While soliciting people to send you "millions of dollars"[2] and holding yourself out as a beacon of truth, you have purposefully avoided naming Dominion as a defendant in your sham litigations—effectively denying Dominion the opportunity to disprove your false accusations in court.  Dominion values freedom of speech and respects the right of all Americans—of all political persuasions—to exercise their First Amendment rights and to disagree with each other.  But while you are entitled to your own opinions, Ms. Powell, you are not entitled to your own facts.  Defamatory falsehoods are actionable in court and the U.S.

---

[1]    The Epoch Times, *American Thought Leaders* (Dec. 13, 2020), available at, https://www.theepochtimes.com/exclusive-sidney-powell-on-election-lawsuits-supreme-court-decision-and-the-flynn-case_3617067.html.

[2] *Sidney Powell's Legal Defense Fund*, Defending the Republic, https://defendingtherepublic.org/.



Supreme Court has made clear that "there is no constitutional value in false statements of fact." *Gertz v. Welch, Inc.*, 418 U.S. 323, 340 (1974). Dominion welcomes transparency and a full investigation of the relevant facts in a court of law, where it is confident the truth will prevail. Here are the facts:

1. Dominion's vote counts have been repeatedly verified by paper ballot recounts and independent audits.

Dominion is a non-partisan company that has proudly partnered with public officials from both parties in accurately tabulating the votes of the American people in both "red" and "blue" states and counties. Far from being created to rig elections for a now-deceased Venezuelan dictator, Dominion's voting systems are certified under standards promulgated by the U.S. Election Assistance Commission ("EAC"), reviewed and tested by independent testing laboratories accredited by the EAC, and were designed to be auditable and include a paper ballot backup to verify results. Indeed, paper ballot recounts and independent audits have repeatedly and conclusively debunked your election-rigging claims, and on November 12, 2020, the Elections Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Executive Committees released a joint statement confirming that there is "*no evidence* that any voting system deleted or lost votes, changed votes, or was in any way compromised" and that the 2020 election was the most secure in American history.[3] The Joint Statement was signed and endorsed by, among others, the National Association of State Election Directors, National Association of Secretaries of State, and the U.S. Cybersecurity & Infrastructure Security Agency ("CISA")—then led by a Trump appointee, Chris Krebs.

In addition, your false accusation that Dominion rigged the 2020 election is based on a demonstrably false premise that wildly overstates Dominion's very limited role in elections. Dominion provides tools such as voting machines that accurately tabulate votes for the bipartisan poll workers, poll watchers, and local election officials who work tirelessly to run elections and ensure accurate results. Dominion's machines count votes from county-verified voters using a durable paper ballot. Those paper ballots are the hard evidence proving the accuracy of the vote counts from Dominion's machines. If Dominion had manipulated the votes, the paper ballots would not match the machine totals. In fact, they do match. Recounts and audits have proven that Dominion did what it was designed and hired to do: accurately tabulate votes.

---

[3] Cybersecurity & Infrastructure Security Agency, *Joint Statement From Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees* (Nov. 12, 2020), available at, https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election.



2.    Dominion has no connection to Hugo Chavez, Venezuela, or China.

As you are well aware from documents in the public domain and attached to your court filings, *Hugo Chavez's elections were **not** handled by Dominion*, but by an entirely different company—Smartmatic. This is a critical fact because you have premised your defamatory falsehoods on your intentionally false claim that Dominion and Smartmatic are the same company even though you know that they are entirely separate companies who compete with each other. Dominion was not created in or for Venezuela, has never been located there, and is not owned by Smartmatic or Venezuelan or Chinese investors. Dominion has never provided machines or any of its software or technology to Venezuela, nor has it ever participated in any elections in Venezuela. It did not receive $400 million from the Chinese in the weeks before the 2020 election or otherwise. It has no ties to the Chinese government, the Venezuelan government, Hugo Chavez, Malloch Brown, George Soros, Bigfoot, or the Loch Ness Monster. Dominion does not use Smartmatic's software or machines, and there was no Smartmatic technology in any of Dominion's voting machines in the 2020 election.

3.    You falsely claimed that Dominion's founder admitted he "can change a million votes, no problem at all" and that you would "tweet out the video later"—but you never did so because no such video exists.

During at least one of your many media appearances, you promised to "tweet out [a] video" of Dominion's founder admitting that he "can change a million votes, no problem at all." Your assertion—to a global internet audience—that you had such damning video evidence bolstered your false accusations that Dominion had rigged the election. Yet you have never produced that video because, as you know, it does not exist. Dominion's founder never made such a claim because Dominion cannot change votes. Its machines simply tabulate the paper ballots that remain the custody of the local election officials—nothing more, nothing less.

4.    You falsely claimed that you have a Dominion employee "on tape" saying he "rigged the election for Biden"—but you know that no such tape exists.

In peddling your defamatory accusations, you also falsely told a national audience that you had a Dominion employee "on tape" saying that "he rigged the election for Biden." Your own court filings prove that no such tape exists. In them, you cited an interview of Joe Oltmann, a Twitter-banned "political activist" who—far from claiming he had that shocking alleged confession "on tape"—claimed he took "notes" during a conference call he supposedly joined after "infiltrating Antifa." This is a facially ludicrous claim for a number of reasons, including the fact that he lives in Colorado, where it would have been perfectly legal to record such a call if it had actually happened. As a result of your false accusations, that Dominion employee received death threats.



II.     **Because there is no reliable evidence supporting your defamatory falsehoods, you actively manufactured and misrepresented evidence to support them.**

Despite repeatedly touting the overwhelming "evidence" of your assertions during your media campaign, every court to which you submitted that so-called "evidence" has dismissed each of your sham litigations, and even Trump appointees and supporters have acknowledged—including *after* you filed your "evidence" in court, posted it on your fundraising website, and touted it in the media—that there is *no evidence* that actually supports your assertions about Dominion. Indeed:

- One federal judge observed that you submitted "nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden." Op. & Order Den. Pl.'s Emer. Motion. for Decl., Emer., and Inj. Relief at 34, *Whitmer v. City of Detroit*, No. 20-cv-12134 (E.D. Mich. Dec. 7, 2020) [Dkt. 62].

- Another federal judge commented that the attachments to your complaint were "only impressive for their volume," are "largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections," and include "expert reports" that "reach implausible conclusions, often because they are derived from wholly unreliable sources." Order at 24-25, *Bowyer v. Ducey*, No. 2-20-cv-02321 (D. Ariz. Dec. 9, 2020) [Dkt. 84].

- Despite your claim that you have so much "evidence" that it feels as if you are drinking from a "fire hose," when asked by your interviewers and other media outlets to provide that evidence, you have failed to do so each and every time. Conservative television host Tucker Carlson even called you out for failing to provide any evidence to support your assertions.[4]

- After you put the purported "evidence" in your court filings, Trump loyalist and U.S. Attorney General Bill Barr stated, "There's been one assertion that would be systemic fraud and that would be the claim that machines were programmed essentially to skew the election results. And the DHS and DOJ have looked into that, and so far, *we haven't seen anything to substantiate that*."[5]

---

[4] *Tucker Carlson SLAMS Sidney Powell for not Providing Evidence Election was Taken from Trump*, YouTube (Nov. 19, 2020), available at, https://www.youtube.com/watch?v=57l56J47xhk.

[5] Michael Malsmo, *Disputing Trump, Barr says no widespread election fraud*, Associated Press (Dec. 1, 2020), available at, https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d.



- Long-time Trump ally Chris Christie said your claims were a "national embarrassment."[6]

- Trump appointee Chris Krebs, then the director of CISA, determined that the "Hammer and Scorecard" conspiracy theory advanced by your so-called cybersecurity expert, Navid Keshavarz-Nia, was "nonsense."[7] And Mr. Keshavarz-Nia's "expert" declaration alleges a pattern of improbable vote reporting in "Edison County, Michigan," even though no county by that name exists in Michigan.

- Similarly, another one of your so-called "experts," Russell Ramsland, in alleging fraud in Michigan, discussed places in Minnesota. He also falsely claimed that voter turnout in Detroit was 139.29% and that turnout in North Muskegon was an eye-popping 781.97%; in reality, the turnout in those places was 50.88% and 78.11%, respectively.[8] But Mr. Ramsland did not just make sloppy and inexcusable mistakes. He is also a notorious conspiracy theorist, having given a presentation in 2018 in which he claimed that the "Deep State" was formed when the Muslim Brotherhood, President George H.W. Bush's father, leftists, and George Soros came together in Nazi Germany in the 1930s—notwithstanding the fact that Mr. Soros was born in 1930.[9]

- Another one of your "experts" relied on a list of allegedly ineligible Georgia voters who allegedly voted illegally; but that data included voters who were, in fact, eligible to vote and was rejected by a federal judge for its "sheer unreliability."[10]

[6] Paul Kane and Felicia Sonmez, *Chris Christie calls the conduct of Trump's legal team a 'national embarrassment'*, Washington Post (Nov. 22, 2020), available at, https://www.washingtonpost.com/politics/republicans-christie-trump-concede/2020/11/22/05c280e6-2cda-11eb-bae0-50bb17126614_story.html.

[7] Zach Montellaro and Kyle Cheney, *Pro-Trump legal crusade peppered with bizarre blunders*, Politico (Dec. 3, 2020), available at https://www.politico.com/news/2020/12/03/sidney-powell-trump-election-lawsuit-442472.

[8] Clara Hendrickson, *Affidavit in Michigan lawsuit seeking to overturn election makes wildly inaccurate claims about vote*, PolitiFact (Dec. 4, 2020), available at, https://www.politifact.com/factchecks/2020/dec/04/russell-james-ramsland-jr/affidavit-michigan-lawsuit-seeking-overturn-electi/.

[9] John Savage, *Texas Tea Partiers Are Freaking Out Over 'Deep State' Conspiracy Theories*, Vice (Sept. 30, 2018), available at, https://www.vice.com/en/article/mbwgxx/texas-tea-partiers-are-freaking-out-over-deep-state-conspiracy-theories.

[10] Order at 26, *Bowyer v. Ducey*, No. 2-20-cv-02321 (D. Ariz. Dec. 9, 2020) [Dkt. 84]; Michelle Ye Hee Lee, *Here's what happened when a Georgia lawmaker scrutinized the Trump campaign's list of allegedly illegal votes*, Washington Post (Dec. 10, 2020), available at, https://www.washingtonpost.com/politics/heres-what-happened-when-a-georgia-lawmaker-



- Although you cherry-picked statements by Princeton professor Andrew W. Appel in support of your election-rigging claims, he and 58 other specialists in election security have forcefully rebutted your claims, explaining that they "have never claimed that technical vulnerabilities have actually been exploited to alter the outcome of any US election."[11] They further explained that "*no credible evidence* has been put forth that supports a conclusion that the 2020 election outcome in any state has been altered through technical compromise."[12]

Recognizing the obvious deficiencies and credibility problems of your "evidence," you actively misrepresented and manufactured evidence to support your defamatory falsehoods. For example:

- You deliberately misrepresented that you had a top secret "military intelligence expert" code-named "Spyder" supporting your defamatory accusations about Dominion. But your purported "military intelligence expert" has now admitted that he never actually worked in military intelligence and that the declaration your team wrote for him to sign is misleading.[13] This was no good faith mistake. He has confirmed that the original paperwork he sent to you didn't say that, and that your clerks wrote the misleading statement even though he "was trying to backtrack" on it.[14]

- Two of the Venezuelan declarations attached to your court filings contain nearly identical explanations for why the "witnesses" purportedly claim they came forward, proving that those witnesses did not each write their declarations independently and strongly suggesting that the below manifestos and allegations of a decade-old international conspiracy were written or edited by you or your team—not by the witnesses themselves.

---

scrutinized-the-trump-campaigns-list-of-allegedly-illegal-votes/2020/12/10/1400d628-3b06-11eb-bc68-96af0daae728_story.html.

[11] *See Scientists say no credible evidence of computer fraud in the 2020 election outcome, but policymakers must work with experts to improve confidence* (Nov. 16, 2020), available at, https://www.mattblaze.org/papers/election2020.pdf.

[12] *Id.*

[13] Emma Brown, Aaron C. Davis & Alice Crites, *Sidney Powell's secret 'military intelligence expert,' key to fraud claims in election lawsuits, never worked in military intelligence*, Washington Post (Dec. 11, 2020), available at, https://www.washingtonpost.com/investigations/sidney-powell-spider-spyder-witness/2020/12/11/0cd567e6-3b2a-11eb-98c4-25dc9f4987e8_story.html.

[14] *Id.*



| Declaration of an anonymous source claiming to have been selected for the "national security guard detail of the President of Venezuela." *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-2 at ¶ 4]. | Statement by Ana Mercedes Diaz Cardozo, *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-3 at ¶ 3]. |
|---|---|
| "I want to alert the public and let the world know the truth about the corruption, manipulation, and lies being committed by a conspiracy of people and companies intent upon betraying the honest people of the United States and their legally constituted institutions and fundamental rights as citizens. This conspiracy began more than a decade ago in Venezuela and has spread to countries all over the world. It is a conspiracy to wrongfully gain and keep power and wealth. It involves political leaders, powerful companies, and other persons whose purpose is to gain and keep power by changing the free will of the people and subverting the proper course of governing." | "I want to alert the public and let the world know the truth about corruption, manipulation, and lies being committed through a conspiracy of individuals and businesses with the intention of betraying the honest people of the United States and its legally constituted institutions and fundamental rights as citizens. This conspiracy began more than a decade ago in Venezuela and has spread to countries all over the world. It is a conspiracy to unjustly gain and maintain power and wealth. It involves political leaders, powerful companies, and other persons whose purpose is to gain and maintain power by changing people's free will and subverting the proper course of governing." |

- It also appears that you or your team doctored and misrepresented at least one government document in support of your defamatory accusations about Dominion, attaching and citing an "undated" copy of a certificate from Georgia's Secretary of State and insinuating that the fact that it was undated supported your defamatory falsehoods. That too was false. In reality, the authentic certificate is both dated and publicly available online.[15]

In sum, knowing that you had no reliable evidence, you were actively involved in creating and misrepresenting the so-called "evidence" that you touted during your defamatory media campaign.

---

[15]    Georgia Secretary of State, *Dominion Certification* (Aug. 9, 2019), available at, https://sos.ga.gov/admin/uploads/Dominion_Certification.pdf.



III. **You have intentionally disregarded the reliable evidence conclusively debunking your claims and have manufactured defamatory accusations in an effort to discredit the Republican state officials who confirmed the validity of Georgia's election results.**

Your falsehoods have been repeatedly and conclusively debunked by the real evidence—*i.e.*, the independent audits and hand recounts of paper ballots that have verified the election results, as confirmed by both Democratic and Republican state officials. For example:

- A spokesperson for the Michigan Secretary of State confirmed, "We have not seen any evidence of fraud or foul play in the actual administration of the election. What we have seen is that it was smooth, transparent, secure and accurate."[16]

- In Arizona, the Chairman of the Maricopa County Board of Supervisors released a statement explaining, "The evidence overwhelmingly shows the system used in Maricopa County is accurate and provided voters with a reliable election ... The Dominion tabulation equipment met mandatory requirements during logic and accuracy testing before the Presidential Preference Election, the Primary Election and the General Election. And after each of these 2020 elections, the hand count audit showed the machines generated an accurate count."[17]

- And in Georgia, the Trump-supporting Republican Secretary of State Brad Raffensperger explained that "Georgia's historic first statewide audit reaffirmed that the state's new secure paper ballot voting system accurately counted and reported results."[18] And, Georgia's Trump-supporting Republican Governor Brian Kemp likewise refused to overturn the state's election results.

---

[16] Nick Corasaniti, Reid J. Epstein & Jim Rutenberg, *The Times Called Officials in Every State: No Evidence of Voter Fraud*, The N. Y. Times (Nov. 10, 2020), available at, https://www.nytimes.com/2020/11/10/us/politics/voting-fraud.html.

[17] Letter from Clint Hickman to Maricopa Cty. Voters (Nov. 17, 2020), available at, https://www.maricopa.gov/DocumentCenter/View/64676/PR69-11-17-20-Letter-to-Voters#:~:text=Here%20are%20the%20facts%3A&text=The%20evidence%20overwhelmingly%20shows%20the,voters%20with%20a%20reliable%20election.&text=As%20required%20by%20law%20(A.R.S,used%20in%20any%20Arizona%20elections.

[18] Georgia Secretary of State, *Historic First Statewide Audit of Paper Ballots Upholds Result of Presidential Race*, available at, https://sos.ga.gov/index.php/elections/historic_first_statewide_audit_of_paper_ballots_upholds_result_of_presidential_race#:~:text=2020%20Qualifying%20Packet-,Historic%20First%20Statewide%20Audit%20of%20Paper%20Ballots%20Upholds%20Result%20of,machine%20tally%20of%20votes%20cast.



In order to punish and discredit these "disloyal" Republicans for daring to debunk your false accusations, you falsely accused Dominion of paying them kickbacks to get a "no-bid" contract for the use of its systems in the 2020 election. You have never put forward even a shred of evidence—except perhaps for the doctored Secretary of State certificate—in support of these false bribery accusations. No such evidence exists because your accusations are categorically false. Indeed, public records show that, contrary to your false accusations, there was a bid process for the contract in Georgia and that Dominion offered Georgia the lowest-cost system among three companies that submitted bids.[19] Notably, publicly-available records on the Georgia Secretary of State's website also reflect that *Smartmatic* was one of the other companies that competed with Dominion for that contract, further debunking your false assertions that Dominion and Smartmatic are the same company. *Id.*

## IV. There is clear and convincing evidence that you acted with actual malice in making your false and defamatory accusations about Dominion.

While there is no reliable evidence supporting your wild accusations—and compelling reliable evidence debunking them—there is clear and convincing evidence that you knowingly or recklessly disregarded that your claims about Dominion were false and made them anyway, and therefore acted with actual malice. In addition to the direct evidence that you deliberately misrepresented and manufactured purported "evidence" to support your claims, there is also a wealth of circumstantial evidence that you acted with actual malice.

*First,* your accusations—essentially that Dominion conspired with Republican state officials and thousands of local election workers across the country to perpetrate the greatest fraud in human history—are inherently improbable. You need look no further than the incontrovertible facts that numerous counties in Wisconsin and Pennsylvania that used Dominion systems went for Trump[20] and that some states that used Dominion systems were projected to go for Biden, but actually ended up going for Trump.[21] For example, in the final polls, Florida, which uses Dominion systems,[21] was

---

[19] Georgia Secretary of State, *Elections Security Is Our Top Priority: Security-Focused Tech Company, Dominion Voting to Implement New Verified Paper Ballot System,* available at, https://sos.ga.gov/securevoting/.

[20] *See Wisconsin presidential results,* Politico, available at, https://www.politico.com/2020-election/results/wisconsin/; *Pennsylvania presidential results,* Politico, available at, https://www.politico.com/2020-election/results/pennsylvania/; Verified Voting, available at https://verifiedvoting.org/verifier/#mode/search/year/2020/state/55/make/Dominion%20Voti ng%20Systems; Verified Voting, available at https://verifiedvoting.org/verifier/#mode/search/year/2020/state/42/make/Dominion%20Voti ng%20Systems.

[21] *See* Verified Voting, available at https://verifiedvoting.org/election-system/dominion-imagecast-evolution/; Verified Voting, available at https://verifiedvoting.org/election-system/dominion-imagecast-central/.



projected to be a Biden win. Instead, Trump won the state by over 3%.[22] Similarly, Ohio was projected to be extremely close, with some polls even showing Biden in the lead. Yet, on election day, Ohio, which also used Dominion systems,[23] went for Trump by over 8%.[24] Indeed, across the board in all of the swing states, Trump greatly outperformed the polling averages and final polls.[25]

Even if we entertain your fantasy for just a moment, why would Dominion have rigged the election for the Democratic nominee for President, but let Democrats lose ground in the House and let the Georgia Senate races proceed to a run-off, rather than handing the Senate majority to the Democrats on November 3?[26] Indeed, Dominion systems were used in Iowa,[27] Alaska,[28] and Georgia[29]—and yet, none of the four Democratic candidates in those races won the election even though just two wins would have secured the Senate for the Democrats.

---

[22] *See* RealClear Politics, *Florida: Trump vs. Biden*, available at, https://www.realclearpolitics.com/epolls/2020/president/fl/florida_trump_vs_biden-6841.html (final RCP polling average in Florida was Biden +0.9 and the final result was Trump +3.3).

[23] *See* Verified Voting, *ImageCast X*, available at, https://verifiedvoting.org/election-system/dominion-imagecast-x/; Verified Voting, *ImageCast Evolution*, available at, https://verifiedvoting.org/election-system/dominion-imagecast-evolution/; Verified Voting, *ImageCast Central*, available at https://verifiedvoting.org/election-system/dominion-imagecast-central/.

[24] *See* RealClear Politics, *Ohio: Trump vs. Biden*, available at, https://www.realclearpolitics.com/epolls/2020/president/oh/ohio_trump_vs_biden-6765.html (final RCP polling average for Ohio was Trump +1.0 and final result was Trump +8.2).

[25] *See* RealClear Politics, *Top Battlegrounds: Wisconsin, Michigan, Pennsylvania, North Carolina Florida, Arizona*, available at, https://www.realclearpolitics.com/elections/trump-vs-biden-top-battleground-states/. Trump beat the polling average in Michigan by 1.5%, Wisconsin by 6%, and Arizona by 0.6%.

[26] *See* Fox News, *Presidential Election Results*, available at, https://www.foxnews.com/elections/2020/general-results. At present, Republicans have gained at least 8 House seats with 2 races still too close to call.

[27] *See* Verified Voting, *ImageCast X*, available at, https://verifiedvoting.org/election-system/dominion-imagecast-x/; Verified Voting, *ImageCast Precinct*, available at, https://verifiedvoting.org/election-system/dominion-imagecast-precinct/.

[28] *See* Verified Voting, *ImageCast X*, available at, https://verifiedvoting.org/election-system/dominion-imagecast-x/; Verified Voting, *ImageCast Remote*, available at, https://verifiedvoting.org/election-system/dominion-imagecast-remote/; Verified Voting, *ImageCast Precinct*, available at, https://verifiedvoting.org/election-system/dominion-imagecast-precinct/.

[29] *See* Verified Voting, *ImageCast X*, available at, https://verifiedvoting.org/election-system/dominion-imagecast-x/; Verified Voting, *ImageCast Precinct*, available at, https://verifiedvoting.org/election-system/dominion-imagecast-precinct/.



Although the indisputable facts all point to the conclusion that this was a free and fair election, you launched a media circus and fundraising campaign that undermined confidence in American democracy and peddled false, inherently improbable, and defamatory claims about Dominion participating in an international conspiracy to rig the election, deeply damaging Dominion's hard-earned reputation and business in the process. Your conduct is evidence of actual malice. *See St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) (the publication of allegations that are "inherently improbable" is strong evidence of actual malice); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 46 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003) ("evidence that the story was so inherently improbable that only a reckless person would have put it in circulation" is "likely [to] support a finding of actual malice").

**Second**, as set forth above, you had multiple reasons to know that your sources were not reliable, including their lack of relevant credentials, sloppy work product (*e.g.*, confusing Michigan and Minnesota and relying on unreliable data claiming that eligible Georgia voters were not eligible), and unwillingness to be identified publicly. In addition, you had Joe Oltmann's interview making it clear that he does *not* have any recording to substantiate his ludicrous claim that he infiltrated Antifa and heard a Dominion employee saying he rigged the election. Your reliance on these facially unreliable sources—and your *knowing* lie that there was a recording substantiating Mr. Oltmann's claim—is evidence that you acted with actual malice. *See St. Amant*, 390 U.S. at 732 ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant."); *Wells v. Liddy*, 186 F.3d 505, 542-43 (4th Cir. 1999) (actual malice may be shown where publisher had reason to believe a source might not be credible); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 590 (D.C. Cir. 2016) (relying on a facially unreliable source is evidence of actual malice); *Celle v. Filipino Rep. Enters., Inc.*, 209 F.3d 163, 190 (2d Cir. 2000) (same).

**Third**, you intentionally disregarded the key sources who have forcefully, publicly, and repeatedly debunked your dubious claims—namely, the state officials, including respected Republicans like Secretary of State Brad Raffensperger and Governor Brian Kemp, who have confirmed the validity of the election results after hand recounts of paper ballots. Your intentional disregard of these sources is evidence of actual malice. *See e.g., Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 124 (2d Cir. 2013) ("'evidence of an intent to avoid the truth ... [can be] sufficient to satisfy the [actual malice standard]'") (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 693 (1989)); *Parsi v. Daioleslam*, 595 F. Supp. 2d 99, 106 (D.D.C. 2009) ("Purposeful avoidance of truth can constitute actual malice").

**Fourth**, you made these false accusations because they conformed to your preconceived storyline—despite the inherent improbability of your accusations, the unreliability of your sources, and the credibility of the sources debunking your assertions. This too is evidence of actual malice. *Harris v. City of Seattle*, 152 F. App'x 565, 568 (9th Cir. 2005) (quoting 1 Rodney Smolla, Law of Defamation § 3:71 (2d ed.)); *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 539 (7th Cir. 1982) ("'[E]vidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual



malice, and may often prove to be quite powerful evidence.'"). Indeed, you were peddling your false and preconceived storyline before the polls closed on election day.[30]

   *Fifth*, you had a financial incentive in making the defamatory accusations. Your own conduct and statements at the press conference, media tour, and on your websites make it clear that you were publicizing your wild accusations as part of a fundraising scheme and in order to drum up additional business and notoriety for yourself. Your financial incentive and motive to make the defamatory accusations is further evidence of actual malice. *See Brown v. Petrolite Corp.*, 965 F.2d 38, 47 (5th Cir. 1992); *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 288 (S.D.N.Y. 2016).

