IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SMARTMATIC USA CORP., *et al.*,

                Plaintiffs,

    v.

HERRING NETWORKS, INC.,

                Defendant.

No. 1:21-cv-02900-CJN

Judge Carl J. Nichols

**SMARTMATIC'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS OR TRANSFER**

**Table of Contents**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 2

    A.   Smartmatic's Claims Against OANN. ............................................................... 2

    B.   OANN's Partnership With The Washington Times. ........................................... 3

    C.   OANN's Television Studio In Washington, D.C. .............................................. 4

    D.   OANN's Revenue From Subscribers In Washington, D.C. ............................... 4

    E.   OANN's Performance Of Its Contract With AT&T In Washington, D.C. .......... 5

    F.   OANN's False Statements Made And Published In Washington, D.C. ............. 6

    G.   Smartmatic's Reputational Injury In Washington, D.C. .................................... 7

    H.   OANN's Advertising In Washington, D.C. ...................................................... 7

LEGAL STANDARD .......................................................................................................... 8

ARGUMENT ....................................................................................................................... 9

I.    This District Court Has Personal Jurisdiction Over OANN. ................................... 9

    A.   The Court Has Personal Jurisdiction Under D.C.'s Long-Arm Statute. ............ 9

        1.   The Court Has Personal Jurisdiction Because OANN Transacted Business In This District. ....................................................................... 10

        2.   The Court Has Personal Jurisdiction Because OANN Caused Tortious Injury To Smartmatic In Washington, D.C. By Acts And Omissions Within This District. ......... 12

        3.   The Court Has Personal Jurisdiction Because OANN Caused Tortious Injury To Smartmatic In Washington, D.C. By Acts Outside This District. ............................... 15

           i.   OANN Derives Substantial Revenue From Services Rendered In This District. ....... 16

           ii.   OANN Regularly Does And Solicits Business In This District. ............................... 17

           iii.  OANN Has Engaged In A Persistent Course Of Conduct In This District .............. 17

        4.   The Newsgathering Exception Does Not Destroy Personal Jurisdiction. .................... 19

           i.   The Newsgathering Exception Does Not Apply To Subsections (a)(1) Or (a)(3) Of The D.C. Long-Arm Statute. .......................................................................... 19

i

ii.   The Newsgathering Exception Does Not Apply To The "Deriving Substantial Revenue" Plus Factor In Subsection (a)(4) Of The D.C. Long-Arm Statute. ........... 20

iii.   The Newsgathering Exception Does Not Destroy Personal Jurisdiction Under Subsection (a)(4) Of The D.C. Long-Arm Statute. .................................................. 21

iv.   OANN's Reliance On The Newsgathering Exception Precludes It From Arguing That It Was Publishing Non-Factual Statements About Smartmatic. ...................... 24

B.   The Court's Personal Jurisdiction Over OANN Comports With Due Process ................. 25

II.   Venue Is Proper In This District. ......................................................................................... 28

III.   The Court Should Not Transfer The Case To The Southern District Of California Because Venue Is Proper In This District. .......................................................................... 30

CONCLUSION .......................................................................................................................... 31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akbar v. N.Y. Magazine Co.*,
  490 F. Supp. 60 (D.D.C. 1980) ...................................................................... *passim*

*Am. Directory Serv. Agency, Inc. v. Beam*,
  131 F.R.D. 15 (D.D.C. 1990) ................................................................................17

*Associated Producers, LTD v. Vanderbilt Univ.*,
  76 F. Supp. 3d 154 (D.D.C. 2014) ..........................................................................8

*Blumenthal v. Drudge*,
  992 F. Supp. 44 (D.D.C. 1998) ...............................................................15, 24, 25

*Bristol-Myers Squibb Co. v. Super. Ct.*,
  137 S. Ct. 1773 (2017) ..........................................................................................28

*Burger King v. Rudzewicz*,
  471 U.S. 462 (1985) ...............................................................................................26

*Crane v. Carr*,
  814 F.2d 758 (D.C. Cir. 1987) ..............................................................15, 16, 17, 18

*Crane v. N.Y. Zoological Soc'y*,
  894 F.2d 454 (D.C. Cir. 1990) .........................................................................8, 13

*Edmond v. U.S. Postal Serv. Gen. Counsel*,
  949 F.2d 415 (D.C. Cir. 1991) ................................................................................8

*Envtl. Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.*,
  355 A.2d 808 (D.C. 1976) .....................................................................................11

*Exelon Generation Co., LLC v. Grumbles*,
  380 F. Supp. 3d 1 (D.D.C. 2019) .......................................................................9, 29

*Fam v. Bank of Am. NA (USA)*,
  236 F. Supp. 3d 397 (D.D.C. 2017) .......................................................................31

*Fisher v. Bander*,
  519 A.2d 162 (D.C. 1986) ................................................................................26, 27

*Foretich v. Glamour*,
  741 F. Supp. 247 (D.D.C. 1990) ............................................................................13

*Founding Church of Scientology v. Verlag*,
  536 F.2d 429 (D.C. Cir. 1976) .................................................................16, 21, 22

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
  199 F.3d 1343 (D.C. Cir. 2000) ..................................................................9, 25, 26

*Helmer v. Doletskaya*,
  393 F.3d 201 (D.C. Cir. 2004) ................................................................................10

*Holder v. Haarmann & Reimer Corp.*,
  779 A.2d 264 (D.C. 2001) .......................................................................................10

*IMAPizza, LLC v. At Pizza Ltd.*,
  334 F. Supp. 3d 95 (D.D.C. 2018) ..........................................................................10

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945) .................................................................................................25

*Jalloh v. Underwood*,
  300 F. Supp. 3d 151 (D.D.C. 2018) ........................................................................29

*James v. Verizon Servs. Corp.*,
  639 F. Supp. 2d 9 (D.D.C. 2009) ..............................................................................8

*Johns v. Newsmax Media, Inc.*,
  887 F.Supp.2d 90 (D.D.C. 2012) ..............................................................................9

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984) .................................................................................................14

*Khalil v. L–3 Commc'ns Titan Grp.*,
  656 F. Supp. 2d 134 (D.D.C. 2009) ..........................................................................8

*Lapointe v. Van Note*,
  2004 WL 3609346 (D.D.C. Nov. 9, 2004) ..............................................................13

*Lewy v. S. Poverty Law Ctr., Inc.*,
  723 F. Supp. 2d 116 (D.D.C. 2010) .............................................................. *passim*

*Malveaux v. Christian Bros. Servs.*,
  753 F. Supp. 2d 35 (D.D.C. 2010) ..........................................................................31

*Estate of Manook v. Research Triangle Inst., Int'l & Unity Res. Grp., L.L.C.*,
  693 F. Supp. 2d 4 (D.D.C. 2010) ............................................................................28

*Margoles v. Johns*,
  483 F.2d 1212 (D.C. Cir. 1973) ..............................................................................20

*McFarlane v. Esquire Magazine*,
   1994 WL 510088 (D.D.C. June 8, 1994) ..............................................................13

*\*Moncrief v. Lexington Herald-Leader Co.*,
   807 F.2d 217 (D.C. Cir. 1986) ........................................................20, 21, 22, 27

*Mwani v. bin Laden*,
   417 F.3d 1 (D.C. Cir. 2005) .................................................................................8

*Neely v. Phila. Inquirer Co.*,
   62 F.2d 873 (D.C. Cir. 1932) ...................................................................... *passim*

*Nunes v. WP Company LLC*,
   2021 WL 3550896 (D.D.C. Aug. 11, 2021) .......................................................14

*Quality Air Servs., L.L.C. v. Milwaukee Valve Co.*,
   567 F. Supp. 2d 96 (D.D.C. 2008) .....................................................................10

*Ricketts v. Sun Printing & Publ'g Ass'n*,
   27 App. D.C. 222 (1906) ....................................................................................21

*S.E.C. v. Daly*,
   2006 WL 6190699 (D.D.C. Feb. 11, 2006) ........................................................31

*Sheikh v. Mr. K's Rest., Inc.*,
   2005 WL 1387591 (D.D.C. June 10, 2005) ........................................................17

*Shoppers Food Warehouse v. Moreno*,
   746 A.2d 320 (D.C. 2000) ..................................................................................10

*Smartmatic USA Corp. v. Powell*,
   No. 1:21-cv-02995 (CJN) ...................................................................................31

*Stern v. O'Quinn*,
   2008 WL 11401793 (S.D. Fla. July 14, 2008) ....................................................30

*US Dominion, Inc. v. Giuliani*,
   No. 1:21-cv-00213 (CJN) ...................................................................................31

*US Dominion, Inc. v. Herring Networks, Inc.*,
   No. 1:21-cv-02130 (CJN) ..............................................................................20, 31

