# Exhibit 6

**VEDDER PRICE (CA), LLP**
ERIC R. MCDONOUGH (SB# 193956)
emcdonough@vedderprice.com
MARIE E. CHRISTIANSEN (SB# 325352)
mchristiansen@vedderprice.com
1925 Century Park East, Suite 1900
Los Angeles, California 90067
T:  +1 424-204-7700
F:  +1 424-204-7702

**VEDDER PRICE P.C.**
BLAINE C. KIMREY (to seek admission *pro hac vice*)
bkimrey@vedderprice.com
JEANAH PARK (to seek admission *pro hac vice*)
jpark@vedderprice.com
BRYAN K. CLARK (to seek admission *pro hac vice*)
bclark@vedderprice.com
222 N. LaSalle Street
Chicago, Illinois  60601
T: +1 312-609-7500
F: +1 312-609-5005

*Attorneys for plaintiff*
*HERRING NETWORKS, INC.*

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego

**03/07/2022** at 08:46:03 AM

Clerk of the Superior Court
By Bernabe Montijo,Deputy Clerk

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN DIEGO

| | |
|---|---|
| HERRING NETWORKS, INC., a California corporation, | Case No. 37-2022-00008623-CU-BC-CTL |
| Plaintiff, | **COMPLAINT** |
| v. | (1)-(2) **Breach of Contract;** |
| AT&T, INC., a Delaware corporation, AT&T SERVICES, INC., a Delaware corporation,  DIRECTV, LLC, a California limited liability company, and WILLIAM KENNARD, an individual, | (3)  **Breach of the Covenant of Good Faith and Fair Dealing;** |
| | (4)  **Intentional Interference With Business Expectancy; and** |
| Defendants. | (5)-(6)  **Violation of California's Unfair Competition Law** |
| | **Jury Trial Demanded** |

Herring Networks, Inc., d/b/a One America News Network ("Herring" or "Plaintiff"), by and through its undersigned attorneys, brings this action against defendants AT&T, Inc. ("AT&T"), AT&T Services, Inc. ("AT&T Services"),

DIRECTV, LLC ("<u>DIRECTV</u>"), and AT&T Board Chairman and Staple Street Capital, LLC ("<u>Staple Street</u>") Executive Board Chairman William Kennard ("<u>Kennard</u>") (collectively, "<u>Defendants</u>"), alleging counts against some or all of them for: (1) breach of contract (confidentiality provision); (2) breach of contract (non-disparagement provision);  (3) breach of the covenant of good faith and fair dealing; (4) intentional interference with business expectancy; (5) violation of California's Unfair Competition Law, Business and Professions Code §§ 17200, *et seq.* ("<u>UCL</u>") (unlawfulness); and (6) violation of the UCL (unfairness).   In support of its Complaint, Herring states as follows:

## **<u>NATURE OF THE ACTION</u>**

1.     This is an action to redress the unchecked influence and power that Defendants have wielded in an attempt to unlawfully destroy an independent, family-run business and impede the right of American television viewers to watch the news media channels and programs of their choice.

2.     Family-owned and operated Herring manages two television networks: A Wealth of Entertainment, or "<u>AWE,</u>" and One America News Network, or "<u>OAN</u>." For the past several years, Herring, AT&T, AT&T Services, and DIRECTV have enjoyed a profitable, mutually beneficial business relationship through which AT&T (through AT&T Services and DIRECTV) carried AWE and OAN and was paid generous commissions via selling advertising on AWE and OAN.  As a result of the contractual carriage and advertising arrangements, AT&T, AT&T Services, and DIRECTV have profited financially and Herring has similarly thrived by growing OAN into one of the most popular cable channels offered on DIRECTV's platform.

3.     However, in violation of contracts with and duties to Herring, AT&T, AT&T Services, and DIRECTV have bowed to political pressure and have put their unlawful interests and the unlawful personal, political, and financial interests of their management ahead of contractual and legal obligations.   Defendants have egregiously disparaged Herring, disclosed confidential contractual terms and

conditions, and interfered with Herring's reasonable expectancy of a continued business relationship with DIRECTV. Additionally, their collective conduct constitutes unlawful and unfair competition in violation of the UCL.

4. These wrongdoings are part and parcel of a larger, coordinated, extremely well-financed political scheme to take down Herring and unlawfully destroy its ability to operate in the media business.

## THE PARTIES

5. Herring is a California corporation with its principal place of business in San Diego, California.

6. AT&T is a Delaware corporation with its principal place of business in Dallas, Texas.

7. AT&T Services is a Delaware corporation with its principal place of business in San Antonio, Texas. Upon information and belief, AT&T Services also operates out of Dallas, Texas. AT&T is the parent company of AT&T Services.

8. DIRECTV is a single-membership-unit California limited liability company with its principal place of business in El Segundo, California. DIRECTV has a single member and manager (Michael Hartman at 2250 East Imperial Highway, 12th Floor, El Segundo, California). DIRECTV thus shares California citizenship with Herring. According to his LinkedIn profile, Hartman serves a dual role as Senior Vice President and Assistant General Counsel of AT&T (a position he has held for more than seven years) and General Counsel and Chief External Affairs Officer of DIRECTV, a position he recently took in February 2021. AT&T is the majority owner of DIRECTV.

9. Kennard is a resident of South Carolina and Washington, D.C. Kennard was born and raised in California, received his bachelor's degree from Stanford University, and has been licensed to practice law in California. Kennard is the Chairman of the Board of Directors of AT&T. Kennard also serves on the Executive Board of Directors of Staple Street. Staple Street is the majority owner of Dominion

Voting Systems Corporation, which in turn is the sole owner of Dominion Voting Systems, Inc.   (Dominion Voting Systems Corporation and Dominion Voting Systems, Inc. are collectively referred to as "<u>Dominion</u>").   Kennard visits California regularly for business and personal reasons.

## <u>JURISDICTION AND VENUE</u>

10.     Jurisdiction is proper pursuant to Section 410.10 of the California Code of Civil Procedure because the acts and events giving rise to liability occurred and continue to occur in California.  Specifically, the contracts at issue in this case were negotiated and executed in California, the actions of (at minimum) Herring and DIRECTV at issue in this case occurred in California, all efforts to encourage California-based DIRECTV to cease carriage of California-based Herring were directed at and/or occurred in California, the unfair and unlawful practices intended to harm Herring in the marketplace were directed at California, and the harm suffered by Herring occurred and will continue to occur in California.

11.     Venue is proper pursuant to Sections 395(a) and 395.5 of the California Code of Civil Procedure because Herring's injury occurred and continues to occur in San Diego County and the subject agreements were to be and have been performed in San Diego County.  Specifically, the contracts at issue in this case were negotiated and intended to be performed by and for the benefit of Herring in San Diego County, the efforts to persuade DIRECTV to cease carriage of OAN were intended to harm Herring (and did harm Herring) in San Diego County, and the unfair and unlawful practices intended to harm Herring in the marketplace were directed at San Diego County.

## <u>FACTUAL BACKGROUND</u>

### A.     <u>Herring's Business</u>

12.     Herring is an independent, family-owned media company headquartered in San Diego, California.   CEO Robert Herring Sr. started the company in 2003 with his sons, Charles Herring ("<u>Charles</u>") and Robert Herring Jr.

("Bobby").  Charles is the President of Herring, and Bobby is the General Manager. The Herrings own and operate two television networks that are national cable channels: AWE and OAN.

