**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION c/o Cogency Global 1025 Vermont Ave., NW, Suite 1130 Washington, DC  20005, <br><br> Plaintiffs, <br><br> v. <br><br> MY PILLOW, INC. and MICHAEL J. LINDELL 343 E 82nd Street #102 Chaska, MN  55318, <br><br> Defendants. | Case No. 1:21-cv-00445-CJN <br> Judge Carl J. Nichols |

---

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT MY PILLOW, INC'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM, FOR LACK OF PERSONAL JURISDICTION, AND FOR IMPROPER VENUE**</u>

**LEWIN & LEWIN, LLP**
Nathan Lewin (D.C. Bar No. 38299)
888 17th Street NW
Fourth Floor
Washington, DC 20006
Telephone: (202) 828-1000
nat@lewinlewin.com

*Counsel for Defendant My Pillow, Inc.*


Alan Dershowitz (MA Bar No. 121200)
1575 Massachusetts Avenue
Cambridge, MA 02138



*Of Counsel for Defendant My Pillow, Inc.*

**PARKER DANIELS KIBORT LLC**
Andrew D. Parker (MN Bar No. 195042)*
Elizabeth S. Wright (MN Bar No. 184111)*
Joseph A. Pull (D.C. Bar No. 982468)
Gregory N. Arenson (MN Bar No. 398276)*
Abraham S. Kaplan (MN Bar No. 399507)*
888 Colwell Building
123 N. Third Street
Minneapolis, MN 55401
Telephone: (612) 355-4100
parker@parkerdk.com
wright@parkerdk.com
pull@parkerdk.com
arenson@parkerdk.com
kaplan@parkerdk.com

\* Pro Hac Vice Motion Pending
*Counsel for Defendant My Pillow, Inc.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ............................................................................................................ 1

DIMISSAL BASED ON RULE 12(b)(6) .......................................................................4

I.      THE COMPLAINT'S ALLEGATIONS PROVE ON THEIR FACE
        THAT THIS LAWSUIT SUPPRESSES SPEECH AND IS
        CONSTITUTIONALLY BARRED UNDER
        *NEW YORK TIMES v. SULLIVAN* ...................................................................4

II.     MR. LINDELL'S STATEMENTS WERE MADE IN A
        "DEBATE ON PUBLIC ISSUES" .......................................................................6

III.    PLAINTIFFS' OWN ALLEGATIONS ESTABLISH THAT
        DOMINION IS A PUBLIC FIGURE ..................................................................8

        A.      In the 2020 Presidential Election Dominion Acted as a Public Official ...........8

        B.      Dominion Has Generated Sufficient Fame and Notoriety to Make It a
                Public Figure .........................................................................................9

        C.      Dominion Became a Limited Purpose Public Figure by Thrusting
                Itself Into a Public Controversy ............................................................10

IV.     PLAINTIFFS HAVE MADE NO PLAUSIBLE ALLEGATION THAT
        MR. LINDELL HAD ANY SUBJECTIVE DOUBT OF THE TRUTH
        OF HIS STATEMENTS OR THAT THEY WERE MADE WITH
        RECKLESS DISREGARD OF THEIR TRUTH ........................................11

        A.      The Complaint Fails to Allege Any Statement or Conduct By
                Mr. Lindell Suggesting That He Doubted the Truth of
                His Statements Regarding Dominion ...................................................11

        B.      The Complaint Fails to Allege Any Fact From Which a Factfinder
                Could Infer That Mr. Lindell Had the Subjective Intent Required
                for a Finding of Actual Malice .............................................................12

        C.      The Complaint's Wild Speculations Regarding Mr. Lindell's
                Knowledge Are Worthless .....................................................................12

|   | 1. | The Card-Counting Allegation ................................................... | 12 |
|   | 2. | The Georgia Hand Recount ....................................................... | 13 |
|   | 3. | Dominion's Cease-and-Desist Letters ...................................... | 14 |
|   | 4. | Preconceived Ideas ................................................................... | 14 |
|   | 5. | MyPillow Business Promotion ................................................. | 14 |
|   | D. | It Is Widely Recognized That Dominion's Voting Systems are Insecure and Unreliable .................................................... | 14 |

**V.**     **THE COMPLAINT SHOULD BE DISMISSED NOW SO THAT DEFENDANTS WILL NOT BE BURDENED WITH UNJUSTIFIED ATTORNEYS' FEES AND LITIGATION COSTS** ....................................... **17**

**VI.**     **MYPILLOW CANNOT BE HELD LIABLE FOR ANY STATEMENT ABOUT THE ELECTION OR DOMINION BECAUSE IT HAS MADE NONE** ....................................................................................... **18**

**VII.**     **COUNT TWO SHOULD BE DISMISSED BECAUSE IT RECASTS THE DEFAMATION CLAIM AS A DECEPTIVE TRADE PRACTICE CLAIM** ............................................................................... **20**

**VIII.**     **ATTORNEYS' FEES SHOULD BE AWARDED TO THE DEFENDANTS UNDER THE DISTRICT OF COLUMBIA'S ANTI-SLAPP ACT** ......................................................................................... **21**

**DISMISSAL BASED ON RULE 12(b)(2)** ........................................................... **22**

**IX.**     **MYPILLOW IS NOT SUBJECT TO PERSONAL JURISDICTION IN THE DISTRICT OF COLUMBIA** ..................................................... **22**

|   | A. | Dominion Has Failed to Establish That MyPillow Transacted Business in the District of Columbia ............................... | 25 |
|   | B. | Dominion Has Failed to Establish That It Was Injured in the District of Columbia .......................................................... | 25 |

**DISMISSAL OR TRANSFER DUE TO IMPROPER VENUE** .......................... **27**

**X.**     **MINNESOTA IS THE PROPER VENUE** ............................................. **27**

**CONCLUSION** ....................................................................................................... **30**

**APPENDIX** .............................................................................................................. **32**

## **TABLE OF AUTHORITIES**

**Cases**

*Abbas v. Foreign Policy Group*, 783 F.3d 1328 (D.C. Cir. 2015)..................................... 21

*Arpaio v. Zucker*, 414 F. Supp. 3d (D.D.C. 2019) ............................................................ 21

*Ashcroft v. Iqbal*, 556 U.S. (2009) ..................................................................................... 5

*Bell Atlantic Corp. v. Twombly*, 550 U.S. (2007) ............................................................... 5

*Bristol-Myers Squibb Co. v. Superior Court of California,* 137 S. Ct. (U.S. 2017)............ 22

*Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. (D.D.C. 1995)................................. 18

*Competitive Enterprise Institute v. Mann*, 150 A.3d (D.C. 2016) ...................................... 21

*Crane v. New York Zoological Soc.,* 894 F.2d (D.C. Cir. 1990) ......................................... 23

*Curling v. Raffensperger,*  2020 WL 5994029 (Oct. 11, 2020).................................... 13, 15

*Dameron v. Washington Magazine*, 779 F.2d (D.C. Cir. 1985) ......................................... 10

*Davis v. Costa-Gavras*, 580 F. Supp. (S.D.N.Y. 1984) .......................................... Moncrief27

*Dean v. American Fed'n of Gov't Emps., Local 476,* 509 F. Supp.2d (D.D.C. 2007) ........ 19

*Fairbanks v. Roller*, 314 F. Supp.3d (D.D.C. 2018).......................................................... 21

*Fam v. Bank of America NA*, 236 F. Supp. 3d (D.D.C. 2017)............................................ 27

*Farah v. Esquire Magazine,*  736 F.3d (D.C. Cir. 2013) .............................................. 18, 21

*First Chicago Int'l v. United Exch. Co.,* 836 F.2d (D.C. Cir. 1988)................................... 24

*Fridman v. Bean LLC*, 2019 WL 231751 (D.D.C. 2019)................................................... 21

*Gertz v. Robert Welch, Inc,*. 418 U.S. (1974) ..................................................................... 9

*Greene v. National Head Start Ass'n.*, 610 F.Supp. 2d (D.D.C. 2009) .............................. 28

*GTE New Media Servs. Inc. v. BellSouth Corp*., 199 F.3d (D.C. Cir. 2000).............................. 22

*Hourani v. PsyberSolutions LLC*, 164 F. Supp.3d (D.D.C. 2006).............................. 26, 29

*International Distr'g Corp. v. American Dist. Tel. Co.,* 569 F.2d (D.C. Cir. 1977) .................. 19

*Jankovic v. International Crisis Grp.,*  822 F.3d (D.C. Cir. 2016).............................. 7, 10, 12, 14

*Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F. 3d (D.C. Cir. 2017) ........................................ 4, 18

*Kasner v. Gage*, 161 N.W.2d (Minn. 1968)........................................................................ 19

*Libre by Nexus v. Buzzfeed, Inc.*, 311 F. Supp.3d (D.D.C. 2018)....................................... 21

*Lohrenz v. Donnelly*, 350 F.3d (D.C. Cir. 2003) ............................................................... 10

*Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d (D.D.C. 2011)................................. 21, 26, 29

*McFarlane v. Esquire Magazine*, 74 F.3d (D.C. Cir. 1996) ......................................... 11, 12

*Moldea v. New York Times Co*., 22 F.3d (D.C. Cir. 1994) ................................................. 21

*Moncrief v. Lexington Herald-Leader Co*., 807 F.2d. (D.C. Cir. 1986).............................. 25

*Montgomery v. Risen*, 197 F. Supp.2d  (D.D.C. 2016)................................................. 11, 21

*New York Times Co. v. Sullivan*, 376 U.S. (1964).................................................... passim

*OAO Alfa Bank v. Center for Public Integrity*, 387 F. Supp.2d (D.D.C. 2005) ..................... 8, 11

*Parsi v. Daioleslam*, 595 F. Supp.2d  (D.D.C. 2009) ................................................... 7, 11

*Preservation Soc. of Charleston v. U.S. Army Corps of Eng'rs*, 893 F. Supp. 2d  (D.D.C. 2012)
........................................................................................................................... 28, 30

*Reynolds v. Sims*, 377 U.S. (1964).................................................................................... 7

*Robo-Team NA, Inc. v. Endeavor Robotics,* 313 F.Supp. 3d (D.D.C. 2018)............................ 23

*Rosenblatt v. Baer*, 383 U.S. 75, 87 (1966) ...................................................................... 9

*Rosenbloom v. MetroMedia, Inc.,* 403 U.S. 29, 43-44 (1971) ....................................................... 2

*Semrad v. Edina Realty,* 493 N.W.2d (Minn. 1992)........................................................................ 19

*Smith v. Jenkins,* 452 A. 2d 333, 335 (D.C. 1982)......................................................................... 19

*Stromberg v. California*, 283 U.S. (1931) ......................................................................................... 5

*Tah v. Global Witness Publ'g, Inc.*, 991 F.3d (D.C. Cir. 2021) .................................... 5, 11, 12, 14

*Tavoulareas v. Piro*, 817 F.2d (D.C. Cir. 1987) ..................................................................... 8, 9, 12

*United States v. Associated Press*, 52 F. Supp. (S.D.N.Y. 1943) ................................................... 1

*Waldbaum v. Fairchild Publ'ns, Inc.,* 627 F.2d (D.C. Cir. 1980) ............................................... 7, 9

*Walden v. Fiore*, 571 U.S. (2014). ................................................................................................... 22

*Washington Post Co. v. Keogh,* 365 F.2d (D.C. Cir. 1966)................................................ 4, 17, 19

*White v. Boucher*, 322 N.W.2d 560, 566 (Minn. 1982).................................................................. 19

**Statutes**

21 U.S.C. § 1391(b) .................................................................................................................. 27, 28

28 U.S. C. § §(a) ........................................................................................................................ 4, 28

D.C. Code § 13-423 .............................................................................................................. passim

Minn. Stat. § 325D.44.......................................................................................................... 20, 21, 29

O.C.G.A. § 10–1–372(a)(8) .......................................................................................................... 21

**Rules**

Federal Rule of Civil Procedure 12(b)(3) ..................................................................................... 27

Federal Rule of Civil Procedure 8(a)(2) ......................................................................................... 5

Federal Rule of Civil Procedure 12(b)(2) ....................................................................................... 4

Federal Rule of Civil Procedure 12(b)(6) ..................................................................................... 18

# INTRODUCTION

This case is part of a coordinated crusade by Plaintiffs ("Dominion") to silence debate regarding a matter of the utmost public concern in a democratic society – the integrity of its elections.   Plaintiffs are a private company hired by the government to perform the critical governmental function of helping to conduct free and fair elections.   The freedom to speak openly in the public square about such subjects is a keystone foundational freedom of our democracy. It is under assault in this lawsuit.

