# EXHIBIT 19

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| RUSORO MINING LIMITED, | No. 18-7044 |
| *Petitioner-Appellee*, | |
| v. | (D.D.C. No. 1:16-cv-2020) |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | |
| *Respondent-Appellant*. | |

## MOTION TO STRIKE

Respondent-Appellant the Bolivarian Republic of Venezuela (the "Republic") moves to strike the Notice of Appearance of Moxila A. Upadhyaya and Michael B. MacWilliams of the Venable LLP law firm (Doc. 1774483) and the Response to Motion for Stay (Doc. 1774487) ("Response").

Venable LLP filed the Notice of Appearance and the Response—purportedly on behalf of the Republic—"on instruction from the current and acting Attorney General of the Republic, Reinaldo Muñoz Pedroza," a representative of the Maduro regime. Resp. 1. The purpose of the Response appears to be to record in this Court that "President Maduro vigorously disputes that Mr. Guaidó is the President of the Republic, and asserts that he remains the rightful leader of the

1

Republic." Resp. 2. The Response also assumes *sub silentio* that Mr. Maduro's representatives—and not those of President Guaidó—have the exclusive authority to represent the interests of the Republic in these proceedings. *See* Resp. 5.

But the President of the United States has recognized Juan Guaidó as the rightful President of the Republic. This Court is conclusively bound by that determination, so that only President Guaidó or his representatives may represent the interests of the Republic in U.S. courts. And President Guaidó, through his duly authorized representatives, has directed Arnold & Porter to continue representing the Republic in this Court.[1]

Venable LLP acknowledges that it has not been engaged by President Guaidó. Therefore, this Court should not recognize that firm as counsel for the Republic, and its filings, purportedly made in the name of and on behalf of the Republic, are unauthorized. They should be stricken.

---

[1] As noted in prior filings, Arnold & Porter has been engaged by the Bolivarian Republic of Venezuela—not by any party, political faction, or individual—to represent the interests of the Republic in this Court. Prior to January 23, 2019, Arnold & Porter took instruction from Mr. Maduro's representatives. But since President Donald Trump recognized President Guaidó as Interim President of the Republic on January 23, 2019, Arnold & Porter has, consistent with applicable law, taken instruction from representatives appointed by President Guaidó.

2

## BACKGROUND

Since January 10, 2019, National Assembly President Juan Guaidó has acted as interim President of the Republic pursuant to Article 233 of the Venezuelan Constitution. On January 23, 2019, following a public statement by President Guaidó ratifying the application of Article 233, President Donald Trump issued a statement officially recognizing Mr. Guaidó as interim President of the Republic and rejecting the legitimacy of the Maduro regime.[2]

In response to President Trump's recognition of Mr. Guaidó as President of Venezuela, former president Nicolás Maduro purported to expel all U.S. diplomatic personnel from Venezuela. Secretary of State Pompeo rejected Mr. Maduro's assertion of political and diplomatic authority, stating that "[t]he United States does not recognize the Maduro regime as the government of Venezuela."[3] He explained "the United States does not consider former president Nicolás Maduro to have the legal authority to break diplomatic relations with the United States" and that "the United States maintains diplomatic relations with Venezuela

---

[2]   The White House, *Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaido as the Interim President of Venezuela* (Jan. 23, 2019), *available at* https://www.whitehouse.gov/briefings-statements/statement-president-donald-j-trump-recognizing-venezuelan-national-assembly-president-juan-guaido-interim-president-venezuela/.

[3]   U.S. Dep't of State, Press Statement, *Continuing U.S. Diplomatic Presence in Venezuela* (Jan. 23, 2019), *available at* https://www.state.gov/secretary/remarks/2019/01/288545.htm.

