```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2

3    Smartmatic USA Corp,           ) Civil Action
                                    ) No. 21-cv-2900
4                   Plaintiff,      )
                                    ) MOTION HEARING
5    vs.                            )
                                    ) Washington, DC
6    Herring Networks,             ) July 18, 2023
                                    ) Time:  11:14 a.m.
7                   Defendant.      )
     _____
8
                 TRANSCRIPT OF MOTION HEARING
9                      HELD BEFORE
          THE HONORABLE JUDGE MOXILA A. UPADHYAYA
10               UNITED STATES MAGISTRATE JUDGE

11   _____

                     A P P E A R A N C E S
12

13   For Plaintiffs:     Caitlin Kovacs
                         Olivia Elizabeth Sullivan
14                       BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
                         71 S. Wacker Drive
15                       Suite 1600
                         Chicago, IL 60606
16                       312-212-4949
                         Email:  CKovacs@beneschlaw.com
17                       Email:  Osullivan@beneschlaw.com

18   For Defendant:      Charles L. Babcock
                         Bethany Pickett Shah
19                       JACKSON WALKER L.L.P.
                         1401 McKinney
20                       Suite 1900
                         Houston, TX 77010
21                       713-752-4210
                         Email:  Cbabcock@jw.com
22                       Email:  Bpickett@jw.com
                         R. Trent McCotter
23                       Boyden Gray & Associates PLLC
                         801 17th Street, N.W., Suite 350
24                       Washington, DC 20006
                         202-706-5488
25                       Email:  Mccotter@boydengrayassociates.com

     Proceedings reported by audio recording.
```

1      Transcribing Court Reporter:
2                              Janice Dickman, RMR, CRR, CRC
                               Official Court Reporter
3                              United States Courthouse, Room 6523
                               333 Constitution Avenue, NW
4                              Washington, DC  20001
                               202-354-3267
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      *  *  *  *  *  *  *P R O C E E D I N G S*  *  *  *  *  *  *
 2              THE COURTROOM DEPUTY:  Good morning, Your Honor.
 3      This is civil case 21-cv-2900, Smartmatic USA Corp, et al.
 4      versus Herring networks Inc.  This matter is set for a recusal
 5      hearing.
 6              Parties please introduce yourselves for the record,
 7      starting with plaintiff's counsel.
 8              MS. KOVACS:  Good morning, Your Honor.  I'm Caitlin
 9      Kovacs.  And with me is my colleague Olivia Sullivan.  We're
10      with Benesch, Friedlander, and here for plaintiffs today.
11              THE COURT:  Okay.  Good morning, Ms. Kovacs.  Will
12      you be the one addressing the Court?
13              MS. KOVACS:  I will, Your Honor.
14              THE COURT:  Thank you.  Good morning.
15              MR. BABCOCK:  Good morning, Judge Upadhyaya.  My name
16      is Chip Babcock.  My formal name is Charles.  My nickname is
17      Chip.  And you have a much cooler nickname than I do, but I
18      would never call you that out of respect.
19              THE COURT:  And I won't call you by your nickname
20      either.
21              MR. BABCOCK:  That's how everybody knows me.  Thank
22      you.
23              THE COURT:  Good morning, Mr. Babcock.  Will you be
24      addressing the Court?
25              MR. BABCOCK:  I will.
```

```
 1                THE COURT:  Okay, great.

 2                MS. SHAH:  Your Honor my name is Bethany Shah.  I'm

 3      also part of the Jackson law firm and I represent the

 4      defendants.

 5                THE COURT:  Good morning.

 6                MR. COTTER:  Good morning, Judge.  Trent Cotter, from

 7      Boyden Gray & Associates.

 8                THE COURT:  Okay.  Good morning.

 9                Okay.  First, I would like to just address how we're

10      going to be handling any material that's been requested to be

11      filed under seal.  Either I or Judge Nichols will address the

12      motions to file certain material under seal, but first I would

13      like to get a sense for whether either party thinks that we

14      need to seal the courtroom in order to have argument this

15      morning.  So I'll start with the movant.

16                MR. BABCOCK:  We do not, Your Honor.

17                MS. KOVACS:  Your Honor, I don't expect that we will

18      need to seal the courtroom this morning, just to discuss the

19      materials that we filed under seal.  I do think if it were to

20      come to needing to pull out those documents that are referenced

21      and discuss them in detail, then we may want to raise that at

22      that time.  But I don't expect that to be an issue.

