**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SMARTMATIC USA CORP.,
SMARTMATIC HOLDING B.V., AND
SGO CORPORATION LIMITED,

        Plaintiffs,

   v.

HERRING NETWORKS, INC., D/B/A
ONE AMERICA NEWS NETWORK,

        Defendant.

Civil Action No. 1:21-cv-02900-CJN

**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON
ACTUAL MALICE AND MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................1

II.   STATEMENT OF FACTS ........................................................................3

    A.    Plaintiffs are Corporations and have Sued a Member of the Mass Media for Defamation on a Matter of Public Concern ......................................3

    B.    Public Controversies Regarding Smartmatic Specifically and Electronic Voting Machines Generally Before, During, and After the 2020 Presidential Election ("2020 Election") ..............................................3

    C.    Refutation of Actual Malice ....................................................................4

    D.    Plaintiffs' Allegations ............................................................................4

III.  ARGUMENT .............................................................................................6

    A.    Actual Malice is an Essential Element of Plaintiffs' Claims Because Plaintiffs are (i) Corporations Suing a Mass Media Defendant for Defamation (ii) Limited Purpose Public Figures, and/or (iii) Public Officials Carrying Out a Governmental Function. .....................................6

    B.    This Court's Precedent Holds that All Corporate Plaintiffs Must Prove Actual Malice in Defamation Claims Against the Mass Media. ..............7

    C.    Smartmatic is a Limited Purpose Public Figure Under the Waldbaum Test. ..........9

        1.    A Public Controversy Exists Over Concerns About the Security Vulnerabilities and Foreign Ownership of Electronic Voting Systems. .........................................................................................9

        2.    Smartmatic has Played a Prominent Role in the Controversy. ....................12

            a)    Smartmatic Invited Attention and Comment Through its Conduct. ...............................................................................13

            b)    Smartmatic has Been the Subject of Widespread News Coverage. ..............................................................................15

            c)    Smartmatic has Access to Media and Communications Channels. ..............................................................................16

    D.    The Statements Challenged by Smartmatic are Germane to the Public Controversy over the Security and Foreign Ownership of Electronic Voting Systems. ....................................................................................18

    E.    Smartmatic's Role as a Government Contractor Responsible for Providing Election Infrastructure and Helping Administer Elections Renders It a Public Official. ........................................................................................19

    F.    The Court Should Grant Summary Judgment Because No Dispute as to Any Material Fact Exists and Defendant is Entitled to Judgment on the Issues of Actual Malice as a Matter of Law. ...........................................22

G.      As a Matter of Law, Plaintiffs Do Not, and Cannot, Provide by Clear and
        Convincing Evidence that Defendant Acted With Actual Malice. ........................24
        1.      Prior Public Controversies Regarding Plaintiffs and Resulting
                Media Coverage, Congressional Inquiry and Government Inquiry
                and Action. ...............................................................................................26
        2.      Bias, Questionable Sources, Lack of Investigation and
                Corroboration Do Not Suffice to Show Actual Malice. ...........................27
        3.      Improbability of Defamatory Allegations Do Not Support Actual
                Malice. ......................................................................................................30
        4.      Reliance on Reputable Sources. ................................................................31
        5.      The Lindell Programming. ........................................................................35
        6.      Retraction Demands and OAN's Alleged Access to Contradicting
                Statements [Dkt. 1: ¶¶ 63-64]. .................................................................36

IV.     CONCLUSION .......................................................................................................38

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Afro–American Publ'g Co. v. Jaffe*,
  366 F.2d 649 (D.C. Cir. 1966) ...............................................................................33

*Anderson v. Liberty Lobby*,
  477 U.S. 242 (1986) ...............................................................................1, 23, 25

*Arctic Co., Ltd. v. Loudon Times Mirror*,
  624 F.2d 518 (4th Cir. 1980) ...............................................................................19

*Baumback v. Am. Broad. Cos., Inc.*,
  161 F.3d 1 (4th Cir. 1998) ...............................................................................7, 19

*Bell v. Associated Press*,
  584 F. Supp. 128 (D.D.C. 1984) ...............................................................................16

*Biro v. Conde Nast*,
  963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2nd Cir. 2015) ...........................25

*Boley v. Atlantic Monthly Grp.*,
  950 F. Supp. 2d 249 (D.D.C. 2013) ...............................................................................11

*Brueggemeyer v. American Broad. Cos.*,
  684 F. Supp. 452 (N.D. Tex. 1988) ...............................................................................13

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...............................................................................23, 24, 25

*Chaiken v. Village Voice Publishing Corp.*,
  119 F.3d 1018 (2nd Cir. 1997) ...............................................................................35

*Clyburn v. News World Commc'ns, Inc.*,
  903 F.2d 29 (D.C. Cir. 1990) ...............................................................................9, 12, 13, 14

*Coliniatis v. Dimas*,
  965 F. Supp. 511 (S.D.N.Y. 1997) ...............................................................................36

*D.A.R.E Am. v. Rolling Stone Magazine*,
  101 F. Supp. 2d 1270 (C.D. Cal. 2000) ...............................................................................35

*Dameron v. Washington Magazine, Inc.*,
  779 F.2d 736 (D.C. Cir. 1985) ...............................................................................11

*Deripaska v. Associated Press*
  282 F. Supp. 3d 133, 142 (D.C. Cir. 2017)............................................................11

*Edwards v. Nat'l Audubon Soc'y, Inc.*,
  556 F.2d 113 (2nd Cir. 1977).................................................................................36

*Ellis v. Time, Inc.*,
  No. Civ. A. 94–1755 (NHJ), 1997 WL 863267 (D.D.C. 1997)...............................16

*Farah v. Esquire Magazine*,
  736 F.3d 528 (D.C. Cir. 2013) ..........................................................................4, 33

*Ford v. Artiga*,
  No. 2:12-cv-02370, 2013 WL 3941335 (E.D. Cal. July 30, 2013) ...........................4

*Foretich v. Advance Mag. Publishers, Inc.*,
  765 F. Supp. 1099 (D.D.C. 1991) ....................................................................12, 17

*Garrison v. Louisiana*,
  379 U.S. 64 (1964)..................................................................................................25

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974)...............................................................2, 3, 6, 7, 9, 16, 25

*Hatfill v. New York Times Co.*,
  488 F. Supp. 2d 522 (E.D. Va. 2007) ......................................................19, 20, 22

*Hunt v. Liberty Lobby*,
  720 F.2d 631 (11th Cir. 1983) ...............................................................................36

*Jadwin v. Minneapolis Star & Trib. Co.*,
  367 N.W.2d 476 (Minn. 1985)..................................................................................8

*Jankovic v. Int'l Crisis Grp.*,
  822 F.3d 576 (D.C. Cir. 2016) ............................................1, 9, 11, 18, 24, 27, 28

*Jenoff v. Hearst Corp.*,
  644 F.2d 1004 (4th Cir. 1981) ................................................................................19

*Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*,
  909 F.3d 446 (D.C. Cir. 2018).................................................................................7

*Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*,
  838 F.2d 1287 ...........................................................................................4, 29, 31

*Lohrenz v. Donnelly*,
  187 F.R.D. 1 (D.D.C. 1999)....................................................................................37

*Lohrenz v. Donnelly*,
  223 F. Supp. 2d 25 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003) ...................... 11, 13

*Lohrenz v. Donnelly*,
  350 F.3d 1272 (D.D.Cir. 2003) ............................................................................ 24, 27, 28, 37

*Martin Marietta Corp. v. Evening Star Newspaper Co.*,
  417 F. Supp. 947 (D.D.C. 1976) ....................................................................................... 7, 8

*Masson v. New Yorker Magazine, Inc.*,
  501 U.S. 496 (1991) ........................................................................................................ 6, 26

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ............................................................................................................. 23

*McBride v. Merrell Dow & Pharms, Inc.*,
  717 F.2d 1460 (D.C. Cir. 1983) .......................................................................................... 23

*McFarlane v. Esquire*,
  74 F.3d 1296 (D.C. Cir. 1996) ........................................................ 24, 25, 28, 32, 35, 37

*McFarlane v. Sheridan Press, Inc.*,
  91 F.3d 1501 (D.C. Cir. 1996) .......................................... 2, 24, 25, 27, 28, 29, 30

*Metastorm, Inc. v. Gartner Grp., Inc.*,
  28 F. Supp. 2d 665 (D.D.C. 1998) ....................................................................................... 7

*Miller v. Transamerican Press*,
  621 F.2d 721, 724 (5th Cir. 1980), *mod'f on reh'r,* 628 F.2d 932 (5th Cir. 1980) ................... 2

*Moldea v. New York Times Co.*,
  15 F.3d 1137 (D.C. Cir. 1994), *modified*, 22 F.3d 310 (D.C. Cir. 1994) .............................. 33

*Montgomery v. Risen*,
  197 F. Supp. 3d 219 (D.D.C. 2016) ....................................................... 4, 24, 31, 34, 37

*N. A. A. C. P.* v. *Button*,
  371 U. S. 415 (1963) ............................................................................................................. 6

*New York Times v. Sullivan*,
  376 U.S. 254 (1964) .................................................................. 1, 2, 6, 19, 25, 29, 38

*Novecon Ltd v. Bulgarian-American Enter. Fund*,
  190 F.3d 556 (D.C. Cir. 1999) .............................................................................................. 2

*OAO Alfa Bank v. Center for Pub. Integrity*,
  387 F. Supp. 2d 20 (D.D.C. 2005) .............................. 2, 3, 7, 9, 10, 11, 13, 14, 15, 16

*U.S. ex rel. Osheroff v. Humana Inc.*,
  776 F.3d 805. (11th Cir. 2015) .......................................................................4

*Pearce v. E.F. Hutton Grp.*,
  664 F. Supp. 1490 (D.D.C. 1987) ....................................................................2

*Rosanova v. Playboy Enters., Inc.*,
  580 F.2d 859 (5th Cir. 1978) .........................................................................30

*Rosenblatt v. Baer*,
  383 U.S. 75 (1966) ...................................................................................19, 22

*Smartmatic USA Corp. v. Lindell*,
  No. 22-CV-0098, 2022 WL 4343299 (D. Minn. Sept. 19, 2022) ....................8