   *Sixth*, you cannot simply claim ignorance of the facts. As a licensed attorney, you were obligated to investigate the factual basis for your claims before making them in court.[31] There is no factual basis for your defamatory accusations against Dominion and numerous reliable sources and documents in the public domain have repeatedly debunked your accusations. As such, you either conducted the inquiry required of you as a licensed attorney and violated your ethical obligations by knowingly making false assertions rebutted by the information you found, or you violated your ethical obligations by purposefully avoiding undertaking the reasonable inquiry required of you as a member of the bar. Either is additional evidence of actual malice.

   Taken together, your deliberate misrepresentation and manufacturing of evidence, the inherent improbability of your accusations, your reliance on facially unreliable sources, your intentional disregard of reliable sources, your preconceived storyline, your financial incentive, and your ethical violations are clear and convincing evidence of actual malice. *See Eramo v. Rolling Stone*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016) (denying defendant's motion for summary judgment and finding "[a]lthough failure to adequately investigate, a departure from journalistic standards, or ill

---

[30] *See* OAN, *Sidney Powell: Dems will use 'lawfare' to alter election*, YouTube (Nov. 3, 2020), available at, https://www.youtube.com/watch?v=Vh5U_6apzvI&feature=emb_logo.

[31] *See, e.g.*, Fed. R. Civ. P. 11(b) ("By presenting to the court a pleading, written motion, or other paper ... an attorney ... certifies that to the best of that person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery"); Texas Disciplinary Rules of Professional Conduct 3.01 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless the lawyer reasonably believes that there is a basis for doing so that is not frivolous."); *id.*, Comment 2 ("All judicial systems prohibit, at a minimum, the filing of frivolous or knowingly false pleadings, motions or other papers with the court or the assertion in an adjudicatory proceeding of a knowingly false claim or defense."); *id.*, Comment 3 (prohibiting a filing "if it contains knowingly false statements of fact.").



will or intent to injure will not singularly provide evidence of actual malice, the court believes that proof of all three is sufficient to create a genuine issue of material fact").

**V.      Your false and defamatory accusations must be retracted.**

Your false accusations about Dominion are defamatory *per se* and have exposed you, the entities you control, and the Trump Campaign to substantial legal risk for defamation. As a result of your false accusations, Dominion has suffered enormous harm, and its employees have been stalked, have been harassed, and have received death threats. For the safety of Dominion's employees and for the sake of the truth and confidence in American democracy, we demand that you immediately and publicly retract your false accusations and set the record straight. If you refuse to do so and instead choose to stand by your defamatory falsehoods, that will be viewed as additional evidence of actual malice. *See Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987) ("[r]efusal to retract an exposed error tends to support a finding of actual malice.").

Until these claims are resolved, please ensure that you, your principals, and all your sources are preserving and retaining all emails, text messages, audiovisual recordings, voice mails, drafts, notes, communications, documents, data, and electronically stored information of any kind that relates in any way to these matters. Without limitation, this requires you to preserve all financial and corporate records of your "legal defense fund" Defending the Republic, all versions of all documents attached to any of your lawsuits relating to the election, including the undoctored and doctored version of the Secretary of State certificate referenced above, all drafts of and comments to all declarations attached to your complaints, and all communications with:

- Any member, volunteer, staff, or employee of the Trump Campaign;

- Your associates, clerks, and paralegals; and Rudy Giuliani, Jenna Ellis, Lin Wood, and each of their associates and paralegals;

- Every individual who submitted a declaration attached to any of your complaints relating to the election;

- Every reporter, editor, blogger, host, or other member of the media with whom you communicated about Dominion or the 2020 election, regardless of whether they published any of your claims; and

- Donors to your "legal defense fund," Defending the Republic.

14



Your document preservation obligations apply both to you individually, as well as to any entities you control, including but not limited to your law firm and your "legal defense fund," Defending the Republic. Please confirm receipt of this letter and that you intend to adhere to our request to retain documents as set forth above. This is not a complete recitation of our client's rights and remedies, all of which are expressly reserved.

We look forward to your prompt response.

Regards,

Thomas. A. Clare, P.C.

Megan L. Meier

15

# Exhibit 2

**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tyler Bowyer, et al., | No. CV-20-02321-PHX-DJH |
| Plaintiffs, | **ORDER** |
| v. | |
| Doug Ducey, et al., | |
| Defendants. | |

Plaintiffs bring their Complaint seeking injunctive relief from this Court, specifically, to "set aside the results of the 2020 General Election," because they claim the election process and results were "so riddled with fraud, illegality and statistical impossibility . . . that Arizona voters, courts and legislators cannot rely on or certify" its results. (Doc. 1 at 2). By any measure, the relief Plaintiffs seek is extraordinary. If granted, millions of Arizonans who exercised their individual right to vote in the 2020 General Election would be utterly disenfranchised. Such a request should then be accompanied by clear and conclusive facts to support the alleged "egregious range of conduct in Maricopa County and other Arizona counties . . . at the direction of Arizona state election officials." (*Id.*) Yet the Complaint's allegations are sorely wanting of relevant or reliable evidence, and Plaintiffs' invocation of this Court's limited jurisdiction is severely strained. Therefore, for the reasons stated herein, the Complaint shall be dismissed.

## I.    Background

In Arizona, more than 3.4 million voters participated in the November 3, 2020,

General Election. Thereafter, pursuant to A.R.S. § 16-602, several counties performed a hand count of sample ballots to test the tabulation equipment, and either no discrepancies were found or, if there were, they were "within the acceptable margin."[1] Arizona law also requires the secretary of state, in the governor's presence, to certify the statewide canvas on the fourth Monday after a general election. A.R.S. § 16-648. On November 30, 2020, Secretary of State Katie Hobbs, in the presence of Governor Doug Ducey, certified the statewide canvas. (Doc. 40 at 4). The Canvas shows that former Vice President Joseph Biden prevailed over President Donald Trump by more than ten thousand votes.[2] On that same day, Governor Ducey signed the Certificate of Ascertainment for Vice President Biden's presidential electors. (Doc. 40 at 4). The Certificate was then transmitted to the United States Archivist pursuant to the Electoral Count Act. (*Id.*); s*ee also* 3 U.S.C. § 6.

In their Complaint and the accompanying Motion for Temporary Restraining Order ("TRO") filed on December 2, Plaintiffs "contest" the election and ask this Court to compel the Governor to "de-certify" these results. (Docs. 1 ¶ 145; 2 at 10). The Complaint also requests that this Court grant a permanent injunction "enjoining Secretary Hobbs and Governor Ducey from transmitting the currently certified election results to the Electoral College," declare the election results unconstitutional, and seize all voting machines, equipment, software, and other election-related records and materials, including all ballots cast.[3] (Doc. 1 at 51–52). The Complaint claims to show "multifaceted schemes and artifices implemented by Defendants and their collaborators" to defraud the election. (*Id.* at ¶ 3). And these schemes allegedly resulted in "the unlawful counting, or fabrication, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots." (*Id.*)

---

[1] Ariz. Sec'y of State, *Summary of Hand Count Audits–2020 General Election* (Nov. 17, 2020), https://azsos.gov/election/2020-general-election-hand-count-results.

[2] Ariz. Sec'y of State, State of Arizona Official Canvass, https://azsos.gov/sites/default/files/2020_General_State_Canvass.pdf.

[3] Under 3 U.S.C. § 5, if a state enacts and applies procedures to decide election controversies before election day, and a decision regarding a contested election is made at least six days before the electors' meetings, then the decision is conclusive and will apply in counting the electoral votes. That deadline, referred to as the "safe harbor" deadline, was December 8, 2020, as the Electoral College will meet on December 14, 2020. *See* 3 U.S.C. § 7.

Of the fourteen named Plaintiffs, three are registered voters and GOP Chairs for various Arizona counties. (*Id.* at ¶¶ 29–31). The remaining eleven are Republican nominees for Arizona's presidential electors. (*Id.* at ¶ 28). One of the eleven, Dr. Kelli Ward, filed suit in state-court over allegations of fraud in this election. *See Ward v. Jackson*, Case No. CV2020-015285, slip. op. (Ariz. Super. Ct. Dec. 4, 2020) (finding no evidence of alleged fraud and dismissing claims of election misconduct); (Doc. 55-1). In that case, on December 8, 2020, the Arizona Supreme Court affirmed the Maricopa County Superior Court's findings that there was no evidence of fraud or misconduct in Arizona's election. (*Ward v. Jackson*, CV2020-015285 (Ariz. 2020); (Doc. 81-1).

Plaintiffs' Complaint contains four counts, three of which assert 42 U.S.C. § 1983 claims for violations of the Constitution's Elections and Electors Clauses, as well as the Fourteenth Amendment's Due Process and Equal Protection guarantees. (Doc. 1 ¶¶ 103–34). The final count, which does not specify a cause of action, is for "Wide-Spread Ballot Fraud." (*Id.* at ¶¶ 135–41).

On December 3, the day after Plaintiffs filed their Complaint, the Court received a Motion to Intervene from the Arizona Democratic Party, which was subsequently denied.[4] (Docs. 26 and 69). The Court also received a Motion to Intervene from the Maricopa County Board of Supervisors and Maricopa County Recorder Adrian Fontes, which was granted. (Docs. 27 and 32). The Court held a status conference on the same day, in which it scheduled a December 8 hearing on the TRO. (Doc. 28). By subsequent Order (Doc. 43), the Court converted that hearing to oral argument on the Motions to Dismiss filed on December 4. (Docs. 36, 38, and 40). Plaintiffs have filed their Response to the Motions (Doc. 44), and Defendants have filed their Replies. (Docs. 53, 54, and 55). On December 8, 2020, the Court held oral argument on the Motions to Dismiss and took this matter under advisement. Being fully briefed on the matter, the Court now issues its ruling.

…

---

[4] The Arizona Democratic Party sought intervention under theories of permissive joinder. While the Court did not believe the Motion was inappropriate, the Court did not find their presence necessary to this lawsuit and therefore denied the Motion to Intervene.

## II.    Analysis

Given the import of the overarching subject—a United States Presidential Election—to the citizens of Arizona, and to the named Plaintiffs, the Court is compelled to make clear why it finds it inappropriate to reach the merits of Plaintiffs' Complaint and why it must grant the Motions to Dismiss this matter in its entirety.  The Court will endeavor to lay bare the independent reasons for its conclusions, including those related to Article III standing, abstention, laches, mootness, and the federal pleading standards, which govern its review.

### A.    Article III Standing

"To ensure that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society, a plaintiff may not invoke federal-court jurisdiction unless he can show a personal stake in the outcome of the controversy."  *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (internal citations omitted).  Article III provides that federal courts may only exercise judicial power in the context of "cases" and "controversies."  U.S. Const. art. III, § 2, cl. 1; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992).  For there to be a case or controversy, the plaintiff must have standing to sue.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("*Spokeo II*").  Whether a plaintiff has standing presents a "threshold question in every federal case [because it determines] the power of the court to entertain the suit."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 341 (2006).  A suit brought by a plaintiff without Article III standing is not a "case or controversy," and an Article III federal court therefore lacks subject matter jurisdiction.  *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101 (1998).

"[A] plaintiff seeking relief in federal court must first demonstrate . . . a personal stake in the outcome," *Baker v. Carr*, 369 U.S. 186, 204 (1962), distinct from a "generally available grievance about government," *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per

curiam). "That threshold requirement ensures that we act as judges, and do not engage in policymaking properly left to elected representatives." *Gill*, 138 S. Ct. at 1923. To establish standing, a plaintiff has the burden of clearly demonstrating that she has: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo II*, 136 S. Ct. at 1547 (*quoting Warth*, 422 U.S. at 518); *accord Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting the party asserting jurisdiction bears the burden of establishing subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss).

To establish an injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo,* 136 S. Ct. at 1548 (*quoting Lujan,* 504 U.S. at 560). "When we have used the adjective 'concrete, we have meant to convey the usual meaning of the term—'real,' and not 'abstract.'" *Id.* The plaintiff must establish a "particularized" injury, which means that "the injury must affect the plaintiff in a personal and individual way." *Raines v. Byrd*, 521 U.S. 811, 819 (1997). Moreover, "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Where a plaintiff has not established the elements of standing, the case must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

Rule 12(b)(1) authorizes a court to dismiss claims over which it lacks subject-matter jurisdiction. A Rule 12(b)(1) challenge may be either facial or factual. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial attack, the court may dismiss a complaint when the allegations of and documents attached to the complaint are insufficient to confer subject-matter jurisdiction. *See Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). In this context, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir.

1996). In contrast, when a court evaluates a factual challenge to jurisdiction, a court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Safe Air for Everyone*, 373 F.3d at 1039 ("In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment.").

### 1. Elections and Electors Clause – Count One

Plaintiffs allege in Count One that Defendants violated the Elections and Electors Clauses and 28 U.S.C. § 1983 by, among other things, losing or destroying absentee ballots, and/or replacing those ballots with "blank ballots filled out by election workers, Dominion or other third parties" sending thousands of absentee ballots to someone besides the registered voter that "could have been filled out by anyone." (Doc. 1 at 41). Defendants argue that Plaintiffs do not have standing to assert such a claim. (Doc. 40 at 8–9).

The Elections Clause of the United States Constitution states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof[.]" U.S. Const. art. I, § 4, cl. 1. The Elections Clause authorizes the state governments to regulate federal elections held in the state, while Congress retains "exclusive control" to alter a state's regulations. *Colegrove v. Green*, 328 U.S. 549, 554 (1946). A separate provision, the "Electors Clause" of the Constitution, states: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors . . . ." U.S. Const. art. II, § 1, cl. 2.[5]

Plaintiffs' Complaint alleges that Defendants violated the Elections Clause. However, the Complaint does not allege grounds for standing to assert this claim, nor does it distinguish between the status of the groups of Plaintiffs. At oral argument, Plaintiffs'

---

[5] While the Electors Clause and Elections Clause are separate Constitutional provisions, they share "considerable similarity." *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839, (2015) (Roberts, C.J., dissenting). These provisions are therefore often considered together. *See Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 348–52 (3d Cir. 2020) (analyzing standing for Elections Clause and Electors Clause under the same test); *Wood v. Raffensperger*, 2020 WL 6817513, at *1 (N.D. Ga. Nov. 20, 2020) (same); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804–05 (1995) (holding that state's "duty" under Elections Clause "parallels the duty" described by Electors Clause). Plaintiffs do not meaningfully distinguish between the two clauses in their Complaint or briefing.

counsel stated that eleven of the Plaintiffs were Republican Party nominees to be electors, and the other three were county GOP Chairs.  As an initial matter, Plaintiffs' briefing does not contain any arguments that the GOP Chairs have standing to assert this claim and the Court will dismiss the claim as to the GOP Chairs outright.

Plaintiffs argue that the Plaintiff Electors should be considered "candidates," and thus that they have standing under the Electors and Elections Clause pursuant to an Eighth Circuit case, *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020).  (Doc. 44 at 5).  That case, which is based on the operation of Minnesota state election law, allowed electors to bring claims under the Elections Clause because electors were treated as candidates for office under Minnesota law and thus would be injured by the governor's failure to seat them if chosen as the state's electors.  *See Carson*, 978 F.3d at 1057.

Plaintiff Electors likewise assert that under Arizona law they should also be considered "candidates."  (Doc. 44 at 5–6) (citing A.R.S. § 16-344).  However, the Electors are not candidates for office as the term is generally understood.  Arizona law makes clear that the duty of an Elector is to fulfill a ministerial function, which is extremely limited in scope and duration, and that they have no discretion to deviate at all from the duties imposed by the statute.  *See* A.R.S. § 16-212(C) ("After the secretary of state issues the statewide canvass containing the results of a presidential election, the presidential electors of this state ***shall cast their electoral college votes for the candidate for president and the candidate for vice president who jointly received the highest number of votes*** in this state as prescribed in the canvass.") (emphasis added).  Arizona voters do not show up to vote for any single Electors listed next to the presidential candidates' names; they vote for their preferred presidential candidate.  By specifying that the electors "shall be enclosed in a bracketed list" next to "the surname of the presidential candidate and vice-presidential candidate," A.R.S. § 16-507(B) clarifies and distinguishes the Electors' ministerial status from that of the presidential candidate running for office, the latter who unquestionably suffers the discrete injury required for standing.[6]  Notably, the Republican candidate whose

---

[6] A.R.S. § 16-507(B) in its entirety reads: "Presidential electors, which, shall be enclosed in a bracketed list and next to the bracketed list shall be printed in bold type the surname

name was on the ballot is not a plaintiff in this case.

Other circuit courts to reach the issue have cited the *Carson* decision with disapproval, noting that there was no precedent for expanding standing in the way that it did.[7]  *See Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 351 n.6 (3d Cir. 2020) ("Our conclusion departs from the recent decision of an Eighth Circuit panel which, over a dissent, concluded that candidates for the position of presidential elector had standing under *Bond* [*v. United States*, 564 U.S. 211 (2011)] to challenge a Minnesota state-court consent decree that effectively extended the receipt deadline for mailed ballots. . . . The *Carson* court appears to have cited language from *Bond* without considering the context— specifically, the Tenth Amendment and the reserved police powers—in which the U.S. Supreme Court employed that language. There is no precedent for expanding *Bond* beyond this context, and the *Carson* court cited none.").  Indeed, as numerous other courts have held, where, as here, the injury alleged by plaintiffs is that defendants failed to follow the Elections Clause, the Supreme Court has stated that the "injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance." *Lance*, 549 U.S. at 442.

Elector Plaintiffs have not established they can personally bring suit, and therefore, they do not have standing to bring Count One.[8]  Therefore, the Court will dismiss Count

---

of the presidential candidate and vice-presidential candidate who is seeking election jointly with the presidential candidate shall be listed directly below the name of the presidential candidate. The indicator for the selection of the presidential and vice-presidential candidates shall be directly next to the surname of the presidential candidate, and one mark directly next to a presidential candidate's surname shall be counted as a vote for each elector in the bracketed list next to the presidential and vice-presidential candidates."

[7] *See also Carson,* 78 F.3d at 1063 (Kelly, J., dissenting) ("I am not convinced the Electors have Article III standing to assert claims under the Electors Clause. Although Minnesota law at times refers to them as 'candidates,' *see, e.g.*, Minn. Stat. § 204B.03 (2020), the Electors are not candidates for public office as that term is commonly understood. Whether they ultimately assume the office of elector depends entirely on the outcome of the state popular vote for president. *Id.* § 208.04 subdiv. 1 ('[A] vote cast for the party candidates for president and vice president shall be deemed a vote for that party's electors.'). They are not presented to and chosen by the voting public for their office, but instead automatically assume that office based on the public's selection of entirely different individuals.").

[8] The Court notes that Count One of the Complaint makes passing references to the "VRA and HAVA," (the Voting Rights Act and the Help America Vote Act of 2002) but does not bring any claims under these statutes.  (Doc. 1 ¶ 106).

1  One.

2           **2.**      **Vote Dilution – Count Two**

3        In Count Two, Plaintiffs allege Equal Protection violations based on Defendants'

4  failure to comply with Arizona law by permitting "illegal votes," allowing "voting fraud

5  and manipulation," and in preventing "actual observation and access to the elector

6  process," which allegedly resulted in "the dilution of lawful votes . . . and the counting of

7  unlawful votes." (Doc. 1 at 45). Plaintiffs ask the Court to order that "no ballot processed

8  by a counting board in Arizona can be included in the final vote tally unless a challenger

9  [i]s allowed to meaningfully observe the process." (Doc 1 ¶ 120). Absent from the

10  Complaint is an allegation that Plaintiffs (or any registered Arizona voter for that matter)

11  were deprived of their right to vote. Instead, they bring baseless claims of "disparate

12  treatment of Arizona voters, in subjecting one class of voters to greater burdens or scrutiny

13  than another." (Doc. 1 ¶ 115). They do not allege what "class" of voters were treated

14  disparately. Nor do the Elector Plaintiffs cite to any authority that they, as "elector

15  delegates," are a class of protected voters. Defendants contend that Plaintiffs do not have

16  standing to assert these claims and point out that these allegations are nothing more than

17  generalized grievances that any one of the 3.4 million Arizonans who voted could make if

18  they were so allowed. The Court agrees.

19        Here, Plaintiffs have not alleged a concrete harm that would allow the Court to find

20  Article III Standing for their vote dilution claim. As courts have routinely explained, vote

21  dilution is a very specific claim that involves votes being weighed differently and cannot

22  be used generally to allege voter fraud. "Contrary to the Voter Plaintiffs'

23  conceptualization, vote dilution under the Equal Protection Clause is concerned with votes

24  being weighed differently." *Bognet*, 980 F.3d at 355; *see also Rucho v. Common Cause*, –

25  –– U.S. ––––, 139 S. Ct. 2484, 2501 (2019) ("[V]ote dilution in the one-person, one-vote

26  cases refers to the idea that each vote must carry equal weight."). "This conceptualization

27  of vote dilution—state actors counting ballots in violation of state election law—is not a

28  concrete harm under the Equal Protection Clause of the Fourteenth Amendment. Violation

of state election laws by state officials or other unidentified third parties is not always amenable to a federal constitutional claim." *Bognet*, 980 F.3d at 355; *see also Shipley v. Chicago Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A deliberate violation of state election laws by state election officials does not transgress against the Constitution."); *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970) (rejecting Equal Protection claim where allegations of state's erroneous counting of votes cast by voters unqualified to participate).

Additionally, Plaintiffs cannot sustain their Equal Protection Clause claim on a vote dilution theory. *See Bognet*, 980 F.3d at 355 (rejecting Equal Protection theory and explaining "[t]his conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment"); *see also Shipley*, 947 F.3d at 1062 ("A deliberate violation of state election laws by state election officials does not transgress against the Constitution") (internal citations omitted); *Am. Civil Rights Union v. Martinez-River*a, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) (holding that allegations of "vote dilution" as a result of alleged voting process irregulates "[are] speculative and, as such, are more akin to a generalized grievance about the government than an injury in fact."); *Powell*, 436 F.2d at 88 (rejecting Equal Protection Clause claim arising from state's erroneous counting of votes cast by voters unqualified to participate in closed primary); *Snowden v. Hughes*, 321 U.S. 1, 11 (1944) ("It was not intended by the Fourteenth Amendment . . . that all matters formerly within the exclusive cognizance of the states should become matters of national concern.").

Setting aside that Plaintiffs' claims regarding the election are not viable vote dilution claims, Plaintiffs also have not requested relief that is redressable in a tailored way as is required. *See Gill*, 138 S. Ct. at 1934 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *see also Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). Therefore, even if Plaintiffs could somehow establish that

1  their vote dilution claim was more than a generalized grievance to the point of asserting an

2  injury, Plaintiffs have not established that the Court can redress this grievance.  To give

3  Plaintiffs the relief they desire would disenfranchise the nearly 3.4 million Arizonans that

4  voted in the 2020 General Election.  Under Plaintiffs' theory of dilution, this would

5  transform all of the alleged diluted votes from being "diluted" to being destroyed.  As

6  Plaintiffs raise "only a generally available grievance about government—claiming only

7  harm to his and every citizen's interest in proper application of the Constitution and laws,

8  and seeking relief that no more directly and tangibly benefits him than it does the public at

9  large," the Court finds that Plaintiffs' Count Two "does not state an Article III case or

10  controversy." *See Lance*, 549 U.S. 437 at 439.  Therefore, Plaintiffs do not have standing

11  to bring suit in this forum.[9]

12      **B.**    **Abstention**

13      Defendants also argue the Court should abstain from reaching Plaintiffs' claims

14  based on their similarities with ongoing state court cases.  Yesterday, the Arizona Supreme

15  Court ruled on one such case—filed by Dr. Kelli Ward—seeking to "set aside the 2020

16  General Election results." *See Ward*, CV 2020-015285 (Ariz. 2020); (Doc. 81-1).  That

17  case was filed pursuant to A.R.S. § 16-672 and was also filed after Governor Ducey

18  certified the election results on November 30, 2020. (Doc. 58-1 at 17).  The *Ward* plaintiffs

19  alleged an insufficient opportunity to observe election officials, an overcounting of mail-

20  in ballots by not adequately comparing signatures on the ballot envelopes, and errors in the

21  ballot duplication process.  (*Id.* at 17–21).  After an evidentiary hearing, the Maricopa

22  County Superior Court issued a ruling on December 4, 2020, finding that there was no

23  misconduct, fraud, or effect on the outcome of the election.[10]  (*Id.*)  This ruling was

24  _____

25  [9] Having established that the Court does not have jurisdiction over Plaintiffs' Counts One
through Three, the Court will decline to exercise supplemental jurisdiction over Count

26  Four, which pleads no federal cause of action and is entirely based on alleged fraud under
Arizona law.

27  [10] Judge Randall H. Warner of the Maricopa County Superior Court addressed Ward's
allegations of election misconduct.  First, Ward argued that there was an insufficient

28  opportunity to observe the actions of election officials. The State Court dismissed that
claim as untimely, holding that "[t]he observation procedures for the November general
election were materially the same as for the August primary election, and any objection to

1    unanimously affirmed by an *en banc* panel of the Arizona Supreme Court on expedited

2    review.[11]

3            Here, Plaintiffs' Complaint similarly relies upon A.R.S. § 16-672 and its provisions

4    related to bringing suit for alleged election misconduct, including illegal votes and

5    erroneous counting.  (Doc. 1 at ¶ 15).  A.R.S. § 16-672 also provides that an elections

6    contest brought under this statute should be filed in the superior court of the county in

7    which the person contesting resides or in the superior court of Maricopa county.  A.R.S. §

8    16-672(B).  Plaintiffs aver that their claims seek federal action under federal statutes, and

9    therefore, their claims are distinguishable from the claims being litigated in the state court.