*US Dominion, Inc. v. My Pillow, Inc.*,
   No. 1:21-cv-00445 (CJN) ...................................................................................31

*\*US Dominion, Inc. v. Powell*,
   554 F. Supp. 3d 42 (D.D.C. 2021) .............................................................. *passim*

*US Dominion, Inc. v. Powell*,
   No. 1:21-cv-00040 (CJN) ..............................................................................31

*Wachtel v. Storm*,
   796 F. Supp. 114 (S.D.N.Y. 1992) ...............................................................29

*Wilson v. Wilson*,
   785 A.2d 647 (D.C. 2001) ............................................................................10

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980) .....................................................................................25

*Wultz v. Islamic Republic of Iran*,
   755 F. Supp. 2d 1 (D.D.C. 2010) .................................................................31

**Statutes**

28 U.S.C. § 1391 ....................................................................................2, 28, 29, 30

28 U.S.C. § 1406 ............................................................................................2, 30, 31

D.C. Code § 13-423 ................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 4 ...................................................................................................9

Fed. R. Civ. P. 12 .................................................................................................8

## **INTRODUCTION**

From its television studio in Washington, D.C., with the Capitol Building in the backdrop, OANN published defamatory statements about Smartmatic, claiming that there was "overwhelming evidence of voter fraud" in the 2020 U.S. election and that "Smartmatic was designed for the sole purpose of shifting voting results." (ECF #1, Compl. ¶¶ 87-89.) Thereafter, OANN made dozens of other defamatory statements about Smartmatic in nationwide broadcasts and publications that reached D.C. residents—including its most famous resident at the time, President Donald Trump, who then began promoting OANN from the White House. OANN made and recorded many of these false statements in its television studio in Washington, D.C., where its employees researched, edited, and produced the programs on which the statements appeared. OANN also generated substantial revenue from its viewers and subscribers in Washington, D.C. Yet despite all these D.C. contacts (and more), OANN now claims that this Court cannot exercise personal jurisdiction over it.

OANN is wrong. This Court has personal jurisdiction over OANN under several subsections of the D.C. long-arm statute. Smartmatic's claims arise out of OANN's transaction of business in this District, which began with OANN's partnership with *The Washington Times*. Smartmatic has also suffered reputational injury in this District—where many officials with influence over election issues reside—because of OANN's defamatory statements in this District. Even OANN's acts outside the District confer personal jurisdiction because OANN was also doing business, generating substantial revenue, and engaging in a persistent course of conduct here. This includes performing on a contract with AT&T in this District, earning fees based on subscribers in this District, and advertising in this District. OANN's many contacts with the District of Columbia—all of which were purposeful—satisfy the D.C. long-arm statute and comport with the constitutional requirements of due process. This Court has personal jurisdiction over OANN.

Venue is also proper in this District because "a substantial part of the events giving rise to the claims" occurred in the District of Columbia. 28 U.S.C. § 1391(b)(2). OANN argues that the "most substantial parts" occurred elsewhere, but even if that were true, that is not what the statute requires. As long as "*a* substantial part" of the events occurred here—which they clearly did—then venue is proper here. In this case, Smartmatic was injured in this District, by defamatory statements made and published in this District, in television segments researched, edited, produced, and broadcast in this District. These are "a substantial part of the events giving rise to the claims" in this case. Venue is therefore proper in this District.

Finally, because venue here is proper, transfer is not authorized by 28 U.S.C. § 1406(a). Section 1406(a) requires that the case was "filed . . . in the wrong division or district." Here, as explained above and more fully below, this case was *not* filed in the wrong district. As a result, transferring the case to the Southern District of California would be improper. Transferring the case would not be in the interest of justice either, in light of all the related 2020 U.S. election cases that are currently pending in this District and before this Court. For all these reasons, OANN's motion to dismiss or transfer venue should be denied in its entirety.

## FACTUAL BACKGROUND

### A.    Smartmatic's Claims Against OANN.

Plaintiffs Smartmatic USA Corp., Smartmatic International Holding B.V., and SGO Corporation Limited (collectively, "Smartmatic") have alleged that Defendant Herring Networks, Inc. (herein, "OANN") defamed Smartmatic in numerous statements concerning the 2020 U.S. election. (ECF #1, Compl. ¶¶ 1-9.) OANN made these statements in Washington, D.C. and California, and it broadcast and published them nationally, including in this District. (*Id.* ¶¶ 16, 18, 184, 196, 205, 218, 227, 441, 445, 456, 460.). OANN made a variety of false statements about Smartmatic, but the overarching theme was that Smartmatic's election technology was designed

2

and used to fix, rig, and steal the 2020 election from President Trump. (*Id.* ¶¶ 441, 456.) As a result of OANN's defamatory statements, Smartmatic has suffered injury to its reputation, including its reputation in the District of Columbia. (*Id.* ¶¶ 16, 18, 430-34, 437, 441, 445, 456, 460.) In response to the Complaint, OANN has not argued that Smartmatic has failed to state a claim. Rather, OANN asks this Court to dismiss the case for lack of personal jurisdiction or improper venue, or to transfer the case to Southern District of California. (ECF #21, OANN Mem.)

**B.      OANN's Partnership With The Washington Times.**

OANN announced its debut as a national news network in a press release issued from Washington, D.C. (ECF #1-167, Compl. Ex. 137.) OANN touted its partnership with *The Washington Times*, an established D.C. newspaper, which OANN would "rely on . . . as a key source of news and analysis from the nation's capital [*sic*]." (*Id.* at 1.) OANN's "relationship with The Washington Times" would provide OANN with "access to staff and content." (*Id.* at 2.) In addition, OANN "leased production studio and office space within The Washington Times headquarters," where it would be "building a state-of-the-art TV studio inside the 31-year-old newspaper's newsroom." (*Id.* at 1.) OANN boasted that its partnership with *The Washington Times* and its television studio in Washington, D.C. would "giv[e] One America News Network immediate presence in the nation's capital [*sic*]." (*Id.*)

OANN thereafter highlighted its Washington connections on its website. OANN represented there that the network had "its primary production operations in California and Washington, DC." (ECF #1, Compl. ¶ 14.) In addition, OANN's debut press release noted that OANN and *The Washington Times* were "anchor sponsors" for the Conservative Political Action Conference (CPAC), "the largest gathering of conservatives in Washington each spring," where they would be "discussing the new network with attendees." (ECF #1-167, Compl. Ex. 137 at 2.)

OANN asked that any questions about its press release be directed to its "Press Relations Department" located at "3600 New York Ave NE, Washington, D.C. 20002." (*Id.*)

### C.   OANN's Television Studio In Washington, D.C.

Not long thereafter, in another press release issued from Washington, D.C., OANN "announce[d] that it's relocating its Washington, D.C. bureau to 101 Constitution Avenue, NW, at the foot of Capitol Hill." (ECF #1-167, Compl. Ex. 137 at 3.) OANN heralded that its "new production studios" were in "the closest commercial office building to the U.S. Capitol." (*Id.*) According to OANN, its new building featured "a rooftop deck [with] an incredible, unobstructed view of the Capitol, which we've secured usage of as a backdrop for live reports." (*Id.*) From this production studio in Washington, D.C., OANN produces, records, edits, and broadcasts television programs—including the segments in which OANN made some of its defamatory statements about Smartmatic. (ECF #1, Compl. ¶¶ 87, 110, 127, 135.)

OANN's operation of a television studio here necessarily requires employing D.C. residents as reporters, producers, writers, researchers, camera operators, and numerous other positions. (*See*, *e.g. id.*, ¶110 ("[John] Hines is an OANN reporter based in Washington, D.C.").) OANN also had an assigned seat in the White House briefing room and "provide[d] daily live reporting from the White House using multiple reporters and staff videographers." (Ex. 1 at 1.) When OANN became dissatisfied with how the White House briefing room operated, OANN's employee launched a "newly organized" National White House Correspondents Association in Washington, D.C. (Ex. 2 at 1-2.)

### D.   OANN's Revenue From Subscribers In Washington, D.C.

OANN has disclosed in public filings in other litigation that its revenues from multichannel video programming distributors ("MVPD") that carry its network—such as AT&T U-verse and DirecTV—are based on the number of subscribers that the MVPD has. (Ex. 3, ¶¶ 25-26.) "The

MVPD customers, or subscribers, pay a fee to get access to a variety of networks; and in turn, the MVPD pays the networks a licensing fee to distribute their content." (*Id.* ¶ 25.) For instance, in exchange for carrying OANN on U-verse, AT&T paid OANN "a monthly licensing fee of $0.18 cents per subscriber." (*Id.*) That means that "AT&T pays [OANN] a licensing fee based on the number of U-verse subscribers." (*Id.* ¶ 38.) "Fewer subscribers mean less revenue for [OANN]," and, by the same token, more subscribers mean more revenue for OANN. (*Id.*) The Washington, D.C. television market is one of the top 10 largest markets nationwide. (Ex. 4 at 1.) There are nearly 300,000 households in the District of Columbia according to the U.S. Census. (Ex. 5 at 1.) Consequently, OANN was earning substantial revenue from many of the millions of television subscribers in the D.C. area. (ECF #1, Compl. ¶ 18.)