13.     AWE is a lifestyle and entertainment channel, which Herring launched in 2004.  AWE airs a wide range of programming, including travel-related series, automotive shows, international news, documentaries, and live championship boxing.  AWE has demonstrated excellent performance since its inception.  It is distributed domestically on 150 cable systems; it has received regional Emmy awards and nominations for its productions; its live championship boxing programming has received multiple recognitions; and as of Q3 2021, AWE performed in the top 35 percent of the channel lineup according to AT&T's own data.

14.     OAN, launched on July 4, 2013, is a news channel that delivers timely national and international news 24 hours a day throughout the United States.  It features political analysis programming, political talk shows, and special documentary-style reports.  OAN provides more live news than any other network. As of the third quarter of 2021, AT&T's own data showed that OAN was a top performing network, ranked 24th (excluding broadcast networks) out of over 300 channels, putting OAN in the top 10 percent of channels offered via DIRECTV. OAN outperformed CNBC, Fox Business, CNN Headline News, Newsmax, and popular entertainment channels such as Paramount Network, Comedy Central, and Animal Planet.  Additionally, OAN's extensive live programming lineup, which preserves the linear experience for viewers, is an ideal genre moving forward to compete with streaming services that don't offer live programming experiences.

**B.     AT&T Helped Launch OAN.**

15.     AT&T is the largest combined telecommunications and entertainment company in the world.  It provides mobile telecommunications, broadband, and Internet subscription services throughout the United States and Latin America. Through its WarnerMedia subsidiary, AT&T manages one of the world's largest TV

and film studios and delivers streaming services through its recently launched HBO Max platform. WarnerMedia also offers a significant portfolio of advertising solutions through Basic Networks, which sells advertising on WarnerMedia's networks and digital properties and through another wholly owned AT&T subsidiary called Xandr, Inc. ("Xandr") (which provides marketers with advanced advertising solutions). As of the close of 2021, AT&T reported $153 billion in aggregate revenue across its three operating segments.

16.     Through its WarnerMedia division, AT&T owns Cable News Network ("CNN") and Home Box Office ("HBO"). Indeed, AT&T's Web site prominently features CNN and one of its news personalities on its investor profile landing page, and AT&T similarly highlights HBO and the HBO Max streaming platform as one of AT&T's crown jewels.

17.     DIRECTV is the country's largest paid satellite TV provider. AT&T acquired DIRECTV in 2015. With a 70 percent ownership interest in DIRECTV, AT&T remains the majority owner of DIRECTV.

18.     AT&T Services is another wholly owned subsidiary of AT&T.

19.     Herring and AT&T have been in business together since June 2006, when AT&T began distributing AWE (formerly known as WealthTV) on its "U-Verse" network. In 2013, at the urging of AT&T, which wanted to compete with Fox News Network with an alternative conservative-leaning network, Herring launched OAN. AT&T Services and OAN entered into a Network Affiliation Agreement on April 10, 2014. AT&T was planning to take an equity stake in Herring to ensure that OAN gained carriage on DIRECTV (pursuant to a put-right agreement between AT&T and DIRECTV). The plan was terminated as AT&T began targeting DIRECTV for a possible acquisition.

20.     AT&T announced its plan to acquire DIRECTV shortly thereafter and enlisted Herring's help to ensure that the Federal Communications Commission ("FCC") approved the acquisition. Herring obliged by, among other things, hiring

lobbyists, meeting with FCC officials, and signing filings in support of the acquisition that were ghostwritten by AT&T.  In exchange, AT&T promised to air OAN and AWE on U-Verse and DIRECTV.

21.    But when the FCC approved AT&T's acquisition of DIRECTV and the acquisition completed in July of 2015, AT&T and DIRECTV did not hold up their end of the bargain, forcing Herring to file suit.  AT&T Services, DIRECTV, and Herring subsequently entered into an Affiliation Agreement on March 9, 2017 ("Affiliation Agreement").  Upon information and belief, AT&T Services later fully assigned the Affiliation Agreement to DIRECTV.  AT&T Services, a/k/a Xandr, and Herring later entered into an Advertising Agreement on April 15, 2019 ("Advertising Agreement").

**C.    The Affiliation Agreement and the Advertising Agreement**

22.    The Affiliation Agreement expanded the business relationship between AT&T and Herring and further extended the business relationship between DIRECTV and Herring.  The Affiliation Agreement demonstrates AT&T's desire for OAN to compete with Fox News Network, providing that OAN's programming was "designed to have broad appeal with special interest to viewers interested in independent and conservative political thought."  (Affiliation Agreement, Ex. A.)

23.    The term of the Affiliation Agreement is five years and is set to expire on April 7, 2022.  (Affiliation Agreement § 1.1.1.)  The Affiliation Agreement is governed by California law.  (*Id.* § 13.)

24.    Since execution of the Affiliation Agreement, OAN has grown substantially, benefiting AT&T, AT&T Services, and DIRECTV.  As of 2021, a substantial amount of OAN's revenue came from the Affiliation Agreement.  Because of OAN's success with DIRECTV, Herring reasonably expected that the Affiliation Agreement would be renewed and took steps in furtherance of that expectation.

25.    For example, in April 2019, Herring expanded its relationship with and reliance on the continuing carriage of OAN through AT&T, AT&T Services, and DIRECTV by entering into the Advertising Agreement with AT&T Services, d/b/a Xandr, on April 15, 2019.  The Advertising Agreement expires in mid-2024.

26.    Before April 2019, Herring worked with a different media vendor that had a non-exclusive right to sell direct response advertising broadcast commercial time on behalf of Herring.

27.    The agreement with the media vendor provided only for the sale of "traditional advertising."

28.    Traditional advertising is seen by all viewers who watch a program.  In contrast, "programmatic targeted advertising" or "dynamic ad insertion" tailors the advertisement to the individual viewer based on data known about the viewer. Programmatic targeted advertising requires express approval by the multichannel video programming distributor or "MVPD" before it can be used.  It is generally more expensive than traditional advertising in terms of commissions paid by the programmer to the sales representative, but has the potential to generate greater revenue.

29.    Herring and AT&T saw an opportunity to expand their relationship to include other services in addition to carriage under the Affiliation Agreement.  By entering into the Advertising Agreement, AT&T Services would provide both traditional advertising and programmatic targeted advertising for Herring's programs.  But the Advertising Agreement gave AT&T Services the exclusive right to sell ad space and required that Herring terminate its existing media vendor.  Seeing an opportunity to solidify and expand its business relationship with AT&T, Herring agreed.

30.    Herring showed loyalty to AT&T through termination of its existing media vendor and also agreed to give AT&T Services more favorable terms.  For example, the Advertising Agreement gave AT&T Services a commission rate for

direct response advertising that was 10 percent higher than Herring's prior deal.  For programmatic targeted advertising, AT&T Services received a commission rate that was 15 percent higher than the market rate for commissions for programmatic targeted advertising.

31.     The Advertising Agreement covers all current and future MVPDs that carry Herring's programs and provides very limited circumstances in which the parties can terminate the agreement before its expiration.

32.     Additionally, there was a slight overlap in April 2019 when both AT&T Services and the prior vendor believed that they were providing advertising sales on behalf of Herring.  Rather than dispute the charges by either company, Herring agreed to make a double payment to satisfy both parties.