The First Amendment shelters more than popular speech or small talk. It exists to protect controversial attitudes, including those that challenge mainstream narratives.   Dominion is a governmental actor whose actions may have determined the outcome of a presidential election and it is aggressively trying to stifle all criticism.   Such criticism of a governmental actor to whom such a crucial governmental role has been delegated warrants the highest level of First Amendment protection. Retaining an open democratic society requires vigilance against both direct and indirect efforts to gag and stifle speech, particularly speech that is critical of the government or its agents and is a matter of great public interest.

"Debate on public issues should be uninhibited, robust, and wide open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).   The First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." *Id.* (quoting Judge Learned Hand, *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)).

This case is no ordinary isolated defamation lawsuit.  Plaintiffs' suit is a part of a broader campaign consisting of at least (a) four widely publicized billion-dollar lawsuits, (b) Dominion's

public boast that it has sent more than 150 cease-and-desist letters, and (c) Dominion's multiple media declarations and assertions made for one goal - to shut down and end public debate concerning the 2020 Presidential election and concerning the integrity of Dominion's electronic voting machines. Plaintiffs pervert the legal system to destroy those who do not fall in line and to threaten those who consider speaking their mind. This is a form of "lawfare" intended to compel compliance and restrict the marketplace of ideas to a single viewpoint. It is antithetical to our Constitution and cannot be allowed.

By undertaking (for ample payment) to tabulate ballots in the Presidential election of 2020, Plaintiffs became governmental actors and public figures as those terms have been defined by decisions of the Supreme Court and United States Courts of Appeal.  The performance of their public/governmental functions is "a subject of public or general interest." *Rosenbloom v. MetroMedia, Inc.,* 403 U.S. 29, 43-44 (1971) (plurality opinion of Brennan, J.)  Under binding Supreme Court precedent, Defendants have a constitutionally protected right to criticize those who perform such governmental functions. Some, or even many, may disagree, but the dispute must be aired in the hurly burly of the marketplace of ideas, not in a courtroom, even if the debate becomes boisterous and distasteful.

In any event, Defendant My Pillow, Inc. ("MyPillow") cannot be held liable for defamation. It has not made any statement about Plaintiffs, defamatory or otherwise.  It is a stretch too far to impute a company executive's personal political statements to the company. Such expansion of liability will encourage others to emulate the Plaintiffs' tactics and will chill free speech.

The public record and incontrovertible facts support Mr. Lindell's personal commitment to the truth of his statements. As described more fully below, courts have explicitly stated that

Dominion's voting systems lack cybersecurity and voting-system integrity. Reports and expert opinions, as well as affidavits, attest to system deficiencies that affected the 2020 election and those that came before. Some states like Texas have rejected the Dominion voting systems after examining their vulnerability to hacking. Others like Arizona have attempted to "restore integrity to the election process" by ordering post-election forensic audits that include Dominion's voting machines.[1] The New Hampshire Senate voted 24-0 last month to conduct a complete examination of Dominion-owned voting machines after suspicious shorting of votes was discovered.[2] After about 6,000 votes were discovered to have been wrongly switched between the Presidential candidates – a so-called "glitch" – litigation involving Dominion voting machines is ongoing in Antrim County, Michigan.   After about 6,000 votes were discovered to have been wrongly switched between the Presidential candidates – a so-called "glitch" – litigation involving Dominion voting machines is ongoing in Antrim County, Michigan.

Mr. Lindell has an absolute right secured by the First Amendment to summarize publicly the evidence of election fraud and the conclusions regarding Dominion's performance that this evidence generates, even if these conclusions conflict with the views expressed by Hollywood, by mainstream legacy media, and by mainstream social media platforms.  This is the very debate that the Constitution encourages and protects.

In the 115 pages of Dominion's bombastic and tedious complaint no credible fact is alleged to support the Plaintiffs' legal burden to prove that Mr. Lindell – much less MyPillow – made any statement concerning Dominion that he knew was false or that was made with reckless

---

[1]   https://www.azsenaterepublicans.com/post/senate-chooses-qualified-auditing-firm-to-conduct-forensic-audit-of-maricopa-county-election-results

[2] https://onenewsnow.com/politics-govt/2021/03/05/dominion-gets-caught-shorting-gop-candidates

disregard of its truth. Plaintiffs cannot meet this standard, described by courts as "daunting" and "almost impossible" to satisfy. Plaintiffs' allegations concerning Mr. Lindell's state of mind are mere conclusory assertions and rank speculation.

The substantial expense of litigation and risks involved in cases such as this have an enormous chilling effect on speech and often result in cancelling the freedom to express ideas. Defamation cases like this one must be weeded out and terminated on early Rule 12(b)(6) motions to avoid the enormous costs (economic and otherwise) and to avoid silencing and self-censorship. *New York Times*, 376 U.S. at 279. *See also Kahl v. Bureau of Nat'l Affairs, Inc*., 856 F. 3d 106, 109 (D.C. Cir. 2017); *Washington Post Co. v. Keogh,* 365 F.2d 965, 968 (D.C. Cir. 1966). Dismissal at this early stage of the litigation is required.

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure this matter must be dismissed for lack of personal jurisdiction over MyPillow. If it proceeds, this case should be transferred to the Federal District Court in Minnesota pursuant to 28 U.S. C. § 1404(a).

## DISMISSAL BASED ON RULE 12(b)(6)

### I.

### THE COMPLAINT'S ALLEGATIONS PROVE ON THEIR FACE THAT THIS LAWSUIT SUPPRESSES SPEECH AND IS CONSTITUTIONALLY BARRED UNDER *NEW YORK TIMES V. SULLIVAN*

In *New York Times v. Sullivan*, 376 U.S. 254 (1964), the Supreme Court enforced the First Amendment's right to freedom of expression by declaring a "federal rule" that "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' – that is knowledge that it was false or with reckless disregard of whether it was false or not." *Id*. at 279-280. The First Amendment enshrines "a profound national commitment to the principle that debate on

public issues should be uninhibited, robust, and wide-open." *Tah v. Global Witness Publ'g, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021) (quoting *New York Times,* 376 U.S. at 270).

Plaintiffs have filed a 115-page pleading that flouts the instruction of Federal Rule of Civil Procedure 8(a)(2) that a complaint contain "a short and plain statement of the claim." Its 178 paragraphs and 241 footnotes speak more to the media than to a court of justice. In all its endless verbosity, Dominion's complaint is devoted to general attacks having nothing to do with their legal claims.  The complaint fails to allege any "factual content" under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The Court need not look beyond the complaint's allegations to conclude that the relief it requests would suppress constitutionally protected freedom to engage in public debate in a public forum.

*First*, as demonstrated in Section II of this Memorandum (pp. 6-8, *infra*), the subject of the statements allegedly made by the Defendants – utterances that the Plaintiffs pejoratively characterize in at least 24 paragraphs as the "Big Lie" – is the integrity of the 2020 Presidential Election. That subject, which continues to be debated – and investigated – to this day by several states and by many loyal Americans, is unquestionably a matter of substantial public interest. The Supreme Court in its *New York Times* opinion emphasized "[t]he maintenance of the opportunity for ***free political discussion*** to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means." 376 U.S. at 269 (quoting *Stromberg v. California*, 283 U.S. 359, 369 (1931) (emphasis added)). In the United States today there is no more important national debate calling for "free political discussion" than the

controversy over election integrity. It continues to capture the attention of print, electronic, and social media platforms.

*Second*, as we explain in Section III of this Memorandum (pp. 8-11, *infra*), the Plaintiffs proudly boast that they carried out critical public functions in the 2020 Presidential election. Paragraph 157 of the complaint alleges that Dominion's voting "technology services" are used "in a majority of states across the country." Under "long term" contracts Dominion can net "over a hundred million dollars." If a human being or a group of humans would ever amass such enormous control over the accuracy of votes cast in a democracy, no one could possibly quarrel with their characterization as "public officials" under *New York Times v. Sullivan*. The Plaintiffs may be corporations, but their legal rights to maintain a defamation lawsuit must be measured by the same standard as would govern the rights of individuals having that huge responsibility to the public.

*Third*, we note in Section IV of this Memorandum (pp. 11-17, *infra*) that the complaint contains not a single credible and plausible allegation that the allegedly defamatory statements made by Mr. Lindell were believed by him to be false or made with reckless disregard of their truth. The complaint declares in paragraph 164 – with no proof whatever of Mr. Lindell's state of mind – that he acted with "actual malice." It wantonly attributes malicious motives to 27 statements of Mr. Lindell that are enumerated in paragraph 165 with nothing more than Plaintiffs' conclusory characterization of these statements as "false." In fact, Mr. Lindell knew all his statements regarding Dominion to be true when he made them and continues to know them to be true today.

## II.

## MR. LINDELL'S STATEMENTS WERE MADE IN A "DEBATE ON PUBLIC ISSUES"

The Supreme Court's decision in *New York Times* implemented "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." 376 U.S. at 270. After cautioning that "[c]ourts must exercise care in deciding what is a public controversy" and meticulously analyzing its elements, the D.C. Circuit held in *Waldbaum v. Fairchild Publ'ns, Inc.*,  "If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy." 627 F.2d 1287, 1297 (D.C. Cir. 1980).

The merit and integrity of Dominion voting machines was – and continues to be – "debated publicly." The ramifications of this debate are "foreseeable and substantial" for nonparticipants. The Supreme Court held in 1964 that "[t]he right to vote freely for the candidate of one's choice is the essence of a democratic society." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). The right to vote encompasses not only the option to cast a ballot but also a right to have one's vote counted. *United States v. Classic*, 313 U.S. 299, 315 (1941). Hence the subject that Mr. Lindell discussed in his public statements regarding Dominion was unquestionably a "public issue" constitutionally committed to debate in the public marketplace of ideas.

This conclusion is fortified by decisions in the District of Columbia that followed *Waldbaum*. Judge Rogers' opinion in *Jankovic v. International Crisis Grp.*,  822 F.3d 576, 585-586 (D.C. Cir. 2016), held that "the progress of political and economic reform in Serbia and the integration of Serbia into international institutions" was a debatable public controversy shielded by the *New York Times* decision. Can there be any doubt that the integrity of the 2020 Presidential election and Dominion voting machines that may have affected its outcome is a more critical "public issue" in the United States than economic reform in Serbia?

7

In *Parsi v. Daioleslam*, 595 F. Supp.2d 99, 105 (D.D.C. 2009), District Judge Bates ruled that "[t]he relationship between the United States and Iran" is a public issue because it "has been debated at length and for years." Other controversial topics that are plainly much less significant to the American public have been acknowledged to be constitutionally protected public issues in reported District of Columbia cases. *Tavoulareas v. Piro*, 817 F.2d 762, 773 (D.C. Cir. 1987) ("whether the management and structure of the United States' private oil industry was in need of alteration or reform"); *OAO Alfa Bank v. Center for Public Integrity*, 387 F. Supp.2d 20, 43 (D.D.C. 2005) ("the rise of the oligarchs and the decline of the Russian economy"). In light of these judicial precedents, there can hardly be any question that Mr. Lindell was addressing a "public issue" when he questioned the integrity of the Plaintiffs' "technology services."