3

and will conduct our relations with Venezuela through the government of interim President Guaidó, who has invited our mission to remain in Venezuela."[4]

On February 25, Treasury Secretary Mnuchin, in announcing new sanctions against the Maduro regime, stated: "The United States fully supports the efforts of Interim President Juan Guaidó to address the endemic corruption, human rights abuses, and violent repression that has become the hallmark of the illegitimate Maduro regime, and looks forward to the restoration of a democratically elected government for the people of Venezuela."[5]

Also on February 25, Vice President Pence reiterated the position of the United States: "President Guaidó, President Donald Trump asked me to be here today to deliver a simple message to you and to the people of Venezuela: *Estamos con ustedes*. We are with you 100 percent. We stand with you in America, along with all the nations gathered here today, and we will keep standing with you until democracy and your *libertad* are restored."[6]

---

[4] *Id.*

[5] U.S. Dep't of the Treasury, Press Release, *Treasury Sanctions Governors of Venezuelan States Aligned with Maduro* (Feb. 25, 2019), *available at* https://home.treasury.gov/news/press-releases/sm616.

[6] The White House, *Remarks by Vice President Pence to the Lima Group, Bogota, Colombia* (Feb. 25, 2019), *available at* https://www.whitehouse.gov/briefings-statements/remarks-vice-president-pence-lima-group-bogota-colombia/.

## DISCUSSION

The President's decision to recognize a party as the rightful representative of the government of a foreign state is conclusive and binding on the courts:

> What government is to be regarded here as representative of a foreign sovereign state is a political rather than a judicial question, and is to be determined by the political department of the government. Objections to its determination as well as to the underlying policy are to be addressed to it and not to the courts. Its action in recognizing a foreign government and in receiving its diplomatic representatives is conclusive on all domestic courts, which are bound to accept that determination … .

*Guaranty Trust Co. v. United States,* 304 U.S. 126, 137–38 (1938).

Courts are equally bound to accept the Executive Branch's refusal to recognize a foreign government or faction. Permitting such a government to appear on behalf of the foreign state in U.S. courts necessarily implies acknowledgment of that government as the legitimate sovereign of the people residing within its borders—an acknowledgement and legitimization that would encroach upon the Executive Branch's exclusive recognition power. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964). Accordingly, to avoid the "possible incongruity of judicial 'recognition,'" *id.*, only the representatives of a government that has been recognized by the United States have standing to sue in U.S. courts or otherwise can avail themselves of the U.S. judicial system. *See Pfizer v. Government of India*, 434 U.S. 308, 319–20 (1978); *see also* Restatement

5

(Third) of Foreign Relations Law § 205 ("[A] regime not recognized as the government of a state[] is ordinarily denied access to courts in the United States [and] is not entitled to property belonging to that state located in the United States … .").

The Executive Branch's authority to recognize and refuse to recognize foreign governments is derived from the President's exclusive constitutional power to appoint and receive ambassadors (Article II, Sections 2 and 3), and from the pre-constitutional sovereign power to conduct the foreign relations of the United States. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320–21 (1936); *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2084–85 (2015); Restatement (Third) of Foreign Relations Law § 204 ("Under the Constitution of the United States the President has exclusive authority to recognize or not to recognize a foreign state or government … ."). "As a government, the United States is invested with all the attributes of sovereignty. As it has the character of nationality it has the powers of nationality, especially those which concern its relations and intercourse with other countries. *We should hesitate long before limiting or embarrassing such powers*." *Curtiss-Wright*, 299 U.S. at 322 (quoting *Mackenzie v. Hare*, 239 U.S. 299, 311 (1915)) (emphasis by the *Curtis-Wright* court).

6

The constitutional allocation of power over foreign affairs to the Political Branches reflects differing institutional competences: "federal courts generally lack the institutional expertise and constitutional authority to oversee foreign policy and national security, and should be wary of straying where they do not belong." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1419 (2018) (Gorsuch, J., concurring). Thus, the courts are "wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs," *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004), and circumspect when faced with "the danger of unwarranted judicial interference in the conduct of foreign policy," *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 117 (2013). As the Supreme Court has explained, "neither the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people." *Boumediene v. Bush*, 553 U.S. 723, 797 (2008).