23                THE COURT:  Okay.  Well, I will -- in order to have a

24      full and fair public hearing, I'm not going to seal the

25      courtroom and I will rely on counsel for both sides to just
```

1    stand up, if you think that we're getting into any materials

2    that might wade into materials that have been requested to be

3    filed under seal.  So for that purpose only, I'll allow -- if

4    someone is about to say something or has said something in that

5    limited instance, I will allow opposing counsel just to stand

6    to make me aware of that, so that we can address it right at

7    the moment.  Okay?  All right.

8          All right.  On May 31st this case was referred to me

9    for the resolution of certain discovery disputes that were

10   existing between the parties.  And on June 5th, 2023, I

11   received a letter to my chambers from counsel for defendant,

12   purporting to informally raise the issue of my potential

13   recusal in this matter.  In the interest of full and fair

14   public access to any discussion regarding any recusal request,

15   I docketed the letter, invited plaintiffs to respond and set

16   this hearing.

17         After I set the hearing on July 6, 2023, defendant

18   filed a formal motion for recusal, and plaintiffs filed an

19   opposition yesterday, on July 17, 2023.

20         I believe you all have received a note from my law

21   clerk alerting you to the fact that I'm allocating 25 minutes

22   per side for today's argument.  Okay.  So, I've asked the

23   parties to assume that I have reviewed the papers, which I

24   have, so I'm hoping that we can spend our time very efficiently

25   today and that you make an argument that perhaps isn't in the

1  paper or in response to another side, so that we -- in light of

2  a number of statements which have been made in the papers, and

3  so that we actually might spend our time efficiently today.

4      I will first briefly clarify some issues which have

5  been raised about an appellate case on which I served as one of

6  the attorneys when I was in private practice at the law firm of

7  Venable, LLP.  And as you both know -- or, as you all know, at

8  issue is the *Rusoro Mining* case in the D.C. Circuit.

9      As is evident from the public record, I entered my

10  appearance on behalf of a firm client, the government of

11  Venezuela, on February 22nd, 2019.  My designation as lead

12  counsel on that docket was due to my having been an attorney in

13  the D.C. office credentialed to electronically file documents

14  in that court.  I was not lead counsel in the matter or what is

15  often referred to as a relationship partner.  My role was akin

16  to a local counsel role.

17      As is reflected on the docket, Venable withdrew its

18  appearance in the case 17 days later, on March 11th, 2019.

19  Prior to Venable's withdrawal, I was one of two attorneys on

20  three filings.  One filing on February 22nd, 2019 was a

21  response to a motion to stay -- which you all know about --

22  outlining legal arguments of Venable's client.  The second

23  filing was a motion for extension of time which we filed on

24  March 6, 2019.  That did not contain any legal arguments.  The

25  third filing was Venable's notice of withdrawal on March 11,

1    2019.

2            My role in the *Rusoro Mining* case was brief and

3    limited to that period of time mentioned above.  There was no

4    development of facts or evidentiary issues which occurred

5    during that time on appeal.  I was not involved in the case in

6    the U.S. District Court for D.C., the underlying commercial

7    arbitration at issue, or any factual development or discovery.

8    I was not involved with the case or the client in any way after

9    my firm withdrew its appearance.

10           I have no personal knowledge of any facts presented

11   in this case.  Other than my role in the *Rusoro* matter, which

12   I've described above, I have no connection, past or present,

13   personal or professional, to any leader or government official

14   from the country of Venezuela and have no connection, past or

15   present, to any party or lawyer in this case.

16           There has been one other matter that's been discussed

17   in the papers I just want to briefly address, and that's a

18   matter handled by another attorney at Venable.  I just want to

19   clarify, I had no involvement in that matter and, in fact, the

20   first time I ever heard about it was in defendant's motion in

21   this case.

22           So with that brief background, I'm hoping that you

23   all can tailor the arguments and address anything you want to

24   address in the papers.  And I'll let, Mr. Babcock, you go

25   first.

1          MR. BABCOCK:  Thank you very much, Your Honor.  May

2     it please the court.  Chip Babcock for the defendant, Herring

3     Networks, one of the networks who is the One American News

4     Network, which is the activities of the defendant that is at

5     issue in this lawsuit.

6          Thank you for that helpful background.  Obviously, we

7     did not know some of those things or could we or should we.

8          THE COURT:  I think it's important for -- I think

9     it's important, when there's discussion being made, for you all

10     to have some context and background.

11          MR. BABCOCK:  Yeah, absolutely true.  I don't

12     purport -- or, I don't intend to rehash the things that were in

13     the papers, since the Court has read them.  I would like to

14     talk about some of the matters that were in the brief that was

15     filed yesterday, although they've been foreshadowed by the

16     plaintiff in its statement on June 30th.

17          First, we are delighted to hear that there is no

18     claim against OAN regarding the 218 -- the 2018 presidential

19     election.  And so we don't expect that at trial there will be

20     any claim made against us in that with regard to that election.

21     However, that does not mean that the 2018 presidential election

22     in Venezuela is not still at issue in the case we have pled in

23     our defense docket 36, the ECF pages 304, that our statements

24     are either true or substantially true.  And substantial truth

25     is a well known concept in not only the defamation law of D.C.,

1    but in all jurisdictions that I'm aware of.  The *Moldea versus*

2    *New York Times* case, the *(unintelligible) versus CBS*, *Nunes*

3    *versus Washington Post*, the most recent one.

4         And the substantial truth doctrine says that if I

5    incorrectly say that Ms. Shah robbed Wells Fargo of

6    $10 million, but in fact she robbed Chase Bank of $5 million,

7    nevertheless, despite that factual inaccuracy, my statement is

8    substantially true because the reasonable listener or reader of

9    my publication would not -- that would not affect her

10   reputation in any way.

11        Similarly, we believe and intend to prove that the

12   2018 election was in fact a rigged election, as many

13   international observers and which the administration of our

14   country at the time said was true and that the Smartmatic, as

15   they say at page 9 of their brief in this case, filed

16   yesterday, and in their pleadings, that their second cause of

17   action is that we falsely said Smartmatic's electronic

18   technology and software was designed to fix, rig, and steal

19   elections, and had done so before.

20        We intend to prove that that 2018 election, which

21   they admittedly had a hand in, was rigged with the help of

22   Smartmatic.  If there is any doubt that Smartmatic was involved

23   in the 2018 election, it is dispelled completely, I think, by