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ...................................................................................8, 39

*St. Amant v. Thompson*,
  390 U.S. 727 (1968) .............................................................................2, 30, 35

*Straw v. Chase Revel, Inc.*,
  813 F.2d 356 (11th Cir. 1987) .........................................................................2

*Sweeney* v. *Patterson*,
  128 F.2d 457 (D.C. Cir. 1942) .........................................................................6

*Tavoulareas v. Piro*,
  817 F.2d 762 (D.C. Cir. 1987) .............................6, 9, 11, 12, 13, 17, 18, 19, 25, 28

*Waldbaum v. Fairchild Publications, Inc.*,
  627 F.2d 1287 (D.C. Cir. 1980) ....................................4, 7, 9, 10, 12, 15, 18

*Washington Post Co. v. Keogh*,
  365 F.2d 965 (D.C. Cir. 1966) ..................................................................23, 29

*Westmoreland v. CBS, Inc.*,
  601 F. Supp. 66 (S.D.N.Y. 1984) ..................................................................28

*Weyrich v. New Republic, Inc.*,
  235 F.3d 617 (D.C. Cir. 2001) ..................................................................32, 33

*White v. City of Birmingham*,
  96 F. Supp. 3d 1260 (N.D. Ala. 2015) ............................................................4

**Other Authorities**

First Amendment, United States Constitution ..........................................1, 25, 32, 33, 39

Fourteenth Amendment, United States Constitution ....................................................25

Fed. R. Civ. P. 56(a) ...............................................................................................1, 23

Fed. R. Evid. 201 ............................................................................................................4

Fed. R. Evid. 902(6)........................................................................................................4

Fed. Rule Civ. Proc. 1 ...................................................................................................23

4 ELLIOT'S DEBATES ON THE FEDERAL CONSTITUTION ....................................................6

The Help America Vote Act and Election Administration: Overview and Selected
    Issues for the 2016 Election (congress.gov) .........................................................10

Herring Networks, Inc., D/B/A One America News Network ("OAN") files this Motion for Partial Summary Judgment on Actual Malice and Request for Hearing as follows:

Defendant OAN moves this Court for an order granting this motion for partial summary judgment under Fed. R. Civ. P. 56(a) on actual malice ("Motion"). OAN requests a 90 minute hearing (45 minutes for each side) due to the size of the record and importance of the First Amendment issues at stake. The Motion is ripe for decision because fact discovery closed yesterday, December 8, 2023, pursuant to the Court's Scheduling Order signed October 11, 2022 [Dkt. 42].

## I.      INTRODUCTION

Constitutionally compelled "actual malice" affects this defamation case in two ways. First, if a plaintiff is a corporation, public figure or public official, it must show "clear and convincing" evidence of "actual malice" at both the summary judgment and trial stages of the case because proof of "actual malice" is an essential element of the claim. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986) ("[A] court ruling on a motion for summary judgment must be guided by the *New York Times* [*v. Sullivan*] 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists — that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity."). In *Anderson,* the Court reversed the District of Columbia Court of Appeals, which had applied the traditional summary judgment standard. Whether Plaintiffs[1] are corporations, public figures, or officials required to prove actual malice is a question of law. *See Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 585 (D.C. Cir. 2016). In a defamation action, the plaintiff's status as a public or private

---

[1] Plaintiffs as referenced herein include named plaintiffs Smartmatic USA Corp., Smartmatic Holding B.V., and SGO Corporation Limited (together, "Smartmatic").

figure "is pervasive" and should be "answered as soon as possible." *Miller v. Transamerican Press,* 621 F.2d 721, 724 (5th Cir. 1980), *mod'f on reh'r,* 628 F.2d 932 (5th Cir. 1980).[2]

Second, a plaintiff must show clear and convincing evidence of "actual malice" to obtain punitive damages. *See Straw v. Chase Revel, Inc.*, 813 F.2d 356, 361 (11th Cir. 1987) ("[I]n *Gertz* [*v. Welch*] the Supreme Court held that punitive or presumed damages may not be awarded in a defamation case unless the plaintiff can show that Defendant acted with actual malice."). The clear and convincing standard for "actual malice" on damages is applicable at the summary judgment stage as well. *See Pearce v. E.F. Hutton Grp.*, 664 F. Supp. 1490, 1518 (D.D.C. 1987).

Constitutional "actual malice" has a precise meaning at odds with the common law understanding of malice as bad faith and evil motive. *See Novecon Ltd v. Bulgarian-American Enter. Fund,* 190 F.3d 556 (D.C. Cir. 1999). As the Court held in *New York Times v. Sullivan,* 376 U.S. 254, 279-80 (1964), constitutional guarantees "require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

The Court later explained that "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

---

[2] Courts in this Circuit have repeatedly held that *all* corporate plaintiffs must prove actual malice in defamation claims against the mass media. *See OAO Alfa Bank v. Center for Pub. Integrity,* 387 F. Supp. 2d 20, 47-48 (D.D.C. 2005) ("*OAO*"). Furthermore, Plaintiffs are public figures under the test articulated by the United States Supreme Court in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ("*Gertz*") and the District of Columbia Circuit in *McFarlane v. Sheridan Press, Inc.*, 91 F.3d 1501 (D.C. Cir. 1996).

The Supreme Court in *Gertz* subsequently extended the "actual malice" element required in defamation cases to public figure plaintiffs and this court has applied it to corporate plaintiffs. *See OAO Alpha Bank,* 387 F. Supp. 2d at 47-48.

The record contains absolutely no evidence of "actual malice" — and certainly none that rises to the level of clear and convincing — but rather refutes it. And Plaintiffs — despite having over a year to conduct discovery — are unable to demonstrate any "actual malice" regarding the complained of broadcasts or posts (some of which were not even produced by OAN). The Court should decide the legal question regarding the Plaintiff's status as a public or private figure ("a pervasive issue") and further determine that there are no facts that would permit a reasonable jury to find by clear and convincing evidence that any of the complained of broadcasts or posts were published by OAN with actual malice.

## II.      STATEMENT OF FACTS

### A.      Plaintiffs are Corporations and have Sued a Member of the Mass Media for Defamation on a Matter of Public Concern

It is undisputed that Plaintiffs are corporate entities who have brought this defamation lawsuit against a member of the mass media, *see* Statement of Undisputed Material Facts ("Statement") §§ 4-7 (submitted herewith and incorporated by reference), and that the subject of the alleged defamation (integrity of a national election) is a matter of public concern.

### B.      Public Controversies Regarding Smartmatic Specifically and Electronic Voting Machines Generally Before, During, and After the 2020 Presidential Election ("2020 Election")

As we show in the Statement, electronic voting machines generally and Smartmatic specifically were subject to multiple controversies resulting in extensive media coverage years before, during, and after the 2020 Election. *See* Statement at ¶¶ 9-100, 134-148. These public controversies affected more than the immediate participants; Plaintiffs' role in the controversies

was more than trivial or tangential; and the claimed defamation related to Plaintiffs' roles in the

controversy, which is the test for public figure status. *See Waldbaum v. Fairchild Publications,*

*Inc.,* 627 F.2d 1287, 1294-97 (D.C. Cir. 1980) (*"Waldbaum"*). Furthermore, by administering

these elections, Smartmatic was performing a governmental function and is, thus, a public official.

### C.    Refutation of Actual Malice

OAN relied on press coverage, government documents and investigations as well as

sources it believed at the time of publication (which is the pertinent period) were credible.[3] We

detail those factual matters in our Statement.

### D.    Plaintiffs' Allegations

The Plaintiffs' 193 page Complaint, with several hundred pages of exhibits, complains of

26 unique OAN Broadcasts ("Complained of Broadcasts"), four programs produced by Mike

Lindell ("Lindell Programming"), and ten internet posts ("OAN Posts") (together, the

---

[3] *See* Exs. B, C, E-M, O-121-150. The news articles and court and congressional records are
admissible under judicial notice. *See* Fed. R. Evid. 201; *Montgomery v. Risen*, 197 F. Supp. 3d
219, 260 n. 32 (D.D.C. 2016) ("Courts regularly rely on media publications, government records,
arrest records and other purportedly hearsay documents when considering defendants' motions
for summary judgement in defamation cases."); *see e.g., Liberty Lobby*, *Inc. v. Dow Jones &
Co., Inc.*, 838 F.2d 1287, 1296-97 (substantively discussing several articles upon which the
defendant had relied); *U.S. ex rel. Osheroff v. Humana Inc*., 776 F.3d 805, 811 n.4. (11th Cir.
2015) ("[C]ourts may take judicial notice of documents such as the newspaper articles at issue
here for the limited purpose of determining which statements the documents contain (but not for
determining the truth of those statements)."); *Farah v. Esquire Magazine,* 736 F.3d 528, 534
(D.C. Cir. 2013) ("Judicial notice is properly taken of publicly available historical articles.").
*Ford v. Artiga,* No. 2:12-cv-02370, 2013 WL 3941335, at *7 n.5 (E.D. Cal. July 30, 2013)
("Defendants request that the court take judicial notice of newspaper and internet articles
published in 2004 that discuss plaintiff's accusations. (ECF 29-4.) The court takes judicial notice
of the publication of these articles, but not of the truth of their content."); *White v. City of
Birmingham,* 96 F. Supp. 3d 1260, 1274 (N.D. Ala. 2015) ("[T]he AL.com news articles are
analogous to traditional newspaper articles and could be found self-authenticating at trial. *See*
Fed. R. Evid. 902(6).").

"Complained of Publications"). A list of those publications is attached hereto as Index of Complained of Publications.

Plaintiffs allege OAN (1) had no support for its statements about Smartmatic, (2) did not have sources to prove something that did not happen, (3) purposefully avoided learning the truth about Smartmatic and its elections technology, (4) had access to information showing its statements were factually inaccurate, (5) knew Smartmatic's election technology and software were not widely used in other voting machines in the Election, (6) knew Smartmatic's elections technology and software were not used to fix, rig, or steal the Election, (7) knew Smartmatic's election technology and software were not compromised or hacked during the Election and did not send votes overseas, (8) knew that corrupt dictators did not control Smartmatic, and (9) knew Smartmatic's election technology had not been designed to or used to fix, rig, or steal elections. [Dkt. 1: ¶¶ 3, 120-157].