10   The Court disagrees.

11           Generally, a federal court has a duty to exercise the jurisdiction conferred by

12   Congress.  However, under certain circumstances, it is prudent for a federal court to abstain

13   from hearing a matter.  "Indeed, we have held that federal courts may decline to exercise

14   its jurisdiction, in otherwise 'exceptional circumstances,' where denying a federal forum

15   would clearly serve an important countervailing interest."  *Quackenbush v. Allstate Ins.*

16   _____

17   them should have been brought at a time when any legal deficiencies could have been
     cured," and citing *Lubin v. Thomas*, 144 P.3d 510, 511 (Ariz. 2006) ("In the context of

18   election matters, the laches doctrine seeks to prevent dilatory conduct and will bar a claim
     if a party's unreasonable delay prejudices the opposing party or the administration of

19   justice.").  Second, Ward alleged that "election officials overcounted mail-in ballots by not
     being sufficiently skeptical in their comparison of signatures on the mail-in

20   envelope/affidavits with signatures on file."  The state court allowed Ward to examine a
     sampling of mail-in ballots, and the court held that "[t]he evidence does not show that these

21   affidavits are fraudulent, or that someone other than the voter signed them. There is no
     evidence that the manner in which signatures were reviewed was designed to benefit one

22   candidate or another, or that there was any misconduct, impropriety, or violation of Arizona
     law with respect to the review of mail-in ballots."  Lastly, Ward alleged errors with

23   duplication of ballots.  The state court also allowed Ward to examine a sampling of
     duplicate ballots and held that '[t]he duplication process prescribed by the Legislature

24   necessarily requires manual action and human judgment, which entail a risk of human
     error. Despite that, the duplication process for the presidential election was 99.45%

25   accurate. And there is no evidence that the inaccuracies were intentional or part of a
     fraudulent scheme. They were mistakes. And given both the small number of duplicate

26   ballots and the low error rate, the evidence does not show any impact on the outcome."
     The state court concluded by holding that "[t]he Court finds no misconduct, no fraud, and

27   no effect on the outcome of the election."  *Ward*, CV 2020-015285 (Ariz. Super. Ct. Dec.
     4, 2020); (Doc. 58-1).

28   [11] "The Court concludes, unanimously, that the trial judge did not abuse his discretion in
     denying the request to continue the hearing and permit additional inspection of the ballots."
     *Ward*, CV 2020-015285, at *7 (Ariz. 2020); (Doc. 81-1).

*Co.*, 517 U.S. 706, 716 (1996) (citing *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189 (1959)).  Abstention may be "warranted by considerations of proper constitutional adjudication, regard for federal-state relations, or wise judicial administration." *Id.* *Colorado River* abstention permits a federal court to abstain from exercising jurisdiction over a matter in deference to a state court suit regarding similar claims and allegations. *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813, 817 (1976).

The Ninth Circuit has enumerated an eight-part test for whether *Colorado River* abstention is warranted, stressing that the factors are "not a mechanical checklist," with some factors that "may not have any applicability to a case." *Seneca Ins. Co., Inc. v. Strange Land, Inc.*, 862 F.3d 835, 841–42 (9th Cir. 2017).  The factors are: (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court.  *Id.*

Factors two through seven all support abstaining from this case.[12]  To begin, this federal forum is less convenient than the state forum, considering the state election law violations alleged, the claims are brought against state actors, and the interplay of state election law.  Moreover, the present suit reflects the very essence of "piecemeal litigation," with many of the same parties and attorneys litigating related matters in both forums.  As to the primacy of cases, this case was the last filed case.  All of the state court litigation filed related to the election preceded this action.  As to the nature of the claims, while Plaintiffs bring their claims under federal laws, the crux of their arguments, and the statutes upon which they rely, involve Arizona election law and the election procedures carried out at the county and state level by state officials.  The state courts are adequately equipped to

---

[12] The Court finds that the first factor is not relevant to the facts alleged herein.

protect the rights of the named Plaintiffs, especially considering that Plaintiff Ward already pursued her grievances there.  Moreover, as Congress has conferred concurrent jurisdiction on state courts to adjudicate Section 1983 claims, there is no concern that the state is unable to adjudicate Plaintiffs' Section 1983 claims.  *Felder v. Casey*, 487 U.S. 131, 139 (1988).  Lastly, abstention would alleviate the necessity to consider whether this matter was filed in this Court as a form of forum shopping, especially considering that a number of other related state court lawsuits have already been disposed of.  The eighth factor is the only factor that weighs against abstention, as it does not appear that Plaintiffs' allegations of widespread fraud in relation to the tabulation systems and software were before the state court.  However, as discussed *infra*, the Court finds that claim lacks Rule 9(b) particularity and plausibility.

Moreover, when considering abstention, "proper constitutional adjudication, regard for federal-state relations, or wise judicial administration," also inform this Court.  *Quackenbush*, 517 U.S. at 716.  If the Court were to reach the merits of Plaintiffs' claims, it would be entirely possible today for it to reach a different legal determination, or the same conclusion but with a different analysis, than the Arizona Supreme Court reached in *Ward v. Jackson*.  The Court cannot think of a more troubling affront to "federal-state relations" than this.  *See Quackenbush*, 517 U.S. at 716.  Therefore, the Court finds that abstention of these parallel issues is appropriate and indeed necessary.

## C.     Eleventh Amendment

Defendants also argue that the Eleventh Amendment bars Plaintiffs' demands for relief because they, as state officials who have not consented to being sued, are immune from suit.  Further, they argue that no exception applies, that the relief Plaintiffs seek is not prospective, and that the claims are barred.

The Eleventh Amendment to the Constitution provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

- 14 -

U.S. Const. amend. XI. Such immunity applies when a citizen brings a claim against their own state. *See Hans v. Louisiana*, 134 U.S. 1, 19 (1890). The immunity extends to "suit[s] against state officials when the state is the real, substantial party in interest." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "This jurisdictional bar applies regardless of the nature of the relief sought." *Id.* "When the suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself." *Id.* at 101. "The general rule is that a suit is against the sovereign . . . if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620 (1963).

There are three recognized exceptions to the above: (1) Congress has abrogated the immunity within a federal statute; (2) the State has waived immunity and allowed individuals to sue it pursuant to specific state statutes; and (3) in "claims seeking *prospective* injunctive relief against state officials to remedy a state's *ongoing* violation of *federal* law." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 865 (9th Cir. 2016) (citing *Ex parte Young*, 209 U.S. 123 (1908)) (emphasis added).

None of these exceptions are present here. As for Plaintiffs' 42 U.S.C. § 1983 claims, Congress did not abrogate the states' immunity from suit in the enacting language of Section 1983, and therefore, the Eleventh Amendment bars those claims. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989) (holding that Section 1983 "does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties"). Plaintiffs provided no argument or authority that the state has explicitly waived its immunity for elections challenges. Therefore, the second exception does not apply. As for the remaining claims, the Court must determine whether Plaintiffs are seeking prospective relief to cure an ongoing violation of federal law.

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645

1   (2002) (internal citations omitted).  However, where the claims are state law claims,

2   masked as federal law claims, *Ex parte Young* is inapplicable and the Eleventh Amendment

3   clearly bars the suit.  *See Massey v. Coon*, 865 F.2d 264 (9th Cir. 1989) (affirming dismissal

4   where "on its face the complaint states a claim under the due process and equal protection

5   clauses of the Constitution, [but] these constitutional claims are entirely based on the

6   failure of defendants to conform to state law"); *see also Pennhurst*, 465 U.S. at 90 ("[W]hen

7   a plaintiff alleges that a state official has violated state law" and "when a federal court

8   instructs state officials on how to conform their conduct to state law, this conflicts directly

9   with the principles of federalism that underlie the Eleventh Amendment.").  This is true

10  whether the relief requested is "prospective or retroactive" in nature.  *Pennhurst*, 465 U.S.

11  at 106.

12      Here, Plaintiffs face a number of difficulties in their attempt to pierce Defendants'

13  sovereign immunity.  Defendants argue that all of Plaintiffs' allegations are actually state

14  law allegations masked under federal law.  Defendants point to numerous instances in

15  Plaintiffs' Complaint where Arizona state election law is relied on, including their catch-

16  all fraud claims, which are entirely based on state law.  The Eleventh Amendment clearly

17  bars such claims.  *See Pennhurst*, 465 U.S. at 106 ("On the contrary, it is difficult to think

18  of a greater intrusion on state sovereignty than when a federal court instructs state officials

19  on how to conform their conduct to state law.").

20      However, even assuming that Plaintiffs established that their claims are indeed

21  independent federal claims, it is unclear what *ongoing* violation of federal law is being

22  asserted.  Plaintiffs allege Due Process and Equal Protection claims, along with a catch-all

23  fraud claim, that arise from Defendants' alleged failure to follow Arizona state election

24  laws.  (Doc. 1 at ¶¶ 106–120).  These numerous alleged violations—related to alleged

25  issues with signature verification, ballot duplication, and poll observation—concern past

26  conduct.[13]  The relief requested—compelling the Governor to decertify the election—

27  ───────────────

28  [13] These include objections regarding poll watchers' ability to observe ballot counting,
    issues related to the manner and process by which Arizona election officials matched
    signatures on absentee ballots (Doc. 1 at ¶¶ 46–48); issues related to the process and role
    assigned to poll referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49);

1  similarly seeks to alter past conduct. Plaintiffs have not identified an ongoing violation to
2  enjoin. In short, "Plaintiffs are seeking to undo what has already occurred, as their
3  requested relief reflects." *See King v. Whitmer*, 2020 WL 7134198, at *5 (E.D. Mich. Dec.
4  7, 2020).

5  The Eleventh Amendment bars the injunctive relief sought.

6  **D.  Laches**

7  Defendants also argue that the doctrine of laches bars Plaintiffs' claims. Laches
8  will bar a claim when the party asserting it shows the plaintiff unreasonably delayed in
9  filing the action and the delay caused prejudice to the defendant or the administration of
10  justice. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951–52 (9th Cir. 2001) (noting that
11  laches requires a "defendant [] prove both an unreasonable delay by the plaintiff and
12  prejudice to itself"). Laches can bar untimely claims for relief in election cases, even when
13  the claims are framed as constitutional challenges. *Soules v. Kauaians for Nukolii
14  Campaign Comm.*, 849 F.2d 1176, 1181 (9th Cir. 1988); *U.S. v. Clintwood Elkhorn Min.
15  Co.*, 553 U.S. 1, 9 (2008) ("[A] 'constitutional claim can become time-barred just as any
16  other claim can.'") (*quoting Block v. North Dakota ex rel. Board of Univ. and School
17  Lands*, 461 U.S. 273, 292 (1983)).

18  Plaintiffs filed their Complaint and request for TRO seeking to "de-certify" the
19  election results on December 2, 2020, nearly a month after the General Election on
20  November 3, 2020. Plaintiffs conclusively argue that they waited this long because they
21  "could not have known the basis of their claim, or presented evidence substantiating their
22  claim, until after the election." (Doc. 44 at 9.) They further state that, because "Arizona
23  election officials and other third parties did not announce or publicize their misconduct,
24  and in fact prevented Republican poll watchers from observing the ballot counting and
25  handling, it took Plaintiffs additional time post-election to gather the fact and expert
26  witness testimony presented in the Complaint." (*Id.*) During oral argument, Plaintiffs'
27  counsel repeatedly stated that the alleged fraud related to the Dominion voting machines
28  "irregularities" with the voting machines (*Id.* at ¶¶ 50–52); and certification of the
    Dominion voting system on November 18, 2020 (*Id.* at ¶ 53).

- 17 -

1   was not known until election night, when their experts noted a "blip" in their reporting data

2   that showed an increase in votes for Joe Biden around 8:00 p.m.  Plaintiffs also argue that

3   A.R.S. §16-673 supports the timeliness of their Complaint because it requires an elector to

4   file a challenge to the election in state court within five days of certification of the election.

5         Plaintiffs' Complaint includes a hodge-podge of alleged misconduct by Arizona

6   elections officials, occurring on various dates over the past weeks, months, and even years.

7   In addition to the objections regarding poll watchers' inability to observe ballot counting

8   and handling, Plaintiffs also object to the manner and process by which Arizona election

9   officials matched signatures on absentee ballots (Doc. 1 ¶¶ 46–48); to the process and role

10   assigned to poll referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49);

11   to "irregularities" with the voting machines on Election Day and before (*Id.* at ¶¶ 50–52);

12   and to the certification of the Dominion voting system on November 18, 2020 (*Id.* at ¶ 53).

13         The affidavits or declarations upon which Plaintiffs rely clearly shows that the basis

14   for each of these claims was either known well before Election Day or soon thereafter, and

15   thus cannot be excused by a lack of knowledge nor an inability to substantiate their claims

16   through December 2.  For example, Plaintiffs' Complaint cites to documents showing that

17   Plaintiffs were in possession of information about suspected irregularities with the

18   Dominion voting machines as early as 2018.  (*Id.* at ¶¶ 21, 69, 71–73) (referencing

19   "publicly available evidence (including judicial and administrative proceedings)" that

20   discuss concerns with security flaws in Dominion voting machines dating back to 2018);

21   (Doc. 1-10 at 19, Ex. 20, Declaration of Mark Paul Law dated November 24, 2020

22   (describing his concerns over Maricopa County Dominion voting machine security and

23   observations while poll watching on October 25, 2020 and November 1, 2020); *id.* at 30,

24   Ex. 22, Declaration of Gregory Wodynski dated November 23, 2020 (describing his

25   concerns over Maricopa County Dominion voting machine security and his perception that

26   "Bruce," a Dominion employee, could manually manipulate voter data files while poll

27   watching on October 24, 2020 and November 1, 2020).

28         Plaintiffs also include documents showing that the facts underlying their allegations

of ballot counting and verification misconduct occurred weeks before Election Day. Canvassing in Arizona began in October, and the poll watcher declarations and affidavits attached to the Complaint object to the signature verification and ballot process during this time. (*See* Doc. 1-3 at 7, Ex. 5) (containing unsigned Declaration dated October 25, 2020 from poll watcher objecting to "NO EFFECTIVE oversight" in signature verification rooms); *id.* at 9, Ex. 5A (document listing poll watcher objections made on 10/7/20, 10/23/20, 10/24/20, 10/29/20); (Doc. 1-10 at 25, Ex. 21) (containing a Declaration of poll watcher Judith Burns dated November 16, 2020 and noting her objections in observing the signature verification and ballot processing on October 17, 2020 and October 21, 2020). In a statement from Ms. Linda Brickman, the First Vice-Chair of the Maricopa County Republican Committee, she represents that she had ongoing concerns regarding the signature verification for early and mail-in ballots during her time as an elections worker "from 10/19/20 to 11/11/20" (Doc. 1-10 at 38, Ex. 23) and had objections to the Logic and Accuracy Certification of the Dominion voting systems that occurred on November 18, 2020. (*Id.* at 35). Indeed, at least one Plaintiff has already raised some of these complaints in state court.[14] *Ward*, CV2020-015285 (Super. Ct. of Ariz. Dec. 4, 2020) (dismissing the Petition with prejudice); (Doc. 58-1 at 14, Ex. B). Dr. Ward clearly knew the basis of her claim before December 2, 2020 but offers no reasonable explanation for the delay in bringing this suit in federal court. When contesting an election, any delay is prejudicial, but waiting until a month after Election Day and two days after certification of the election is inexcusable. *See Kelly v. Penn.*, 2020 WL 7018314, at *1 (Pa. Nov. 28, 2020) ("Petitioners failed to act with due diligence in presenting the instant claim" when they waited until November 21 to sue to invalidate Pennsylvania's election); *Kistner v. Simon*, No. A20-1486, slip op. at 3–4 (Minn. Dec. 4, 2020); *see also, e.g., Ariz. Libertarian Party*

---

[14] As she does here, Ms. Ward's state court action claimed that poll watchers were given insufficient opportunity to observe the actions of election officials. Notably, the state court judge found this claim barred by the doctrine of laches, as Ms. Ward had failed to assert it during a time when it could have been corrected. (Doc. 1-10 at 19 ("The observation procedures for the November general election were materially the same as for the August primary election, and any objection to them should have been brought at a time when any legal deficiencies could have been cured.").

1    *v. Reagan*, 189 F. Supp. 3d 920, 922–23 (D. Ariz. 2016).

2          The Court does not find that the Arizona state election challenge deadline excuses

3    delay on Plaintiffs' part in these circumstances. *See* A.R.S. §16-673. As noted above, the

4    facts underlying the suspected irregularities complained of were either known to Plaintiffs

5    prior to Election Day or soon thereafter. Although Arizona electors may have a deadline

6    by which to file election contests in Arizona state court, Plaintiffs here opted to file their

7    federal constitutional challenges in federal court. The exhibits to the Complaint confirm

8    that the events complained of occurred on or before Election Day. Accordingly, the Court

9    rejects Plaintiffs' self-serving statement that they did not know the basis for their claims

10   before December 2, 2020. The documents they submit with their Complaint plainly shows

11   the contrary is true, and the delay—which has resulted in a rush by this Court and

12   Defendants to resolve these issues before the Electoral College meeting deadline of

13   December 14, 2020—is unreasonable.

14         The second part of the laches test—prejudice—is also unquestionably met. First,

15   the prejudice to the Defendants and the nearly 3.4 million Arizonans who voted in the 2020

16   General Election would be extreme, and entirely unprecedented, if Plaintiff were allowed

17   to have their claims heard at this late date. *SW Voter Registration Educ. Project v. Shelley*,

18   344 F.3d 914, 919 (9th Cir. 2003) ("Interference with impending elections is extraordinary,

19   and interference with an election after voting has begun is unprecedented."). As an Eastern

20   District of Michigan Court stated in a nearly identical case, "[the prejudice] is especially

21   so considering that Plaintiffs' claims for relief are not merely last-minute—they are after

22   the fact. While Plaintiffs delayed, the ballots were cast; the votes were counted; and the

23   results were certified. The rationale for interposing the doctrine of laches is now at its

24   peak." *King*, 2020 WL 7134198, at *7.

25         Second, the challenges that Plaintiffs assert quite simply could have been made

26   weeks ago, when the Court would have had more time to reflect and resolve the issues.

27   "Unreasonable delay can prejudice the administration of justice by compelling the court to

28   steamroll through . . . delicate legal issues in order to meet election deadlines." *Arizona*

1   *Libertarian Party*, 189 F. Supp. 3d at 923 (quotation marks and citations omitted).

2   Plaintiffs offer no reasonable explanation why their claims were brought in federal court

3   at this late date. Their delay and the resulting prejudice bars their claims by laches.

4       **E.    Mootness**

5           Defendants also argue that this case is moot. (Docs. 38 at 5; 40 at 22). The Court

6   agrees. "Mootness is a jurisdictional issue, and 'federal courts have no jurisdiction to hear

7   a case that is moot, that is, where no actual or live controversy exists.'" *Foster v. Carson*,

8   347 F.3d 742, 745 (9th Cir. 2003) (quoting *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d

9   986, 989 (9th Cir. 1999)). In addition, a case is moot when a party cannot obtain relief for

10  its claim. *Id.*; *see also Ruvalcaba v. City of L.A.*, 167 F.3d 514, 521 (9th Cir. 1999).

11          Plaintiffs request an injunction that (a) enjoins Governor Ducey from transmitting

12  the certified results, (b) orders Defendants to "de-certify" the election results, (c) nullifies

13  votes tabulated by uncertified machines, (d) declares that illegal ballot fraud occurred in

14  violation of the Electors and Elections Clauses and the Fourteenth Amendment's Due

15  Process and Equal Protections Clauses, (e) mandates a manual recount or statistical

16  sampling of all mail-in and absentee ballots, and (f) allows Plaintiffs to seize and inspect

17  voting hardware and software as well as security camera recordings "of all rooms used in

18  Maricopa County" from November 3 to 4. (Doc. 1 at ¶ 145).

19          Obviously, the Court cannot enjoin the transmission of the certified results because

20  they have already been transmitted. (Doc. 40 at 4). Plaintiffs' counsel orally argued that

21  Defendants had the power to de-certify the election under 3 U.S.C. § 6. Nothing in that

22  statute authorizes this Court to de-certify the results. The manner provided to contest

23  elections under Arizona law requires election contest claims to be brought, "in the superior

24  court of the county in which the person contesting resides or in the superior court of

25  Maricopa County." A.R.S. § 16-672. Therefore, if de-certification were possible, it would

26  only be possible through an action brought in Arizona superior court. In other words, this

27  Court has no power to de-certify the results. But even assuming the Court were able to

28  grant the extraordinary relief requested, ordering Governor Ducey to de-certify the

1   election, such relief would necessarily run afoul of 3 U.S.C. § 6 by ignoring Arizona law.

2   In this instance, the Court cannot allow Plaintiffs to circumvent both federal and Arizona

3   law.

4        Because this Court cannot de-certify the results, it would be meaningless to grant

5   Plaintiffs any of the remaining relief they seek. *See Wood v. Raffensperger*, 2020 WL

6   7094866, at *6 (11th Cir. Dec. 5, 2020) ("[I]t is not possible for us to delay certification

7   nor meaningful to order a new recount when the results are already final and certified.");

8   *King*, 2020 WL 7134198, at *5 n.3 ("[T]he evidence Plaintiffs seek to gather by inspecting

9   voting machines and software and security camera footage only would be useful if an

10  avenue remained open for them to challenge the election results."). Plaintiffs' claims are

11  moot.

12       **F.    Failure to State a Claim**

13       "A motion to dismiss a complaint or claim 'grounded in fraud' under Rule 9(b)[15]

14  for failure to plead with particularity is the functional equivalent of a motion to dismiss

15  under Rule 12(b)(6) for failure to state a claim." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d

16  1097, 1107 (9th Cir. 2003). In a Rule 12(b)(6) context, courts must consider all well-

17  pleaded factual allegations as true and interpret them in the light most favorable to the

18  plaintiff. *Schlegal v. Wells Fargo Bank, NA,* 720 F.3d 1204, 1207 (9th Cir. 2013).

19  Dismissal is proper when there is either (1) a lack of a cognizable legal theory or (2)

20  insufficient facts to support a cognizable legal claim. *Conservation Force v. Salazar*, 646

21  F.3d 1240, 1242 (9th Cir. 2011), *cert. denied, Blasquez v. Salazar*, 565 U.S. 1261 (2012).

22       When pleading allegations concerning fraudulent conduct, Rule 9(b) requires

23  something more than Rule 8: particularity. *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009);

24

---

25  [15] Although Plaintiffs strenuously argue that they can bring their Arizona election law-
    based claims in federal court because of the presence of federal allegations, they also boldly
26  assert in their Reply that they need not follow the heightened pleading standard of Federal
    Rule of Civil Procedure 9(b) in pleading their fraud claims with particularity, because the
27  federal rules are somehow abrogated by "controlling Arizona Supreme Court precedent.[15]"
    (Doc. 44 at 23). Plaintiffs cannot have it both ways. Plaintiffs have not provided any
28  authority that a state court decision can alter the pleading requirements in federal court
    established by United States Supreme Court precedent and the Federal Rules of Civil
    Procedure.

*see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). "This particularity requirement demands a higher degree of notice than that required for other claims. The claim must identify who, what, where, when, and how." *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003).

Moreover, "claims of fraud or mistake . . . must, in addition to pleading with particularity, also plead plausible allegations. That is, the pleading must state enough facts to raise a reasonable expectation that discovery will reveal evidence of the misconduct alleged." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal citations omitted). Indeed, "Rule 9(b) serves not only to give notice to defendants of the specific fraudulent conduct against which they must defend, but also 'to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.'" *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001) (citing *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996)).

Establishing the plausibility of a complaint's allegations is a two-step process that is "context-specific" and "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. 679. First, a court must "identif[y] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Then, assuming the truth only of well-pleaded factual allegations, a court must "determine whether they plausibly give rise to an entitlement to relief." *Id.*; *see also Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (identifying the two-step process for evaluating pleadings). Although a plaintiff's specific factual allegations may be consistent with a plaintiff's claim, a district court must assess whether there are other "more likely explanations" for a defendant's conduct such that a plaintiff's claims cannot cross the line "'from conceivable to plausible.'" *Iqbal*, 556 U.S. at 680

1   (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This standard represents
2   a balance between Rule 8's roots in relatively liberal notice pleading and the need to
3   prevent "a plaintiff with a largely groundless claim" from "'tak[ing] up the time of a
4   number of other people, with the right to do so representing an *in terrorem* increment of
5   settlement value.'"  *Twombly*, 550 U.S. at 557–58 (quoting *Dura Pharmaceuticals, Inc. v.*
6   *Broudo*, 544 U.S. 336, 347 (2005)).

7           Advancing several different theories, Plaintiffs allege that Arizona's Secretary of
8   State and Governor conspired with various domestic and international actors to manipulate
9   Arizona's 2020 General Election results allowing Joseph Biden to defeat Donald Trump in
10  the presidential race.  The allegations they put forth to support their claims of fraud fail in
11  their particularity and plausibility.  Plaintiffs append over three hundred pages of
12  attachments, which are only impressive for their volume.  The various affidavits and expert
13  reports are largely based on anonymous witnesses, hearsay, and irrelevant analysis of
14  unrelated elections.  Because the Complaint is grounded in these fraud allegations, the
15  Complaint shall be dismissed.  *Vess*, 317 F.3d at 1107 ("When an entire complaint, or an
16  entire claim within a complaint, is grounded in fraud and its allegations fail to satisfy the
17  heightened pleadings requirements of Rule 9(b), a district court may dismiss the complaint
18  or claim.").

19          Plaintiffs first "describe specific violations of Arizona law" to support their fraud
20  claims.[16]  In doing so, they attach declarations from poll watchers that observed election
21  officials during the November General Election.  (Doc. 1 ¶¶ 46–53).  As Intervenor-
22  Defendant Maricopa County points out, these are the only declarants offered by Plaintiffs
23  with first-hand observation of the election administration.  (Doc. 36 at 4).  But these four
24  declarants do not allege fraud at all.  (*See* Doc. 1-10 at 18–24).  Instead, they raise
25  objections to the manner and process by which Arizona election officials matched
26  signatures on absentee ballots (Doc. 1 ¶¶ 46–48); to the process and role assigned to poll

---

[16] Plaintiffs' often scattershot pleadings allege that "Defendants failed to administer the November 3, 2020 election in compliance with the manner prescribed by the **_Georgia legislature_**."  (Doc 2 at 6) (emphasis added).  Plaintiffs also nonsensically include references to Wisconsin state statutes.  (Doc. 1 at 33).