### E.   OANN's Performance Of Its Contract With AT&T In Washington, D.C.

In a 2016 lawsuit, OANN stated that it performed the terms of a contract with AT&T in Washington, D.C., in exchange for AT&T's commitment to carry OANN on DirecTV. (Ex. 3, ¶¶ 64-75.) According to OANN, "AT&T promis[ed] to put [OANN] on DirecTV in return for [OANN's] support and lobbying with governmental regulators in favor of AT&T's $65 billion acquisition of DirecTV." (*Id.* ¶ 4.) "The FCC and DOJ, and Congress too, were closely scrutinizing this transaction," and "[i]n order to obtain the necessary governmental approvals, AT&T needed support and lobbying from independent programmers, such as [OANN]." (*Id.* ¶¶ 49-50.) AT&T therefore "proposed that if [OANN] publicly supported AT&T during the Acquisition process, AT&T would ensure that DirecTV carried [OANN] upon completion of the Acquisition." (*Id.* ¶ 56.)

OANN accepted and thereafter "aggressively lobbied . . . for the Acquisition with the FCC, DOJ, Senators and Representatives on Capitol Hill." (*Id.* ¶ 65.) In performance of the contract, OANN "actively supported the Acquisition in Washington, D.C.," including by

- "[h]iring political consultant PC Koch ("Koch"), a well-connected legislative strategist in Washington D.C."

- "[m]aking multiple visits to the FCC and DOJ to express support for the Acquisition"

- "[l]obbying key members of Congress to support the Acquisition"

- "fil[ing] briefs with the FCC in support of the Acquisition"

- "[s]etting a positive tone regarding the Acquisition with the press"

- "me[eting] Koch for lunch in D.C."

- "me[eting] Cicconi [D.C. executive of AT&T] at the Hyatt Hotel in Washington, D.C. for breakfast"

(*Id.* ¶¶ 66-75.) Following all of OANN's efforts in Washington, D.C., AT&T ultimately agreed to carry OANN on DirecTV. (Ex. 6, ¶ 21.) DirecTV carried OANN nationally from 2017 to 2022, during which time OANN aired its defamatory statements about Smartmatic on DirecTV. (*Id.* ¶¶ 21, 64-68.)

**F.     OANN's False Statements Made And Published In Washington, D.C.**

Smartmatic alleges that OANN researched, edited, produced, and broadcast multiple defamatory television segments out of its Washington, D.C. studio. (*See, e.g.*, ECF #1, Compl. ¶¶ 87, 110, 127, 135.) OANN employees, such as Elma Aksalic and John Hines, made defamatory statements about Smartmatic while reporting from its Washington, D.C. studio. (*Id.* ¶¶ 87, 110, 127, 135, 184(p), 196(a), 227(b).) OANN also broadcast defamatory statements made by its invited guests—including Allan Santos, Tom Fitton, and Clay Clark—during interviews researched, edited, produced, and broadcast in OANN's Washington, D.C. studio. (*Id.* ¶¶ 110, 127, 135, 184(v), 184(z), 205(i), 205(j), 205(l), 218(u), 218(z), 227(l).) In addition, OANN made defamatory

statements outside this District, but even those statements were broadcast nationally, including in the District of Columbia. (*Id.* ¶¶ 16, 18, 184, 196, 205, 218, 227, 441, 445, 456, 460.).

### G.     Smartmatic's Reputational Injury In Washington, D.C.

OANN published its defamatory statements to D.C. residents, including government officials here—most notably President Trump—causing reputational harm to Smartmatic. (ECF #1, Compl. ¶¶ 16, 18, 148, 422-24, 430-34, 437, 441, 445, 456, 460.) Smartmatic alleges that "OANN's defamatory statements about Smartmatic and Dominion were a substantial cause of certain government officials becoming critical of the companies, specifically, and electronic voting, generally . . . This includes government officials directly or indirectly involved in the selection of the voting system used in their jurisdiction and the companies who supply machines and services for the selected voting system." (*Id.* ¶ 431.) OANN's defamatory statements harmed Smartmatic's reputation and made it less likely that individuals responsible for selecting voting systems (including government officials in this District) would work with Smartmatic, resulting in a decline in Smartmatic's business valuation. (*See, e.g.*, *id.* ¶¶ 434-438.)

### H.     OANN's Advertising In Washington, D.C.

In addition to broadcasting in Washington, D.C., OANN advertises its broadcasters and programming here too. OANN regularly issues press releases in Washington, D.C. from its PR department located here. (ECF #1, Compl. Ex. 137; Exs. 7-10.) For example, OANN advertised its hiring of "Christina Bobb for DC and Administration News Coverage" in a press release issued from Washington, D.C. (Ex. 8.) OANN also promoted its programming—such as "The Ukraine Hoax: Impeachment, Biden Cash, and Mass Murder" and "Ukrainian Witnesses Destroy Schiff's Case"—in press releases issued from Washington, D.C., which advertised the showtimes of those programs on OANN. (Exs. 9-10.) In addition, OANN's defamatory statements about the 2020 U.S. election received rave reviews from D.C.'s then most famous resident, President Trump. (ECF #1,

Compl. ¶¶ 148, 424.) In fact, President Trump even began promoting OANN in his tweets from the White House. (*Id*.) OANN's numbers skyrocketed, with over 767,000 people installing the OANN app in November 2020 alone. (*Id*. ¶139.)

## LEGAL STANDARD

Rule 12(b)(2) of the Federal Rules of Civil Procedure permits dismissal where the Court lacks personal jurisdiction over the defendant. When responding to a Rule 12(b)(2) motion to dismiss, the plaintiff must make a "prima facie showing" of specific and pertinent jurisdictional facts. *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991). To establish a prima facie showing, "plaintiffs are not limited to evidence that meets the standards of admissibility required by the district court" and "may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005). In determining whether the plaintiff has established a factual basis for the exercise of personal jurisdiction over the defendant, "factual discrepancies appearing in the record must be resolved in favor of the plaintiff." *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).

When ruling on a Rule 12(b)(3) motion to dismiss for improper venue, the Court "accepts the plaintiff's well-pled factual allegations regarding venue as true, draws all reasonable inferences from those allegations in the plaintiff's favor and resolves any factual conflicts in the plaintiff's favor." *Associated Producers, LTD v. Vanderbilt Univ.*, 76 F. Supp. 3d 154, 162 (D.D.C. 2014) (quoting *James v. Verizon Servs. Corp.*, 639 F. Supp. 2d 9, 11 (D.D.C. 2009)). To prevail on a Rule 12(b)(3) motion, "the defendant must present facts that will defeat the plaintiff's assertion of venue." *Id.* (quoting *Khalil v. L–3 Commc'ns Titan Grp.*, 656 F. Supp. 2d 134, 135 (D.D.C. 2009)). On a motion to dismiss, "the question is not which district is the 'best' venue, or which venue has the most significant connection to the claim"; the question is "whether the district the plaintiff

chose had a substantial connection to the claim, whether or not other forums had greater contacts."

*Exelon Generation Co., LLC v. Grumbles*, 380 F. Supp. 3d 1, 11 (D.D.C. 2019) (quoting *Johns v.*

*Newsmax Media, Inc.*, 887 F.Supp.2d 90, 96 (D.D.C. 2012)).

## ARGUMENT

**I.      This District Court Has Personal Jurisdiction Over OANN.**

A federal court has jurisdiction over a defendant "who is subject to the jurisdiction of a

court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P

4(k)(1)(A); *US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 65 (D.D.C. 2021). Thus, "[i]f a

District of Columbia court could exercise jurisdiction over the Defendants, then so can this Court."

*Id.* When assessing specific personal jurisdiction,[1] the Court's inquiry is two-fold. First, the Court

must determine "whether jurisdiction is applicable under the [D.C.] long-arm statute." *GTE New*

*Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). Second, the Court

must decide "whether a finding of jurisdiction satisfie[s] the constitutional requirements of due

process." *Id.* Here, the answer to both questions is yes.