33.     Herring reasonably believed that the Advertising Agreement was proof of a commitment to a long-term carriage relationship by AT&T, AT&T Services, and DIRECTV.  This belief was solidified by the fact that the Advertising Agreement was set to expire more than two years after the Affiliation Agreement was set to expire.  Herring did not take issue with the term of the Advertising Agreement because Herring had a reasonable belief that the Affiliation Agreement would be renewed.  Considering the high commission rates, the double payment, the termination of a prior vendor agreement, and the right of exclusivity in the new Advertising Agreement, Herring reasonably believed that AT&T Services and DIRECTV were valuable partners that intended to continue to facilitate carriage of Herring's programs at least through the initial term of the Advertising Agreement.

34.     However, AT&T, AT&T Services, and Kennard, faced with increasing political pressure, interfered with Herring's prospective business expectancy with DIRECTV.  And in doing so, AT&T, AT&T Services and DIRECTV breached the Affiliation Agreement with Herring.

**D.     Dominion Sued Herring for Defamation, Seeking Over $1.6 Billion in Damages in an Attempt to Destroy Herring and Silence OAN.**

35.     Dominion, which Staple Street acquired in 2018, has provided and continues to provide electronic voting systems for elections held in several states in the country, including for the 2020 presidential election.  Long before the 2020 U.S. presidential election, voting machines and software created by Dominion were under intense public scrutiny for their lack of security and reliability.  For example, in 2017, Georgia voters filed a lawsuit related to the security of Dominion voting machines, and in October 2020, the federal judge in that case credited testimony from an "array of experts and subject matter specialists [that] provided a huge volume of significant evidence regarding the security risks and deficits in the [Dominion] systems," finding that those risks were neither "hypothetical nor remote."[1]

36.     Similarly, in January 2020, the state of Texas refused to certify Dominion voting systems, questioning whether they were "safe from fraudulent or unauthorized manipulation."

37.     In the weeks leading up to and after the November 2020 presidential election, President Trump began announcing his belief that the results of the November 2020 presidential election were not accurate, in part because of alleged flaws in Dominion's voting system technology.  Across the country, dozens of lawsuits were filed on behalf of President Trump's campaign challenging the results of the election.

38.     Like most national media outlets, OAN provided extensive coverage of the 2020 presidential election, Dominion's role in the election, and the President's pronouncements about alleged election irregularities, all of which were matters of great public concern.

39.     However, as part of a public relations strategy to burnish Dominion's public image, in early 2021, Dominion began unleashing a torrent of defamation

---

[1]   *Curling v. Raffensperger*, 493 F. Supp. 3d 1264, 1278, 1341 (N.D. Ga. 2020).

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

lawsuits against multiple Trump campaign surrogates and media outlets including Fox News Network, Newsmax, Rudy Giuliani, Sidney Powell, Patrick Byrne, and Michael Lindell.

40.     Later that year, on August 10, 2021, Dominion filed suit against Herring, Robert Herring, Charles Herring, and two OAN reporters in the U.S. District Court for the District of Columbia in a case styled *U.S. Dominion, Inc. et al. v. Herring Networks, Inc. et al.*, Case No. 1:21-cv-02130.   Dominion alleges that Herring and the other defendants defamed Dominion in connection with OAN's coverage of the 2020 presidential election and seeks at least **$1.6 billion** in damages against Herring.

41.     In public interviews, Dominion CEO John Poulos has made clear that it is "[o]ne hundred percent correct" that Dominion will not accept a settlement in its defamation litigation and that it intends to take all of its cases to trial.[2]

42.     AT&T Board Chairman Kennard also serves as a member of the Executive Board of Directors of Staple Street, which is the majority owner of Dominion.   Kennard's role with Staple Street creates a conflict of interest for him in anything having to do with Herring because Dominion, owned largely by Staple Street, currently is suing Herring for $1.6 billion.   Herring is confident that discovery will further demonstrate that Kennard was directly involved in DIRECTV's decision to non-renew OAN and that Kennard has a personal, political, and financial interest in destruction of OAN that is inconsistent with his fiduciary obligations to AT&T shareholders.

43.     Kennard was appointed as Chairman of AT&T's Board on November 6, 2020 — three days after the 2020 U.S. presidential election.   Around this same time, Staple Street's Web site underwent a full transformation, and all information

---

[2] https://www.npr.org/2021/01/12/955938741/dominion-voting-systems-sues-ex-trump-lawyer-over-false-claims (last visited March 5, 2022).

about Staple Street's investment in Dominion and Kennard's role as a member of Staple Street's Executive Board of Directors vanished.

44.     In addition to being Chairman of the Board of AT&T, Kennard also sits on AT&T's Public Policy and Corporate Reputation Committee, which has "the authority to review AT&T's management of its brands to ensure that the value and reputation of the Company's brand names is maintained and enhanced."

45.     Kennard, who is a registered Democrat, has deep ties to the Democratic Party, having been appointed in 1997 as Chairman of the FCC by President Bill Clinton and in 2009 as the U.S. Ambassador to the European Union by President Barack Obama.

46.     When Staple Street acquired Dominion in 2018, it announced that "[w]e are excited to partner with [Dominion CEO John Poulos] and the Dominion Voting team as they embark on their next phase of growth. . . ."  Like any private equity company, Staple Street's goal in acquiring Dominion as a portfolio company was presumably to make Dominion as profitable as possible so Staple Street could in turn sell Dominion for a profit.

47.     On October 8, 2020, Staple Street's Form D Notice of Exempt Offering of Securities filed with the Securities and Exchange Commission disclosed that Staple Street had raised $400 million from unknown investors in an unusual "one and done" deal.  This additional capital raise suggests that Staple Street continues to invest in Dominion's success.

48.     As an Executive Board member of Dominion's majority owner, Staple Street, Kennard is invested in helping to make Dominion succeed and become as profitable as possible.  This includes ensuring Dominion defeats its opponents such as Herring in Dominion's defamation litigation.  And one way to hasten Herring's defeat is by cutting off Herring's ability to earn revenue to help fund its defense.

49.     Kennard's role as Chairman of AT&T's Board gives Kennard significant influence over AT&T and its subsidiaries.  Given AT&T's sole ownership

of AT&T Services and AT&T's majority ownership in DIRECTV, it is obvious that AT&T — through Kennard — induced DIRECTV to discontinue its relationship with Herring without legally adequate justification.

**E.   Liberal Organizations Pressured AT&T to "Drop" OAN.**

50.    AT&T's political goals became clearer in the fall of 2021.  On October 6, 2021, Reuters published an article titled "How AT&T helped build far-right One America News."

51.    In response to that article, AT&T released the following statement, providing confidential information on how the Affiliation Agreement came to be (and implying that AT&T carried OAN only because OAN forced AT&T's hand by suing AT&T in 2016):



AT&T has never had a financial interest in OAN's success and does not 'fund' OAN.  When AT&T acquired DIRECTV, we refused to carry OAN on that platform, and OAN sued DIRECTV as a result.  Four years ago, DIRECTV reached a commercial carriage agreement with OAN, as it has with hundreds of other channels and as OAN has done with the other TV providers that carry its programming.  DIRECTV offers a wide variety of programming, including many news channels that offer a variety of viewpoints, but it does not dictate or control programming on the channels. Any suggestion otherwise is wrong. The decision of whether to renew the carriage agreement upon its expiration will be up to DIRECTV, which is now a separate company outside of AT&T.

52.    AT&T's release of confidential information about the discussions leading to the Affiliation Agreement and its terms violates the Affiliation Agreement's non-disclosure provision, as discussed further below.

53.    Immediately upon release of the Reuters article, liberal and other organizations began publicly criticizing AT&T and DIRECTV for their relationship with OAN.