## III.

## PLAINTIFFS' OWN ALLEGATIONS ESTABLISH THAT DOMINION IS A PUBLIC FIGURE

Paragraph 157 of Plaintiffs' complaint describes Dominion as a "company that provides local election officials with tools they can use to run elections." It sells "voting technology services to elected officials from both political parties" in "a majority of states across the country." Plaintiffs boast that in the 2020 Presidential election 28 states "administered their elections by using Dominion's tabulation devices to count paper ballots." Dominion carried out the government's primary function related to the election and is a governmental actor.

### A.     In the 2020 Presidential Election Dominion Acted as a Public Official.

The *New York Times* decision held that the Constitution bars "damages for libel in actions brought by public officials against critics of their official conduct." 376 U.S. at 283. The statements that the Plaintiffs claim are defamatory all related to the "official conduct" in which Dominion engaged when its voting machines and "tabulation devices" recorded and counted the

ballots in 28 states. These devices performed a governmental task that would, in the absence of modern technology, be performed by human personnel. Hence Dominion is, in every material legal and practical respect, acting as a public official engaged in official conduct. Criticism of Dominion's performance is as constitutionally protected as criticism of a secretary of state responsible for certification of election results or an election commissioner.

The Supreme Court stated in *Rosenblatt v. Baer*,  that the constitutional shield extends to criticism of "those persons who are in a position significantly to influence the resolution" of public issues. 383 U.S. 75, 87 (1966). The Plaintiffs trumpet their ability "significantly to influence" elections in at least 28 states. Their own allegations render them "public officials" within the scope of the *New York Times* doctrine, and the Constitution remits them to the public square to rebut criticism and denies them access to a court unless they can prove "actual malice."

**B.**   **Dominion Has Generated Sufficient Fame and Notoriety to Make It a Public Figure.**

Beyond being a "public official," Dominion is also a "public figure." The Court of Appeals said in *Waldbaum v. Fairchild Publ'ns, Inc.,* 627 F.2d 1287, 1294 (D.C. Cir. 1980), that "general purpose public figures" are those who are so well-known that their names are a "household word." That proposition was quoted and approved by Circuit Judge Starr in *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987) (en banc).

In *Gertz v. Robert Welch, Inc.*,  the Supreme Court said that an individual can become "a public figure for all purposes and in all contexts" if he "achieve[s] . . .  pervasive fame or notoriety." 418 U.S. 323, 351 (1974). During and after the 2020 Presidential election in which its "voting technology services" were utilized in 28 states, Dominion achieved such fame and

notoriety that it became a "household word" and is, therefore, a "general purpose public figure."[3]

*See* Introduction to Appendix regarding Judicial Notice and Appendix § III.

## C. Dominion Became a Limited Purpose Public Figure by Thrusting Itself Into a Public Controversy.

In any event, Dominion is also a "limited-purpose public figure" because it thrust itself "to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Jankovic v. International Crisis Grp.*, 822 F.3d 576, 584 (D.C. Cir. 2016). Paragraphs 59 and 60 and notes 64 and 67 of Plaintiffs' complaint describe how Dominion initiated a massive public relations campaign to shore up its reputation by publicly releasing to the mainstream news media 15-page cease and desist letters it sent to Sidney Powell and ***three media outlets***.[4] This lawsuit – a blatantly unconstitutional effort to suppress justified criticism of its performance in the 2020 Presidential election – is one component of an expensive and tightly organized campaign to sway public opinion.

The Court of Appeals for the District of Columbia Circuit has applied the constitutional protection afforded by *New York Times* to defamation actions brought by plaintiffs who were far

---

[3] Defendant requests that judicial notice is taken of the Appendix documentation and references in the footnotes herein.

[4] For example, when the controversy regarding its voting machines increased in the aftermath of the 2020 election, Dominion sent its CEO, John Poulos, to testify in front of Michigan lawmakers about charges of voting fraud. *See* Compl., Ex. 154. Mr. Poulos has also given numerous national television interviews.  E.g., *Cuomo Prime Time*, (CNN Jan. 25, 2021), https://www.youtube.com/watch?v=65qx-4g2bSc; *Meet the Press*, (CNBC Feb. 23, 2021), https://www.cnbc.com/2021/02/23/dominions-lagainst-mypillow-lindell-is-definitely-not-the-last-ceo-says.html.  Dominion further used its access to channels of communication when it sent cease and desist letters to multiple individuals and organizations and then succeeded in having some of them published in such national outlets as *The New York Times, The Washington Post,* and *Forbes*.  Compl., ¶¶ 59-60, n. 64 and 67, and Exs. 154, 167-69. Dominion has even adopted duplicitous tactics to further amplify its megaphone.  Recently, Dominion purchased the web address lindell-management.com.  This web address takes the user to a Dominion website where it peddles its wares and makes claims about election disinformation.

less aggressive in "thrusting" themselves into public controversies. *Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003) (female combat pilot is public figure in debate whether women should be integrated into combat aviation roles); *Dameron v. Washington Magazine*, 779 F.2d 736 (D.C. Cir. 1985) (air traffic controller on duty at time of airline crash); see also *Parsi v. Daioleslam*, 595 F.Supp. 99 (D.D.C. 2009) (author of book and articles on U.S.-Iran relations); *OAO Alfa Bank v. Center for Public Integrity*, 387 F. Supp.2d 20 (D.D.C. 2005) (Russian businessmen who were participants in transformation of Russian economy); *Montgomery v. Risen*, 197 F. Supp.2d 219, 255-258 (D.D.C. 2016) (developer of noise filtering and object recognition software). Dominion's status as at least a limited-purpose public figure follows *a fortiori* from these rulings binding on this Court.

## IV.

## PLAINTIFFS HAVE MADE NO PLAUSIBLE ALLEGATION THAT MR. LINDELL HAD ANY SUBJECTIVE DOUBT OF THE TRUTH OF HIS STATEMENTS OR THAT THEY WERE MADE WITH RECKLESS DISREGARD OF THEIR TRUTH

**A.      The Complaint Fails to Allege Any Statement or Conduct By Mr. Lindell Suggesting That He Doubted the Truth of His Statements Regarding Dominion.**

Plaintiffs bear the burden of alleging and proving "actual malice" – a "famously 'daunting'" standard. *Tah v. Global Witness Publishing, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021) (quoting *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996)). Their complaint never plausibly suggests that they could satisfy this prerequisite.

Mr. Lindell knows that his statements regarding problems with voting machines are true. The complaint does not, and cannot, allege that Mr. Lindell has ever expressed or demonstrated any doubt of the truth of his statements or any acknowledgement that they were made recklessly. "A plaintiff must prove by 'clear and convincing evidence' that the speaker made the statement 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Id.*

At 240. A defamation suit by a public figure alleging reckless disregard for the truth must plead "that the defendant must have made the false publication with a high degree of awareness of probable falsity, or 'must have entertained serious doubts as to the truth of his publication.'" *Id*. (citation omitted).   Plaintiffs' failure to plausibly plead either Mr. Lindell's knowledge or reckless disregard of the falsity of his statements is fatal to their claim.

If this lawsuit were ever to proceed to discovery and trial, Mr. Lindell would prove that his statements were, and continue to be, true.

**B.**    **The Complaint Fails to Allege Any Fact From Which a Factfinder Could Infer That Mr. Lindell Had the Subjective Intent Required for a Finding of Actual Malice.**

Paragraphs 164, 34, 41, and 70 of the complaint allege that "Lindell knew or recklessly disregarded" the truth, that he "purposefully disregarded" the truth,    "deliberately misrepresented," and "knowingly lied." These are not ***plausible facts*** which could support an inference of subjective knowledge; they are bare conclusory allegations. In *Tah,* the Court of Appeals affirmed dismissal of a defamation lawsuit in which similar conclusory accusations were made in a complaint. 991 F.3d at 243.   Earlier decisions reached the same result when complaints failed to allege plausible facts that would support a finding of the constitutionally mandatory "actual malice." *Jankovic v. International Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016) ("[I]t is not enough to show that defendant should have known better; instead, the plaintiff must offer evidence that the defendant in fact harbored subjective doubt."); *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1304-05 (D.C. Cir. 1996); *Tavoulareas v. Piro*, 817 F.2d 762, 775-76 (D.C. Cir. 1987).

C.    **The Complaint's Wild Speculations Regarding Mr. Lindell's Knowledge Are Worthless.**

Lacking any plausible basis for imputing to Mr. Lindell the subjective knowledge and intent that is constitutionally required before a defamation lawsuit can proceed, Plaintiffs make wild accusations that are both irrelevant and false.

1.    **The Card-Counting Allegation**

Paragraphs 1, 25, 27, and 129 of Dominion's complaint claim that Mr. Lindell is a "former professional card counter."  Why a skill in recalling cards played in a game has any relevance to his evaluation of the criticism of Dominion's voting machines is never explained. The allegation is patently part of Dominion's public-relations effort to smear Mr. Lindell and silence criticism by him and others who agree with him.

2.    **The Georgia Hand Recount**

The hand recount in Georgia did not confirm the accuracy or reliability of Dominion voting machines. This "risk-limiting audit" simply matched the ballot count with the machine count. It did not address whether the machines were connected to the internet or hacked.  *See* Compl., Ex. 11.  Moreover, the Court in *Curling v. Raffensperger*,  2020 WL 5994029 at * 32 (Oct. 11, 2020), explicitly stated that issues with Dominion's ballot-marking devices would actually prevent the detection of errors in recording and counting votes.

Moreover, the Georgia Senate Judiciary Subcommittee on Elections (the "Committee") issued a public report on December 17, 2020, discussing a myriad of voting irregularities and potential fraud in Georgia's 2020 general election. The Committee stated in the Executive Summary that "[t]he November 3, 2020 General Election (the 'Election') was chaotic and **any reported results must be viewed as untrustworthy**."[5] The Committee unanimously approved

---

[5] http://www.senatorligon.com (emphasis added).

this Report in a second live-streamed public hearing on December 30, 2020, during which a testifying expert hacked into a Dominion polling pad live broadcast to the world.[6] Plaintiffs' reliance on the hand-count in Georgia is surely weakened by current litigation over voting fraud in Fulton County Georgia.[7]

### 3.    Dominion's Cease-and-Desist Letters

Dominion's self-serving letters (Complaint ¶¶ 63, 69, 71, 101-103) were part of its public-relations campaign and were not reason for Mr. Lindell to doubt the truth of his statements.  The Court of Appeals recently declared that a publisher "need not accept denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharges that, in themselves they hardly alert the conscientious reporter to the likelihood of error." *Tah,* 991 F.3d at 242 (internal quotations omitted).

### 4.    Preconceived Ideas

Paragraphs  38, 73, 117, 118 and 154 of Dominion's complaint allege, with no supporting plausible fact whatever, that Mr. Lindell had a "preconceived narrative" regarding election integrity. The *Tah* court held that "suspicion" does "little to show actual malice."  991 F.3d at 241 (quoting *Jankovic v. International Crisis Grp.*, 822 F.3d 576, 597 (D.C. Cir. 2016)).

### 5.    MyPillow Business Promotion

The Plaintiffs finally claim that Mr. Lindell's statements about Dominion were nothing more than an attempt to sell pillows. Exhibit 230 demonstrates that Mr. Lindell's principled stand resulted in a ***loss*** of business. Numerous retailers – including Bed Bath & Beyond, Kohl's,

---

[6] https://bwi.forums.rivals.com/threads/dominion-machines-hacked-live-during-georgia-election-hearing.286325/

[7] https://www.ajc.com/politics/election/judge-may-unseal-fulton-absentee-ballots-for-fraud-investigation/3IPZKDO3BJGRRGVFTEW4MLLAKQ/

H-E-B, Today's Shopping Choice and Wayfair – dropped MyPillow products after Mr. Lindell's public statements. See Exhibit 230.