For these reasons, courts deem the President's recognition actions binding and conclusive. *Guaranty Trust Co.*, 304 U.S. at 137–38. That is so both in cases where an unrecognized government seeks to assert claims in U.S. court, *see id.*, and where competing political factions attempt to assert the interests of a foreign sovereign in U.S. court, *see Republic of Panama v. Air Panama Internacional, S.A.*, 745 F. Supp. 669, 673 (S.D. Fla. 1988). In *Air Panama*, the court resolved a dispute between President Delvalle, the recognized president of Panama, and

Manuel Noriega over control of the Panamanian national airline, Air Panama. The court held that the decision by the President to recognize the Delvalle government conclusively resolved the dispute:

> In the instant case it is undisputed that Air Panama is owned by the Republic of Panama. The Executive Branch has recognized the Delvalle government as the lawful government of the Republic of Panama. Therefore, under the political question doctrine, this Court accepts that recognition and consequently concludes that the Delvalle government is entitled to control Air Panama.

745 F. Supp. at 672–73. The court also rejected purported "appearances" entered by lawyers entered on behalf of Air Panama on the instruction of the Noriega regime. *Id.* at 676 ("It clearly appears, and the Court so finds, that Messrs. Kurzban and Gross are in fact attempting to assert the interests of the Noriega/Palma regime. This effort must be rejected. Only governments recognized by the United States are entitled to access to United States courts.").

The Response attempts to create an exception to this rule in cases where two competing factions "both ask to be heard in order to defend claims that have been filed against their country." Resp. 2–3. The Response does not contest that Mr. Maduro's representatives may not *assert claims* on behalf of the Republic in U.S. courts, but nevertheless seeks to *defend claims* brought against the Republic. Resp. 3.

8

That position is irreconcilable with the reasoning of controlling precedent. Permitting an unrecognized regime to appear in U.S. courts side-by-side with the recognized regime would imply acknowledgment of the unrecognized regime as the legitimate representative of the foreign sovereign. *See Sabbatino*, 376 U.S. at 410. The Executive Branch, however, has unequivocally and repeatedly repudiated Mr. Maduro's claims of political, legal, and diplomatic authority. Any judicial "recognition" of the Maduro regime would thus conflict with the foreign-policy determinations of the Executive Branch, in stark violation of the Constitution's allocation of such determinations to the President. This is equally true whether the regime seeks to appear on behalf of the Republic in the posture of plaintiff or defendant.

The distinction the Response seeks to draw is also irrational. Extinguishing or limiting a liability may be far more important to a foreign sovereign than controlling an asset—depending on the size of the liability and the size of the asset. The position of the Response, moreover, would put the Court in the untenable position of disregarding the President's recognition decision and deciding between conflicting or incongruous positions taken by groups purporting to speak for the same foreign sovereign.

The Response also selectively quotes from a 1952 decision from the Northern District of California to give the impression that courts, not the Executive

9

Branch, should determine what government or political faction is lawfully entitled to represent the interests of a foreign state. Resp. 4–5 (quoting *Bank of China v. Wells Fargo Bank & Union Trust Co.*, 104 F. Supp. 59 (N.D. Cal. 1952), *aff'd*, 209 F.2d 467 (9th Cir. 1953). But the Response omits that court's fundamental legal conclusion:

> It is not a proper function of a domestic court of the United States to attempt to judge which government best represents the interests of the Chinese State in the Bank of China. In this situation, the Court should justly accept, as the representative of the Chinese State, that government which our executive deems best able to further the mutual interests of China and the United States.

104 F. Supp. at 66. Likewise, the Ninth Circuit's decision affirming the 1952 district court decision is quite direct on the effect of recognition in the statutory regime there at issue: "The Nationalist Government of China was at the time these suits were commenced, and still is, the recognized government of China. The Bank of China is a central bank of a recognized foreign state." 209 F.2d at 474.