24   Exhibit B to the brief that was filed yesterday.  That is a

25   letter on behalf of Smartmatic by a law firm by the name of DLA

1    Piper.  And the Court will find, in paragraphs 42 and 45, the

2    statements are made that Smartmatic was kicked out of the

3    country after it blew the whistle on the 2017 election for a

4    special general assembly, claiming that that election which had

5    used its equipment and software was fraudulent.  But then went

6    on to say that Venezuela had no ability to conduct the 2018

7    presidential election without using the Smartmatic software

8    personnel and technology, and did so.  So, clearly, by their

9    own admission, they were involved in the 2018 presidential

10   election.

11           So how does that relate to the recusal matter?  Well,

12   as the Court noted, you were involved briefly in the D.C.

13   District Court of Appeals for the D.C. Circuit, but they say 11

14   days, I think maybe your timeline extends it by a few days.

15   But a short period.

16           THE COURT:  Yeah, whatever February 22nd, 2019 to

17   March 11, 2019 was.  I think it's a little more than --

18           (Overlapping speakers.)

19           MR. BABCOCK:  -- substantially proven, 11 versus 18.

20           But, as I think anybody who practices in a big law

21   firm knows, that, you know, you don't wake up one day and say

22   I'm going to file something in the D.C. Circuit.  There's some

23   substantial things that precede that.  First of all, you get

24   contacted by a client, whether it's the relationship partner

25   who talks to you, or whether you talk to -- whatever.  And then

1   a conflict check is run.  And I would think that this one might

2   have been tricker than usual because your client is the

3   Republic of Venezuela.  But there's already a party in the

4   case, represented by Arnold & Porter, by the Republic of

5   Venezuela.  And then, of course, the plaintiff in the case

6   would have been in the conflicts check.  And then, after

7   getting the conflicts check back, you would have to make some

8   contact with the client, which in this case was Maduro.

9          I don't know if you spoke, nor do I want to know

10  whether you spoke to President Maduro or not.  But

11  nevertheless, you would have had to have some contact in order

12  to make the statements and you would have done your normal due

13  diligence, you would have done legal research, and then you

14  would have drafted the brief, presumably sent to the client for

15  approval, and then filed it.  And in that filing you told the

16  D.C. Circuit that Maduro was the legitimate president of

17  Venezuela and that it was the will of the electorate that had

18  placed him there, despite the claims of the former president of

19  the assembly, Mr. Guaido, who claimed to be the acting

20  president and was recognized by our government.

21         After you filed that brief, there was a motion to

22  strike and your firm -- you and your firm withdrew, as you

23  said, on March 11th.  It seems to me, that it would be

24  impossible for you not to have obtained some knowledge about

25  the legitimacy of the 2018 election, which is going to be

1    directly implicated in this case, if not by their claim against

2    us, despite the statement on page 9 of their brief,

3    nevertheless, by our defense, a substantial truth.

4              So, our view is that the 2018 election, despite their

5    response, is very much at issue in this case.  And, frankly,

6    most of their argument is predicated on the fact that they made

7    no claim about 2018.

8              There is -- one of your partners by the name of Ed

9    Wilson, who had some involvement with somebody involved with

10   Venezuela, if that's all we had, we wouldn't be here.  That is

11   just an additional thing that if this was a disqualification of

12   a lawyer, and Miss Shah knew something with regard to a

13   completely different representation, it would be imputed to me.

14   But that's surely not the central focus of our argument here.

15             THE COURT:  Well, the rules regarding

16   disqualification of counsel in a case are different from those

17   governing whether a judge might consider recusing him or

18   herself, correct?

19             MR. BABCOCK:  Yes, I agree it would be analogous.

20   And we cited a case from the Fourth Circuit, I believe, that

21   said if a partner has something, then the judge knows it.  But

22   we haven't delved into that deeply.  And, frankly, Mr. Wilson's

23   involvement is just an added reason why somebody who might be

24   looking at this situation -- and it's a reasonable person, it's

25   not -- it's not, you know, some other judge or some elaborate

1    thing.  The impartiality is measured by the average citizen.

2         The reason for the amendments to Section 455 in 1974

3    was to greatly expand, in light of the desire of congress to

4    increase public confidence in the judiciary.  And that actually

5    should be the overriding goal that we have.  I proceeded in

6    this matter in the way I did not to avoid public scrutiny of a

7    motion, but, rather, out of deference to the Court and

8    deference to the judiciary to not raise matters that could be

9    dealt with by agreement, with the judge's concurrence.

10        When we started this -- when I started this, a few

11   days after I found out about it, I called opposing counsel,

12   Mr. Connolly, and we had a very professional discussion and he

13   agreed that this was an issue that we needed to raise.  And, in

14   fact, the third sentence of the first paragraph of my letter to

15   you was dictated to me by Mr. Connolly.  That's his sentence.

16        THE COURT:  So that raises an interesting point.  My

17   understanding of the statement in defendant's letter was not

18   that plaintiff agreed that recusal was necessary or that

19   plaintiff, rather, was consenting to a request to recuse, but,

20   rather, that plaintiff was consenting to defendant raising the

21   issue with me.

22        MR. BABCOCK:  Absolutely.

23        THE COURT:  All right.

24        MR. BABCOCK:  No, I did not mean to suggest that he

25   consented.

1          THE COURT:  Right.

2          MR. BABCOCK:  He certainly did not.

3          You know, (intelligible) I want to think about it.

4    But you're right, it's a legitimate issue, send your letter.

5    And I said, I want you to say whatever you want to say, and

6    that's when he dictated the third sentence which I put in the

7    letter.  And then you asked him to make a response, and he did.

8    And it was clear then, to me, that the plaintiff was not only

9    opposing our, at that point, you know, raising the issue, but

10   was opposing recusal, which is why I filed a more fulsome

11   motion, which has now been responded to.

12         But Section 455(a), which is the catchall, really,

13   there has not been much of a response, other than to, I think,

14   cite cases suggesting that the test is, you know, some -- some,

15   you know, judicial watch or some court watcher who is going to

16   be really fully informed.  And I don't think that's right.  I

17   think it's the average citizen that is the standard.

18         There are two more recent D.C. Circuit cases that

19   have not been cited to you by either party.  One is --

20         THE COURT:  Have you shared this authority with

21   plaintiff's counsel?  Because it's not in any paper.

22         MR. BABCOCK:  In about three seconds I will.

23         THE COURT:  Okay.  I -- that's not usually how I do

24   things in this courtroom.  I want everyone to have a chance to