Plaintiffs further allege (1) OAN's guests did not provide evidence supporting their statements about Smartmatic, (2) OAN did not corroborate the statements about Smartmatic, (3) OAN was aware of publicly available information that contradicted statements by Rudy Giuliani, Sidney Powell, Mike Lindell and others about Smartmatic, (4) OAN knew its guests were biased and not credible but did not disclose that to the audience, (5) OAN knowingly violated journalistic standards, and (6) OAN used its disinformation campaign against Smartmatic for financial gain and acted with ill-will and improper motives. [Dkt. 1: iii, ¶¶ 158-97].

Plaintiffs allege OAN acted with actual malice and seek punitive damages. [Dkt. 1: ¶ 193].

### III.    ARGUMENT

**A.    Actual Malice is an Essential Element of Plaintiffs' Claims Because Plaintiffs are (i) Corporations Suing a Mass Media Defendant for Defamation (ii) Limited Purpose Public Figures, and/or (iii) Public Officials Carrying Out a Governmental Function.**

In *New York Times v. Sullivan*, the Supreme Court noted the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . ." 376 U.S. at 270. It recognized that "erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive[.]'" *Id.* at 271-72 (quoting *N. A. A. C. P.* v. *Button,* 371 U. S. 415, 433 (1963)). This was not a novel idea. James Madison, the original author of the First Amendment's free speech and press clauses, observed that "[s]ome degree of abuse is inseparable from the proper use of everything; and in no instance is this more true than in that of the press." 4 ELLIOT'S DEBATES ON THE FEDERAL CONSTITUTION (1876), p. 571. More than two decades before *Sullivan* was decided, the D.C. Circuit explained that, in public discourse, "[e]rrors of fact . . . are inevitable . . . Whatever is added to the field of libel is taken from the field of free debate." *Sweeney* v. *Patterson,* 128 F.2d 457, 458 (D.C. Cir. 1942).

In the service of this longstanding, "profound national commitment" to protect the "breathing space" necessary for public debate to flourish despite the "inevitable" false statement, the Supreme Court has imposed heightened requirements on certain types of defamation plaintiffs. Public officials and public figures cannot prevail in a defamation suit unless they produce "clear and convincing evidence that the defendant published the defamatory statement with actual malice, *i.e.,* with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) (quoting *Sullivan*, 376 U.S. at 279-80; *Tavoulareas v. Piro*, 817 F.2d 762, 775 (D.C. Cir. 1987) (en banc) (citing *Gertz v. Robert*

*Welch, Inc.* 418 U.S. 323, 342 (1974)). The "public official" and "public figure" categories are broad, as courts have recognized numerous circumstances in which a defamation plaintiff becomes one — or both — and is thus required to prove actual malice. *Waldbaum*, 627 F.2d at 1294-97 (discussing public figures); *Baumback v. Am. Broad. Cos., Inc.*, 161 F.3d 1, *3-4 (4th Cir. 1998) (discussing public officials).

As demonstrated below, Smartmatic falls into both categories (as well as being corporations) — and must prove actual malice — for several reasons.

### B. This Court's Precedent Holds that *All* Corporate Plaintiffs Must Prove Actual Malice in Defamation Claims Against the Mass Media.

Because Plaintiffs are all corporate entities, the question of their constitutional status is an easy one. This Court has repeatedly held that "[c]orporate plaintiffs are treated as public figures as a matter of law in defamation actions brought against mass media defendants involving matters of legitimate public concern." *OAO Alfa Bank*, 387 F. Supp. 2d at 47-48 (citing *Metastorm, Inc. v. Gartner Grp., Inc.*, 28 F. Supp. 665, 669 (D.D.C. 1998); *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F. Supp. 947, 955 (D.D.C. 1976)). Accordingly, there is no need for the Court to analyze Smartmatic's "public figure" status through the *Waldbaum* factors discussed below. *OAO Alfa Bank*, 387 F. Supp. 2d at 47-48 (applying *Waldbaum* to natural-person plaintiffs, but holding that corporate plaintiffs are public figures as a matter of law). The Court need only determine whether (1) OAN is a member of the mass media, and (2) OAN's challenged reporting involves a matter of legitimate public interest.[4] *Id.*

---

[4] The different treatment of corporate and natural-person defamation plaintiffs is based on their fundamentally different reputational interests. *See Martin Marietta*, 417 F. Supp. at 955-56. As recognized in *Martin Marietta*, the Supreme Court's opinion in *Gertz* is premised on the notion that doctrines designed to protect the vigor of public debate must sometimes yield to the individual's right to protect their own good name, which "'reflects no more than our basic concept of the essential dignity and worth of every human being[.]'" *Id.* at 955 (quoting *Gertz*, 418 U.S. at 341). A libel action by a corporation does not involve "the essential dignity and

There can be no serious dispute that these elements are satisfied. Smartmatic's own complaint characterizes OAN as a member of the mass media, noting that "[i]n addition to operating a cable news channel [available in 35 million homes], OAN[] also operates its website, and company social media accounts" and makes its content available on "multiple digital platforms including YouTube and Rumble, and on the subscription service, KlowdTV." [Dkt. 1: ¶¶ 15-16]. Moreover, OAN's reporting on claims by the former President and his legal team that the 2020 election had been "stolen" unquestionably involves a matter of legitimate public concern. *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (*"Phelps"*) ("Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community'. . . or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public'. . . "). Indeed, applying the same standard that this Court applies,[5] a federal court in Minnesota recently held in another of Smartmatic's defamation cases that the "[t]he invalidity of a presidential election as a result of hacking is a matter of public concern" and that Smartmatic must therefore be treated a public figure as a matter

---

worth of every human being[.]" *Id.* This distinction between the reputational interests of corporations and natural persons remains vital in defamation law and analogous areas. *See, e.g.*, *Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, 909 F.3d 446, 461–62 (D.C. Cir. 2018) ("Corporations are very different. To be sure, corporations may derive substantial financial value from their brands' reputations. But that is precisely the point: reputation is an asset that companies cultivate, manage, and monetize. It is not a quality integral to a company's emotional well-being, and its diminution exacts no psychological cost. This is why, for example, '[t]he law of libel has long reflected the distinction between corporate and human plaintiffs by limiting corporate recovery to actual damages in the form of lost profits.'") (quoting *Martin Marietta*, 417 F. Supp. at 955).

[5] Like this Court, courts in Minnesota hold that that "corporate plaintiffs in defamation actions must prove actual malice by media defendants when the defendants establish that the defamatory material concerns matters of legitimate public interest." *Jadwin v. Minneapolis Star & Trib. Co.*, 367 N.W.2d 476, 487 (Minn. 1985) (citing *Martin Marietta*, 417 F. Supp. at 955).

of law. *Smartmatic USA Corp. v. Lindell*, No. 22-CV-0098 (WMW/JFD), 2022 WL 4343299, at *2 (D. Minn. Sept. 19, 2022).

### C.   Smartmatic is a Limited Purpose Public Figure Under the *Waldbaum* Test.

Even if Smartmatic were not treated as a public figure based on its corporate status, it would still qualify as a limited purpose public figure under the D.C. Circuit's seminal decision in *Waldbaum*.[6] Distilling the constitutional principles set forth in *Gertz* and its progeny, *Waldbaum* adopted a three-part test to determine limited purpose public figure status. Under that test, a plaintiff is a limited purpose public figure if: (1) there is a public controversy; (2) the plaintiff played more than a trivial or tangential role in the controversy; and (3) the alleged defamatory statement is germane to the plaintiff's participation in the controversy. *Waldbaum*, 627 F.2d at 1296-98; *Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 31 (D.C. Cir. 1990); *Tavoulareas v. Piro*, 817 F.2d 762, 772-73 (D.C. Cir. 1987) (en banc); *OAO Alfa Bank*, 387 F. Supp. 2d at 42 (applying *Waldbaum* test to natural person plaintiffs). Applying these factors, it is clear that Smartmatic is a limited purpose public figure for its defamation claim in this case.

### 1.   A Public Controversy Exists Over Concerns About the Security Vulnerabilities and Foreign Ownership of Electronic Voting Systems.

Under *Waldbaum*, "a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." 627 F.2d at 1296. To determine the existence of a public controversy, a court "must examine whether persons actually were discussing some specific question." *Id.* at 1297. Importantly, the "specific

---

[6] In *Gertz*, the Supreme Court identified two categories of public-figures plaintiffs: "general" and "limited purpose" public figures. A general public figure is one whose "general fame or notoriety in the community" is such that they have assumed a "*pervasive* involvement in the affairs of society." 418 U.S. at 351-352 (emphasis added). Because Smartmatic is at least a *limited purpose* public figure, the Court need not decide whether it is also a *general* public figure or whether its public figure status extends beyond the public controversy at issue here.

question" must be "broader than the narrower discussion contained in the defamatory document." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 586 (D.C. Cir. 2016). The court should also consider "if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment." *Waldbaum*, 627 F.2d at 1297.

As demonstrated above and in the Statement, a public controversy has existed over concerns about the security of electronic voting systems and  foreign ties of the Plaintiffs' owners. *See supra* at II.B. Since the federal government's push to fund states' transition to electronic voting in 2002, public officials and subject-matter experts have raised questions about whether electronic voting machines and their software are vulnerable to manipulation, hacking, and other sabotage. These concerns have been the focus of congressional hearings, government investigations, lawsuits and expert reports. They have also been the subject of extensive media coverage in the United States and around the world. *Waldbaum*, 627 F.2d at 1297 (an issue qualifies as a public controversy "if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment."); *OAO Alfa Bank*, 387 F. Supp. 2d at 47 ("public controversy" inquiry considers worldwide media coverage where alleged defamation published online). The debate has impacted public policy and resulted in the expenditure of billions of dollars in taxpayer funds.[7] And there is no question that it has affected more than just its immediate participants. It is virtually impossible to think of a more broadly consequential issue in a democracy than the integrity and reliability of elections. Indeed, as

---

[7] The Help America Vote Act and Election Administration: Overview and Selected Issues for the 2016 Election (congress.gov) (summarizing annual appropriations under HAVA).