- 24 -

referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49); to "irregularities" with the voting machines on Election Day and before (*Id.* at ¶¶ 50–52); and to the certification of the Dominion voting system on November 18, 2020 (*Id.* at ¶ 53). These objections to the manner in which Arizona officials administered the election cannot serve to overturn the results of the 2020 presidential election in Arizona because they fail to present evidence that supports the underlying fraud claim. At most, these are the type of "garden variety election irregularities" federal courts are "not equipped nor empowered to supervise . . . ." *Griffin v. Burns*, 570 F.2d 1065, 1076, 1077 (1st Cir. 1978) ("If every election irregularity or contested vote involved a federal violation, the court would be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitioners, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law.").

Plaintiffs next argue that they have expert witnesses who can attest to widespread voter fraud in Arizona. As an initial matter, none of Plaintiffs' witnesses identify Defendants as committing the alleged fraud, or state what their participation in the alleged fraudulent scheme was. Instead, they allege that, absentee ballots "*could have* been filled out by anyone and then submitted in the name of another voter," "*could be* filled in by third parties to shift the election to Joe Biden," or that ballots were destroyed or replaced "with blank ballots filled out by election workers, Dominion or other third parties." (Doc. 1 ¶¶ 54–58) (emphasis added). These innuendoes fail to meet Rule 9(b) standards. But perhaps more concerning to the Court is that the "expert reports" reach implausible conclusions, often because they are derived from wholly unreliable sources.

Plaintiffs' expert Mr. William Briggs ("Briggs"), for example, concludes that "troublesome" errors by Arizona election officials "involving unreturned mail-in ballots []" are indicative of voter fraud" and that the election should consequently be overturned. (Doc. 1 at ¶ 54). Briggs relies on data provided by an unknown person named "Matt Braynard," a person who may or may not have tweeted a "Residency Analysis of ABS/EV Voters" on his Twitter account on November 20, 2020 (Doc. 1-2 at 14, Ex. 2); (*Id.* at 52,

Ex. 3). Apart from a screenshot of Mr. Braynard's tweets that day, Plaintiffs offer nothing further about Mr. Braynard's identity, qualifications, or methodologies used in conducting his telephone "survey." But according to the Briggs' report, Mr. Braynard conducted his survey of unknown size and to unknown persons in Georgia, Michigan, Wisconsin, Arizona, and Pennsylvania regarding absentee ballots, and his "findings" were conveyed to Mr. Briggs. (*Id.*) In concluding that there were "clearly a large number of troublesome ballots in each state," Mr. Briggs assumed Mr. Braynard's "survery [sic] respondents [were] representative and the data [was] accurate." (*Id.*) This cavalier approach to establishing that hundreds of thousands of Arizona votes were somehow cast in error is itself troublesome. The sheer unreliability of the information underlying Mr. Briggs' "analysis" of Mr. Braynard's "data" cannot plausibly serve as a basis to overturn a presidential election, much less support plausible fraud claims against these Defendants.

The Complaint is equally void of plausible allegations that Dominion voting machines were actually hacked or compromised in Arizona during the 2020 General Election. Plaintiffs are clearly concerned about the vulnerabilities of voting machines used in some counties across Arizona and in other states. They cite sources that attest to knowledge of "well-known" vulnerabilities, have included letters from concerned citizens, Arizona elected officials, and United States senators. Plaintiffs even attach an affidavit of an anonymous witness with connections to the late Venezuelan dictator Hugo Chavez claiming to be privy as to how officials in Venezuela rigged their elections with the help of a voting systems company whose software "DNA" is now used in voting machines in the United States. (Doc. 1-1, Ex. 1). These concerns and stated vulnerabilities, however, do not sufficiently allege that any voting machine used in Arizona was in fact hacked or compromised in the 2020 General Election. Rather, what is present is a lengthy collection of phrases beginning with the words "could have, possibly, might," and "may have." (Doc. 1 ¶¶ 8, 53, 55, 57, 60, 66, 77, 88, 91, 108, 109, 122). To lend support to this theory, Plaintiffs offer expert Russell Ramsland, Jr., who asserts there was "an improbable, and *possibly impossible* spike in processed votes" in Maricopa and Pima Counties at 8:46 p.m.

on November 3, 2020.  (Doc. 1 ¶ 60); (Doc. 1-9, Ex. 17) (emphasis added).  He suggests that this spike "could easily be explained" by presuming that Dominion "pre-load[ed] batches of blank ballots in files such as Write-Ins or other adjudication-type files then casting them almost all for Biden using the Override Procedure . . . ." (Doc. 1-9 at 9, Ex. 17).  This scenario is conceivable.  However, Defendant Hobbs points to a much more likely plausible explanation: because Arizona begins processing early ballots before the election, the spike represented a normal accounting of the early ballot totals from Maricopa and Pima Counties, which were reported shortly after in-person voting closed.  (Doc. 40 at 17–18).  Thus, the Court finds that while this "spike" *could* be explained by an illicit hacking of voting machinery in Arizona, the spike is "not only compatible with, but indeed was more likely explained by, lawful, unchoreographed" reporting of early ballot tabulation in those counties.  *See Iqbal*, 556 U.S. at 680.  Plaintiffs have not moved the needle for their fraud theory from conceivable to plausible, which they must do to state a claim under Federal pleading standards.  *Id.*

Because Plaintiffs have failed to plead their fraud claims with particularity and because the Complaint is grounded in these claims, it must be dismissed.[17]

### G.    Motion for TRO and Preliminary Injunction

There are multiple independent grounds upon which to dismiss Plaintiffs' Complaint.  Accordingly, it is not necessary to reach the merits of Plaintiffs' requests for a temporary restraining order and preliminary injunction and the Court will therefore only briefly addresses those Motions here.

"The standard for issuing a temporary restraining order is identical to that for issuing a preliminary injunction." *Taylor-Failor v. Cty of Hawaii*, 90 F. Supp. 3d 1095, 1098 (D. Haw. 2015).  Under normal circumstances, both are extraordinary and drastic remedies,

---

[17] Throughout their pleadings, Plaintiffs allege that there were "spikes" of votes for Joe Biden that occurred in Arizona, which also occurred in other states that certified the election for Joe Biden, including Georgia, Wisconsin, Michigan, and Pennsylvania. Regardless of whether these "spikes" shifting the vote majorities from President Trump to Vice President Biden occurred in other states, Plaintiffs have presented nothing to support the claim that these same "spikes" occurred in Arizona, where Biden never trailed Trump in the vote tally.

1   and "should not be granted unless the movant, by a clear showing, carries the burden of
2   persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v.*
3   *Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def.*
4   *Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy
5   never awarded as of right.") (citation omitted). A plaintiff seeking a temporary restraining
6   order or preliminary injunction must show that (1) he or she is likely to succeed on the
7   merits, (2) is likely to suffer irreparable harm without an injunction, (3) the balance of
8   equities tips in his or her favor, and (4) an injunction is in the public interest. *Winter*, 555
9   U.S. at 20.

10          Plaintiffs simply cannot establish they have a likelihood of success on their claims.
11  Plaintiffs face serious jurisdictional impediments in bringing their claims to federal court
12  at the eleventh hour. These insurmountable legal hurdles are exacerbated by insufficiently
13  plead allegations of fraud, rendered implausible by the multiple inadmissible affidavits,
14  declarations, and expert reports upon which their Complaint relies.

15          Furthermore, granting Plaintiffs the injunctive relief they seek would greatly harm
16  the public interest. As stated by Defendant Hobbs, "the requested relief would cause
17  enormous harm to Arizonans, supplanting the will of nearly 3.4 million voters reflected in
18  the certified election results and potentially imperiling Arizona's participation in the
19  Electoral College. It would be more difficult to envision a case in which the balance of
20  hardships would tip more strongly against a plaintiff." (Doc. 40 at 24). The Court agrees.
21  The significant weight of these two *Winters* factors requires that the Court deny Plaintiffs'
22  requests for injunctive relief. [18]

23  **III.    Conclusion**

24          Not only have Plaintiffs failed to provide the Court with factual support for their
25  extraordinary claims, but they have wholly failed to establish that they have standing for
26  the Court to consider them. Allegations that find favor in the public sphere of gossip and
27  innuendo cannot be a substitute for earnest pleadings and procedure in federal court. They

28  ------------------------------------------------------------
    [18] The Court will vacate the hearing on Plaintiffs' TRO and Request for Preliminary
    Injunction scheduled for December 10, 2020.

most certainly cannot be the basis for upending Arizona's 2020 General Election.  The Court is left with no alternative but to dismiss this matter in its entirety.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Governor Doug Ducey, Secretary of State Katie Hobbs, and Intervenor Defendants Maricopa County Board of Supervisors and Adrian Fontes' Motions to Dismiss the Complaint (Docs. 36, 38, and 40) are **GRANTED** for the reasons stated herein.

**IT IS FURTHER ORDERED** that all remaining pending motions (Docs. 14, 62, 65 and 66) are **denied as moot,** and the hearing on Plaintiffs' TRO and Preliminary Injunction set for December 10, 2020 is **vacated**.

**IT IS FINALLY ORDERED** that this matter is dismissed, and the Clerk of Court is kindly directed to terminate this action.

Dated this 9th day of December, 2020.


_____
Honorable Diane J. Humetewa
United States District Judge

From: Kayla Cardoza <kayla@clarelocke.com>
Subject: Time-Sensitive Legal Correspondence
Date: December 22, 2020 at 10:02:46 PM EST
To: "bobby@awetv.com" <bobby@awetv.com>, "charles.herring@oann.com"
<charles.herring@oann.com>
Cc: Tom Clare <tom@clarelocke.com>, Megan Meier <megan@clarelocke.com>

Dear Messrs. Herring:

Please see the attached correspondence from Tom Clare and
Megan Meier. Kindly confirm receipt.

Sincerely,

Kayla Cardoza | Case Manager
C L A R E   L O C K E   L L P
10 Prince Street | Alexandria, Virginia 22314
(202) 899-3873 - direct
kayla@clarelocke.com | www.clarelocke.com

This electronic message transmission contains information from the law firm of Clare
Locke LLP, which may be confidential or privileged.  The information is intended
exclusively for the individual or entity named above.  If you are not the intended
recipient, be aware that any disclosure, copying, distribution, or use of the contents of this
information is prohibited.  If you received this electronic transmission in error, please
notify us immediately at admin@clarelocke.com.





THOMAS A. CLARE, P.C.                                                    MEGAN L. MEIER

December 22, 2020

*Via Email*

Robert Herring
Chief Executive Officer, OAN
Email: bobby@awetv.com

Charles Herring
President, OAN
Email: charles.herring@oann.com

> **Re:** *Dominion's Second Demand for Retraction of Defamatory Accusations*

Dear Messrs. Herring:

We write again on behalf of US Dominion Inc.[1]  Our December 18, 2020 letter demanded that One America News Network ("OAN") retract its recent defamatory statements that Dominion was involved in a clandestine conspiracy to somehow rig the November 2020 presidential election. This letter serves as Dominion's renewed demand that you publicly correct your defamatory statements in accordance with California Civil Code § 48a.

Our last letter explained in great detail the substantial harm that OAN's inflammatory accusations have caused Dominion.  This includes damages from diminished sales and customer goodwill, injury to Dominion's reputation, and the loss of public trust.  These are all critical to Dominion's success, and OAN's reckless disregard for the truth has substantially interrupted the company's ability to operate.  To add insult to injury, OAN's smear campaign against Dominion has presented a real and present safety risk to Dominion employees throughout the country.  Recent news reports describe the harrowing account of one such employee who is currently in hiding because of the "$1,000,000 bounty" that has been placed on his head.

Indeed, in response to numerous threats the company has received, Dominion has hired private security firms to protect the health and safety of its employees and to monitor and repulse continued attempts to compromise its physical locations.  Many of these threats were made in the hours after OAN published false claims that Dominion was attempted a coup to subvert the true outcome of the November 2020 presidential election.  By way of example, OAN published the following stories on December 2nd and December 3rd, both containing false accusations about Dominion's role in the recent election.

---

[1] We also represent and write on behalf of its subsidiaries, Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation (collectively, "Dominion").




Within hours of OAN publishing these stories—and promoting them on their various social media accounts—Dominion received obscene and demeaning messages from members of the public who were outraged by the prevarications and lies set forth in OAN's "reporting." OAN's reporting prompted numerous death threats that were aimed towards Dominion and its employees. A few examples follow:

- *"I hope you get execute [sic] by chainsaw."*
- *"Why won't you fucking cowards testify. We're coming for you. You guys are done. You are treasonous scumbags."*
- *"You better watch y'alls back we know where you live and we're coming for you."*
- *"Your days are numbered!"*
- *"I hope you get execute [sic] by chainsaw."*
- *"Why won't you fucking cowards testify. We're coming for you. You guys are done. You are treasonous scumbags."*
- *"You better watch y'alls back we know where you live and we're coming for you."*
- *"Your days are numbered!"*
- *"You scumbag vote rigging son of a bitches. Your not gonna get away with it. And yes, you will be proven to be "enemy combatants" in conspiracy with China and the Democrats. Get right or get the consequences. Pricks."*



These are just a handful of examples of the threats that Dominion continues to receive online, via telephone, and even in person. Dominion urges you, therefore, to intervene and set the record straight so that Dominion can begin mitigating some of the harm OAN's conduct has inflicted.

For the avoidance of doubt, you must correct the defamatory statements described in this letter and our previous correspondence, and you must publish those corrections in substantially as conspicuous a manner as the original libels. Enclosed please find an appendix containing (1) our December 18, 2020 letter and (2) the relevant defamatory statements subject to Dominion's demands for retraction. For your reference we have highlighted the defamatory statements that you must correct and retract. If you harbor any confusion concerning this letter or its requirements, please notify my office immediately.

For the reasons set forth in our December 18, 2020 letter, you must:

1. Immediately cease and desist publishing defamatory statements about Dominion, regardless of whether the statements are made by you or by third parties.

2. Immediately issue a public retraction of the defamatory statements identified in the Appendix to this letter, making clear that Dominion did not interfere in the November 2020 election and explaining that Dominion has no involvement in a supposed "deep-state" conspiracy to reverse the proper outcome of the election.

3. Save and preserve all documents and materials related to your reporting.

4. Immediately apologize for your defamatory claims.

Finally, this letter puts you on notice that Dominion will pursue legal remedies to protect its interests, including the substantial damages and attorneys' fees that Dominion has incurred because of OAN's reckless disregard for the truth.

Please respond accordingly.

Regards,

Thomas. A. Clare, P.C.

Megan L. Meier

Enclosures

3

_____

*Dominion adv. One American News Network*

_____

**DOMINION'S RETRACTION DEMAND**
**APPENDIX A**

Thomas A. Clare, P.C.
Megan L. Meier, Esq.
CLARE LOCKE LLP

*Counsel for Dominion*

*This appendix is submitted in connection with the retraction demand to OAN from US Dominion Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation (Collectively, "Dominion").*

1

## TABLE OF CONTENTS

1.  *Clinton Ties To Dominion Voting System, Which 'Glitched' For Biden* (Nov. 11, 2020)..3

2.  *Cyber Analyst On Dominion Voting: Shocking Vulnerabilities* (Nov. 15, 2020) ...............4

3.  *Dominion Scandal Goes Worldwide With Michael Johns* (Nov. 18, 2020) ........................6

4.  *Dominion Voting Systems Under Scrutiny For Security* (Nov. 18, 2020)...........................7

5.  *Dominion Executive: Trump Is Not Going To Win. I Made F***Ing Sure Of That* (Nov. 24, 2020).......................................................................................................................................9

6.  *Maricopa County GOP Chairwoman Testifies She Saw Votes For President Trump Flipped For Biden* (Dec., 2020) ...................................................................................................11

7.  *Election Fraud Witnesses Provide Testimony in Mich.* (Dec. 3, 2020).............................11

8.  *Reports: Ga. Gov. Kemp Awarded Dominion Voting Contract After Meeting With Chinese Consulate Official In Atlanta* (Dec. 10, 2020) ..............................................................12

9.  *Mich. Fraud Witness Debunks Dominion CEO Testimony, Says Poulos Falsely Denied Internet Connection & Ballot Dumps* (Dec. 16, 2020).................................................................13

10. *Dominion Falsely Claims QR Codes Protect Against Fraud* (Dec. 16, 2020) ..................14

11. *Dominion-izing' the Vote with Chanel Rion* (Nov. 21, 2020, *rebroadcast on* December 19, 2020)...................................................................................................................................................15

1. ***Clinton Ties To Dominion Voting System, Which 'Glitched' For Biden*** (Nov. 11, 2020)

https://www.oann.com/clinton-ties-to-dominion-voting-system-which-glitched-for-biden/

Clinton Ties To Dominion Voting System, Which 'Glitched' For Biden.

Software used by the voting system Dominion reportedly "glitched" in favor of Joe Biden in key parts of Michigan. As it turns out, key members of Dominion have ties that go back to Hillary Clinton.

**Video**

Host (00:00):

Software used by the voting system, Dominion reportedly glitched in favor of Joe Biden and key parts of Michigan. And as it turns out, key members of Dominion have ties that go back to Hillary Clinton. As we just reported there here's Chanel Rion.

Chanel Rion (00:14):

One county in Michigan glitched and turned Trump votes into Biden votes. Upon exposing this error, it turns out that 6,000 votes had accidentally gone from Trump to Biden when they corrected this error. Not only did Trump win the County, but the house gained a Republican Congressman. Head of the Trump legal battle against fraudulent ballots, Rudy Giuliani says this glitch was widespread.

Rudy Giuliani (00:41):

A complete breakdown of a software system called Dominion, in which in Antrim County Biden won on election night, only to find out that the software didn't work and it reversed the vote. That Dominion technology was used in three-quarters to almost 80% of the state. So now we've got to look at how often did its breakdown in other parts of the state. And when you look back on the history of Dominion, which is a Canadian firm, it's made mistakes in the Canadian election system.

Chanel Rion (01:17):

This Dominion software was used in at least 47 counties in Michigan. A state Trump had been projected to win. Election officials in Michigan were quick to dismiss this initial mistake as simply a failure to update the software, but Trump's legal team and the Republican party are calling this a bluff pushing for a full audit of the counties in which Dominion was used.

Rudy Giuliani (01:40):

The idea that there's no evidence in the networks keep saying, but the Trump campaign has produced no evidence. And I say, you are censoring the evidence.

Chanel Rion (01:51):

But there is another aspect of the Dominion software company that escaped the notice of most: Dominion's ties to the Clinton Foundation. Penelope Chester-Starr is the communications manager for Dominion Voting Systems. Prior to coming to Dominion, she worked for the Clinton Growth Initiative and was Vice President for Teneo. Teneo was the firm started to help manage Bill and Hillary Clinton's foreign businesses and booked their personal speaking engagements. Even more disturbing, there appears to be a formal partnership between the Clinton Initiative and Dominion Voting Systems. But back to just one example of many, Chester-Starr also helped organize a 2017 women's March against Trump and is a rabid anti-Trumper working for a vote counting company. One that claims to be the leading supplier of election technology across Canada and the U.S. The question is how many more anti-Trump activists and former Clinton allies work for or affect the Dominion software company? The company that accidentally flipped thousands of votes from Trump to Biden in key swing states.

2. *Cyber Analyst On Dominion Voting: Shocking Vulnerabilities* (Nov. 15, 2020)

   https://www.oann.com/cyber-analyst-on-dominion-voting-shocking-vulnerabilities/

   Cyber Analyst On Dominion Voting: Shocking Vulnerabilities

   A cyber analyst shares alarming insights into the scandal ridden voting software Dominion. One America's Chanel Rion has more.

   **Video**

   Host (00:00):

   And a cyber analyst shares alarming insights into the scandal-ridden voting software Dominion. One America Chanel Rion has more.

   Chanel Rion (00:10):

   Well voter fraud deniers continue to proclaim the perfection of the U.S. election system. Skeptics are looking at irregular patterns in vote data in particular software irregularities that would switch votes from President Trump to Joe Biden. Dominion Voting Systems is one such software that seemed to have a pattern of switching votes from Trump to Biden. How easily could bad actors have used Dominion to switch thousands of votes in alternate election County by County? The answer is shocking. One America News spoke with Ron Watkins, a large

systems technical analyst who has been pouring over the Dominion systems manual.

Ron Watkins (00:50):

First, I was looking at this manual with the mindset of a penetration tester of which I am. I'm reading the manual with a discerning eye and trying to figure out which parts of the system could be abused by, uh, end-users. The physical security of the device is the first step to security. If you can't secure the physical device, then you have no security. It-it's impossible to have security if you don't secure the physical device.

Chanel Rion (01:18):

Working off the Dominion manual and public request documents from Pennsylvania, Secretary of State, Watkins says the vulnerabilities of Dominion reside in the fact that administrative access is so easy to attain with administrative access comes direct access to ballots and how they are counted.

Ron Watkins (01:37):

So, you have the issue of the person who is inside the tabulation machine, which is just a normal Windows 10 computer. Are they manipulating the vote before it goes to the flash drive? And then you have the next issue, which is now the votes are on the flash drive, does, how does that flash drive get to the -the county commissioner or whoever is assigned to accept the flash drive? Is the same flash drive being, uh, being sent over? So, you could swap the flash drive, theoretically, there's no accountability there. And then once the County Commissioner or whoever accepts that flash drive gets the flash drive, do you trust them to not go in and edit the contents before they report it?

Chanel Rion (02:26):

In Michigan, one county reported 6,000 ballots being affected because of a software malfunction. Catching this error meant the difference between that county voting Biden to that county actually having voted for Trump by 2,500 votes.

Ron Watkins (02:42):

So, another issue is the keys. The keys to the machine are digital devices. It's unclear what the device is. It might be like an RFID device or USB or, or something, but it is clear that it's a digital device that holds a, some kind of cryptographic key on it. If you lose this physical key, you lose absolute security of the entire precinct. So, for example, if say Philadelphia was storing these keys in a warehouse and they were robbed, and the only thing stolen where these keys and a laptop, then you should consider their entire election to be illegitimate because they have lost the physical security of the system, which is the most important, uh, part of information security.

Chanel Rion (03:36):

And that's exactly what happened in Philadelphia. Just one month before the election USB drives and a laptop had been stolen from a key precinct in Philadelphia. On election day, Biden overtook Trump's 800,000 vote lead in the dark of night. According to these tabulating machines, Biden surpassed Trump by nearly 60,000 votes statewide. A lead found in one county, the County from which a thief stole USB keys and a laptop to the precincts ballot machines the month prior.

3. *Dominion Scandal Goes Worldwide With Michael Johns* (Nov. 18, 2020)

https://www.oann.com/dominion-scandal-goes-worldwide-with-michael-johns/

Dominion Scandal Goes Worldwide With Michael Johns

Tipping Point's Kara McKinney caught with Michael Johns, the co-founder and leader of the National Tea Party Movement, to get his take on the controversy surrounding the 2020 presidential election and the role of Dominion Voting Systems.

**Video**

Kara McKinney (00:00):

Foreign governments seem to be tied in with these systems, whether it be Canada, Venezuela, Spain, or even Germany. What can you tell us about that?

Michael Johns (00:09):

Well, there's been some reporting at some of these, um, systems in Germany were actually seized. Um, they clearly the, you know, Smartmatic has had incredible ties, uh, with some of the greater far-left concerns that we have, including, um, this Lord Malloch Brown, who's very tight, uh, with, uh, Soros is on the, uh, Open Societies Global Board and a bunch of other sources boards, meaning this is not some casual associate of George Soros. This is kind of an individual as part of that inner circle. Um, and we have, and we have case after case. The Philippines is, is another great example where these systems have been utilized and there's been nothing but broad concerns. Now, since we last talked, which was not broadly known and still not probably known, just so happens that one of two campaigns has a very strong relationship with Smartmatic.

And I probably don't have to ask you to guess which one. Um, but we have, um, an individual, uh, named, named Peter Neffinger who has been handling what's typically called, um, the, the landing teams for transitions, where personnel are brought in for the, no, nothing short of the Department of Homeland Security. This guy has been on the board of Smartmatic. He has, uh, an extensive historical relationship with the Atlantic Council, which, you know, one of the great, I think untold stories is the amount of foreign money that's flooded into Washington, D.C.,

including thinktanks, uh, over the last few years. And I come out of the thinktank environment, um, and worked with, I think the best of the bunch with Heritage Foundation. But he worked with the Atlantic Council known for lots of Qatar money, lots of China money, uh, lots of UAE money, and even Burisma money that went into Atlantic Council, which did not come out in the Hunter Biden story.

So, we have, I think, and you can hear it in legal counsel coming out of the Trump, um, legal team, major concerns. And you know, my guidance right now is don't jump up and down with glee. It's firstly, astonishing and reprehensible that we've allowed this to occur. And we have to begin as con--know, as least I say this as a conservative as a lifelong Republican taking some responsibility for these actions. Where were Republicans? Where were conservatives, when these systems that were, were shown to be flawed, um, were not, were not adopted? And by the way, you know, Elizabeth Warren, Klobuchar there's Democrats, who've raised concerns about, about them as well. So, I think we haven't like we're at a point right now where this has to be fixed. It is inexcusable. It is not acceptable for us to sort of say, you know, yeah, there were some concerns out there and it probably didn't go well, we've got to get that fixed before 2024. No, the, the President who is sworn in on January 20 absolutely has to have the full confidence of the American people that, that, that individual was elected in a free and fair election. Right now you cannot say that at all. And in a country that's still roughly split 50/50 by ideology and party. That's a recipe for immense, uh, divisiveness among

Kara McKinney (03:41):

Exactly. You're exactly right. And the only thing, this, this smacks me of intention here on the Democrats part, as you were saying in laying out over these past few years, red flags popping up here and there over these many, many years. And the fact that Democrats knew that and then push to bring these systems into as many as 30 States and Republicans as well, some Republicans as well. It tells me that something is not sitting right here. Thank you so much for breaking it all down for us, Michael.