**A.      The Court Has Personal Jurisdiction Under D.C.'s Long-Arm Statute.**

The D.C. long-arm statute authorizes specific personal jurisdiction "over a person, who

acts directly or by an agent, as to a claim for relief arising from the person's":

> (1) transacting any business in the District of Columbia;
>
>                                  *   *   *
>
> (3) causing tortious injury in the District of Columbia by an act or
> omission in the District of Columbia;

---

[1]      OANN argues that "Smartmatic has not pled sufficient facts to make a *prima facie* case of general jurisdiction as to OAN." (ECF #21, OANN Mem. at 6.) Smartmatic has never argued that OANN is subject to general jurisdiction in this District. Rather, the Complaint alleged that "[t]his Court has personal jurisdiction over OANN pursuant to § 13-423 of the District of Columbia Code." (ECF #1, Compl. ¶18.)

> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he [i] regularly does or solicits business, [ii] engages in any other persistent course of conduct, or [iii] derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia;

D.C. Code § 13-423(a)(1), (3)-(4). A plaintiff needs to satisfy only one prong. *See id.* Here, as shown below, this Court has personal jurisdiction over OANN under the first, third, and fourth prongs of the D.C. long-arm statute.

### 1.   The Court Has Personal Jurisdiction Because OANN Transacted Business In This District.

This Court has personal jurisdiction under Section 13-423(a)(1) of the D.C. long-arm statute because OANN "transact[ed] . . . business in the District of Columbia," and Smartmatic's claims arise out of those transactions. D.C. Code § 13-423(a)(1). Subsection (a)(1) authorizes jurisdiction where "the defendant has purposefully engaged in some type of commercial or business-related activity directed at District residents." *Holder v. Haarmann & Reimer Corp.*, 779 A.2d 264, 270–71 (D.C. 2001). "[A] single act may be sufficient to constitute transacting business, so long as that contact is voluntary and deliberate, rather than fortuitous." *Quality Air Servs., L.L.C. v. Milwaukee Valve Co.*, 567 F. Supp. 2d 96, 100 (D.D.C. 2008) (citations and quotations omitted).

The long-arm statute encompasses "business transactions" in the everyday sense of commercial deal-making activities, such as negotiating or performing contracts. *See Helmer v. Doletskaya*, 393 F.3d 201, 206–07 (D.C. Cir. 2004). But the statute also covers business activities such as advertising in the District, operating an office in the District, or traveling to the District for a business purpose when accompanied by some kind of transaction in the traditional sense. *US Dominion,* 554 F. Supp. 3d at 66 (citing *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 330–32 (D.C. 2000)) (advertising); *Wilson v. Wilson*, 785 A.2d 647, 650 (D.C. 2001) (operating an office); *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 112 (D.D.C. 2018) (traveling to

the District). Moreover, this subsection does not require that the business transactions be between the parties, just that OANN "purposefully engaged in some type of *commercial or business-related activity* directed at District residents" and that there is a "discernible relationship" between OANN's contacts and Smartmatic's claims. *US Dominion*, 554 F. Supp. 3d at 66-67 (citations and quotations omitted, emphasis in original).

In this case, the transaction giving rise to OANN's very existence occurred in this District. OANN launched its television network through a partnership with *The Washington Times*. (ECF #1, Compl. Ex. 137.) This led to other transactions, such as leasing television production studio and office space, building a state-of-the-art TV studio, sponsoring CPAC and promoting its new network with attendees, and otherwise advertising in the District. (ECF #1-167, Compl. Ex. 137; Exs. 2, 7-10.) In addition, OANN engaged in a transaction with AT&T whereby it performed certain contractual obligations in Washington, D.C. in exchange for AT&T's promise to carry OANN on DirecTV. (Ex. 3, ¶¶ 4, 64-75.) OANN's performance included supporting AT&T's acquisition of DirecTV in Washington, D.C., setting a positive tone with the press, hiring a D.C. political consultant, visiting the FCC and DOJ to express support for the acquisition, filing briefs with the FCC in support of the acquisition, lobbying Senators and Representatives on Capitol Hill, and traveling to and meeting with a political consultant and AT&T executives in Washington, D.C. (*Id.*)[2]

---

[2]    These activities are not covered by the "government contacts" exception to personal jurisdiction. *See Envtl. Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808 (D.C. 1976). As OANN itself has stated, its actions in Washington, D.C. in regard to the DirecTV acquisition were part of a *commercial transaction* with AT&T whereby AT&T promised to put OANN on DirecTV in exchange for OANN's "support and lobbying" (not just lobbying). (Ex. 3, ¶ 4.) Moreover, OANN did more in Washington, D.C. than merely contact the government. OANN also hired and met with a political consultant and AT&T executives there. (*Id.* ¶¶ 66, 70, 73.) In addition, "[p]ursuant to its agreement with AT&T to support the Acquisition," OANN "solicit[ed] other independent programmers to support the Acquisition." (*Id.* ¶¶ 73-74.) OANN's performance

OANN's defamation of Smartmatic was directly tied to these D.C. transactions. It was through these transactions—all of them in the District of Columbia—that OANN established a television network and a production studio whereby it published defamatory statements about Smartmatic that aired nationally on DirecTV. There is much more than a "discernible relationship" between these transactions and Smartmatic's claims. *US Dominion*, 554 F. Supp. 3d at 66-67. Indeed, but for OANN's transactions in this District, there would be no OANN, no television studio, no defamatory broadcasts on DirecTV, and no claims. Accordingly, this Court has jurisdiction over OANN under subsection (a)(1) of the statute.

### 2. The Court Has Personal Jurisdiction Because OANN Caused Tortious Injury To Smartmatic In Washington, D.C. By Acts And Omissions Within This District.

This Court has personal jurisdiction over OANN under Section 13-423(a)(3) of the D.C. long-arm statute because OANN "caus[ed] tortious injury in the District of Columbia by an act or omission in the District of Columbia." D.C. Code § 13-423(a)(3). OANN does not seriously argue that no "act or omission" occurred in the District of Columbia. Rather, OANN has conceded that "certain actions by OANN employees occurred in this District." (ECF #21, OANN Mem. at 3.) In fact, Smartmatic has alleged that OANN made numerous defamatory statements in this District. (ECF #1, Compl. ¶¶ 87, 110, 127, 135, 184(p), 196(a), 227(b).)

OANN tries to focus the Court's attention on the statements made by its guests in this District, rather than its employees, arguing that the "unilateral activity" of a "third party" is not an appropriate consideration when deciding personal jurisdiction. (ECF #21, OANN Mem. at 9.) But calling its guests' statements—*which OANN then published*—"unilateral activity" is misleading. Smartmatic has alleged that OANN itself is liable for publishing those guests' statements when it

---

of a commercial arrangement with AT&T, for which OANN was being compensated, is not covered by the "government contacts" exception.

knew that the statements were false or acted with reckless disregard as to their truth or falsity. (ECF #1, Compl. ¶¶ 448, 462.)[3] Further, Smartmatic has alleged that OANN researched, edited, produced, and broadcast these interviews in its Washington, D.C. studio. (*Id.* ¶¶ 87, 110, 127, 135.) These are acts and omissions in this District by OANN itself. Beyond that, OANN completely ignores the defamatory statements that its own employees made in this District. (*Id.* ¶¶ 87, 110, 127, 135, 184(p), 196(a), 227(b).) Each of these defamatory statements constitutes an act or omission in this District under subsection (a)(3).

Smartmatic has also alleged "tortious injury" in this District. (*Id.* ¶ 18.) As Smartmatic alleged, OANN published its defamatory statements nationwide—including in the District of Columbia. (*Id.* ¶¶ 16, 18, 441, 445, 456, 460.) Some of these defamatory statements were actually uttered in this District. (*Id.* ¶¶ 87, 110, 127, 135, 184(p), 196(a), 227(b).) Others were uttered elsewhere but still published here. (*Id.* ¶¶ 16, 18, 184, 196, 205, 218, 227, 441, 445, 456, 460.) Courts routinely hold that defamatory statements cause injury where the statements are published, even if the injury also extends beyond the place of publication. *Lapointe v. Van Note*, 2004 WL 3609346, at *6 (D.D.C. Nov. 9, 2004) ("An injury by libel occurs at the site of publication."); *N.Y. Zoological Soc'y*, 894 F.2d at 457 (D.C. Cir. 1990) ("[L]ibel occurs in the place where published, but the injuries that may flow from libel are not necessarily restricted to the place of publication."); *McFarlane v. Esquire Magazine*, 1994 WL 510088, at *4 (D.D.C. June 8, 1994) ("Plaintiff . . . has made a *prima facie* case that he suffered an injury in the District by the publication of the article in *Esquire* magazine, which is a national magazine"). Because OANN's statements were published in this District, Smartmatic suffered tortious injury here.

---

[3]      "[U]nder the 'republication rule,' one who republishes a defamatory statement adopts it as his own and is liable for defamation." *Foretich v. Glamour*, 741 F. Supp. 247, 253 (D.D.C. 1990).