54.    On October 6, 2021, NAACP President Derrick Johnson issued a public statement condemning AT&T for supporting OAN.  In that statement, the NAACP accused AT&T for causing "irreparable damage to our democracy," stating that it was "sickened by these revelations."[3]  The NAACP's statement was picked up and published throughout the media.[4]

55.    Media Matters of America ("Media Matters"), a politically left-wing organization founded by a prominent political operative within the Democratic Party, began a public Twitter campaign criticizing OAN and AT&T.  On October 6, 2021, Media Matters President Angelo Carusone tweeted, "I want to just put a few things out there about OANN and ATT/DirecTV . . . on how absurd and odious this deal is.  ATT has been paying OANN. . . .  The amount of revenue they give OANN every month is massive.  But it's worse than that."[5]  Carusone went on to take AT&T to task for "propping up" OAN.

56.    Media Matters then published articles critical of AT&T's relationship with OAN.  One such article published October 8, 2021, titled "Fact-checking AT&T's defense of single-handedly funding OAN," criticized AT&T, stating "AT&T is having a bad day after the first part of a bombshell Reuters exposé uncovered the company's extensive involvement in helping to create and fund the far-right conspiracy theory outlet One America News Network."

57.    On October 7, 2021, Ultraviolet, a women's advocacy group, joined the fray, calling on AT&T CEO John Stankey to either resign or immediately sever ties with OAN and fire Ed Gillespie, the former Chairman of the Republican National Committee who had joined AT&T as its senior vice president of external and

[3]  https://naacp.org/articles/naacp-president-and-ceo-derrick-johnson-released-following-statement-following-revelation (last visited March 5, 2022).

[4] https://www.msn.com/en-us/news/politics/naacp-president-blasts-at-t-after-report-linking-company-to-one-america-news/ar-AAPd2WE?li=BB141NW3 (last visited March 5, 2022).

[5] https://twitter.com/GoAngelo/status/1445858337673781249, *available at* https://tinyurl.com/MMtweet5 (last visited March 5, 2022).

VEDDER PRICE (CA), LLP ATTORNEYS AT LAW LOS ANGELES   COMPLAINT

legislative affairs.[6]   Ultraviolet also criticized AT&T for donating to Texas Republican lawmakers who facilitated the passage of recent legislation relating to abortions.

58.   AT&T, under mounting pressure, agreed to meet with the NAACP shortly thereafter.  On October 20, 2021, the NAACP issued a press release stating that NAACP President Derrick Johnson would be meeting with AT&T leadership the next day, on October 21, in Washington, D.C.[7]   The release further stated, "The meeting will focus on the need for AT&T to drop OAN immediately."  The meetings indeed included Mr. Gillespie and others in AT&T's leadership.   During those meetings, the NAACP demanded that AT&T de-platform OAN from DIRECTV and AT&T U-Verse, which are both products directly owned by DIRECTV, not AT&T. In other words, while AT&T publicly claimed on the one hand that it was not affiliated with DIRECTV and did not participate in programming decisions made by DIRECTV, AT&T took meetings with organizations such as the NAACP suggesting that AT&T in fact had the authority and ability to influence DIRECTV's programming decisions.

59.   On October 26, 2021, environmental organization Greenpeace published yet another article titled "How AT&T Funds Right Wing Extremism and Six More Scary Things You Need to Know About the Company."[8]   The article led with criticism of AT&T's support for OAN.

60.   On October 29, 2021, Media Matters published another article titled "AT&T is funding OAN's incendiary misogyny and virulent anti-abortion tirades." The article attempted to make the case that OAN's viability depends on AT&T's

---

[6]  https://www.commondreams.org/newswire/2021/10/07/ultraviolet-says-att-ceo-john-stankey-should-end-companys-relationship-radical (last visited March 5, 2022).

[7] *See* https://thehill.com/homenews/media/577669-naacp-att-to-meet-to-discuss-oann (last visited March 5, 2022).

[8]  https://www.greenpeace.org/usa/how-att-funds-right-wing-extremism-and-six-more-scary-things-you-need-to-know-about-the-company/ (last visited March 5, 2022).

support, stating, "Though AT&T continues to support OAN financially despite its hateful rhetoric, the multinational corporation quickly tried to spin its support for OAN with half-truths and misdirection, which Media Matters debunked."

61.    On November 8, 2021, 16 liberal organizations (including Media Matters) sent a joint letter to the CEOs of AT&T and DIRECTV, stating:

> **We call on DIRECTV to stop carrying OANN.**
> **AT&T, you hold a 70 percent equity stake in DIRECTV and appoint half of DIRECTV's board.  Your equity interest brings with it tremendous influence.  We call on you to do the right thing and demand that DIRECTV take all available means to end its relationship with OANN, so that its customers are no longer forced to subsidize hate and disinformation.[9]**

62.    On October 21, 2021 a representative of AT&T called OAN President Charles Herring on behalf of AT&T CEO John Stankey and told Herring to "stand down" from speaking out and defending OAN from the recent attacks by Media Matters and others, assuring Herring that AT&T would take the lead in defending against the attacks.  In reliance on that statement, neither Herring nor OAN took any public positions to defend themselves against the attacks on their reporting, their business, and their reputations.

63.    As a result, OAN reasonably believed that AT&T would continue its relationship with OAN at least through the term of the Advertising Agreement. Indeed, as recently as December 2021, DIRECTV implemented dynamic ad insertion on AWE, which generates higher revenue than traditional advertising and therefore benefits both Herring and AT&T Services.  The December 2021 deployment of dynamic ad insertion solidified Herring's belief that its relationship with AT&T Services and DIRECTV was on solid ground.

---

[9] November 8, 2021 letter to AT&T and DIRECTV at 1, *available at* https://tinyurl.com/oannletter (last visited March 5, 2022) (emphasis in original).

**F.   Defendants Caved and Publicly Announced that DIRECTV Would "Drop" OAN and AWE.**

64.   On Friday, January 14, 2022, OAN President Charles Herring spoke with DIRECTV Senior Vice President of Content Rob Thun ("Thun").  Throughout much of Herring's relationship with AT&T, Thun has been Herring's primary contact with AT&T and DIRECTV.  During that call, Thun informed Charles that DIRECTV decided not to renew the Agreement.  Thun informed Charles that the decision was made at the board level and was "political," implying that outside forces, such as AT&T and/or Kennard (given his role with Dominion's owner, Staple Street), had influenced the decision.  Indeed, Charles later learned that AT&T's CEO, John Stankey, knew at least two days before that OAN would not be renewed.  The news stunned Charles, Robert and Bobby.

65.   That same day, Bloomberg News released an article titled "DirecTV to Drop One America News in Blow to Conservative Channel."[10]  DIRECTV provided confidential information regarding the parties' discussions on the non-renewal of the Affiliation Agreement to Bloomberg News, writing via email that it had "informed Herring Networks that, following a routine internal review, we do not plan to enter into a new contract when our current agreement expires."  Multiple news outlets such as *The Wall Street Journal, The New York Times* and *The Washington Post* picked up the article, and DIRECTV has since provided similar statements to other media outlets.

66.   Since the news media reported that DIRECTV intended to drop OAN, Herring has been flooded with emails and other communications from viewers who have expressed their dismay that they will no longer be able to watch OAN through DIRECTV.  Consequently, as a direct result of Defendants' wrongful actions, the public will be deprived of its ability to watch the national news source of its choice.

---

[10] *See* https://www.bloomberg.com/news/articles/2022-01-14/directv-to-drop-one-america-news-in-blow-to-conservative-channel (last visited March 5, 2022).