**D.**    **It Is Widely Recognized That Dominion's Voting Systems are Insecure and Unreliable.**

In the years, months, and days leading up to the 2020 general elections, courts, elected officials, government agencies and even the media expressed concerns about the security and reliability of Dominion voting systems.  Moreover, concerns about the security, accuracy, and reliability of voting systems generally have been extensively reported in investigations and reports by academic institutions, think tanks, and the media.  Appendix at § I and II.

The court in *Curling v. Raffensperger* found that "the evidence shows that the Dominion BMD [Ballot Marking Device] does not produce a voter verifiable paper ballot … Thus, … voters must cast a BMD-generated ballot that … has the potential to contain information regarding the voter's choices that does not match what they enter on the BMD … or could cause a precinct scanner to improperly tabulate their votes."  2020 WL 5994029 at *35 (N.D. Ga. Oct. 11, 2020). The evidentiary record in the court's 147-page opinion is extensive. The court's concluding statement commenting on Dominion's obstruction tactics in discovery and verifiable vulnerabilities is prophetic. (*Id*. at *58):

> The Court's Order has delved deep into the true risks posed by the new [Dominion] voting system as well as its manner of implementation. These risks are neither hypothetical nor remote under the current circumstances. The insularity of the Defendants' and Dominion's stance here in evaluation and management of the security and vulnerability of the BMD system does not benefit the public or citizens' confident exercise of the franchise. The stealth vote alteration or operational interference risks posed by malware that can be effectively invisible to detection, whether intentionally seeded or not, are high once implanted... .
>
> The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of 'might this actually ever happen?' — but 'when it will happen,' especially if further protective measures are not taken. Given the masking nature of malware and the current systems described here, if the State

15

and Dominion simply stand by and say, "we have never seen it," the future does not bode well.

In December 2019 Senators Warren, Klobuchar and Wyden and Representative Pocan launched an investigation into Dominion and the other two "election technology firms responsible for developing, manufacturing and maintaining the vast majority voting machines and software in the United States."   Appendix at § I.4.   The Senators' letter to Dominion expressed grave concerns about the security of electronic voting machines, including Dominion's machines, stating, "Election security experts have noted for years that our nation's election systems and infrastructure are under serious threat." *Id*. at 2.  Moreover:

> [R]esearchers recently uncovered previously undisclosed vulnerabilities in 'nearly three dozen backend election systems in 10 states. And, just this year, after the Democratic candidate's electronic tally showed he received an improbable 164 votes out of 55,000 cast in a Pennsylvania state judicial election in 2019, the county's Republican Chairwoman said, '[n]othing went right on Election Day. Everything went wrong. That's a problem.' These problems threaten the integrity of our elections and demonstrate the importance of election systems that are strong, durable, and not vulnerable to attack.

*Id.* at 3. To support this conclusion the Senators' letter cited two articles that express the public's long-time criticism of electronic voting machines, including Dominion's machines, related to hacking, vote switching, and lost votes. [8]

Texas state officials rejected Dominion's voting machines for use in their state because of, among other things, the machines' vulnerabilities to hacking. The Texas examiners found that:

> "Without question, one or more of the components of the 5.5-A System can be connected to an external communication network and this can only be avoided if the end-user takes the proper precautions to prevent such a connection." Appendix § I.5 at 4.

---

[8] See Appendix at § I.4, 15 and 16.

"The ethernet port is active . . . during an election. It should be disabled when the machine is put into voting mode by the poll worker. This is an unnecessary open port during the voting period and ***could be used as an attack vector***." Appendix § I.5(a) at 3 (emphasis added).

"The flaws and questionable design choices that were identified through this exam that indicate that the system is not suitable for the purpose for which it is intended and therefore cannot be certified for use in Texas under Texas Election Code 122.001(a)(2). In addition, ***the potential security vulnerabilities that were identified in the exam indicate that the system may not be safe from fraudulent or unauthorized manipulation, and therefore cannot be certified*** for use in Texas under Texas Election Code 122.001(a)(4)." Appendix § I.5(d) at 5 (emphasis added).

The Arizona Senate recently hired a team of independent auditors to complete a comprehensive, full forensic audit to validate every area of the voting process in Maricopa County, including the electronic voting system.  The audit will include a hand recount of all ballots.[9]  A recent Rasmussen poll indicates 51 percent of American voters believe cheating likely affected the outcome of the 2020 presidential election.[10] Mr. Lindell's statements are not just his conclusions. They are known to be true by many. This is just a short list exemplifying the serious dispute that is ongoing.

## V.

## THE COMPLAINT SHOULD BE DISMISSED NOW SO THAT DEFENDANTS WILL NOT BE BURDENED WITH UNJUSTIFIED ATTORNEYS' FEES AND LITIGATION COSTS

Decisive prompt judicial relief is needed at this early stage of litigation to protect the constitutional right to free expression meaningfully. Judge J. Skelly Wright observed more than a

---

[9] Press Release, Arizona Senate Republicans *Arizona Senate hires auditor to review 2020 election in Maricopa County* (March 31, 2021), https://www.azsenaterepublicans.com/post/arizona-senate-hires-auditor-to-review-2020-election-in-maricopa-county.

[10] *Election Integrity: 62% Don't Think Voter ID Laws Discriminate*, RASMUSSEN REPORTS, Apr. 13, 2021.

half-century ago in *Washington Post Co. v. Keogh*,  that "long and expensive litigation" threatens speech by discouraging "full and free exercise of . . . First Amendment rights with respect to the conduct of . . . government." 365 F.2d 965, 968 (D.C. Cir. 1966). He added, "The threat of being put to the defense of a lawsuit . . . may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself." *Id.* If not "assured freedom from the harassment of lawsuits," those who desire to exercise First Amendment freedoms "will tend to become self-censors." *Id.;* see also *New York Times*, 376 U.S. at 279 ("would-be critics of official conduct may be deterred from voicing their criticism, even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so").

Associate Supreme Court Justice Brett Kavanaugh, while a Circuit Judge, opened his opinion for the Court in *Kahl v. Bureau of Nat'l Affairs*, as follows: "The First Amendment guarantees freedom of speech and freedom of the press. Costly and time-consuming defamation litigation can threaten those essential freedoms. To preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." 856 F.3d 106, 109 (D.C. Cir. 2017).

Circuit Judge Rogers made the same point in his opinion in *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013), when he noted that "summary proceedings are essential in the First Amendment area because if a suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails." See also *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 30 (D.D.C. 1995) ("Given the threat to the first amendment posed by non-meritorious defamation actions, it is particularly appropriate for courts to scrutinize such actions at an early stage … .").

These admonitions by respected judges warrant prompt termination of this lawsuit by dismissal of the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## VI.

### MYPILLOW CANNOT BE HELD LIABLE FOR ANY STATEMENT ABOUT THE ELECTION OR DOMINION BECAUSE IT HAS MADE NONE

Paragraph 165 of the complaint lists the 27 statements that the Plaintiffs allege to be defamatory. As demonstrated in pp. 4-18, *supra*, none of these statements is defamatory under the law in this Circuit. Moreover, none of these statements were made by MyPillow. None of these statements can be attributed to MyPillow. None of those statements were made on the MyPillow corporate website or on its social media accounts. Nor does the complaint allege that any statement was made by any MyPillow spokesman or in any MyPillow advertisement. The MyPillow board of directors is not alleged to have directed, authorized, or ratified any statement regarding Dominion or the Election.

Agency law does not impute liability to MyPillow. In the District of Columbia, the party asserting the existence of an agency relationship the burden of proving it. *Smith v. Jenkins,* 452 A. 2d 333, 335 (D.C. 1982); *see also White v. Boucher*, 322 N.W.2d 560, 566 (Minn. 1982) (existence of principal-agent relationship is a question of fact, and the party alleging the existence of the agency has the burden of proof). Under well-established law in Minnesota and the District of Columbia, a corporation cannot be held liable for executives' allegedly defamatory statements unless the executives were acting within the scope of their employment and in furtherance of the company's business. *Washington Gas-Light Co. v. Lansden,* 172 U.S. 534, 546 (1899); *International Distr'g Corp. v. American Dist. Tel. Co.,* 569 F.2d 136, 139 (D.C. Cir. 1977); *Dean v. American Fed'n of Gov't Emps., Local 476,* 509 F. Supp.2d 39, 58 (D.D.C. 2007).

19

Minnesota law is similar.  A principal is liable for the act of its agent only if the act giving rise to alleged liability was committed within the scope of the agency and was not for a purpose personal to the agent.  *Semrad v. Edina Realty,* 493 N.W.2d 528, 535 (Minn. 1992).  In *Kasner v. Gage*, 161 N.W.2d 40, 42 (Minn. 1968), the Minnesota Supreme Court held that a corporation was not liable for an employee's theft of a competitor's business records because theft was not how the corporation competed and was accordingly not within the scope of employment.  No plausible fact is alleged in Dominion's complaint to support a finding that Mr. Lindell's statements were within the scope of his role as President and CEO of MyPillow.

MyPillow is managed by a Board of Directors, subject to its articles of incorporation and bylaws as well as to Minnesota law, all of which limit Mr. Lindell's authority to act on behalf of MyPillow. No plausible factual allegation in Dominion's complaint supports a conclusion that political activities are among Mr. Lindell's enumerated duties.  Nor does the complaint allege any fact to warrant a finding that Mr. Lindell is authorized by the corporation to engage in political commentary on its behalf.  MyPillow's Board of Directors has never passed a resolution making such activities part of Mr. Lindell's duties.  In short, Mr. Lindell has commented on politics and on the integrity of Dominion voting machines in his personal capacity – as is his constitutional right.

**VII.**

**COUNT TWO SHOULD BE DISMISSED BECAUSE IT RECASTS THE DEFAMATION CLAIM AS A DECEPTIVE TRADE PRACTICE CLAIM**

Because Dominion's defamation claim fails, so does Count Two which arises under Minnesota's Deceptive Trade Practices Statute, Minn. Stat. § 325D.44 ("MDTP").  Pursuant to the MDTP, "[a] person engages in a deceptive trade practice when, in the course of business,

20

vocation, or occupation, the person … (8) disparages the goods, services, or business of another by false or misleading representation of fact". Minn. Stat. § 325D.44.

The MDTP claim is just a repackaged defamation claim.  Specifically, Dominion alleges in paragraph 174 of its complaint that "Lindell's false and defamatory statements, as described in detail above, constitute deceptive trade practices … as they disparage Dominion's goods and services by false and misleading representations of fact." The allegations that support the MDTP claim are identical to the allegations supporting the Plaintiffs' defamation claim.

It is well established that "a plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim." *Moldea v. New York Times Co*., 22 F.3d 310, 319 (D.C. Cir. 1994); *see also Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017); *Farah v. Esquire Magazine*, 736 F.3d 528, 540 (D.C. Cir. 2013); *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 93 (D.D.C. 2019); *see also Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 124 (D.D.C. 2011) (dismissing a claim under the Georgia Uniform Deceptive Trade Practices Act, O.C.G.A. § 10–1–372(a)(8)).  Dominion cannot do an end run around the First Amendment by recasting an unconstitutional defamation claim as an MDTP claim.

### VIII.

### ATTORNEYS' FEES SHOULD BE AWARDED TO THE DEFENDANTS UNDER THE DISTRICT OF COLUMBIA'S ANTI-SLAPP ACT

In *Abbas v. Foreign Policy Group*, 783 F.3d 1328 (D.C. Cir. 2015), the DC Circuit Court held that the District of Columbia law penalizing "Strategic Lawsuits Against Public Participation" – known as the Anti-SLAPP Act – does not authorize the award of attorneys' fees in federal court because DC courts would not, in similar circumstances, apply the DC law. *Id*. at 1332. However, after that decision, in 2016, the District of Columbia Court of Appeals issued an opinion in *Competitive Enterprise Institute v. Mann*, 150 A.3d 1213 (D.C. 2016), that conflicted

21

with the premises of the *Abbas* decision. District Judges have noted this conflict and suggested that the Court of Appeals might revisit its *Abbas* holding and authorize District Judges to grant attorneys' fees against plaintiffs who bring defamation lawsuits that violate the protection afforded by *New York Times*. *See Fridman v. Bean LLC*, 2019 WL 231751 (D.D.C. 2019); *Arpaio v. Zucker*, 414 F. Supp.3d 84 (D.D.C. 2019); *Fairbanks v. Roller*, 314 F. Supp.3d 85 (D.D.C. 2018); *Libre by Nexus v. Buzzfeed, Inc.*, 311 F. Supp.3d 149 (D.D.C. 2018). This Court should apply DC's Anti-SLAPP Act and award attorneys' fees to the Defendants in this case.