Moreover, the Response's assertion that there are "serious issues" with President Guaidó's interpretation of the Venezuelan constitution (Resp. 5) is simply irrelevant to the question at hand. Arguments about Venezuelan constitutional law and counter-arguments concerning election fraud have no bearing on the bright-line standard required by applicable law. Recognition is left to the Executive Branch. *See Air Panama*, 745 F. Supp. at 673 ("[T]he issue

10

presented is which rival government properly represents the Republic of Panama in the United States. That issue is to be determined not under Panamanian law governing private corporations, but under the foreign relations law of the United States."). President Trump recognized President Guaidó. No additional inquiry is required or permitted in this Court.

Finally, striking the papers at issue is appropriate. Litigation involving foreign sovereigns raises delicate issues of international relations. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493 (1983). Allowing a regime that the Executive Branch has determined not to recognize to use the U.S. courts as a platform to broadcast its position lends that regime a patina of legitimacy that may be contrary to the foreign policy of the United States as expressed by the Executive Branch. *See Sabbatino*, 376 U.S. at 410. Indeed, the filings already before the Court demonstrate the Maduro regime's intent to use this Court as a forum in which to express its views on the Executive Branch's foreign policy determinations. Resp. 2 ("President Maduro vigorously disputes that Mr. Guaidó is the President of the Republic, and asserts that he remains the rightful leader of the Republic.").

Moreover, a filing purporting to be made by the Republic on instructions from Mr. Maduro simply is not a filing of the Bolivarian Republic of Venezuela. The Response points out that "an unrecognized state is not a juridical nullity."

11

Resp. 3 (citing *Kadic v. Karadžić*, 70 F.3d 232 (2d Cir. 1995), and cases citing *Kadic*). But this case does not involve an "unrecognized state." It involves an unauthorized filing by the *former* head of a *recognized* state. The Notice of Appearance and the Response—filed purportedly on behalf of the Republic upon instructions from Mr. Maduro—have no more legitimacy in this Court than filings purportedly on behalf of the Republic of France upon instructions from a pretender to the French throne.[7] *See Air Panama*, 745 F. Supp. at 676 (rejecting appearances by lawyers of unrecognized regime). Such filings are a misuse of this Court's offices, and they should not stand.

## CONCLUSION

For the foregoing reasons, the Bolivarian Republic of Venezuela respectfully requests that the Court strike the notice of appearance of Moxila A. Upadhyaya and Michael B. MacWilliams of the Venable LLP law firm (Doc. 1774483) and the Response to Motion for Stay (Doc. 1774487).

---

[7] *See* Kim Willsher, *Death of Count of Paris Sparks Pretend Game of Thrones in France*, The Guardian (Jan. 25, 2019), *available at* https://www.theguardian.com/world/2019/jan/25/death-of-count-of-paris-sparks-pretend-game-of-thrones-in-france-jean-dorleans.

                Respectfully submitted,

Dated: February 28, 2019        */s/ Kent A. Yalowitz*

Kent A. Yalowitz
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: +1 212.836.8000
Fax: +1 212.836.8689
kent.yalowitz@arnoldporter.com

E. Whitney Debevoise
Stephen K. Wirth
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001-3743
Telephone: +1 202.942.5000
Fax: +1 202.942.5999
whitney.debevoise @arnoldporter.com

*Attorneys for the Bolivarian Republic of Venezuela*

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2019, I electronically filed the foregoing document with the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: February 28, 2019         */s/ Stephen K. Wirth*
                                 Stephen K. Wirth

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document complies with Federal Rule of Appellate Procedure 27(d)(2)(A) and Federal Rule of Appellate Procedure 32(g)(1) because it contains 2,405 words. I further certify that the foregoing document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.


Dated:  February 28, 2019        */s/  Stephen K. Wirth*
                                 Stephen K. Wirth