25   respond to cases, if they're being raised for the first time.

 1      And I'm not aware of these cases yet, either.  But go ahead.

 2              MR. BABCOCK:  Well, then I won't cite them, Judge.  I

 3      found them by Shepardizing the *Cordova* case which plaintiff

 4      cited.

 5              But the point is, I think, that it is an average

 6      citizen test.  It's not some super citizen who is following the

 7      judiciary.  In fact, it's people who have not served on the

 8      bench.  And that's -- that's the measure for Section 455(a),

 9      (b)(1) and (b)(2).

10              THE COURT:  Is the defendant's position that the

11      Supreme Court's outlining of the standard in *Cheney versus U.S.*

12      *District Court*, 541 U.S. 913, in 2004, is incorrect, where the

13      court says that in order -- in looking at whether recusal is

14      required under the appearance of impartiality prong, the court

15      looks to the perspective of a reasonable observer who is

16      informed of all of the surrounding facts and circumstances and

17      whether that observer would entertain significant doubt about

18      the judge's impartiality?

19              MR. BABCOCK:  I'm sorry, I didn't -- that statement

20      that you just read is found in cases for sure.

21              THE COURT:  Okay.  Well, this is the Supreme Court

22      case, so I just want to know defendant's position.

23              MR. BABCOCK:  If the Supreme Court has said that, I'm

24      way in favor of that.

25              THE COURT:  Smart movie.

1          MR. BABCOCK:  But, I will say that the Supreme Court

2     says things and then -- and then lower courts interpret what

3     the Supreme Court has said.  I only suggest that as recently as

4     2020 the D.C. Circuit has -- has talked about the average

5     citizen.  But the language that you read has certainly -- is

6     found in expression in many cases, some of which the plaintiffs

7     have cited to you in this case.

8          Just briefly, responding on 455(b)(1), personal

9     knowledge of disputed evidentiary facts concerning the

10    proceeding.  Once again, the response has always been, by the

11    other side, that 2018 is not involved and that's all you could

12    have known about.  And I've already gone over that issue,

13    including the statement in their brief that Smartmatic

14    technology and software is designed to rig and steal elections,

15    and has done so in the past.  455(b)(2), where when in private

16    practice you served as a lawyer in a matter of controversy,

17    they cite the *Philip Morris* case, district court decision here,

18    that made the points that there really was no authority about

19    what "matter in controversy" meant, but concluded, based on a

20    D.C. Circuit opinion by Judge Kavanaugh, now Justice Kavanaugh,

21    that it was a broad term, and obviously broader than just the

22    case we're here about.  And -- and we think that that applies

23    as well.

24          I can go on because lawyers can go on forever, but if

25    the Court has any questions, I'm happy to do that.  I hope I've

1    reserved maybe some of my time --

2              THE COURT:  Yes, you have about ten minutes.

3              MR. BABCOCK:  -- to review.

4              THE COURT:  Yes, I think you still have 10, 15

5    minutes.

6              Actually, I do have a question, sir.  It seems to

7    me -- but I don't want to characterize your motion for you --

8    it's really defendant's position that recusal is mainly

9    required under 28 U.S.C. 455(a), that the appearance of

10   impartiality is what is the driving factor behind your motion.

11   If I'm misunderstanding that, please let me know, because

12   defendant has made it clear that it has no basis to question my

13   impartiality in this case or any facts to suggest any personal

14   bias in this case.  Is that true?

15             MR. BABCOCK:  Yes.  I think I -- yes, I would agree

16   that 455(a) is the strongest of our grounds.  I would not want

17   to concede (b)(1) or (b)(2).  But I think (a) is stronger.  I

18   also think that the cases are quite clear.  And we want to

19   emphasize that it's the defendant's position that it is the

20   appearance, not that there is any actual bias.  That's our

21   opinion and that's what the cases say.  So we want to be clear

22   about that.

23             THE COURT:  Okay.  Thank you, sir.  I'll give you

24   time on rebuttal.

25             MR. BABCOCK:  Thank you very much.

1          THE COURT:  Ms. Kovacs.

2          Now you all hear how thin these walls are.

3          MS. KOVACS:  Again, Ms. Kovacs for Smartmatic.  And I

4    wanted to start by saying OAN's motion should be denied in this

5    case because OAN's defamatory statements regarding Smartmatic

6    during the 2020 U.S. presidential election are the primary

7    basis for the case and the 2018 election in Venezuela was

8    neither mentioned nor the subject of any of the defamatory

9    statements within Smartmatic's complaint.  In fact, the

10   election is not mentioned anywhere in what OAN has described

11   Smartmatic's very lengthy complaint.  Neither of the two priors

12   matters that OAN points to in its request today has any bearing

13   on either Smartmatic or the 2020 U.S. presidential election.

14          So I would like to start, if I could, with a brief

15   review of the state of the law regarding recusal and then move

16   to highlighting the lack of connection between the three cases

17   that are at issue here and discuss the analogous case law and

18   end with the point regarding the importance of precedent here.

19          So to start, I would like to emphasize that recusal

20   is an extraordinary request.  When examining requests for

21   recusal, courts must begin with the presumption against

22   disqualification.  The reasonable observer understands that

23   judges are generally capable of handling disputes without

24   letting their personal connections or prior experiences cloud

25   their judgment.

1    For example, in this court Judge Lamberth opined that

2    because judges are presumed to be impartial, the court must

3    begin its analysis of the allegations supporting the request

4    for recusal with the presumption against disqualification.  And

5    that was in *SEC versus Bilzerian*.

6    Judge Kollar Kotelly, also within this district, held

7    a reasonable observer must assume that judges are ordinarily

8    capable of setting aside their own interests and adhering to

9    their sworn duties to faithfully and impartially discharge and

10    perform all the duties incumbent upon them.  And that was in

11    *Armenian Assembly*.

12    Yet another judge from this district, Judge Mehta,

13    warned against recusal motions where a decision to recuse would

14    encourage inappropriate judge shopping by future litigants.

15    That was in *Philip Morris*.  And Judge Bates, also in this

16    district, similarly recognized that a motion to recuse should

17    not be lightly granted.

18    Other courts, going up to the highest court, have

19    also emphasized the importance of the presumption against

20    disqualification.  For instance, Justice Kennedy observed,

21    "Judges, if faith full to their oath, approach every aspect of

22    each case with a neutral and objective disposition.  They

23    understand their duty to render decisions upon a proper record

24    and disregard earlier judicial contacts with a case or party."

25    The Second Circuit also affirmed the importance of

1    denying recusal in situations that do not warrant it, saying,

2    "A judge is as much obliged not to recuse herself when it is