Democratic Congresswoman Carolyn Maloney recognized, it is impossible to "think of a larger national security threat than not having the total integrity of your voting machines."[8]

This controversy cannot be artificially limited to a single candidate, political party, or election cycle. As demonstrated above, for years the most vocal concerns about electronic voting security and foreign ownership issues came from Democrats.[9] More recently, the tables have turned. But the definition of a public controversy is not determined by the party affiliation of its participants. Nor do new developments in the debate require a redefinition of the controversy. Public controversies can be durable, multifaceted, overlapping, and recurring — as this one certainly is.

The breadth of this public controversy is consistent with other public controversies recognized by the D.C. Circuit and this Court. In *Jankovic*, the D.C. Circuit defined the relevant public controversy as the "progress of political and economic reform in Serbia and the integration of Serbia into international institutions in the post-Milosevic Serbian government, including the Prime Minister Djindjic regime." *Jankovic,* 822 F.3d at 585. Likewise, in *Alfa Bank*, this Court broadly defined the public controversy as "Russian corruption and the future of Western aid and investment." 387 F. Supp. 2d at 46. Similarly, in *Deripaska v. Associated Press*, the Court identified the relevant controversy as "relating to Russian oligarchs acting on behalf of the Russian government." 282 F. Supp. 3d 133, 142 (D.C. Cir. 2017); *see also Tavoulareas*, 817 F.2d at 767 (public controversy involved "manner in which the United States should respond to the rise of OPEC and the ensuing energy crisis"); *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736 (D.C. Cir. 1985) (public controversy over government's administration of air traffic control

---

[8] Ex. O-97, APP2847.

[9] Exs. O-48, O-93, O-94.

system); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 43 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003) (public controversy "concerned the role of women in the military and whether women should be allowed in combat."); *Boley v. Atlantic Monthly Grp.*, 950 F. Supp. 2d 249, 261 (D.D.C. 2013) (public controversy was "Liberian Civil War"); *Foretich v. Advance Mag. Publishers, Inc.*, 765 F. Supp. 1099, 1102 (D.D.C. 1991) (public controversy concerned "child abuse, women's rights, the intrusion of the state into private affairs, and the limits of punishment for contempt of court").

Based on this precedent and the undisputed evidence cited above, a public controversy has existed over concerns about security vulnerabilities and foreign ownership of electronic voting systems, as well as the controversies that have "dogged" Smartmatic from Caracas to Chicago and from Miami to Manila,[10] thus satisfying the first factor of the *Waldbaum* test.

### 2. Smartmatic has Played a Prominent Role in the Controversy.

The second element of the *Waldbaum* test analyzes the plaintiff's role in the controversy. 627 F.2d at 1297. A plaintiff's participation must be more than merely "trivial or tangential." *Id.*; *Tavoulareas*, 817 F.2d at 773. Courts consider whether plaintiffs "have 'thrust themselves to the forefront' of the controvers[y] so as to become factors in [its] ultimate resolution." *Waldbaum,* 627 F.2d at 1297. But the plaintiff need not have acted with that intention (although Smartmatic did). As the D.C. Circuit has explained, "[t]he plaintiff either may have been purposely trying to influence the outcome *or could realistically have been expected*, because of his position in the controversy, to have an impact on its resolution." *Id.* (emphasis added). To perform this analysis, courts review the "plaintiff's past conduct, the extent of press coverage, and the public reaction to his conduct and statements." *Id.* The inquiry boils down to whether a plaintiff "engaged in

---

[10] Ex. O-92, APP2828.

conduct" that they know will "markedly raise[] the chances" of becoming embroiled in a public controversy. *Clyburn*, 903 F.2d at 33. Applying these standards, the evidence is undisputed and overwhelming that Smartmatic has played a prominent role in the public controversy over the security of electronic voting systems and the foreign ties of their owners.

a)    **Smartmatic Invited Attention and Comment Through its Conduct.**

In assessing the plaintiff's role in the controversy, courts look to whether the plaintiff has chosen a "path[] of endeavor that 'invite[s] attention and comment.'" *OAO Alfa Bank*, 387 F. Supp. 2d at 44 (quoting *Tavoulareas*, 817 F.2d at 773). Even if the plaintiff does not solicit media attention (which here, Plaintiffs did), their choice to engage in activities that are of inherent public interest or to conduct themselves controversially may reflect a desire to invite public attention. *Lohrenz*, 223 F. Supp. 2d at 43 (plaintiff was "well-aware that her position as one of the first female F-14 pilots would attract public attention."); *Clyburn*, 903 F.2d at 33 ("[Plaintiff] engaged in conduct that he knew markedly raised the chances that he would become embroiled in a public controversy."); *Brueggemeyer v. American Broad. Cos.*, 684 F. Supp. 452, 458 (N.D. Tex. 1988) ("The court rejects the assertion that [the plaintiff] cannot be a public figure because he did not, of his own volition, undertake to become one. It is sufficient that [he] 'voluntarily engaged in a course that was bound to invite attention and comment.'").

Smartmatic's existence as a provider of electronic voting systems was literally born of a desire to participate in an endeavor it knew would invite attention and public comment. [Dkt. 1: ¶ 23]. As *The New York Times* reported, Smartmatic's founders transformed their nascent networked-devices company into an electronic voting company after watching the 2000 Florida election controversy unfold.[11] Years later, the company would candidly admit that elections are

---

[11] Ex. O-98, APP2849.

controversial, which brings with it the spotlight of public attention.[12] Smartmatic has echoed this acknowledgement repeatedly in its internal communications.[13]

Smartmatic's background and activities have made it a particularly controversial player in this inherently controversial arena. Even as its Venezuelan roots and continued work for the Hugo Chavez and Nicolas Maduro governments became lightning rods for controversy in the United States, Smartmatic sought to expand its U.S. presence by purchasing Sequoia Voting Systems ("Sequoia"). Statement at ¶¶ 26-27.  It then piqued that controversy by (according to the company's claims) requesting a CFIUS investigation of the transaction, then refusing to participate, only to abruptly reverse course and decide to sell Sequoia in an apparent effort to stop the investigation. Statement at ¶¶ 30-32. The sale engendered further controversy with one government official questioning whether the transaction was a sham to avoid regulatory scrutiny. Statement at ¶ 43. Several years later, Smartmatic voluntarily chose to reenter the U.S. market. It did so by bidding on, and ultimately securing, a nearly $300 million public contract to manufacture and implement a new voting system for Los Angeles County, the nation's largest and most complex voting jurisdiction. [Dkt. 1: ¶ 49]. Smartmatic did so with the knowledge that its prior history in the United States, its ties to Venezuela, and its allegedly criminal actions in the Philippines would resurface in public debate over the L.A. County project.[14]

---

[12] Ex. O-99, APP2852.

[13] *See, e.g.*, Ex. O-100, APP2857.

[14] Smartmatic has also invited public attention and comment by bringing high-profile individuals into the company, including Lord Mark Malloch-Brown, former Chairman and Board Member, SGO Corporation and Smartmatic, its Elections division. Malloch-Brown is President of the Open Society Foundation, the frequently controversial philanthropic organization founded by George Soros. Ex. O-101, APP2861. *See OAO Alfa Bank*, 387 F. Supp. 2d at 46 (public figure plaintiffs increased their prominence by "associating closely and openly" with elite figures); *see also Clyburn,* 903 F.2d at 33 (one who "hobnob[s] with high officials" runs greater risk of becoming public figure). Despite Smartmatic's more recent attempts to publicly deny any

### b) Smartmatic has Been the Subject of Widespread News Coverage.

Of course, Smartmatic's actions did attract controversy. As recounted above, Smartmatic has been the subject of congressional hearings, federal regulatory and law enforcement investigations in the United States, diplomatic warnings, a criminal investigation in the Philippines (and a current one in the United States), and widespread criticism by electronic voting experts on precisely the issues that define this public controversy: security vulnerabilities and owners' foreign ties. Statement at ¶¶ 8-81, 146-148. Indeed, it is difficult to identify any other electronic voting company that has attracted so much public and government scrutiny on these issues.

Predictably, Smartmatic has also attracted "widespread news coverage." *OAO Alfa Bank*, 387 F. Supp. 2d at 45 (citing *Waldbaum*, 627 F.2d at 1297). This includes extensive coverage by major news outlets such as *The New York Times*, *The Wall Street Journal*, *The Miami Herald*, *Politico*, the *BBC*, and *WIRED*, along with various local news outlets. *See, e.g.,* Exs. O-47, O-66-O-68, O-98, O-119, O-120. The articles, broadcasts, and other publications cited above are just a small fraction of the media attention. A search on December 9, 2023 of an online news database for English language news revealed more than 10,000 articles since 2000 that mention the name "Smartmatic," and more than 880 articles that include the name "Antonio Mugica" (Smartmatic's Chief Executive Officer). A search that confined the scope to U.S. publications revealed over 9,800 articles since 2001 that contain the term "Smartmatic," and over 980 pages of results. Similarly, a search that confined the scope to U.S. publications for the name "Antonio Mugica" revealed over

---

association with Soros, internal corporate documents confirm that Malloch-Brown – as Chairman of SGO Corporation Limited and coordinating with Soros at the same time on election and political matters – and others at Smartmatic repeatedly leveraged Soros's reputation, behind-the-scenes support, and connections when it suited their business aims. Statement at ¶¶ 136-145. *See also* Exs. O-102, O-103.

740 articles since 2001 and 75 pages of results.[15] By comparison, in *OAO Alfa Bank*, the Court relied on similar evidence of 1,100 articles mentioning the plaintiffs, who were determined to be public figures. *Id.* at 28; *see also Ellis v. Time, Inc.*, No. Civ. A. 94–1755 (NHJ), 1997 WL 863267, at *6 (D.D.C. 1997) (plaintiff was limited public figure where he was the subject of five articles in newspapers ranging from *The Washington Post* to a Russian newspaper); *Bell v. Associated Press*, 584 F. Supp. 128, 131 (D.D.C. 1984) (plaintiff was limited public figure where "over one hundred newspaper articles have appeared concerning his various activities during the course of plaintiff's career").