4. ***Dominion Voting Systems Under Scrutiny For Security*** (Nov. 18, 2020)

https://www.oann.com/dominion-voting-systems-under-scrutiny-for-security/

Dominion Voting Systems Under Scrutiny For Security.

One of the nation's biggest voting machine operators, Dominion Voting Systems, appears to have ties to high-level Democrats. One America's Pearson Sharp has more on the story as democratic senators warn that electronic voting machines are highly vulnerable to hacking.

**Video**

Host (00:00):

In the meantime, one of the nation's biggest voting machine operators, Dominion Voting Systems appears to have ties to high level Democrats. Here's one America's Pearson sharp.

Pearson Sharp (00:11):

As the question of election integrity grows, one of the largest operators of voting systems in the U.S. appears to have questionable relationships with some of the biggest names in the Democratic Party. Dominion voting systems has taken center stage and the controversy over vote tampering and has tried to deny claims that it was manipulating the outcome of the 2020 election. However, the Colorado based company has admitted to not only hiring a former staffer for Nancy Pelosi as a lobbyist, but also to making a sizable donation to Bill and Hillary's Clinton foundation. Furthermore, President Trump's campaign attorney Sidney Powell claims Dominion was working to bolster Joe Biden over Trump and says they have enough evidence to launch a widespread criminal investigation. Powell explained that operators at Dominion can watch the votes coming in real time. And more importantly, they can also switch the votes in real time. This is something that even Dominion's Vice-President Eric Coomer admitted to back in 2017, explaining that the votes can be altered after the election, but claiming they never do that.

Eric Coomer (01:19):

Does this system allow alterations of the ballot images after the election, only through the adjudication system? Again, because I'm making a judications on the records. We update the audit mark. We never update the actual image of the physical ballot front and back.

Pearson Sharp (01:35):

Even Democrats are aware of Dominion's vulnerabilities. And back in 2019 senators Elizabeth Warren, Amy Klobuchar and Ron Wyden admitted that voting electronically was a security risk in a letter written in December of last year. They stated quote researchers recently uncovered previously undisclosed vulnerabilities in nearly three dozen backend election systems in ten States. Even election security activists, warn that Dominion has no safeguards and is highly vulnerable to outsider hacking or vote tampering. Experts like Alex Halderman, a professor of computer science from the University of Michigan, says the QR codes used a scan. The ballot could simply be copied and resubmitted as another vote. He says that could be done as many times as you wanted. And a copy would be just as valid as the original. And after the hand recounts began in Georgia. It appears that manipulation of the vote may have indeed taken place putting the state back in play for President Trump.

Pearson Sharp (02:35):

Following the previous discovery that some 2,600 uncounted ballots were uncovered in Floyd County, which Georgia's voting system, chief Gabriel Sterling called an amazing blunder. The same thing as apparently happened again in Fayette County, another 2,755 votes were found on a memory card, according to Sterling with nearly 1600 going to President Trump and just over 1100 going for Biden that closes the gap between Trump and Biden by another 449 votes. In addition to the 800 votes discovered in Floyd County shrinking Biden's lead even further. These are just the incidents that we know about so far, but as more and more discrepancies and major voting errors are uncovered on a daily basis. It seems clear the American people, regardless of party are justified and there are concerns over the integrity of their elections. Pearson Sharp, One American News.

5. ***Dominion Executive: Trump Is Not Going To Win. I Made F\*\*\*Ing Sure Of That*** (Nov. 24, 2020)

https://www.oann.com/dominion-executive-trump-is-not-going-to-win-i-made-fing-sure-of-that/

*Dominion Executive: Trump Is Not Going To Win. I Made F\*\*\*Ing Sure Of That.*

One America's Chief White House Correspondent Chanel Rion spoke with the founder of FEC United, Joe Oltmannn, who made a bombshell discovery about a key member of Dominion's leadership.

**Video**

Host (00:00):

One America's Chanel Rion speaks with founder of FEC United Joel Oltmann, who made a bombshell discovery about a key member of Dominion's leadership.

Chanel Rion (00:11):

Joe, you infiltrated an Antifa conference call this past September and accidentally came upon a top Dominion Voting Systems executive named Eric Coomer. Describe that call and what it led you to find.

Joe Oltmann (00:26):

How the call started. If, somebody says who's Eric? He says, Eric's Dominion guy. Someone actually said: Hey, go ahead and tell them to continue speaking. Um, and someone interrupts and says, uh, what are we going to do if f-ing Trump wins? And Eric responds, and I'm paraphrasing this, by the way, um, don't worry about the election. Trump is not going to win. I made effing sure of that. And then he started laughing and somebody says f-ing right. At that point, I thought to myself, you

know, this guy is crazy. These people are crazy because they think that they are, you know, Jedi warriors and they could just will themselves to Trump not winning.

Chanel Rion (00:58):

Fast forward to just after the election. Oltmann sees an article concerning Georgia's last minute Dominion Voting software updates. The article cites Eric speaking on behalf of Dominion. Oltmann remembers his September call and begins to dig deeper.

Joe Oltmann (01:16):

Um, and, but I did do research on Eric. And so, I just put it a simple Google search to start, which was Eric Dominion, uh, Denver, Colorado. And Eric Coomer came up immediately under Dominion Voting Systems. Anytime that there was a press release, Eric Coomer was the one giving that press release. Anytime, but they were pitching the product to, uh, different municipalities. He was the one pitching the product. And I'm talking about Arizona, uh, Wisconsin, um, Georgia, Pennsylvania, you name it, his name pops up everywhere.

Chanel Rion (01:49):

The real shocker came when Oltmann found Coomer's Facebook posts,

Joe Oltmann (01:53):

I've got access to his Facebook. You get that sinking feeling like what, like what this is, this is crazy here. Here's the director of security and excuse me, of strategy and security at Dominion. Um, and when I got into his Facebook page, that's when things really started to kind of come together for me that you know, that Eric Coomer was this, you know, that he was not just Antifa. He was, uh, he was responsible for putting his finger on the scales of our election

Chanel Rion (02:22):

Posts, including the Antifa manifesto, vitriolic posts against all Trump voters, song links like "Dead Prez" and "F-the police" and "F the USA." Oltmann says Coomer had the title and the power to exercise his vitriol through Dominion. If Coomer is investigated and found to have indeed tampered with a presidential election, such an action could be tried for treason. Unfortunately, the question is, will the FBI step up to investigate. For more on this interview and others tune in for OAN's upcoming investigation on Dominion. Chanel Rion One American News, Washington.

6. *Maricopa County GOP Chairwoman Testifies She Saw Votes For President Trump Flipped For Biden* (Dec., 2020)

https://www.oann.com/maricopa-county-gop-chairwoman-testifies-she-saw-votes-for-president-trump-flipped-for-biden/

Maricopa County GOP Chairwoman Testifies She Saw Votes For President Trump Flipped For Biden.

The GOP vice chairwoman of Maricopa County, Arizona said she saw ballots changed from a vote for President Trump to a vote for Joe Biden on election night.

Linda Brickman testified before Arizona state legislators on Monday, stating that she witnessed votes being entered into the Dominion system automatically changed to reflect a vote for Biden. She said she was threatened and barred from the counting room after telling her supervisor what she saw.

Despite multiple witnesses coming forward with similar stories, counters were reportedly never told whether any action had been taken to correct the miscount.

Maricopa County is among the largest in the nation with more than 2 million votes in the 2020 election.

"I read her a Trump Republican ballot and as soon as she entered it into the system, the ballot defaulted on the screen to a Biden Democratic ballot," explained the GOP vice chairwoman.

Brickman said her purpose of appearing at the hearing was to speak the truth and protect the integrity of the election.

7. *Election Fraud Witnesses Provide Testimony in Mich.* (Dec. 3, 2020)

https://www.oann.com/election-fraud-witnesses-provide-testimony-in-mich/

Voting irregularities in Michigan are under scrutiny again as the President's legal team continues to present their case to the American public.

On Wednesday, state Rep. Matt Hall (R), chairman of the Michigan House Oversight Committee, led a hearing to listen to poll watchers and election workers testify to what they saw on November 3 as well as the days that followed.

In his introduction, Hall recognized that the state of Michigan needed to investigate these claims because pre-election mandates had left the state vulnerable to tabulation errors. During the 2018 midterms, Michigan voted to change a number of election procedures, including the implementation of 'no excuse absentee' voting.

More than 3 million voters used the new policy to register to vote by mail in 2020, but county clerks quickly reported tens-of-thousands of ballots were thrown out due to signature errors or voters no longer living in Michigan. This led the President's legal team to question how many fraudulent ballots were not thrown out.

The President's personal attorney, Rudy Giuliani, questioned witnesses before the Michigan House Oversight Committee. This allowed lawmakers in the Wolverine State the opportunity to hear firsthand stories of fraud and negligence.

One witness, Mellissa Carone, was contracted by Dominion voting machines to provide IT support in Detroit and told the committee how she was forced to watch as election officials added the same batches of ballots to the final tally over and over again.

The mishandling of ballots and the negligence of poll workers affected not only the presidential race, but several ballot measures within the state.

Giuliani ended the hearing by saying that the work undertaken by the President's legal team was vital because "every dishonest vote deprives an honest voting person of their vote."

8. ***Reports: Ga. Gov. Kemp Awarded Dominion Voting Contract After Meeting With Chinese Consulate Official In Atlanta* (Dec. 10, 2020)**

https://www.oann.com/reports-ga-gov-kemp-awarded-dominion-voting-contract-after-meeting-with-chinese-consulate-official-in-atlanta/

Reports: Ga. Gov. Kemp Awarded Dominion Voting Contract After Meeting With Chinese Consulate Official In Atlanta

New reports highlight the relationship between Georgia's governor and consuls from China. They show that Gov. Brian Kemp (R-Ga.) may have closer ties to China than just asking for their business.

According to recent **reports**, Kemp met with China's consul general from the Houston consulate in Atlanta on July 12, 2019. The Houston consulate was shut down by the U.S. government for being used as a **location for spies**.

"We've terminated special treatment agreements with Hong Kong in response to CCP's actions to deny freedom to the people of Hong Kong," Secy. of State Mike Pompeo said when he appeared before the Senate in July. "And we closed our consulate in Houston because it was a den of spies."

On July 29 of the same year, Kemp handed Dominion a ten-year contract worth over $100 million.

Dominion has been accused multiple times of changing votes for President Trump to votes for Joe Biden. The company also has **various ties to China**.

In June of this year, the New York Times reported there is evidence that heavy lobbying and sales tactics were used leading up to their implementation.

On Tuesday, outlets highlighted resurfaced pictures of Kemp meeting with several Chinese diplomats who are suspected of committing espionage and attempting to steal COVID-19 research.

Separate reports also called attention to massive Chinese investment in Georgia, which may violate **CFIUS** rules. Kemp is known to have welcomed questionable Chinese money in his state.

"China is a top source of imports and our third-largest export market," Kemp stated. "We welcome thousands of Chinese visitors every year to the Peach State and we are constantly helping to develop new opportunities for Chinese companies."

Critics said Kemp is willing to hand election results in his state to Joe Biden, despite evidence of fraud, due to his soft stance on China.

9. *Mich. Fraud Witness Debunks Dominion CEO Testimony, Says Poulos Falsely Denied Internet Connection & Ballot Dumps* (Dec. 16, 2020)

https://www.oann.com/mich-fraud-witness-debunks-dominion-ceo-testimony-says-poulos-falsely-denied-internet-connection-ballot-dumps/

Mich. Fraud Witness Debunks Dominion CEO Testimony, Says Poulos Falsely Denied Internet Connection & Ballot Dumps

Michigan's top witness of election fraud debunked recent claims that Dominion CEO John Poulos made while under oath to a State Senate Committee.

"He stated none of the machines were connected to the Internet," election fraud witness Melissa Carone said. "[There is a] 53-minute audio recording of the Dominion training session, in which they admit that all of their hardware is connected to the internet."

Melissa Carone said the Dominion CEO also lied by saying that election workers had ballots locked in steel boxes. In reality, she said, they had access to the ballots and even ran them through machines several times.

Additionally, Carone added Poulos falsely denied ballot dumps at Detroit's TCF Center. She noted there is documented evidence of the ballot dumps.

"These pictures are crazy," Carone said. "They are from outside the Department of Elections on the third and the fourth and there are Penske moving trucks. The back of them are open."

She noted that trucks belonging to the city of Detroit were allegedly parked behind the moving trucks to guard them.

10. *Dominion Falsely Claims QR Codes Protect Against Fraud* (Dec. 16, 2020)

https://www.oann.com/dominion-falsely-claims-qr-codes-protect-against-fraud/

Dominion Falsely Claims QR Codes Protect Against Fraud

Dominion executives are being called out for making false claims about the company as lawmakers increase calls to it's officials to answer for election irregularities

**Video**

Speaker 1 (00:00):

Dominion executives are being called out for making false claims about the company. As lawmakers increased calls to its officials to answer for election irregularities, here's One America's Chanel Rion.

Chanel Rion (00:13):

Dominion Voting Systems has a lot to answer for, with the latest forensics audit in Michigan finding a whopping 68% error rate in the machines. Lawmakers are growing frustrated that Dominion executives continue to stonewall baffling issues found in the use of their system. Jovan Hutton Pulitzer inventor, and holder of hundreds of patents tells One American News eventually lawmakers with an opportunity to ask Dominion executives questions need to be aware of their trickster tech speak. Namely QR codes have been a common defense as to the security of these votes. Wrong says Pulitzer.

Jovan Hutton Pulitzer (00:49):

I had Dominion executives under oath asking them questions. First, we'd get a few little admissions. Obviously, can the machines be changed? And they'll say it can't. Then they always use this QR code excuse. Now remember there are several different codes on it, but one of them is QR codes and they tell you that can't be hacked. Yeah, that's unique. And that's how we do it. Well, the reality is that particular use of the Q code technology is actually dynamic. And that's not what they're telling you. So, let me give you an example. If you could take that code and scan it, don't let it go anywhere. But you look underneath that the geeky gobbledy goop, right? You see a bunch of numbers and it would make no sense to you, but in the technical world, it's basically saying, hey, this is what machine I came from and system I use. So, when they tell you that that code is unique, it's actually a little bit of geek smoke and mirrors. And it means yes, of you were to look for that exact vote with that exact code, yeah. It'd show up one time. And you say, well, the vote wasn't duplicated well in reality is you can take that same ballot. You can copy it in a scanner and feed it back into the machines and get another vote.

Chanel Rion (02:02):

Pulitzer's own background is diverse. But in particular, he is known as the father of scan commerce. Technology that eventually evolved into QR codes use today. Pulitzer says, lawmakers beware. The QR code excuse needs to be expanded upon when they do face Dominion executives.

Jovan Hutton Pulitzer (02:19):

Lawmakers and I would have Dominion executives and other voting system executives. As a matter of fact, actually met this, say, tell me what, let's just take the code that was printed on that one ballot. It's supposed to be unique, right? And let's just say, we really don't care about who you voted for, how many little footballs you filled in. We care about the rest of the data. Let's just look for that machine and the rest of the code compared to the internal clock of the computer and every machine. Because remember if your date time stamp's off and the clock's off that machine doesn't work. Every device in the world works like this. And so, when you start seeing that code minus the stuff that makes it even further unique, then you begin to see the codes duplicate themselves. And so, there are physical ways to tell that balance had been manipulated and there are computer ways.

Chanel Rion (03:10):

The big problem now is access to physical machines and ballots. This says Pulitzer is not actually a problem. There are other technical and physical ways to audit the ballot.

Jovan Hutton Pulitzer (03:20):

Let's say they torched them in a massive bonfire somewhere, and they won't allow us access to the machines. There are four other audit trails to prove was the system batch loaded with fraudulent ballots. And that's what we should be explaining to judges. And just try to look at it audit because, hey, let's face it with the numbers this tight and this close. If all of a sudden there's one state that mailed millions of ballots, uh, and they said 97% of them came back in his mail-in ballots. However, when you audit the exterior sources, the exterior sources say, well, it was really just a little over 60% came back. Well, when you have like a 30 plus percent discrepancy, don't you think that has to be answered?

Chanel Rion (04:06):

An audit of dominion machines was conducted via server in Michigan. The findings were released by the judge there Monday concluding that the 68% error rate does not meet FEC standards. Chanel Rion One American News, The White House.

11. **Dominion-izing' the Vote with Chanel Rion (Nov. 21, 2020, *rebroadcast on* December 19, 2020)**

   https://www.youtube.com/watch?v=746HTjhFifA

Chanel Rion (00:07):

In this edition of one American News investigates, We look at Dominion Voting Systems and its role in the 2020 presidential elections, glitches errors, money trails to powerful Democrats. Dominion is just one of three major companies providing voting systems to America. But Dominion captured headlines when it was discovered it had glitched 6,000 votes giving Biden a fraudulent win. This was not an isolated event

Chanel Rion (00:50):

In 2016, Antrim County, Michigan, affirmed its Republican loyalties by voting Trump 62% beating Clinton by 4,000 votes. Fast forward four years, and Antrim County was shocked to find itself voting Joe Biden over Trump by 3,000 votes, a complete flip from the last presidential election. Something was very wrong. When the County said to work with a manual recount, they discovered a ghastly error, 6,000 Trump votes were accidentally tallied for Biden. RNC, chairwoman, Ronna McDaniel held a press conference, noting a litany of irregularities in Michigan. But when it came to Antrim County, the irregularity was potentially much bigger in scale.

Ronna McDaniel (01:37):

When inquired with the floor, they were told it was a software issue and it was corrected. But now we know that 47 counties use that same software.

Chanel Rion (01:48):

It was certainly odd. Republicans wanted an investigation to ensure no more such mistakes happened elsewhere. However, Michigan's Democrat Secretary of State was quick to pronounce such concerns as ridiculous, immediately denouncing any suspicion of technical foul play. "The software did not cause a misallocation of votes. It was a result of user human error." See no need to investigate after all it's 2020 and software errors are impossible, right?

Video Clip Plays (02:21):

I'm here to tell you that the electronic voting machines, Americans got to solve the problem of voting integrity. They turned out to be an awful idea. One vote for McCain that's because people like me can hack them all too easily.

Chanel Rion (02:38):

That was some professor out of Michigan, back in 2018 in the New York Times. Ignore that. The system, Michigan Democrats don't want Republicans to investigate the system. Part of what DHS proclaimed quote, "the most secure in American history." Meet Dominion Voting Systems. A Canadian firm. Dominion is one of three companies providing 90% of America's voting systems. Dominion serves 28

U.S states, including battlegrounds like Pennsylvania, Michigan, Arizona, all of Georgia, and Nevada. Incidentally, Michigan was not the only battleground state to experience problems with Dominion. Georgia went all-in with Dominion buying 30,000 machines installed across the state just nine months before the general election Georgia Secretary of State boasted of his state's partnership with Dominion to install all these new machines.

Video Clip (03:33):

Dominion and the Secretary of State's office worked very closely together on making sure we had the staff here to get these things put through.

Chanel Rion (03:40):

A few months later in Georgia's June primaries, Dominion proved to have a few hiccups. Don't take it from us. Here's PBS:

Video Clip (03:47):

Yes, the poll pads took as long as 30 hours to download the voter database, displayed the wrong races and would randomly shut down and the power-hungry ballot marking devices, blew circuit breakers in numerous locations, poll workers, many of whom had no hands-on training because of the pandemic were often befuddled by the new technology.

Chanel Rion (04:11):

Indeed, even by the general election, five months later, Georgia was still in trouble.

Video Clip (04:17):

I have not certified the elections, including two of the most populous in the state between technical issues--

Video Clip (04:23):

Let's begin with Lysa Lucas, she's live at Gwinnett County's elections office in Lawrenceville, where thousands of votes are in limbo because of a software issue.

Video Clip (04:33):

There is an issue in Gwinnett County. As officials have told us that 60,000 Gwinnett County ballots are in limbo after a software issue. And this is according to the communications director of Gwinnett County.

Chanel Rion (04:46):

While all of this plays out before our eyes, Republicans demand investigations, but government officials demand we look away. There has not been any evidence of

17

anything that would undermine the validity of this election and it's time to move forward. Meanwhile, the Trump legal team under former New York Mayor and prosecutor, Rudy Giuliani disagreed. Antrim County put Dominion systems front and center. Now we must dig deeper.

Rudy Giuliani (05:12):

Now we've got to look at how often did it break down in other parts of the state. And when you look back on the history of Dominion, which is a Canadian firm, it's made mistakes in the Canadian election similar to that.

Chanel Rion (05:24):

The Trump legal team's Dominion wing is led by general Michael Flynn's attorney, Sidney Powell, who has long warned Americans, the dangers of our election systems relying on foreign software. Mind you, no one is claiming that Dominion is solely responsible for the fiasco and the vote irregularities that defined the 2020 general election. But when we return, prepare to be stunned when you find out just how easy it is to manipulate votes through Dominion, why one major state deemed Dominion dangerously easy to hack and how one hacker read the user guide flagging stunning questions for the feds. We'll be right back.

Chanel Rion (08:01):

No voting system is perfect. Here are the heads of the top three voting systems telling Congress as much.

Video Clip: (08:06) Is there any method of voting. That's a hundred percent secure.

No, no,

Chanel Rion (08:12):

No. They go on to say their voting systems are mostly safe, but here's a Senate letter from December 2019 slamming these three companies. Election security experts have noted for years that our nation's election systems and infrastructure are under serious threat. The Senate letter then highlights how the top three voting systems ES&S, Heart Intercivic and Dominion Voting Systems, quote have long skimped on security in favor of convenience, leaving voting systems across the country, prone to security problems. The lawmakers who wrote this letter, none other than senators, Elizabeth Warren, Amy Klobuchar, Ron Wyden and Congressman Mark Pocan, all Democrats. One year later. Now that America is asking whether Dominion to tampered with our votes and Joe Biden's favor, where are these Democrats now?  In the last two years, Dominion aggressively marketed itself to every State in the union. And while Georgia went all in and lived to regret it, one state gave it a Texas sized thumbs down.   Upon testing Dominion machines and its accompanying systems, the state of Texas concluded Dominion was to quote, fragile and error-prone and could not be trusted for safe and secure elections.

So, what makes the machines fragile and error prone? Ron Watkins, a large systems data analyst tells One American News. After over a week, pouring over Dominion user guides. He was stunned by how easily ballots could be accessed by one person with access to one machine.

Ron Watkins (09:49):

With the Dominion system, you need to be most concerned about activist IT people. The operator's system, in my opinion, have way too much power to control the internal features and settings of the system.

Chanel Rion (10:05):

Just reading the dominion manual, Watkins says he understands the system enough to devise an alarming number of ways to alter vote counts across an entire precinct using Dominion.

Ron Watkins (10:17):

I was looking at this manual with the mindset of a penetration tester. An administrator would have the ability to delete ballots, reset counts, delete entire batches, *etc*. There's a lot of things that they can do.

Chanel Rion (10:29):

Watkins notes while there are legitimate reasons for such controls. There's no mention as to whether there's way to track or hold users accountable for deleting or altering ballots.

Ron Watkins (10:40):

Dominion will train between two to six workers per county, who are appointed by the county to undergo election systems training. These two to six workers are trusted to not tamper with the final tabulation accounts while transferring data between the ICC, which is the image cast central tabulation software, and the county. So, this transfer process is literally just dragging some folders on a Windows computer onto a flash drive, then physically handling, handing the flash drive to the county. What I want to know is during this handoff, are these people being watched by auditors or to make sure this flash drive isn't switched off for something else? Or are these folders being dragged correctly onto the flash drive? Has the data been altered before or after it's been handed off?

Chanel Rion (11:20):

This is where the security problem magnifies.

Ron Watkins (11:23):

Do you trust the worker who logs into the tabulation machine to drag the correct votes onto the flash drive? Are they dragging all the votes? Theoretically you could solve swap the flash drive for a different flash drive. There's a no accountability there. And then once the county commissioner or whoever accepts that flash drive gets the flash drive, do you trust them to not go in and edit the contents before they report it.

Chanel Rion (11:47):

As Georgia underwent its recount two weeks after election day flash drives were found with uncounted ballots on them. Over 2,700 votes had been forgotten in the initial count. 1,500 of those votes were for Donald Trump, 1,100 for Biden.

Ron Watkins (12:03):

So another issue is the keys. The keys to the machine are digital devices. Uh, they it's unclear what the device is. It might be like an RFID device or USB or, or something, but it is clear that it's a digital device that holds some kind of cryptographic key on it. If you lose this physical key to the machine, then you lose absolute security of the entire precinct. Say Philadelphia was storing these keys in a warehouse and the--they were robbed. And the only thing stolen were these keys and a laptop. Then you should consider their entire election to be illegitimate because they have lost the physical security of the system.

Chanel Rion (12:48):

That's just what happened in Philadelphia. One month before election day.

Video Clip (12:53):

Philadelphia police are investigating after somebody broke into an election machine warehouse and stole a laptop and a USB drive that that happened last night at the warehouse on the 3500 block of Scott's lane and East Falls.

Chanel Rion (13:07):

Officials were quick to declare this theft had nothing to do with the election and was not malicious at all. An odd declaration. You don't catch the criminal, but you decide, you know their motive. Interesting judicial logic, Philadelphia. Meanwhile, local reporter posted this video on social media where he seen walking around that same warehouse without being noticed.

Ron Watkins (13:29):

Whoever stole those keys in Philadelphia has admin access. Do you trust a random thief who has administrative access to the voting machine? They could have, theoretically, you'd been able to make as many keys as they want for Philadelphia.