OANN suggests that Smartmatic suffered the "bulk" of harm in its home state. (ECF #21, OANN Mem. at 10.) Even if that were true, that does not mean that Smartmatic has not also suffered tortious injury in the District of Columbia. While courts recognize that a defamation plaintiff suffers injury where it resides, courts do not require plaintiffs to sue for defamation in their home forum, particularly where plaintiffs have alleged injury in another forum. *See*, *e.g.*, *Nunes v. WP Company LLC*, 2021 WL 3550896, *8 (D.D.C. Aug. 11, 2021) (Nichols, J.) (California resident's defamation injury was "primarily suffered in the District of Columbia" because "[t]hat is where he alleges he meets and interacts with other public officials, was considered for appointed positions, received numerous threats, and performs the majority of his duties"); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780-81 (1984) ("There is no justification for restricting libel actions to the plaintiff's home forum. The victim of a libel . . . may choose to bring suit in any forum with which the defendant has certain minimum contacts [ ] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'").

Indeed, Smartmatic's injury in the District of Columbia is particularly clear here because Smartmatic alleges defamatory statements about its election technology. This Court has already recognized that a competing provider of election technology, Dominion, alleged reputational injury in this District under the D.C. long-arm statute because, among other reasons, "[t]his District is where elected officials—some of whom have influence over decisions about elections and government contracts—conduct their business." *US Dominion*, 554 F. Supp. 3d at 67. Like its competitor Dominion, Smartmatic "certainly has an interest in maintaining its reputation with the federal government and state governments that might be influenced by federal employees." *Id.* Smartmatic has alleged that OANN published its defamatory statements in the District of Columbia, where its reputation with elected officials is especially important, and that Smartmatic

consequently suffered reputational injury here. (ECF #1, Compl. ¶¶ 16, 18, 430-34, 437, 441, 445, 456, 460.) These allegations satisfy subsection (a)(3) of the D.C. long-arm statute. *US Dominion,* 554 F. Supp. 3d at 67.

3.    **The Court Has Personal Jurisdiction Because OANN Caused Tortious Injury To Smartmatic In Washington, D.C. By Acts Outside This District.**

This Court has personal jurisdiction over OANN under Section 13-423(a)(4) of the D.C. long-arm statute because OANN "caus[ed] tortious injury in the District of Columbia by an act or omission outside the District of Columbia," and at least one of the three "plus factors" in this subsection is satisfied. Smartmatic has already shown above (*supra* at I.A.2) that it has alleged a "tortious injury in the District of Columbia" by alleging that its reputation was injured here. *See US Dominion,* 554 F. Supp. 3d at 67. And OANN does not deny that Smartmatic has alleged an "act or omission outside the District of Columbia"—namely, OANN's many defamatory statements about Smartmatic from its California studio. (ECF #1, Compl. ¶¶ 184, 196, 205, 218, 227.) Thus, the only question remaining is whether at least one plus factor has been satisfied.

Tellingly, OANN's memorandum does not address any of the plus factors in subsection (a)(4), which should be deemed satisfied. To the extent that OANN does dispute the plus factors—only one of which needs to be met—all three have been satisfied here. As shown below, OANN (i) "derives substantial revenue from goods used or consumed, or services rendered" in this District, (ii) "regularly does or solicits business" in this District, and (iii) otherwise "engages in [a] persistent course of conduct" in this District. *See* D.C. Code § 13-423(a)(4).

"The 'plus factor' or factors need not be related to the act that caused the injury; all that is required is 'some other reasonable connection between the defendant and the forum.'" *Blumenthal v. Drudge,* 992 F. Supp. 44, 54 (D.D.C. 1998), quoting *Crane v. Carr,* 814 F.2d 758, 762-63 (D.C. Cir. 1987). In other words, subsection (a)(4) "contemplates a connection that may be *un*related to

the claim in suit." *Crane* 814 F.2d at 763. "Courts have routinely considered the totality of defendants' contacts in assessing the 'plus factors' of subsection (a)(4)." *Lewy v. S. Poverty Law Ctr., Inc.*, 723 F. Supp. 2d 116, 126 (D.D.C. 2010).

> **i.      OANN Derives Substantial Revenue From Services Rendered In This District.**

OANN "derives substantial revenue from . . . services rendered" in this District under subsection (a)(4) of the D.C. long-arm statute. OANN broadcasts its programs nationally, including in the District of Columbia. (ECF #1, Compl. ¶¶ 16, 18, 441, 445, 456, 460.) These television broadcasts—along with all the research, editing, and producing that OANN does in its D.C. studio—are "services rendered" in this District. OANN's revenue is based on the number of subscribers that the carriers of its network—such as AT&T U-verse and DirecTV—have signed up. (Ex. 3, ¶ 25.) The carriers pay OANN a monthly fee per subscriber (*e.g.*, $0.18 for AT&T U-verse), so the more subscribers that the carrier has in this District, the more fees it pays OANN. (*Id.* ¶ 25.) The Washington, D.C. television market is the ninth largest in the country, and the U.S. Census reports that there are nearly 300,000 households in the District of Columbia itself. (Exs. 4-5.) As a result, OANN has been deriving substantial revenue from the many television subscribers in this District for almost a decade. These revenues are surely more substantial than the revenues deemed sufficient in other defamation cases in this District. *See Founding Church of Scientology v. Verlag*, 536 F.2d 429, 433 (D.C. Cir. 1976) ("sales of $26,000 in ten months constitute 'substantial revenue'"); *Akbar v. N.Y. Magazine Co.*, 490 F. Supp. 60, 65 (D.D.C. 1980) ("average total annual sales in the District of Columbia, of $32,897.04, which represents approximately .7% of total sales, constitutes substantial revenue within the meaning of [] (a)(4).").

In addition, a record number of over 767,000 people installed the OANN app through AT&T in November 2020 alone, when OANN began its disinformation campaign. (ECF #1,

Compl. ¶ 139.) Another 517,000 people followed in January 2021. (*Id.* ¶ 149.) While the revenues that OANN derived from all these downloads are not publicly available, it would be reasonable for this Court to infer that a substantial amount of those revenues were attributable to D.C. residents. *See Sheikh v. Mr. K's Rest., Inc.*, 2005 WL 1387591, at *2 (D.D.C. June 10, 2005) ("A court must draw all reasonable inferences in favor of the plaintiff in ruling on a motion to dismiss a complaint for lack of personal jurisdiction"); *Am. Directory Serv. Agency, Inc. v. Beam*, 131 F.R.D. 15, 17 (D.D.C. 1990) ("We may safely infer that [defendant] derived substantial revenue from [ ] sales generated by his efforts in the District"). Accordingly, the "derives substantial revenue" plus factor has been satisfied.

### ii.      OANN Regularly Does And Solicits Business In This District.

OANN "regularly does or solicits business" in this District under subsection (a)(4) of the D.C. long-arm statute. The "doing business" plus factor is "satisfied by connections considerably less substantial than those it takes to establish general, all-purpose 'doing business'- or 'presence'-based jurisdiction." *Crane*, 814 F.2d at 763. Here, as described above (*supra* at I.A.1), OANN partners with *The Washington Times*, operates a production studio, broadcasts television programs, sponsors political events, maintains a PR department, issues press releases, and advertises in this District. All of this constitutes doing and soliciting business for purposes of subsection (a)(4).

### iii.     OANN Has Engaged In A Persistent Course Of Conduct In This District

OANN has otherwise engaged in a "persistent course of conduct" in the District under subsection (a)(4) of the long-arm statute. The court considers the "totality of defendants' contacts" in determining whether the "persistent course of conduct" plus factor is satisfied. *Lewy*, 723 F. Supp. 2d at 126-128. Like the "doing business" plus factor, the "persistent course of conduct" plus factor is also satisfied by "connections considerably less substantial than those it takes to establish

general, all-purpose 'doing business'- or 'presence'-based jurisdiction." *Crane*, 814 F.2d at 763.

Here, OANN's many connections with Washington, D.C. reflect a persistent course of conduct in this District since OANN's inception. Those connections include:

- Negotiating a partnership with *The Washington Times* for access to staff and content (ECF #1-167, Compl. Ex. 137.)

- Leasing space in Washington, D.C. for a "state-of-the-art TV studio" (*Id.*)

- Building, operating, and broadcasting from its television production studio in Washington, D.C. (*Id.*)

- Broadcasting television programs in Washington, D.C. (ECF #1, Compl. ¶ 16.)

- Sponsoring CPAC, "the largest gathering of conservatives in Washington each spring" (ECF #1-167, Compl. Ex. 137.)

- Discussing and promoting its network with CPAC attendees in Washington, D.C. *(Id.)*

- Launching a "newly organized National White House Correspondents Association" (Ex. 2.)

- Performing a contract with AT&T in Washington, D.C. in exchange for DirecTV's promise to carry OANN (Ex. 3, ¶¶ 4, 64-75, 117-127.)