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

67.   Also after DIRECTV's public announcement, OAN representatives have been told by a major MVPD that it will take "wait and see" approach to adding OAN.  The pre-announcement by DIRECTV to not renew OAN — more than 75 days in advance — is atypical in the industry.  There is no question that AT&T's and DIRECTV's strategy was intended to harm OAN.  By making the gratuitous announcement that breached the Affiliation Agreement, AT&T and DIRECTV signaled to the public that something was wrong, hurting OAN's business and standing in the news media business.  And as demonstrated above, concerns about OAN's viability directly sparked by DIRECTV's aggressive, well-in-advance notification approach, have significantly harmed OAN.

68.   The January 14, 2022 Bloomberg News article reported that a "person familiar with the matter" told Bloomberg that the Affiliation Agreement expires in April.  *Supra* note 10.  The only reasonable conclusion is that this information came from someone at DIRECTV or AT&T because the termination date of the Affiliation Agreement was confidential and thus unknown to non-parties.

69.   The Affiliation Agreement contains a confidentiality provision that provides in relevant part:

> **The Parties agree that all terms and provisions of this Agreement** (as well as all data, summaries, reports or information of all kinds, whether oral or written, acquired or devised or developed in any manner from the other Party (and/or the Programmer Related parties or the AT&T Related Parties, as applicable, and/or their respective Representatives), or any proprietary or subscriber information, provided by one Party (and/or the Programmer Related parties or the AT&T Related Parties, as applicable, and/or their respective Representatives) and to the other Party), **its negotiation, and any discussions, or agreements related thereto, as well as information, testimony, documents or other data related to or concerning the Litigation**, or provided and/or obtained in discovery in the Litigation (together, the "Confidential Information") **shall be held strictly confidential by the Parties**, the Programmer Related Parties, the AT&T Related Parties, and their respective Representatives.

Affiliation Agreement § 16.2 (emphasis added.)

70.     In addition to AT&T's October 2021 public statement disclosing the discussions leading to the Agreement, DIRECTV's disclosure of its intent not to renew the Affiliation Agreement and the expiration date of the Affiliation Agreement breached the confidentiality provision in that agreement.  But Defendants' breaches of the Affiliation Agreement did not stop there.

71.     The Affiliation Agreement also contains a non-disparagement provision that AT&T, AT&T Services, and DIRECTV also have breached.

72.     The non-disparagement provision provides, in relevant part:

[T]he Parties, the AT&T Related Parties, the Programmer Related parties, and their respective Representatives during the Term of this Agreement and for two (2) years thereafter, shall not directly or indirectly (or encourage, suggest or organize any other individual, entity or third party or their Representatives to) (1) disparage (including, without limitation, via the Services, blogging, social media, press interviews and/or any public statement) the other Party, the Programmer Related Parties, the AT&T Related parties, and/or their respective Representatives . . . .

Affiliation Agreement § 16.3.

73.     "AT&T Related Parties" is defined broadly to include AT&T and DIRECTV "and all of their current, then-current and former members of the Board of Directors, officers, representatives, agents, employees, attorneys, parent companies, subsidiaries, insurers, partners, predecessors, contractors, successors and assigns including, but not limited to, AT&T Inc., DIRECTV, LLC, AT&T Services, Inc. and AT&T Mobility LLC." *Id.* §§ 16.1.1, 16.1.3.

**G.     AT&T and AT&T Services Disparaged OAN in Violation of the Affiliation Agreement.**

74.     While DIRECTV was still 100 percent owned by AT&T, AT&T and AT&T Services began breaching the non-disparagement provisions in the Affiliation Agreement through CNN, which competes with OAN.  On January 10, 2021, during CNN's *Reliable Sources* program, CNN chief media correspondent Brian Stelter interviewed CNN media reporter Oliver Darcy, who stated, "You have corporations

and people that are profiting off of lies and conspiracy theories, whether that is big tech, whether that's Fox News, whether that's **TV providers that beam OAN** and Newsmax into homes." (Emphasis added.) Stelter responded, "Right. This is a poisoned informational well. That is the big story here."[11]

75. On January 17, 2021, CNN's Stelter continued promoting disparagement of OAN by inviting former Facebook Chief Security Officer Alex Stamos on his *Reliable Sources* program.[12] During the program, Stamos advocated eliminating the capability of conservative programs such as OAN from reaching large audiences. Stamos stated, "And then we're going to have to figure out the OANN and Newsmax problem, that these companies have freedom of speech, but I'm not sure we need Verizon, AT&T, Comcast, and such to be bringing them into tens of millions of homes. . . . Allowing people to seek out information if they really want to, but not pushing it into their faces, I think, is where were going to have to do here." CNN's Stelter thanked Stamos for his comments.

76. On January 22, 2021, Bloomberg News Canada published an article quoting CNN's Darcy and CNN analyst Max Boot.[13] In the article, Darcy implied that conservative channels contributed to the unfortunate events of January 6, 2021 at the U.S. Capitol. In that same article, Boot wrote that "cable providers should 'step in and kick Fox News off.' If Newsmax and rival One America News Network 'continue to incite viewers, they, too, should be booted off,' [CNN analyst Boot] added."

---

[11] *See* https://t.co/ljEEQvKiKI. (last visited March 5, 2022).

[12] *See* https://www.cnn.com/videos/business/2021/01/17/how-to-cover-the-information-crisis--and-curb-it.cnn. (last visited March 5, 2022).

[13] *See* https://www.bnnbloomberg.ca/fox-news-foes-face-uphill-fight-in-getting-cable-network-dropped-1.1552416 (last visited March 5, 2022).

77.     Throughout 2021, CNN steadily released a drumbeat of similar reports and commentary that falsely accused OAN of contributing to the events of January 6, 2021 and engaging in "disinformation" campaigns.

78.     AT&T and AT&T Services also breached the non-disparagement provisions in the Affiliation Agreement on April 5, 2020, when HBO's *Last Week Tonight with John Oliver* dedicated an entire segment to OAN.  Host John Oliver made the following comments about OAN during the segment:

- "The whole selling point for OAN is that they are Fox News with even less shame and even fewer scruples."

- "And I know that it is easy to dismiss OAN as just a stupid, little watched, borderline self-parody.  The problem is if we're learning one thing right now it's that toxic things that start small can get big fast and it's dangerous to ignore them."

- "OAN's weird combination of far right-wing talking points and dirt stupid reporting is incredibly dangerous at a time like this."

- "It is more important than ever to be on the lookout for OAN's bullshit and to make sure no one that *you* know is falling for it either."

79.     Oliver doubled down in his October 10, 2021 episode, referring to OAN as a "ragtag band of fascists" and stating that "with [AT&T's] help, OAN has grown into the toxic network that is today — one that's happy to give a platform to batshit election fraud theories from America's most out-of-breath pillow fetishist."

80.     Around that same time, CNN also doubled down on its disparagement attack on OAN.  For example, on October 6, 2021, CNN anchor Don Lemon stated that OAN is "corrosive to our democracy" and CNN media reporter Oliver Darcy referred to OAN as a "far right-wing conspiracy channel" that "promotes all sorts of nonsense."  The next day when appearing on CNN's *New Day*, CNN chief media correspondent Brian Stelter called OAN "conspiracy laden" and accused OAN of putting "some of the worst of the worst content out there."  He went even further to

state that "there's a difference between real news and conspiracy crap. . . . [OAN] goes on the air and lies to people who for some reason want the lies."