## DISMISSAL BASED ON RULE 12(b)(2)

### IX.
### MYPILLOW IS NOT SUBJECT TO PERSONAL JURISDICTION IN THE DISTRICT OF COLUMBIA

A federal district court follows the law of the state where the court sits to determine whether it may assert personal jurisdiction over a defendant. *Walden v. Fiore*, 571 U.S. 277, 283 (2014). There are two types of personal jurisdiction: (1) general jurisdiction, which may be exercised where the corporation is domiciled and (2) specific jurisdiction, which exists when the plaintiffs' claims arise out of or relate to the defendants' contacts with the forum. *Bristol-Myers Squibb Co. v. Superior Court of California,* 137 S. Ct. 1773, 1780 (U.S. 2017). Plaintiffs here do not allege that this Court has general jurisdiction over MyPillow. *See* Compl., ¶ 12. In any event, because MyPillow is not incorporated in the District of Columbia and does not have its principal place of business here, Declaration of Mark Schabert ("Schabert Decl.") at ¶ 2, general personal jurisdiction does not apply to MyPillow.

To establish specific jurisdiction over MyPillow this Court must first determine whether jurisdiction exists under the District of Columbia's long-arm statute, D.C. Code § 13-423.

Because assertion of personal jurisdiction by a court sitting in another state subjects an out-of-state defendant to the coercive power of that state, satisfaction of the requirements of a long-arm statute does not end the inquiry.  Exercise of personal jurisdiction is further constrained by the Due Process Clause of the Fourteenth Amendment.  *Walden v. Fiore*, 571 U.S. 277, 283 (2014).  If this Court finds that MyPillow's contacts with the District of Columbia satisfy the requirements of § 13-423, it must then determine whether exerting jurisdiction under § 13-423 would also satisfy constitutional due process requirements. *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).

Plaintiffs bear the burden of establishing the factual basis for personal jurisdiction. *Crane v. New York Zoological Soc.,* 894 F.2d 454, 456 (D.C. Cir. 1990); *Robo-Team NA, Inc. v. Endeavor Robotics,* 313 F.Supp. 3d 19, 23 (D.D.C. 2018). In attempting to do so, Plaintiffs make clear that this Court's personal jurisdiction over MyPillow is predicated solely on the actions of Mr. Lindell in the District of Columbia:

> This Court has personal jurisdiction over all Defendants pursuant to §13-423 of the District of Columbia Code because Lindell, who at all relevant times during the defamatory marketing campaign at issue in this case acted as an agent for My Pillow . . ..

Compl., ¶ 12.

Plaintiffs cannot establish the factual basis for this Court's exercise of personal jurisdiction over MyPillow.  Other than a vague allegation that MyPillow advertises and sells its products in the District of Columbia, Dominion has not identified any specific conduct of MyPillow itself in the District.  MyPillow's two manufacturing facilities are both located in Shakopee, Minnesota.  Schabert Decl. at ¶ 2.  Of MyPillow's approximately 700 employees, nearly all reside in Minnesota.  Fewer than ten employees reside outside of Minnesota.  None of MyPillow's executive officers, board members, or employees work or reside in the District of

Columbia.  *Id.* at ¶ 3.  Less than 0.1 percent of MyPillow's 2020 revenues were generated from sales in the District of Columbia.  *Id.* at ¶ 4.

In their vain attempt to find a legally cognizable nexus between Mr. Lindell's personal political activities and MyPillow, Plaintiffs make the astounding claim that Mr. Lindell's speeches, interviews and social media posts concerning the integrity of the 2020 election amount to nothing more than a ploy by MyPillow to sell more of its products. According to Plaintiffs, Mr. Lindell was acting as an agent of MyPillow when he made those statements.  Compl. at ¶¶ 1, 10, 12, 13. Plaintiffs cite no facts to support that absurd theory and conclusory statements.

Bare allegations of agency are insufficient to establish personal jurisdiction.  *First Chicago Int'l v. United Exch. Co.,* 836 F.2d 1375, 1378–79 (D.C. Cir. 1988).  Just as Mr. Lindell's personal statements cannot be imputed to MyPillow (see pp. 19-21, *supra*), Mr. Lindell's personal contacts with the District of Columbia cannot be imputed to MyPillow. Without a finding that MyPillow is liable for Mr. Lindell's personal political activities, Plaintiffs' complaint against MyPillow must be dismissed for lack of personal jurisdiction because Plaintiffs have failed to allege any contacts between MyPillow and the District of Columbia sufficient to satisfy the District of Columbia long-arm statute and the Due Process Clause of the Fourteenth Amendment.

Even if Mr. Lindell's contacts are imputed to MyPillow, Plaintiffs have failed to carry their burden of establishing that those contacts are sufficient for a finding of personal jurisdiction over MyPillow under the District of Columbia's long-arm statute, D.C. Code § 13-423, which is the only statutory basis alleged for personal jurisdiction.

Dominion relies upon the following provisions of § 13-423:

(a)      A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's –

(1)      Transacting any business in the District of Columbia;

*        *        *

(3)      causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;

(4)      causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered,

*        *        *

(b)      When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.

Plaintiffs have not alleged facts sufficient for a finding of personal jurisdiction over MyPillow on any of these grounds.

## A.      Dominion Has Failed to Establish That MyPillow Transacted Business in the District of Columbia.

Subsection (a)(1) of § 13-423 allows the exercise of personal jurisdiction "as to a claim for relief arising from" the defendant's transaction of business in the District of Columbia.  As set forth above, Dominion has failed to allege any acts of MyPillow in the District of Columbia, other than advertising and selling its products here. On their face, Dominion's claims relating to Mr. Lindell's allegedly defamatory statements concerning Dominion's voting machines did not arise out of MyPillow's sale of pillow, bedding, and related products. Accordingly, those contacts are irrelevant for purposes of § 13-423(a)(1) and do not allow this court to exercise jurisdiction over MyPillow pursuant to that subsection.  Because Dominion has failed to establish the requirements of § 13-423(a)(1), no Due Process analysis is required.

**B.** **Dominion Has Failed to Establish That It Was Injured in the District of Columbia.**

Subsection (a)(3) and (4) of § 13-423 allow the exercise of personal jurisdiction when a defendant has "caus[ed] tortious injury in the District of Columbia." Subsection (a)(3) specifically applies when the defendants' act or omission occurred in the District of Columbia and subsection (a)(4) specifically applies when the defendants' act or omission occurred outside the District of Columbia. Unlike subsection (a)(1), which is intended to extend jurisdiction to the full extent permitted by the Due Process clause, subsections (a)(3) and (4) are not intended to extend jurisdiction to the fullest extent permitted by due process. *Moncrief v. Lexington Herald-Leader Co.*, 807 F.2d. 217, 221 (D.C. Cir. 1986).

Despite devoting over 100 pages of its Complaint to Mr. Lindell's personal political speech and activities, Dominion says virtually nothing about its own business and is silent about any alleged contacts it may have with the District of Columbia. None of the Dominion entities is incorporated in or has its principal place of business in the District of Columbia. Compl., ¶¶ 6-9. None of the Dominion entities claims to have any operations, offices, or employees in the District of Columbia. Dominion does not claim that the District of Columbia uses any of its voting machines or that any of the Dominion entities has ever even negotiated with the District of Columbia for the sale of any voting machines. Given the Dominion entities' utter lack of contacts with the District of Columbia, it is not surprising that Dominion does not allege to have been injured in the District of Columbia. *See* Compl., ¶¶ 12 and 171.

As shown above, Plaintiffs have failed to identify any conduct of MyPillow that caused any injury to Dominion. Even if Mr. Lindell's personal political commentary can be attributed to MyPillow, Dominion still cannot show that it has sustained any damage in the District of Columbia. It does not even attempt to allege that it sustained any injury in the District of Columbia. Instead, in its reference to § 13-423, Dominion carefully omits any mention of

"injury in the District of Columbia." Dominion's stark omission is attributable to the legal principle that injury from defamatory statements occurs where the corporation's operations occur. *Mar-Jac Poultry v. Katz*, 773 F. Supp. 2d 103, 112 (D.D.C 2011) (Georgia poultry processing corporation sustained its reputational injury in Georgia where its operations occur); *Hourani v. PsyberSolutions LLC*, 164 F. Supp.3d 128, 138 (D.D.C. 2006) (in action for defamation, no personal jurisdiction in the District of Columbia pursuant to § 13-423(a)(3) and (4) because Virginia resident sustained injury in Virginia).  In the absence of any allegation that Dominion was injured in the District of Columbia, it cannot establish personal jurisdiction over MyPillow pursuant to subsections (a)(3) and (4) of § 13-423.

Dominion's failure to establish the requirements of § 13-423(a)(1), (3), and (4) requires dismissal of the Plaintiffs' claims against MyPillow.

## DISMISSAL OR TRANSFER DUE TO IMPROPER VENUE

### X.

### MINNESOTA IS THE PROPER VENUE

This action is improperly venued in the District of Columbia and should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(3).  On a motion to dismiss, plaintiff bears the burden to establish that venue is proper. *Fam v. Bank of America NA*, 236 F. Supp. 3d 397, 405 (D.D.C. 2017).  Plaintiffs assert venue under 21 U.S.C. § 1391(b), claiming that a substantial part of the events giving rise to this action occurred in the District of Columbia.  Compl., ¶ 14. The remaining allegations in the complaint demonstrate that this allegation is false.  Plaintiffs allege 27 instances in which Mr. Lindell allegedly made false statements about Dominion, Compl., ¶ 165(a)-(aa), but only six of those are alleged to have occurred in the District of Columbia, Compl., ¶165(a), (b), (k)-(n).  Moreover, Plaintiffs have not alleged they sustained any injury in the District of Columbia.  *See* Compl., ¶¶154-159.  In cases where events in

multiple jurisdictions give rise to a claim, the "weight of defendant's contacts in the various districts must be compared, and the claim must be deemed to have arisen in the district where the contacts [were] most significant." *Davis v. Costa-Gavras,* 580 F. Supp. 1082, 1090 (S.D.N.Y. 1984) (quotation omitted).   Here the bulk of the alleged statements occurred outside of the District of Columbia, accordingly venue is improper here.

Even if there were sufficient events occurring in the District of Columbia (which there were not), courts may transfer cases initially commenced in a proper venue for the convenience of the parties and in the interests of justice.  28 U.S.C. § 1404(a).  Transfer pursuant to § 1404(a) is appropriate when the moving party shows (1) that the action could have originally been brought, and (2) the private and public interests weigh in favor of transfer.  *Preservation Soc. of Charleston v. U.S. Army Corps of Eng'rs*, 893 F. Supp. 2d 49, 53 (D.D.C. 2012).  Private interest factors include: (1) the plaintiff's choice of forum; (2) the defendants' choice of forum; (3) where the claim arose; (4) the convenience of the parties; and (5) the convenience of the witnesses.  Public interest factors include: (1) the transferee court's familiarity with the laws governing the case and the pendency of related actions in the transferee forum; (2) the relative congestion of the calendars of the transferor and transferee courts; and (3) the interest in having local controversies decided locally.  *Id.* at 54.