3    not called for, as she is obliged to do so when it is."

4         And so, with that background, Your Honor, I would

5    like to briefly review the bases for each case that is in front

6    of you and the lack of connection between them.

7         First, former partner Mr. Wilson's representation in

8    *Casa Express*.  Casa Express was a holder of some unpaid

9    Venezuela bonds and obtained judgment in the SDNY against

10   Venezuela.  And following that suit, Casa Express sued

11   Venezuela and a number of other defendants, asserting a real

12   estate claim in Florida.  That case had nothing to do with any

13   election, had nothing to do with any of the parties in this

14   case and there is no connection between that case and the

15   issues present here.

16        *Rusoro Mining*, which Your Honor was involved in.  OAN

17   described this as the confirmation and arbitration award to

18   restore mining for the expropriation of its assets.  Again, the

19   underlying case had nothing to do with any election.  The only

20   issue that arises with regard to Your Honor's filing was who

21   should properly be leading the case on behalf of Venezuela.

22   Your representation in that matter lasted for what we know now

23   is 17 days.  And no filing in that matter, either made by Your

24   Honor or by anyone else in the case, mentions Smartmatic or

25   mentioned any provider of election services at all.

1          Finally, the case at hand, *Smartmatic versus OAN*.

2     First, the cause of the action that is -- first, that

3     Smartmatic has made out in its complaint is the defamatory

4     allegations that Smartmatic participated in a criminal

5     conspiracy to fix, rig, and steal the 2020 U.S. election.

6          The second cause of action, completely separate, is

7     the defamatory allegations that Smartmatic's election

8     technology and software were widely used, including in

9     Dominion's voting machine system in the 2020 U.S. election,

10    including in states where claims of election fraud were made,

11    were used to fix, rig, and steal the 2020 U.S. election, were

12    hacked or compromised during the 2020 U.S. election or while

13    votes were sent abroad to be counted, and were designed to fix,

14    rig, and steal elections, and have been used to do so before.

15         That cause of action referred back to all of the

16    statements that have been laid out with specificity earlier in

17    the body of the complaint and not one of those statements had

18    anything to do with the 2018 election.

19         Now, most certainly, OAN did defame Smartmatic with

20    respect to its alleged relationship with Venezuela.  It said

21    that Smartmatic is partially owned by the Maduro regime and

22    George Soros.  It said that the technology was controlled by

23    allies of Venezuela's Maduro regime, again in the context of

24    the 2020 U.S. election.  And it stated that any election that

25    involves Maduro was a sham and must not be recognized by any

1    civilized country.  It finally said that Smartmatic has faced

2    controversy in the past with allegations of rigging the 2013

3    election in Venezuela to favor socialist president Nicholas

4    Maduro.  None of these statements alleges that Smartmatic was

5    involved in the 2018 election.  None of these statements

6    alleges that Smartmatic rigged the 2018 election.

7            Now, I want to you touch briefly on OAN counsel's

8    discussion of Smartmatic's alleged involvement in the 2018

9    election.

10           So, OAN submitted its own sources as part of the

11   briefing here.  And its own exhibits belie the idea that

12   Smartmatic had any involvement in the 2018 election.  Now, that

13   even assumes that that would have anything to do with the

14   matter at hand.  Even if Smartmatic were somehow involved in

15   the 2018 election -- and it's not -- that would not warrant

16   your recusal in this case, where your representation had

17   nothing to do with Smartmatic.  Smartmatic was not mentioned in

18   *Rusoro* at all.

19           But even if it did matter, Your Honor, Smartmatic --

20   there's no -- I'm sorry, there's no evidence at all that

21   Smartmatic itself was involved in the 2018 election.  And, in

22   fact, OAN's own sources have shown that Smartmatic had left

23   Venezuela by the time that election happened, that Venezuela

24   had expropriated Smartmatic's machines that it had to leave

25   behind when it fled, that Smartmatic had hired another company,

1     Ex-Clé, to run its future elections, and that it was refusing

2     to pay Smartmatic for its prior services unless Smartmatic

3     simply handed over access codes to let Ex-Clé do all of the

4     work.  And I would like to point Your Honor to the particular

5     exhibits where OAN says this for your reference.

6             Exhibit 12, at page 8, is a news article that says,

7     "It wasn't until 2017 when Smartmatic denounced the fraud and

8     results of the Constituent Assembly that work began on a new

9     system.  At that time, all of the infrastructure that the

10    multinational company had set up in Venezuela, including

11    regional centers that served as support during electoral

12    projects and servers, was expropriated," and began to explain.

13            OAN's Exhibit 13, page 1, is a news article

14    circulated among Smartmatic employees.  It says, "It was not

15    until 2017 when Smartmatic called fraud following the vote for

16    the new national constitutional assembly that a new system

17    began to be developed.  The government then seized all the

18    infrastructure Smartmatic had employed in Venezuela, from the

19    regional centers for election support to the servers, and

20    handed it to Ex-Clé, the company responsible for managing the

21    country's (unintelligible) database."

22            And finally, Exhibit 13, page 2, is another news

23    article and it states, "The security systems in Smartmatic's

24    voting machines prevented (unintelligible) and Ex-Clé from

25    running them with their altered software following the 2018

1    election."

2           Now -- excuse me -- Exhibit B to Smartmatic's

3    response yesterday was also touched on by OAN's counsel.  And

4    Exhibit B shows exactly the same thing that was just shown by

5    OAN's own sources, which is that Smartmatic's machines and its

6    software were taken by the government of Venezuela for its own

7    use in the 2018 election.  Smartmatic itself as a company had

8    no control over the machines, had no control over the software,

9    and no involvement whatsoever in the actual election.

10          And now, Your Honor, I would like to turn to the most

11   analogous cases that we've cited for Your Honor in our brief

12   and just discuss them in a little more detail.  So there are a

13   handful of particularly analogous cases that are close in terms

14   of the issues that are present in the case, but these cases

15   involve even closer connections than what we're looking at

16   today.  And in each instance the court declined to recuse.

17          The first is *Philip Morris*, a case out of this court

18   where plaintiffs moved under Section 455(b) and (a).  But they

19   moved because the judge's former firm had provided advice

20   regarding the regulations that were at issue in front of the

21   court.  So in that case the judge was interpreting regulations

22   and resolving disputes around the interpretation of them, when

23   his former colleague had been involved in the creation of those

24   regulations in the first place while they were at the same