### c) Smartmatic has Access to Media and Communications Channels.

The third guidepost this Court considers is whether the plaintiff has "'access to the channels of effective communication' that enable them to respond to any defamatory statements and influence the course of the public debate." *OAO Alfa Bank*, 387 F. Supp. 2d at 46 (quoting *Gertz*, 418 U.S. at 344). There is no doubt that Smartmatic — a company that bills itself as "the world leader" in a multibillion-dollar industry, maintains a robust communications department, and employs outside public relations firms to facilitate its ability shape public debate — enjoys such access. Proof of this access is found in the numerous news articles and other publications in which Smartmatic and its leaders have been quoted, ranging from Chief Executive Officer Antonio Mugica's Caracas-based interview with *The New York Times* in the early days of the company,[16] to media reports specifically concerning the 2020 election-related allegations.[17] *See, e.g.*, *OAO*

---

[15] Ex. O, ¶ 154, APP2083.

[16] Ex. O-98.

[17] Ex. O-116, APP2927 (published on Election Day, quoting Smartmatic regarding its alleged connection to Soros and linking to Smartmatic's website); Ex. O-115, APP2925 (published Nov.

*Alfa Bank*, 387 F. Supp. 2d at 45-46 (citing plaintiffs' commentary "in newspapers and other media outlets throughout the world"); *see also Tavoulareas*, 817 F.2d at 774 (plaintiff maintained access to press through his company's public-relations apparatus); *Foretich*, 765 F. Supp. at 1108 (public figure plaintiff had given statements to press and sat for media interview).

Proof is also found in Smartmatic's own documents, including documents received from one of its several public relations firms in 2019, which show that Smartmatic maintained a list of media contacts and reached out to reporters to share news and arrange for meetings.[18]  In addition to these direct outreaches to the press, Smartmatic took less transparent steps to inject itself into and shape the debate surrounding the company specifically and the integrity of electronic voting more broadly. As described above, it engaged in a protracted campaign to launder its Wikipedia page by secretly procuring the creation of media content that positively portrayed Smartmatic and by taking various actions (including litigation) to remove critical content.[19] It also worked to engage with academics, legislators, lobbyists, think tanks, and others to promote awareness, thought leadership, and create its own news[20] In addition, Smartmatic has made "effort[s] to increase awareness on the benefits of voting technologies, and the importance of well-run elections in the advancement of societies."[21]

---

17, 2020 and linking to Smartmatic website responding to allegations by President Trump's legal team).

[18] Ex. O-82, APP2691-92.

[19] Ex. O-104, O-105. Smartmatic also leveraged Board member Peter Neffenger's connections and position on the Biden transition team to pressure Google to change its policy on censorship of conservative media, including OAN. Ex. O-35, APP2292-93.

[20] Ex. O-82, APP2691-706.

[21] Ex. O-106, APP2880.

In sum, Smartmatic repeatedly stepped into the spotlight of this public controversy in numerous ways. Having injected itself into this public controversy, it established a special prominence in the controversy and thus "must take the bad with the good." *Waldbaum*, 627 F.2d at 1295.

### D.     The Statements Challenged by Smartmatic are Germane to the Public Controversy over the Security and Foreign Ownership of Electronic Voting Systems.

The final prong of the *Waldbaum* test requires that the alleged defamation be "germane" to the plaintiff's participation in the controversy. 627 F.2d. at 1298. The germaneness test "ensures that publishers cannot use an individual's prominence in one area of public life to justify publishing negligent falsehoods about an unrelated aspect of the plaintiff's life." *Jankovic*, 822 F.3d at 589. The standard for determining germaneness is low. The test is satisfied as long as the subject of the alleged defamation is not "wholly unrelated" to the controversy. *Tavoulareas*, 817 F.2d at 774; *Waldbaum*, 627 F.2d. at 1298.

Smartmatic's complaint makes clear that the specific statements on which it bases its defamation claim relate directly to the broader public controversy over the security and foreign ownership of electronic voting systems. Many of the alleged defamatory statements expressly invoke Smartmatic's Venezuelan roots and the use of its machines and software in foreign elections. *See e.g.,* [Dkt. 1: ¶¶ 85; 95; 99; 101; 106; 111; 118; 122; 123; 125; 127; 129; 130; 131; 136]. Smartmatic also repeatedly complains that OAN's reporting covered security concerns that Smartmatic believes to have been unfounded. *Id.* ¶¶ 4; 85; 104; 127; 128; 130; 171; 180; 184; 205; 218; 227. Indeed, many of the challenged statements are virtually indistinguishable from the testimony and other statements of Rep. Maloney, computer scientists, and others who raised concerns that Smartmatic's and other companies' technology was plagued with security weaknesses that left elections vulnerable to manipulation of the vote. *See, e.g.*, *id.* ¶ 127 (Tom

Fitton: "We're hearing witness after witness highlight the security weaknesses of these systems."). Based on the close connection between the broader public controversy and the specific statements that form the basis of Smartmatic's defamation claim, there can be no doubt that *Waldbaum*'s germaneness requirement is "abundantly satisfied." 817 F.2d at 774.

E.   **Smartmatic's Role as a Government Contractor Responsible for Providing Election Infrastructure and Helping Administer Elections Renders It a Public Official.**

Smartmatic is required to prove actual malice for the additional reason that it is a "public official." *Sullivan*, 376 U.S. at 279-80. This designation applies "at the very least" to "government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). But it is not limited to the government itself. It can also apply to government contractors and others with "substantial responsibility — actual or apparent — for the administration of government matters." *Baumback*, 161 F.3d at *3; *Jenoff v. Hearst Corp.*, 644 F.2d 1004, 1006 (4th Cir. 1981) ("It is conceivable that an individual holding no formal public position, and standing in no employment or even contractual relationship with government, nevertheless may participate in some governmental enterprise to such an extent that the policies underlying *New York Times Co. v. Sullivan* . . . would demand that he or she be classified a public official."); *Arctic Co., Ltd. v. Loudon Times Mirror*, 624 F.2d 518, 522 (4th Cir. 1980) ("There well may be circumstances in which a consultant employed by a government entity could be classified as a public official.").

Applying this test, the Eastern District of Virginia held that a scientist working for an important government contractor was a "public official" for purposes of his defamation claim against *The New York Times* even though he did not hold government office. *Hatfill v. New York Times Co.*, 488 F. Supp. 2d 522, 528 (E.D. Va. 2007). The court noted that the plaintiff qualified as a public official both in fact and appearance because he "perform[ed] governmental functions

as a contractor with the government, sharing his expertise in the field of biological warfare, and as a participant at [Louisiana State University] in a government-funded program dealing with biological weaponry and training of other government officials and special forces." *Id*. The court also relied on the plaintiff's receipt of "federal funds to work on national defense programs that he himself described as being of 'national importance.'" *Id*. Further, the court noted that the "public had an independent interest in Plaintiff's qualifications and performance given the highly sensitive nature of his work and its importance to national defense. His responsibilities and close connection with the federal government rendered him a public official." *Id*.

The same analysis applies to Smartmatic. It is impossible to imagine a more important government function in a democracy than the administration of elections. By its own admission, Smartmatic has played a significant role in elections, including the 2020 presidential election. As Smartmatic's own Complaint notes, the company partnered with Los Angeles County to spearhead its Voting Solutions for all People ("VSAP") initiative. [Dkt. 1: ¶¶ 49-60]. According to the government's press release, Smartmatic's responsibilities as the initiative's "Prime Contractor and Operator" were substantial:

> Smartmatic USA will assist the Registrar-Recorder/County Clerk (RR/CC) in manufacturing and implementing components of a new voting experience for Los Angeles County scheduled for introduction in the March 2020 California Presidential Primary election.
>
> ***
>
> Smartmatic USA and its team will be responsible for systems integration, engineering and manufacturing of the system components that were designed by and for Los Angeles County voters with a focus on security, accessibility and usability.[22]

---

[22] Ex. O-107, APP2883.

According to Smartmatic's own description, its role in the 2020 election included providing the following technology and services to Los Angeles County:

- engineering and manufacturing voting machines;

- programming and installing the software for the machines;

- leading the California certification process;

- creating the backend software and managing the machines;

- building the VSAP operations center;

- handling logistics and setup/breakdown of the vote centers;

- overseeing real-time data management for deployment; and

- supplying Help Desk services on Election Day.

[Dkt. 1: ¶ 55].

For its role in this major government initiative, Smartmatic was paid nearly $300 million in taxpayer funds.[23] The size of the payment reflects the significance of the work. Though Los Angeles County may be just one county, (as Smartmatic notes) it has outsized significance. With more than 5.4 million registered voters, it "is the nation's most populous voting jurisdiction." [Dkt. 1: ¶ 49]. As *The Los Angeles Times* noted last year, the county's population exceeds that of 40 states.[24]

Smartmatic also *appeared* to be performing government functions in connection with the election in Los Angeles County. The VSAP contract, which is publicly available, provided that Smartmatic staff members were required to wear County-approved identification badges.[25] The

---

[23] Ex. O-108, APP2887.

[24] Ex. O-109, APP2892.

[25] Ex. O-108, APP2888-89.

County's public relations team was instructed to ensure that "the county is seen as owning" the Smartmatic system, with Smartmatic as the County's "implementation partner."[26] Smartmatic was publicly touted as a "proud partner of LA County" and its voting machines bore L.A. County logos and held signs directing voters to LAVote.net, a government website.[27] Indeed, Smartmatic's role was so pervasive that even Smartmatic cannot separate itself from its government client. Smartmatic's complaint touts *the company's* success in the election by citing a poll of voters who were asked about how well "*LA County* implemented new voting technology." *Id.* ¶ 56 (emphasis added). Of course, Smartmatic cannot claim the government's success (in the eyes of voters) as its own success without implicitly acknowledging that the company was largely responsible for performing functions that the public assumed to be governmental.[28]

Based on this undisputed evidence, Smartmatic is an example of a private contractor that performs such significant governmental functions that it must be considered a "public official" under *Hatfill*, *Rosenblatt*, and the other authority cited above. This classification provides yet another, independent basis for the Court to hold Smartmatic to an actual malice burden on its defamation claim.