Chanel Rion (13:41):

On election night. Donald Trump led Joe Biden by 800,000 votes, major precincts reporting. In the dead of night that lead disappeared Biden overtook Trump and took the whole state of Pennsylvania by 60,000 votes. That 60,000-vote bump came from the very Philadelphia County in which the drive and laptop had been stolen. Watkins' list of concerns about Dominion's vulnerabilities went on. Watkins found it strange that algorithms for ballots with just one candidate on it called an undervote were so complicated. And it is unclear what happens to these ballots.

Ron Watkins (14:18):

The computer may or may not throw out your vote.

Chanel Rion (14:21):

Another concern right after the 2018 midterms, Pennsylvania made a custom request. They requested Dominion change the system to read a straight Republican or straight Democrat ballot. But oddly read an individual candidate separately from the rest of the straight ticket choices below.

Ron Watkins (14:40):

I looked at the font they're using and it's uh, it's part of the arial family of fonts, a-r-i-a-l, which is a sans serif-font. And with this font family, a capital I and a lowercase L are nearly indistinguishable on a piece of paper. The person who designs the ballot and the race could theoretically put a Donald Trump in the Repub-I-can party not the Republican party. And that would be a capital I instead of the L. And then everybody else on the Republican party would just be in the normal Republican party. In that situation, if you vote just straight party for the Republicans, then Trump would not get a vote. And there are a lot of, I've been hearing a lot of issues of, uh, Trump performing poorly in heavily Republican, uh, areas.

Chanel Rion (15:35):

Next Watkins says, the machines are not supposed to connect to the internet, but there don't seem to be physical safeguards against connecting to internet through the store-bought laptop.

Ron Watkins (15:45):

If these computers, if even one of these computers was connected to the internet, like if one election worker said, oh, I'm going to look at TikToK videos for the next hour for my break. Then the entire precinct is compromised.

Chanel Rion (15:58):

But even these concerns were minor compared to what Watkins shared with us next. Dominion's algorithm for handling an anomaly, that is a stray mark or bleed through from my Sharpie pen.

Ron Watkins (16:10):

So this is, this is the big one that I'm most concerned about. If the scanning system detects any anomaly on your ballot, then you are not counted.

Chanel Rion (16:20):

What Watkins reveals next explains one of the strangest mysteries of the 2020 election. We'll be right back.

Chanel Rion  (18:42):

Ron Watkins' analysis of Dominion Voting Systems is through a singular lens, that of an infiltration hacker. Through that lens, the machines are disastrously vulnerable, but as a systems analyst, the biggest red flag about Dominion was its algorithm where ballots with anomalies bleed throughs or stray marks are set aside and not counted.

Ron Watkins (19:04):

What happens when your vote is not counted due to an anomaly, then a scan of your ballot gets saved into a folder on the ICC, the ImageCast Central tabulation system. This allows for those two to six people who were trained by Dominion to go through the folder of anomalies in either deletes or verifying each of the ballots inside the folder. I believe it's called vote adjudication. These workers can theoretically see which candidates have been marked as votes on these anomalous ballots before they are verified and officially cast. So it's possible they could, in theory, handpick a certain party's votes to be verified while throwing out all the others.

Chanel Rion (19:41):

But it's the next point that stuns Watkins most.

Ron Watkins (19:44):

Biggest issue here is that the system for detecting anomalies can be set up by altering gamma settings on the scanner so that every ballot has an anomaly. This, in effect, by altering gamma settings on the scanner so that every ballot has an anomaly. This in effect allows those two to six trained people to go through and hand check every single ballot before they're verified and cast into the tabulation system as an actual vote. That last point explains to me how certain candidates can get 130,000 votes at once with zero votes going to the other candidate. It explains to me how or why vote workers in places like Arizona might have given Sharpies to certain voters because they might have wanted that specific vote to be caught by the anomalies system and, uh, hand verified at a later time.

Chanel Rion (20:40):

Watkins' says, this is a task for the feds.

Ron Watkins (20:43):

My recommendation is for data forensics teams, federal data forensics teams, to seize or subpoena the ICC ImageCast Central vote tabulation machines. Which are just Windows 10 off-the-shelf machines. Go through and see how many votes hit or how many votes arrived into the, the folder, which is specifically set up for anomalies. This one bug has to affect an entire election, and it's not even a bug. This is a feature.

Chanel Rion (21:12):

One that would allow enormous batches by the hundreds of thousands to be decided on by a few unmonitored workers.

Ron Watkins (21:19):

Your vote doesn't matter in these districts with the Dominion machines in them, because these two to six people trained by Dominion have ultimate control. It doesn't take a genius to realize that setting the gamma levels incorrectly makes all the battle become anomalies, which you can then go through later and adjudicate. If I was Trump, I would investigate those two to six people per county first.

Chanel Rion (21:43):

Watkins is of the opinion, any competent hacker, thief, or paid-off poll worker could gain the Dominion system and alter hundreds of thousands of votes. But a bigger question lurks: to what extent was this actually designed by the top on purpose? In September 2020, FEC United founder, Joe Oltmann, had infiltrated Antifa to uncover journalists who are active members of the Antifa group attacking his company in Colorado. Joe, you infiltrated an Antifa conference call this past

September and accidentally came upon a top Dominion Voting Systems executive named Eric Coomer describe that call and what it led you to find.

Joe Oltmann (22:25):

How the call started. If, somebody says who's Eric? He says, Eric's Dominion guy. Someone actually said: Hey, go ahead and tell them to continue speaking. Um, and someone interrupts and says, uh, what are we going to do if f-ing Trump wins? And Eric responds, and I'm paraphrasing this, by the way, um, don't worry about the election. Trump is not going to win. I made effing sure of that. And then I started laughing and somebody says effing right. And so, I just put it a simple Google search to start, which was Eric, Dominion, uh, Denver, Colorado, and Eric Coomer came up immediately under Dominion Voting Systems

Chanel Rion (23:01):

Turns out Eric Coomer held a top position at Dominion. With a PhD in nuclear physics, Coomer joined Dominion as Vice President of engineering and holds several patents with Dominion. Ensuring users can adjudicate ballots from the machines. The very function Ron Watkins pointed out as a huge red flag. After the election, Oltmann was sent an article highlighting Eric Coomer from Dominion. Oltmann started looking into Eric again, Eric was the Director of Strategy and Security at Dominion and a shareholder in the company.

Joe Oltmann (23:37):

When I got into his Facebook page, that's when things really started to kind of come together for me that you know, that Eric Coomer was this, you know, that he was not just Antifa. He was, um, he was responsible for putting his finger on the, the, uh, scales of our election.

Chanel Rion (23:54):

And Dominion seemed to be a friendly place for such anti-Trump sentiment. Coomer goes on to travel to battleground States, all of 2019.

Joe Oltmann (24:03):

Where they were building to coming into the 2020 election that he made sure it happened. He made sure that, um, that Dominion Voting Systems was in all the battleground States, uh, for the 2020 election. Yeah.

Chanel Rion (24:14):

Eric shared three folders of screenshots capturing the disturbing profile of Eric Coomer starting back in the 2016 election.

Joe Oltmann (24:22):

So this is a, um, rant. He, he says, rant. Facebook friend, land open call. If you're planning to vote for this autocratic. Narcissistic. fascist, uh, asshat blowhard, and his Christian jihadist VP pick, unfriend me now. No, I'm not joking. I'm not for reasoned political discourse and healthy debate. You could see how he started to just become unhinged. And so he actually talks about the fact that his work has the same mentality that he has towards being anti-Trump.

Chanel Rion (24:53):

Oltmann shared over 80 images of posts Coomer shared on his pages, the Antifa manifesto, songs like "Dead Prez," "Body Count," "Cop Killer," and "F- the USA."

Joe Oltmann (25:07):

He locked down everything. He scraped the internet of everything, having Eric Coomer on it. So they even went into lead candy. Dominion, took them off their website, removes them from the board position on their site. They've literally made Eric Coomer a ghost.

Chanel Rion (25:20):

As we were putting this investigation together, the public listings of employees for Dominion were fast and dwindling from public purview. But we also came upon a friend of Coomer, a woman named Penelope Chester-Starr. She works at Dominion too, as Communications Director, her resume reads Clinton Foundation and Vice President of the Bill and Hillary Clinton cash cow Teneo. Teneo booked Bill Clinton's speaking engagements. Chester-Starr also organizes anti-Trump rallies in Canada. These are just two Dominion employees of dozens more with clear anti-Trump allegiances. In Coomer's case, he was in a position of power to actually act upon his rage against Trump and Trump voters. What does he mean when he says, "Trump won't win? I made effing sure of that." Nothing? According to DHS's former Cybersecurity Director, Chris Krebs, this was our most secure election in history. Nothing to see here. Incidentally Krebs is now infamous most secure election in history memo was co-written with the endorsement of the election commission. Dominion is on that commission. Dare we dig deeper? We'll be right back.

Sidney Powell Clip (28:38):

There should never be another election conducted in this country. I don't care if it's for local dog catcher using a Dominion machine and Smartmatic software. We've got to have an American company that uses paper ballots that we can all verify. So every one of us can see that our vote is our vote.

Chanel Rion (28:59)

In the early 2000s, the election technology market had over 20 competitors. 20 years later, Dominion and two others dominate the voting technology market in America. This is a problem, especially if they're Antifa drenched engineers who are hell bent on deleting half of America's voice. If they're saying this in the open, what are they saying behind closed doors?  In 2014, Dominion partnered with the Clinton Foundation. Dominion admits this but assures all their partnership with the Clinton Foundation has nothing to do with how Dominion tabulates votes across America. Go ahead. Believe them.  Big media, big tech, and big government demand that you do. Meanwhile, citizens like Joe Oltmann, analysts like Ron Watkins, news outlets like OAN, and lawyers like Sidney Powell will keep asking the questions the FBI refuses to and the left demands you ignore.





THOMAS A. CLARE, P.C.                                                                MEGAN L. MEIER

December 22, 2020

*Via Email*

Robert Herring
Chief Executive Officer, OANN
Email: bobby@awetv.com

Charles Herring
President, OANN
Email: charles.herring@oann.com

Re:      *Notice of Obligation to Preserve Documents*

Dear Messrs. Herring:

We trust that you are well. We wrote to you on December 18, 2020, regarding false statements you have recently published regarding Dominion. In that letter, we instructed you to:

> [E]nsure that you preserve and retain all emails, text messages, audiovisual recordings, voice mails, drafts, notes, communications, documents, data, and electronically stored information of any kind that relates in any way to these matters.[1]

We write again to remove any doubt that litigation regarding these issues is imminent. With this letter you are once again on formal notice of your ongoing obligations to preserve documents related to Dominion's claims for defamation based on allegations that the company behaved improperly during the November 2020 presidential election and somehow rigged the election in favor of President-Elect Joe Biden. Consequently, you must ensure that you and your principals, agents, employees, and subcontractors under your supervision, as well as any sources of articles or segments upon which you relied in making any statement (whether in writing or verbally) about Dominion are preserving and retaining all emails, text messages (including all messages exchanged on any messaging platform such as WhatsApp), audiovisual recordings, voice mails, drafts, notes, communications, documents, data, and electronically stored information of any kind that relate in any way to these matters. Without any limitation, this requires you to preserve all drafts, redline edits, versions, comments, and any other modifications to articles or segments related to Dominion or the November 2020 presidential election; all research, due diligence, and any and all other work relating to every article or segment which you have published or featured related to Dominion or alleged voting impropriety; all research, due diligence, and any and all other work relating to every

---

[1] December 18, 2020 Ltr. at 11.

allegation you have made against Dominion (regardless of the format or forum in which such accusation was made).

In addition, you must preserve, without limitation, all communications with:

- Any member, volunteer, staff, or employee of the Trump campaign;

- Sidney Powell, Rudy Giuliani, Jenna Ellis, L. Lin Wood, and each of their associates and paralegals;

- Every reporter, editor, blogger, host, or other member of the media with whom you communicated about Dominion or the November 2020 presidential election; and

- Every individual who has compensated OAN or any of its principals, agents, employees, or any other related entity in any manner for making statements about, or producing media content related to, Dominion and/or the November 2020 presidential election.

The laws and rules prohibiting destruction of evidence apply to electronically stored information in the same manner that they apply to other evidence. Due to its format, electronic information is easily deleted, modified, or corrupted. Accordingly, you must take every reasonable step to preserve this information until this matter is resolved. This may include, but would not be limited to, an obligation to discontinue all data destruction and data backup recycling policies and procedures on any and all devices within your possession, custody, or control. Your document preservation obligations apply both to OAN individually, as well as to any entities OAN controls.

Confirm receipt of this letter and that you intend to adhere to our request to retain documents as set forth above. This is not a complete recitation of our client's rights and remedies, all of which are expressly reserved.

We look forward to your prompt response.

Regards,

Thomas. A. Clare, P.C.

Megan L. Meier





THOMAS A. CLARE, P.C.          C L A R E  L O C K E          MEGAN L. MEIER
                                      L  L  P

February 4, 2021

Via Email

Eric P. Early
Early Sullivan Wright Gizer & McRae LLP
eearly@earlysullivan.com

Re:    OAN's Knowingly False Coverage of Dominion

Dear Mr. Early:

We have now sent multiple retraction demands to One American News Network ("OAN") urging the company to correct the record and retract the Big Lie that Dominion rigged the November 2020 election. The fact that OAN quietly removed numerous broadcasts and online videos featuring its coverage of Dominion from its websites—even though it continues to publicly double-down on its debunked stories—demonstrates that OAN knew those claims are false.[1] Yet OAN is still producing new content perpetuating the Big Lie and the network continues to lend a global platform to facially unreliable sources simply because they are willing to falsely accuse Dominion of rigging the election.

For example, on January 27, 2021, OAN broadcast a segment featuring a purported "mathematician" named Edward Solomon to repeat the Big Lie.[2]



In that January 27 segment, Mr. Solomon falsely claimed that the November 2020 election results were "impossible" and that therefore "computer software must have used an algorithm to change the votes." He claimed that the results "can only have been done by an algorithm, it can't be done by humans" after he supposedly analyzed the results in Fulton County, Georgia—where

---

[1] See "OAN deletes articles about Dominion election conspiracy, Business Insider (Ja. 21, 2021), available at https://www.businessinsider.com/oan-deletes-articles-about-dominion-voting-election-conspiracy-2021-1.

[2] See "Mathematician:    Election Numbers Don't Add Up," OAN (Jan. 27, 2021), available at https://www.oann.com/mathematician-election-numbers-dont-add-up/.

Dominion machines were used to tabulate votes. He then claimed that the odds of those results occurring naturally were "1 over 10 to an exponent so large there's not enough stars in the universe, there aren't enough atoms in the universe, to explain the number."

For all the same reasons we detailed in our multiple letters to you and OAN, these claims are demonstrably false and have been wholly and repeatedly debunked. OAN already knows that—and that is precisely why it already scrubbed much of its post-election Dominion coverage from the internet. But OAN is now going out of its way to find unreliable sources to make false claims on air; including this so-called "mathematician." Far from being a "mathematician," Mr. Solomon is a convicted felon whose current job is setting up swing sets on Long Island.

Here's what we know about Mr. Solomon:

- He is an "Installer" at Creative Playthings (a swing set construction company) and a "Carpenter/Labor" at Racanelli Construction, Inc.;[3]

- He says he "attended" Stony Brook University, but notably does not represent that he has obtained any degrees from Stony Brook or any other university;[4]

- He claims to work at Stony Brook University, though he is not listed anywhere in Stony Brook's staff and faculty directory;[5] and

- In November 2016, he pled guilty to a felony charge of "criminal sale of a controlled substance" and—according to records from New York's Department of Corrections—Solomon served seven months and five days in jail for his crime.[6]

| Identifying and Location Information | |
| :--- | :--- |
| As of 02/04/21 | |
| DIN (Department Identification Number) | 16R3204 |
| Inmate Name | SOLOMON, EDWARD K |
| Sex | MALE |
| Date of Birth | 03/07/1990 |
| Race / Ethnicity | WHITE |
| Custody Status | RELEASED |
| Housing / Releasing Facility | MORIAH |
| Date Received (Original) | 12/08/2016 |
| Date Received (Current) | 12/08/2016 |
| Admission Type | |
| County of Commitment | SUFFOLK |
| Latest Release Date / Type (Released Inmates Only) | 07/13/17 PAROLE - COND REL TO PAROLE |

Based on these facts, it is clear that OAN knew Mr. Solomon is not a mathematician—and in fact is an ex-con with apparently no college degree who works in construction—or it purposefully

---

[3] Mr. Solomon's personal Facebook page contains details about his work and education, available at, https://www.facebook.com/solomonscourge/about_work_and_education.

[4] See Mr. Solomon's LinkedIn is available here: https://www.linkedin.com/in/edward-solomon-965842145/.

[5] Compare Mr. Solomon's personal Facebook page, https://www.facebook.com/solomonscourge/about_work_and_education with Stony Brook's Directory, https://www.stonybrook.edu/search/people/.

[6] See People v. Solomon, 162 A.D.3d 912, 912, 80 N.Y.S.3d 81, 82 (2018).

avoided the truth and elected not to look into his credentials at all. Either way, OAN acted with actual malice in putting Mr. Solomon on the air and broadcasting his debunked claims that Dominion rigged the November 2020 election. But OAN took it one step further. In this segment, OAN did not just put a random conspiracy theorist with no relevant expertise or knowledge about what he was talking about on the air; it outright endorsed and repeated **as its own** those knowingly false claims that Dominion had rigged the election. OAN reporter Christina Bibb concluded the segment by stating:

> The numbers produced by this election result can't happen naturally and humans trying to replicate the results would not be able to produce them this perfectly. This evidence requires election officials to take a closer look and audit their results with real forensic experts.

Ms. Bibb's statement is an outright endorsement and repetition by OAN of Mr. Solomon's false claims that the election results were impossible and an algorithm in Dominion's machines must have been used to rig the election. Indeed, she called Mr. Solomon's rant "evidence." Thus, the false statements about Dominion in this segment are attributable to OAN and it is liable for them.

OAN's angle here is obvious. Having received specific notice that Dominion did not rig the 2020 election—and that the election results tabulated on Dominion machines have been proven accurate—and after removing much of its content that aired those very same false claims, OAN is determined to find a new wave of con artists to peddle the Big Lie, qualifications be damned.

That game stops now. OAN must immediately retract and remove the January 27, 2021 segment featuring ex-convict Edward Solomon from all platforms it controls and issue an immediate on-air and written apology to Dominion with the same prominence as the original broadcast.

We also understand that OAN plans to air Mike Lindell's "documentary" that will falsely claim Dominion rigged the election—we have enclosed our letter to Mr. Lindell for your reference. With this letter, OAN is on notice that, should it broadcast Mr. Lindell's "documentary," it will be airing knowingly defamatory falsehoods about Dominion.

OAN cannot fix the catastrophic damage it has already caused Dominion and to our democratic institutions—that ship has sailed. But it can still limit its exposure by taking the action noted above.

We await your prompt response.

Regards,

Thomas. A. Clare, P.C.

Megan L. Meier

Enclosure

3





THOMAS A. CLARE, P.C.                                                                                    MEGAN L. MEIER

February 4, 2021

*Via Email & Federal Express*

Mike Lindell
Founder and CEO
My Pillow, Inc.
343 E 82nd Str #102
Chaska, MN 55318
mlindell@mypillow.com

Re:      **False Claims About Dominion**

Mr. Lindell:

For months, you have been lying about Dominion in order to financially enrich yourself and My Pillow, Inc. by selling more MyPillow products to Trump supporters who tuned in or attended rallies because they wanted to hear that the election had been stolen and that Trump would have another term in office.[1]  In support of your defamatory marketing campaign—which we understand has boosted your sales considerably—you have repeatedly claimed to have "evidence" and "100% proof" of your false claims.  But you have never produced any real evidence because it doesn't exist.

Recently, you announced your intention to release a "documentary" with the "evidence" of your false claims about Dominion.  We write to put you on formal written notice of the facts so that there is absolutely no doubt at a future date about what was known to you before you published that documentary.  As set forth in Dominion's complaint and exhibits against Sidney Powell (which we sent you on January 8) and Dominion's complaint and exhibits against Rudy Giuliani (which we have attached),[2] purported "evidence" that has previously been put forward in support of false claims about Dominion was manufactured, misrepresented, and cherry picked by unreliable sources.  These people lack any relevant expertise about voting machines and election security, and they are determined to promote a false preconceived narrative about the 2020 election.  In light of this, you are well aware that there are countless people willing to put forward fake "evidence" of fraud in the 2020 election and that any "evidence" must therefore be carefully scrutinized for reliability ***before*** you choose to broadcast it to a global internet audience.

---

[1] "Dominion" refers to US Dominion Inc. and its subsidiaries, Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation.
[2] A copy of the Giuliani Complaint is available here: https://www.washingtonpost.com/context/dominion-voting-systems-defamation-lawsuit-against-lawyer-rudy-giuliani/91600fbd-9526-46ef-b951-b6f9b89950fc/.

I.      **Despite Knowing Your Claims About Dominion Are False, You Doubled Down on Your Smear Campaign and Promoted Fabricated Evidence to Support Your Accusations.**

Independent audits, hand recounts of paper ballots, bipartisan governmental officials, Trump's Department of Justice, local election officials, election security experts, and high-profile Trump loyalists have repeatedly, forcefully, and publicly disproven and rebutted the false claim that Dominion machines were hacked or that Dominion flipped, weighted, or otherwise manipulated vote counts to steal the 2020 election.

Purposefully disregarding the paper ballot recounts and knowledgeable sources, you have continued to falsely accuse Dominion on the basis of facially unreliable sources and nonsense from the dark corners of the internet. For instance, you tweeted disinformation from a blog known for promoting conspiracy theories, writing: "Here are the pages of the machine voter fraud evidence that came out last week and the media including Twitter has tried to bury it! This is an attack on our country."[3] Your tweet included a document with the headline "EXCLUSIVE: Proof China, Russia Hacked 2020 Election: IP Addresses in China, Russia, Hong Kong, Germany, Canada, Czech Republic Hacked PA, NV, MI, GA Battleground States Raw Data Analytics Show."[4] This January 11 story from *The American Report* purports to list "[r]aw data analytics *exclusively* obtained by *The American Report* show[ing] that during the 2020 presidential election" random IP addresses across the globe hacked into IP addresses in four key battleground states.



---

[3] Mike Lindell (@MikeLindell), Twitter (Jan. 15, 2021), available at https://twitter.com/realMikeLindell/status/13502 97812668477441.

[4] Mary Fanning and Alan Jones, *EXCLUSIVE: Proof China, Russia Hacked 2020 Election: IP Addresses in China, Russia, Hong Kong, Germany, Canada, Czech Republic Hacked PA, NV, MI, GA Battleground States Raw Data Analytics Show*, The American Report (Jan. 11, 2021), available at, https://theamericanreport.org/2021/01/11/exclusive-proof-china-russia-hacked-2020-election-ip-addresses-in-china-russia-hong-kong-germany-canada-czech-republic-hacked-pa-nv-mi-ga-battlegro und-states-raw-data-analytics-show/.

But the story you posted doesn't contain any details about how the supposed hacking took place. The story also does not say that votes were "flipped." The story does mention Alibaba founder Jack Ma before discussing the "Soviet military intelligence service," and also naming "Amazon Data Services" without explaining why. And while the story falsely states that "Dominion Voting Services is based in Toronto,"—it is based in Denver, Colorado—it does not contain any reference to machine voter fraud.

Near the end of the story, the purported "raw data analytics" appear in a pixelated pdf of a spreadsheet embedded to the page as a shareable Pinterest pin. The pdf contains fields purporting to show IP addresses of election hackers and their targets, locations of allegedly compromised machines, the time each hack allegedly took place, and the number of votes that were allegedly stolen from Donald Trump.

Notably, while the native spreadsheet itself would contain metadata revealing highly relevant information about its creation (when the spreadsheet was created, *etc.*) the spreadsheet was converted into a pdf, concealing data about its creation. Nor does the story itself reveal any information about who created the spreadsheet—the implication is that it's from an expert in voting machines or election security, but it could have been created by a Trump supporter with no experience in voting machines or election security, or a hostile foreign actor looking to undermine confidence in the American election—or their expertise or motives for doing so. This alone is a giant red flag signaling that the spreadsheet is not reliable and that its creator wanted to conceal its origins.

Further adding to the implausibility of the story, *The American Report's* theory appears to be that votes were tampered with at transfer points of the state election computer system and external third-party data election result vaults. But this theory is nonsensical. ***First,*** votes are first captured at the local level, and then precincts report their votes to the state. If hacking had taken place at the state level, it would have been detected because those numbers are verified by the local results and documented on paper ballots. ***Second,*** every ballot tabulator is required by law to produce a paper printout summarizing the vote totals for the ballots it counted. So if fraud had affected the reporting process, it would have been detected by reviewing the paper printouts from the tabulators.

Turning back to the "raw data analytics" you tweeted, even they do not support your claims. The pdf identifies a total of 56,395 votes that were supposedly stolen from Donald Trump. Even if the pdf were accurate—it isn't—the number of votes at issue would not have changed the outcome of the election. Other obvious problems in the pdf include:

- The "deleted votes" would not have changed the winner of the election. Even assuming the pdf were correct, the electoral votes in favor of Trump would total 248, which is 22 votes short of the 270 required for victory.

- Of the 13 purported "hacks," only one instance of supposed vote switching would have changed the candidate who received the most votes in any given county. That locality is Leelanau County, Michigan, where 8,795 votes were cast in favor of Biden, and 7,916 were cast for Trump.

- Almost 20% of the counties listed in the pdf did not even use Dominion machines in the 2020 election.

- It alleges that 1,108 votes were stolen from Trump in Luce County, Michigan, and switched to Biden. In reality, Trump received the majority of votes in this county, and Biden's vote total was only 556 – approximately half the number of votes that were supposedly switched to him.

- Trump received the majority of votes in four of the counties where the pdf purports to show votes being stolen: Churchill County, Nevada; Douglas County, Nevada; Luce County, Michigan; and Coweta County, Georgia.