- Supporting the DirecTV acquisition "in Washington, D.C." *(Id. ¶ 66.)*

- Hiring political consultant PC Koch, a well-connected legislative strategist in Washington D.C. (*Id.*)

- Making multiple visits to the FCC and DOJ to express support for the DirecTV acquisition (*Id.*)

- Lobbying key members of Congress to support the DirecTV acquisition (*Id.*)

- Filing briefs with the FCC in support of the DirecTV acquisition (*Id.*)

- Meeting with political consultant PC Koch in Washington, D.C. (*Id.* ¶ 70.)

- Meeting with AT&T executive James Cicconi in Washington, D.C. (*Id.* ¶¶ 73-74.)

- Issuing press releases in and from Washington, D.C. (ECF #1-167, Compl. Ex. 137; Exs. 7-10.)

- Operating a "Public Relations Department" in Washington, D.C. (ECF #1-167, Compl. Ex. 137.)

- Advertising OANN's programming in Washington, D.C. (ECF #1-167, Compl. Ex. 137; Exs. 2, 7-10.)

All of these activities demonstrate that OANN has engaged in a persistent course of conduct in this District—from its partnership with *The Washington Times*, to its performance of a contract with AT&T to appear on DirecTV, to its production and broadcasting of television programs from its state-of-the-art studio in Washington, D.C. In light of all these contacts with the District, the "persistent course of conduct" plus factor is satisfied here.

### 4.      The Newsgathering Exception Does Not Destroy Personal Jurisdiction.

Finally, OANN's reliance on the "newsgathering exception" to escape personal jurisdiction under the long-arm statute is misplaced. As shown below, the exception does not apply to subsections (a)(1) and (a)(3) of the D.C. long-arm statute. Nor does it apply to the "deriving substantial revenue" plus factor in subsection (a)(4). Nor does it cover a national broadcast that includes the District of Columbia. Nor does it immunize nonresident news organizations from personal jurisdiction where (as here) they have other contacts with the District in addition to newsgathering. The newsgathering exception is extremely limited and does not apply here.

### i.      The Newsgathering Exception Does Not Apply To Subsections (a)(1) Or (a)(3) Of The D.C. Long-Arm Statute.

OANN's argument seems to suggest that the newsgathering exception applies to subsections (a)(1) and (a)(3) of the D.C. long-arm statute. (ECF #21, OANN Mem. at 7-9.)

However, OANN has not cited any case holding that the exception applies outside of subsection (a)(4), and Smartmatic is not aware of any such case. (*Id.*) To the contrary, the D.C. Circuit has made clear that the newsgathering exception applies only to subsection (a)(4): "The 'newsgathering exception' *to paragraph (a)(4)* of the long-arm statute was announced by this court in *Neely.*" *Moncrief v. Lexington Herald-Leader Co.*, 807 F.2d 217, 222 (D.C. Cir. 1986) (emphasis added); *see also Akbar*, 490 F. Supp. at 64 (same); *Margoles v. Johns*, 483 F.2d 1212, 1221-22 (D.C. Cir. 1973) (same). Thus, the newsgathering exception is far more limited than OANN portrays.[4] The exception is irrelevant to subsections (a)(1) and (a)(3) of the D.C. long-arm statute, notwithstanding OANN's suggestion to the contrary.

### ii. The Newsgathering Exception Does Not Apply To The "Deriving Substantial Revenue" Plus Factor In Subsection (a)(4) Of The D.C. Long-Arm Statute.

In fact, the newsgathering exception does not even apply to all three plus factors under subsection (a)(4). The D.C. Circuit has recognized that, "for purposes of subjecting a news organization to personal jurisdiction for acts or omissions outside the District under [ ] (a)(4), the mere act of newsgathering in the District is not to be considered as [i] *doing or soliciting business* or [ii] *engaging in a persistent course of conduct* as those terms are used in [ ] (a)(4)." *Akbar*, 490 F. Supp. at 64 (emphasis added). The exception does *not* apply to the "deriv[ing] substantial revenue from goods used or consumed, or services rendered, in the District of Columbia" plus factor. *See id; Moncrief*, 807 F.2d at 222. As the D.C. Circuit explained, other contacts with the District, such as "sales of magazines" here, "are not protected by the exception because this is the type of 'business' contemplated by the 'deriving substantial revenue' clause of paragraph (a)(4)."

---

[4]     Notably, OANN did not even bother to make a newsgathering exception argument in its motion to dismiss the Dominion complaint for lack of personal jurisdiction. *See US Dominion, Inc. v. Herring Networks, Inc.*, No. 1:21-cv-02130 (CJN), at ECF #41, #47.

*Moncrief*, 807 F.2d at 225; *Verlag*, 536 F.2d at 434; *see also Akbar*, 490 F. Supp. at 65 ("We find that average total annual sales in the District of Columbia, of $32,897.04, which represents approximately .7% of total sales, constitutes substantial revenue under the meaning of [ ] (a)(4)"). Thus, the newsgathering exception is relevant to only two plus factors under subsection (a)(4): "doing business" and "persistent course of conduct."

iii.     **The Newsgathering Exception Does Not Destroy Personal Jurisdiction Under Subsection (a)(4) Of The D.C. Long-Arm Statute.**

Even when properly limited, the newsgathering exception still does not allow OANN to avoid personal jurisdiction under subsection (a)(4). The exception was recognized 90 years ago to avoid "subject[ing] a nonresident newspaper corporation to legal process in Washington for matter appearing in its paper at home," when all the local newspaper does in Washington, D.C. is maintain a bureau to collect news for its local readers. *Neely v. Phila. Inquirer Co.*, 62 F.2d 873, 875 (D.C. Cir. 1932). The D.C. Circuit reasoned that, "[a]s the seat of national government, Washington is the source of much news of national importance, which makes it desirable in the public interest that many newspapers should maintain vigilant correspondents here." *Id.* Accordingly, the court held that the "mere collection of news material here [in Washington, D.C.] for use in subsequent publication *elsewhere*" did not constitute doing business in the District for purposes of personal jurisdiction under a previous long-arm statute. *Id.* (emphasis added). At the same time, the D.C. Circuit noted that the exception did not apply when a newspaper was doing other business in the District. *Id.* (citing *Ricketts v. Sun Printing & Publ'g Ass'n*, 27 App. D.C. 222 (1906)).

Since the newsgathering exception was first recognized in 1932—a time when many Americans got their national news from local newspapers—courts in this District have more clearly defined its parameters. More recently, this District Court confirmed that the newsgathering exception "is intended to protect news organizations who cover national news for a *local* audience

21

*outside the District.*" *Lewy*, 723 F. Supp. 2d at 127 (emphasis added). Thus, where (as here) the "newsgathering efforts . . . are aimed at a national audience that includes D.C. residents," the exception does not destroy personal jurisdiction. *Id.*

Furthermore, the newsgathering exception is "intended to protect a newspaper whose *only* persistent course of conduct in the District is the maintenance of an office there for gathering news from being subject to the jurisdiction of the District's courts." *Moncrief*, 807 F.2d at 222 (emphasis added). Where (as here) defendants have engaged in *other* activities in the District, then the "totality of defendants' contacts" can still satisfy the "persistent course of conduct" plus factor in subsection (a)(4) of the D.C. long-arm statute. *Lewy*, 723 F. Supp. 2d at 126-128. In other words, merely being a nonresident news organization like OANN does not immunize a defendant from personal jurisdiction in the District of Columbia. *See*, *e.g.*, *Lewy*, 723 F. Supp. 2d at 127; *Verlag*, 536 F.2d at 434; *Akbar*, 490 F. Supp. at 64.

Here, the newsgathering exception does not destroy personal jurisdiction under subsection (a)(4) for at least two reasons. *First*, as shown above (*supra* at I.A.3.i), OANN "derives substantial revenue from . . . services rendered, in the District of Columbia." D.C. Code § 13-423(a)(4). OANN broadcasts nationally, including in Washington, D.C., which has close to 300,000 households. (Ex. 5.) OANN's revenues are based on the number of television subscribers that its carriers like AT&T U-verse and DirecTV had, and many of these subscribers were in this District. (Exs. 3-4.) As explained above (*supra* at I.A.4.ii), such in-district revenue-generating activities "are not protected by the [newsgathering] exception because this is the type of 'business' contemplated by the 'deriving substantial revenue' clause of paragraph (a)(4)." *Moncrief*, 807 F.2d at 225.