81.     Additionally, when speaking with Oliver Darcy and Reuters reporter John Shiffman on an October 7, 2021 episode of *The Lead with Jake Tapper*, Tapper referred to OAN as "the ultra-far-right cable network that's a major source of lies masquerading as facts."

82.     These are mere examples of the ways in which AT&T and AT&T Services have breached the non-disparagement provision in the Affiliation Agreement.

**H.     AT&T Accused Herring of Defamation, Then Backed Down.**

83.     After DIRECTV announced it would not renew the Affiliation Agreement, OAN anchor Dan Ball reported on January 17, 2022, that Kennard pressured DIRECTV to drop OAN and not renew the Affiliation Agreement.  Robert Herring also gave a statement on January 20, 2022, in which he concluded that Kennard and the AT&T Board directed DIRECTV to remove OAN from DIRECTV's channel lineup.  On January 21, 2022, AT&T's counsel sent a letter to Robert Herring and Mr. Ball accusing them of defaming AT&T and Kennard by suggesting that AT&T and Kennard pressured DIRECTV to drop OAN from its channel lineup.   In that letter, AT&T's counsel demanded that OAN issue a retraction.

84.     That demand for retraction invoked the Texas Defamation Mitigation Act ("DMA"), Tex. Civ. Prac. & Rem. Code §§ 73.051-73.062.  The DMA states, in relevant part:

> A person who has been requested to make a correction, clarification, or retraction may ask the person making the request to provide reasonably available information regarding the falsity of the allegedly defamatory statement not later than the 30th day after the date the person receives the request.  Any information requested under this section must be provided by the person seeking the correction, clarification, or

retraction not later than the 30th day after the date the person receives the request.

DMA § 73.056(a).

85.     The DMA further states, in relevant part:

If a correction, clarification, or retraction is not made, a person who, without good cause, fails to disclose the information requested under Subsection (a) may not recover exemplary damages, unless the publication was made with actual malice.

DMA § 73.056(b).

86.     On February 2, 2022, Herring sent AT&T a letter responding to AT&T's accusations, noting that OAN's assertions that AT&T and Kennard were involved in DIRECTV's decision were not defamatory.

87.     Among other reasons, Herring's letter stated that the statements were true or substantially true because AT&T owns 70 percent of DIRECTV and it is likely irrefutable that Kennard, Chairman of the Board and a member of AT&T's Public Policy and Reputation Committee, provided input on how to respond to the demands to drop OAN.

88.     Herring's letter also argued that AT&T (as DIRECTV's majority owner) and Kennard (as AT&T Board Chairman) tortiously interfered with the Affiliation Agreement (and, by extension, OAN's ongoing relationship with DIRECTV) by inducing DIRECTV to make the decision not to renew the Affiliation Agreement.

89.     Herring's letter also asserted that AT&T and DIRECTV breached the Affiliation Agreement by disclosing confidential terms in the Affiliation Agreement and by disparaging OAN through the statements made by CNN reporters and HBO's John Oliver.

90.     Herring offered to discuss a potential resolution to the claims raised in the January 21 and February 2 letters but received no response as of filing this Complaint.

91.     In the February 2 letter, Herring also demanded, pursuant to the DMA, that AT&T produce information relating to AT&T's retraction demand, including but not limited to (i) communications relating to demands or complaints to AT&T about OAN, including requests that AT&T and/or DIRECTV drop OAN from carriage via DIRECTV; (ii) internal and external communications by Kennard about OAN; (iii) information and communications relating to Kennard's relationship with Staple Street; (iv) internal and external communications about reporting by OAN regarding DIRECTV's non-renewal, AT&T's ownership interest in or control of DIRECTV, Kennard's role in non-renewal of OAN, and the AT&T Board of Directors' role in the non-renewal of OAN; and (v) Kennard's human resources file. Under the DMA, AT&T was required to provide this information to Herring no later than March 2, 2022.

92.     Despite the statutory deadline of March 2, 2022, under the DMA — a statute first invoked by AT&T in its letter — AT&T has neither responded to Herring's letter nor produced any of the information requested as of filing this Complaint.  Given AT&T's obvious familiarity with the DMA and the implications of failing to respond by the deadline, AT&T's lack of response shows that AT&T actually has no evidence of falsity as to Dan Ball's and Robert Herring's statements.

93.     Thus, Ball and Herring were right that AT&T and Kennard, at minimum, were involved in the decision not to renew the Affiliation Agreement.

94.     Kennard is motivated to use his role and position of influence at AT&T to induce DIRECTV not to continue its carriage of OAN, to the benefit of Kennard, Staple Street, and Dominion and to the detriment of OAN.

## **FIRST CAUSE OF ACTION**
### **(Breach of Contract v. AT&T, AT&T Services, and DIRECTV)**

95.     Herring incorporates Paragraphs 1 through 70 by reference as if fully set forth herein.

96.     AT&T Services and DIRECTV entered into a valid and legally enforceable Affiliation Agreement with Herring.

97.     The confidentiality provision contained in Section 16 of the Affiliation Agreement is valid and enforceable.

98.     AT&T is specifically included in the definition of "AT&T Related Party" under Section 16.1.1 of the Affiliation Agreement and is therefore bound by the confidentiality provision therein.   Moreover, "AT&T Related Parties" is specifically defined to include all of the current and former members of the Board of Directors, officers, representatives, agents, employees, attorneys, parent companies, subsidiaries, insurers, partners, predecessors, contractors, successors and assigns of AT&T, DIRECTV, AT&T Services and AT&T Mobility LLC.

99.     In exchange for their commitment not to disclose any Confidential Information as defined in the Affiliation Agreement, AT&T, AT&T Services, and DIRECTV received adequate and sufficient consideration, including advertising revenue and other fees collected from Herring relating to carriage of OAN and AWE.

100.    Herring has fulfilled all of its obligations under the Affiliation Agreement.

101.    AT&T, AT&T Services, and DIRECTV have breached the Affiliation Agreement by disclosing the discussions and terms of the Affiliation Agreement to Reuters, Bloomberg News, and other media outlets.

102.    The foregoing breaches and continuing breaches have directly and proximately caused and will continue to cause Herring damages including, but not limited to, lost revenue associated with a decrease in viewership, lost advertising revenue, and other potential lost business opportunities.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff Herring Networks, Inc. respectfully requests that the Court enter judgment in Plaintiff's favor on Count I and award Plaintiff the following relief:

A. Compensatory and other damages, in an amount to be determined at trial;

B. Pre-judgment and post-judgment interest;

C. Costs of suit, including reasonable attorneys' fees and expenses pursuant to California Code of Civil Procedure Section 1021.5; and

D. Such other and further relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION
### (Breach of Contract v. AT&T and AT&T Services)

103. Herring incorporates Paragraphs 1 through 63 and 71 through 82, by reference as if fully set forth herein.

104. AT&T Services entered into a valid and legally enforceable Affiliation Agreement with Herring.

105. The non-disparagement provision contained in Section 16 of the Affiliation Agreement is valid and enforceable.

106. AT&T is specifically included in the definition of "AT&T Related Party" under Section 16.1.1 of the Affiliation Agreement and is therefore bound by the non-disparagement provision contained therein. Moreover, "AT&T Related Parties" is specifically defined to include all of the current and former members of the Board of Directors, officers, representatives, agents, employees, attorneys, parent companies, subsidiaries, insurers, partners, predecessors, contractors, successors and assigns of AT&T, DIRECTV, AT&T Services and AT&T Mobility LLC. Therefore, CNN and HBO, as well as their on-air personalities and employees (including, but not limited to, John Oliver, Don Lemon, Jake Tapper, Max Boot, Oliver Darcy, and Brian Stelter), are similarly bound by the non-disparagement provision in the Affiliation Agreement.