When subject-matter jurisdiction is based upon diversity of citizenship, a civil action may be brought in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located."  28 U.S.C. § 1391(b)(1).  Accordingly, this action could have been brought in the United States District Court for the District of Minnesota because all defendants are residents of the State of Minnesota.  Compl., ¶¶ 9 and 10.

The private interest factors weigh in favor of transfer to Minnesota.   Although Dominion has chosen venue in this district, Dominion has no connection with the District of Columbia.   None of the defendant companies is incorporated in or has their principal place of business in the District of Columbia.   Compl., ¶¶ 6-8.   When a plaintiff is not a resident of the forum and most of the relevant events occurred elsewhere, any deference that would have been accorded to the plaintiff's choice of forum is weakened.   *Greene v. National Head Start Ass'n.*, 610 F.Supp. 2d 72 (D.D.C. 2009).   Plaintiffs' choice of the District of Columbia should not be given greater weight than defendant's choice of forum.

Moreover, very little of Dominion's claim arose in the District of Columbia.   Out of 27 statements forming the basis of Dominion's claims, only six are alleged to have occurred while Mr. Lindell was in the District of Columbia.   Compl., ¶ 167.   To the extent that MyPillow is liable for any of the statements made by Mr. Lindell based upon an agency theory, as Dominion alleges, all of the corporate actions related to creating or ratifying that agency would have occurred in Minnesota where MyPillow has its headquarters and where its board and executive officers are based.   Shabert Decl. at ¶¶ 2-3   .

Finally, Dominion does not claim in its complaint to have been injured in the District of Columbia, *see* Compl., ¶ 171, and, as a matter of law, it was not. *E.g.*, *Mar-Jac Poultry*, 773 F.Supp. 2d at 112;  *Hourani*, 164 F.Supp 3d. at 138. Because very few of the events giving rise to this action occurred in the District of Columbia, there are very few, if any, witnesses that reside in the District of Columbia. Dominion's witnesses presumably reside in Colorado or Ontario, where plaintiffs have their principal places of business.   Compl., ¶¶ 6-8.   Proof of Dominion's agency theory will be central to establishing MyPillow's liability for Mr. Lindell's statements because this issue turns upon Mr. Lindell's authority based on actions of MyPillow,

many of the relevant witnesses are located in Minnesota.   Schabert Decl. at ¶ 3. Thus, the convenience of the witnesses and the ease of access to sources of proof favors dismissal or transfer of this case to federal court in Minnesota.

The public interest factors also weigh in favor of transferring this action to federal court in Minnesota.  Dominion's second claim in this case arises under the Minnesota Deceptive Trade Practices Act, Minn. Stat. §325D.44(8).  Minnesota courts are uniquely qualified to interpret and apply Minnesota law.  Dominion's other claim, a defamation claim, will largely turn on an analysis of the constitutional limits on defamation claims.  As a result, federal law applies. Because transferee federal courts are deemed to be competent to decide federal issues correctly, *Preservation Soc. of Charleston,* 893 F. Supp. 2d at 57, this factor favors transfer to Minnesota. Minnesota also has an interest in providing a forum for disputes to be resolved against its corporate and individual residents, whereas the District of Columbia has little specific interest in this dispute.  This is especially true because there is a related action pending between these parties in the United States District Court for the District of Minnesota.  Judicial efficiency would be promoted by transferring this action to Minnesota.  Accordingly, the public factors weigh in favor of transfer to Minnesota.

This action could have been brought in Minnesota.  The private factors weigh in favor of transfer of this action to Minnesota as do the public factors.  This action should be transferred to the United States District Court for the District of Minnesota.

## <u>CONCLUSION</u>

For the foregoing reasons, the complaint against My Pillow, Inc. should be dismissed.


DATED:  April 19, 2021                    **LEWIN & LEWIN, LLP**


                                       By */s/ Nathan Lewin*

30

Nathan Lewin (D.C. Bar No. 38299)
888 17th Street NW
Fourth Floor
Washington, DC 20006
Telephone: (202) 828-1000
nat@lewinlewin.com

*Counsel for Defendant My Pillow, Inc.*

**PARKER DANIELS KIBORT LLC**

By */s/ Andrew D. Parker*
　　Andrew D. Parker (MN Bar No. 195042)*
　　Elizabeth S. Wright (MN Bar No. 184111)*
　　Joseph A. Pull (D.C. Bar No. 982468)
　　Gregory N. Arenson (MN Bar No. 398276)*
　　Abraham S. Kaplan (MN Bar No. 399507)*
　　888 Colwell Building
　　123 N. Third Street
　　Minneapolis, MN 55401
　　Telephone: (612) 355-4100
　　Facsimile: (612) 355-4101
　　parker@parkerdk.com
　　wright@parkerdk.com
　　pull@parkerdk.com
　　arenson@parkerdk.com
　　kaplan@parkerdk.com

　　* Pro Hac Vice Motion Pending

　　*Counsel for Defendant My Pillow, Inc.*

By */s/ Alan Dershowitz*
　　Alan Dershowitz (MA Bar No. 121200)
　　1575 Massachusetts Avenue
　　Cambridge, MA 02138

*Of Counsel for Defendant My Pillow, Inc.*

31

# APPENDIX

## INTRODUCTION

This Court should take judicial notice of the existence of widespread, ongoing public debate on all sides about the election process. Judicial notice may be taken of any and all facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." "If particular facts are outside the area of reasonable controversy, this process is dispensed with as unnecessary." Advisory Committee Note to Fed. R. Evid. 201. There is no controversy about the fact that there is ongoing public debate about the election.

Fed. R. Evid. 201(b)(2). A court *may* take judicial notice on its own at any stage of the proceeding.  Fed. R. Evid. 201(c)(1). It *must* take judicial notice if a party requests it, and the court is supplied with the necessary information. Fed. R. Evid. 201(c)(2).

When ruling on this motion to dismiss, a Court may take judicial notice of and consider documents attached to and incorporated by reference in a complaint. *See E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). Courts take judicial notice of matters of common knowledge. *See Smith v. Ergo Sols., LLC*, 306 F.R.D. 57, 65 (D.D.C. 2015). This Court may take judicial notice of the records of this Court and of other federal courts. *Akers v. Watts*, 589 F. Supp. 2d 12, 15 (D.D.C. 2008).

With this memorandum, MyPillow submits an Appendix of citations to documents produced by state and federal governmental entities (Appendix at § I), research reports referenced in state and federal governmental reports (Appendix at § II), references to media coverage of concerns regarding the security and reliability of voting machines sold by Dominion and others (Appendix at § III). This Court may take judicial notice of the references in section I of the Appendix because courts may take judicial notice of public records and other public

33

records such as government documents. *HTC Corp. v. IPCom GmbH & Co., KG*, 671 F. Supp. 2d 146, 151 (D.D.C. 2009) ("A court may take judicial notice of court documents and other public records."). This includes governmental websites, *Dark Storm Indus., LLC v Cuomo,* 471 F. Supp. 3d 482, 483, n. 2 (N.D. N.Y. 2020), and facts in public records of judicial proceedings, *Morris v. Federal Bur. of Prisons*, 2010 WL 2574142 * 1 (D.D.C. June 25, 2010). The accuracy of research reports referenced in section II of the Appendix, having been relied upon by the government in reports it has prepared cannot reasonably be questioned since reports of the government themselves are deemed sufficiently reliable. The references to media coverage in section III of the Appendix are offered not for the truth of the matter asserted in them, but to show what information about voting machines manufactured by Dominion and others has been published and has been available to the public.  Courts may take judicial notice of newspaper articles for the purpose of showing that particular information was in the public realm.  *Gerritsen v. Warner Bros. Entm't, Inc.,* 112 F.Supp. 3d 1011, 1028 (C.D. Cal. 2015).

I.      GOVERNMENTAL ACTIONS AND REPORTS

1. U.S. GOV'T ACCOUNTABILITY OFF., GAO-05-956, ELECTIONS: FEDERAL EFFORTS TO IMPROVE SECURITY AND RELIABILITY OF ELECTRONIC VOTING SYSTEMS ARE UNDER WAY, BUT KEY ACTIVITIES NEED TO BE COMPLETED (2005), https://www.gao.gov/assets/gao-05-956.pdf.
2. Joseph A. Calandrino, Ariel J. Feldman, J Alex Halderman, et al., *Source code Review of the Diebold Voting System* for the California Secretary of State (July 20, 2007). https://votingsystems.cdn.sos.ca.gov/oversight/ttbr/diebold-source-public-jul29.pdf
3. CONGRESSIONAL TASK FORCE ON ELECTION SECURITY, FINAL REPORT (January 2018). https://homeland.house.gov/imo/media/doc/TFESReport.pdf
4. *Warren, Klobuchar, Wyden, and Pocan Investigate Vulnerabilities and Shortcomings of Election Technology Industry with Ties to Private Equity*, Elizabeth Warren: U.S. Sen. for Mass. (Dec. 10, 2019), https://www.warren.senate.gov/oversight/letters/warren-klobuchar-wyden-and-pocan-investigate-vulnerabilities-and-shortcomings-of-election-technology-industry-with-ties-to-private-equity.
5. JOSE A. ESPARZA, TEX. SEC'Y OF STATE, REP. OF REVIEW OF DOMINION VOTING SYSTEMS DEMOCRACY SUITE 5.5-A (2020). https://www.sos.texas.gov/elections/forms/sysexam/dominion-d-suite-5.5-a.pdf.

      a)        https://www.sos.texas.gov/elections/forms/sysexam/oct2019-watson.pdf#search=dominion%20voting%20systems

      b)        https://www.sos.texas.gov/elections/forms/sysexam/oct2019-mechler.pdf#search=dominion%20voting%20systems

      c)        https://www.sos.texas.gov/elections/forms/sysexam/oct2019-hurley.pdf#search=dominion%20voting%20systems

      d)        https://www.sos.texas.gov/elections/forms/sysexam/oct2019-pinney.pdf#search=dominion%20voting%20systems

6. U.S. DEP'T OF HOMELAND SEC., OFFICE OF INSPECTOR GEN., OIG-21-01, DHS HAS SECURED THE NATION'S ELECTION SYSTEMS, BUT WORK REMAINS TO PROTECT THE INFRASTRUCTURE (2020), https://www.oig.dhs.gov/sites/default/files/assets/2020-10/OIG-21-01-Oct20.pdf.

## II.    STUDIES CITED IN GOVERNMENTAL REPORTS

1. Tadayoshi Kohno, Adam Stubblefield, Aviel D. Rubin, and Dan S. Wallach, *Analysis of an Electronic Voting System*, AVIRUBIN.COM (Feb. 27, 2004). https://avirubin.com/vote.pdf.  (Cited in reference I.1 above)
2. Ariel J. Feldman, J. Alex Halderman, and Edward W. Felten, *Security Analysis of the Diebold AccuVote-TS Voting Machine*, USENIX (Sep. 13, 2006), https://www.usenix.org/legacy/event/evt07/tech/full_papers/feldman/feldman_html/index.html#cw:sleepovers. (Cited in reference I.2. above)
3. Lawrence Norden and Ian Vanderwalker, *Securing Elections from Foreign Interference,* Brennan Ctr. for Just., https://www.brennancenter.org/sites/default/files/publications/Securing_Elections_From_Foreign_Interference_1.pdf.  (Cited in reference I.3 above)
4. Penn Wharton Public Policy Initiative, *The Business of Voting*, July 2018, https://electionline.org/resources/the-business-of-voting-market-structure-and-innovation-in-election-technology-industry/. (Cited in reference I.3 and I.4. above)
5. Lawrence Norden and Christopher Famighetti, *America's Voting Machines at Risk*, 2015 Brennan Ctr. for Just., https://www.brennancenter.org/sites/default/files/2019-08/Report_Americas_Voting_Machines_At_Risk.pdf. (Cited in reference I.3 and I.4. above)

## III.    MEDIA COVERAGE

1. *Voting Machine Maker Misused DMCA to Squelch Debate, Court Finds*, 11 No. 14 Andrews Intell. Prop. Litig. Rep. 7, https://www.westlaw.com/Document/If5392da165b611db8a54a698991202fa/View/FullText.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=cblt1.0 (citing *Online Policy Group*, et al. *v. Diebold Inc.*, et al., No. C03-04913, 2004 WL 2203382 (N.D. Cal., San Jose Div. Sept. 30, 2004)).