25   firm.  And Judge Mehta engaged in a very detailed discussion of

1    what "matter in controversy" means, and stated that

2    "Substantial overlap between the subjects of two matters is not

3    enough to warrant recusal."  He said that typically recusal is

4    warranted because of the judge's prior law firm, it's because

5    the present case is the same or similar to the case the law

6    firm worked on before, which certainly isn't true in our case

7    here.

8         The factor that Judge Mehta looked at involved the

9    overlap of legal issues between the two cases, whether the

10   former law firm was likely to be a witness in the present case,

11   whether the former law firm was involved in discovery in the

12   present case, and the impact of the pending case's outcome on

13   the law firm's client.

14        The judge noted that the prior law firm could benefit

15   from the present case, but indirectly, because a favorable

16   outcome would merely align with the law firm's interests

17   (unintelligible) law firm (unintelligible).

18        For the instant case here, Your Honor's former law

19   firm has zero current interest in this case.  It's very

20   unlikely that they would represent a third party.  And if they

21   were, Your Honor, the case law is clear that that is no reason

22   for recusal because judges are typically deemed able to

23   adjudicate matters before them where their former law firms are

24   involved.

25        In *Philip Morris*, the movant also moved for recusal

1    under 455(a) on three grounds.  First, the former law clerk's

2    advice given to antitobacco organizations, like in 455(b).

3    And, second, the judge's wife's partnership at the judge's

4    prior firm.  And third was the judge's former partner was of

5    counsel for defendants.  So there were a few different

6    potential connections that were noted.

7         The judge ruled that the current connections that had

8    been raised in front of him did not warrant recusal because it

9    is not unusual to have overlap between judges and their

10   friends, former law firms, former coworkers, legal issues they

11   may have tangentially worked on or parties.  That's just a part

12   of being part of the legal community and so recusal should not

13   happen just because there is some overlap.

14        Next, in *U.S. versus DeTemple*, this is a case out of

15   the Fourth Circuit that involved all three of the sections at

16   issue here, 455(a), (b)(1, and (b)(2).  Here, DeTemple had

17   filed for personal bankruptcy under Chapter 11 and Contractors

18   Supply, Inc., was identified as one of the unsecured creditors

19   in that Chapter 11 proceeding.  The judge in *U.S. v. DeTemple*

20   had represented Contractors Supply with respect to that Chapter

21   11 case that DeTemple was the subject of.  Three years later,

22   DeTemple was charged with arson, mail fraud, and bankruptcy

23   fraud related to its Chapter 11 case.

24        DeTemple moved to recuse the judge on the basis that

25   he previously represented Contractor Supply and that partners

1    at the judge's prior firm represented several entities that

2    were involved in that Chapter 11 case.  DeTemple also asserted

3    that the judge gained disputed evidentiary facts when he

4    represented Contractors Supply.

5           In the case before the court then, the Chapter 11

6    bankruptcy was the basis for the claim against DeTemple for

7    bankruptcy fraud.  The judge acknowledged that the bankruptcy

8    fraud prosecution clearly implicated the interests of the

9    bankruptcy creditors, including Contractor Supply, but

10   Contractor Supply was never mentioned at trial and no one from

11   the judge's prior law firm testified at trial.  The judge's

12   representation of Contractors Supply was five years before the

13   case in front of him as a judge.

14          In that case the judge found that none of those facts

15   supported the assertion that the judge served as a lawyer in a

16   matter of controversy or could not otherwise be impartial.

17   DeTemple's debt to contractor supply -- excuse me.

18          I apologize.  I got my three-year-old's cold.

19          THE COURT:  That's okay.

20          MS. KOVACS:  DeTemple's debt to Contractors Supply

21   was not a disputed evidentiary fact at trial, so the judge's

22   personal knowledge that he potentially gained from his

23   representation would not have been relevant.  And the judge's

24   knowledge of the single debt owed to Contractor Supply did not

25   put him on notice of DeTemple's dire financial condition.

1          Similarly here, Your Honor's brief representation of

2     Maduro would not have put you on any notice about OAN's

3     defamatory statements about the 2020 election or about

4     Smartmatic's alleged relationship with Venezuela.

5          Just one more moment, Your Honor.

6          (Pause.)

7          MS. KOVACS:  All right.  Next I would like to turn to

8     *Chitimacha Tribe*, which is a case out of the Fifth Circuit.

9     There, a Native American tribe appealed the lower court's grant

10    of summary judgment entered in favor of the landowners in the

11    tribe's suit claiming ownership of a large tract of land in

12    Louisiana.  One of the issues raised on appeal was whether the

13    trial court judge erred in not recusing himself.

14         Texaco had had an interest in the land that was the

15    subject of the dispute and was a defendant in the case.  Judge

16    Davis had represented Texaco in an unrelated matter six years

17    before.  The other basis for recusal was that Judge Davis

18    allegedly owned a tract of land on the disputed land.  The

19    court found that the present case would in no way impact Judge

20    Davis's land, so there was no basis for recusal.  The court

21    upheld Judge Davis's decision not to recuse itself.

22         So sorry.  One more.

23         THE COURT:  That's okay, you can take a moment.

24         (Pause.)

25         MS. KOVACS:  Apologize, Your Honor.

1           All right.  The last case I would like to discuss is

2      that in *Veneklase versus City of Fargo*.  There the judge's

3      former law firm partners had represented Fargo, the defendant.

4      The present case concerned Fargo's anti-picketing ordinance.

5      And an issue arose when there was a vigil outside of Jane

6      Bovard's house, who was the director of the Fargo Women's

7      Health Clinic.  In that matter, the law firm's recusal was

8      based (unintelligible) to the lawsuit.  The judge's law firm

9      handled two cases that defendants claimed warranted recusal.

10     First, a medical malpractice case for Bovard and the clinic.

11     And, second, a civil rights case for the clinic.

12          The court denied the motion, stating that none of the

13     plaintiffs were party to either of the two prior litigations,

14     that Bovard and the clinic were not parties to the present

15     case, that the judge's prior law firm was not involved in the

16     present case or anything similar, that the prior law firm's

17     involvement with Bovard and the clinic were isolated and

18     unrelated litigation going back five -- I'm sorry, six years.

19     Bovard also had no interest in the outcome of the present case.

20          Now, to apply these cases to our issues today, the

21     connections we have here are even more tenuous than those that

22     were in *Philip Morris*, *DeTemple*, *Chitimacha*, or *Veneklase*.

23          Mr. Wilson's prior representation will not be at

24     issue here.  His clients have nothing to do with this case and

25     none of the legal issues or facts in his case are similar to