### F. The Court Should Grant Summary Judgment Because No Dispute as to Any Material Fact Exists and Defendant is Entitled to Judgment on the Issues of Actual Malice as a Matter of Law.

Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the

---

[26] Ex. O-110, APP2903.

[27] Ex. O-119.

[28] Smartmatic has continued to perform these governmental functions. By the end of 2022, Smartmatic had assisted Los Angeles County in "more than half a dozen elections since the system debuted in 2020." *Id.*

just, speedy and inexpensive determination of every action." Fed. Rule Civ. Proc. 1; *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Under Federal Rule Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to summary judgment as a matter of law." Although the Court views the evidence in a light favorable to the non-moving party, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment"; there must be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 247-48 (1986); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574 (1986).

Here, Plaintiffs carry the burden of proof at trial, so OAN may obtain summary judgment simply by establishing that no genuine issue of material fact exists as to an essential element of Plaintiffs' claim or an affirmative defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). OAN does not need to "support its motion with affidavits or other similar material negating the opponent's claim." *Id*. at 323. Rather, OAN's burden may be discharged by "showing" — that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case. *Id*. at 325.

The concerns embodied in Rule 56(a) are especially present in defamation cases such as this, where forcing defendants to incur unnecessary costs defending ultimately meritless claims can chill speech.[29] Thus, in libel cases particularly because of their potential chilling effect on speech about important issues to our democracy (such as concerns of election irregularities in a

---

[29] *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966); *McBride v. Merrell Dow & Pharms, Inc.,* 717 F.2d 1460, 1467 (D.C. Cir. 1983)("District of Columbia law…endorses the use, where possible, of summary procedures in handling libel actions.").

Presidential election), courts routinely grant motions for summary judgment on libel and related claims on the grounds set forth in this motion and appellate courts routinely affirm and even reverse for failure to grant summary judgment.[30]

>    **G.    As a Matter of Law, Plaintiffs Do Not, and Cannot, Provide by Clear and Convincing Evidence that Defendant Acted With Actual Malice.**

The Complaint alleges OAN acted with actual malice in making the Complained of Publications, and they further, allege actual malice in connection with their punitive damage claim, a necessary element of their claim.  [Dkt. 1: ¶¶ 121-180, 192, 195]. Since Plaintiffs seek an award of punitive damages, the parties must focus on the question of actual malice, even if, assuming arguendo, Plaintiffs are found by the Court not to be public figures.

Even though more than two years have passed since this lawsuit was filed on November 3, 2021, and the Court's Scheduling of October 2022 setting the discovery deadline at December 8, 2023, has expired, Plaintiffs have no evidence of "actual malice." Frankly, it is OAN that has been hurt by Plaintiffs' approach to discovery, where they have ignored noticed depositions without even asking the court for relief, failed to wait (when they did ask) for a ruling, and successfully moved for a stay of all remaining depositions noticed by OAN but for one third party deposition (of former Smartmatic/Sequoia President Jack Blaine). Plaintiffs' strategy, however, does not thwart OAN's ability to move for summary judgment on actual malice as OAN does not need to support its motion with evidence negating Plaintiffs' claims, although Defendant might have been in a stronger position had OAN been able to question Plaintiffs' executives and other witnesses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Rather, OAN meets its burden by

---

[30]*See Montgomery v. Risen*, 197 F. Supp. 3d 219, 259 (D.D.C. 2016) *aff'd* 875 F.3d 709 (D.C. Cir. 2017); *McFarlane v. Sheridan Square Press Inc.,* 91 F.3d 1501, 1508 (D.C. Cir. 1996); *Jankovic v. Int'l Crisis Group*, 822 F.3d 576, (D.C. Cir. 2016); and *Lohrenz v. Donnelly*, 350 F.3d 1272 (D.D.Cir. 2003); *McFarlane v. Esquire*, 74 F.3d 1296 (D.C. Cir. 1996).

demonstrating "an absence of evidence"; that is, an absence of actual malice to support Plaintiffs' case. *Id.* at 325.

"The standard of actual malice is a daunting one," *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996) ("*McFarlane I*"), "and quite purposefully so." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 277 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2nd Cir. 2015); *accord Anderson*, 477 U.S. at 255-57; *Gertz*, 418 U.S. at 342. Actual malice gives "breathing space" to journalists and publishers reporting on matters of public concern even where, although not present here, "erroneous statement is inevitable." *New York Times Co. v. Sullivan*, 376 U.S. 254, 271-72 (1964). The proper inquiry focuses on what the defendant knew about the veracity of the statements, not the defendant's motivation, and "only those false statements made with a high degree of awareness of their probable falsity … may be the subject of civil … sanctions." *Garrison v. Louisiana,* 379 U.S. 64, 74 (1964). "For speech concerning public affairs is more than self-expression; it is the essence of self-government. The First and Fourteenth Amendments embody our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Id.* at 74-75 (quoting *New York Times Co. v. Sullivan*, 376 U.S. at 270). As a result, "[t]he 'serious doubt standard' requires a showing of subjective doubts by the defendant. It does not turn on whether a reasonably prudent person would have published under the circumstances." *McFarlane v. Sheridan Sq. Press, Inc.,* 91 F.3d 1501, 1509 (D.C. Cir. 1996) ("*McFarlane II*") (quoting *Tavoulareas*, 817 F.2d at 789). "'For [the actual malice] standard to be met, the publisher must come close to willfully blinding itself to the falsity of the utterance." *Tavoulareas*, 817 F.3d at 776. Plaintiffs must prove actual malice by

clear and convincing evidence; a preponderance of evidence will not suffice. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991).

        **1.**      **Prior Public Controversies Regarding Plaintiffs and Resulting Media Coverage, Congressional Inquiry and Government Inquiry and Action.**

Bi-partisan concerns about the security of US voting machines and software systems were in the news for more than a decade preceding the 2020 Election.[31] Over the last two decades, the election technology industry has become highly concentrated, with a handful of consolidated vendors controlling the vast majority of the market. In the early 2000s, almost twenty vendors competed in the election technology market.[32] Today, three large vendors — Election Systems & Software, Dominion, and Hart InterCivic — collectively provide voting machines and software that facilitate voting for over 90% of all eligible voters in the United States.[33] Private equity firms reportedly own or control each of these vendors, with very limited "information available in the public domain about their operations and financial performance."[34] While experts estimate that the total revenue for election technology vendors is about $300 million, there is no publicly available information on how much those vendors dedicate to research and development, maintenance of voting systems, or profits and executive compensation.[35] Indeed, in the year leading up to the Election and in the months and years since, there has been a literal fire storm of media coverage, congressional hearings, state and federal investigations into the security of the Election, the voting

---

[31] Ex. O-21.

[32] Ex. O-117.

[33] *Id.*, APP2954.

[34] *Id.*, APP2939.

[35] *Id.*

machines, software and vote tabulations. We are coming up on the eve of the next Presidential election and the fire has not yet died out.

As set forth below, OAN, like many, if not most, other news organizations, relied on other media coverage, press conferences, statements from President Trumps' legal team and advisors and reports from hearings and court filings in producing its news broadcasts and programming which are the subject of this litigation. *See* Exs. B, C, E-M.

> ### 2.    Bias, Questionable Sources, Lack of Investigation and Corroboration Do Not Suffice to Show Actual Malice.

Plaintiffs allege OAN did not have any sources with first-hand knowledge to support the Complained of Publications and purposefully avoided the truth. [Dkt. 1: ¶¶ 122-123]. Plaintiffs also allege that OAN had obvious reasons to doubt its guests and their veracity yet had them on the shows anyway. [Dkt. 1: ¶¶ 157-158]. They contend that the guests did not provide OAN with any documentation to support their allegations and, further, that OAN did not independently corroborate the statements but instead published them without evidence to support them. [Dkt. 1: ¶ 158).

In sum, Plaintiffs seek to impose a duty to investigate, an argument that the D.C. Circuit has previously rejected as a "non-starter." *See Jankovic v. Int'l Crisis Group*, 822 F.3d 576, 590 (D.C. Cir. 2016); *see McFarlane II*, 91 F.3d at 1510. Only if "a defendant has reason to doubt the veracity of its source" is its "failure to examine evidence within easy reach or to make obvious contacts" evidence of reckless disregard. *Jankovic,* 822 F.3d at 594. "Even where doubt-inducing evidence could be discovered, a publisher may still opt not to seek out such evidence and may rely on an informed source, so long as there is no 'obvious reason to doubt' that source." *Id.; Lohrenz*, 350 F.3d at 1285.

27

Assuming arguendo without admitting that OAN's sources had a pre-conceived storyline and bias about Smartmatic, that is not "antithetical to the truthful presentation of facts." *Jankovic*, 822 F.3d at 597; *Tavoulareas*, 817 F.2d at 795. "The fact that a commentary is one sided and sets forth categorical accusations has no tendency to prove that the publisher believed it to be false." *Westmoreland v. CBS, Inc.,* 601 F. Supp. 66, 68 (S.D.N.Y. 1984); *McFarlane I,* 74 F.3d at 1307. In other words, that a defendant acted on the basis of a biased source and incomplete information does not "demonstrate with clear and convincing evidence that the defendant[s] realized that [their] statement was false or that [they] subjectively entertained serious doubts as to the truth of [their] statement[s]." *Lohrenz v. Donnelley*, 350 F.3d 1272, 1284 (D.C. Cir. 2003) (evidence that the publishers of the alleged defamatory statements were on a mission to reinstate the ban against women being assigned to combat positions in the military did not suffice to show actual malice); *see also Jankovic*, 822 F.3d at 594 (finding no actual malice where sources were Serbian press outfits known to be "sensationalists bordering on libel" and others were "notorious for spreading rumors and outright lies," and author had reason to be "wary" of the press reports, but "he also had some reason to believe the story, based upon his own research and his conversations with journalists and experts on Balkan affairs."); *McFarlane II*, 91 F.3d 1501 at 1508.