- One of the "targets" that supposedly owned the relevant machines was the "Secretary of state offices." As a preliminary matter, voting machines are in local voting precincts and not the state official. Moreover, this target is the only one without an IP address listed – a series of asterisks is present in the IP address field.

## II. Proven Liars, Conspiracy Theorists, and Non-Experts Are Not Reliable Sources of Information.

Despite constantly stating that you have "done [your] due diligence," and "seen the evidence" yourself, the only evidence you have ever delivered is the nonsensical and facially unreliable *American Report*.[5] Indeed, after an interview with NBC News, when asked if you could produce **any** evidence, you replied: "All the evidence against Dominion is before the Supreme Court . . . Here is one page of the proof."[6] NBC reported that "[t]he email did not include an attachment. When asked if the omission was a mistake, you sent another email with an empty attachment and a third with screenshots of illegible text."[7]

Later you said that you "helped to organize some of the leading experts" to include in your "big documentary" about Dominion. Because there is no legitimate evidence, we understand that you are planning to amplify perjurers, con artists, non-experts, and other facially unreliable sources in support of your false and defamatory marketing campaign. And although you have not disclosed which experts you plan to feature in your glorified MyPillow infomercial, facts readily available to you demonstrate the obvious and facial unreliability of those who have propagated falsehoods about Dominion:

1. **Russell Ramsland.** Russell Ramsland is a "Deep State" conspiracy theorist in cahoots with Sidney Powell who was selected not because Ramsland has election security expertise, but because he was committed to promoting the false preconceived narrative that the election had been fixed. Ramsland has been peddling "rigged election" conspiracy theories for years. And he has publicly claimed, among other things, that

---

[5] *See e.g.,* Newsmax, *Mike Lindell to Newsmax TV: 'President Trump will Prevail'* (Dec. 17, 2020), available at, https://www.newsmax.com/newsmax-tv/mike-lindell-election-fraud-mypillow-ceo/2020/12/17/id/1002145/ ("I know what evidence is out there, plus I've done my own due diligence."); The Victory Channel, *FlashPoint: Stand Firm! Mike Lindell, Hank Kunneman and Mario Murillo* (Dec. 23, 2020), available at, https://www.youtube.com/watch?v=kPhpPLknmBw ("What I've seen and what I know ... I declare this, just go get the machines.").

[6] Elisha Fieldstadt, *My Pillow CEO Mike Lindell says products were dropped from major retailers after voter fraud claims,* NBC News (Jan. 19, 2021), available at, https://www.nbcnews.com/news/us-news/mypillow-ceo-mike-lindell-says-products-were-dropped-major-retailers-n1254676

[7] *Id.*

George Soros helped form the "Deep State" in Nazi Germany in the 1930s—along with President George H.W. Bush's father, the Muslim Brotherhood, and "leftists." [8] Mr. Soros was born in 1930.

Before he released his nonsense "forensics report," Ramsland had been publicly discredited for making false claims of overvoting in Michigan, which Ramsland based on vote counts from an entirely different state—Minnesota. [9] Indeed, a Delaware judge determined that Ramsland provided "materially false information" in support of his claims of vote manipulation [10] when he referenced and cited locations in Minnesota when alleging voter fraud in Michigan—something that is readily verifiable through a basic Google search. [11]

Ramsland's so-called "forensics report" of the Dominion machines in Antrim County, Michigan, contains a staggering number of inaccuracies; obvious misunderstandings of election procedures, hardware, and software; and other indicia of unreliability.  Even though Ramsland cites to "experts" upon whom he purportedly relied in creating his report, he does not identify a single one.  Nor does he identify any of their credentials or prior experience—other than the vaguest reference to a handful of government agencies—to justify their designation as "experts." [12] And Ramsland does not identify any experience that he, or any of his so-called "experts," have in elections or election hardware or software.  The rag-tag team of "experts" associated with Ramsland don't have any relevant experience analyzing voting machines or vote tabulations.  A Republican county clerk in Michigan complained about one of Ramsland's team members—who runs a brewery outside of Austin after working as an account manager at a pharmaceutical company—for failing to "understand how election results are updated on county websites." [13]

Additionally, Ramsland references the "allowable election error rate established by the Federal Election Commission."  The Federal Election Commission does not regulate voting machines or software.  It regulates campaign finance. [14]  Ramsland confused—or

---

[8] John Savage, *Texas Tea Partiers Are Freaking Out Over 'Deep State' Conspiracy Theories*, Vice (Sept. 20, 2018), available at, https://www.vice.com/en/article/mbwgxx/texas-tea-partiers-are-freaking-out-over-deep-state-conspiracy-theories .

[9] Clara Hendrickson, *Affidavit in Michigan lawsuit seeking to overturn election makes wildly inaccurate claims about vote*, PolitiFact (Dec. 4, 2020), available at, https://www.politifact.com/factchecks/2020/dec/04/russell-james-ramsland-jr/affidavit-michigan-lawsuit-seeking-overturn-electi/; *see also*, Louis Jacobson & Noah Y. Kim, *Giuliani cites affidavit with crucial errors in press conference*, PolitiFact (Nov. 20, 2020), available at, https://www.politifact.com/factchecks/2020/nov/20/rudy-giuliani/giuliani-cites-affidavit-crucial-errors-press-conf/.

[10] Rule to Show Cause, *Page v. Oath Inc.*, No. S20C-07-030 (Del. Super. Ct. Dec. 18, 2020).

[11] Hendrickson, n. 9.

[12] Pet. Notice of Suppl. Authority, *King v. Whitmer*, No. 20-815 (S. Ct. Dec. 13, 2020), available at, https://www.supremecourt.gov/DocketPDF/20/20-815/163875/20201215164905775_Final%20Michigan%20Notice%20of%20Supplemental%20Authority.pdf.

[13] Craig Mauger, *Why 8 claims from Rudy Giuliani's Michigan witnesses don't add up*, The Detroit News (Dec. 4, 2020), available at https://www.detroitnews.com/story/news/politics/2020/12/04/why-8-claims-rudy-giulianis-michigan-witnesses-dont-add-up/3824210001/.

[14] *Mission and history*, FEC, available at, https://www.fec.gov/about/mission-and-history/.

did not bother to research the differences between—the FEC and the EAC.[15] Dominion's election voting system suite is, of course, certified by the EAC.[16]

Apart from these red flags indicating he is no expert at all, Ramsland also illustrates a gross misunderstanding of the machines and software in the details of his report. For example, he claims that his "forensics team" "perform[ed a] forensic duplication of the Antrim County Election Management Server running Dominion Democracy Suite 5 5.3-002." But there is no Democracy Suite 5.5.3-002. Instead, 5.5.3-002 is the version of the ImageCast Precinct tabulator (*i.e.*, the actual scanner), not the election management server or software.[17] This demonstrates that Ramsland is incapable of telling the difference between the relevant hardware, software, and servers involved—or that he simply did not take care to do so. Ramsland also fails to understand the difference between—or he intentionally distorted—adjudication software (which is an optional component of Dominion's voting system suite) and the process of adjudicating a ballot. In fact, Antrim County only purchased (and therefore only used) certain components of Dominion's voting system suite; critically, Antrim County neither purchased nor used—nor possessed the hardware required to use—the adjudication software.[18] This did not prevent Ramsland from falsely claiming that "[b]allots sent to adjudication can be altered by administrators," and that "all adjudication log entries for the 2020 election cycle are missing" and must have been "manually removed."

And Ramsland's specific claim of a 68% "error rate" evidences a fundamental misunderstanding of election software. Ramsland claims to have used the tabulation logs as the source for his supposed "error rate." But the tabulation logs do not reflect the machine's tabulation of votes. They record activities logged by the machine during the tabulation process.[19] So Ramsland's claim that "these ... tabulation totals were used as the official results" is false (because they are a recording of machine activity, not votes). Simply put, Ramsland does not understand what he is seeing.

While Ramsland claims that a huge percentage of machine activity reflected in the tabulation logs were "errors" or "warnings," he gives no explanation of how he identified or defined an "error" or "warning." Ramsland references three settings—"reverse," "divert," and "override"—as examples of these so-called "critical errors" or "warnings." But these are not "errors." They are parameters used in the tabulator to handle ballots that—for example—include write-in candidates or ballots that contain votes for two candidates for the same office. Calling these "errors" is analogous to claiming that the low fuel indicator light turning on in a car is an "error"—it is of course

---

[15] *How the U.S. Election Assistance Commission Facilitates Fair and Secure Elections*, EAC, available at, https://www.eac.gov/news/2020/12/03/how-us-election-assistance-commission-facilitates-fair-and-secure-elections/.

[16] Certificate of Conformance, EAC (Sept. 14, 2018), available at, https://www.eac.gov/sites/default/files/voting_system/files/DSuite55_CertConf_Scope%28FINAL%29.pdf.

[17] Declaration of Ryan Macias, FactCheck.org, available at, https://cdn.factcheck.org/UploadedFiles/Rebuttal_ASOG-Antrim_Report.pdf.

[18] *Id.*

[19] *See* Paul Egan & Clara Hendrickson, *Trump tweet wrongly suggests there were defects with Michigan voting machines*, The Detroit Free Press (Dec. 15, 2020), available at, https://www.freep.com/story/news/politics/elections/2020/12/15/trump-fact-check-defect-voting-machines-michigan/3902951001/.

not an error; the car is operating precisely how it is supposed to. Similarly, just because the tabulator recorded, for example, "divert" does not mean that there was error with the ballot or the vote; precisely the opposite—it means that the machine operated properly in response to that ballot.[20] This is even more evidence that Ramsland does not understand—or that he did not take care to distinguish—the difference between an actual error and proper functioning.

Other people who are actually knowledgeable about election security and procedures in Antrim County promptly, publicly, and forcefully rebutted Ramsland's report. Antrim County officials determined—and publicly announced—that Ramsland's report was "riddled with false and unsupported claims, baseless attacks, and incorrect use of technical terms."[21] Similarly, the former acting director of the EAC's Voting System Testing and Certification program said that Ramsland's report showed a "grave misunderstanding" of Antrim County's voting system and "a lack of knowledge of election technology and process."[22] Michigan's Attorney General and Secretary of State issued a joint statement that Ramsland's report was "critically flawed, filled with dramatic conclusions without any evidence to support them."[23] The Republican county clerk who made the mistake that resulted in the inaccurate unofficial results stated that Ramsland's report contained "many misleading statements" and was "simply not accurate."[24]

2. **Patrick Byrne.** Byrne was previously the CEO of Overstock.com, but abruptly resigned his board seat and position as CEO after it was revealed that he had had a romantic affair with the now-notorious Russian agent, Maria Butina, who was sentenced to 18 months in prison after being indicted by federal prosecutors for trying to infiltrate powerful political circles in the United States at the direction of the Russian government.[25] In 2016, a judge issued a $1 million judgment against Byrne after he was sued for defamation.

3. **The affidavit—and repurposed affidavit—of Josh Merritt aka "Spyder."** Josh Merritt, a top-secret witness code-named "Spyder" by Sidney Powell, knowingly signed, under penalty of perjury, an admittedly "misleading" declaration (that he "was trying to

---

[20] Angelo Fichera, *Audit in Michigan County Refutes Dominion Conspiracy Theory*, FactCheck.org (Dec. 18, 2020), available at, https://www.factcheck.org/2020/12/audit-in-michigan-county-refutes-dominion-conspiracy-theory/.
[21] *See* Ali Swenson, *Report spreads debunked claims about Dominion machines in Michigan county*, Associated Press (Dec. 15, 2020), available at, https://apnews.com/article/fact-checking-afs:Content:9847904839.
[22] *See* Todd Spangler, *Former election security chief for Trump knocks down Antrim County report*, The Detroit Free Press (Dec. 16, 2020), available at, https://www.freep.com/story/news/politics/elections/2020/12/16/antrim-county-report-debunked-by-former-trump-election-official/3923499001/.
[23] *AG, SOS: Plaintiff's Report in Antrim County Election Lawsuit Demonstrates Lack of Credible Evidence in Widespread Fraud or Wrongdoing*, Michigan Dep't of Attorney General (Dec. 14, 2020), available at, https://www.michigan.gov/ag/0,4534,7-359-92297_47203-547422-,00.html.
[24] Craig Mauger, *Michigan election officials slam report on votes in Antrim County*, The Detroit News (Dec. 14, 2020), available at, https://www.detroitnews.com/story/news/politics/2020/12/14/michigan-judge-allows-release-report-antrim-county-voting/6537394002/.
[25] *See* Michael Corkery, *Overstock C.E.O. Takes Aim at 'Deep State' After Romance With Russian Agent*, N.Y. Times (Aug. 15, 2019), available at, https://www.nytimes.com/2019/08/15/business/overstock-paul-byrne-maria-butina-affair.html.

backtrack" on) claiming he was a "military intelligence expert" even though he has never worked in military intelligence.[26]

But since Merritt had been discredited, Powell has put his declaration forward as though it were written by someone else. Indeed, the only difference between the "new" declaration and Merritt's declaration is the information about the declarant's background; the rest of the declaration is substantively ***identical*** to Merritt's.[27]

4. **Terpsichore Maras-Lindemann.** Powell submitted Maras-Lindeman's affidavit in court filings as evidence without even bothering to speak to her, whether to assess her credibility or otherwise.[28] According to a publicly available court order, Terpsichore Maras-Lindeman is a serial liar and con artist.[29] After serving in the Navy for less than a year, Maras-Lindeman created a profile on an online veterans community called "Together We Served," and she falsely claimed to have had an extensive military career—including that she had reached the rank of lieutenant, served in the Office of Naval Intelligence and in combat zones in the Republic of Kosovo, Afghanistan, and Iraq, and was awarded multiple medals including a Purple Heart.[30] In a recent fraud case, attorneys for the state of North Dakota said that Maras-Lindeman falsely claimed to be a doctor. They also said she used multiple aliases and social security numbers and created exaggerated online resumes as part of what they called "a persistent effort … to deceive others."[31] They alleged that Maras-Lindeman organized a charitable event to raise funds for homeless shelters, a Catholic school, and a monument, but then used money she collected on purchases for herself at Wal-Mart, McDonald's, QVC, and elsewhere.[32] A judge ordered Maras-Lindeman to pay more than $25,000 after finding

---

[26] Emma Brown, Aaron C. Davis & Alice Crites, *Sidney Powell's secret 'military intelligence expert,' key to fraud claims in election lawsuits, never worked in military intelligence*, Wash. Post (Dec. 11, 2020), available at, https://www.washingtonpost.com/investigations/sidney-powell-spider-spyder-witness/2020/12/11/0cd567e6-3b2a-11eb-98c4-25dc9f4987e8_story.html

[27] *Compare* Complaint at Ex. 7, *Pearson v. Kemp*, No. 12-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-9], available at, https://defendingtherepublic.org/?page_id=986 *with* Defending the Republic, *Foreign Ties Affidavit*, (Dec. 16, 2020), av ailable at, https://defendingtherepublic.org/wp-content/uploads/2020/12/foreign_ties_affidavit.pdf.

[28] "Maras-Lindeman told The Post she had never spoken directly to Powell or anyone working on her legal team. She said she distributed the affidavit widely to like-minded people and was unaware it had come to Powell's attention until it appeared as an exhibit in one of her cases." Jon Swaine, *Powell's secret intelligence contractor witness is a pro-Trump podcaster*, Wash. Post (Dec. 24, 2020), available at, https://www.washingtonpost.com/investigations/sidney-powells-secret-intelligence-contractor-witness-is-a-pro-trump-podcaster/2020/12/24/d5a1ab9e-4403-11eb-a277-49a6d1f9dff1_story.html.

[29] Findings of Fact, Conclusions of Law, and Order for Judgment, *State v. Maras*, No. 51-2018-CV-01339 (Dist. Ct. N. Central Jud. Dist., N.D. Sept. 11, 2020), available at, https://attorneygeneral.nd.gov/sites/ag/files/documents/Recent Actions/2020-09-14-MagicCityChristmas-Judgment.pdf; *see also* Jon Swaine, *Powell's secret intelligence contractor witness is a pro-Trump podcaster*, Wash. Post (Dec. 24, 2020), available at, https://www.washingtonpost.com/investigations/sidney-powells-secret-intelligence-contractor-witness-is-a-pro-trump-podcaster/2020/12/24/d5a1ab9e-4403-11eb-a277-49a6d1f9dff1_story.html.

[30] LT Terpsichore Lindeman, Together We Served, (Mar. 5, 2020), available at https://web.archive.org/web/20200305152810/https%3A/navy.togetherweserved.com/usn/servlet/tws.webapp.WebApp?cmd=SBVTimeLine&type=Person&ID=506419.

[31] *State v. Maras*, No. 51-2018-CV-01339 (Dist. Ct. N. Central Jud. Dist., N.D. Jul. 2, 2018).

[32] *Id.*

8

that she violated consumer protection laws by misspending money she raised and soliciting donations while misrepresenting her experience and education.[33]

5. **Edward Solomon.** Edward Solomon paints himself as an expert "mathematician" whose statistical "analysis" determined that the results of the November 2020 election were "impossible," and that therefore "computer software must have used an algorithm to change the votes." He also concluded that the odds of the election results occurring naturally were "1 over 10 to an exponent so large there's not enough stars in the universe, there aren't enough atoms in the universe, to explain the number." Here's the problem: Solomon is not a "mathematician." Solomon is currently employed as an "Installer" at a swing set construction company. And he recently served six months in jail for selling drugs.

6. **Jovan Pulitzer.** Jovan Pulitzer is not the "QR code inventor" he purports to be, but a "failed treasure hunter" and "failed investor." [34] QR code was invented by Masahiro Hara in 1994, when he was an employee of the automotive components firm Denso Wave. As explained by Georgia's Republican Secretary of State Brad Raffensperger: "the treasure hunter provided no evidence" to support his claims. And Poll Pad creator KnowInk issued the following response to Pulitzer's tale about hacking their product: "The assertions made about unauthorized access to our systems are patently false. The man claiming that someone 'got into' our systems did not happen according to our forensic analysis. There was no 'hack,' there was no 'back door' entry, there was no 'pump and dump,' and there was no access through a 'thermostat' located hundreds of miles away in Savannah."[35]

7. **Dennis Montgomery.** Dennis Montgomery is a fraudster known for pulling off "one of the most elaborate and dangerous hoaxes in American history" after he tricked the federal government into paying millions of dollars for bogus terrorist-detection software.[36] In 2009 he was charged with obtaining money under false pretenses and theft after failing to repay Caesars Palace for nine checks totaling $1 million.[37] Setting that issue aside, Montgomery was "just another [] gambler in the casinos of Reno," but that all changed when he falsely claimed to have developed software to "decode secret messages" embedded in Osama bin Laden tapes broadcast on Al Jazeera.[38] Montgomery has been cited as the creator of the "powerful supercomputer system known as

---

[33] *Id.*

[34] Georgia Secretary of State, *FACT CHECK: GEORGIA SENATE MASQUERADES FAILED TREASURE HUNTER AS HACKER AND ELECTION SECURITY EXPERT,* (Dec. 2020), available at, https://sos.ga.gov/index.php/elections/fa ct_check_georgia_senate_masquerades_failed_treasure_hunter_as_hacker_and_election_security_expert.

[35] Knowing Admin, *Georgia Runoff Election Update,* (Dec. 31, 2020), available at, https://knowink.com/georgia-runoff-election-update/.

[36] Travis Daub, *How a Reno casino con man duped the CIA and pulled one of the 'most dangerous hoaxes' in American history,* PBS News (Oct. 14, 2014), available at https://www.pbs.org/newshour/nation/reno-casino-conman-pulled-greatest-hoax-american-history.

[37] Tiffany Gibson, *Court date set for man with $1 million gambling debt,* Las Vegas Sun (Oct. 9, 2009), available at, https://lasvegassun.com/news/2009/oct/09/man-who-prompted-gibbons-probe-appear-court-casino/.

[38] Thomas E. Ricks, *Shameful Side of the War on Terror,* New York Times (Oct. 12, 2014), available at, https://www.nytimes.com/2014/10/13/arts/in-pay-any-price-james-risen-examines-the-war-on-terror.html.

THE HAMMER" and related software called "SCORECARD that is capable of hacking into elections and stealing the vote."[39] When Montgomery was asked under oath whether his software was a "complete fraud," he answered, "I'm going to assert my right under the Fifth Amendment."[40] Authorities have described his "fantastic-sounding computer technology" as nothing more than a hoax after an intelligence commission concluded Montgomery's "technology was a fabrication."[41] Even Montgomery's co-workers told the FBI that he "repeatedly doctored test results at presentations for government offiials," and other co-workers "doubted Montgomery's software existed."[42] And witness interviews from U.S. Military investigations state "Montgomery's programming skills were not what he alleged," that "Montgomery was doing something other than what he was actually telling people he was doing," and that "Montgomery had not written significant software." Other witnesses said that "Montgomery was dishonest" and shared "suspicions that Montgomery was less technically competent than he led people to believe." A few years ago, Montgomery sued a journalist for accusing him of being a con man and for exposing some of his scams. But the court threw out the suit because Montgomery failed to prove that his software even existed, much less worked. In its dismissal order, the court explained, "This lawsuit . . . has been defined by the software's persistent absence."[43]

8. **Sidney Powell & Lin Wood**. The complaint we previously sent you explains in detail why Powell and Lin Wood are unreliable sources of information about Dominion. Without limitation, they misrepresented, manufactured, and cherry-picked evidence, and deliberately lied about having recordings and other proof that they never produced because it does not exist.

9. **Rudy Giuliani**. The enclosed complaint explains in detail why Rudy Giuliani is not a reliable source. In addition, the New York State Bar Association has described his claims as "baseless," and it admonished him for "commenc[ing] and prosecut[ing] [] court actions in multiple states without any evidentiary basis whatsoever."

But you don't have to take our word about the unreliable nature of these "experts." The United States District Court for the District of Arizona found this very same evidence impressive only for its volume and described the same conclusions you are promoting as "largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections," and include "expert reports" that "reach implausible conclusions, often because they are derived from wholly unreliable

---

[39] Mary Fanning and Alan Jones, *Biden Using SCORECARD and THE HAMMER to Steal Another U.S. Presidential Election–Just Like Obama and Biden Did in 2012*, The American Report (Oct. 31, 2020), available at https://theamericanreport.org/2020/10/31/biden-using-scorecard-and-the-hammer-to-steal-another-u-s-presidential-election-just-like-obama-and-biden-did-in-2012/?utm_source=ground.news&utm_medium=referral.

[40] Eric Lichtblau & James Risen, *Hiding Details of Dubious Deal, U.S. Invokes National Security*, N.Y. Times (Feb. 19, 2011), available at, https://www.nytimes.com/2011/02/20/us/politics/20data.html.

[41] Erich Lichtblau, *US regretting dubious deal with computer programmer Is now suspected of selling phony antiterror software*, New York Times (Feb. 20, 2011), available at, http://archive.boston.com/news/nation/articles/2011/02/20/us_regretting_dubious_deal_with_computer_programmer/.

[42] Eric Lichtblau & James Risen, *U.S. tech contractor seen as con man by some*, Statesman (Feb. 20, 2011), available at, https://www.statesman.com/article/20110220/NEWS/302209742.

[43] Op. at 2, *Montgomery v. Risen*, No. 16-7096 (D.C. Cir. 2017).

sources."[44]  The United States District Court for the Eastern District of Michigan reached the same conclusion after it reviewed affidavits submitted by many of the characters listed above.  That court described the submissions as "nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden."[45]

***

Given the chorus of pretenders who have proven their willingness to manufacture fake evidence and to lie about Dominion, you are well aware that there is serious reason to doubt the credibility of the "evidence" you are planning to broadcast in your "documentary."  If you were actually interested in the truth, you would tell us who you will be featuring in your "documentary" and give us a reasonable opportunity to review their purported "evidence" *before* you publish, so that we can point out the red flags and other obvious errors that have plagued all of the other purported "evidence" that has been put forward against Dominion.

We have no doubt that you will purposefully avoid this opportunity because you are not actually interested in the truth and—as you told CBS News—you want Dominion to sue you.[46]  After all, positioning yourself as Dominion's enemy and a victim of "cancel culture" has been very good for My Pillow, Inc.'s bottom line.

Regards,

Thomas. A. Clare, P.C.

Megan L. Meier

---

[44] Order at 24-25, *Bowyer v. Ducey*, No. 2-20-cv-02321 (D. Ariz. Dec. 9, 2020) [Dkt. 84].

[45] Op. & Order Den. Pl.'s Emer. Motion. for Decl., Emer., and Inj. Relief at 34, *King v. Whitmer*, No. 20-cv-12134 (E.D. Mich. Dec. 7, 2020) [Dkt. 62].

[46] Brian Dakss, *"My Pillow guy" Mike Lindell says he'd welcome suit from voting machines maker Dominion*, CBS News (Jan. 19, 2021), available at, https://www.cbsnews.com/news/mike-lindell-dominion-lawsuit-mypillow-ceo/.

# SUSMAN GODFREY L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
32ND FLOOR
1301 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6023
(212) 336-8330
FAX (212) 336-8340
WWW.SUSMANGODFREY.COM

| | | |
|---|---|---|
| SUITE 5100 | SUITE 1400 | SUITE 3800 |
| 1000 LOUISIANA STREET | 1900 AVENUE OF THE STARS | 1201 THIRD AVENUE |
| HOUSTON, TEXAS 77002-5096 | LOS ANGELES, CALIFORNIA 90067-6029 | SEATTLE, WASHINGTON 98101-3000 |
| (713) 651-9366 | (310) 789-3100 | (206) 516-3880 |

STEPHEN SHACKELFORD, JR.
DIRECT DIAL (212) 729-2012

E-MAIL SShackelford@susmangodfrey.com

April 16, 2021

*Via E-Mail*

Eric P. Early
Early Sullivan Wright Gizer & McRae LLP
eearly@earlysullivan.com

Re:     OAN's Knowingly False Coverage of dominion

Dear Mr. Early:

On behalf of Dominion, we write to once again insist that your client—One America News Network ("OAN")—retract its defamatory statements that it continues to broadcast and stop spreading these hateful and hurtful lies. We have recently learned that OAN will continue to broadcast defamatory statements about Dominion on April 17 and 18.[1]

As you well know, counsel for Dominion has sent multiple retraction demands to OAN urging the company to correct the record and retract the many lies it has published about Dominion. The need for the multiple demands stems from OAN's continued refusal to issue any sort of retraction, not to mention its continued insistence on publishing ever more falsehoods about our client. I will not repeat the lengthy history of that correspondence here, let alone the detailed information previously provided to OAN establishing the falsity of its claims about Dominion; rather I refer you to the December and January letters, which are incorporated herein by reference.