*Second*, OANN's activities in this District go far beyond "the mere act of newsgathering." *Akbar*, 490 F. Supp. at 64. When defendants have engaged in activities in the District besides newsgathering, the court looks at the "totality of defendants' contacts" to determine whether they satisfy the "persistent course of conduct" plus factor in subsection (a)(4). *Lewy*, 723 F. Supp. 2d at 126-128. Here, OANN has not cited any case suggesting that operating a television production studio in Washington, D.C. even qualifies as the "mere collection of news material." *Neely*, 62 F.2d at 875. A local newspaper that maintains a Washington bureau so that it can report national news to its local readers is a far cry from OANN's "production studios," featuring an "unobstructed view of the Capitol, which [OANN] secured . . . as a backdrop for live reports" that it televises nationally, including in the District of Columbia. (ECF #1-167, Compl. Ex. 137.) Newsgathering is one thing, but producing and broadcasting national television programs is quite another.

Moreover, even apart from activities that are arguably newsgathering, OANN has otherwise engaged in a persistent course of conduct in Washington, D.C. for many years, including:

- Negotiating a partnership with *The Washington Times* (*Id.*)

- Advertising OANN's programming in Washington, D.C. (*Id.*)

- Issuing press releases in and from Washington, D.C. (ECF #1-167, Compl. Ex. 137; Exs. 7-10.)

- Operating a "Public Relations Department" in Washington, D.C. (ECF #1-167, Compl. Ex. 137.)

- Sponsoring CPAC, "the largest gathering of conservatives in Washington each spring" (*Id.*)

- Discussing and promoting its network with CPAC attendees in Washington, D.C. (*Id.*)

- Performing a contract with AT&T in Washington, D.C. in exchange for DirecTV's promise to carry OANN (Ex. 3, ¶¶ 4, 64-75, 117-127.)

- Supporting the DirecTV acquisition "in Washington, D.C." (*Id.* ¶ 66)

- Hiring political consultant PC Koch, a well-connected legislative strategist in Washington, D.C. (*Id.*)

- Making multiple visits to the FCC and DOJ to express support for the DirecTV acquisition (*Id.*)

- Lobbying key members of Congress to support the DirecTV acquisition (*Id.*)

- Filing briefs with the FCC in support of the DirecTV acquisition (*Id.*)

- Meeting with political consultant PC Koch in Washington, D.C. about the DirecTV acquisition (*Id.* ¶ 70)

- Meeting with AT&T executive James Cicconi in Washington, D.C. (*Id.* ¶¶ 73-74)

From its inception as a partnership with *The Washington Times*, through its deal with AT&T to appear on DirecTV, to its sponsorship of political events and its promotion and advertising of the network, OANN has consistently concentrated its efforts in Washington, D.C. This "persistent course of conduct" in the District satisfies subsection (a)(4) of the long-arm statute, irrespective of other activities that could be considered the "mere collection of news material." *Neely*, 62 F.2d at 875. The newsgathering exception does not apply here.

> **iv.  OANN's Reliance On The Newsgathering Exception Precludes It From Arguing That It Was Publishing Non-Factual Statements About Smartmatic.**

OANN's reliance on the newsgathering exception to avoid personal jurisdiction precludes it from later arguing that it was publishing anything other than statements of fact about Smartmatic. In *Drudge*, 992 F. Supp. 44 (D.D.C. 1998), this District Court addressed a motion to dismiss for lack of personal jurisdiction in another defamation case. The defendant, Matt Drudge, creator of the now famous Drudge Report, made the following allegedly defamatory statements:

> The DRUDGE REPORT has learned that top GOP operatives who feel there is a double-standard of only reporting republican shame believe they are holding an ace card: New White House recruit Sidney Blumenthal has a spousal abuse past that has been effectively covered up.
>
> The accusations are explosive.
>
> There are court records of Blumenthal's violence against his wife, one influential republican, who demanded anonymity, tells the DRUDGE REPORT.

*Id.* at 46. Like OANN, Drudge tried to rely on the newsgathering exception to avoid personal jurisdiction. The court observed that "the subject matter of the Drudge Report primarily concerns political gossip and rumor in Washington, D.C." *Id.* at 57-58. The court therefore concluded that Drudge's "argument that he should benefit from the 'news gathering exception' to subsection (a)(4) of the long-arm statute merits no serious consideration" because "Drudge is not a reporter, a journalist or a newsgatherer," but rather "a purveyor of gossip." *Id.* at n.18. Accordingly, by relying on the newsgathering exception, OANN has affirmed that it is in fact a "newsgatherer" that publishes *factual material* that it gathers from sources. OANN cannot later claim that it is something else—like a "purveyor of gossip" or conspiracy theories or entertainment.

### B.  The Court's Personal Jurisdiction Over OANN Comports With Due Process.

This Court's personal jurisdiction over OANN comports with the constitutional requirements under the Due Process Clause. The exercise of personal jurisdiction is within the permissible bounds of the Due Process Clause if the defendant has sufficient "minimum contacts" with the forum "establishing that 'the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *GTE New Media*, 199 F.3d at 1347 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Courts must ensure that defendant's minimum contacts with the forum "are such that he should reasonably anticipate being haled into court there." *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). The "fair

warning" requirement is satisfied "if the defendant has 'purposefully directed' his activities at residents of the forum, [ ] and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Fisher v. Bander*, 519 A.2d 162, 163 (D.C. 1986) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 474 (1985)).

In this case, personal jurisdiction under all three subsections of the D.C. long-arm statute comports with due process. *First*, Section (a)(1)'s "transacting any business" clause has generally been interpreted to be coextensive with the Constitution's due process requirements and thus to merge into a single inquiry. *GTE New Media*, 199 F.3d at 1347. Thus, because subsection (a)(1) has been satisfied (as shown *supra* at I.A.1), constitutional due process is satisfied, as well. *US Dominion,* 554 F. Supp. 3d at 75 n.14.

*Second*, jurisdiction under subsection (a)(3) comports with due process because OANN was physically in the District when it made defamatory statements about Smartmatic. *US Dominion*, 554 F. Supp. 3d at 75 n.16. OANN also researched, edited, produced, and broadcast defamatory television segments out of its Washington, D.C. studio. (ECF #1, Compl. ¶¶ 87, 110, 127, 135.) As this Court has held, "[p]ersonal jurisdiction under § 13-423(a)(3) is proper under the Due Process Clause when, as here, the defendant is physically within the District when [it] took the alleged action." *US Dominion*, 554 F. Supp. 3d at 75 n.16.

*Third*, jurisdiction is proper under subsection (a)(4) because OANN has purposefully availed itself of numerous privileges in this District and thus could reasonably anticipate being subject to jurisdiction here. OANN partnered with *The Washington Times* in order to "giv[e] One America News Network immediate presence in the nation's capital [*sic*]." (ECF #1, Compl. Ex. 137.) OANN built and operates a television production studio in Washington, D.C., from which it broadcasts programs nationally, including in this District. OANN could reasonably anticipate

being subject to jurisdiction in this District for the defamatory statements it made here and published here. *See*, *e.g.*, *Lewy*, 723 F. Supp. 2d at 129 (jurisdiction over non-resident comports with due process where it regularly distributed copies of its publication to D.C. residents and caused injury here through intentional tortious conduct).

Moreover, OANN "purposefully directed" its activities at one "resident" of this District in particular: President Trump. *Fisher*, 519 A.2d at 163. OANN's publication of defamatory statements about Smartmatic was intended to "strengthen endorsements [from] President Trump." (ECF #1, Compl. ¶ 423.) And that they did. "After November 12, when OANN started covering the 'election fraud' story, President Trump tweeted @OANN to his tens of millions of followers over 40 times," saying such things as "Hope everybody is watching @OANN right now. Other media afraid to show." (*Id.* ¶ 424.) With its message amplified by President Trump, OANN's audience multiplied dramatically, with over 767,000 people (a record number) downloading its app in November 2020, and another 517,000 in January 2021. (*Id.* ¶¶ 139, 149.) OANN therefore benefitted handsomely by "purposefully direct[ing]" its activities at D.C. "resident" Trump.

OANN argues that "forcing a media company to litigate in a distant jurisdiction based on its newsgathering efforts would . . . raise significant First Amendment questions." (ECF #21, OANN Mem. at 11.) However, the D.C. Circuit has already held that "the 'newsgathering exception' [to personal jurisdiction] is not based upon first amendment considerations." *Moncrief*, 807 F.2d at 223. Application of the newsgathering exception is a "question . . . of statutory interpretation" of subsection (a)(4) of the long-arm statute, not constitutional law. *Id.* Moreover, as shown above (*supra* at I.A.4.iii), personal jurisdiction over OANN is based on much more than the "mere collection of news material." *Neely*, 62 F.2d at 875.