107. In exchange for their commitment not to disparage Herring and OAN, AT&T and AT&T Services received adequate and sufficient consideration, including

advertising revenue and other fees collected from Herring relating to carriage of OAN and AWE.

108.   Herring has fulfilled all of its obligations under the Affiliation Agreement.

109.   AT&T and AT&T Services have breached the Affiliation Agreement by disparaging OAN as described above.

110.   The foregoing breaches and continuing breaches have directly and proximately caused and will continue to cause Herring damages including, but not limited to, lost revenue associated with a decrease in viewership, lost advertising revenue, and other potential lost business opportunities.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff Herring Networks, Inc. respectfully requests that the Court enter judgment in Plaintiff's favor on Count II and award Plaintiff the following relief:

A.   Compensatory and other damages, in an amount to be determined at trial;

B.   Pre-judgment and post-judgment interest;

C.   Costs of suit, including reasonable attorneys' fees and expenses pursuant to California Code of Civil Procedure Section 1021.5; and

D.   Such other and further relief as the Court deems just and proper.

## **THIRD CAUSE OF ACTION**
**(Breach of Covenant of Good Faith and Fair Dealing v. AT&T Services and DIRECTV)**

111.   Herring incorporates Paragraphs 1 through 49 and 64 through 73 by reference as if fully set forth herein.

112.   AT&T Services and DIRECTV entered into a valid and legally enforceable Affiliation Agreement with Herring.

113.   In connection with the Affiliation Agreement, Herring entered into the exclusive Advertising Agreement with AT&T Services a/k/a Xandr that does not terminate until July 1, 2024.

114.   The Advertising Agreement is less favorable for Herring than Herring's prior vendor because AT&T Services' commission rates were higher than Herring's prior deal, but Herring entered into the Advertising Agreement nonetheless because Herring reasonably believed that it would also get the additional benefit of extended carriage under the Affiliation Agreement.

115.   Herring's belief was reasonable because the Advertising Agreement extended two years beyond the Affiliation Agreement and neither AT&T Services nor DIRECTV gave any indication before January 14, 2022 that the Affiliation Agreement would not be renewed.  In fact, as recently as December 2021, DIRECTV implemented dynamic ad insertion on AWE, which generates higher revenue than traditional advertising and therefore benefits both Herring and AT&T Services.  The December 2021 deployment of dynamic ad insertion bolstered Herring's reasonable belief that DIRECTV intended to renew the Affiliation Agreement beyond its expiration.

116.   Herring has fulfilled its obligations under the Affiliation Agreement and the Advertising Agreement, including by terminating its prior media vendor, entering into the exclusive relationship with AT&T Services through the Advertising Agreement, and paying higher commissions to AT&T Services under the Advertising Agreement than amounts Herring paid under its prior deal.  Herring continues to fulfill all of its obligations under the Affiliation Agreement and all conditions precedent to AT&T Services' and DIRECTV's performance under the Affiliation Agreement have occurred.

117.   But despite Herring's performance, AT&T Services and DIRECTV have unfairly interfered with Herring's rights to receive the benefits of the

Advertising Agreement by inducing DIRECTV to terminate and by terminating carriage of Herring's television networks, OAN and AWE.

118.   As a result, Herring is locked into an Advertising Agreement requiring AT&T Services to be the exclusive advertiser for OAN and AWE, but will be unable to broadcast OAN and AWE via DIRECTV if DIRECTV fails to renew the Affiliation Agreement.

119.   The damage caused by DIRECTV's non-renewal, if not addressed and reversed in the near future, will result in damage to Herring *exceeding $1 billion*.

120.   The conduct of AT&T Services and DIRECTV violates their duties of good faith and fair dealing inherent in the Affiliation Agreement.

121.   The foregoing breaches and continuing breaches have directly and proximately caused and will continue to cause Herring damages including, but not limited to, lost revenue associated with a decrease in viewership, lost advertising revenue, and other potential lost business opportunities.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Herring Networks, Inc. respectfully requests that the Court enter judgment in Plaintiff's favor on Count III and award Plaintiff the following relief:

A.    Compensatory and other damages, in an amount to be determined at trial;

B.    Exemplary damages pursuant to Section 3294(a) of the California Civil Code;

C.    Costs of suit, including reasonable attorneys' fees and expenses pursuant to California Code of Civil Procedure Section 1021.5;

D.    Pre-judgment and post-judgment interest; and

E.    Such other and further relief as the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**(Intentional Interference With Business Expectancy v.**
**AT&T, AT&T Services, and Kennard)**

122.   Herring incorporates Paragraphs 1 through 94 by reference as if fully set forth herein.

123.   Herring has an economic relationship with DIRECTV through the Affiliation Agreement and has a reasonable expectation that that relationship will continue beyond April 2022 to Herring's benefit.  Herring's expectation that its economic relationship with DIRECTV will continue is based on the fact that Herring entered into the exclusive Advertising Agreement with AT&T Services a/k/a Xandr, which does not terminate until July 1, 2024.

124.   The Advertising Agreement is less favorable for Herring than Herring's prior deal because AT&T Services' commission rates were higher than the rates Herring paid to its prior vendor, but Herring entered into the Advertising Agreement nonetheless because Herring reasonably believed that it would also get the additional benefit of extended carriage under the Affiliation Agreement.

125.   Herring's belief was reasonable because the Advertising Agreement extended two years beyond the Affiliation Agreement and neither AT&T Services nor DIRECTV gave any indication before January 14, 2022 that the Affiliation Agreement would not be renewed.  In fact, as recently as December 2021, DIRECTV implemented dynamic ad insertion on AWE, which generates higher revenue than traditional advertising and therefore benefits both Herring and AT&T Services.  The December 2021 deployment of dynamic ad insertion bolstered Herring's reasonable belief that DIRECTV intended to continue its economic relationship beyond the expiration of the Affiliation Agreement.

126.   Indeed, it would not make sense for AT&T Services to be the exclusive advertiser for OAN and AWE if DIRECTV did not also carry OAN and AWE.

127.   AT&T, AT&T Services and Kennard were aware of Herring's economic relationship with DIRECTV and AT&T and AT&T Services took meetings with

leaders of liberal organizations such as the NAACP, who publicly urged AT&T to force DIRECTV to discontinue broadcasting OAN.  There is no reason why AT&T and AT&T Services would agree to meet with the leaders of the NAACP if AT&T and AT&T Services had no ability to influence decision-making at DIRECTV. Indeed, AT&T is DIRECTV's majority owner.

128.   Moreover, AT&T *instructed* Herring to "stand down" from defending itself and OAN from attacks from these organizations and assured Herring that AT&T would "take the lead" in the defense.  Herring reasonably believed that AT&T would also exercise its influence to ensure ongoing carriage on DIRECTV.  Instead, AT&T did the opposite — it took advantage of Herring and interfered with Herring's relationship with DIRECTV, punishing Herring for AT&T's own actions.   And AT&T's ploy worked because AT&T enriched itself by enhancing its standing with prominent organizations such as the NAACP and burnishing its public image, all at the expense of Herring.

129.   For his part, Kennard is motivated to disrupt OAN's business relationship with DIRECTV because the economic consequences of losing carriage with DIRECTV could be devastating to OAN.  This change in circumstances to OAN would enrich Staple Street's portfolio company, Dominion, which is seeking $1.6 billion in damages from OAN.