2.  Robert F. Kennedy, Jr., *Will the Next Election Be Hacked?*, Rolling Stone, Oct. 5, 2006, https://web.archive.org/web/20061013093110/http://www.rollingstone.com/politics/story/11717105/robert_f_kennedy_jr__will_the_next_election_be_hacked.

3.  Ina Reformina, *Source code firm Dominion sheds light on voting glitch*, ABS-BSN News, May 7, 2010, https://news.abs-cbn.com/nation/05/07/10/source-code-firm-dominion-sheds-light-voting-glitch.

4.  Victoria Collier, *How to Rig an Election*, HARPER'S MAGAZINE, Nov. 6, 2012, https://harpers.org/archive/2012/11/how-to-rig-an-election/5/.

5.  Gus Langman, *Want your Vote to Be Counted?*, INQUIRER, May 1, 2016, https://opinion.inquirer.net/94535/want-your-vote-to-be-counted.

6.  Kathleen Hickey, *San Francisco Funds Open Source Voting,* GCN, Jun. 2, 2016, https://gcn.com/articles/2016/06/02/sf-open-source-voting.aspx.

7.  Roger Stone, *Can the 2016 election be rigged? You bet*, THE HILL, Aug. 16, 2016, https://thehill.com/blogs/pundits-blog/presidential-campaign/291534-can-the-2016-election-be-rigged-you-bet.

8.  Michael Riley Jordan Robertson, and David Kocieniewski, *The Computer Voting Revolution Is Already Crappy, Buggy, and Obsolete*, Bloomberg Businessweek, Sep. 29, 2016, https://www.bloomberg.com/features/2016-voting-technology/.

9.  Yarno Ritzen, *Al Jazeera launches interactive investigation #Hacked*, AL JAZEERA, Oct. 5, 2016, https://www.aljazeera.com/features/2016/10/5/al-jazeera-launches-interactive-investigation-hacked.

10. David Brooks, *In a connected world, New Hampshire voting machines are isolated – by choice*, Concord Monitor, Oct. 18, 2016, https://www.concordmonitor.com/voting-machines-accuvote-5175705.

11. Aditi Roy, *US election machine technology is out of date, experts say*, CNBC, Oct. 19, 2016, https://www.cnbc.com/2016/10/19/us-election-machine-technology-is-out-of-date-experts-say.html.

12. Stephanie Dube Dwilson, *Election Fraud List: Which States Have Voter Fraud Allegations?*, HEAVY, Nov. 6, 2016, https://heavy.com/news/2016/11/election-fraud-list-which-states-had-have-voter-fraud-allegations-early-voting-rigged-hoax-truth-trump-clinton-bernie-flipped-suppression-dnc/.

13. Grant Gross, *Security vendor demonstrates hack of US e-voting machine*, NETWORK WORLD, Nov. 7, 2016, https://www.networkworld.com/article/3138873/security-vendor-demonstrates-hack-of-us-e-voting-machine.html.

14. Stanley Q. Woodvine, *Homeless in Vancouver: Charges of U.S. Vote Rigging Will Likely Involve Canadian Voting Machines,* THE GEORGIA STRAIGHT, Nov. 7, 2016, https://www.straight.com/blogra/823596/homeless-vancouver-charges-us-vote-rigging-will-likely-involve-canadian-voting.

15. Deidre Fulton, *Claiming Clinton Actually Won, Three Florida Voters Sue for Recount*, COMMON DREAMS, Dec. 6, 2016, https://www.commondreams.org/news/2016/12/06/claiming-clinton-actually-won-three-florida-voters-sue-recount.

16. Marianne Goodland, *The Winner of the 2016 Election in Colorado Just May Be Wayne Williams,* THE COLORADO INDEPENDENT, Dec. 9, 2016, https://www.coloradoindependent.com/2016/12/09/wayne-williams-profile/.

17. Tom Kertscher, *In Russian hacking case, did Hillary Clinton's campaign chairman use 'password' as his password?*, POLITIFACT, Jan. 11, 2017, https://www.politifact.com/factchecks/2017/jan/11/reince-priebus/russian-hacking-case-did-hillary-clintons-campaign/.

18. Jonathan Oosting, *Michigan Plans to Replace All Voting Machines by 2018*, THE DETROIT NEWS, Jan. 24, 2017, https://www.detroitnews.com/story/news/politics/2017/01/24/voting-machines/96991230/.

19. Kathleen Gray, *Michigan Selects New Voting Machine Vendors for Next Election,* GOVERNMENT TECHNOLOGY, Jan. 25, 2017, https://www.govtech.com/products/Michigan-Selects-New-Voting-Machine-Vendors-for-Next-Election.html.

20. Julissa Zavala, *County May Get New Voting Machines*, THE SENTINEL, Aug. 16, 2017, https://hanfordsentinel.com/news/local/county-may-get-new-voting-machines/article_78daa860-f3e2-53fd-a79a-cfeef398f58f.Julissa Zavala.html.

21. Elizabeth Weise, *Paper ballots are back in vogue thanks to Russian hacking fears*, USA TODAY, Sep. 19, 2017, https://www.usatoday.com/story/tech/news/2017/09/19/russia-hacking-election-fears-prompts-states-to-switch-to-paper-ballots/666020001/.

22. Ron Wyden Press Release, *Wyden Questions Voting Machine Manufacturers on Security Measures,* WYDEN.SENATE.GOV, Oct. 3. 2017, https://www.wyden.senate.gov/news/press-releases/wyden-questions-voting-machine-manufacturers-on-security-measures.

23. Derek B. Johnson, *What are voting machine companies doing about cyber?*, FCW, Nov. 17, 2017, https://fcw.com/articles/2017/11/17/voting-machine-company-wyden-cyber.aspx.

24. David Weissman, *York County Details Lack of Internal Controls in Post-Election Report to State*, YORK DISPATCH, Dec. 7, 2017, https://www.yorkdispatch.com/story/news/local/2017/12/07/york-county-details-lack-internal-controls-post-election-report-state/931308001/.

25. Miles Parks, *5 Ways Election Interference Could (and Probably Will) Worsen in 2018 and Beyond*, NATIONAL PUBLIC RADIO, Jan. 27, 2018, https://www.npr.org/2018/01/27/579683042/5-ways-election-interference-could-and-probably-will-worsen-in-2018-and-beyond.

26. Kim Zetter, *The Myth of the Hacker-Proof Voting Machine,* THE NEW YORK TIMES MAGAZINE, Feb. 21, 2018, https://www.nytimes.com/2018/02/21/magazine/the-myth-of-the-hacker-proof-voting-machine.html.

27. Gary Gibula, Naperville Sun, *DuPage County Board Blasts Election Commission for 'Stunning' Voting Machine Problems*, CHICAGO TRIBUNE, Mar. 27, 2018, https://www.chicagotribune.com/suburbs/naperville-sun/ct-nvs-dupage-voting-machine-problems-st-0328-20180327-story.html.

28. Lee Harris, *At DEF CON '18, Kids as young as 5 Challenged to Hack Election Results Websites, Voting Machines,* ABC NEWS, Aug. 10, 2018, https://abcnews.go.com/Politics/def-con-18-kids-young-challenged-hack-election/story?id=57122727.

29. Michael D. Regan, *An 11-Year Old Changed Election Results on a Replica Florida State Website in Under 10 Minutes*, PBS, Aug. 12, 2018,

37

https://www.pbs.org/newshour/nation/an-11-year-old-changed-election-results-on-a-replica-florida-state-website-in-under-10-minutes.

30. James DeHaven, *RGJ Investigates: Nevada's Voting Machine Problems Were Much Bigger Than First Thought*, RENO GAZETTE JOURNAL, Aug. 27, 2018, https://www.rgj.com/story/news/politics/2018/08/27/nevada-voting-machine-glitches-2018-primary/1085254002/.

31. Miles Parks, *Hacks, Security Gaps and Oligarchs: The Business of Voting Comes Under Scrutiny,* NATIONAL PUBLIC RADIO, Sep. 21, 2018, https://www.npr.org/2018/09/21/649535367/hacks-security-gaps-and-oligarchs-the-business-of-voting-comes-under-scrutiny.

32. Jake Belcher, *A Professor at MIT Demonstrated Just How Easy it is To Tamper with Voting Machines – But There's a Fairly Simple Way to Prevent it from Happening,* BUSINESS INSIDER, Sept. 22, 2018, https://www.businessinsider.com/hacking-voting-machines-and-how-to-stop-it-2018-9.

33. Jessica Bennet, *Texas Voting Machine Glitch Switches Votes to Opposing Party,* EBONY, Oct. 26, 2018, https://www.ebony.com/news/texas-voting-machine-glitch-switches-votes-to-opposing-party/.

34. Andrea Zelinski, Austin, Bureau, *Voting Machine Errors Changed Votes in Cruz-O'Rouke Race, Group Says,* CHRON., Oct. 26, 2018, https://www.chron.com/politics/texas/article/Voting-machine-errors-changed-some-Texans-13339298.php.

35. Frank Bajak, *US election integrity depends on security-challenged firms*, ASSOCIATED PRESS NEWS, Oct. 29, 2018, https://apnews.com/article/f6876669cb6b4e4c9850844f8e015b4c.

36. Sue Halpern, *How Voting-Machine Errors Reflect a Wider Crises for American Democracy*, THE NEW YORKER, Oct. 31, 2018, https://www.newyorker.com/news/news-desk/how-voting-machine-errors-reflect-a-wider-crisis-for-american-democracy.

37. Taylor Armerding, *Threats Obvious, But Electronic Voter Systems Remain Insecure*, FORBES, Nov. 1, 2018, https://www.forbes.com/sites/taylorarmerding/2018/11/01/threats-obvious-but-electronic-voter-systems-remain-insecure/?sh=4ee9466342ce.

38. Christina A. Cassidy and Alina Hartounian, *Voters Raise Concerns About Voting Machines, Poll Access*, KSLA NEWS, Nov. 2, 2018, https://www.ksla.com/2018/11/02/voters-raise-concerns-about-voting-machines-poll-access/.

39. Anders Melin and Reade Pickert, *Private Equity Controls the Gatekeepers of American Democracy*, BLOOMBERG, Nov. 3, 2018, https://www.bloomberg.com/news/articles/2018-11-03/private-equity-controls-the-gatekeepers-of-american-democracy.

40. Christian Vasquez and Matthew Choi, *Voting Machine Errors Already Roil Texas and Georgia Races*, POLITICO, Nov. 5, 2018, https://www.politico.com/story/2018/11/05/voting-machine-errors-texas-georgia-2018-elections-midterms-959980.

41. Charles Duncan, Noah Feit, and Teddy Kulmala, *Reports of Changed Votes, Long Lines and Broken Machines in SC for Election Day*, THE STATE, Nov. 6, 2018, https://www.thestate.com/news/state/south-carolina/article221190430.html.

42. Conor Friedersdorf, *An Embarrassment of Glitches: A Wealthy Country Should Be Able to Conduct a National Election with Fewer Problems Than the United States Experienced in the 2018 Midterms,* THE ATLANTIC, Nov. 6, 2018, https://www.theatlantic.com/ideas/archive/2018/11/voting-machines/575044/.

43. Issie Lapowsky, *Voting Machine Meltdowns Are Normal – That's the Problem*, WIRED, Nov. 6, 2018, https://www.wired.com/story/voting-machine-meltdown-midterm-elections-2018/.

44. Joyce Smith, Aaron Randle, *Why Does This Happen Every Single Time? Electronic Ballot Boxes Fail in Missouri,* THE KANSAS CITY STAR, Nov. 6, 2018, https://www.kansascity.com/news/politics-government/election/article221214335.html.