1    ours.  And Your Honor's prior representation in *Rusoro* is,

2    similarly, even less connected to issues here than the prior

3    representations in *Chitimacha*, and DeTemple.

4         Your Honor's previous client, the Republic of

5    Venezuela, is not a party here, as the former client was in

6    *Chitimacha*, and Your Honor was not involved in any prior

7    litigation on which the current litigation was based, like the

8    judge in DeTemple was.  This court will not need to examine or

9    adjudicate anything of the issues that Your Honor was involved

10   with in *Rusoro*, and so there is even less connection here than

11   there was in *DeTemple*.

12        Now, finally, Your Honor, I would like to make a note

13   about the importance of precedent here.  The District of D.C.

14   courts are very concerned with avoiding any decision to recuse

15   that would encourage inappropriate judge shopping by future

16   litigants.  It is crucial that the U.S. judges are presumed to

17   be impartial.

18        The court must begin its analysis of allegations

19   supporting a request of recusal with the presumption against

20   disqualification.  And recent case law has noted how

21   interconnected the legal industry is, and that judges will

22   often adjudicate disputes between parties or regarding issues

23   that it has familiarity with.  There's nothing untoward about

24   that.  Recusal should not be based on an ordinary tenuous

25   connection when it has no bearing on the actual disputes before

1      this Court.

2                Thank you, Your Honor.

3                THE COURT:  Ms. Kovacs, I do have one question, and

4      I'll -- Mr. Babcock, I'll ask you the same question when you

5      get back up.  Do any of the cases deal with a situation in

6      which the judge that was being requested to recuse him or

7      herself was a judge that was appointed for the sole purpose of

8      managing discovery?  My reading of the cases, they're largely

9      cases in which the judge is the ultimate -- it's the judge that

10     is going to preside either over a trial, whether it be a bench

11     or jury trial, or maybe the judge who is called upon to decide

12     dispositive motions.

13               I think it's pretty clear in this case that that's

14     not the issue with the referral that Judge Nichols made to me.

15     So do any of the cases that you cite deal with that

16     circumstance?

17               MS. KOVACS:  We had not seen that, Your Honor.  But

18     we had seen, in many cases, the reference to the fact that this

19     is a very fact-intensive inquiry.  And so where -- a reference

20     where a judge's role in a case would be limited, that would

21     certainly be relevant to the question of recusal, if it were to

22     have an effect on the issue (unintelligible).

23               THE COURT:  Okay.  All right.  Thank you.  Let me ask

24     you, Ms. Kovacs, does it matter -- take a moment, please.

25     That's fine.

1               (Pause.)

2               THE COURT:  That's okay, take all the time you need.

3               My question was:  Does it matter?  Does it matter

4       that the case was referred to me for the limited purpose of

5       resolving some discovery disputes?

6               MS. KOVACS:  (Unintelligible) because we don't see

7       any overlap, Your Honor.  We don't see any issues that you need

8       to decide here that would be inappropriate.  And that would be

9       the case if you were the trial court judge as well.  I do think

10      that if Your Honor has certain concerns, that the nature of the

11      fact-intensive inquiry means that you could certainly take your

12      scope and your role here into consideration when making your

13      decision.

14              THE COURT:  Okay.  Thank you.

15              So I'll just start by asking that question first,

16      Mr. Babcock.

17              MR. BABCOCK:  The statute includes magistrate judges,

18      which magistrate judges typically are involved in pretrial

19      matters, although by consent there could be a trial that the

20      magistrate judge would preside over.  But typically, they are

21      involved in pretrial matters, as you are in this case.

22              I thought about that, actually, the question you

23      raise.  Certainly nobody has cited a case to Your Honor that

24      raises that distinction, and I'm not aware of any.  That

25      doesn't mean they don't exist, and we'll look more closely than

1    I did and if we find something we'll certainly advise the

2    Court, if that's okay with you.

3              THE COURT:  Yeah, I mean, I just -- sure.  And I do

4    want to -- if defendant is taking the position that somehow the

5    D.C. Circuit has changed the standard as outlined by the

6    Supreme Court as to 455(a) on what the reasonable observer --

7    what knowledge the reasonable observer might have, if you want

8    to share those two cases, if you still want to make that

9    argument, just one- or two-page filing on the docket citing

10   those two cases, that way -- I want to make sure that plaintiff

11   has an opportunity to respond, but also that you have the

12   opportunity to make your argument.

13             I mean, the question just comes up because, you know,

14   I'm not -- I don't see any argument being made in the papers

15   that I'll be deciding any dispositive issues, so I was just

16   curious whether any of the cases address a magistrate judge or

17   a judge that's handling discovery.

18             MR. BABCOCK:  I don't think the two D.C. Circuit

19   cases, who will remain unnamed for the moment, were in conflict

20   with the Supreme Court, or could they be, really.  But they do

21   explain and focus on the person, the so-called objective

22   reasonable person, what kind of person that is.

23             Having read a lot of these cases, I do note that, you

24   know, a lot of them come up in a criminal context, a lot of

25   them were by pro se plaintiffs.  And I see that just the

1    visceral reaction by the courts being tougher when, you know,

2    the more frivolous the recusal motion is.  But that's just an

3    atmospheric thing.  Obviously, we got to be guided by whatever

4    those -- by whatever the standard is.  And I will take you up

5    on it, cite those two cases and, of course, provide counsel

6    that information.

7              I've got a couple of responses, if I may be permitted

8    to --

9              THE COURT:  Yes, you have a few minutes.

10             MR. BABCOCK:  Thank you.  Ms. Kovacs says that this

11   is an extraordinary request, and I certainly agree with her

12   about that.  This would be the second such motion I've filed in

13   my career.  And as you can tell by looking at me, I've

14   practiced for a number of years.  Not proud of that, but

15   standing in front of you now.

16             Judge shopping and public policy of course is

17   important.  But I don't think that we could be accused

18   inappropriately of judge shopping.  There are four magistrates

19   in this district and we were quick to raise the issue before

20   you had done anything.  And I've never appeared before you, in

21   front -- before you before.  Mr. (Unintelligible), I don't know

22   if he has or not.  But there's certainly nothing about you that

23   is troublesome such that we want to shop for a different

24   magistrate judge.

25             So, but public policy is important and that's one of

1   the reasons why I raised the matter.  The credibility of the

2   judiciary is certainly something that needs to be considered by