In *McFarlane II*, for example, Sheridan Square Press, the publisher, conceded that it published the alleged defamatory *Profits of War* without having any independent verification of the allegations about McFarlane: it did not uncover any affirmative evidence that McFarlane was indeed an Israeli spy or that he played a role in the alleged arms-for hostages scheme. 91 F.3d. at 1508-09. The D.C. Circuit rejected McFarlane's contention that a publisher has a "duty to corroborate" when the source of potentially libelous material is of questionable credibility. *Id*. at 1510. Although the author relied for the most part on secondary sources, the Court held "there is

no authority for the proposition that anything short of interviewing those with first-hand knowledge amounts to 'willful blindness.'" *Id*. The Court continued, "[t]o hold that a publisher who relies upon a questionable source must not only investigate the allegations but actually corroborate them – that is establish through an independent source that the allegations are true – would be to turn the inquiry away from the publisher's state of mind and to inquire instead whether the publisher satisfied an objective standard of care." *Id*. at 1509; *see Washington Post Co. v. Keogh*, 365 F.2d 965, 972 (D.C. Cir. 1966) (discussing difficulties with proposed rule requiring newspapers to verify controversial allegations, stating: "There simply is no convincing, realistic basis for the position that newspapers in circumstances similar to the Post's should bear greater responsibilities of verification than the Supreme Court required of the New York Times, where information available from published articles in the Times' own files 'demonstrated the falsity of the allegations.'") (quoting *New York Times Co. v. Sullivan, supra*, 376 U.S. at 263, 84 S.Ct. at 717).

The Court in *McFarlane II* also rejected the argument that the publisher of the article acted with reckless disregard by deciding to go ahead with the publication after having attempted but failing to corroborate the allegations. *McFarlane II*, 91 F.3d at 1510. Finding "there is no authority for the proposition that anything short of interviewing those with first-hand knowledge amounts to "willful blindness," the Court continued, "[o]n the contrary, we have held that a publisher's good faith reliance on previously published reports in reputable sources. . . precludes a finding of actual malice as a matter of law." *Id*. at 1510; (internal quotation omitted); *Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1297 (D.C. Cir. 1988) ("We think *The Wall Street Journal*'s good faith reliance on previously published reports in reputable sources of Liberty Lobby's connections with Noontide and *Western Destiny* precludes a finding of actual malice as a matter

of law." (citing *Rosanova v. Playboy Enters., Inc.,* 580 F.2d 859, 862 (5th Cir. 1978) ("The subjective awareness of probable falsity required by [*St. Amant*] cannot be found where, as here, the publisher's allegations are supported by a multitude of previous reports upon which the publisher reasonably relied."))). Simply put, the D.C. Circuit has held that a publisher has no duty to corroborate its allegations. *See McFarlane II*, 91 F.3d at 1508.

Here, the OAN declarations submitted in the Appendix substantiate the reliable sources underlying the subject broadcasts and other publications. Those sources and guests included the then-current President's lawyers and representatives, Rudy Giuliani, Sidney Powell, Joseph diGenova, prominent commentators and subject matter experts in government affairs and elections, U.S. Congress members, attorneys, and military veterans. The OAN hosts, anchors and journalists connected to the programming each attest that they did not believe or have reason to believe or have serious doubt as to the truth of the statements. *See* Exs. B, C, E-M.

### 3. Improbability of Defamatory Allegations Do Not Support Actual Malice.

While Plaintiffs claim the alleged storyline about Smartmatic was "fabricated," the subject matter of that "fabricated storyline," that is, wide spread concern over the possibility of election fraud, spawned litigation across the United States (including in Michigan, Arizona, Pennsylvania, Georgia, Nevada, and Wisconsin), Congressional hearings. and were the subject of national debate and continued dialogue. Consequently, the allegations, which did not emanate from OAN but were from other reliable sources, were taken seriously enough by many government officials to investigate and, therefore, can hardly be fairly characterized as "fabricated." Any inherent improbability of the allegation does not itself support a finding of actual malice. *See McFarlane II*, 91 F.3d at 1513.

###### 4.       Reliance on Reputable Sources.

It cannot be gainsaid: OAN relied on reliable news sources that predate the alleged defamations. A publisher's "good faith reliance on previously published reports in reputable sources . . . precludes a finding of actual malice as a matter of law." *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988). In *Montgomery v. Risen*, 197 F. Supp. 3d 219, 226 (D.D.C. 2016), *aff'd* 875 F.3d 709 (D.C. Cir. 2017), the defendants pointed to an abundance of evidence tending to show that the author and publisher neither knew nor had reason to suspect that the alleged defamatory publication was false. *Montgomery*, 197 F. Supp. 3d at 260. The district court noted that "[o]f most relevance" was the "plethora" of other news articles and other evidence, pre-dating the allegedly defamatory publication, which aligned with and corroborated its general thrust that the plaintiff's technology did not work as billed. *Id.* And in considering the issue of actual malice, it noted that of most relevance was "an abundance of evidence" in the record, pre-dating the alleged defamatory publication, which aligned with and corroborated the publication's general thrust.

Here, because OAN[36] expressly relied on previously published articles in reputable publications and news outlets (including but not limited to the *Washington Examiner*, *New York Times*, *European News Daily*, Philippines based *ABS-CBN*, and *Fox News among others*), statements of sitting Congresswomen Amy Klobuchar and Senator Elizabeth Warren, and legal advisors to President Trump's Campaign including Harmeet Dillon (attorney and co-chair of Republican National Lawyers Association), Rudy Giuliani, Sidney Powell, Joseph diGenova,

---

[36] The Complaint notes that its allegations that discuss how "OANN" acted with actual malice should be read and understood to include its anchors, hosts and producers of the shows at issue. [Dkt. 1: ¶ 121, n. 9]. The declarations of the anchors, hosts and producers of the shows at issue (hereafter "Declarants") are attached to the Appendix hereto as Exs. B, C, E-M.

among others, and other reliable sources, together with declarations that they neither knew or believed any of the Complained of Publications to be false or entertained serious doubt as to their truth, Plaintiffs cannot meet the "daunting standard" of showing actual malice. *McFarlane I*, 74 F.3d at 1308.

For example, a November 9, 2020 article in the *Washington Examiner* titled, "Officials raised  concerns for years about security of US voting machines, software systems," was a source for the November 12, 2020 *After Hours with Alex Salvi*. [Dkt. 1: ¶¶ 32-33; Ex. H]. That article states, in part:

> Dominion "got into trouble" with several subsidiaries it used of alleged cases of fraud. One subsidiary is Smartmatic, a company "that has played a significant role in the U.S. Market over the last decade," according to a report published by UK based Accesswire.
>
> Litigation over Smartmatic 'glitches ' alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source code used in the machines found multiple problems, which concluded, 'The software inventory provided by Smartmatic is inadequate,…which brings into question the software credibility.' ABS-CBN reported.
>
> …The company's reported global ties have caused members of the media and government officials to raise questions about its involvement in the U.S. electoral process.

*See* Ex. O-21, APP2208.

Of course, a necessary predicate to "actual malice" is that for each Complained of Publication, there must be a *false statement of fact* as opposed to opinion, rhetoric or hyperbole. *See Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001) (for a statement to be actionable under the First Amendment, it must at a minimum express or imply a verifiably false fact; however "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection."). Further,

defamatory meaning must be measured by the reasonable viewer or reader. *See Moldea v. New York Times Co.*, 15 F.3d 1137, 1142 (D.C. Cir. 1994), *modified*, 22 F.3d 310 (D.C. Cir. 1994) (the defamatory meaning inquiry focuses only on whether a reasonable reader could understand a statement as tending to injure a plaintiff's reputation); *see also Farah v. Esquire Magazine*, 736 F.3d 528, 537 (D.C. Cir. 2013) (the test is not whether some actual readers were misled, but whether the hypothetical reasonable reader could be after time for reflection). In assessing defamatory meaning, the publication must be taken as a whole and in the proper context. *Farah*, 736 F.3d at 535; *see also Afro–American Publ'g Co. v. Jaffe*, 366 F.2d 649, 655 (D.C. Cir. 1966) (en banc ) (the "publication must be taken as a whole, and in the sense in which it would be understood by the readers to whom it was addressed"); *Weyrich*, 235 F.3d at 625 ("[T]he First Amendment demands" that the court assess the disputed statements "in their proper context").

The first challenged publication (After Hours With Alex Salvi ("Salvi") on November 12, 2020) provides a ready of example of Plaintiffs' overreach. Salvi testifies that he did not believe that anything he published that night was false nor that he entertained any serious doubt about the truth. Indeed, his broadcast starts with a discussion of Dominion and quotes the *New York Times* (and displays a portion of the newspaper graphically on air) reporting that the company is at the center of "baseless claims" regarding software glitches. He then cites a Princeton University professor who, Salvi says, "has been raising alarms about Dominion Voting Systems for years." He then reports that Smartmatic (which he incorrectly refers to as a Dominion subsidiary although as we see internal corporate documents detailed in the Statement at ¶¶ 50-57, the two companies are significantly intertwined, particularly with regard to the legacy machines and software used in the 2020 Election) was used for the Philippine elections back in 2010 and 2013. This is not only true but Plaintiffs plead it is accurate. [Dkt. 1: ¶¶ 34, 37]. He then reports (relying on the

*Washington Examiner*) that there were questions raised about cheating and fraud in those elections, undeniably true as the evidence shows. *See* Statement ¶¶ 70-71.

Salvi concludes by saying "Now to be clear, at this point, we don't have any independent evidence that any additional votes have been affected by these voting systems or that the results were tainted in any way by large scale voter fraud. But that doesn't mean that people should be shamed for asking, because it's not out of the realm of possibility." Ex. A-1, APP16. Truer words … And it's a long way from a false statement of defamatory fact and not even close to actual malice.

Each of the OAN declarants also assert that they relied on a number of additional articles, in connection with their respective programs (which they attach) as well as various sources which we discuss. Exs. B, C, E-M.  Each of those articles make similar factual claims to the broadcasts and statements that are the subject of the Complaint. *See Montgomery*, 197 F. Supp. 3d at 260.