Even now, months after an election that has repeatedly been proven to be the most secure in our nation's history, OAN continues to devote significant resources to defaming Dominion and casting doubt over our democratic institutions. Specifically, on April 13, 2021, OAN once again broadcasted lies about Dominion, including numerous statements claiming Dominion machines were connected to the internet, as well as numerous statements claiming Dominion machines facilitated foreign involvement in the 2020 Presidential Election.[2] Not only did OAN promote

---

[1] "Dominion" refers to US Dominion Inc. and its subsidiaries, Dominion Voting Systems, Inc. and Dominion Systems Corporation.

[2] The defamatory segment is available here: https://twitter.com/OANN/status/1382714455092432904?s=20.

Eric P. Early
April 16, 2021
Page 2

these lies, it adopted them as its own, declaring, for example, that certain evidence "is a clear admission [Dominion] knew the machines were connected to the Internet." These accusations are defamatory *per se*, and—as OAN well knows—entirely false.

The above statements were coupled with powerful—and again patently false—imagery, including the below image of an ES&S DS200 system, which in the broadcast is equated with a Dominion machine and then claimed to have been connected to the internet.



Again, as has repeatedly been made clear to OAN in Dominion's many letters, Dominion machines were never connected to the internet, whether during the tabulation process or at any time that would enable manipulation of vote counts. As Dominion has made clear in repeated testimony, its systems are "closed networks." External modems that comply with federal and state security guidelines are used in certain jurisdictions to electronically transmit results only *after* polls are closed and results have been tallied and printed in hardcopy (while a paper tally is hand-delivered to the county clerk). And Dominion machines did not facilitate any foreign interference in the 2020 Presidential Election. The claim of foreign interference is apparently based on spreadsheets containing fake "raw data analytics" comprised of doctored and fraudulent data—publicly available IP addresses of county government websites and **fake** MAC addresses for both the "SOURCE" and "TARGET" owners. As you know, the validity of these spreadsheets and the related claims of foreign interference have been widely debunked,[3] and they leave viewers with the false impression that the vote count was manipulated.

---

[3] *See, e.g.*, https://news.yahoo.com/dominion-v-my-pillow-guy-mike-lindell-test-for-libel-laws-090617228.html. We refer you also to the Complaint Dominion filed against Mike Lindell, which details at length why the clams of foreign interference based out outlandish videos showing falsified spreadsheets are intentionally misleading and knowingly false. *See* https://www.courtlistener.com/docket/59670901/1/us-dominion-inc-v-my-pillow-inc/.

Eric P. Early
April 16, 2021
Page 3

But OAN has gone even further than adopting and promoting these lies. OAN branded the lies "Dominion-izing the Vote" through its false and misleading videos, thereby making the Dominion name synonymous with electoral fraud, as Kleenex is to tissues. The harm from these lies cannot be overstated.

Worse yet, we understand this April 13 report is just the beginning of the next chapter in OAN's defamatory scheme, as OAN plans on airing a so-called exclusive investigation on Saturday April 17 and Sunday April 18, during which it is clear OAN intends to champion yet more lies about Dominion.[4] In so doing, OAN also plans to provide a platform for Col. Phil Waldron, who has made a name for himself by repeating widely debunked false statements, rejected by numerous election officials not to mention federal courts, about the election results in certain key swing states, including Michigan and Georgia.[5] No disclaimers by OAN can immunize it from accountability for publishing and republishing these and other outlandish and widely discredited statements.

OAN must immediately retract and remove the April 13 report, as well as the promotion for the April 17 and 18 so-called investigation, from all platforms it controls and issue an immediate on-air and written apology to Dominion with the same prominence as the original broadcast. OAN is also on notice that, should it decide to air its so-called exclusive investigations, and should those investigations repeat the same falsities OAN has long since been on notice of, it will be airing knowingly defamatory falsehoods about Dominion.

OAN cannot fix the catastrophic damage it has already caused Dominion and our democratic institutions. It can, however, decide to take this no further. We urge it to do so.

Sincerely,

Stephen Shackelford, Jr.

---

[4] The defamatory promo is available here: https://twitter.com/OANN/status/1382113274557198337?s=20.
[5] https://www.detroitnews.com/story/news/politics/2020/12/04/why-8-claims-rudy-giulianis-michigan-witnesses-dont-add-up/3824210001/; https://www.newsweek.com/trump-campaign-witness-cant-back-claims-georgia-election-fraud-hearings-1552257.

# SUSMAN GODFREY L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
32ND FLOOR
1301 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6023
(212) 336-8330
FAX (212) 336-8340
WWW.SUSMANGODFREY.COM

| Suite 5100 | Suite 1400 | Suite 3800 |
| --- | --- | --- |
| 1000 Louisiana Street | 1900 Avenue of the Stars | 1201 Third Avenue |
| Houston, Texas 77002-5096 | Los Angeles, California 90067-6029 | Seattle, Washington 98101-3000 |
| (713) 651-9366 | (310) 789-3100 | (206) 516-3880 |

Stephen Shackelford, Jr.
Direct Dial (212) 729-2012

E-Mail SShackelford@susmangodfrey.com

May 12, 2021

*Via E-Mail*

Eric P. Early
Early Sullivan Wright Gizer & McRae LLP
eearly@earlysullivan.com

Re:     OAN's Repeated and Knowingly False Coverage of Dominion

Dear Mr. Early:

I write, yet again, on behalf of my client Dominion.[1] OAN continues to spread its knowing and reckless lies about Dominion and the 2020 election, most recently in its April 4, April 22, April 29, and May 3, 2021 broadcasts. We write once again to put OAN on notice that its shameful reporting has caused extraordinary and irreparable harm to Dominion and that it must immediately retract its defamatory statements in full and issue an immediate on-air and written apology.

OAN's lies about Dominion have spiraled out of control. Rather than correcting its lies about Dominion in response to Dominion's multiple retraction demands, OAN has crafted an entire line of programming centered on continuing to spread falsehoods about Dominion. For example, on April 4, 2021, OAN aired yet another of Mike Lindell's fantasies, this one titled "Scientific Proof." In the segment, Lindell repeated the same lies OAN previously broadcast, including that Dominion "attacked" the country by working with "foreign actors in the game starting with China" to rig the 2020 Presidential Election, that the Big Lie was perpetrated "maybe by the head of Dominion," and that "corrupt" Dominion rigged the election through the use of a "supercomputer." What's more, Lindell urged OAN's audience to continue repeating these lies: "We have to get the word out. . .

---

[1] "Dominion" refers to US Dominion Inc. and its subsidiaries, Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation.

May 12, 2021
Page 2

. We have to spread the word of this." OAN aired these lies despite complete knowledge of their falsity and despite Dominion's numerous retraction letters.

OAN's ongoing lies about Dominion do not stop there. On April 21, 2021, OAN promoted on Twitter yet another special hosted by Mike Lindell called "Absolute Interference," which spread more falsehoods about Dominion. On April 22, 2021, OAN then aired that special, where Lindell and OAN hosted Michael Flynn, among others, to promote and spread more disinformation about Dominion. Lindell again asserted that Dominion had Venezuelan ties, and that Dominion had been "cheating over the decades and centuries." Flynn agreed: "not just the foreign side of it, but how they are working with people inside of our own system."

Just over a week later, on April 29, 2021, OAN put Lindell on TV again, this time on a segment titled, "One-on-One with Mike Lindell," to spread lies about Dominion yet again. Lindell called the election "an attack by China" through Dominion voting machines. Lindell also accused Dominion of "the biggest attack" and "one of the biggest crimes against humanity in history." Lindell claimed to have "absolute scientific proof" of these claims, despite Lindell's and OAN's knowledge of their patent falsity.

And four days later, on May 3, 2021, OAN and OAN's Pearson Sharp yet again hosted Mike Lindell to spread falsehoods about Dominion in a segment titled "Mike Lindell Tackles Election Fraud." Lindell falsely claimed that Dominion conspired with China to rig the 2020 Presidential Elections using "these machines . . . Dominion machines." Lindell falsely claimed that these allegations "would hold up in any court." Lindell also bragged that he has the "biggest voice in this country" to defame Dominion and used this segment to promote his earlier "docu-movies" spreading lies about Dominion, including "Absolute Interference."

All told, OAN has willingly and knowingly provided Lindell with its platform to falsely defame Dominion almost a dozen times since the end of January. OAN, its on-air talent, its executives, its ownership, and even you (their lawyer) know that these are lies. OAN's claims are not improbable; they are impossible. These lies have all been debunked, including in the numerous previous letters sent to you, all of which are incorporated here by reference. OAN's conduct is precisely what the Supreme Court had in mind when it defined "actual malice."

Forget about the billions of dollars that Dominion has lost—and the millions of dollars your client has made. Peoples' lives have been threatened, and indeed some lives have even been lost, as a result of these lies that OAN continues to endorse and propagate *to this day*. Rather than retracting its lies in response to Dominion's multiple letters setting out the facts, OAN has not just doubled down;

May 12, 2021
Page 3

OAN has developed and capitalized on an entire line of programming focused solely on spreading lies about Dominion.

The damage is done. Even so, OAN can do the right thing and pull its knowingly false and defamatory broadcasts off of all of its platforms. OAN can still tell the world the truth and let them know that OAN has propagated and endorsed lies—not facts—and OAN spread these lies without any evidence. OAN can tell the world what it knows is true: that it does not believe that Dominion rigged the 2020 election and that it never had any evidence of it. And OAN can still tell the world that the real fraud of the 2020 election was the con-job committed against the American people by Sidney Powell, Rudy Giuliani, Mike Lindell, and others that OAN propagated, adopted, and endorsed. Give these retractions at minimum the same level of prominence as the terrible lies that OAN spread.

I want to be absolutely clear: Dominion is committed to holding OAN accountable for its shameful, utterly self-serving, and unethical conduct. But if OAN has any decency, any idea of what is right and what is wrong, or any remaining semblance of integrity, it will take these basic steps on the road to redemption.

The ball is in your court.

Sincerely,

Stephen Shackelford, Jr.

SUSMAN GODFREY L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
32ND FLOOR
1301 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6023
(212) 336-8330
FAX (212) 336-8340
WWW.SUSMANGODFREY.COM

| SUITE 5100 | SUITE 1400 | SUITE 3800 |
|---|---|---|
| 1000 LOUISIANA STREET | 1900 AVENUE OF THE STARS | 1201 THIRD AVENUE |
| HOUSTON, TEXAS 77002-5096 | LOS ANGELES, CALIFORNIA 90067-6029 | SEATTLE, WASHINGTON 98101-3000 |
| (713) 651-9366 | (310) 789-3100 | (206) 516-3880 |

STEPHEN SHACKELFORD, JR.
DIRECT DIAL (212) 729-2012

E-MAIL SShackelford@susmangodfrey.com

June 18, 2021

Re:     OAN's Repeated and Knowingly False Coverage of Dominion

Dear Mr. Rhodes:

        I write on behalf of my client Dominion[1] to put OAN on notice yet again that its false and outrageous reporting—which OAN has continued despite multiple retraction demands—has caused extraordinary and irreparable harm to Dominion. Since Dominion's May 13, 2021 letter, OAN has refused to apologize or retract its defamatory statements. Rather, OAN has continued to spread its knowing and reckless lies about Dominion and the 2020 election, most recently in its May 15, May 19, and June 6, 2021 broadcasts. OAN must immediately retract its defamatory statements in full and issue an immediate on-air and written apology.

        By now, OAN has spun its lies about Dominion into an entire segment of OAN's programming, in which OAN regularly hosts guests to spread known falsehoods about Dominion. For example, on May 15, 2021, OAN and OAN's Christina Bobb hosted Colonel Phil Waldron, who falsely claimed that Dominion voting machines were connected to the internet and that Dominion rigged the election with "Chinese communist party involvement." OAN aired these lies despite its complete knowledge of their falsity and Dominion's numerous retraction letters putting OAN on notice.

        Just days later, OAN continued its lies about Dominion. On May 19, 2021, OAN and OAN's Pearson Sharp and Mike Dinow claimed that votes on Dominion voting machines were "clearly deleted." Sharp also suggested that Dominion was affiliated with George Soros and claimed that Soros's "henchman [were] working overtime to control the outcome of the 2020 election." OAN knew these far-fetched lies were false or at minimum recklessly disregarded their falsity.

---

[1] "Dominion" refers to US Dominion Inc. and its subsidiaries, Dominion Voting Systems, Inc. and Dominion Systems Corporation.

June 18, 2021
Page 2

But OAN's lies about Dominion still did not stop there. On June 6, 2021, OAN and OAN's Natalie Harp hosted Mike Lindell to promote his newest special defaming Dominion, "Absolute 9-0." Harp yet again falsely claimed that Dominion rigged the 2020 election, adding: "What a neat and tidy little narrative they rig to cheat and steal an election." Mike Lindell agreed, falsely claiming that Dominion orchestrated a "cyber attack" on the 2020 election and that Lindell has "evidence of the machine fraud of this cyber attack with mostly . . . China." Later that same day, on a segment entitled "Cyber Attack on the 2020 Election," Lindell once again falsely claimed that Dominion orchestrated a cyber attack on the 2020 election. "This was something that came through the machines. The Dominion machines, the Smartmatic and other machines. This was a cyber attack."

OAN's lies about Dominion must stop. Contrary to OAN's assertions in its May 23, 2021 letter, these statements are not constitutionally protected lies, nor are these statements merely opinion. Rather, OAN *knows* these statements are false. Indeed, the public record is replete with evidence disproving these lies, and Dominion has sent countless letters correcting OAN's lies and demanding a retraction and an apology. Yet despite OAN's knowledge of these lies, OAN has continued to spread them for OAN's profit at Dominion's great expense.

Although OAN cannot undo the damage it has done to Dominion, this is OAN's opportunity to stop the bleeding by retracting its defamatory statements in full and issuing an on-air and written apology.

Sincerely,

Stephen Shackelford, Jr.

SUSMAN GODFREY L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
32ND FLOOR
1301 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6023
(212) 336-8330
FAX (212) 336-8340
WWW.SUSMANGODFREY.COM

SUITE 5100                          SUITE 1400                          SUITE 3800
1000 LOUISIANA STREET          1900 AVENUE OF THE STARS          1201 THIRD AVENUE
HOUSTON, TEXAS 77002-5096    LOS ANGELES, CALIFORNIA 90067-6029   SEATTLE, WASHINGTON 98101-3000
(713) 651-9366                  (310) 789-3100                  (206) 516-3880

STEPHEN SHACKELFORD, JR.                          E-MAIL SShackelford@susmangodfrey.com
DIRECT DIAL (212) 729-2012

July 13, 2021

Re:     OAN's Continued and Knowingly False Coverage of Dominion

Dear Mr. Rhodes:

        I write on behalf of my client Dominion[1] to insist yet again that OAN stop
its false and outrageous reporting about Dominion. Far from "chest-thumping
denials," Dominion has sent numerous detailed letters debunking OAN's lies,
beginning with Dominion's December 18, 2020 retraction demand. Yet OAN has
persisted in its false reporting and refused to apologize or retract its defamatory
statements. This has caused extraordinary and irreparable harm to Dominion. OAN
must immediately retract its defamatory statements in full and issue an immediate
on-air and written apology.

        OAN's latest letter suggests that OAN has not been on notice of the falsity
of its statements. On the contrary, OAN knew—or at minimum recklessly
disregarded—that its statements were false. To date, Dominion has sent **nine
retraction demands** to OAN; this is its tenth. Those letters detailed the mountain
of evidence debunking OAN's lies, which was also publicly available and widely
reported.

        In addition to the evidence raised in Dominion's earlier letters, more
evidence continues to surface demonstrating OAN's reckless disregard of the truth.
For example, OAN's own Christina Bobb has been moonlighting as a Trump
campaign adviser actively working to overturn the 2020 election—a fact that OAN

---

[1] "Dominion" refers to US Dominion Inc. and its subsidiaries, Dominion Voting Systems, Inc. and
Dominion Voting Systems Corporation.

July 13, 2021
Page 2

hid from its viewers for almost two months—while Bobb, along with others at OAN, spread lies about Dominion and the election generally.[2] In addition:

- On June 24, 2020, Rudy Giuliani's law license was suspended in New York after he "communicated demonstrably false and misleading statements to courts, lawmakers and the public at large."[3] On July 7, 2021, his law license was likewise suspended in Washington, DC.[4]

- On June 23, 2021, the Republican-led Michigan Senate Oversight Committee released a 55-page report, which stated that "The Committee found no evidence of widespread or systemic fraud in Michigan's prosecution of the 2020 election."[5]

- On June 27, 2021, evidence emerged that former Attorney General Bill Barr had "received two briefings from cybersecurity experts at the Department of Homeland Security and the FBI," after which he and his team at the Department of Justice "realized from the beginning it was just bullshit." Barr further disclosed that "even if the machines somehow changed the count, it would show up when they were recounted by hand" and that Dominion's machines were just "counting machine[s], and they save everything that was counted. So you just

---

[2] *Arizona Senate Releases Emails Related to 'Audit' to American Oversight*, Am. Oversight (June 4, 20201), https://www.americanoversight.org/arizona-senate-releases-emails-related-to-election-audit-to-american-oversight.

[3] *See* Per Curiam Opinion, *In the Matter of Rudolph W. Giuliani, an Attorney*, Motion No. 2021-00491, Case No. 2021-00506 (June 24, 2021), *available at* https://www.nycourts.gov/courts/ad1/calendar/List_Word/2021/06_Jun/24/PDF/Matter%20of%20Giuliani%20(2021-00506)%20PC.pdf; Jim Mustian, *New York Court suspends Rudy Giuliani's Law License*, AP News (June 24, 2021), https://apnews.com/article/rudy-giuliani-new-york-law-license-suspended-c67f4504a22f8642d6096f29e3a5c51e

[4] Rachel Weiner, *Rudy Giuliani suspended from practicing law in D.C. court*, Wash. Post (July 7, 2021), https://www.washingtonpost.com/local/legal-issues/giuliani-washington-court/2021/07/07/9f7a7f5c-df6a-11eb-9f54-7eee10b5fcd2_story.html.

[5] MICH. SENATE OVERSIGHT COMMITTEE, REPORT ON THE NOVEMBER 2020 ELECTION IN MICHIGAN, https://misenategopcdn.s3.us-east-1.amazonaws.com/99/doccuments/20210623/SMPO_2020ElectionReport.pdf; David Eggert, *Michigan Senate GOP probe: No systemic fraud in election*, ABC NEWS (June 23, 2021), https://abcnews.go.com/Politics/wireStory/michigan-senate-gop-probe-systemic-fraud-election-78445547; Clara Hendrickson & Dave Boucher, *Michigan Republican-led investigation rejects Trump's claim that Nov. 3 election was stolen*, DETROIT FREE PRESS (June 23, 2021), https://www.freep.com/story/news/politics/elections/2021/06/23/michigan-senate-investigation-election-trump/5035244001/.

July 13, 2021
Page 3

reconcile the two. There had been no discrepancy reported anywhere, and I'm still not aware of any discrepancy."[6]

This is just a sample of the mountain of evidence debunking OAN's continued lies. Yet OAN spouted more lies about Dominion most recently and perhaps most egregiously in its June 23 and June 29, 2021 broadcasts. On June 23, 2021, OAN broadcast a segment by presenter Pearson Sharp in which Sharp claimed that the 2020 election was "actually overthrown" and that those responsible for doing so, like Dominion, should face "execution" for committing treason.[7]

As if that were not enough, on June 29, 2021, OAN hosted MyPillow founder, CEO, and spokesperson Mike Lindell to predictably spread yet more lies about Dominion. In the segment, Lindell announced a "cyber symposium" in August at which he would present "non-subjective evidence" that votes were "flipped" at the "Dominion level." OAN introduced Lindell as the one who "continues to lead the charge in exposing election fraud," and during the segment ran the chyron, "Lindell Announces Cyber Symposium Exposing Election Fraud Evidence."[8]

Although OAN cannot undo the damage it has done to Dominion or the enormous risk OAN has already created, this is OAN's opportunity to help curb some of the damage by retracting its defamatory statements in full and issuing an on-air and written apology.

Sincerely,

Stephen Shackelford, Jr.

---

[6] Jonathan D. Karl, *Inside William Barr's Breakup with Trump*, THE ATLANTIC (June 27, 2021), https://www.theatlantic.com/politics/archive/2021/06/william-barrs-trump-administration-attorney-general/619298/.

[7] Justin Baragona, *OAN Goes Full Fascist, Calls for Mass Executions Over 'Election Fraud,'* Daily Beast (Jun. 24, 2021), https://www.thedailybeast.com/oan-goes-full-fascist-pearson-sharp-calls-for-mass-executions-over-election-fraud; OAN, *OAN Reports with Pearson Sharp*, DAILY BEAST (June 23, 2021), available at https://www.thedailybeast.com/oan-goes-full-fascist-pearson-sharp-calls-for-mass-executions-over-election-fraud?jwsource=cl.

[8] OAN, *MyPillow CEO Mike Lindell announces details of upcoming cyber symposium*, RUMBLE (June 29, 2021), available at https://rumble.com/vj9ddv-mypillow-ceo-mike-lindell-announces-details-of-upcoming-cyber-symposium.html.

# SUSMAN GODFREY L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
32ND FLOOR
1301 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6023
(212) 336-8330
FAX (212) 336-8340
WWW.SUSMANGODFREY.COM

<table>
<tr><td>Suite 5100<br>1000 Louisiana Street<br>Houston, Texas 77002-5096<br>(713) 651-9366</td><td>Suite 1400<br>1900 Avenue of the Stars<br>Los Angeles, California 90067-6029<br>(310) 789-3100</td><td>Suite 3800<br>1201 Third Avenue<br>Seattle, Washington 98101-3000<br>(206) 516-3880</td></tr>
</table>

Stephen Shackelford, Jr.
Direct Dial (212) 729-2012

E-Mail SShackelford@susmangodfrey.com

August 4, 2021

Re:    OAN's Continued and Knowingly False Coverage of Dominion

Dear Mr. Rhodes:

I write on behalf of my client Dominion[1] to insist yet again—for the *eleventh* time—that OAN stop its false and outrageous reporting about Dominion. Your hollow denials of the incontrovertible truth are not enough. OAN's reporting has caused extraordinary and irreparable harm to Dominion. OAN must immediately retract its defamatory statements in full and issue an immediate on-air and written apology.

Since Dominion's July 13, 2021 letter, OAN has relentlessly persisted in its false reporting. On July 15, 2021, OAN and its host Alicia Summers falsely claimed that Dominion machines "had not been properly certified."[2] Summers and OAN also falsely claimed that Maricopa County officials decided to purchase new Dominion machines because officials "falsely claim" the sham investigation headed by Cyber Ninjas (and trumpeted by OAN) "contaminated the machines."

Later that day, OAN and its host Dan Ball falsely claimed that the counting of ballots in Maricopa County "isn't fully complete," even though the Maricopa County count has been long confirmed, as OAN well knows.[3] Ball went on: "The auditors came out today and spoke about the discrepancies they found. ***It's called election fraud.***" As OAN knows, its concocted theories of election fraud—which OAN has falsely made synonymous with Dominion—have been long debunked.

---

[1] "Dominion" refers to US Dominion Inc. and its subsidiaries, Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation.

[2] OAN, *Maricopa County Officials Want to Buy More Dominion Machines* (July 15, 2021).

[3] OAN, *Real America with Dan Ball* (July 15, 2021).

August 4, 2021
Page 2

And yet OAN continues to spread this destructive disinformation. On July 16, 2021, OAN and its host Natalie Harp falsely claimed yet again that "the numbers Arizona certified are obviously not correct."[4] Harp went on to again falsely claim the election was stolen: "We have known" the results of the 2020 election "from the very beginning and they can be summed up in two words: Trump won and that's the 'real story.'"

On July 20, 2021, OAN and OAN's Dan Ball hosted Ken Bennett to spread yet more lies about Dominion. Bennett pointed out that "Maricopa uses Dominion here in Arizona" and called for an "audit" of Dominion machines.[5] Ball responded: "***They know there was cheating***, and even if they didn't individually know there was cheating, they can see it."

As if all of those lies were not enough, on July 23, 2021, OAN and OAN's Natalie Harp hosted Rudy Giuliani—whose lies have been publicly debunked and penalized—to spread even more disinformation about Dominion.[6] As OAN knows (and as Dominion pointed out in our latest letter), Giuliani has been suspended from practicing law in both New York and Washington, D.C. because of his lies. And yet OAN gave Giuliani a platform to spread them even further. In the segment, Giuliani persisted in his lies: "I know we've lost the spin war, but we haven't lost the truth war. I have the truth. And the reason they're persecuting me; they are." OAN's Harp responded: "You never back down. That's why they're afraid of you."

OAN's lies have spun out of control. OAN knows that Dominion did not steal the election or participate in election fraud. OAN has long been on notice of the truth—and yet OAN continues not only to trumpet its false narrative, but to ***create*** a false narrative to trumpet. I write once again to demand OAN retract its statements in full and issue an on-air apology with the same prominence as its lies.

Sincerely,

Stephen Shackelford, Jr.

---

[4] OAN, *Uncovering What Happened in Maricopa County* (July 16, 2021).

[5] OAN, *Fighting for Election Transparency* (July 20, 2021).

[6] OAN, *Real Story with Natalie Harp* (July 23, 2021).