OANN further argues that in determining whether personal jurisdiction comports with due process, the "burden on the defendant" is the "primary concern." (ECF #21, OANN Mem. at 11 (citing *Bristol-Myers Squibb Co. v. Super. Ct.*, 137 S. Ct. 1773, 1780 (2017)).) OANN then mentions that many of its executives and staff are in California, but it does not explain *how* it would be burdensome for OANN if this case proceeds in Washington, D.C., where many other relevant employees work at its D.C. production studio. (ECF #21, OANN Mem. at 11.) Litigating this case in Washington, D.C. could not possibly be more burdensome than operating a television studio and a news bureau in the District for the last nine years. For all these reasons, this Court's personal jurisdiction over OANN comports with due process.[5]

## II.    Venue Is Proper In This District.

Venue is proper in this District under Section 1391(b)(2) because, as Smartmatic alleges, "a substantial part of the events giving rise to the claims in this Complaint occurred in this District." (ECF #1, Compl. ¶20.) Specifically, OANN made and/or published all of its defamatory statements in this District. (ECF #1, Compl. ¶¶ 16, 18, 87, 110, 127, 135, 184, 196, 205, 218, 227, 441, 445, 456, 460.) OANN also published defamatory statements made by its invited guests during interviews researched, edited, produced, and broadcast in OANN's Washington, D.C. studio. (*Id.* ¶¶ 110, 127, 135, 184(v), 184(z), 205(i), 205(j), 205(l), 218(u), 218(z), 227(l).) These are a

---

[5]    Smartmatic has alleged sufficient facts showing that this Court's exercise of jurisdiction over OANN is proper under the long-arm statute and comports with due process. To the extent that this Court finds that Smartmatic has not alleged sufficient facts, Smartmatic is entitled to jurisdictional discovery as to OANN. *See, e.g.*, *Estate of Manook v. Research Triangle Inst., Int'l & Unity Res. Grp., L.L.C.*, 693 F. Supp. 2d 4, 15 (D.D.C. 2010) ("Jurisdictional discovery is appropriate when the existing record is 'inadequate' to support personal jurisdiction and a party demonstrates that it can supplement its jurisdictional allegations through discovery.") (internal citations and quotations omitted). Jurisdictional discovery would provide further evidence of other, non-newsgathering activities at OANN's D.C. office, the number of OANN subscribers in this District, the revenues generated in this District, OANN's advertising to District residents, and OANN's efforts to research, edit, and produce defamatory broadcasts in the Washington, D.C. studio beyond those identified in the Complaint and the public record.

"substantial part of the events giving rise" to Smartmatic's claims in this case. 28 U.S.C. § 1391(b)(2).

OANN argues that venue is not proper in this District because "the most substantial parts" of the claims did not occur in this District. (OANN Mem. at 13.) Even if that were true, venue does not require that "the *most* substantial parts" occur in this District—only that "*a* substantial part" occurred in this District. 28 U.S.C. § 1391(b)(2) (emphasis added). As this Court has held, on a motion to dismiss the question is not "which district is the 'best' venue" or which "has the most significant connection"; it is "whether the district the plaintiff chose had a substantial connection to the claim." *US Dominion*, 554 F. Supp. 3d at 68 (quoting *Exelon*, 380 F. Supp. 3d at 11). "[E]ven if a substantial part of the events in a case took place in one district, a plaintiff may still file suit in another district if a substantial part of the events *also* took place there." *Jalloh v. Underwood*, 300 F. Supp. 3d 151, 155 (D.D.C. 2018). Here, regardless of events in other districts, a substantial part of the events giving rise to Smartmatic's claims took place in *this* District.

Moreover, in defamation cases, venue is proper where the defamatory statements at issue were uttered and published. *US Dominion*, 554 F. Supp. 3d at 68-69. For example, this Court found that a "substantial part" of the events giving rise to Dominion's defamation claims occurred in this District, where one defendant "made numerous in-person and televised appearances in which she voiced her claims to D.C. audiences" and another defendant "spoke at several in-person rallies" in Washington, D.C. *Id.* The same is true here. OANN broadcast numerous televised segments in which its employees and invited guests made defamatory statements about Smartmatic—including statements uttered in this District—to audiences in this District, where the segments were aired. (ECF #1, Compl. ¶¶ 16, 18, 87, 110, 127, 135, 184, 196, 205, 218, 227, 441, 445, 456, 460.) Venue is therefore proper in this District. *US Dominion,* 554 F. Supp. 3d at 68-69; *see also Wachtel v.*

*Storm*, 796 F. Supp. 114, 116 (S.D.N.Y. 1992) (venue proper under Section 1391(a)(2) in the District where defamatory letter was published); *Stern v. O'Quinn*, 2008 WL 11401793, at *7 (S.D. Fla. July 14, 2008) (venue was proper in the District where defendant made defamatory statements in television interviews and where defendant's other nationally televised interviews were broadcast and made available online).

OANN argues that a substantial part of the events giving rise to defamation claims occurs where the plaintiff is injured. (ECF #21, OANN Mem. at 12-13.) However, OANN has not cited a single defamation case where the Court decided venue was improper based on the location of the plaintiff's injury. (*Id.*) Regardless, as shown above (*supra* at I.A.2), Smartmatic *did* suffer reputational injury in this District because, as the Court has reasoned, "[t]his District is where elected officials—some of whom have influence over decisions about elections and government contracts—conduct their business." *US Dominion,* 554 F. Supp. 3d at 67. Smartmatic was injured in this District, by defamatory statements made and published in this District, in television segments researched, edited, produced, and broadcast in this District. These are "a substantial part of the events giving rise to the claims" in this case, and thus venue is proper in this District. *See* 28 U.S.C. § 1391(b)(2).

## III.   The Court Should Not Transfer The Case To The Southern District Of California Because Venue Is Proper In This District.

Finally, this Court should not transfer the case to the Southern District of California because venue is proper in this District. OANN asks the Court to transfer venue pursuant 28 U.S.C. § 1406(a). (ECF #21, OANN Mem. at 14.) Section 1406(a) requires that a "district court of a district in which is filed a case laying venue in the wrong division or district [ ] dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). Transfer under Section 1406(a) "is premised on an action being

brought in the 'wrong' district." *Fam v. Bank of Am. NA (USA)*, 236 F. Supp. 3d 397, 407 (D.D.C. 2017). That is why transfer would be improper here. Smartmatic has already established that venue in this District is proper. *See supra* at II. Where, as here, a case is filed in the proper venue, "the Court has no obligation to dismiss or transfer the case pursuant to 28 U.S.C. [Section] 1406." *Malveaux v. Christian Bros. Servs.*, 753 F. Supp. 2d 35, 38-39 (D.D.C. 2010).[6]

Because OANN has not met the threshold requirement under Section 1406—that the action was filed in the wrong district—this Court need not consider whether transferring it to the Southern District of California would be "in the interest of justice" *See Malveaux*, 753 F. Supp. 2d at 38-39 (court did not review whether a transfer would be "in the interest of justice" under 1406(a) because venue was proper). In any event, the interest of justice would be best served by the case remaining in the District of Columbia, where other related 2020 U.S. election cases—*US Dominion, Inc. v. Herring Networks, Inc.*, No. 1:21-cv-02130 (CJN); *US Dominion, Inc. v. Powell*, No. 1:21-cv-00040 (CJN); *US Dominion, Inc. v. Giuliani*, No. 1:21-cv-00213 (CJN); *US Dominion, Inc. v. My Pillow, Inc.*, No. 1:21-cv-00445 (CJN); *Smartmatic USA Corp. v. Powell*, No. 1:21-cv-02995 (CJN)—are pending before this Court. *See*, *e.g.*, *S.E.C. v. Daly*, 2006 WL 6190699, at *7, n. 1 (D.D.C. Feb. 11, 2006) ("[t]he presence of related cases is a relevant consideration when considering" whether to transfer venue). For all these reasons, OANN's motion to transfer venue should be denied.

## CONCLUSION

OANN's motion to dismiss or transfer (ECF #21) should be denied for all the reasons set forth above.

---

[6]     OANN has not moved for transfer pursuant to 28 U.S.C. § 1404(b)—only Section 1406—and thus it cannot do so on reply. *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 37 (D.D.C. 2010) ("by not raising its venue concerns in its original motion, [defendant] has waived those concerns").

Date:  April 15, 2022

*R*espectfully submitted,

*/s/ J. Erik Connolly*
J. Erik Connolly (D.C. Bar No. IL0099)
Nicole E. Wrigley (D.C. Bar No. IL0101)
Lauren C. Tortorella (D.C. Bar No. IL0102)
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone: 312.212.4949
econnolly@beneschlaw.com
nwrigley@beneschlaw.com
ltortorella@beneschlaw.com

*Attorneys for the Plaintiffs Smartmatic USA Corp., Smartmatic International Holding B.V., and SGO Corporation Limited*

32

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 15th day of April 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system.

*/s/ J. Erik Connolly*
J. Erik Connolly