130.   When DIRECTV's Rob Thun informed Herring of the decision not to renew the Affiliation Agreement, Thun added that the decision was "political" and was made at the board level, implying that AT&T leadership such as Kennard influenced the nonrenewal decision.

131.   Indeed, AT&T executives knew days before January 14, 2022 that Herring's Affiliation Agreement would not be renewed, a clear indication of direct communications and influence by AT&T and DIRECTV regarding the decision not to renew the Affiliation Agreement.

132.   AT&T, AT&T Services, and Kennard took steps to disrupt Herring's economic relationship with DIRECTV.   And AT&T's, AT&T Services, and Kennard's disruption succeeded because DIRECTV has informed Herring it does not intend to continue its business relationship with Herring.

133.   But for AT&T's, AT&T Services' and Kennard's unlawful and unjustifiable interference, DIRECTV would have renewed the Affiliation Agreement at least through the termination date of the Advertising Agreement.

134.   The damage caused by DIRECTV's non-renewal, if not addressed and reversed in the near future, will result in damage to Herring *exceeding $1 billion*.

135.   As a proximate cause of AT&T's, AT&T Services', and Kennard's interference, Herring has been and will be damaged including, but not limited to, all of Herring's lost revenue as a result of DIRECTV's nonrenewal.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Herring Networks, Inc. respectfully requests that the Court enter judgment in Plaintiff's favor on Count IV and award Plaintiff the following relief:

A.   Compensatory and other damages, in an amount to be determined at trial and in an amount sufficient to have a deterrent effect on Defendants;

B.   Exemplary damages pursuant to Section 3294(a) of the California Civil Code;

C.   Injunctive relief;

D.   Costs of suit, including reasonable attorneys' fees and expenses pursuant to California Code of Civil Procedure Section 1021.5;

E.   Pre-judgment and post-judgment interest; and

F.   Such other and further relief as the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### (Violation of Unlawfulness Prong of
### California UCL v. AT&T, AT&T Services, DIRECTV, and Kennard)

136.   Herring incorporates Paragraphs 1 through 94 by reference as if fully set forth herein.

137.   As described above, AT&T, AT&T Services, and DIRECTV have breached the Affiliation Agreement, AT&T Services and DIRECTV have breached the covenant of good faith and fair dealing with respect to the Affiliation Agreement, and AT&T, AT&T Services, and Kennard have tortiously interfered with Herring's reasonable expectancy of a continued business relationship with DIRECTV.

138.   These improper business practices of AT&T, AT&T Services, DIRECTV, and Kennard are unlawful and therefore constitute unfair competition in violation of Cal. Bus. & Prof. Code §17200.

139.   As a result of the unlawful conduct of AT&T, AT&T Services, DIRECTV, and Kennard, Herring paid increased commissions for advertising, and Herring has been and will be significantly injured in the form of lost market share, among other things, as a result of the non-renewal decision if not reversed.

140.   Herring is entitled to injunctive relief and restitution including, but not limited to, the difference between the higher commissions Herring was forced to pay AT&T Services under the Advertising Agreement and market rate commissions.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Herring Networks, Inc. respectfully requests that the Court enter judgment in Plaintiff's favor on Count V and award Plaintiff the following relief:

A.   Injunctive relief;

B.   Restitution;

C.   Costs of suit incurred herein, including reasonable attorneys' fees and expenses pursuant to California Code of Civil Procedure Section 1021.5; and

D.     Such other and further relief as the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### (Violation of Unfairness Prong of California UCL v. AT&T, AT&T Services, DIRECTV, and Kennard)

141.   Herring incorporates Paragraphs 1 through 94 by reference as if fully set forth herein.

142.   Viewers of OAN, including citizens of California, have a personal interest in being given a choice to watch diverse news programming that offers a wide range of views and opinions, including those offered by OAN.

143.   AT&T, which owns WarnerMedia, ultimately operates several channels such as CNN and HBO, which compete with OAN.

144.   As described above, AT&T, AT&T Services, and DIRECTV have breached the Affiliation Agreement, AT&T Services and DIRECTV have breached the covenant of good faith and fair dealing with respect to the Affiliation Agreement, and AT&T, AT&T Services, and Kennard have tortiously interfered with Herring's reasonable expectancy of a continued business relationship with DIRECTV.

145.   Additionally, the actions by AT&T, AT&T Services, DIRECTV, and Kennard harmed consumers and shareholders of AT&T because Defendants have allowed their personal, political, and financial interests to undermine what is best for viewers of OAN and AWE and shareholders of AT&T.

146.   As a result of the conduct of AT&T, AT&T Services, DIRECTV, and Kennard, OAN and AWE might be forced off the air because Herring will no longer be able to broadcast OAN and AWE via DIRECTV and Herring presently has limited alternative carriage options.

147.   AT&T, AT&T Services, DIRECTV, and Kennard's conduct is unfair and limits competition and viewers' choices.

148.   As a result of the unfair conduct of AT&T, AT&T Services, DIRECTV, and Kennard, Herring paid increased commissions for advertising, and Herring has

been and will be significantly injured in the form of lost market share, among other things, as a result of the non-renewal decision.

149.   Herring is entitled to injunctive relief and restitution, including, but not limited to, the difference between the higher commissions Herring paid AT&T Services under the Advertising Agreement and market rate commissions.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff Herring Networks, Inc. respectfully requests that the Court enter judgment in Plaintiff's favor on Count VI and award Plaintiff the following relief:

A.      Injunctive relief;

B.      Restitution;

C.      Costs of suit incurred herein, including reasonable attorneys' fees and expenses pursuant to California Code of Civil Procedure Section 1021.5; and

D.      Such other and further relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

**(All Claims)**

WHEREFORE, plaintiff Herring Networks, Inc. respectfully requests that the Court enter judgment in Plaintiff's favor on all Causes of Action and award Plaintiff the following relief:

A.      Injunctive relief;

B.      Compensatory damages, in an amount to be determined at trial and in an amount sufficient to have a deterrent effect on Defendants;

C.      Restitution;

D.      Exemplary damages pursuant to Section 3294(a) of the California Civil Code;

E.      Pre-judgment and post-judgment interest;

F.      Costs of suit incurred herein, including reasonable attorneys' fees and

expenses pursuant to California Code of Civil Procedure Section 1021.5; and

G.     Such other and further relief as the Court deems just and proper.

Plaintiff Herring Networks, Inc. hereby demands a trial by jury.

Dated: March 7, 2022                    HERRING NETWORKS, INC.


By:/s/ *Eric R. McDonough*
ERIC R. MCDONOUGH

**VEDDER PRICE (CA), LLP**
ERIC R. MCDONOUGH (SB# 193956)
emcdonough@vedderprice.com
MARIE E. CHRISTIANSEN (SB# 325352)
mchristiansen@vedderprice.com
1925 Century Park East, Suite 1900
Los Angeles, California 90067
T:  +1 424-204-7700
F:  +1 424-204-7702

**VEDDER PRICE P.C.**
BLAINE C. KIMREY
(to seek admission *pro hac vice*)
bkimrey@vedderprice.com
JEANAH PARK
(to seek admission *pro hac vice*)
jpark@vedderprice.com
BRYAN K. CLARK
(to seek admission *pro hac vice*)
bclark@vedderprice.com
222 N. LaSalle Street
Chicago, Illinois  60601
T: +1 312-609-7500
F: +1 312-609-5005