45. Eric Geller, *State Election Officials Opt for 2020 Voting Machines Vulnerable to Hacking*, POLITICO, Mar. 1, 2019, https://www.politico.com/story/2019/03/01/election-vulnerable-voting-machines-1198780.

46. Eric Geller, *Wyden Lambastes Voting Machine Makers As 'Accountable to Nobody',* POLITICO, Mar. 14, 2019, https://www.politico.com/story/2019/03/14/wyden-voting-machine-election-security-1221639.

47. Gopal Ratnam, *Mueller Report: Russia Hacked State Databases and Voting Machine Companies,* ROLL CALL, Apr. 22, 2019, https://www.rollcall.com/2019/04/22/mueller-report-russia-hacked-state-databases-and-voting-machine-companies/.

48. Jordan Wilkie, *'They think they are above the law': the firms that own America's voting system*, THE GUARDIAN, Apr. 23, 2019, https://www.theguardian.com/us-news/2019/apr/22/us-voting-machine-private-companies-voter-registration.

49. Will Doran, *Cyber Security Concerns Lead NC Officials to Delay Approval of New Voting Machines,* THE NEWS & OBSERVER, Jun. 13, 2019, https://www.newsobserver.com/news/politics-government/article231523978.html.

50. Luke Darby, *The Biggest U.S. Voting Machine Manufacturer Is Worried About Election Security,* GQ, Jun. 23, 2019, https://www.gq.com/story/voting-machine-companies-want-paper-ballots.

51. Tami Abdollah, *AP Exclusive: New election systems use vulnerable software*, Associated Press, Jul. 13, 2019, https://apnews.com/article/e5e070c31f3c497fa9e6875f426ccde1.

52. Tami Abdollah, *Outdated Software Could Make New Voting Systems Vulnerable to Hackers,* LOS ANGELES TIMES, Jul. 14, 2019, https://www.latimes.com/nation/la-na-election-machine-hacks-20190714-story.html.

53. Eric Geller, Beatrice Jin, Jordyn Hermani, Michael B. Farrell, *The Scramble to Secure America's Voting Machines,* POLITICO, Aug. 6, 2019, https://www.politico.com/interactives/2019/election-security-americas-voting-machines/.

54. Kim Zetter, *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials*, VICE, Aug. 8, 2019, https://www.vice.com/en_us/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials.

55. Alfred Ng, *Senator: Status Quo on Voting Machine Security is a 'Danger to Our Democracy,'* CNET, Aug. 9, 2019, CNN, https://www.cnet.com/news/status-quo-on-voting-machine-security-represents-danger-to-democracy-senator-warns/.

56. CNN Business, *Watch this Hacker Break into a Voting Machine,* CNN, Aug. 10, 2019, https://www.cnn.com/videos/business/2019/08/10/voting-booth-hack-def-con-orig.cnn-business.

57. Taylor Telford, *Hackers Were Told to Break Into U.S. Voting Machines. They Didn't Have Much Trouble.*, THE WASHINGTON POST, Aug. 12, 2019, https://www.washingtonpost.com/business/2019/08/12/def-con-hackers-lawmakers-came-together-tackle-holes-election-security/.

58. Ben Popken, *Voting Machine Issues and Viral Video Cast Shadow on Mississippi Governor's Race,* NBC NEWS, Aug. 28, 2019, https://www.nbcnews.com/tech/security/voting-machine-issues-viral-video-cast-shadow-mississippi-governor-s-n1047576.

59. Miles Parks, *Cyber Experts Warn of Vulnerabilities Facing 2020 Election Machines,* NPR, Sep. 4, 2019, https://www.npr.org/2019/09/04/755066523/cyber-experts-warn-of-vulnerabilities-facing-2020-election-machines.

60. Patrick Howell O'Neill, *16 Million Americans Will Vote on Hackable Paperless Machines*, MIT TECHNOLOGY REVIEW, Sep. 13, 2019, https://www.technologyreview.com/2019/08/13/238715/16-million-americans-will-vote-on-hackable-paperless-voting-machines/.

61. Lulu Friesdat, *Voting Machines Pose a Greater Threat to Our Elections Than Foreign Agents,* THE HILL, Oct. 2, 2019, https://thehill.com/opinion/technology/464065-voting-machines-pose-a-greater-threat-to-our-elections-than-foreign-agents.

62. Brook Crothers, *Hacking a Voting Machine is Getting Easier,* FOX NEWS, Oct. 4, 2019, https://www.foxnews.com/tech/hacking-a-voting-machine-is-getting-easier.

63. Jessica Huseman, *The Market for Voting Machines is Broken. This Company Has Thrived in It.*, PROPUBLICA, Oct. 28, 2019, https://www.propublica.org/article/the-market-for-voting-machines-is-broken-this-company-has-thrived-in-it

64. Derek B. Johnson, *Voting Machines Still Easy Prey for Determined Hackers,* FCW, Oct. 29, 2019, https://fcw.com/articles/2019/10/29/voting-village-congress-johnson.aspx.

65. Owen Daugherty, *Machines Reportedly Switching Votes Plagues Indiana County for Second Straight Election,* THE HILL, Nov. 5, 2019, https://thehill.com/homenews/state-watch/469137-machines-reportedly-switching-votes-plagues-indiana-county-for-second.

66. Ivey DeJesus, *GOP Officials File Legal Action in PA After 'Massive Voting Machine Malfunctions'; Ballots Placed in Suitcase,* PENN LIVE, Nov. 5, 2019, https://www.pennlive.com/news/2019/11/gop-officials-file-legal-action-in-pa-after-massive-voting-machine-malfunctions-ballots-placed-in-suitcase.html.

67. Paige Pauroso, *NC Voting Machine Reliability Brought Up as Concern After Issues with Similar Machines in Other State,* WBTV, Dec. 2, 2019, https://www.wbtv.com/2019/12/03/nc-voting-machine-reliability-brought-up-concern-after-issues-with-similar-machines-other-state/.

68. Emily Previti, *Suit Filed in PA Court Challenges Widely Used Electronic Voting Machine,* WHYY, Dec. 14, 2019, https://whyy.org/articles/suit-filed-in-pa-court-challenges-widely-used-electronic-voting-machine/.

69. Kartikay Mehrotra, *America Won't Give Up Its Hackable Wireless Voting Machines (1)*, BLOOMBERG LAW, Jan. 3, 2020, https://news.bloomberglaw.com/tech-and-telecom-law/america-wont-give-up-its-hackable-wireless-voting-machines.

70. Ben Popken, *Voting Machine Makers Face Questions from House Lawmakers – But More Remain*, NBC NEWS, Jan. 9, 2020, https://www.nbcnews.com/tech/security/voting-machine-makers-face-questions-house-lawmakers-more-remain-n1113181.

71. Kevin Monahan, Cynthia McFadden, Didi Martinez, '*Online and Vulnerable*': *Experts Find Nearly Three Dozen U.S. Voting Systems Connected to Internet,* NBC NEWS, Jan. 10, 2020, https://www.nbcnews.com/politics/elections/online-vulnerable-experts-find-nearly-three-dozen-u-s-voting-n1112436?cid=sm_npd_nn_tw_ma.

72. Alexandra Ossola, *Security Vulnerabilities in Voting Machines Show America Still Isn't Ready for the 2020 Election,* QZ, Jan. 12, 2020, https://qz.com/1783766/these-voting-machine-security-flaws-threaten-election-2020/.

73. Emily Previti, *Lawsuits Over Voting Machines in Pennsylvania,* NATIONAL PUBLIC RADIO, Jan. 19, 2020, https://www.npr.org/2020/01/19/797721971/lawsuits-over-voting-machines-in-pennsylvania.

74. Frank Bajak, *Reliability of Voting Machines Doubted*, THE DETROIT NEWS, Feb. 23, 2020, https://www.detroitnews.com/story/news/politics/2020/02/23/voting-machine-reliabilty-doubted-new-technology/111365646/.

75. Frank Bajak, The Associated Press, *Reliability of New Voting Machines Questioned*, THE COLUMBUS DISPATCH, Feb. 24, 2020, https://www.dispatch.com/news/20200224/reliability-of-new-voting-machines-questioned.

76. Eric Geller, *Doublecheck that Ballot: Controversial Voting Machines Make Their Primary Debut in South Carolina,* POLITICO, Feb. 28, 2020, https://www.politico.com/news/2020/02/28/south-carolina-voting-machines-118046.

77. Rebecca Heilweil, *Voters Struggled with LA's Fancy New Voting Machines on Super Tuesday,* VOX, Mar. 4, 2020, https://www.vox.com/recode/2020/3/3/21163700/los-angeles-california-voting-machines-technical-flaws.

78. Thomas Barrabi, *Election Software Firm Tyler Technologies Discloses System Hack: Report*, FOX NEWS, Sept. 23, 2020, https://www.foxnews.com/politics/election-software-vendor-tyler-technologies-hack.

79. Michael Ruiz, *After Philadelphia Sees Voting Machine Controls Stolen, Reporter Finds Lax Security at Warehouse,* FOX NEWS, Oct. 1, 2020, https://www.foxnews.com/politics/philadelphia-voting-machines-reporter-finds-lax-security-warehouse.

80. John Pacenti, Palm Beach Post, *Experts: Florida Voting Machines Ripe for Foreign Hackers,* GOVERNMENT TECHNOLOGY, Oct. 16, 2020, https://www.govtech.com/security/Experts-Florida-Voting-Machines-Ripe-for-Foreign-Hackers.html.

81. Mark Ballard, Capitol Bureau Editor, *Voting Machine Malfunctions Reported in Louisiana; Ardoin Says Issues was 'Intermittent,'* THE ADVOCATE, Nov. 3, 2020, https://www.theadvocate.com/baton_rouge/news/politics/elections/article_4c4640c0-1e2a-11eb-8c19-938c84f1ce2c.html.

82. Madeleine List, *Voting Machine Rejecting Some Ballots in Central Falls*, THE PROVIDENCE JOURNAL, Nov. 3, 2020, https://www.providencejournal.com/story/news/politics/2020/11/03/voting-machine-rejecting-some-ballots-central-falls/6149806002/.

83. WBRZ Staff, *Voting Machines in Spaulding County, GA Once Again Operating After Countywide Outage,* WBRZ, Nov. 3, 2020, https://www.wbrz.com/news/voting-machines-in-spalding-county-georgia-stop-working-due-to-glitch/.

84. Kevin Monohan, Cynthia McFadden, and Didi Martinez, *'Online and vulnerable':*
*Experts find nearly three dozen U.S. voting systems connected to internet*, NBC NEWS,
Jan. 10, 2020, https://www.nbcnews.com/politics/elections/online-vulnerable-experts-
find-nearly-three-dozen-u-s-voting-n1112436.

85. Zachary Stieber, *Dominion Voting Systems Uses Firm That Was Hacked*, THE EPOCH
TIMES, Dec. 14, 2020, https://www.theepochtimes.com/dominion-voting-systems-uses-
firm-that-was-hacked_3617507.html.

86. Brian Fung, *Why the US government hack is literally keeping security experts awake at*
*night*, CNN, Dec. 16, 2020, https://www.cnn.com/2020/12/16/tech/solarwinds-orion-
hack-explained/index.html.

87. Jack Sellers and Stephen Richer, *Maricopa County's Election Audit Isn't About 2020. It's*
*About the Future,* AZ CENTRAL, Jan. 30, 2021,
https://www.azcentral.com/story/opinion/op-ed/2021/01/30/why-we-approved-maricopa-
county-election-audit/4283183001/.

88. *Election Integrity: 62% Don't Think Voter ID Laws Discriminate*, RASMUSSEN REPORTS,
Apr. 13, 2021,
https://www.rasmussenreports.com/public_content/politics/general_politics/april_2021/el
ection_integrity_62_don_t_think_voter_id_laws_discriminate.