3   all judges and all courts.  It is, in my judgment, more under

4   attack today than it has ever been.

5          And the cases will reflect, in addition to this being

6   an extraordinary request, that the public confidence in the

7   judiciary must be taken into account in everything we do, and I

8   include myself, as well as Your Honor.  In fact, I'm on a --

9   the Judiciary Committee, the American College of Trial Lawyers.

10  And that is what we're doing right now, a project to attempt to

11  improve public perception of our justice system, which has

12  suffered recently.

13         And so I think that the test that, if I were in your

14  seat, I might ask would be if knowing that the legitimacy of

15  the presidential election in 2018 was at issue in the lawsuit,

16  either because there was a claim or because there was a

17  defense, and as a lawyer I had taken a position on that in

18  favor of the allegedly -- the illegitimate president, Maduro,

19  who survived the attack on his presidency and continues to

20  serve as president today.  If the public knew that and knew

21  that I was deciding disputes about the breadth and scope of

22  discovery and were ruling on the plaintiff's resistance to

23  discovery about anything about the 2018 election, would that

24  make a difference?  Would that raise an issue within that group

25  of the public?

1          There is the statement made by plaintiff's counsel,

2     Ms. Kovacs, that there's no mention of Smartmatic, nothing

3     about 2018 in your brief.  And certainly there wouldn't be, of

4     course.  But as I said before, Exhibit D certainly indicates

5     that Smartmatic's personnel -- Exhibit B, I should say, their

6     personnel, their software, their hardware were all used in the

7     2018 presidential election.  And according to Exhibit B, the

8     letter from DLA Piper on behalf of Smartmatic, the election

9     couldn't have taken place without Smartmatic's assistance.

10          The three cases that counsel cited, *Philip Morris*,

11     that was where there was a partner, not the judge, that was

12     involved.  The attack was under 455(b)(2), not (b)(1), although

13     455(a) was a ground as well.  And as I've said before, if it

14     was only about your partner's representation, we wouldn't be

15     here (unintelligible) case is about representation of a client

16     six years ago, unrelated (unintelligible).  And as you know,

17     there are rules, somewhat informal.

18          I have a partner who is a federal district judge in

19     Texas now and he wouldn't hear any cases involving our firm for

20     a year.  I don't know if that's a rule or his rule.  But there

21     are rules that go on with that.  Certainly, an unrelated case

22     for Exxon that -- six years earlier would not be a basis for

23     recusal, and I don't think anybody should suggest that it was.

24     In the *Fargo* case, once again, which another -- a different

25     partner, not the judge, so 455(b)(1) would not be implicated.

1          I'd like to close with this in mind:  I hope that the

2     Court will not hold it against me or my client -- more

3     importantly, my client -- or my firm that we brought this

4     motion in all seriousness, with no attack on the court in any

5     way.  And I attempted to do it in a way whereby if the

6     plaintiffs chose to advise you that, yeah, we agree, then it

7     would be a relatively easy manner.  They chose otherwise, which

8     is their right, and here we are.  But I hope that nothing we

9     have done has irritated the Court.  And that's all I can say.

10          THE COURT:  Thank you.  Well, this is my job, so it

11     does not irritate me.  And these are -- you're well within your

12     right to raise any motion that you wish, so that's not an

13     issue.  I do have one question:  With respect to the reasonable

14     observer in connection with the 455(a) prong, your position is

15     that the D.C. Circuit has perhaps modified the standard or

16     articulated the standard?  And I'll see the two cases that you

17     file.

18          In that case, would the reasonable observer that

19     we're looking at, as to the appearance of the impartiality

20     prong, be a reasonable observer who would know what is only

21     available on the docket, or would the reasonable observer know

22     the context behind the representation, as I shared with the

23     parties at the beginning of this hearing --

24          MR. BABCOCK:  It is the --

25          THE COURT:  -- or is it a third person that knows

1   nothing or anything at all about the case?

2          MR. BABCOCK:  I think it's the average citizen.  The

3   average citizen doesn't go trolling through the dockets, they

4   typically get their news from a variety of sources.  There have

5   already been two news articles about this motion.  And the

6   articles, one of which I think more fairly than the other lays

7   out the (unintelligible) of the parties.  And it's that sort of

8   average citizen, reasonable person that is at issue, that

9   should be determined.

10          I would have to think about whether your remarks

11   today, which have been heard by counsel and maybe three people,

12   would count for the average citizen.  I think we're going to

13   attempt to figure out how to order a transcript so maybe that

14   will be placed on the public record, so perhaps the average

15   citizen could take that into account.  But I'll think about

16   that and if any productive thoughts occur, I'll try to set it.

17          THE COURT:  I appreciate that because the Supreme

18   Court has made it very clear that in their view the reasonable

19   person that the Court is to consider in a request under 455(a)

20   is that person who is informed of the filings in the case and

21   informed of the issues and arguments that have been raised.  So

22   if you do have authority that is binding on this Court, or even

23   persuasive, that says that's not the case, I would like to hear

24   it.  But my understanding is the *Cheney* case from the Supreme

25   Court has not been overturned.  So if you would like to submit

1    those two cases, I would just ask that you do so by close of

2    business tomorrow.  And, you know, I'll give you two pages.  Is

3    that sufficient to write anything you wish to write on that

4    issue?

5              MR. BABCOCK:  I would hope to do it in a shorter

6    filing.

7              THE COURT:  That's fine, too.  And then I will give

8    the plaintiffs until close of business Monday.  So two business

9    days for each side.  Okay.

10              MR. BABCOCK:  That would be fine.

11              THE COURT:  Thank you all for your argument.  I'll

12    take the motion under advisement.

13              MR. BABCOCK:  Thank you very much, Your Honor.

14                              *   *   *

15

16

17

18

19

20

21

22

23

24

25

1                                CERTIFICATE

2          I do hereby certify that the foregoing is a true, correct

3     and complete transcript of the audio-recorded proceedings in

4     this matter, audio recorded on July 18, 2023, and transcribed

5     from the audio recording to the best of my ability, and that

6     said transcript has been compared with the audio recording.

7                              Dated:  August 6, 2023

8

9                              /s/_____

10                             Janice Dickman
                               Official Court Reporter
11                             333 Constitution Avenue
                               Washington, DC  20001
12                             202-354-3267

13

14

15

16

17

18

19

20

21

22

23

24

25