The OAN declarants also state that they relied on statements made by the President's lawyers, Powell, Giuliani, diGenova (OAN's Ms. Hamill introduced diGenova as "a part of President Trump's legal team, a lawyer, political commentator and former U.S. Attorney for the District of Columbia) (*In Focus*, Stephanie Hamill, November 20, 2020, Dkt. 1: ¶¶ 49-50), and these statements were from persons considered reputable and reliable,[37] and often these individuals were guests on the broadcasts. These contentions largely corroborated the factual assertions made in media reports. Moreover, they were further substantiated by the statements of other sources.

Plaintiffs complain that OAN informed its viewers that Giuliani, Powell, and other guests were lawyers to create the impression that they were reliable sources of facts by bolstering their credibility, sharing their background and experience as lawyers and that as lawyers, Giuliani,

---

[37] *See* Statement ¶¶ 110-135.

Powell, and diGenova were barred by the ethical codes of conduct from lying and bolstered their credibility sharing their backgrounds and experience as lawyers. [Dkt. 1: ¶¶ 83, 85-86]. Indeed, at the time of the Complained of Publications, especially those by Giuliani, Powell and diGenova, those very same credentials were reason enough for OAN to find them credible and reliable.[38]

### 5.    The Lindell Programming.

My Pillow contracted with OAN to air four programs (*Absolute Proof* (February 11, 2021); *Scientific Proof* (April 3, 2021); *Absolute Interference* (April 22, 2021); and *Absolutely 9-0* (June 5, 2021) (referred to herein as the "Lindell Programming") relating to the 2020 Election and ongoing concerns regarding alleged voting irregularities with the voting systems used in the election. Lindell was the sole author and executive producer of the program and was solely and exclusively responsible for its content. Ex. I, ¶7, APP1157. OAN had no involvement in the production, writing or editing of any of the Lindell Programming. Ex. I, ¶8, APP1157. As such, OAN cannot be held liable for the actual malice, if any, of Lindell in the Lindell Programming. *See McFarlane I,* 74 F.3d at 1303 ("[U]nder the *New York Times* standard, and our own analysis leads us to conclude that under *New York Times* actual malice may not be attributed outside *respondeat superior.*"); *Chaiken v. Village Voice Publishing Corp.*, 119 F.3d 1018, 1033-34 (2nd Cir. 1997) (finding a newspaper publisher was not vicariously liable for the actual malice of an independent contractor); *D.A.R.E Am. v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, 1278–80

---

[38] Giuliani's suspension from the practice of law by the New York State Bar on June 24, 2021, and Powell's sanctioning by the U.S. District Court in Michigan on August 25, 2021, are of no moment insofar as their reliability as sources is concerned with respect to the subject shows and statements at issue because they postdate the Complained of Publications. Indeed, the New York bar cited an attorney's credibility as a basis for suspension of the former mayor's law license. Ex. O-29, APP2266-67. The pertinent dates are the date of the Complained of Publications. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Moreover, even if sources are questionable, the pertinent issue is whether the declarant had reason to seriously doubt or question the truth at issue. *Id.*

(C.D. Cal. 2000) (finding a magazine publisher was not vicariously liable for the actual malice of an independent contractor); *Hunt v. Liberty Lobby*, 720 F.2d 631, 649 (11th Cir. 1983) (applying Florida law).

**6.  Retraction Demands and OAN's Alleged Access to Contradicting Statements [Dkt. 1: ¶¶ 63-64].**

Plaintiffs complain that despite a retraction demand dated December 18, 2020, from Dominion and a letter from Smartmatic dated December 11, 2020, OAN "did not acknowledge that there was no evidence to support its claims" regarding Smartmatic. [Dkt. 1: ¶¶ 63-64]. Plaintiffs' general denials and retraction demand, however, do not establish knowledge or serious doubt as to falsity. *See e.g., Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2nd Cir. 1977) (actual malice "cannot be predicated on the mere denials, however, vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error"). Plaintiffs' contention that there was publicly available and easily accessible information showing which company's election technology and software were selected for use in each state and county, including contested states, simply does not address the issues of legacy technology designed and developed by Plaintiffs that remained in voting machines used in the 2020 Election or the lack of transparency of ownership that are the subject of the Complained of Publications.

Moreover, Smartmatic's statements that OAN's reporting was inaccurate and denials that its electronic voting systems are not vulnerable to rigging, hacking or abuse, were not enough to alert OAN to a likelihood of error. "Publisher's need not accept 'denials however, vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error. *Edwards,* 556 F.2d at 121; *see also Coliniatis v. Dimas*, 965 F. Supp. 511, 519 (S.D.N.Y. 1997). Indeed, unlike

evidence that could be readily verified, Smartmatic's denials did not give OAN "obvious reasons" to doubt the veracity of its broadcasts. *See McFarlane I*, 74 F.3d at 1299.

Furthermore, as has been evidenced by Smartmatic's discovery conduct throughout this litigation, including thwarting OAN's ability to take the depositions of Smartmatic witnesses at every turn, virtually every record and information that might have shed light on Smartmatic's history and technology have been marked "CONFIDENTIAL" and often bearing the "Attorneys Eyes-Only" stamp,[39] meaning they are not and were not available for public disclosure and, therefore, not available via its websites or otherwise prior to the broadcasts. *See Lohrenz v. Donnelly*, 187 F.R.D. 1, 10 (D.D.C. 1999) (finding plaintiff's full performance records were not available in advance of publication without plaintiff's consent)." The failure to verify statements with the plaintiff and reliance upon some biased sources, in themselves, do not amount to reckless disregard for the truth." *Lohrenz v. Donnelly*, 350 F.3d 1272, 1286.  This is also particularly true when it comes to Plaintiffs' corporate structure and business activities in countries such as Venezuela and the Philippines. The mere proffering of purportedly credible evidence that contradicts the publisher's story is not enough to meet the standard of reckless disregard for the truth. *See Id.* at 1284.

Nonetheless, as the D.C. Circuit has explained, "reporting perspectives at odds with the publisher's own, 'tend [] to rebut a claim of malice, not to establish one.'" *Montgomery*, 197 F. Supp. 3d at 261 *quoting Lohrenz*, 350 F.3d at 1286 (quoting *McFarlane I*, 74 F.3d at 1304)). On several occasions, OAN included counterpoints and denials in their reports. For example, as the Complaint acknowledges, on November 12, 2020, the Complaint states OAN anchor Salvi "informed viewers that the New York Times reported that claims of 'software glitches' involving

---

[39] Ex. N.

Dominion machines in Michigan and Georgia are 'baseless.'" [Dkt. 1: ¶ 33]. And on December 5, 2020, in the *News Room* broadcast, reporter Emily Finn stated "Smartmatic denied having any connection with Dominion Voting Systems in the U.S." [Dkt. 1: ¶ 59]. On December 26, 2020, on *Weekly Briefing with Christina Bobb*, host Christina Bobb read the statement Newsmax prepared in response stating, "Newsmax has found no evidence that either Dominion or Smartmatic owns the other, or has a business association with each other. We have no evidence that Dominion uses Smartmatic software or vice versa. No evidence has been offered that Dominion or Smartmatic used software or reprogrammed software that manipulated votes in the 2020 election." [Dkt. 1: ¶ 65].

## IV.    CONCLUSION

This is an important case. We concede that in some quarters OAN is an unpopular speaker. OAN has lost all of its major cable carriers (Verizon, AT&T Uverse and Direct TV). Google has demonetized and periodically censors OAN content from appearing on YouTube, which Google owns. Other conservative media have been targeted as well and Smartmatic and Dominion have selectively filed lawsuits claiming damages against only conservative media which will be potentially ruinous to the Defendants' business if the cases are successful. None more so than OAN, a small, family-owned news outlet which their major distributors and platforms are censoring because of its content. The result of all this might soon mean that there are fewer voices in this country. Just as the Supreme Court stepped in to stop the weaponization of the legal system in some jurisdictions in the South that was designed to silence and not heed the rising voices of the civil rights movement, this Court should enforce the protections that the Court erected in *Sullivan* to save a voice that many in this jurisdiction (and elsewhere) find distasteful and who would say should be silenced.

Chief Justice Roberts' writing for the Court in *Snyder v. Phelps,* 562 U.S. 443, 458-61 (2011) said there what should be said here:

> "'If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.' … Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and – as it did here – inflict great pain.  On the facts before us, we cannot react to that pain by punishing the speaker.  As a Nation we have chosen a different course – to protect even hurtful speech on public issues to ensure that we do not stifle public debate."

We ask that this motion be granted finding that the status of the Plaintiffs is such that the actual malice element applies both to their claim for defamation and for punitive damages and that there is no disputed material fact which could lead a reasonable jury to decide by clear and convincing evidence that Defendant published any of the Complained of Publications with actual malice and for such further relief as to which the Defendant is entitled.

Dated: December 9, 2023.                    By: */s/ Charles L Babcock*

**JACKSON WALKER LLP**
Charles L. Babcock
(admitted *pro hac vice*)
Nancy W. Hamilton
(admitted *pro hac vice*)
John K. Edwards
(admitted *pro hac vice*)
Joel R. Glover
(admitted *pro hac vice*)
Bethany Pickett Shah
(admitted *pro hac vice*)
1401 McKinney Suite 1900
Houston, TX 77010
Tel: (713) 752-4200
Fax: (713) 308-4110
cbabcock@jw.com
nhamilton@jw.com
jedwards@jw.com
jglover@jw.com
bpickett@jw.com

Jonathan D. Neerman
D.C. Bar No. 90003393
Carl C. Butzer
(admitted *pro hac vice*)
Minoo Sobhani Blaesche
(admitted *pro hac vice*)
2323 Ross Avenue, Suite 600
Dallas, TX 75201
Tel: (214) 953-5664
Fax: (214) 661-6899
jneerman@jw.com
cbutzer@jw.com
mblaesche@jw.com

**BOYDEN GRAY & ASSOCIATES**
Trent McCotter
D.C. BAR NO. 1011329
801 17th St NW, #350
Washington, DC 20006
(202) 706-5488
mccotter@boydengrayassociates.com

*Counsel for Herring Networks, Inc.*

40

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of December 2023, the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will electronically mail notification of the filing to all counsel of record who are registered ECF users.

/s/ *R. Trent McCotter*

Trent McCotter