# Exhibit O

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SMARTMATIC USA CORP., ) | |
| SMARTMATIC HOLDING B.V., AND ) | |
| SGO CORPORATION LIMITED, ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. 1:21-cv-02900-CJN |
| v. ) | |
| ) | |
| HERRING NETWORKS, INC., D/B/A ) | |
| ONE AMERICA NEWS NETWORK, ) | |
| ) | |
| Defendant. ) | |

**DECLARATION OF STEPHEN RUSSO IN SUPPORT OF**
**OAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ACTUAL MALICE**

I, Stephen Russo, declare as follows:

1.     My name is Stephen Russo. I am over the age of twenty-one years, am of sound mind and am otherwise fully competent to testify. All of the facts contained in this Declaration are based upon my personal knowledge, unless stated otherwise, and are true and correct; and if called as a witness, I could and would testify as follows.

2.     I am making this declaration in support of OAN's Motion for Partial Summary Judgment on Actual Malice ("Motion").

3.     I am a paralegal at Jackson Walker LLP assisting in the representation of Defendant Herring Networks, Inc. dba One America News Network ("OAN") in the above captioned matter. In that capacity, I am familiar with filings made in the above-captioned matter and document productions made by Plaintiffs Smartmatic USA Corp., Smartmatic Holdings B.V., and SGO Corporation Limited (collectively, "Smartmatic") and by subpoenaed non-parties.

4.     Attached hereto as Exhibit 1 is a true and correct copy of a screen capture of electronically accessible material, specifically a April 22, 2017 post on the X (formerly Twitter) social media platform by Antonio Mugica via his X user handle: @antoniomugica. Exhibit 1

1

**APP2055**

accurately reflects the computer image of the web page from which the screen capture was obtained as of December 3, 2023.

5.      Attached hereto as Exhibit 2 is a true and correct copy of a screen capture of electronically accessible material, specifically an October 21, 2014 post on the X (formerly Twitter) social media platform by Smartmatic via its X user handle: @smartmatic. Exhibit 2 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 3, 2023.

6.      Attached hereto as Exhibit 3 is a true and correct copy of a March 2, 2020 internal email chain amongst Smartmatic employees, with an attached excerpt of an Excel spreadsheet, which was produced by Smartmatic in this matter at SMMT-OAN00012603–04, SMMT-OAN00012611.

7.      Attached hereto as Exhibit 4 is a true and correct copy of an October 26, 2016 internal email chain amongst Smartmatic employees, which was produced by Smartmatic in this matter at SMMT-OAN00137366–67.

8.      Attached hereto as Exhibit 5 is a true and correct copy of an excerpt from the April 7, 2016 deposition transcript of Antonio Mugica, taken in the matter of *In re SVS Holdings, Inc.* in the United States District Court for the District of Colorado, which was produced by Smartmatic in this matter at SMMT-OAN07880046–110.

9.      Attached hereto as Exhibit 6 is a true and correct copy of an excerpt from the certified transcript of the April 7, 2006 meeting of the City Council of Chicago Joint Committee on Finance, Committee on Budget and Government Operations, and Committee on Committees, Rules and Ethics, which was produced by the Board of Election Commissioners for the City of Chicago in this matter at CBEC-SMARTMATIC-004951–5155.

2

10.     Attached hereto as Exhibit 7 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from Smartmatic's website as it existed on August 15, 2004, available on The Wayback Machine as an archived web page. Exhibit 7 accurately reflects the computer image of the archived web page from which the screen capture was obtained as of December 5, 2023.

11.     Attached hereto as Exhibit 8 is a true and correct copy of a January 24, 2000 transmittal letter concerning Bizta Corporation, which was obtained from and is publicly available as a public record from the Florida Secretary of State's website.

12.     Attached hereto as Exhibit 9 is a true and correct copy of a September 11, 2000 transmittal letter concerning Smartmatic Corporation, which was obtained from and is publicly available as a public record from the Florida Secretary of State's website.

13.     Attached hereto as Exhibit 10 is a true and correct copy of an excerpt from the June 10, 2016 deposition transcript of Bob Cook, taken in the matter of *In re SVS Holdings, Inc.* in the United States District Court for the District of Colorado, which was produced by Smartmatic in this matter at SMMT-OAN07880440–512.

14.     Attached hereto as Exhibit 11 is a true and correct copy of an excerpt from the October 2, 2023 deposition of Jack Blaine.

15.     Attached hereto as Exhibit 12 is a true and correct copy of an excerpt from the 2005 Agreement relating to the Acquisition of Sequoia Voting Systems, Inc. by Smartmatic International Corporation Delaware, which was produced by Smartmatic in this matter at SMMT-OAN08063656–955.

16.     Attached hereto as Exhibit 13 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from Smartmatic's website containing

3

**APP2057**

a statement dated March 29, 2006. Exhibit 13 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 3, 2023.

17.    Attached hereto as Exhibit 14 is a true and correct copy of sworn affidavits dated January 7, 2010 and January 15, 2015, respectively, by affiant Christopher Butler of Internet Archive. The affidavits were obtained from and are publicly available through the public docket for the case *Pohl v. MH Sub I LLC*, Case No.: 4:17-cv-00181-MW-MAF (N.D. Fla.), Dkt. 99-3 (filed September 6, 2019).

18.    Attached hereto as Exhibit 15 is a true and correct copy of an excerpt from the December 31, 2008 and 2007 Consolidated Financial Statements for Smartmatic International Group N.V. and Subsidiaries, which was produced by Smartmatic in this matter at SMMT-OAN00053512–39.

19.    Attached hereto as Exhibit 16 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page containing a December 22, 2006 Press Release from Rep. Maloney's website as it existed on October 4, 2014, available on The Wayback Machine as an archived web page. Exhibit 16 accurately reflects the computer image of the archived web page from which the screen capture was obtained as of December 6, 2023.

20.    Attached hereto as Exhibit 17 is a true and correct copy of a March 31, 2011 internal email chain amongst Smartmatic employees, with an attached document, which was produced by Smartmatic in this matter at SMMT-OAN01502087–97.

21.    Attached hereto as Exhibit 18 is a true and correct copy of a July 18, 2019 invoice to Smartmatic from Stripe Reputation, which was produced by Smartmatic in this matter at SMMT-OAN03087486.

22.     Attached hereto as Exhibit 19 is a true and correct copy of a Certified Transcription of August 7, 2017 Smartmatic Press Conference.

23.     Attached hereto as Exhibit 20 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from Smartmatic's website containing a statement dated August 2, 2017. Exhibit 20 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 3, 2023.

24.     Attached hereto as Exhibit 21 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the Washington Examiner website containing an article dated November 9, 2020 and titled "Officials raised concerns for years about security of US voting machines, software systems." Exhibit 21 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 2, 2023.

25.     Attached hereto as Exhibit 22 is a true and correct copy of an excerpt from the certified deposition transcript of Roger A. Piñate, taken October 23, 2023 in the matter of *Smartmatic USA Corp., et al. v. Newsmax Media, Inc.*, Case No. N21C-11-028 EMD, currently pending in the Superior Court of the State of Delaware.

26.     Attached hereto as Exhibit 23 is a true and correct copy of an August 16, 2016 email chain involving Smartmatic employees, which was produced by Smartmatic in this matter at SMMT-OAN02569392.

27.     Attached hereto as Exhibit 24 is a true and correct copy of an August 24, 2016 email chain involving Smartmatic employees, with attached documents, which was produced by Smartmatic in this matter at SMMT-OAN02569395–97.

28.     Attached hereto as Exhibit 25 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the CNN Philippines website

5

containing an article dated November 29 and titled "Smartmatic disqualified from Comelec procurements." Exhibit 25 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 3, 2023.

29.     Attached hereto as Exhibit 26 is a true and correct copy of Exhibit 46 to Smartmatic's Complaint in the above-captioned matter, which purports to be a "Legal Notice and Retraction Demand from Smartmatic USA Corp." dated December 11, 2020.

30.     Attached hereto as Exhibit 27 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the Associated Press website containing an article dated April 18, 2023 and titled "Fox, Dominion reach $787M settlement over election claims." Exhibit 27 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

31.     Attached hereto as Exhibit 28 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page labeled "Lawsuit Updates & Fact Checks" from Smartmatic's website. Exhibit 28 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 4, 2023.

32.     Attached hereto as Exhibit 29 is a true and correct copy of an excerpt of Exhibit 153 to Smartmatic's Complaint in the above-captioned matter, which purports to be an Order by the Supreme Court of the State of New York, Appellate Division, First Judicial Department, in the *Matter of Giuliani*, dated June 24, 2021.

33.     Attached hereto as Exhibit 30 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the Federal News Network website containing an article dated November 10, 2020 and titled "Meet the agency transition teams for

President-Elect Biden." Exhibit 30 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

34.  Attached hereto as Exhibit 31 is a true and correct copy of an excerpt of a screen capture of electronically accessible material, specifically a web page from the Biden-Harris Transition website. Exhibit 31 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 3, 2023.

35.  Attached hereto as Exhibit 32 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from Smartmatic's website containing Smartmatic USA Board Chairman Peter Neffenger's bio. Exhibit 32 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 3, 2023.

36.  Attached hereto as Exhibit 33 is a true and correct copy of a November 14, 2020 email chain including Smartmatic employees, which was produced by Smartmatic in this matter at SMMT-OAN07387916–17.

37.  Attached hereto as Exhibit 34 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the YouTube Official Blog website containing an entry dated December 9, 2020 and titled "Supporting the 2020 U.S. election." Exhibit 34 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

38.  Attached hereto as Exhibit 35 is a true and correct copy of a December 9, 2020 email chain including Smartmatic employees, which was produced by Smartmatic in this matter at SMMT-OAN00165785–86.

7

39.     Attached hereto as Exhibit 36 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the YouTube Official Blog website containing an entry dated June 2, 2023 and titled "An update on our approach to US election misinformation." Exhibit 36 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 3, 2023.

40.     Attached hereto as Exhibit 37 is a true and correct copy of a document titled "Three prongs to restoring trust in elections" and authored by Antonio Mugica, which was produced by Smartmatic in this matter at SMMT-OAN01261586–87.

41.     Attached hereto as Exhibit 38 is a true and correct copy of an Excel spreadsheet, which was produced by Smartmatic in this matter at SMMT-OAN02476880.

42.     Attached hereto as Exhibit 39 is a true and correct copy of a July 31, 2015 email chain including Smartmatic employees, which was produced by Smartmatic in this matter at SMMT-OAN02484507.

43.     Attached hereto as Exhibit 40 is a true and correct copy of a July 31, 2015 email chain including Smartmatic employees and George Soros, which was produced by Smartmatic in this matter at SMMT-OAN03929777–78.

44.     Attached hereto as Exhibit 41 is a true and correct copy of a November 17, 2015 email chain including Smartmatic representative Mark Malloch-Brown and George Soros, with an attached document, which was produced by Smartmatic in this matter at SMMT-OAN03931491–92.

45.     Attached hereto as Exhibit 42 is a true and correct copy of a November 8, 2019 email chain including Smartmatic employees, with an attached document, which was produced by Smartmatic in this matter at SMMT-OAN04402796–808.

**APP2062**

46.     Attached hereto as Exhibit 43 is a true and correct copy of an April 29, 2020 email chain including Smartmatic representative Mark Malloch-Brown, with attached documents, which was produced by Smartmatic in this matter at SMMT-OAN04410366–77.

47.     Attached hereto as Exhibit 44 is a true and correct copy of a July 14, 2014 email chain including Smartmatic employees, which was produced by Smartmatic in this matter at SMMT-OAN01604829–30.

48.     Attached hereto as Exhibit 45 is a true and correct copy of an August 17, 2015 email chain including Smartmatic employees, which was produced by Smartmatic in this matter at SMMT-OAN02067740–41.

49.     Attached hereto as Exhibit 46 is a true and correct copy of a screen capture of electronically accessible material, specifically a .pdf document—a study titled "In Search of the Black Swan: Analysis of the Statistical Evidence of Electoral Fraud in Venezuela" authored by Ricardo Hausmann and dated September 3, 2004—embedded within and available from a web page located on Harvard's John F. Kennedy School of Government website as it existed on September 15, 2004, which web page is accessible on The Wayback Machine as an archived web page. Exhibit 46 accurately reflects the computer image of the archived web page from which the embedded .pdf was accessed and from which the screen capture was obtained as of December 6, 2023, as well as the computer image of the .pdf itself.

50.     Attached hereto as Exhibit 47 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the Wall Street Journal website containing an article dated September 7, 2004 and titled "Academics' Study Backs Fraud Claim in Chavez Election." Exhibit 47 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

9

**APP2063**

51.     Attached hereto as Exhibit 48 is a true and correct copy of a screen capture of electronically accessible material, specifically a .pdf document—a letter from Rep. Maloney to Department of the Treasury Secretary John W. Snow dated May 4, 2006—embedded within and available from a web page including a May 5, 2006 Press Release located on Rep. Maloney's website as it existed on December 27, 2006, which web page is accessible on The Wayback Machine as an archived web page. Exhibit 48 accurately reflects the computer image of the archived web page from which the embedded .pdf was accessed and from which the screen capture was obtained as of December 6, 2023, as well as the computer image of the .pdf itself.

52.     Attached hereto as Exhibit 49 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the Associated Press website containing an article dated November 11, 2020 and titled "Pompeo brushes aside results of presidential election." Exhibit 49 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

53.     Attached hereto as Exhibit 50 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the NBC News website containing an article dated November 7, 2020 and titled "Trump says election 'far from over' as he vows to fight results." Exhibit 50 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

54.     Attached hereto as Exhibit 51 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the NPR website containing an article dated November 7, 2020 and titled "'Far From Over': Trump Refuses To Concede As Biden's Margin Of Victory Widens." Exhibit 51 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

55.     Attached hereto as Exhibit 52 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the Al Jazeera website containing an article dated November 10, 2020 and titled "Donald Trump's US election lawsuits: Where do things stand?". Exhibit 52 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

56.     Attached hereto as Exhibit 53 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the Washington Post website containing an article dated November 9, 2020 and titled "The Trump legal team's latest voter fraud Hail Mary." Exhibit 53 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

57.     Attached hereto as Exhibit 54 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the USA Today website containing an article dated November 12, 2020 and titled "Trump campaign's challenge of election results in Pennsylvania, Michigan and Arizona push US toward 'loss of democracy'." Exhibit 54 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

58.     Attached hereto as Exhibit 55 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the NBC News website containing an article dated November 17, 2020 and titled "Rudy Giuliani joins Trump campaign's sputtering legal effort in Pennsylvania." Exhibit 55 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

59.     Attached hereto as Exhibit 56 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the CNN website containing an

article dated November 5, 2020 and titled "Trump stages corrosive attempt to undermine votes as his path to 270 evaporates." Exhibit 56 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

60.     Attached hereto as Exhibit 57 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the NBC News website containing an article dated November 19, 2020 and titled "Rudy Giuliani alleges 'centralized' voter fraud at free-wheeling news conference." Exhibit 57 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

61.     Attached hereto as Exhibit 58 is a true and correct copy of an November 14, 2020 email chain including Smartmatic representatives Brian Courtney, Antonio Mugica, Pedro Mugica, Peter Neffenger, Ernesto Parisca, Roger Piñate, and Samira Saba and Richard Ades, with an attached document, which was produced by Smartmatic in this matter at SMMT-OAN00164124–26.

62.     Attached hereto as Exhibit 59 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the Washington Post website containing an article published on August 1, 2023 and updated on October 24, 2023 and titled "Tracking the Trump investigations and where they stand." Exhibit 59 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

63.     Attached hereto as Exhibit 60 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the CNN website containing an article dated November 28, 2023 and titled "Trump demands thousands of classified documents in

his court fight to prove the 2020 election was stolen." Exhibit 60 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

64.     Attached hereto as Exhibit 61 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the New York Times website containing an article dated November 28, 2023 and titled "Trump Seeks to Use Trial to Challenge Findings That 2020 Election Was Fair." Exhibit 61 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

65.     Attached hereto as Exhibit 62 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the Washington Post website containing an article dated October 7, 2023 and titled "Amazon's Alexa has been claiming the 2020 election was stolen." Exhibit 62 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

66.     Attached hereto as Exhibit 63 is a true and correct copy of the Declaration of Jack Blaine dated March 20, 2014 and excerpts of certain exhibits attached thereto. The Declaration and accompanying exhibits were obtained from and are publicly available through the public docket for the case *In re SVS Holdings, Inc., and Sequoia Voting Systems, Inc.*, Case No.: 14-11360 TBM (Bankr. D. Co.), Dkt. 87-2 (filed April 1, 2016).

67.     Attached hereto as Exhibit 64 is a true and correct copy of the Criminal Complaint by Telephone or Other Reliable Electronic Means, which was obtained from and was publicly available through the public docket for the case *United States of America v. Juan Andres Donato Bautista*, Case No.: 1:23-mj-03829 LOUIS (S.D. Fla.), Dkt. 1 (filed Sept. 19, 2023, entered on docket Sept. 20, 2023).

68.     Attached hereto as Exhibit 65 is a true and correct copy of a March 4, 2020 email chain including Smartmatic employees, which was produced by Smartmatic in this matter at SMMT-OAN00161207–11.

69.     Attached hereto as Exhibit 66 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the CBS News Los Angeles website containing an article dated February 4, 2020 and titled "Goldstein Investigation: Officials Warn of 'Vulnerabilities' With E-Voting Machines Ahead Of March 3 Primary." Exhibit 66 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 8, 2023.

70.     Attached hereto as Exhibit 67 is a true and correct copy of the certified transcript of the February 4, 2020 CBS Los Angeles Goldstein Investigation: Officials Warn of Vulnerabilities With E-Voting Machines Ahead Of March 3 Primary.

71.     Attached hereto as Exhibit 68 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the Politico website containing an article dated March 3, 2020 and titled "Los Angeles County's risky voting experiment." Exhibit 68 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 8, 2023.

72.     Attached hereto as Exhibit 69 is a true and correct copy of the December 24, 2019 Freeman, Craft, McGregor Group California Secretary of State Consultant's Public Report on: Security and Telecommunications Testing of the LA County VSAP 2.0 Voting System, Prepared for the California Secretary of State, publicly available through CA.gov at https://votingsystems.cdn.sos.ca.gov/vendors/LAC/vsap2-sec-tel.pdf.

73.     Attached hereto as Exhibit 70 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the Smartmatic website containing the bio of Antonio Mugica. Exhibit 70 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 7, 2023.

74.     Attached hereto as Exhibit 71 is a true and correct copy of an internal Smartmatic document, which was produced by Smartmatic in this matter at SMMT-OAN01996184–85.

75.     Attached hereto as Exhibit 72 is a true and correct copy of an excerpt of the 2022 Smartmatic Communications Toolkit, which was produced by Smartmatic in this matter at SMMT-OAN00127507–27.

76.     Attached hereto as Exhibit 73 is a true and correct copy of the certified transcription of a August 2, 2017 CNN Mexico News Report, available at https://www.cnn.com/videos/spanish/2017/08/02/cnnee-brk-tibisay-lucena-sobre-fraude-eleccion-venezuela-constituyente.cnn translated from Spanish to English by a certified translator.

77.     Attached hereto as Exhibit 74 is a true and correct copy of an excerpt from a September 13, 2019 email chain including Smartmatic employees, with an attached letter, which was produced by Smartmatic in this matter at SMMT-OAN08071877–906.

78.     Attached hereto as Exhibit 75 is a true and correct copy of a Response to Motion for Stay (Dkt. 1774487) filed in Rusoro Mining Limited, as Petitioner-Appellee, against Bolivarian Republic of Venezuela, as Respondent-Appellant, in the United States Court of Appeals for the District of Columbia Circuit, Case No. 18-7044, also filed in this matter at Dkt. 79-3.

79.     Attached hereto as Exhibit 76 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the New York Times website

containing an article dated February 4, 2019 and titled "Who is Venezuela's Legitimate President? A Messy Dispute, Explained," also filed in this matter at Dkt. 79-4.

80.    Attached hereto as Exhibit 77 is a true and correct copy of a screen capture of electronically accessible material, specifically a press release from OAS dated January 10, 2019 and titled "OAS Permanent Council Agrees 'to not recognize the legitimacy of Nicolas Maduro's new team'," also filed in this matter at Dkt. 79-2.

81.    Attached hereto as Exhibit 78 is a true and correct copy of a Smartmatic presentation, which was produced by Smartmatic in this matter at SMMT-OAN10500460–63.

82.    Attached hereto as Exhibit 79 is a true and correct copy of a September 21, 2011 email chain including Smartmatic employees, which was produced by Smartmatic in this matter in Spanish at SMMT-OAN04281890–93. Appended to Exhibit 79 is a certified translation of the document.

83.    Attached hereto as Exhibit 80 is a true and correct copy of a Smartmatic internal document, which was produced by Smartmatic in this matter at SMMT-OAN00149243–44.

84.    Attached hereto as Exhibit 81 is a true and correct copy of a May 31, 2016 email chain including Smartmatic employees, which was produced by Smartmatic in this matter at SMMT-OAN00066004–06.

85.    Attached hereto as Exhibit 82 is a true and correct copy of a November 30, 2019 email chain including Smartmatic employees, with an attached Smartmatic 2020 PR Strategy, which was produced by Smartmatic in this matter at SMMT-OAN00124101–17.

86.    Attached hereto as Exhibit 83 is a true and correct copy of the certified transcription of a November 19, 2020 Press Conference of Giuliani, Powell and Ellis.

87.    Attached hereto as Exhibit 84 is a true and correct copy of a November 12, 2020 Fox Business airing of an interview of Rudy Giuliani on *Lou Dobbs Tonight*, available at https://www.foxbusiness.com/video/6209487966001.

88.    Attached hereto as Exhibit 85 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the Fox 5 DC website containing an article published November 19, 2020 and updated November 20, 2020, titled "President Trump's attorney Rudy Giuliani presses election challenge case in fiery news conference." Exhibit 85 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 6, 2023.

89.    Attached hereto as Exhibit 86 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the NBC News website containing an article dated November 9, 2020 titled "Justice Department's election crimes chief resigns after Barr allows prosecutors to investigate voter fraud claims." Exhibit 86 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 5, 2023.

90.    Attached hereto as Exhibit 87 is a true and correct copy of a November 20, 2020 letter, which was produced by Smartmatic in this matter at SMMT-OAN07034300–02.

91.    Attached hereto as Exhibit 88 is a true and correct copy of an excerpt from an internal Smartmatic presentation, which was produced by Smartmatic in this matter at SMMT-OAN07015537–52.

92.    Attached hereto as Exhibit 89 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the White House website containing an article dated November 15, 2023 and titled "President Biden Announces Key

Appointments to Boards and Commissions." Exhibit 89 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 6, 2023.

93.     Attached hereto as Exhibit 90 is a true and correct copy of an October 12, 2020 email chain, which was produced by Smartmatic in this matter at SMMT-OAN04082002–03.

94.     Attached hereto as Exhibit 91 is a true and correct copy of a July 25, 2018 email chain including Smartmatic employees, which was produced by Smartmatic in this matter at SMMT-OAN09825988–91.

95.     Attached hereto as Exhibit 92 is a true and correct copy of an April 5, 2018 email chain including Smartmatic employees, which was produced by Smartmatic in this matter at SMMT-OAN01075776–77.

96.     Attached hereto as Exhibit 93 is a true and correct copy of electronically accessible material, specifically a letter available from Senator Warren's website at https://www.warren.senate.gov/imo/media/doc/H.I.G.%20McCarthy,%20&%20Staple%20Street%20letters.pdf dated December 6, 2019 and addressed to Stephen D. Owens and Hootan Yaghoobzadeh of Staple Street Capital Group, LLC. Exhibit 93 accurately reflects the .pdf document obtained as of December 6, 2023.

97.     Attached hereto as Exhibit 94 is a true and correct copy of a screen capture of electronically accessible material, specifically a December 2, 2019 post on the X (formerly Twitter) social media platform by Vice President Kamala Harris via her X user handle: @VP. Exhibit 94 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 8, 2023.

98.     Attached hereto as Exhibit 95 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the Smartmatic website containing

18

the bio of Roger Piñate. Exhibit 95 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 7, 2023.

99. Attached hereto as Exhibit 96 is a true and correct copy of the file-stamped Report and Recommendation of Ad Hoc Hearing Committee in the matter of: Rudolph W. Giuliani, before the District of Columbia Court of Appeals Board on Professional Responsibility Ad Hoc Hearing Committee, filed July 7, 2023.

100. Attached hereto as Exhibit 97 is a true and correct copy of an excerpt from the April 18, 2007 Congressional Hearing before the Subcommittee on Information Policy, Census, and National Archives of the Committee on Oversight and Government Reform House of Representatives 110th Congress First Session (Serial No. 110-5), publicly available through https://www.govinfo.gov/app/collection/chrg/110/house/Committee%20on%20Oversight%20and%20Government%20Reform at https://www.govinfo.gov/content/pkg/CHRG-110hhrg35768/pdf/CHRG-110hhrg35768.pdf (last accessed December 8, 2023).

101. Attached hereto as Exhibit 98 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the New York Times website containing an article dated July 20, 2004 and titled "A Crucial Vote for Venezuela and a Company." Exhibit 98 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 8, 2023.

102. Attached hereto as Exhibit 99 is a true and correct copy of a Smartmatic internal document, which was produced by Smartmatic in this matter at SMMT-OAN07690483–86.

103. Attached hereto as Exhibit 100 is a true and correct copy of a December 1, 2006 email chain, which was produced by Smartmatic in this matter at SMMT-OAN08118715–16.

19

104.    Attached hereto as Exhibit 101 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page titled Leadership from the Open Society Foundation website. Exhibit 101 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 8, 2023.

105.    Attached hereto as Exhibit 102 is a true and correct copy of a July 18, 2015 email chain including Smartmatic employees, which was produced by Smartmatic in this matter at SMMT-OAN03929683.

106.    Attached hereto as Exhibit 103 is a true and correct copy of a February 23, 2016 email chain including Smartmatic employees, which was produced by Smartmatic in this matter at SMMT-OAN03830996.

107.    Attached hereto as Exhibit 104 is a true and correct copy of a September 29, 2017 email chain including Smartmatic employees, which was produced by Smartmatic in this matter at SMMT-OAN01150916–18.

108.    Attached hereto as Exhibit 105 is a true and correct copy of a March 1, 2019 email chain, with an attached letter, which was produced by Smartmatic in this matter at SMMT-OAN08132958–64.

109.    Attached hereto as Exhibit 106 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the Smartmatic website containing the bio of Samira Saba. Exhibit 106 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 8, 2023.

110.    Attached hereto as Exhibit 107 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from lavote.gov containing an article dated July 2, 2018 and titled "Registrar-Recorder/County Clerk signs contract with Smartmatic

USA." Exhibit 107 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 8, 2023.

111.   Attached hereto as Exhibit 108 is a true and correct copy of an excerpt from the June 12, 2018 Los Angeles County Registrar-Recorder/County Clerk Board of Supervisors correspondence, publicly available through lavote.gov at https://www.lavote.gov/docs/rrcc/board-correspondence/06122018.pdf (last accessed December 7, 2023).

112.   Attached hereto as Exhibit 109 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from LA Times containing an article dated May 12, 2022 and titled "L.A. County has more people than 40 states, but its political power doesn't reflect that." Exhibit 109 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 8, 2023.

113.   Attached hereto as Exhibit 110 is a true and correct copy of a October 8, 2018 email chain including Smartmatic employees, which was produced by Smartmatic in this matter at SMMT-OAN08827454.

114.   Attached hereto as Exhibit 111 is a true and correct copy of a web page from the Huffington Post website containing an article dated June 21, 2010 and titled "EXCLUSIVE: On Heels of Diebold/Premier Purchase, Canadian eVoting Firm Dominion Also Acquires Sequoia, Lies About Chavez Ties in Announcement," which was produced by Smartmatic in this matter at SMMT-OAN04275575–78.

115.   Attached hereto as Exhibit 112 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the New York Times website containing an article dated September 27, 2017 and titled "For Paper Trails in Voting." Exhibit

112 accurately reflects the computer image of the web page from which the screen capture was obtained as of August 4, 2023.

116. Attached hereto as Exhibit 113 is a true and correct copy of an excerpt from the January 11, 2008 letter from Alderman Edward M. Burke to Langdon D. Neal, which was produced by the Board of Election Commissioners for the City of Chicago in this matter at CBEC-SMARTMATIC-002608–11.

117. Attached hereto as Exhibit 114 is a true and correct copy of Deposition Exhibit 20 from the October 2, 2023 deposition of Jack Blaine.

118. Attached hereto as Exhibit 115 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the New York Times website containing an article published November 18, 2020 and updated December 1, 2020, and titled "Giuliani peddles election conspiracy theories and falsehoods." Exhibit 115 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

119. Attached hereto as Exhibit 116 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the New York Times website containing an article published November 3, 2020 and titled "Watch Out for This Misinformation on Election Day." Exhibit 116 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

120. Attached hereto as Exhibit 117 is a true and correct copy of a University of Pennsylvania, Penn Wharton publication titled "The Business of Voting: Market Structure and Innovation in the Election Technology Industry," publicly available from verifiedvoting.org at

https://verifiedvoting.org/wp-content/uploads/2021/05/the-business-of-voting-single-page.pdf

(last accessed December 9, 2023).

121.    Attached hereto as Exhibit 118 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the Wired website containing an article dated October 30, 2006 and titled "NYT: Venezuela E-Vote Connection." Exhibit 118 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

122.    Attached hereto as Exhibit 119 is a true and correct copy of a video published to and available on Smartmatic's website at https://www.smartmatic.com/us/case-studies/los-angeles-county-building-deploying-vsap-a-model-for-21st-century-elections/ (last accessed December 9, 2023).

123.    Attached hereto as Exhibit 120 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the Miami Herald website containing an article dated August 2, 2017 and titled "Venezuela election results were manipulated, voting company says." Exhibit 120 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

124.    Attached hereto as Exhibit 121 is a true and correct copy of a screen capture of electronically accessible material, specifically the biography of Rudy Giuliani available from the Brittanica website. Exhibit 121 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

125.    Attached hereto as Exhibit 122 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from licensedtolie.com. Exhibit 122

accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

126.    Attached hereto as Exhibit 123 is a true and correct copy of a screen capture of electronically accessible material, specifically Sidney Powell's LinkedIn profile. Exhibit 123 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

127.    Attached hereto as Exhibit 124 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the DePerno Law Office, PLLC website as it existed on January 22, 2019, available on The Wayback Machine as an archived web page. Exhibit 124 accurately reflects the computer image of the archived web page from which the screen capture was obtained as of December 9, 2023.

128.    Attached hereto as Exhibit 125 is a true and correct copy of a screen capture of electronically accessible material, specifically Matthew DePerno's LinkedIn profile. Exhibit 125 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

129.    Attached hereto as Exhibit 126 is a true and correct copy of a screen capture of electronically accessible material, specifically Patrick Colbeck's LinkedIn profile. Exhibit 126 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

130.    Attached hereto as Exhibit 127 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from shiva4president.com. Exhibit 127 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

131.    Attached hereto as Exhibit 128 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from https://www.amazon.com/stores/Mary%20Fanning/author/B0989HB4T5. Exhibit 128 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

132.    Attached hereto as Exhibit 129 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from tkassociatesllc.com. Exhibit 129 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

133.    Attached hereto as Exhibit 130 is a true and correct copy of a screen capture of electronically accessible material, specifically Terry Turchie's LinkedIn profile. Exhibit 130 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

134.    Attached hereto as Exhibit 131 is a true and correct copy of a screen capture of electronically accessible material, specifically the biography of Steve Bannon available from the Brittanica website. Exhibit 131 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

135.    Attached hereto as Exhibit 132 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from digenovatoensing.com. Exhibit 132 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

136.    Attached hereto as Exhibit 133 is a true and correct copy of a screen capture of electronically accessible material, specifically Thomas Fitton's bio page available at

https://www.congress.gov/116/meeting/house/110768/witnesses/HHRG-116-JU00-Bio-FittonT-20200603.pdf. Exhibit 133 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

137.    Attached hereto as Exhibit 134 is a true and correct copy of a screen capture of electronically accessible material, specifically Phil Waldron's LinkedIn profile. Exhibit 134 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

138.    Attached hereto as Exhibit 135 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from january6th-benniethompson.house.gov. Exhibit 135 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

139.    Attached hereto as Exhibit 136 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from https://january6th-benniethompson.house.gov/news/press-releases/select-committee-subpoenas-james-p-phil-waldron containing a press release dated December 16, 2021 and titled "Select Committee Subpoenas James P. 'Phil' Waldron." Exhibit 136 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

140.    Attached hereto as Exhibit 137 is a true and correct copy of a screen capture of electronically accessible material, specifically Russell Ramsland's LinkedIn profile. Exhibit 137 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

141.    Attached hereto as Exhibit 138 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from irvingrepublicanwomen.com.

Exhibit 138 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

142.   Attached hereto as Exhibit 139 is a true and correct copy of a screen capture of electronically accessible material, specifically Thomas G. McInerney's bio page available at https://docs.house.gov/meetings/GO/GO06/20151105/104180/HHRG-114-GO06-Bio-McInerneyT-20151105.pdf. Exhibit 139 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

143.   Attached hereto as Exhibit 140 is a true and correct copy of a screen capture of electronically accessible material, specifically Clay Clark's biography from Thrive15. Exhibit 140 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

144.   Attached hereto as Exhibit 141 is a true and correct copy of a screen capture of electronically accessible material, specifically Michael Johns's LinkedIn profile. Exhibit 141 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

145.   Attached hereto as Exhibit 142 is a true and correct copy of a screen capture of electronically accessible material, specifically Keith Trippie's biography from Trippie Group LLC. Exhibit 142 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

146.   Attached hereto as Exhibit 143 is a true and correct copy of a screen capture of electronically accessible material, specifically Allan Santos's LinkedIn profile. Exhibit 143 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

147.   Attached hereto as Exhibit 144 is a true and correct copy of a screen capture of electronically accessible material, specifically Kyle Becker's LinkedIn profile. Exhibit 144 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

148.   Attached hereto as Exhibit 145 is a true and correct copy of a screen capture of electronically accessible material, specifically a Facebook post from the New York Young Republican Club of Evi Kokalari's biography. Exhibit 145 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

149.   Attached hereto as Exhibit 146 is a true and correct copy of a screen capture of electronically accessible material, specifically Michael Waller's biography from the Italian Institute for Strategic Studies. Exhibit 146 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

150.   Attached hereto as Exhibit 147 is a true and correct copy of a screen capture of electronically accessible material, specifically Michael Waller's LinkedIn profile. Exhibit 147 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

151.   Attached hereto as Exhibit 148 is a true and correct copy of a screen capture of electronically accessible material, specifically a web page from the Washington Post website containing an article dated May 27, 2020 and titled "Is the MyPillow guy the future of the Republican Party, or is he just dreaming?" Exhibit 148 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

152.   Attached hereto as Exhibit 149 is a true and correct copy of a screen capture of electronically accessible material, specifically Congressman Cory biography available at

28

**APP2082**

https://mills.house.gov/about. Exhibit 149 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

153. Attached hereto as Exhibit 150 is a true and correct copy of a screen capture of electronically accessible material, specifically Chris Farrell's biography available at Judicial Watch. Exhibit 150 accurately reflects the computer image of the web page from which the screen capture was obtained as of December 9, 2023.

154. A search on December 9, 2023 of Lexis English-Language News database for English language news revealed more than 10,000 articles since 2000 that mention the name "Smartmatic," and more than 880 articles that include the name "Antonio Mugica." A search that confined the scope to U.S. publications revealed over 9,800 articles since 2001 that contain the term "Smartmatic," and over 980 pages of results. Similarly, a search that confined the scope to U.S. publications for the name "Antonio Mugica" releveled over 740 articles since 2001 and 75 pages of results.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 9, 2023.

Stephen Russo

# Exhibit O-1

12/3/23, 2:47 PM                    (1) Antonio Mugica on X: "President #Obama #voting on a @smartmatic #votingmachine https://t.co/rB6rldOijA" / X







# Exhibit O-2

12/3/23, 2:46 PM        (1) Smartmatic on X: "#Obama cast his early vote, with a voting machine designed and manufactured by #Smartmatic. http://t.co/k…



**APP2087**

# Exhibit O-3



Confidential



Confidential



SMMT-OAN00012611

**APP2091**



SMMT-OAN00012611

**APP2092**



SMMT-OAN00012611
**APP2093**



SMMT-OAN00012611

**APP2094**



SMMT-OAN00012611

**APP2095**



**APP2096**



SMMT-OAN00012611

**APP2097**



SMMT-OAN00012611
**APP2098**



SMMT-OAN00012611
**APP2099**





SMMT-OAN00012611

**APP2101**





SMMT-OAN00012611

**APP2103**



SMMT-OAN00012611

**APP2104**



SMMT-OAN00012611

**APP2105**



SMMT-OAN00012611

**APP2106**



SMMT-OAN00012611
**APP2107**



SMMT-OAN00012611

**APP2108**



SMMT-OAN00012611
**APP2109**

SMMT-OAN00012611

**APP2110**

# Exhibit O-4



Confidential

SMMT-OAN00137366
SMMT-OAN00137366

**APP2112**



Confidential

SMMT-OAN00137367
SMMT-OAN00137366

**APP2113**

# Exhibit O-5



Confidential

SMMT-OAN07880046
SMMT-OAN07880046



Confidential



Confidential



Confidential

SMMT-OAN07880051
SMMT-OAN07880046



Confidential

SMMT-OAN07880097
SMMT-OAN07880046

# Exhibit O-6

1

```
              CITY COUNCIL OF CHICAGO


     JOINT COMMITTEE ON FINANCE, COMMITTEE ON BUDGET
      AND GOVERNMENT OPERATIONS AND COMMITTEE ON
              COMMITTEES, RULES AND ETHICS



     ALDERMAN EDWARD BURKE, CHAIRMAN
     ALDERMAN WILLIAM BEAVERS, CHAIRMAN
     ALDERMAN RICHARD MELL, CHAIRMAN


     ALDERMAN MADELINE HAITHCOCK
     ALDERMAN JOHN POPE
     ALDERMAN JAMES BALCER
     ALDERMAN L. THOMAS
     ALDERMAN TOM MURPHY
     ALDERMAN WALTER BURNETT
     ALDERMAN ED SMITH
     ALDERMAN RAY SUAREZ
     ALDERMAN EMMA MITTS
     ALDERMAN VI DALEY
     ALDERMAN PATRICK LEVAR
     ALDERMAN HELEN SHILLER
     ALDERMAN BERNARD STONE
```

```
                         April 7, 2006
                         10:00 o'clock a.m.

                         City Hall
                         Council Chambers
                         Chicago, Illinois
```

McGUIRE'S II
Certified Shorthand Reporters
(312) 346-0911

CBEC-SMARTMATIC-004951
CBEC-SMARTMATIC-004087

**APP2121**

2

1          CHAIRMAN BURKE:  Good morning, ladies and

2    gentlemen.  The meeting will come to order.

3              Chairman Beavers, Chairman Mell, members

4    of the Joint Committee, thank you for your

5    attendance this morning.

6              Almost three weeks ago on March 21st the

7    voters of the City of Chicago and Cook County were

8    permitted to vote in the primary election.

9              One of the candidates in his concession

10   remarks stated that the voters of Cook County were

11   treated as guinea pigs serving as the first

12   controlled group in the roll-out of untested voting

13   machinery and technology.  What resulted was

14   certainly an embarrassment.

15             As of today, three weeks, almost three

16   weeks later, the voters still do not have the

17   official results of the election.

18             The public was required to wait days and

19   weeks for unofficial results to be disclosed.

20   Candidates, participants in the election, public

21   officials and voters were frustrated, disappointed

22   and confused as a result of the use of this untested

23   election process.

24             The fact that these malfunctions would

McGUIRE'S II
Certified Shorthand Reporters
(312) 346-0911

CBEC-SMARTMATIC-004952
CBEC-SMARTMATIC-004087

**APP2122**

3

1   have occurred may have been anticipated.  The

2   history of the company that was hired to run this

3   election is no stranger to scandal, not the least of

4   which involves its ties to Venezuela and the claims

5   of its partnership with political corruption in that

6   country.

7          There's a 26 page list of security

8   breaches and system breakdowns attributable to

9   Sequoia Voting Systems.

10          I think it's clear from the statements of

11   members of the City Council that they share in a

12   desire to protect the Democratic process and

13   safeguard the voting rights of our constituents.

14   These kinds of mistakes cannot be permitted to go

15   uncorrected.

16          This morning we have witnesses to

17   testify, the president of Sequoia Voting Systems,

18   Mr. Jack Blaine, representatives of the Board of

19   Election Commissioners.

20          And, ladies and gentlemen, I think I

21   speak for the members of the City Council when I

22   state that it's our goal to uncover where the voting

23   system malfunctioned in an attempt to ensure and

24   urge the Board of Election Commissioners that those

McGUIRE'S II
Certified Shorthand Reporters
(312) 346-0911

CBEC-SMARTMATIC-004953
CBEC-SMARTMATIC-004087

**APP2123**

4

1   problems never happen again.

2         I really don't know what our complete

3   power will be since there's opinions from the Law

4   Department that Board of Election Commissioners is

5   really not a unit of City government and need not

6   comply with the purchasing requirements or the

7   Ethics Ordinance, so we may be limited in what we

8   can ultimately do, but certainly this forum can

9   serve as a place where questions can be posed and

10  hopefully answers can be delivered.

11        Chairman Mell.

12        CHAIRMAN MELL:  Mr. Chairman, thank you.

13        Your statement was correct in all

14  aspects.  I think this is probably in 32 years the

15  worst election that we've ever had in regards to

16  systems working and the ability to garner results at

17  the end of the day.

18        I can't remember by 11:00 o'clock at the

19  very, very latest that I did not have counts from

20  every precinct in our ward.

21        There were four precincts that never did

22  report that night, and I don't know if we ever did

23  get the results from those precincts.

24        As we speak, in Pennsylvania there's a

McGUIRE'S II
Certified Shorthand Reporters
(312) 346-0911

CBEC-SMARTMATIC-004954
CBEC-SMARTMATIC-004087

**APP2124**

19

1    at this organizational chart which has been prepared

2    by staff of the Committee.

3           Ladies and gentlemen of the Committee,

4    this is being displayed on the overhead.  It shows

5    that Sequoia Voting Systems is headquartered in

6    California.

7           How many employees does Sequoia Voting

8    Systems currently have?

9           A.   Around 110 people.

10          Q.   110 people?

11          A.   Yes.

12          Q.   Any employees in Illinois?

13          A.   We have a few in Illinois and many of

14   them resided here during this process, yes.

15          Q.   How many Illinois residents are employed

16   by Sequoia Voting Systems?

17          A.   I don't know.

18          Q.   You don't know.  Would it be more than

19   ten?

20          A.   No.

21          Q.   Less than ten?

22          A.   Yes.

23          Q.   So I take it then you bring people in to

24   Chicago to work on these elections?

McGUIRE'S II
Certified Shorthand Reporters
(312) 346-0911

CBEC-SMARTMATIC-004969
CBEC-SMARTMATIC-004087

**APP2125**

20

1       A.    Yes.

2       Q.    From whence do they come?

3       A.    Many different states, primarily

4    California and Colorado.

5       Q.    Any from foreign countries?

6       A.    And some from Venezuela.

7       Q.    From Venezuela.  Witnesses have told our

8    investigators that you had Venezuelans working on

9    the tabulation of the results; is that correct?

10      A.    Venezuelans were here providing support

11   to the U.S.

12      Q.    How many Venezuelans?

13      A.    I'm not sure of the exact number.

14      Q.    Would it be more than ten?

15      A.    In providing total support, yes, more

16   than ten.

17      Q.    Would it be more than 15?

18      A.    I think so.

19      Q.    Would it be more than 20?

20      A.    Do not know.

21      Q.    So about 15 Venezuelans were working on

22   the Chicago election?

23      A.    In a support role.

24      Q.    Okay.  Did they arrive here on visas?

McGUIRE'S II
Certified Shorthand Reporters
(312) 346-0911

CBEC-SMARTMATIC-004970
CBEC-SMARTMATIC-004087

**APP2126**

27

1      A.   Yes.

2      Q.   Do you know an Antonio Mugica Sessman?

3      A.   Well, I only know two Mugicas or three

4  Mugicas, male Mugicas, Antonio, his father and his

5  brother Pedro.

6      Q.   They live in Caracas, Venezuela?

7      A.   His father and Antonio live in Caracas.

8  Pedro resides in the United States.

9      Q.   Where does he reside?

10     A.   Boca Raton, Florida.

11     Q.   Well, if I showed you this document from

12  the records of incorporation in Delaware and that

13  reveals that the Mugicas list their address as Boca

14  Raton, would that surprise you?  It is your

15  testimony that they live in Caracas, Venezuela, is

16  it not?

17     A.   I certainly don't know back in 1920 or

18  the year 2000 where they were living.

19     Q.   But they're Venezuelan citizens, I take

20  it?

21     A.   Yes, they are.

22     Q.   Have they updated their filings with the

23  State of Delaware to indicate that they actually

24  live in Caracas, Venezuela, if you know?

CBEC-SMARTMATIC-004977
CBEC-SMARTMATIC-004087

**APP2127**

1   Chicago Board of Elections Election Board reviewed

2   Sequoia's ownership structure and found it was

3   appropriate."

4        Q.   Did you tell the Board of Election

5   Commissioners that the company was really owned by a

6   company domiciled in the Curacao Islands directed by

7   proxies to which you did not know and whom you did

8   not know the real owners?

9        A.   We certainly told them about the

10  structure that was in the Curacao, the end ownership

11  was in the Curacao Islands.

12       Q.   Did you supply them with written

13  information?

14       A.   I believe we did.

15       Q.   You believe you did.  You don't know.

16  Did you ever give them a chart like this to show

17  that the true ownership was hidden through shell

18  corporations tracing its way back to the Curacao

19  Islands?

20       A.   I don't know if we did or not.

21       Q.   Did you tell them that the true owners

22  lived in Caracas but told the officials in Delaware

23  that they lived in Boca Raton?

24       A.   What we told them it was clear that it

McGUIRE'S II
Certified Shorthand Reporters
(312) 346-0911

CBEC-SMARTMATIC-004979
CBEC-SMARTMATIC-004087

**APP2128**

1   was owned by Venezuelans.  It was, the end company

2   was the Curacao, but I don't know the other details.

3       Q.   And what kind of documents did you supply

4   to the Board of Election Commissioners or to the

5   Cook County Clerk that revealed the ownership

6   structure that stretches through the Netherlands and

7   the Curacao Islands or did you?

8       A.   My recollection, obviously we provided

9   financial statements, and I believe that in writing

10  and e-mail I explained the ownership structure at

11  one point.

12      Q.   Do you have a copy of that e-mail?

13      A.   No, I don't.

14      Q.   Can you produce it?

15      A.   I will certainly -- if, in fact, I sent

16  it which I believe I did, I can reproduce it.

17      Q.   Very good.  I'm also going to show you a

18  time line of events that's been prepared by the

19  staff.  See if you can review that and then try to

20  go through that with us.

21                    (Witness peruses document.)

22          Now, obviously you haven't been with the

23  company -- you've been with Smartmatic since when?

24      A.   July, I think I said 2005.  I guess it's

CBEC-SMARTMATIC-004980
CBEC-SMARTMATIC-004087

**APP2129**

42

```
 1   operations outside of Venezuela.

 2        Q.   Who is Alfredo Anzola?

 3        A.   He is the CFO of the company.

 4        Q.   Who is Antonio -- is there a father

 5   Antonio Mugica?

 6        A.   Yes, there is.

 7        Q.   And Roger Pinate.  You identified

 8   Mr. Roger Pinate.  He's apparently present today.

 9   What does Mr. Pinate do?

10        A.   He heads up technology for Smartmatic.

11        Q.   He lives in Caracas?

12        A.   Yes.

13        Q.   Is that the same Roger Pinate that when

14   they filed the documents with Delaware said that he

15   resided or shouldn't say he resided but that his

16   address was 19591 Dinner Key Drive, Boca Raton?

17        A.   I assume it's the same Roger Pinate.

18        ALDERMAN SUAREZ:  Must be a big house.

19        CHAIRMAN BURKE:  Q.  Antonio Mugica Sessman,

20   who is that?

21        A.   That's the father, I believe.

22        Q.   You believe?

23        A.   I only know Antonio Mugica but it's got

24   to be the father of Antonio Mugica.
```

CBEC-SMARTMATIC-004992
CBEC-SMARTMATIC-004087

**APP2130**

43

```
 1          Q.   Who is Antonio Mugica Rivera?

 2          A.   I only know of two Antonio Mugicas.

 3          Q.   Who is Louis Feliu, F-E-L-I-U?

 4          A.   He was the controller at one point in

 5    time.

 6          Q.   But no longer?

 7          A.   No longer.

 8          Q.   But Mr. Pinate is a director?

 9          A.   Yes, he is.

10          Q.   Antonio Mugica Sessman is a director?

11          A.   Yes.

12          Q.   And Antonio Mugica Rivera is a director?

13          A.   I'm not familiar with their family names,

14    their mothers' family names, but Antonio Mugica is a

15    director, and Antonio Mugica, Sr., is a director.

16          Q.   We can assume then that Roger Pinate,

17    your guess here today, who is a director of

18    Smartmatic is also director of Smartmatic

19    International Group?

20          A.   I don't know.  I do not have a list of

21    directors of each one of the companies.

22          Q.   But they're available.  I can show them

23    to you.

24               If I told you that that was the case, you
```

McGUIRE'S II
Certified Shorthand Reporters
(312) 346-0911

CBEC-SMARTMATIC-004993
CBEC-SMARTMATIC-004087

**APP2131**

117

1   precinct that I lived in who were I thought computer

2   literate.  I'm not computer literate.  I could never

3   figure it out.  We had to go through and re, to get

4   the chip, get the card back out so we could get it

5   back in so I could use the touch tone.  I was the

6   first person to use it.  I just don't know if a

7   system like this works in this jurisdiction period.

8   That's all.

9        CHAIRMAN BURKE:  Mr. Blaine, I just have a few

10   follow-up questions.

11        Can you tell me how many employees does

12   Smartmatic have in Venezuela and how many in the

13   United States?

14        THE WITNESS:  Smartmatic has around 100

15   employees in Venezuela and has a few employees in

16   the United States, like 5 or less.

17        CHAIRMAN BURKE:  Five or less in the U.S.  Can

18   you --

19        THE WITNESS:  Excuse me.  That's five or less

20   that have come from Venezuela.  There's probably

21   another 5 to 8 that are Americans working and living

22   in the United States as well, 10 to 15.

23        CHAIRMAN BURKE:  So 100 in Venezuela; 10 in

24   the U.S.?

CBEC-SMARTMATIC-005068
CBEC-SMARTMATIC-004087

**APP2132**

203

```
 1   STATE OF ILLINOIS  )

 2                      ) SS.

 3   COUNTY OF C O O K  )

 4

 5        KELLY A. BRICHETTO, being first duly sworn

 6   on oath says that she is a Certified Shorthand

 7   Reporter doing business in the City of Chicago,

 8   County of Cook and the State of Illinois;

 9        That she reported in shorthand the

10   proceedings had at the foregoing Meeting of the

11   Joint Committee on Finance, Committee on Budget and

12   Government Operations and Committee on Committees,

13   Rules and Ethics;

14        And that the foregoing is a true and

15   correct transcript of her shorthand notes so taken

16   as aforesaid and contains all of the proceedings had

17   at said Meeting.

18                        KELLY A. BRICHETTO

19

20   SUBSCRIBED AND SWORN TO

21   before me this

22   day of April, A.D. 2006

23

24        NOTARY PUBLIC
```

McGUIRE'S II
Certified Shorthand Reporters
(312) 346-0911

CBEC-SMARTMATIC-005154
CBEC-SMARTMATIC-004087

**APP2133**

204

```
 1                    I N D E X

 2   JACK BLAINE

 3   Examination by Chairman Burke              17-44
     Examination by Alderman Suarez             45-46
 4   Examination by Chairman Beavers            46-48
     Examination by Alderman Hairston           49-57
 5   Examination by Chairman Mell               58-60
     Examination by Alderman Ed Smith           61-66
 6   Further Examination by Chairman Burke         66
     Further Examination by Alderman Ed Smith   67-68
 7   Further Examination by Chairman Mell       69-72
     Further Examination by Alderman Hairston   72-79
 8   Further Examination by Chairman Burke      79-86
     Further Examination by Alderman Ed Smith   87-88
 9   Examination by Alderman Mitts                 88
     Further Examination by Alderman Suarez     89-93
10   Further Examination by Alderman Hairston   93-95
     Further Examination by Chairman Burke      95-96
11   Further Examination by Alderman Hairston   96-97

12
     Statement by JACK BLAINE                   97-125
13   Statement by LANGDON NEAL                 126-181
     Statement by NEAL RESNIKOFF              182-188
14   Statement by BOB WILSON                   189-194
     Statement by DONNA CONROY                 195-199
15   Statement by WILLIAM WENDT                199-201

16

17

18

19
     REPORTED BY:  KELLY A. BRICHETTO
20

21

22

23

24
```

CBEC-SMARTMATIC-005155
CBEC-SMARTMATIC-004087

**APP2134**

# Exhibit O-7

12/5/23, 1:21 PM                                   : : : SMARTMATIC_History : : :

The Wayback Machine - https://web.archive.org/web/20040815022054/http://www.smartmatic.com:80/about_us_02…



<< home



business partners

technology      +
solutions       +
press room      +
contact         +
special
venezuelan      +
elections

# Overview

Seven years ago we were the Research and Development Unit of Panagroup in Venezuela. Our main goal was to provide smart connectivity and information technologies to the automation and industrial control market.

In 2000 we realized the true impact of our technology in the growing device-networking market, and we emerged as an independent company. We developed a comprehensive infrastructure that allows our customers to solve the challenges inherent to the implementation and management of device-networking applications.

Today Smartmatic develops embedded and enterprise software that links many kinds of devices from a wide range of existing networks, allowing thousands of devices to suddenly connect and simultaneously execute millions of tasks, irrespective of their complexity level.

Smartmatic solutions are currently operating in several vertical markets. In the securities market, SmartBank is yielding optimal results in over 500 branches of the Santander-Serfin Bank, one of Mexico's three largest financial institutions.

In the electoral market, Smartmatic's Automated Electoral Solution (SAES) recently won an open bid for the automation of electoral processes in Venezuela, with the support of Bitza, a software consultant, and CANTV, the most important telecommunications company in Venezuela.

Smartmatic products have achieved international acknowledgement from leading organizations in the world of technology. In 2000 we were named one of Microsoft's "Top-Five Packaged Application Partner of the Year," and have been awarded the Securities Industry Association's "Industry Finest" award.

__ © 2000-2004 Smartmatic Corporation. All rights reserved.

APP2136

# Exhibit O-8



4.

# F01000000453

## TRANSMITTAL LETTER

**TO:** Registration Section
Division of Corporations

**SUBJECT:** Bizta Corporation
(Name of corporation - must include suffix)

Dear Sir or Madam:

The enclosed "Application by Foreign Corporation for Authorization to Transact Business in Florida", "Certificate of Existence", and check are submitted to register the above referenced foreign corporation to transact business in Florida.

Please return all correspondence concerning this matter to the following:

Alfredo Anzola
(Name of Person)

Bizta Corporation
(Firm/Company)

19891 Dinner Key Drive
(Address)

Boca Raton, FL 33498
(City/State and Zip code)

600003573406--4
-01/24/01--01081--006
*****87.50  *****87.50

For further information concerning this matter, please call:

Georgina Sorensen at ( 561 ) 862·0747
(Name of Person)                    (Area Code & Daytime Telephone Number)

00 JAN 24 PM 10: 58
SECRETARY OF STATE
TALLAHASSEE, FLORIDA
FILED

**STREET ADDRESS:**
Registration Section
Division of Corporations
409 E. Gaines St.
Tallahassee, FL 32399

**MAILING ADDRESS:**
Registration Section
Division of Corporations
P.O. Box 6327
Tallahassee, FL 32314

ymtw
1/25

Enclosed is a check for the following amount:

☐ $70.00 Filing Fee   ☐ $78.75 Filing Fee & Certificate of Status   ☐ $78.75 Filing Fee & Certified Copy   ☒ $87.50 Filing Fee, Certificate of Status & Certified Copy

**APP2138**

**APPLICATION BY FOREIGN CORPORATION FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA**

*IN COMPLIANCE WITH SECTION 607.1503, FLORIDA STATUTES, THE FOLLOWING IS SUBMITTED TO REGISTER A FOREIGN CORPORATION TO TRANSACT BUSINESS IN THE STATE OF FLORIDA.*

1. _Bizta Corporation_
(Name of corporation; must include the word "INCORPORATED", "COMPANY", "CORPORATION" or words or abbreviations of like import in language as will clearly indicate that it is a corporation instead of a natural person or partnership if not so contained in the name at present.)

2. _Delaware_
(State or country under the law of which it is incorporated)

3. _52-2243722_
(FEI number, if applicable)

4. _4-12-2000_
(Date of incorporation)

5. _Perpetual_
(Duration: Year corp. will cease to exist or "perpetual")

6. _Upon Qualification_
(Date first transacted business in Florida. If corporation has not transacted business in Florida, insert "upon qualification.")
(SEE SECTIONS 607.1501, 607.1502 and 817.155, F.S.)

7. _19591 Dinner Key Drive, Boca Raton, FL 33498_
(Principal office address)

_19591 Dinner Key Drive, Boca Raton FL 33498_
(Current mailing address)

8. _Business Services Through Internet Software delivery_
(Purpose(s) of corporation authorized in home state or country to be carried out in state of Florida)

9. **Name and street address of Florida registered agent:** (P.O. Box or Mail Drop Box **NOT** acceptable)

Name: _Alfredo Anzola_

Office Address: _19591 Dinner Key Drive_
_Boca Raton_ , Florida _33498_
(City)                        (Zip code)

10. **Registered agent's acceptance:**
*Having been named as registered agent and to accept service of process for the above stated corporation at the place designated in this application, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.*

(Registered agent's signature)

11. Attached is a certificate of existence duly authenticated, not more than 90 days prior to delivery of this application to the Department of State, by the Secretary of State or other official having custody of corporate records in the jurisdiction under the law of which it is incorporated.

12. **Names and business addresses of officers and/or directors:**

**A. DIRECTORS**

Chairman: Antonio Múgica Rivero

Address: 19691 Dinner Key Drive

Boca Raton, Florida 33398

Vice Chairman: _____

Address: _____

Director: _____

Address: _____

Director: _____

Address: _____

**B. OFFICERS**

President: Antonio Múgica

Address: 19691 Dinner Key Drive

Boca Raton, FL 33498

Vice President: Alfredo Anzola

Address: 19691 Dinner Key Drive

Boca Raton, FL 33498

Secretary: Alfredo Anzola

Address: 19691 Dinner Key Drive, Boca Raton, FL 33498

Treasurer: Alfredo Anzola

Address: 19691 Dinner Key Drive, Boca Raton, FL 33498

**NOTE:** If necessary, you may attach an addendum to the application listing additional officers and/or directors.

13. _____

(Signature of Chairman, Vice Chairman, or any officer listed in number 12 of the application)

14. Antonio Múgica Rivero - Chairman

(Typed or printed name and capacity of person signing application)

**APP2140**

*State of Delaware*                          PAGE  1

## *Office of the Secretary of State*

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "BIZTA CORPORATION" IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-NINTH DAY OF DECEMBER, A.D. 2000.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "BIZTA CORPORATION" WAS INCORPORATED ON THE TWELFTH DAY OF APRIL, A.D. 2000.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE NOT BEEN ASSESSED TO DATE.

FILED
00 JAN 24  PM 10: 58
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

3211192  8300

001658432

Edward J. Freel, Secretary of State

AUTHENTICATION: 0836209

DATE: 12-29-00

**APP2141**

# Exhibit O-9

# F0000005069

## TRANSMITTAL LETTER

**TO:**   Registration Section
Division of Corporations

**SUBJECT:** _____SMARTMATIC_____CORPORATION_____
(Name of corporation - must include suffix)

Dear Sir or Madam:

The enclosed "Application by Foreign Corporation for Authorization to Transact Business in Florida",
"Certificate of Existence", and check are submitted to register the above referenced foreign corporation
to transact business in Florida.

Please return all correspondence concerning this matter to the following:

_____ALFREDO_____ANZOLA_____
(Name of Person)

_____SMARTMATIC_____CORPORATION_____
(Firm/Company)

_____19591_____DINNER_____KEY_____DRIVE_____
(Address)

_____BOCA_____RATON_____,FLORIDA,_____33498_____
(City/State and Zip code)

400003387604--2
-09/11/00--01018--014
*****78.75   *****78.75

For further information concerning this matter, please call:

_____ALFREDO_____ANZOLA_____  at ( 561 )  4514885
(Name of Person)                         (Area Code & Daytime Telephone Number)

**STREET ADDRESS:**
Registration Section
Division of Corporations
409 E. Gaines St.
Tallahassee, FL 32399

**MAILING ADDRESS:**
Registration Section
Division of Corporations
P.O. Box 6327
Tallahassee, FL 32314

Enclosed is a check for the following amount:

☐ $70.00 Filing Fee     ☐ $78.75 Filing Fee &     ☒ $78.75 Filing Fee &     ☐ $87.50 Filing Fee,
                            Certificate of Status       Certified Copy              Certificate of Status &
                                                                                    Certified Copy

**APP2143**

**APPLICATION BY FOREIGN CORPORATION FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA**

*IN COMPLIANCE WITH SECTION 607.1503, FLORIDA STATUTES, THE FOLLOWING IS SUBMITTED TO REGISTER A FOREIGN CORPORATION TO TRANSACT BUSINESS IN THE STATE OF FLORIDA.*

1. _SMARTMATIC   CORPORATION_
(Name of corporation; must include the word "INCORPORATED", "COMPANY", "CORPORATION" or words or abbreviations of like import in language as will clearly indicate that it is a corporation instead of a natural person or partnership if not so contained in the name at present.)

2. _DELAWARE_     3. _____
(State or country under the law of which it is incorporated)    (FEI number, if applicable)

4. _APRIL, 11TH, 2000_     5. _PERPETUAL_
(Date of incorporation)    (Duration: Year corp. will cease to exist or "perpetual")

6. _UPON   QUALIFICATION_
(Date first transacted business in Florida. If corporation has not transacted business in Florida, insert "upon qualification.")
(SEE SECTIONS 607.1501, 607.1502 and 817.155, F.S.)

7. _19591  DINNER  KEY  DRIVE, BOCA RATON, FL-33498_
(Principal office address)

_19591 DINNER KEY DRIVE, BOCA RATON, FL-33498_
(Current mailing address)

8. _INTERNET  AUTOMATION_
(Purpose(s) of corporation authorized in home state or country to be carried out in state of Florida)

9. **Name and street address of Florida registered agent:** (P.O. Box or Mail Drop Box **NOT** acceptable)

Name: _ALFREDO   ANZOLA_

Office Address: _19591  DINNER  KEY  DRIVE_

_BOCA   RATON_ , Florida _33498_
(City)                    (Zip code)

10. **Registered agent's acceptance:**
*Having been named as registered agent and to accept service of process for the above stated corporation at the place designated in this application, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.*

_____
(Registered agent's signature)

11. Attached is a certificate of existence duly authenticated, not more than 90 days prior to delivery of this application to the Department of State, by the Secretary of State or other official having custody of corporate records in the jurisdiction under the law of which it is incorporated.

**APP2144**

12. Names and business addresses of officers and/or directors:

A. DIRECTORS

Chairman: ANTONIO   MUGICA   RIVERO

Address: 19591   DINNER   KEY   DRIVE
BOCA   RATON , FLORIDA 33498

Vice Chairman: ALFREDO   ANZOLA

Address: 19591   DINNER   KEY   DRIVE
BOCA   RATON , FLORIDA 33498

Director: ROGER   PINATE

Address: 19591   DINNER   KEY   DRIVE
BOCA   RATON , FLORIDA 33498

Director: ANTONIO   MUGICA   SESMA

Address: 19591   DINNER   KEY   DRIVE
BOCA   RATON , FLORIDA 33498

B. OFFICERS

President: ANTONIO   MUGICA

Address: 19591   DINNER   KEY   DRIVE
BOCA   RATON , FLORIDA 33498

Vice President: ALFREDO   ANZOLA

Address: 19591   DINNER   KEY   DRIVE
BOCA   RATON , FLORIDA 33498

Secretary: ALFREDO   ANZOLA

Address: 19591 DINNER KEY DRIVE , BOCA RATON , FL 33498

Treasurer: ALFREDO   ANZOLA

Address: 19591 DINNER KEY DRIVE , BOCA RATON , FL 33498

NOTE: If necessary, you may attach an addendum to the application listing additional officers and/or directors.

13. _____
(Signature of Chairman, Vice Chairman, or any officer listed in number 12 of the application)

14. ALFREDO   ANZOLA , VICE – CHAIRMAN , CFO , BUSSINESS DEVELOPMENT
(Typed or printed name and capacity of person signing application)

**APP2145**

*State of Delaware*

*Office of the Secretary of State*

PAGE 1

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "SMARTMATIC CORPORATION" IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE SIXTH DAY OF SEPTEMBER, A.D. 2000.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "SMARTMATIC CORPORATION" WAS INCORPORATED ON THE ELEVENTH DAY OF APRIL, A.D. 2000.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE NOT BEEN ASSESSED TO DATE.

*Edward J. Freel, Secretary of State*

AUTHENTICATION: 0659825

3209993   8300

001450016

DATE: 09-06-00

**APP2146**

# Exhibit O-10



Attorney's Eyes-Only

SMMT-OAN07880440
SMMT-OAN07880440



Attorney's Eyes-Only

SMMT-OAN07880441
SMMT-OAN07880440



Attorney's Eyes-Only

SMMT-OAN07880454
SMMT-OAN07880440



Attorney's Eyes-Only

SMMT-OAN07880455
SMMT-OAN07880440



Attorney's Eyes-Only

SMMT-OAN07880457
SMMT-OAN07880440

**APP2152**



Attorney's Eyes-Only

SMMT-OAN07880480
SMMT-OAN07880440



Attorney's Eyes-Only

SMMT-OAN07880497
SMMT-OAN07880440

**APP2154**

# Exhibit O-11

Jack Blaine - October 2, 2023

## 1

```
1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2
   SMARTMATIC USA CORP.,        )
3  SMARTMATIC INTERNATIONAL     )
   HOLDINGS, B.V., and SGO      )
4  CORPORATION, LIMITED,        )
                                )
5        Plaintiffs,            )
                                )
6  vs.                          ) CASE NO. 1:21-cv-02900-CJN
                                )
7  HERRING NETWORKS, INC.,      )
   D/B/A ONE AMERICA NEWS       )
8  NETWORK,                     )
                                )
9        Defendants.            )
10
11
12          ORAL AND VIDEOTAPED DEPOSITION OF
13                    JACK BLAINE
14                  October 2, 2023
15
16     ORAL AND VIDEOTAPED DEPOSITION OF JACK BLAINE,
17 produced as a witness at the instance of the Defendants
18 and duly sworn, was taken in the above-styled and
19 numbered cause on the 2nd day of October, 2023, from
20 11:19 a.m. to 4:47 p.m., before Amy M. Clark, Certified
21 Machine Shorthand Reporter for the State of Texas, at
22 the offices of Jackson Walker, LLP, 100 Congress Avenue,
23 Suite 1100, Austin, Texas 78701, pursuant to the Federal
24 Rules of Civil Procedure and the provisions stated on
25 the record or attached hereto.
```

## 2

```
1                    APPEARANCES
2  FOR PLAINTIFFS:
3     Mr. John Breig
      Ms. Amakia Attey
4     Benesch, Friedlander, Coplan & Aronoff LLP
      71 South Wacker Drive, Suite 1600
5     Chicago, Illinois 60606
      Phone: (312)212-4949
6     Email: jbreig@beneschlaw.com
             aattey@beneschlaw.com
7
   FOR DEFENDANTS:
8
      Mr. William J. Stowe
9     Ms. Baker Howry
      Mr. John Edwards
10    Jackson Walker, LLP
      1401 McKinney Suite 1900
11    Houston, Texas 77010
      Phone: (713)752-4200
12    Email: wstowe@jw.com
             bhowry@jw.com
13           jedwards@jw.com
14 ALSO PRESENT:
15    Mr. Manuel Martin, Videographer
16
17
18
19
20
21
22
23
24
25
```

## 3

```
1
2                      INDEX
3                                              PAGE
4  Appearances ........................................2
5  JACK BLAINE
6  Examination by Mr. Stowe ...........................7
   Examination by Mr. Breig .........................194
7  Signature Page  ..................................199
   Court Reporter's Certificate .....................201
8
9                     EXHIBITS
10 EXHIBIT        DESCRIPTION                    PAGE
11 Exhibit 1   Notice of Deposition              11
12 Exhibit 2   Declaration of Jack Blaine        56
13 Exhibit 3   City Council of Chicago meeting   107
               transcript
14
   Exhibit 4   Email to Paul Vovk from Jack      117
15             Blaine, 9/20/05
16 Exhibit 5   Letter to Jack Blaine from        120
               Langdon Neal, 11/28/05
17
   Exhibit 6   Office Memorandum to Langdon      124
18             Neal from Lance Gough, 2/10/06
19 Exhibit 7   Letter from Langdon Neal to       126
               Jack Blaine, 2/13/06
20
   Exhibit 8   Email to Sequoia employees from   127
21             Michelle Shafer, 3/29/06
22 Exhibit 9   Letter to Chairman Burke,         132
               Chairman Beavers, and Chairman
23             Mell from Jack Blaine, 4/12/06
24 Exhibit 10  Letter to Sequoia customers       134
               from Jack Blaine, 5/1/06
25
```

## 4

```
1              EXHIBITS (cont.)
2  EXHIBIT         DESCRIPTION              PAGE
3  Exhibit 11  Press release, 5/11/06       135
4  Exhibit 12  Letter to Jack Blaine from   138
               Lance Gough, 10/22/06
5
   Exhibit 13  Email from Jennifer Pedone on 139
6              behalf of Jack Blaine's desk,
               5/16/06
7
   Exhibit 14  Email to Pedro Mugica from   141
8              Alfredo Anzola, 6/13/06
9  Exhibit 15  Email to Victor Ramirez from 144
               Robert Cook, 10/10/07
10
   Exhibit 16  Email to Jeff Bialos from    145
11             Michelle Shafer, 11/6/07
12 Exhibit 17  Letter to Edwin Smith, III from 152
               Brian Hancock, 11/20/07
13
   Exhibit 18  Email to Roger Pi ate from   151
14             Peter McManemy, 11/28/07
15 Exhibit 19  Email to Robert Cook from Juan 155
               Villa, 12/4/07
16
   Exhibit 20  Email to Edward Burke from   156
17             Marianna Cutter, 3/7/08
18 Exhibit 21  Letter to Jack Blaine from   158
               James Scanlon, 3/4/08
19
   Exhibit 22  Letter to Langdon Neal from  163
20             Peter McManemy, 4/16/08
21 Exhibit 23  Letter to Langdon Neal from  163
               Jack Blaine, 4/29/08
22
   Exhibit 24  Email to Robert Cook from    165
23             Robert Cook, 1/28/08
24 Exhibit 25  Email to Robert Pi ate from  166
               Antonio Mugica, 4/11/08
25
```

Jack Blaine - October 2, 2023

---

**29**

1  what you did, briefly, please.
2      A.   The last job was director of international
3  sales and developing markets.  Prior to that, I was
4  controller of Ford Brazil.  Prior to that, I was -- I
5  don't know what the title -- I don't know what the title
6  was.  But, anyway, director of North American financial
7  planning.  And prior to that, assistant controller of
8  product development for North America.  And prior to
9  that, I was a financial analyst at finance down
10  [phonetic].
11     Q.   All right.  Prior to Ford, what was your next
12  job?
13     A.   United States Navy.
14     Q.   Any other jobs before that?
15     A.   Part-time jobs.
16     Q.   Any having to do with voting?
17     A.   My biggest job was football prior to that.
18     Q.   What did you do in the Navy?  Did you have a
19  special job?
20     A.   I went to Naval Officer Candidate School after
21  I graduated from college, and I was a supply officer in
22  the Navy.
23     Q.   Okay.
24     A.   Left as a lieutenant in the Navy.
25     Q.   Okay.  I want to circle back to something you

---

**30**

1  said about Smartmatic.  We're about to dive deep into
2  Smartmatic.
3          You said when I asked you earlier that you
4  did everything except for Venezuela.
5          Do you recall saying that or am I
6  misstating what you said?
7      A.   I -- I essentially said that.
8      Q.   Okay.
9      A.   I mean, I -- I can't say I never touched
10  Venezuela.  I mean, I was asked questions occasionally
11  and for advice, but I never -- my feet were -- I went
12  there a few times, but -- but it was 2 percent of what I
13  was involved in.
14     Q.   So, as an example, when you went there a few
15  times, what were you going there for?
16     A.   Primarily meeting -- meetings for the whole --
17  for total Smartmatic.  The -- I came on board just
18  before the infamous election of Chavez.
19     Q.   In 2004?
20     A.   Whatever year that was.  Well, that tells you
21  what year I started, 2004.  I came there a few months
22  before that, but I was not involved in that election.
23     Q.   Understood.
24     A.   I was learning, but...
25     Q.   Understood.

---

**31**

1          So when you just testified they were
2  Smartmatic meetings when I asked you about why were you
3  going over there, what were the purpose of these
4  meetings in Venezuela?
5      A.   Well, that's where the chairman was.  It's
6  where Antonio Mugica was.  And we were talking about
7  things, other than Venezuela.
8      Q.   So when you went to Venezuela in connection
9  with your employment with Smartmatic, it was never in
10  connection with anything having to do with Venezuela
11  itself?
12     A.   I cannot say we never discussed Venezuela at
13  all, but I never got involved.  I never was -- other
14  than flesh deep in anything in Venezuela.
15     Q.   When you say flesh deep, can you provide some
16  examples of the types of things that you were involved
17  relating to Venezuela?
18     A.   Well, I was learning about the product and I
19  was learning about Venezuela and the election laws and
20  learning about -- that's kind of where I learned quite a
21  bit about the election business was in Venezuela.  But
22  it was more learning -- it was much more learning
23  experience in Venezuela than -- than a supervisory role
24  in Venezuela.
25     Q.   Great.

---

**32**

1          And before we go any deeper with
2  Smartmatic, I just want to ask you couple of questions.
3          I know I've spoken with you on the phone
4  before.
5          Have you spoken with anybody else, prior
6  to today's deposition, about this matter?
7      A.   Yes.
8      Q.   With whom did you speak?
9      A.   Bob Cook.
10     Q.   And can you explain who Robert or Bob Cook is
11  in relation to Smartmatic?
12     A.   Today, he told me he was -- he's the same age I
13  am.  That's why he called to wish me a happy birthday,
14  coincidence.  He didn't know anything about --
15     Q.   Is today your birthday?
16     A.   No.  It was Friday.
17     Q.   Okay.
18     A.   But he's actually the individual that got me to
19  Smartmatic.  He had gone to Smartmatic before me.  He --
20  he was a long-term Unisys guy, too, and he recommended
21  Antonio Mugica, that he named me or appoint me as the
22  president of Smartmatic.
23     Q.   So he called you on Friday?
24     A.   Yes.
25     Q.   Did you talk about Smartmatic?

---

Jack Blaine - October 2, 2023

57

1    Q.  But, fortunately, the only question pending
2  right now is whether you signed the declaration on
3  Page 6 underneath the Paragraph 22, which says executed
4  on March 20, 2014.
5    A.  Looks like my signature.
6    Q.  If you'll direct your attention to the first
7  page of your -- of your declaration.
8    A.  Uh-huh.
9    Q.  There's a -- what we call a caption at the top,
10  which lists the case name.
11       Do you see that?
12       It says, in re, SVS Holdings Inc. and
13  Sequoia Voting Systems, Inc., debtors.
14       You to see that?
15    A.  Uh-huh.
16    Q.  And it's got a name of the court at the top.
17  It says:  United States Bankruptcy Court, District of
18  Colorado.
19       You see that?
20    A.  Uh-huh.
21    Q.  Does that refresh your recollection about --
22    A.  Yeah.
23    Q.  -- having signed this declaration?
24       Do you recall --
25    A.  I don't remembering signing the declaration,

58

1  but I remember this situation.
2    Q.  Okay.  Well, you don't dispute that you signed
3  this declaration --
4    A.  No.
5    Q.  -- do you?  I'm sorry?
6    A.  No.
7    Q.  Okay.  Do you remember, generally, what your
8  involvement, if any, in this bankruptcy proceeding was?
9    A.  Well, I -- at the time, I was the president and
10  CEO of Sequoia Voting Systems.  So I'm obviously very
11  involved with lots of help from a couple of law firms,
12  my CFO, and -- and I don't know what his title was, but
13  he was -- he was my brain.
14    Q.  So direct your -- your attention, please, to
15  Paragraph 6 of the declaration.
16       You say here:  In 2004, I went to work for
17  Smartmatic, a Delaware Corporation with corporate
18  affiliates in Venezuela, the Netherlands, Barbados, the
19  Dutch Antilles, and the United States, among other
20  countries.
21       When you said their affiliates in
22  Venezuela, do you recall who you were referring to?
23    A.  No.  I probably didn't pay that much attention
24  to that, saying that.  What's in my mind is the
25  buildings in Venezuela.

59

1    Q.  Were those buildings in Caracas?
2    A.  Caracas.
3    Q.  Next sentence:  My external title was
4  president; although, I was not a formal corporate
5  officer.
6    A.  Correct.
7    Q.  What did you mean by external title?
8    A.  Used for customers and -- so customers perceive
9  me as being the president of the company.
10    Q.  Did you have an understanding of why it was
11  simply an external title as opposed to some other type
12  of title?
13    A.  I would -- I don't know -- I probably never
14  really knew exactly.  That was Antonio's preference
15  and -- but my -- I'm guessing a little bit in that it
16  had been a pretty closed-knit family affair and
17  he was a little concerned about what others would think
18  of him bringing somebody else that's gonna be their
19  boss.
20    Q.  Did he ever indicate to you that he had a
21  concern with a perception that might arise if he was
22  named the external -- named the president as an external
23  title?
24       MR. BREIG:  Object to form and foundation.
25    A.  Can you repeat the question?

60

1    Q.  (By Mr. Stowe)  Sure.
2       Did Mr. Mugica ever express to you that he
3  had a concern about if he took on the president title
4  role?
5       MR. BREIG:  Same objection.
6    A.  Well, I actually think I -- I don't know if he
7  was -- no.  To answer your question, no.
8    Q.  (By Mr. Stowe)  Okay.  Paragraph 7:  In 2005, I
9  assisted Smartmatic in purchasing Sequoia, a
10  long-established American voting systems company going
11  back to late 1800s from a company called De La Ru.
12       You testified about that earlier, correct?
13    A.  (Nodding head.)
14    Q.  Do you recall, what was the goal --
15    A.  Yes.
16    Q.  What was the goal of purchasing Sequoia?
17       MR. BREIG:  Object to form and foundation.
18    A.  Well, at that time, we wanted to, as they say,
19  to go worldwide or go as worldwide as we could.  And
20  De La Ru and -- there was the HAVA Act that had been
21  passed by Congress where they granted, I want to say,
22  $4 billion to help modernize U.S. election process,
23  primarily as a result of the fiasco that happened in the
24  Bush/Gore election in whatever year that was that
25  they -- I don't know what year that -- but what year was

Jack Blaine - October 2, 2023

---

**61**

1 the Gore/Bush?
2    Q.  (By Mr. Stowe) 2000.
3    A.  2000.
4       MR. BREIG:  Object to form.
5    A.  They authorized $4 billion.  And Sequoia wanted
6 to sell their business, and Sequoia had a pretty nice
7 base in the United States, and it appeared to make quite
8 attractive to us.
9    Q.  (By Mr. Stowe) So prior to the acquisition of
10 Sequoia, did Smartmatic have any contracts in the United
11 States, to your knowledge?
12    A.  I do not believe so.
13    Q.  So fair to say that one of, if not the main
14 reasons of acquiring Sequoia was to enter into the U.S.
15 market for Smartmatic?
16       MR. BREIG:  Object to form, foundation.
17    A.  Oh, yes.
18    Q.  (By Mr. Stowe) You may answer.
19    A.  Yes.
20    Q.  Paragraph 8:  After Smartmatic's purchase of
21 Sequoia, I was appointed president of Sequoia for
22 external purposes; although, I was not a corporate
23 officer.
24       Did I read that correctly?
25    A.  Yes.

---

**62**

1    Q.  Again, what was the purpose of distinguishing
2 by saying that you were president of Sequoia for
3 external purposes?
4    A.  You know, I never really talked -- didn't
5 bother me.  I -- kind of kid that came up, you know, on
6 the wrong side of the tracks and took every opportunity
7 I could take to for -- to move along in my career.  So
8 it didn't bother me that I had -- didn't bother me
9 personally.
10       I think they didn't want to change the
11 board, that way I was not part of the board directors of
12 Sequoia or anything do with their board of directors --
13 not anything.  I attended their meetings, not all of
14 them, but most of them.
15    Q.  Do you know who was on the board of directors
16 for Sequoia?
17    A.  You named most of them.
18    Q.  Who were they?
19    A.  Pi ate, Anzola, Mugica, Mugica's father, Massa.
20 I think that was it.  That's all I knew about.
21    Q.  But, at some point, you had the understanding
22 that you were not wanted on the board of directors; fair
23 to say?
24       MR. BREIG:  Object to form.
25    A.  Sound -- I'd take exception a little bit with

---

**63**

1 the words because they sound a little harsh.
2    Q.  (By Mr. Stowe) So stipulated.
3       But your understanding was, that at least
4 one reason for having the external purpose of president
5 of Sequoia being your title was that you understood
6 there to be a desire to not change the board of
7 directors for Sequoia, fair?
8    A.  Fair.  Yes.
9    Q.  Nonetheless, you were still running and
10 managing the operations of Sequoia, fair?
11    A.  Yes.
12    Q.  When you were running and managing the
13 operations of Sequoia --
14    A.  Let me back up for just a second.
15    Q.  Sure.
16    A.  When I say I was running, Antonio was still my
17 boss.
18    Q.  I was just about to ask you.
19       Just so the record is clean, even though
20 you were managing the operations of Sequoia, you were
21 still supervised and had to report to Mr. Mugica,
22 correct?
23    A.  Correct.
24    Q.  Next Paragraph, Paragraph 9, still on
25 Exhibit 2.  Approximately 18 months after the Smartmatic

---

**64**

1 acquisition of Sequoia, the Committee on Foreign
2 Investments in the United States, CFIUS, began
3 investigating the ownership of Sequoia by Smartmatic
4 ostensibly because of Smartmatic's Venezuelan connection
5 and concerns about possible impacts on U.S. elections.
6       Did I read that correctly?
7    A.  Yes.
8    Q.  Why did you opine there that it was, quote,
9 ostensibly because of Smartmatic's Venezuelan connection
10 and concerns about possible impacts on U.S. elections?
11    A.  Well, there were two factors -- well, I think
12 the -- no.  I should say the principal factor was that
13 we were beating the heck out of all U.S. competitors.
14 And the opposition party in Venezuela, who hated
15 Smartmatic, because they alleged Smartmatic had helped
16 get Chavez elected, and our competition in the U.S.
17 started talking, making a big deal out of this issue,
18 that we were owned by -- or -- or associated with the
19 Venezuelan company.  And there was all the -- you know,
20 the public opinion was that the -- that first -- well,
21 that -- at that time, that first election that Chavez
22 got -- when he got elected, that it was a rigged
23 election.
24    Q.  You mentioned in there that you thought that a
25 competitor of Smartmatic and/or Sequoia may have been

---

Jack Blaine - October 2, 2023

73

1    Q.  Paragraph 12 in your declaration marked as
2  Exhibit 2.
3         In September 2007, Smartmatic entered into
4  a stock purchase agreement between and among SVS,
5  Sequoia, and various members of Sequoia management.
6         You see that?
7    A.  Uh-huh.
8    Q.  At that time in September 2007, what position
9  are you holding then with Sequoia?
10   A.  Hasn't been dissolved.  The same positon.
11   Q.  So president of Sequoia.
12   A.  Uh-huh.  (Nodding head.)
13   Q.  And --
14   A.  And CEO.
15   Q.  Okay.  Because I'm -- next I'm gonna --
16   A.  No.  No.  No.  Because I -- I don't
17  think -- president of Sequoia, but I don't think at that
18  the -- I -- I -- I'm gonna guess.  I don't think I was
19  CEO of Sequoia at that point.  I don't think I became
20  CEO of Sequoia --
21   Q.  I see.
22   A.  -- until it was actually sold.
23   Q.  So, at that time, you were president of
24  Sequoia, yes?
25   A.  (Nodding.)

74

1    Q.  And also president of Smartmatic, yes?
2    A.  Yes.
3    Q.  Paragraph 13:  At or about the time of the
4  stock purchase agreement, one Smartmatic affiliate
5  entered into a distribution agreement with Sequoia and
6  another Smartmatic affiliate entered into a services
7  agreement with SVS.
8    A.  Where?  What Paragraph is this?
9    Q.  Paragraph 13 of Exhibit 2.
10   A.  At the time...  (Witness reading.)
11      Okay.
12   Q.  Did you read Paragraph 13?
13   A.  Yeah.
14   Q.  Do you recall, generally, those agreements
15  being entered into with the Smartmatic affiliates?
16   A.  I wouldn't have recalled them now.  By, I mean,
17  before we -- having read that, which -- what that was to
18  facilitate that Smartmatic could still sell equipment to
19  Sequoia, but it had to be disclosed to the government
20  what it was.  And my recollection is we had to make an
21  agreement that we would wean ourself from that
22  situation?
23   Q.  I see.
24      And same thing with respect to the
25  services agreement --

75

1    A.  Yeah.
2    Q.  -- that you listed -- hold on.  You gotta let
3  me finish question.
4       Is it true that when you referred to a
5  services agreement with an affiliate of Smartmatic, you
6  were referring to services being provided by Smartmatic
7  to Sequoia even post-disposition?
8    A.  Yes.
9    Q.  And what was the purpose of those services?
10   A.  To provide Sequoia -- you got realize -- at
11  that point in time, Sequoia had just gone from being a
12  $50 million company to a $250 million company.  So it
13  needed resources, expertise, et cetera.
14   Q.  Let's go Paragraph 18 of Exhibit 2.
15      Starting at least as earlier as mid 2007,
16  Sequoia faced financial difficulties.  The financial
17  panic of 2008 and resulting recession along with
18  certification issues exasperated those difficulties.
19   A.  Uh-huh.
20   Q.  What sorts of financial difficulties were you
21  referring to there?
22   A.  When you -- when a company has always been a --
23  first of all, the financial market in the world had
24  turned upside down about that time.  The election
25  industry was in all kinds of trouble at that time.

76

1       And when you have always been a subsidiary
2  of somebody -- another company, you never had any debt
3  yourself.  So it's better if you have debt because it's
4  easier to get whoever's your debtor loan you more money
5  so they don't lose anything.  So we had no debt.  And it
6  made it very difficult to raise money.
7    Q.  When you say we, are you referring to Sequoia?
8    A.  Sequoia.
9    Q.  Paragraph 19 of Exhibit 2, you say:  Due to its
10  financial difficulties, in 2009, Sequoia sold two of its
11  biggest assets.  In a July 15, 2009 asset purchase
12  agreement, Sequoia sold the contract that it had with
13  the State of New York to Dominion.
14      You see that in your declaration?
15   A.  I know that.  I don't need to read it.
16   Q.  Okay.  Whose decision was it to engage in those
17  two sales that you talk about in Paragraph 19?
18   A.  My decision.
19   Q.  Did Mr. Mugica or anybody else for Smartmatic
20  have any impact on that decision?
21   A.  No.
22   Q.  Following the sale of Sequoia to SVS, did
23  Mr. Mugica ever call on you to --
24   A.  Yeah.
25   Q.  -- ask for certain things?

Jack Blaine - October 2, 2023

85

1    To be clear, it's Exhibit B to the
2 document that is your declaration that we have marked as
3 Exhibit 2.
4    But, in any event, just want to have you
5 look at this and confirm that this is, indeed, the stock
6 purchase agreement by and among SVS, Holdings, Inc.,
7 sequoia Voting Systems, Inc., and Smartmatic
8 Corporation.
9    A.  You just want me to say yes?
10    Q.  I just need you to confirm that this is, in
11 fact, the stock purchase agreement.  It's attached to
12 your declaration.
13    A.  It appears that it is.
14    Q.  Okay.  If you'll jump to Page 36 -- actually,
15 before we do that, let's see if we can take a shortcut.
16    Is it your recollection that when
17 Smartmatic sold Sequoia to the management group through
18 SVS, that Smartmatic retained the rights to the
19 intellectual property?
20    MR. BREIG:  Object to form.
21    A.  My recollection is they retained the
22 intellectual property to their products.
23    Q.  (By Mr. Stowe) So when it was sold, Sequoia was
24 told SVS, Smartmatic, it's your understanding, retained
25 the intellectual property to Smartmatic's products,

86

1 correct?
2    A.  Yes.  Again, with that same understanding with
3 the government that we would be moving away from those
4 products.
5    Q.  Okay.  But that -- that understanding that you
6 just testified about is not in the stock purchase
7 agreement between SVS, Sequoia, and Smartmatic, is it?
8    A.  No.  Again, my recollection is that issue came
9 up when CFIUS reviewed this document.  It was -- it was
10 made that we would move away from those products.
11    Q.  Okay.  Now, if you will, go to Exhibit G to
12 your declaration.  So it's right in front of you.
13    And correct me if I've already gotten you
14 to tell me whether or not this is the true and correct
15 document.
16    But I'll represent to you that this is
17 attached to your declaration.
18    And my question is simply:  Is this a true
19 and correct copy of the asset purchase agreement between
20 Dominion Voting Systems Corporation and Sequoia Voting
21 Systems, Inc.?
22    A.  Appears to be.
23    Q.  Okay.  Great.
24    And if you'll go to Exhibit I, which is
25 right behind Exhibit H.  It's in that document right

87

1 there (indicating), the one that's called Exhibit H.  If
2 you'll just flip back, you'll see -- excuse me -- it is
3 Exhibit I.  I'm sorry for causing confusion.
4    And I'll just ask you the same question.
5    Is the Exhibit I that we're looking at,
6 which is embed in the document we've marked as
7 Exhibit 2, a true and correct copy of the asset purchase
8 agreement dated June 3, 2010 between Dominion Voting
9 Systems, Inc. and Sequoia Voting Systems, Inc.?
10    A.  It's the same document right or not.
11    Q.  It appears to be a different one.
12    A.  That's a bit confusing.
13    Q.  Your declaration explains it.  I'm just asking
14 whether or not the documents attached to your
15 declaration are true and correct copies of what you
16 purport them to be in your declaration.
17    Can you confirm that?
18    A.  Appears to be.
19    Q.  Okay.  When Sequoia -- back up.
20    When Smartmatic sold Sequoia to the
21 management team through SVS, there were products that
22 went in the sale that were developed by Smartmatic,
23 correct?
24    MR. BREIG:  Object to form.
25    A.  That is not my recollection.  The products

88

1 that -- oh, say that again.
2    Q.  (By Mr. Stowe) So when Smartmatic sold Sequoia
3 to the management team through SVS, there were products
4 that went in the sale to Sequoia that were developed by
5 Smartmatic, correct?
6    MR. BREIG:  Object to form.
7    A.  That would not be my recollection.  I wouldn't
8 think that Sequoia purchased products from Smartmatic.
9    Q.  (By Mr. Stowe) Sequoia licensed products from
10 Smartmatic after the sale of Sequoia to SVS that were
11 developed by Smartmatic, yes?
12    A.  Yes.
13    Q.  I'm sorry?
14    A.  Yes.
15    Q.  Then when Sequoia is sold to Dominion _-
16    A.  Oh, that's not what you said before.
17    Q.  I know.  I'm moving topics now.
18    Jumping forward, Sequoia is eventually
19 sold to Dominion, yes?
20    A.  (Nodding head.)
21    Q.  Correct?
22    A.  Uh-huh.  (Nodding head.)
23    Q.  When Sequoia is sold to Dominion, there were
24 machines and software that went and were acquired by
25 Dominion that had originally been developed by

1    Certified to by me on this 11th day of October,

2  2023.

3

4

5                        Amy M. Clark, CSR
                         Texas CSR 8753
6                        Expiration:  10/31/2025
                         Dickman Davenport, Inc.
7                        Firm No. 312
                         4228 N. Central Expressway
8                        Suite 101
                         Dallas, Texas 75206
9                        (800)445-9548

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



# Exhibit O-12



Confidential

SMMT-OAN08063656
SMMT-OAN08063656

**APP2164**



Confidential



Confidential

SMMT-OAN08063664
SMMT-OAN08063656



Confidential

SMMT-OAN08063666
SMMT-OAN08063656



Confidential

SMMT-OAN08063954
SMMT-OAN08063656

**APP2168**

# Exhibit O-13

# Sequoia Voting Systems supports review of primary election process and procedures

**Oakland, CA, March 29th, 2006.** Sequoia Voting Systems supports the decision of the City of Chicago Board of Elections and Cook County to review all aspects of the March 21 election. The company anticipates that the results of these examinations will confirm that the equipment and support provided by Sequoia has met or exceeded the contractual and ethical obligations set forth by the City and County.

We are continuing to work with the Cook County Clerk's office and the City of Chicago Board of Elections to facilitate a smoother election process for the November general election by assisting in the assessment of the procedural and human factors surrounding the primary elections, said Jack Blaine, president, Sequoia Voting Systems. In addition, we will also be making technical reviews of the system and stand ready to assist any independent technical reviews the City or County decides to undertake".

For over 100 years, California-based Sequoia Voting Systems has been a leader in providing election equipment and support to cities, counties, and states across the country. The company's equipment has been in use in hundreds of jurisdictions in 20 states.

The primary election in the City of Chicago and Cook County had unique challenges. Voters and election judges experienced early voting for the first time. New technology was employed that required strict procedures for data collection.

In addition, the use of two different types of voting machines presented additional data collection challenges. According to a recent public letter, Chicago Board of Elections Chairman Langdon D. Neal and Cook County Clerk David Orr concurred that. This was not unexpected in that no election authority has ever merged and transmitted election results from two voting systems in the polling place".

Despite the delays, there was good news to report about the new system and the overall election experience.

According to statements made in recent press conferences by the Chicago Board of Elections, everyone who cast a vote in the primary election had their vote counted accurately. In general, voters liked the new system compared to the old punch cards. The process of voting was much easier and simpler and, the average voter experience was a good one. In addition, there was no evidence on any election fraud.

In the same public letter, Chairman Neal and County Clerk Orr declared that In fact, for most voters, election day was a fairly simple and trouble-free experience.

Sequoia has direct responsibility for the technical performance of the voting equipment in Cook County and the City of Chicago. Company officials are confident the tabulation technology worked appropriately and will be making the necessary adjustments to ensure that the machines are more user-friendly for election judges.

Whether it's your office network, cell phone, iPod, or yes, even your voting device, there are going to be growing pains associated with the introduction of new technology, said Blaine. We're very confident that Sequoia, the Chicago Board of Elections, and Cook County can work together to resolve the challenges that surfaced last week, and ensure that voting in Chicago and Cook County is easy, accurate, efficient, and reported as quickly as possible".

**APP2170**

**

**About Smartmatic**

Smartmatic is a multinational company that specializes in the design and end-to-end deployment of complex purpose-specific technology solutions. With an unsurpassed technology base, continuous innovation, and quality in processes and results, Smartmatic is organized around three business areas: Electronic voting systems, intelligent and integrated security systems for large enterprises and governments, and advanced solutions for people registration and authentication for a wide range of government applications.

Smartmatic is a privately held company with offices in the US, Mexico, Venezuela, Barbados, Spain, Philippines, and Taiwan.  It has more than 200 employees worldwide.  Its capacity for innovation and wide range of products and services have earned Smartmatic extensive recognition in the technology community worldwide.

**Contact Information:**

For additional information on this press release, please write us to press@smartmatic.com.

**

**About Sequoia Voting Systems**

Sequoia Voting Systems is an American company, based in Oakland, California with a 100-year history of providing accurate, reliable, state-of-the-art voting solutions dating back to the nation's first lever-based mechanical voting equipment in the 1890s. Sequoia provides election technology, services, and support to state and local government including precinct-based optical scan ballot readers, high-speed central count optical scan ballot readers, ballot layout and printing services, and full-face and paginating electronic voting equipment with optional printers that produce voter-verifiable paper records. The company has hundreds of customers throughout 16 states and the District of Columbia.

**Contact Information:**

Michelle M. Shafer

VP, Communications & External Affairs

mshafer@sequoiavote.com

**APP2171**

# Exhibit O-14



www.archive.org
415.561.6767
415.840-0391 e-fax

Internet Archive
300 Funston Avenue
San Francisco, CA  94118

## AFFIDAVIT OF CHRISTOPHER BUTLER

1. I am the Office Manager at the Internet Archive, located at the Presidio of San Francisco, California. I make this declaration of my own personal knowledge.

2. The Internet Archive is a website that provides access to a digital library of Internet sites and other cultural artifacts in digital form. Like a paper library, we provide free access to researchers, historians, scholars, and the general public. The Internet Archive is affiliated with and receives support from various institutions, including the Library of Congress.

3. The Internet Archive has created a service known as the Wayback Machine. The Wayback Machine makes it possible to surf more than 150 billion pages stored in the Internet Archive's web archive. Visitors to the Wayback Machine can type in a URL (i.e., a website address), select a date range, and then begin surfing on an archived version of the Web. The links on the archived files, when served by the Wayback Machine, point to other archived files (whether HTML pages or images). If a visitor clicks on a link on an archived page, the Wayback Machine will serve the archived file with the closest available date to the originally requested page.

4. The Internet Archive receives data from third parties who compile the data by using software programs known as crawlers that surf the Web and automatically store copies of website files at certain points in time as they existed at that point in time. This data is donated to the Internet Archive, which preserves and provides access to it.

5. The Internet Archive assigns a URL on its site to the archived files in the format http://web.archive.org/web/[Year in yyyy][Month in mm][Day in dd][Time code in hh:mm:ss]/[Archived URL]. Thus, the Internet Archive URL http://web.archive.org/web/19970126045828/http://www.archive.org/ would be the URL for the record of the Internet Archive home page HTML file (http://www.archive.org/) archived on January 26, 1997 at 4:58 a.m. and 28 seconds (1997/01/26 at 04:58:28). Typically, a printout from a Web browser will show the URL in the footer. The date assigned by the Internet Archive applies to the HTML file but not to image files linked therein.  Such image files have their own unique URLs and are assigned their own unique date codes, Thus images that appear on the printed page may not have been archived on the same date as the HTML file. Likewise, if a website is designed with "frames," the date assigned by the Internet Archive applies to the frameset as a whole, and not the individual pages within each frame.

6. Attached hereto as Exhibit A are true and accurate copies of printouts of the Internet Archive's records of the HTML files archived from the URLs and the dates specified in the footer of the printout.

7. Attached hereto as Exhibit B are true and accurate copies of printouts of the Internet Archive's records of image files archived from the URLs and the dates specified in the footer of the printout.

8. I declare under penalty of perjury that the foregoing is true and correct.

DATE: 1/7/10

Christopher Butler

State of California, County of SAN FRANCISCO
Subscribed and sworn to (or affirmed)
before me on this 7TH day of JAN ; 20 10 , by
CHRISTOPHER BUTLER
proved to me on the basis of satisfactory evidence to be the
person(s) who appeared before me.
Signature N Wing (Seal)

STEVE WONG
COMM. #1644336
Notary Public-California
SAN FRANCISCO COUNTY
My Comm. Exp. Feb 10, 2010



www.archive.org
415.561.6767
415.840-0391 c-fax

Internet Archive
300 Funston Avenue
San Francisco, CA  94118

## AFFIDAVIT OF CHRISTOPHER BUTLER

1. I am the Office Manager at the Internet Archive, located in San Francisco, California. I make this declaration of my own personal knowledge.

2. The Internet Archive is a website that provides access to a digital library of Internet sites and other cultural artifacts in digital form. Like a paper library, we provide free access to researchers, historians, scholars, and the general public. The Internet Archive has partnered with and receives support from various institutions, including the Library of Congress.

3. The Internet Archive has created a service known as the Wayback Machine. The Wayback Machine makes it possible to surf more than 400 billion pages stored in the Internet Archive's web archive. Visitors to the Wayback Machine can search archives by URL (i.e., a website address).  If archived records for a URL are available, the visitor will be presented with a list of available dates.  The visitor may select one of those dates, and then begin surfing on an archived version of the Web. The links on the archived files, when served by the Wayback Machine, point to other archived files (whether HTML pages or images). If a visitor clicks on a link on an archived page, the Wayback Machine will serve the archived file with the closest available date to the page upon which the link appeared and was clicked.

4. The archived data made viewable and browseable by the Wayback Machine is compiled using software programs known as crawlers, which surf the Web and automatically store copies of web files, preserving these files as they exist at the point of time of capture.

5. The Internet Archive assigns a URL on its site to the archived files in the format http://web.archive.org/web/[Year in yyyy][Month in mm][Day in dd][Time code in hh:mm:ss]/[Archived URL].  Thus, the Internet Archive URL http://web.archive.org/web/19970126045828/http://www.archive.org/ would be the URL for the record of the Internet Archive home page HTML file (http://www.archive.org/) archived on January 26, 1997 at 4:58 a.m. and 28 seconds (1997/01/26 at 04:58:28). A web browser may be set such that a printout from it will display the URL of a web page in the printout's footer. The date assigned by the Internet Archive applies to the HTML file but not to image files linked therein. Thus images that appear on a page may not have been archived on the same date as the HTML file. Likewise, if a website is designed with "frames," the date assigned by the Internet Archive applies to the frameset as a whole, and not the individual pages within each frame.

6. Attached hereto as Exhibit A are true and accurate copies of printouts of the Internet Archive's records of the HTML and PDF files for the URLs and the dates specified in the footer of the printout (for HTML) or attached coversheet (for PDFs).

7. I declare under penalty of perjury that the foregoing is true and correct.

DATE: 1/15/15                          _____
                                        Christopher Butler

# EXHIBIT 4

**APP2174**

## CALIFORNIA JURAT

See Attached Document.

State of California
County of San Francisco

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

Subscribed and sworn to (or affirmed) before me on this

15 ᵗʰ day of JANUARY , 201 5 , by

Christopher Butler,

proved to me on the basis of satisfactory evidence to be the person who appeared before me.

DANIEL MARCRUM
Commission # 2084554
Notary Public - California
San Francisco County
My Comm. Expires Oct 3, 2018

Signature: _____

# Exhibit O-15



Confidential



-7-

Confidential

SMMT-OAN00053520
SMMT-OAN00053512

**APP2178**

# Exhibit O-16

# Smartmatic Announces It Will Sell Sequoia Voting Systems, Withdraw from CFIUS Review

Dec 22, 2006   Press Release

WASHINGTON, DC – Voting machine firm Smartmatic has announced that it plans to sell major voting machine maker Sequoia Voting Systems. With this pending sale, Smartmatic is withdrawing from the Committee on Foreign Investment in the United States investigation into its 2005 purchase of Sequoia.

Rep. Carolyn Maloney (NY-14), who first raised the need for an investigation of the Sequoia deal to the Department of the Treasury, said today that the CFIUS review, though initially resisted by Smartmatic, was vital in helping eliminate questions about the soundness of the Sequoia voting machines.

"There clearly remained doubts surrounding this company, and as long as those doubts lingered, many people would have legitimate questions about the integrity of these voting machines," said Maloney. "When I first raised this case with Treasury, I thought that it was ripe for a CFIUS investigation, because the integrity of our voting machines is vital to national security. At that time, Smartmatic flatly refused to undergo a CFIUS review. But now it seems the company could not overcome the cloud of doubt surrounding this deal – had they been able to, we would not be talking about a sale of Sequoia today. As I said in May, it seems that a CFIUS review was in fact the proper course.

"It is apparent that the CFIUS process, though it had not completely run its course, was necessary to spur this action that will eliminate this issue with these voting machines. To me, this reinforces the importance of the CFIUS review system, and it underscores the need for a system that will consistently pinpoint the deals that should be reviewed and reliably ask the necessary questions. CFIUS raised no red flags on the Dubai Ports deal, and this deal would not have been reviewed had it not been brought to their attention. These are two examples of why we need a stronger CFIUS process."

When Maloney first raised the possibility of a CFIUS review in May, Sequoia's initial response was to vehemently dismiss the need for an investigation (http://maloney.house.gov/sites/maloney.house.gov/files/documents/financial/acquisitions/20060511SmartmaticRls.pdf).

For a few years, questions have surrounded Smartmatic about its ownership and its possible ties to the Venezuelan government. It has also been recently reported that Smartmatic is the subject of a Department of Justice investigation into possible bribery of the Venezuelan government and U.S. tax fraud.

Maloney is the lead Democratic sponsor of H.R. 5337, the legislation to reform the CFIUS process that unanimously passed the House earlier this year. Among other provisions, that bill would enhance CFIUS reporting to Congress and increase monitoring of withdrawal agreements.

### 

**Issues:** Financial Services, Foreign Acquisitions and National Security, Homeland Security

**APP2180**

# Exhibit O-17



Confidential

SMMT-OAN01502087
SMMT-OAN01502087



Confidential



Confidential

SMMT-OAN01502089
SMMT-OAN01502087

**APP2184**



Confidential

SMMT-OAN01502090
SMMT-OAN01502087

**APP2185**



Confidential



Confidential

**APP2187**

SMMT-OAN01502092
SMMT-OAN01502091



Confidential



Confidential



Confidential



Confidential



Confidential

SMMT-OAN01502097
SMMT-OAN01502091

# Exhibit O-18



Confidential

SMMT-OAN03087486
SMMT-OAN03087486

# Exhibit O-19



CERTIFIED TRANSCRIPTION OF AUGUST 7, 2017

SMARTMATIC PRESS CONFERENCE

1           UNIDENTIFIED FEMALE:  Hi, everybody.

2   Thank you very much for being here.  I would like to

14:18:28  3   introduce you to Antonio Mugica, the chief --

4           MR. MUGICA:  Smartmatic has provided

5   election technology and support services in Venezuela

14:18:55  6   since 2004.  Even in moments of deep political

7   conflict and division, we have been satisfied that the

8   voting process and the count has been completely

9   accurate.  It is therefore with the deepest regret

10  that we have to report that the turnout numbers on

11  Sunday, 30th of July, for the constituent assembly in

12  Venezuela were tampered with.

13          Based on the robustness of our system, we

14  know without any doubt that the turnout of the recent

15  election for a national constituent assembly was

16  manipulated.  It is important to highlight that

17  similar manipulations are made in manual elections in

14:19:57  18  many countries, but they go undetected because of the

19  lack of electronic security and auditing safeguards.

20          So what happened?  Why can't we stand by

21  the results of previous Venezuelan elections, but we

22  cannot endorse the elections held last Sunday?  Our

23  ultimate election system is designed to make -- to

14:20:24  24  make it evident when results are manipulated.

25  However, there must be people auditing the system and

Smartmatic Press Conference - August 7, 2017

1    watching for that evidence.  During the national

2    constituent assembly elections, there were no auditors

3    from the opposition parties as they did not want to

4    participate.

5                  UNIDENTIFIED REPORTER:  So how do you

6    come up with the 1 million?

14:20:59   7          MR. MUGICA:  An audit would allow

8    everyone to know the exact participation.  We estimate

9    the difference between the actual participation and

10   the one announced by the authorities is at least 1

11   million votes.  It is important to point out that this

12   would not have occurred if the auditors of all

13   political parties have been present at every stage of

14   the election.

14:21:30   15         UNIDENTIFIED REPORTER:  (Inaudible).  So

16   how can we actually trust what you're saying?

17                 MR. MUGICA:  (In Spanish)  Smartmatic has

18   provided the technological platform of voting and

19   service for the elections of Venezuela since the year

20   2004.  Even moments of deep political conflict we have

21   been certain that the voting process and the results

22   have been completely accurate.  Today with the deepest

23   regret we have to inform that the participation data

24   of last Sunday, July 30, for the election of the

25   constituent assembly was manipulated.

Smartmatic Press Conference - August 7, 2017

1                    (End of recording.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        I, Audra B. Paty, court-approved transcriber,
2  certify that the foregoing is a correct transcription
3  from the audio recording in the above-entitled matter.
4        I further certify that I am neither counsel
5  for, related to, nor employed by any of the parties to
6  the action in which this recording was taken, and
7  further that I am not financially or otherwise
8  interested in the outcome of the action.
9        Given under my hand and seal of office on the
10  4th day of December, 2023.
11
12
13  _____
         Audra B. Paty, Certified
14       Shorthand Reporter No. 5987
         Dickman Davenport, Inc.
15       Firm Registration #312
         4228 North Central Expressway
16       Suite 101
         Dallas, Texas 75206
17       (214) 855-5100   (800) 445-9548
         e-mail:  abp@dickmandavenport.com
18       My commission expires 10-31-24
19
20
21
22
23
24
25

**Smartmatic Press Conference - August 7, 2017**

**A**

above-entitled 5:3
abp@dickman... 5:17
accurate 2:9 3:22
action 5:6,8
actual 3:9
allow 3:7
announced 3:10
Antonio 2:3
assembly 2:11,15 3:2,25
audio 5:3
audit 3:7
auditing 2:19,25
auditors 3:2,12
Audra 5:1,13
AUGUST 1:11
authorities 3:10

**B**

B 5:1,13
Based 2:13

**C**

Central 5:15
certain 3:21
Certified 1:11 5:13
certify 5:2,4
chief 2:3
come 3:6
commission 5:18
completely 2:8 3:22
CONFERENCE 1:12
conflict 2:7 3:20
constituent 2:11 2:15 3:2,25
correct 5:2
counsel 5:4
count 2:8
countries 2:18

court-approved 5:1

**D**

Dallas 5:16
data 3:23
Davenport 5:14
day 5:10
December 5:10
deep 2:6 3:20
deepest 2:9 3:22
designed 2:23
Dickman 5:14
difference 3:9
division 2:7
doubt 2:14

**E**

e-mail 5:17
election 2:5,15,23 3:14,24
elections 2:17,21 2:22 3:2,19
electronic 2:19
employed 5:5
endorse 2:22
estimate 3:8
everybody 2:1
evidence 3:1
evident 2:24
exact 3:8
expires 5:18
Expressway 5:15

**F**

FEMALE 2:1
financially 5:7
Firm 5:15
foregoing 5:2
further 5:4,7

**G**

Given 5:9
go 2:18

**H**

hand 5:9
happened 2:20
held 2:22
Hi 2:1
highlight 2:16

**I**

important 2:16 3:11
Inaudible 3:15
inform 3:23
interested 5:8
introduce 2:3

**J**

July 2:11 3:24

**K**

know 2:14 3:8

**L**

lack 2:19

**M**

manipulated 2:16,24 3:25
manipulations 2:17
manual 2:17
matter 5:3
million 3:6,11
moments 2:6 3:20
Mugica 2:3,4 3:7 3:17

**N**

national 2:15 3:1
neither 5:4
North 5:15
numbers 2:10

**O**

occurred 3:12
office 5:9
opposition 3:3

outcome 5:8

**P**

participate 3:4
participation 3:8 3:9,23
parties 3:3,13 5:5
Paty 5:1,13
people 2:25
platform 3:18
point 3:11
political 2:6 3:13 3:20
present 3:13
PRESS 1:12
previous 2:21
process 2:8 3:21
provided 2:4 3:18

**Q**

**R**

recording 4:1 5:3 5:6
Registration 5:15
regret 2:9 3:23
related 5:5
report 2:10
Reporter 3:5,15 5:14
results 2:21,24 3:21
robustness 2:13

**S**

safeguards 2:19
satisfied 2:7
saying 3:16
seal 5:9
security 2:19
service 3:19
services 2:5
Shorthand 5:14
similar 2:17
Smartmatic 1:12

2:4 3:17
Spanish 3:17
stage 3:13
stand 2:20
Suite 5:16
Sunday 2:11,22 3:24
support 2:5
system 2:13,23 2:25

**T**

taken 5:6
tampered 2:12
technological 3:18
technology 2:5
Texas 5:16
Thank 2:2
Today 3:22
transcriber 5:1
transcription 1:11 5:2
trust 3:16
turnout 2:10,14

**U**

ultimate 2:23
undetected 2:18
UNIDENTIFI... 2:1 3:5,15

**V**

Venezuela 2:5,12 3:19
Venezuelan 2:21
votes 3:11
voting 2:8 3:18 3:21

**W**

want 3:3
watching 3:1

**X**

Smartmatic Press Conference - August 7, 2017

| | | | | |
|---|---|---|---|---|
| **Y** | | | | |
| **year** 3:19 | | | | |
| **Z** | | | | |
| **0** | | | | |
| **1** | | | | |
| **1** 3:6,10 | | | | |
| **10-31-24** 5:18 | | | | |
| **101** 5:16 | | | | |
| **2** | | | | |
| **2004** 2:6 3:20 | | | | |
| **2017** 1:11 | | | | |
| **2023** 5:10 | | | | |
| **214** 5:17 | | | | |
| **3** | | | | |
| **30** 3:24 | | | | |
| **30th** 2:11 | | | | |
| **312** 5:15 | | | | |
| **4** | | | | |
| **4228** 5:15 | | | | |
| **445-9548** 5:17 | | | | |
| **4th** 5:10 | | | | |
| **5** | | | | |
| **5987** 5:14 | | | | |
| **6** | | | | |
| **7** | | | | |
| **7** 1:11 | | | | |
| **75206** 5:16 | | | | |
| **8** | | | | |
| **800** 5:17 | | | | |
| **855-5100** 5:17 | | | | |

# Exhibit O-20

# Smartmatic Statement on the recent Constituent Assembly Election in Venezuela

*United Kingdom, London – August 2, 2017 – Smartmatic has provided election technology and support services in Venezuela since 2004. Even in moments of deep political conflict and division we have been satisfied that the voting process and the count has been completely accurate. It is, therefore, with the deepest regret that we have to report that the turnout figures on Sunday, 30 July, for the Constituent Assembly in Venezuela were tampered with.*

The automated election system used in Venezuela is tamper evident and self-reports any attempt to interfere with it. This means that the system is designed to protect the votes from any manipulation and to immediately identify and alert of such an attempt. This security feature is achieved by combining a series of auditing mechanisms, intrinsic to the system, that are impossible to circumvent.

Smartmatic has stood behind all the results of the elections held in Venezuela from 2004 to 2015, regardless of what political party won. When President Chavez won in 2004, we did not hesitate to endorse those results based on the many safeguards of our platform and the multiple audits that were carried out. This has always been the case in each and every election thereafter, including when President Maduro won in 2013 by a razor thin margin, or when the opposition won the majority of the National Assembly in 2015.

Based on the robustness of our system, we know, without any doubt, that the turn out of the recent election for a National Constituent Assembly was manipulated. It is important to highlight that similar manipulations are made in manual elections in many countries, but because of the lack of electronic security and auditing safeguards, they go unnoticed.

So, what happened? Why can we stand by the results of previous Venezuelan elections but we cannot endorse the elections held last Sunday? Our automated election system is designed to make it evident when results are manipulated, however, there must be people auditing the system and watching for that evidence. During the National Constituent Assembly elections there were no auditors from the opposition parties as they did not want to participate.

A vulnerability of any election that is clearly identified is that the consolidated results report that the system produces at the National Tabulation Center at the end of Election Day can be ignored by the authorities in charge of running the election and that altered results can be announced in its place. This is why, in all previous elections since 2004, representatives from all the political parties have been present in the Tabulation Center when the results report is issued to have access to the same information. In the election of the Constituent Assembly in 2017, there were no such representatives.

In addition, in all elections held in Venezuela since 2004, all political parties have received printed copies of the election returns of all polling stations. When the election commission publishes the results on its website, precinct by precinct, it is very easy to compare all these printed records against the results published by the elections commission.

Furthermore, the total sum of all election returns must coincide with the final results published by the National Elections Council. This auditing mechanism allows all parties involved to prevent any type of manipulation in the transmission, tallying and publication of election night reports. This protocol has

been followed in all Venezuelan elections since 2004, except for the election last Sunday, because the opposition didn't participate.

An audit would allow everyone to know the exact participation. We estimate the difference between the actual participation and the one announced by authorities is at least one million votes. It is important to point out that this would not have occurred if the auditors of all political parties had been present at the different stages of the election.

**APP2205**

# Exhibit O-21



Sign In    Subscribe

Saturday, December 02, 2023

News ▾    Policy ▾    Opinion ▾    Watch ▾    Restoring America    Newsletters    SUBSCRIBER CONTENT ▾

WATCH LIVE: Donald Trump addresses voters in Cedar Rapids    ✕

STATES

# Officials raised concerns for years about security of US voting machines, software systems

by Bethany Blankley, The Center Square | November 09, 2020 12:00 PM

    

The Dominion Voting Systems, which has been used in multiple states where fraud has been alleged in the 2020 U.S. Election, was rejected three times by data communications experts from the Texas Secretary of State and Attorney General's Office for failing to meet basic security standards.

Unlike Texas, other states certified the use of the system, including Pennsylvania, where voter fraud has been alleged on multiple counts this week.

  

The 29 Coolest Gifts of 2023

Dominion Voting Systems, a Canadian company headquartered in Denver, is one of three companies primarily used in U.S. elections. The others are Election Systems and Software and Texas based-Hart InterCivic.

The Dominion system was implemented in North Carolina and Nevada, where election results are being challenged, and in Georgia and Michigan, where a "glitch" that occurred reversed thousands of votes for Republican President Donald Trump to Democrat Joe Biden.

While Biden declared victory Saturday in his U.S. presidential race against Trump, the Trump campaign is launching several challenges to vote counts in states across the country, alleging fraud.



Search for

1  10 SIGNS OF LUNG CANCER        ▶
2  10 STOCKS TO HOLD FOREVER      ▶
3  CHEAP CAR RENTAL DEALS         ▶
4  10 SIGNS OF ALLERGIES          ▶
5  EARLY SIGNS OF KIDNEY FAILURE  ▶

## Latest

WATCH LIVE: Donald Trump addresses voters in Cedar Rapids
By: Christopher Hutton


Gov. Gretchen Whitmer signs voting rights legislation for ex-cons and teens
By: Christopher Hutton


Susan Sarandon issues apology for Israel comments after Hollywood agency reportedly drops her
By: Jenny Goldsberry


## Videos

Reporter's Notebook: Trump's Obamacare Christmas gift to...


Reporter's Notebook: Good economic news as the holiday...


Georgia judge questions whether Trump can be tried if he wins 2024...


House GOP spending bill votes unleash fresh abortion attack...


## Newsletters





Saturday, December 02, 2023

Sign In     Subscribe

| 4 | 10 SIGNS OF ALLERGIES | ▶ |
| 5 | EARLY SIGNS OF KIDNEY FAILURE | ▶ |
| 6 | 5 STOCKS TO BUY NOW | ▶ |

Featured Insights

Dominion's Democracy Suite system was chosen for statewide implementation in New Mexico in 2013, the first year it was rejected by the state of Texas.

Louisiana modernized its mail ballot system by implementing Dominion's ImageCast Central software statewide; Clark County, Nevada, implemented the same system in 2017. Roughly 52 counties in New York, 65 counties in Michigan and the entire state of Colorado and New Mexico use Dominion systems.

According to a Penn Wharton study, "The Business of Voting," Dominion Voting Systems reached approximately 71 million voters in 1,635 jurisdictions in the U.S. in 2016.

Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that has played a significant role in the U.S. market over the last decade," according to a report published by UK-based AccessWire.

Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software inventory provided by Smartmatic is inadequate, ... which brings into question the software credibility," ABS-CBN reported.

Smartmatic's chairman is a member of the British House of Lords, Mark Malloch Brown, a former vice-chairman of George Soros' Investment Funds, former vice-president at the World Bank, lead international partner at Sawyer Miller, a political consulting firm, and former vice-chair of the World Economic Forum who "remains deeply involved in international affairs." The company's reported globalist ties have caused members of the media and government officials to raise questions about its involvement in the U.S. electoral process.

In January, U.S. lawmakers expressed concern about foreign involvement through these companies' creation and oversight of U.S. election equipment. Top executives from the three major companies were grilled by both Democratic and Republican members of the U.S. House Committee on House Administration about the integrity of their systems.

Also in January, election integrity activists expressed concern "about what is known as supply-chain security, the tampering of election equipment during manufacturing," the Associated Press reported. "A document submitted to North Carolina elections officials by ES&S last year shows, for example, that it has manufacturing operations in the Philippines."



The 29 Coolest Gifts of 2023

 Consumerbags     Open

All three companies "have faced criticism over a lack of transparency and reluctance to open up their proprietary systems to outside testing," the Associated Press reported. In 2019, the AP found that these companies "had long skimped on security in favor of convenience and operated under a shroud of financial and operational secrecy despite their critical role in elections."

In its third examination of Dominion systems in 2019, Texas officials once again rejected using it after

Sign up now to get the Washington Examiner's breaking news and timely commentary delivered right to your inbox.



Saturday, December 02, 2023

## Washington Examiner

Sign In    Subscribe

companies "had long skimped on security in favor of convenience and operated under a shroud of financial and operational secrecy despite their critical role in elections."

In its third examination of Dominion systems in 2019, Texas officials once again rejected using it after identifying "multiple hardware and software issues that preclude the Office of the Texas Secretary of State from determining that the Democracy Suite 5.5-A system satisfies each of the voting-system requirements set forth in the Texas Election Code."

The examiners raised specific concerns about whether the system "was suitable for its intended purpose; operates efficiently and accurately; and is safe from fraudulent or unauthorized manipulation."

They concluded that Dominion systems and corresponding hardware devices did not meet Texas Election Code certification standards.

Last December, a group of Democratic politicians sent a letter to leaders of private equity firms that own the major election vendors asking them to disclose information including ownership, finances and research investments.

"The voting machine lobby, led by the biggest company, ES&S, believes they are above the law," Sen. Ron Wyden, D-Ore., a member of the Intelligence Committee and co-signer of the letter, said. "They have not had anybody hold them accountable even on the most basic matters."

ES&S Chief Executive Tom Burt dismissed the criticism, telling NBC News that it was "inevitable and impossible to answer," and called on Congress to implement "greater oversight of the national election process."

"There are going to be people who have opinions from now until eternity about the security of the equipment, the bias of those companies who are producing the equipment, the bias of the election administrators who are conducting the election," Burt told NBC News.

"What the American people need is a system that can be audited, and then those audits have to happen and be demonstrated to the American public," Burt said.

Burt argued last year in an op-ed published by Roll Call that national regulatory oversight was needed, including requirements for paper backups of individual votes, mandatory post-election audits and additional resources for the U.S. Election Assistance Commission.

NBC News examined publicly available online shipping records for ES&S and found that many parts for U.S. election machines, including electronics and tablets, were made in China and the Philippines. When it raised concerns about the potential for technology theft or sabotage, Burt said the overseas facilities were "very secure" and the final assembly of machines occurs in the U.S.

The AP also surveyed the election software being used by all 50 states, the District of Columbia and territories. Roughly 10,000 election jurisdictions nationwide were using Windows 7 or an older operating system in 2019 to create ballots, program voting machines, tally votes and report counts, the AP found. Windows 7 reached the end of its operational life in January 2020.

After Jan. 14, Microsoft stopped providing technical support and producing "patches" to fix software vulnerabilities, making Windows 7 easy to hack unless U.S. jurisdictions paid a fee to receive security updates through 2023, the AP found.

According to its assessment, multiple states were affected by the end of Windows 7 support, including Arizona, Florida, Georgia, Iowa, Indiana, Michigan, North Carolina, many counties in Pennsylvania, and Wisconsin.

  

    Share your thoughts with friends.

**Paid Content**

Document title: Officials raised concerns for years about security of US voting machines, software systems | Washington Examiner
Capture URL: https://www.washingtonexaminer.com/politics/officials-raised-concerns-for-years-about-security-of-us-voting-machines-software-systems
Capture timestamp (UTC): Sat, 02 Dec 2023 21:42:54 GMT

**APP2209**





Washington Examiner

Sign In

Subscribe

Saturday, December 02, 2023




## Paid Content



**Vanguard vs. Fidelity vs. Schwab**
Sponsored: smartasset.com



**The Truth About Keeping Muscle Mass After 50**
Sponsored: alphahealthfindings.com



**The Worst Way to Withdraw From Retirement Accounts**
Sponsored: smartasset.com



**Here Are 23 Of The Coolest Gifts For Stocking Stuffers 2023**
Sponsored: Coolest Gifts 2023




**Good riddance, Megan Rapinoe**



**Social Security update: First of double direct payments worth $914 to arrive in just three days**



**Supreme Court set to consider conservative-backed state social media laws**



**Thousands of patriotic Americans are ditching Gmail for this private email service**
Sponsored: Proton Mail



**Establishing A New Lithium Capital In N. America**
Sponsored: Wall Street Star







The Worst Way to Withdraw From Retirement Accounts
Sponsored: smartasset.com

Here Are 23 Of The Coolest Gifts For Stocking Stuffers 2023
Sponsored: Coolest Gifts 2023

Good riddance, Megan Rapinoe

Social Security update: First of double direct payments worth $914 to arrive in just three days

Supreme Court set to consider conservative-backed state social media laws



Thousands of patriotic Americans are ditching Gmail for this private email service
Sponsored: Proton Mail

Establishing A New Lithium Capital In N. America
Sponsored: Wall Street Star

7 Mistakes People Make When Hiring a Financial Advisor
Sponsored: smartasset.com

Urologist: 87% of Men with E.D. Don't Know About This Easy Solution (Try Tonight!)
Sponsored: urologytip.pro



Do Not Sell or Share My Personal Information

About Examiner   Magazine Archive   Staff   Policies and Standards   Sitemap   Terms Of Service

Subscription Terms of Use   Privacy Policy   Your Privacy Choices   Transparency In Coverage

Advertise   Contact   Subscribe   Newsletters   Careers   Facebook   Twitter

Copyright 2023. Washington Examiner. All Rights Reserved.

Document title: Officials raised concerns for years about security of US voting machines, software systems | Washington Examiner
Capture URL: https://www.washingtonexaminer.com/politics/officials-raised-concerns-for-years-about-security-of-us-voting-machines-software-systems
Capture timestamp (UTC): Sat, 02 Dec 2023 21:42:54 GMT

APP2211

# Exhibit O-22

THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.
REVIEW OF AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.

THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.
REVIEW OF AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.



THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.
REVIEW OF AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR COURT ORDER.

# Exhibit O-23



Confidential

**APP2217**

SMMT-OAN02569392
SMMT-OAN02569383

# Exhibit O-24



Confidential

SMMT-OAN02569395
SMMT-OAN02569383



Confidential

SMMT-OAN02569396
SMMT-OAN02569383



Confidential

**APP2221**

SMMT-OAN02569397
SMMT-OAN02569383

# Exhibit O-25

# Smartmatic disqualified from Comelec procurements



PHOTO BY ARCHIE ALGARAI CNNPH

**Metro Manila (CNN Philippines, November 29)** — The Commission on Elections (Comelec) disqualified its long-time technology provider Smartmatic from participating in any public bidding process "to uphold the integrity" of the polls amid unresolved bribery allegations against the company.

The Comelec en banc promulgated the decision on Friday, saying it cannot overlook the controversy surrounding Smartmatic, particularly claims that it bribed former Comelec chairman Andres Bautista in exchange for being awarded a contract for election machines for the 2016 elections.

Bautista has denied the bribery allegations.

In the 17-page resolution, the Comelec en banc said the US government has sought its assistance in obtaining official records as early as October 2022, as the latter probed Bautista and other entities for alleged violation of US laws, including the Foreign Corrupt Practices Act, conspiracy, wire fraud, and money laundering.

"Although these allegations, stemming from incidents potentially spanning at least three election cycles, have not been conclusively proven, their gravity and potential to damage public trust warrant the Commission (En banc's) proactive measures to safeguard the integrity of elections and democratic institutions," read the decision.

"Smartmatic Philippines, Inc. is disqualified and disallowed from participating in any public bidding process for elections, in the exercise of its administrative power to decide all matters affecting election and in pursuit of its constitutional mandate," the ruling stated.

APP2223

The commission also referred the matter to the Special Bids and Awards Committee for the 2025 automated election system (AES) for possible permanent disqualification and blacklisting of Smartmatic "from all government procurement proceedings, not just in relation to elections."

In a statement, Smartmatic expressed "profound disappointment" over the decision. The company has been the country's poll technology provider since 2010.

It maintained that it has "consistently adhered" to all procurement processes during biddings and contract execution, adding that in its 23-year history, no Smartmatic company has been indicted in the United States or any other country in connection with any election-related contract.

"We urge Comelec officials to conduct this search independently, and to show to the public any indictment against Smartmatic. We are confident there is no such indictment in the United States," it wrote.

Asked if Smartmatic can still appeal the decision before the Comelec, Garcia only said the poll body's decision is "immediately executory unless restrained."

"Mahirap po sabihin kung ano dapat remedy nila [It's hard to say what their legal remedy should be]. It's for their lawyers to decide]," he also told reporters in a message.

## 'No irregularities in 2022 elections'

While the Comelec en banc was deciding on a petition filed by the group of former Information and Communications Technology Secretary Eliseo Rio and ex-Comelec Commissioner Augusto Lagman, Garcia noted that the disqualification is not based on the allegations of Rio's group.

In June, the petitioners asked that the Comelec review Smartmatic's qualifications and possibly disqualify the company from participating in the procurement for the 2025 AES due to alleged irregularities in the 2022 national elections.

But the commission said that at this stage of the procurement process, it cannot yet review Smartmatic's qualifications. It also pointed out the "procedural infirmity" of the petition filed by Rio's group.

It said the petitioners cannot insist on the disqualification of Smartmatic because of their "non-compliance with the procedural rules for blacklisting."

The Comelec also maintained its stance that there were no irregularities in the conduct of the polls last year.

"The allegations of petitioners pertaining to the alleged consistency in the ratio of transmitted results, the use of single IP address, and alleged discrepancies in the transmission and election returns have been sufficiently addressed by the Commission at length," the decision stated.

Still, the en banc noted that during its hearings in October, it said that it may authorize — upon motion — a recount by opening the ballot boxes of every region in the country.

## Dissenting opinion

**APP2224**

Of the six Comelec commissioners who voted, only Commissioner Aimee Ferolino argued against Smartmatic's disqualification.

Ferolino said while it may be proper to consider the criminal case filed in the US against Bautista, this "does not warrant an outright condemnation of persons or entities involved," since the case is still under investigation and there is no supporting evidence on record.

"It strikes me that a distant matter has been interjected into this case," she wrote in a separate opinion.

The commissioner also said the bribery claims were only raised in the petitioners' motion for early resolution dated October. With this, she argued that Smartmatic was deprived of its right to be properly notified of the allegations and was not given an opportunity to defend itself.

"We value greatly the faith and confidence of the people in the integrity of the electoral process; thus, we must afford them with the utmost degree of prudence in all our actions," Ferolino said.

APP2225

# Exhibit O-26



J. Erik Connolly
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Direct Dial: 312.624.6348
Fax: 312.767.9192
econnolly@beneschlaw.com

December 11, 2020

**VIA EMAIL AND FEDERAL EXPRESS**

Charles Herring, President
One America News Network
4757 Morena Boulevard
San Diego, CA 92117
Charles.Herring@oann.com

   Re: Legal Notice and Retraction Demand from Smartmatic USA Corp.

Dear Mr. Herring:

   I am litigation counsel for Smartmatic USA Corp ("Smartmatic"). One America News Network ("OAN") has published numerous broadcasts, articles, and postings regarding Smartmatic in connection with the November 3, 2020 election (the "2020 U.S. election"). I identify some of those publications below and refer to the totality of your coverage of Smartmatic in November 2020 through today as the "Reports" for purposes of this letter. I am writing to provide you Smartmatic's response to the Reports and put you on notice of potential legal claims.

   OAN has engaged in a concerted disinformation campaign against Smartmatic. OAN told its viewers and readers that Smartmatic was founded by Hugo Chávez, that its software was designed to fix elections, and that Smartmatic conspired with others to defraud the American people and fix the 2020 U.S. election by changing, inflating, and deleting votes. While OAN holds itself out as a trusted news source, it has continually and repeatedly published demonstrably false information and defamatory statements about Smartmatic. OAN used its anchors and on-air guests, including Joe diGenova and Keith Trippie, to spread lies about a company that had absolutely nothing to do with the voting that took place in areas at the heart of the "conspiracies" discussed following the 2020 U.S. election.

   Smartmatic was the system integrator, manufacturing partner, and software developer for one county during the 2020 U.S. election – Los Angeles County, California – and that technology, developed per County specifications, does not count, tabulate, or store votes. No one has claimed irregularities in connection with the vote count in Los Angeles County, and no one could because it was a successful, transparent, and efficient process. Smartmatic's technology was not used in any other county, including the states and counties that have received the most attention following election night. Nor does Smartmatic have any relationship with the company or companies who supplied voting technology in those states and counties. Smartmatic's role in the 2020 U.S. election, while important to the company, was very limited.

   Nonetheless, OAN embarked on a disinformation campaign against Smartmatic shortly after the election closed and continuing today. Over the course of the campaign, OAN published

Charles Herring, President
December 11, 2020
Page 2

and republished dozens of false and misleading statements regarding Smartmatic.  OAN stated and implied that (1) Smartmatic has a corporate relationship with Dominion Voting Systems ("Dominion"), (2) Smartmatic has a corrupt relationship with the Venezuelan government, including Hugo Chávez, (3) Smartmatic's technology and software were designed and used to fix elections, (4) Smartmatic's technology and software were widely used in the 2020 U.S. election, (5) Smartmatic's technology and software were used to fix the 2020 U.S. election, (6) Smartmatic sent votes to foreign countries for tabulation, (7) Smartmatic has ties to the Democratic party and George Soros, and (8) Smartmatic's technology and software has numerous security weaknesses.

All these statements and implications are false and defamatory.  Smartmatic is a global leader in election technology and support services.  The over 300 men and women who work at Smartmatic have dedicated their careers to designing and building the most secure, transparent, and auditable voting systems in the world.  Smartmatic has no ties to dictatorships.  Smartmatic has no relationship with Dominion.  Smartmatic had a limited role – one county – in the 2020 U.S. election.  Smartmatic did nothing to justify or warrant the campaign OAN launched against it.

Smartmatic believes OAN had (and has) no evidence or credible source to support any of the false and misleading statements it published in the Reports.  Indeed, OAN would have easily discovered the falsity of the statements and implications being made about Smartmatic by performing even a modicum of investigation.  Accurate information was and is readily available regarding Smartmatic on its website (www.Smartmatic.com).  Government agencies and election officials have published lists showing the providers of election technologies for the 2020 U.S. election.  Both groups also verified the absence of evidence that voting systems deleted, lost, or changed votes.  And, news organizations across the ideological spectrum, including the New York Times and Washington Post, have "fact checked" the false information published by OAN.  Your statements and implications are factually unsupportable.

To be clear, my client respects and appreciates the role that news organizations, including OAN, play in educating readers and viewers.  My client likewise appreciates the significant emotions and passions associated with the recently completed 2020 U.S. election.  However, neither the importance of the role of news organization in our country, nor widespread interest in the outcome of the 2020 U.S. election, justifies the publication of false information.  "[T]here is no constitutional value in false statements of fact.  Neither the intentional lie nor the careless error materially advances society's interest in uninhibited, robust, and wide-open debate on public issues."  *Gertz v. Welch*, 418 U.S. 323, 340 (1974).

OAN had no right to defame my client when covering the 2020 U.S. election.  Smartmatic demands a full and complete retraction of all false and defamatory statements and reports published by OAN.  This retraction must be done with the same intensity and level of coverage that you used to defame the company in the first place.  Further, Smartmatic requests that you take all necessary steps to preserve communications, videos/recordings, documentation, drafts, and all other material related to the Reports.  This letter serves as notice of potential legal claims against OAN, its reporters, anchors, producers, and on-air guests by my client.

**APP2228**

Charles Herring, President
December 11, 2020
Page 3

<div align="center">

**OAN's False and Defamatory Statements/Implications**

</div>

OAN's disinformation campaign against Smartmatic began in November 2020 and continues today.  The disinformation campaign includes publication and republication of statements during news programs, on OAN's website (www.oann.com) and in social media postings by OAN as well as its reporters and anchors.  Examples of OAN's false and misleading statements are identified below.  Please note that these are just a few examples of the countless false and defamatory statements and implications made by OAN over the course of its ongoing campaign.[1]

**Category 1: False statements and implications regarding a corporate relationship between Smartmatic and Dominion**

Smartmatic has no corporate relationship with Dominion.  Smartmatic does not own Dominion.  Dominion does not own Smartmatic.  Neither is a parent, subsidiary, or intermediary of the other.  Smartmatic and Dominion are competitors.  Notwithstanding these readily verifiable facts, OAN reported the following:

- Kara McKinney: "It's also a convenient lie given that Trump attorney, Sidney Powell, says a member of Biden's transition team is also a member of the Board of Directors for ***Smartmatic, which is a subsidiary of Dominion***."  (Tipping Point, One America News Network (November 16, 2020)).

**Category 2: False statements and implications regarding a corrupt relationship between Smartmatic and the Venezuelan government**

Antonio Mugica (CEO) and Roger Piñate (President) are Smartmatic's founders.  The majority of the company shares are held by their families.  The remaining shares (less than 15%) are held by employees and angel investors.

Smartmatic was founded in Boca Raton, Florida and incorporated in Delaware.  Smartmatic has maintained its Florida office since its founding.  It is not a Venezuelan company.  SGO Corporation Limited, Smartmatic's parent company, is now headquartered in London.  The Venezuelan government, including Hugo Chávez, did not participate in founding or creating the company.

Notwithstanding these readily verifiable facts, OAN published the following:

---

[1] We have **not** prepared verbatim transcripts of the Reports, and we do not represent that the quotations identified below in each category are verbatim accounts of what was said during the Reports.  The quotations represent our attempt to capture what was stated during the Reports, including adding punctuation to the oral communications.  The broadcasts themselves should be watched for a complete and accurate recitation of what was actually said during the Reports.  Any error in our quotations below is unintentional.

<div align="center">

**APP2229**

</div>

Charles Herring, President
December 11, 2020
Page 4

- On-Screen Graphic:   "President's lawyers claim **communist-funded election software** responsible for alleged voting irregularities."  (One America News Network (November 20, 2020)).

- Commentator: "Most claims center around the Canadian-made Dominion voting systems and the **Venezuelan-made Smartmatic systems**.  **Sidney Powell says the same technology was used to secure a victory for Hugo Chavez in Venezuela** and could've been used across the country."  (One America News Network (November 20, 2020)).

- OAN Newsroom: "The President's lawyers are weighing in, once again, on election fraud during the 2020 White House race.  While speaking in D.C. Thursday, they claimed votes were hacked and ballots were switched from President Trump to Joe Biden through **technology that was developed in Venezuela**.  Rudy Giuliani, President Trump's personal lawyer, said **the company funding the technology has close ties to known communist leaders**.  '**The company counting our vote, with control over our vote, is owned by two Venezuelans who were allies of Chavez or present allies of Maduro**,' he stated."  (*President's Lawyers Say Communist-Funded Election Software Responsible For Alleged Voting Irregularities*, One America News Network, (November 20, 2020), https://www.oann.com/presidents-lawyers-say-communist-funded-election-software-responsible-for-alleged-voting-irregularities/).

- Commentator: "This after **reports found Maduro allies were meddling in the latest U.S. election through a company called Smartmatic**."  (One America News Network (November 22, 2020)).

- Commentator: "The [Organization of American States] says **any election that involved Maduro officials is a sham** and must be not recognized by any civilized country."  (One America News Network (November 22, 2020)).

- Kyle Becker: "It is confusing because [] **there are foreign companies that have stations in the United States** . . . **[T]here's you know SGO Smartmatic has been involved in this and they're from London.  They have ties to Venezuela.**  They've been participating in Venezuela."  (Tipping Point, One America News Network, Interview with Kyle Becker (November 22, 2020)).

- Rudy Giuliani: "**Smartmatic**, which is the ultimate software, had switched 6,000 votes.  It switched 6,000 votes from Trump to Biden.  So the poor people of Michigan, that went in to vote for Trump, ended up voting for Biden because **the machine and software, that originates with Venezuela, the dictatorship**, changed their vote without their ever knowing it."  (One America News Network (November 22, 2020)).

- OAN Newsroom: "Smartmatic has faced controversy in the past with allegations of **rigging the 2013 election in Venezuela to favor socialist President Nicolas Maduro**."  (*Chairman Of Smartmatic's Parent Company To Become President Of George Soros's 'Open Society Foundations'*,  One  AMerica  News  Network  (December  7,  2020), https://www.oann.com/chairman-of-smartmatics-parent-company-to-become-president-of-george-soross-open-society-foundations/).

**APP2230**

Charles Herring, President
December 11, 2020
Page 5

**Category 3: False statements and implications regarding Smartmatic's technology and software being designed and used to fix elections**

Smartmatic has provided election services and support in more than 307 U.S. jurisdictions and 27 countries in the past 17 years. Smartmatic is an approved Department of Defense vendor and founding member of the Department of Homeland Security Election Infrastructure Sector Coordinating Council. Smartmatic's technology and software were designed to ensure secure, transparent, and auditable elections. They were not designed and cannot be used to change or alter votes.

Smartmatic's technology safeguards votes at every step of the electoral process and its record logs are fully auditable. Smartmatic's technology has been proven effective in audited elections for almost 20 years. Third-party validators have unequivocally authenticated Smartmatic's technology, including the State of California, PwC, and SLI Government Solutions, one of two accredited U.S. Election Assistance Commission Voting Systems Test Labs. The United Nations, Organization of American States, and the European Union have also validated Smartmatic's technology. The Carter Center has called Smartmatic's electronic voting solution "the best in the world."

Moreover, Smartmatic has no operations in Venezuela. Smartmatic did election projects in Venezuela from 2004 to 2017. Smartmatic stopped doing business in Venezuela after Venezuela's National Electoral Counsel ("CNE") announced election results that differed from the results reflected in Smartmatic's voting systems. Smartmatic publicly condemned the Venezuelan election authorities' announcement of the election results as illegitimate. Smartmatic then ceased operations in Venezuela.

Notwithstanding these readily verifiable facts, OAN published the following:

- Kara McKinney: "It's also a convenient lie given that Trump attorney, Sidney Powell, says a member of Biden's transition team is also a member of the board of directors for Smartmatic, which is a subsidiary of Dominion. Small world I guess. ***Powell claims to have evidence that proves the software was designed to rig elections***." (Tipping Point, One America News Network (November 16, 2020)).

- Evi Kokalari-Angelakis: "In 2016 Hillary Clinton was so sure she was going to win. ***And the only reason she was so sure she was going to win is because they knew Dominion and the software [] – Smartmatic – was in existence and that's how they were going to get the election.*** They just didn't expect, they didn't realize how many Americans were going to vote for Donald Trump and that's probably how they lost that election." (Real America, One America News Network, Interview with Evi Kokalari-Angelakis (November 19, 2020)).

- Dan Ball: "[O]bviously these security folks at Dominion that ***set up the systems in the individual states, they can just do a little tweak here, a little tweak there of the program, and it can make it so minor, to flip votes, but enough to make your guy win*** that hopefully it's not

Charles Herring, President
December 11, 2020
Page 6

noticeable [.]"  (Real America, One America News Network, Interview with Evi Kokalari-Angelakis (November 19, 2020)).

- On-Screen Graphic: "Trump attorney Sidney Powell: ***voting software 'designed to rig elections'***" (In Focus, One America News, Interview with Joe diGenova (November 20, 2020)).

- Keith Trippie: "What I'd like to see Sidney [Powell] and Rudi [Guliani] do is, they need to talk to people over at Dominion and over at Smartmatic. Who were the product managers, who were the lead engineers, who were the lead developers and who were the lead testers? Those are all people directly involved in what software features are made available and testing those features before they're out. ***One of the things I'd want to know is, can you change a vote? Whether it's inside the company on the software or out at a state location where these machines are.***"  (Morning News with Stephanie Myers, One America News Network, Interview with Keith Trippie (November 20, 2020)).

- Commentator: "Most claims center around the Canadian-made Dominion voting systems and the Venezuelan-made Smartmatic systems. Sidney Powell says the same ***technology was used to secure a victory for Hugo Chavez in Venezuela*** and could've been used across the country." (One America News Network (November 20, 2020)).

- Sidney Powell: "***One of its most characteristic features is its ability to flip votes.*** It can set and run an algorithm that probably ran all over the country to take a certain percentage of votes from President Trump."  (One America News Network (November 20, 2020)).

- Allan Santos: "And not only this, the Smartmatic company also used to work with Dominion, the company system that you are using here. But it's weird how they operate . . .***[B]ack [in] 2018 [in Brazil], one candidate was then leading and then stopped counting, and after an hour, after 40 minutes, something like that, everything changed.*** And ***I saw that here*** and I can assure you, companies love fraud election, ***they love to do fraud***." (One America Evening News, One America News Network, Interview with Allan Santos (November 21, 2020)).

- OAN Newsroom: "Smartmatic has faced controversy in the past with allegations of ***rigging the 2013 election in Venezuela to favor socialist President Nicolas Maduro***." (*Chairman Of Smartmatic's Parent Company To Become President Of George Soros's 'Open Society Foundations'*, One America News Network (December 7, 2020), https://www.oann.com/chairman-of-smartmatics-parent-company-to-become-president-of-george-soross-open-society-foundations/).

**Category 4: False statements and implications regarding Smartmatic's technology and software being widely used during 2020 U.S. election**

Smartmatic was the system integrator, manufacturing partner, and software developer for one county during the 2020 U.S. election – Los Angeles County. Smartmatic is not subcontractor to any companies doing business in the United States. Its software was not used by any other company for the 2020 U.S. election, including Dominion. Dominion did not use Smartmatic's

**APP2232**

Charles Herring, President
December 11, 2020
Page 7

software in any county where its voting technology was used in the 2020 U.S. election.  Smartmatic
has never provided Dominion with any software, hardware, or other technology.  There are no ties
between Smartmatic and Dominion, including ownership ties, software licensing, or business at
all.

Notwithstanding these readily verifiable facts, OAN reported the following:

- Dan Ball:  "[O]bviously *these security folks at Dominion that set up the systems in the individual states, they can just do a little tweak here, a little tweak there of the program, and it can make it so minor, to flip votes*, but enough to make your guy win [.]"  (Real America, One America News Network, Interview with Evi Kokalari-Angelakis (November 19, 2020)).

- Commentator: "Most claims center around the Canadian-made Dominion voting systems and the Venezuelan-made *Smartmatic systems*.  Sidney Powell says the same technology was used to secure a victory for Hugo Chavez in Venezuela and *could've been used across the country*."  (One America News Network (November 20, 2020)).

- Sidney Powell: "One of its most characteristic features is its ability to flip votes.  *It can set and run an algorithm that probably ran all over the country to take a certain percentage of votes from President Trump*."  (One America News Network (November 20, 2020)).

- OAN Newsroom: "The President's lawyers are weighing in, once again, on *election fraud during the 2020 White House race*.  *While speaking in D.C. Thursday, they claimed votes were hacked and ballots were switched from President Trump to Joe Biden* through technology that was developed in Venezuela." (*President's Lawyers Say Communist-Funded Election Software Responsible For Alleged Voting Irregularities*, One America News Network (November 20, 2020), https://www.oann.com/presidents-lawyers-say-communist-funded-election-software-responsible-for-alleged-voting-irregularities/).

- Commentator: "[T]his after reports found *Maduro allies were meddling in the latest U.S. election through a company called Smartmatic.*"  (One America News Network (November 22, 2020)).

- Rudy Giuliani: "Smartmatic, which is the ultimate software, had switched 6,000 votes.  It switched 6,000 votes from Trump to Biden.  *So the poor people of Michigan, that went in to vote for Trump, ended up voting for Biden because the machine and software*, that originates with Venezuela, the dictatorship, *changed their vote without their ever knowing it*."  (One America News Network (November 22, 2020)).

- OAN Newsroom: "The move comes after *Smartmatic sold voting technology to foreign-owned Dominion, which is the controversial software used to count votes in 24 U.S. states for the 2020 election*.  Meanwhile, Smartmatic-tied Dominion voting service is facing backlash over what President Trump has described as instances of fraud in the 2020 elections." (*Chairman Of Smartmatic's Parent Company To Become President Of George Soros's 'Open Society Foundations'*, One America News Network (December 7, 2020),

Charles Herring, President
December 11, 2020
Page 8

> https://www.oann.com/chairman-of-smartmatics-parent-company-to-become-president-of-george-soros-open-society-foundations/).

**Category 5: False statements and implications regarding Smartmatic's technology and software being used to fix 2020 U.S. election**

As you know, the members of the Election Infrastructure Government Coordinating Council ("GCC") and the Election Infrastructure Sector Coordinating Council ("SCC") issued a joint statement on November 12, 2020, concluding as follows: "The November 3rd election was the most secure in American history. . .  There is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised."

Moreover, regardless of the above conclusion, Smartmatic developed technology could not have been used to "fix" the 2020 U.S. election given that technology and software supported by Smartmatic was only used in one county, Los Angeles County.  President-elect Biden won approximately 71% of the vote in Los Angeles County compared to 27% for President Trump. This is similar to the voting percentages for the 2016 election, in which Secretary Clinton received 72% of the vote.  No one has claimed improprieties relating to the results in Los Angeles County.

Finally, Smartmatic does not believe that OAN has reviewed or obtained any evidence or credible source indicating that its technology or software were used to alter, change, eliminate, or increase votes in Los Angeles County or elsewhere in the 2020 U.S. election.  OAN could not have reviewed or obtained any such evidence because Smartmatic's technology and software were not used for that purpose during the 2020 U.S. election or any other election.

Notwithstanding these readily verifiable facts, OAN reported the following:

- Sidney Powell: "***One of its most characteristic features is its ability to flip votes.***  It can set and run an algorithm that probably ran all over the country to take a certain percentage of votes from President Trump."  (One America News Network (November 20, 2020)).

- OAN Newsroom: "The President's lawyers are weighing in, once again, on ***election fraud during the 2020 White House race***.  ***While speaking in D.C. Thursday, they claimed votes were hacked and ballots were switched from President Trump to Joe Biden*** through technology that was developed in Venezuela." (*President's Lawyers Say Communist-Funded Election Software Responsible For Alleged Voting Irregularities*, One America News Network (November 20, 2020), https://www.oann.com/presidents-lawyers-say-communist-funded-election-software-responsible-for-alleged-voting-irregularities/).

- Commentator: "[T]his after reports found ***Maduro allies were meddling in the latest U.S. election through a company called Smartmatic.***" (One America News Network (November 22, 2020)).

- Rudy Giuliani: "***Smartmatic, which is the ultimate software, had switched 6,000 votes.  It switched 6,000 votes from Trump to Biden.***  So the poor people of Michigan, that went in to vote for Trump, ended up voting for Biden because the machine and software, that originates

Charles Herring, President
December 11, 2020
Page 9

with Venezuela, the dictatorship, changed their vote without their ever knowing it." (One America News Network (November 22, 2020)).

- OAN Newsroom: "***Meanwhile, Smartmatic-tied Dominion voting service is facing backlash over what President Trump has described as instances of fraud in the 2020 elections.*** 'In one Michigan County as an example, that used Dominion Systems, they found that nearly 6,000 votes had been wrongly switched from Trump to Biden,' stated the President. 'And this is just the tip of the iceberg, this is what we caught.'" (*Chairman Of Smartmatic's Parent Company To Become President Of George Soros's 'Open Society Foundations'*, One America News Network (December 7, 2020), https://www.oann.com/chairman-of-smartmatics-parent-company-to-become-president-of-george-soross-open-society-foundations/).

**Category 6: False statements and implications regarding Smartmatic's technology and software sending votes to foreign countries**

Under County supervision, Smartmatic developed voting technology that was used in Los Angeles County in the 2020 U.S. election. That technology does not count, tabulate, or store votes. Vote tabulation, supervision, and oversight is done at a Los Angeles County facility in Downey, California by County staff. The County owns and operates the voting system, and manages and secures the count. Smartmatic has no involvement in the tabulation and results reporting processes. The technology is not controlled by a server located outside the United States and no votes were or could be transmitted outside the United States.

Notwithstanding these readily verifiable facts, OAN reported the following:

- Stephanie Hamill: "***[S]uggesting that our votes are being counted overseas***. That Dominion software and Smartmatic software [] are controlled by foreign interests[.]" (In Focus, One America News Network, Interview with Joe diGenova (November 20, 2020)).

- Joe diGenova: "I noticed that Dominion software and its other entities issued a statement today saying they're not controlled by foreign entities, etcetera, etcetera. ***They never denied that the votes are actually counted by computers in Frankfurt, Germany and Barcelona, Spain. Ask yourself this question: why would any state hire a company which is going to have its vote tallies done in Frankfurt, Germany and Barcelona, Spain***, where the tallying cannot be monitored by any American citizen during the process and where tabulations can be altered without the knowledge of anybody." (In Focus, One America News Network, Interview with Joe diGenova (November 20, 2020)).

- Kara McKinney: "***We hear about some servers possibly overseas, that at some of this data is being routed through***, [] you know what's going on there? It's so confusing." (Tipping Point, One America News Network, Interview with Kyle Becker (November 22, 2020)).

- Kyle Becker: "It is confusing because [] there are foreign companies that have stations in the United States . . . [T]here's you know SGO Smartmatic has been involved in this and they're from London. They have ties to Venezuela. They've been participating in Venezuela. ***There***

**APP2235**

Charles Herring, President
December 11, 2020
Page 10

*are ties to [] Germany [,] election reporting servers going through there*."  (Tipping Point, One America News Network, Interview with Kyle Becker (November 22, 2020)).

**Category 7: False statements and implications regarding a relationship between Smartmatic and the Democratic Party and George Soros**

Smartmatic has no ties to political parties.  The company is not political.  It has maintained an independent, apolitical operating philosophy in every country where Smartmatic has provided technology or services.

George Soros has no affiliation with the company.  He is not an investor, owner, or Board member.  Lord Mark Malloch-Brown sits on the Board of SGO Corporation (Smartmatic's parent company) and on the board of more than a dozen organizations.  Lord Malloch-Brown is also on the Board of Open Society Foundation, a philanthropic organization founded by Mr. Soros, and was recently named president of the Foundation.

Peter Neffenger is a retired vice admiral of the U.S. Coast Guard.  He received the Department of Homeland Security's Distinguished Service Medal twice during his time with the Coast Guard.  He also served as the Transportation Security Administration chief from 2015 until 2017.  Mr. Neffenger joined President-elect Biden's transition effort as a volunteer.  Alongside about two dozen others, he will support one of the incoming review teams, assigned to the Homeland Security Department.

Notwithstanding these readily verifiable facts, OAN published the following statements to imply that Smartmatic had an incentive to fix the 2020 U.S. election to favor President-elect Biden:

- Kara McKinney: "It's also a convenient lie given that Trump attorney Sidney Powell says *a member of Biden's transition team is also a member of the board of directors for Smartmatic*, which is a subsidiary of Dominion." (Tipping Point, One America News Network (November 16, 2020)).

- Kara McKinney: "Let's go back to Smartmatic for a second.  *Its chairman is a member of the British house of lords – Mark Malloch Brown.*  He once served as a vice-chairman to George Soros investment funds and he's also held high-ranking positions within the World Bank and the World Economic Forum both of which Trudeau mentioned in that address." (Tipping Point, One America News Network (November 16, 2020)).

- Allan Santos: "*And the Smartmatic company owner is the Lord Mark Malloch Brown who's also a board member of the opposite side's foundation*.  And the one thing, is it's weird, [] the Smartmatic official website says they started in Florida back 2000, but the problem is we have story in Brazil, Brazilian BBC version, Portuguese, saying [] Smartmatic started in Venezuela, not in Florida." (One America News Network, Interview with Allan Santos (November 20, 2020)).

- OAN Newsroom: "Rudy Giuliani, President Trump's personal lawyer, said the company funding the technology has close ties to known communist leaders.  'The company counting

**APP2236**

Charles Herring, President
December 11, 2020
Page 11

our vote, with control over our vote, is owned by two Venezuelans who were allies of Chavez or present allies of Maduro,' he stated.  '***With a company whose chairman is a close associate and business partner of George Soros***.'" (*President's Lawyers Say Communist-Funded Election Software Responsible For Alleged Voting Irregularities*, One America News Network (November 20, 2020), https://www.oann.com/presidents-lawyers-say-communist-funded-election-software-responsible-for-alleged-voting-irregularities/).

- Allan Santos: "***And the Smartmatic company owner is the Lord Mark Malloch Brown who's also a board member of the Open Society Foundation***.  And the one thing, is it's weird,[] the Smartmatic official website says they started in Florida back 2000, but the problem is we have story in Brazil, Brazilian BBC version, Portuguese, saying [] Smartmatic started in Venezuela, not in Florida."  (One America Evening News, One America News Network, Interview with Allan Santos (November 21, 2020)).

- Allan Santos: "***The Smartmatic owner [] is a board member of the Open Society Foundations.  Of course [], you're going to see some fact check saying they are not connected, he's just a member of the board, but come on.***  I mean for us in Brazil it's very clear so how George Soros is helping the Black Lives Matter, he has Open Society Foundations, and [] ***the board member of the Open Society foundation is the owner of this Smartmatic, and how can someone tell me they are not connected?***"  (One America Evening News, One America News Network, Interview with Allan Santos (November 21, 2020)).

- Stephanie Myer: "A report Sunday shows foreign-owned Smartmatic licensed a voting technology from the controversial company.  Smartmatic once owned Sequoia voting systems but divested it from its US holdings following in 2007 court's ruling with Dominion purchasing the company in 2010. ***And while Smartmatic has denied any continued ties, a recently resurfaced 2015 interview with chairman Mark Malloch Brown, who's sat on the board of several Soros organizations, shows this was far from the truth,*** and Smartmatic continued to license Dominion technology."  (Morning News with Stephanie Myers, One America News Network, Interview with Keith Trippie (November 23, 2020)).

**Category 8: False statements and implications regarding security features of Smartmatic's technology and software**

Smartmatic designed its technology to enable election stakeholders to audit the entire process.  Smartmatic's software has been open to audits in all countries where it operates and all audits have validated the accuracy of the results.

Moreover, since 2000, Smartmatic's technology has been used to register and count nearly 5 billion auditable votes without any security breaches.  Smartmatic does not rely on a single security application or off-the-shelf protections.  Smartmatic's systems employ multi-layered protection strategies, including security fragmentation, security layering, encryption, device identity assurance, multi-key combinations, and opposing-party auditing.

Finally, computers have been used for the last 50 years to count votes in the United States. There is no evidence that any of them have ever been hacked.  None of them.

**APP2237**

Charles Herring, President
December 11, 2020
Page 12

Notwithstanding these readily verifiable facts, OAN published the following:

- Dan Ball: "Obviously *these security folks at Dominion that set up the systems in the individual states, they can just do a little tweak here, a little tweak there of the program, and it can make it so minor, to flip votes*, but enough to make your guy win [.]" (Real America, One America News Network, Interview with Evi Kokalari-Angelakis (November 19, 2020)).

- Joe diGenova: "*[T]hese computer systems have a back door so they can be hacked*." (In Focus, One America News Network, Interview with Joe diGenova (November 20, 2020)).

- Kyle Becker: "It is confusing because [] there are foreign companies that have stations in the United States . . . [T]here's you know SGO Smartmatic has been involved in this and they're from London. They have ties to Venezuela. They've been participating in Venezuela. There are ties to [] Germany [,] election reporting servers going through there. All of this is being denied, but *there's absolutely zero transparency*. *These source codes that are used in these voting machines are secret and proprietary* [.]" (Tipping Point, One America News Network, Interview with Kyle Becker (November 22, 2020)).

### Smartmatic's Retraction Demand

Smartmatic believes that OAN did not, and does not, have a good faith basis for any of the statements and implications made in the Reports regarding Smartmatic. There is no credible source – documented or otherwise – for any of these false and defamatory statements or implications. Nonetheless, OAN allowed its reporters, anchors, and on-air guests to make these false and defamatory statements time and time again. This pattern of behavior qualifies as either knowingly publishing factually inaccurate information or a reckless disregard for the truth.

The most obvious transgression is your repeated claims that Smartmatic committed, perpetrated, and/or participated in a widespread voter fraud scheme for the 2020 U.S. election and switched votes from President Trump to President-elect Biden. Discovering that this claim was factually inaccurate and impossible took nothing more than learning whether Smartmatic's technology was widely used during the 2020 U.S. election. It was not. It was used in one county. From this simple truth, it was (or would have been) readily apparent that the statements being made about Smartmatic were factually inaccurate.

The damage your disinformation campaign has done, and will do, to Smartmatic is significant. Smartmatic's reputation is one of its most valuable commodities. The government officials who elect to purchase Smartmatic's technology do so based on their belief and understanding that Smartmatic's technology will help them deliver a secure, transparent, and auditable election. They need the utmost trust in Smartmatic so that voters can have the utmost trust in the validity of their elections. Your false and defamatory statements undermine the reputation for reliability that Smartmatic has spent almost 20 years building.

Making matters worse, OAN used various platforms to disseminate this disinformation campaign. The Reports were published on your news programs. The Reports were then repeated and republished on your website (www.oann.com) and further published on Twitter and other

**APP2238**

Charles Herring, President
December 11, 2020
Page 13

accounts. The Reports were then further republished, as you knew they would be, by individuals and other news organizations. As a result, your false and defamatory statements regarding Smartmatic have irreparably damaged the company's reputation.

Beyond the financial harm you have done to Smartmatic, your disinformation campaign has created personal risk for the men and women who work at the company. Smartmatic and its employees and management have received countless threats in the wake of your Reports. These threats have been communicated directly to Smartmatic employees and management across the globe, including threats of death and personal violence. The social media profiles of the company and its CEO have been filled with profanities and more threats. Family members, including children, of Smartmatic's executives have also received threats to their safety and well-being. That is another consequence of your actions.

Now is the time for OAN to start to correct the record. Smartmatic demands that OAN publish a full and complete retraction of all its false and defamatory statements regarding Smartmatic, including but not limited to those identified and categorized above. This retraction must be published on multiple occasions (as were the false and defamatory statements) and across the various platforms used by OAN to disseminate the false and defamatory statements, including its morning and evening news programs, its website, and the social media platforms used by OAN and its reporters and anchors. The prominence of the retraction, including being featured during prime time slots, must match the attention and audience targeted with the original defamatory publications. We ask that OAN treat this retraction and the issues raised in this letter with the attention and seriousness that any reputable business deserves and that you owe to the public as a responsible journalistic operation.

Please confirm by December 16, 2020, that OAN will publish this retraction. Smartmatic reserves all its legal rights and remedies, including its right to pursue defamation and disparagement claims against OAN and its anchors, reporters, and on-air guests. Accordingly, please confirm that OAN will preserve all potentially relevant documents and information regarding the Reports and suspend all document destruction protocols related to these documents and information. The documents and information are relevant to and necessary for Smartmatic's potential claims.

Finally, Smartmatic requests that you provide it with advance notice of and sufficient time to respond to any additional assertions on the issues outlined above prior to any broadcast or other publication. It also requests that any sources OAN intends to rely upon for factual statements about Smartmatic be properly examined.

Please direct all future communications on this matter to my attention. I look forward to your response regarding this important matter.

Charles Herring, President
December 11, 2020
Page 14

Very truly yours,

*/s/ J. Erik Connolly*

J. Erik Connolly

cc: Ann Schick (via email)
    Alex Smith (via email)

# Exhibit O-27

# Fox, Dominion reach $787M settlement over election claims

WILMINGTON, Del. (AP) — Fox News agreed Tuesday to pay Dominion Voting Systems nearly $800 million to avert a trial in the voting machine company's lawsuit that would have exposed how the network promoted lies about the 2020 presidential election.

The stunning settlement emerged just as opening statements were supposed to begin, abruptly ending a case that had embarrassed Fox News over several months and raised the possibility that network founder Rupert Murdoch and stars such as Tucker Carlson and Sean Hannity would have to testify publicly.

"The truth matters. Lies have consequences," Dominion lawyer Justin Nelson told reporters outside a Delaware courthouse after Superior Court Judge Eric Davis announced the deal.

Outside of the $787.5 million promised to Colorado-based Dominion, it was unclear what other consequences Fox would face. Fox acknowledged in a statement "the court's rulings finding certain claims about Dominion to be false," but no apology was offered.

"We are hopeful that our decision to resolve this dispute with Dominion amicably, instead of the acrimony of a divisive trial, allows the country to move forward from these issues," Fox said. Its lawyers and representatives offered no other comment or details about the settlement.

Asked by a reporter whether there was "anything to this other than money," Dominion CEO John Poulos did not answer.

The deal is a significant amount of money even for a company the size of Fox. It represents about one-quarter of the $2.96 billion the company reported earning last year before interest, taxes, depreciation and amortization — a figure often used to approximate a company's cash flow.

The settlement also follows a $965 million judgment issued last year against Alex Jones by a Connecticut jury for spreading false conspiracy theories about the Sandy Hook school massacre.

Coupled with other lawsuits in the pipeline, the agreement shows there is a real financial risk for conservative media that traffic in conspiracy theories. What remains unknown is how much of a deterrent this will be. Even as the Dominion case loomed this spring, Fox's Tucker Carlson aired his alternate theories about what happened at the Jan. 6, 2021, insurrection.

Dominion had sued Fox for $1.6 billion, arguing that the top-rated news outlet damaged the company's reputation by peddling phony conspiracy theories that claimed its equipment switched votes from former President Donald Trump to Democrat Joe Biden. Davis, in an earlier ruling, said it was "CRYSTAL clear" that none of the allegations about Dominion aired on Fox by Trump allies were true.

Dominion set out to prove in the lawsuit that Fox acted with malice in airing allegations that it knew to be false, or with "reckless disregard" for the truth. It presented volumes of internal emails and text messages that showed Fox executives and personalities saying they knew the accusations were untrue, even as the falsehoods were aired on programs hosted by Maria Bartiromo, Lou Dobbs and Jeannine Pirro.

**APP2242**

Records released as part of the lawsuit showed that Fox aired the claims in part to win back viewers who were fleeing the network after it correctly called hotly contested Arizona for Democrat Joe Biden on election night. One Fox Corp. vice president called them "MIND BLOWINGLY NUTS."

During a deposition, Murdoch testified that he believed the 2020 election was fair and had not been stolen from Trump.

"Fox knew the truth," Dominion argued in court papers. "It knew the allegations against Dominion were 'outlandish' and 'crazy' and 'ludicrous' and 'nuts.' Yet it used the power and influence of its platform to promote that false story."

Several First Amendment experts said Dominion's case was among the strongest they had ever seen. But there was real doubt about whether Dominion would be able to prove to a jury that people in a decision-making capacity at Fox could be held responsible for the network's actions.

Dominion's Nelson called the settlement "a tremendous victory" and noted that there are six more lawsuits pending regarding election claims.

"We settled because it was about accountability," Nelson said in an interview. "Our goals were to make sure that there was accountability for the lies, and to try to make our client right. And we accomplished both goals."

It's hard to tell what the deal will mean financially for Dominion. The company would not provide its most recent earnings, saying the figures were not public.

In the weeks leading up to the trial, Davis significantly narrowed Fox's potential line of defense, including nixing the network's argument that it was merely airing newsworthy allegations. Newsworthiness is not a defense against defamation, he said.

In a March 31 ruling, he pointedly called out the network for airing falsehoods while noting that bogus election claims still persist more than two years after Trump lost his bid for reelection.

"The statements at issue were dramatically different than the truth," Davis said in that ruling. "In fact, although it cannot be attributed directly to Fox's statements, it is noteworthy that some Americans still believe the election was rigged."

In its defense, Fox said it was obligated to report on a president who claimed that he had been cheated out of reelection.

"We never reported those to be true," Fox lawyer Erin Murphy said. "All we ever did was provide viewers the true fact that these were allegations that were being made."

Dominion had sued both Fox News and its parent, Fox Corp, and said its business had been significantly damaged. Fox said the company grossly overestimated its losses, before agreeing to pay about half of what Dominion had asked for.

In a 1964 case involving The New York Times, the U.S. Supreme Court limited the ability of public figures to sue for defamation. The court ruled that plaintiffs needed to prove that news outlets published or aired false material with "actual malice" — knowing such material was false or acting with a "reckless disregard" for whether or not it was true.

That has provided news organizations with stout protection against libel judgments. Yet the nearly six-decade legal standard has come under attack by some conservatives in recent years, including Trump

**APP2243**

and Republican Gov. Ron DeSantis of Florida, who have argued for making it easier to win a libel case.

"The larger importance of the settlement ... is that the high level of protection for news media in a defamation case remains intact for now," said Doreen Weisenhaus, an instructor of media law at Northwestern University.

In documents released in recent months, Fox executives and anchors discussed how not to alienate the audience, many of whom believed Trump's claims of fraud despite no evidence to back them up. Fox's Tucker Carlson suggested a news reporter be fired for tweeting a fact check debunking the fraud claims.

Some of the exhibits were simply embarrassing, such as scornful behind-the-scenes opinions about Trump, whose supporters form the core of the network's viewers. Text exchanges revealed as part of the lawsuit show Carlson declaring, "I hate him passionately," and saying that "we are very, very close to being able to ignore Trump most nights."

Fox News announced the settlement on Neil Cavuto's afternoon news show. "It's a done deal," he said. "It's a settlement and for at least Fox, it appears to be over."

But Fox's legal problems may not be over. It still faces a defamation lawsuit from another voting technology company, Smartmatic. Its lawyer, Erik Connolly, said Tuesday that "Dominion's litigation exposed some of the misconduct and damage caused by Fox's disinformation campaign. Smartmatic will expose the rest."

___ Associated Press writers Jennifer Peltz in New York and Nicholas Riccardi in Denver contributed to this report.

────

The Associated Press receives support from several private foundations to enhance its explanatory coverage of elections and democracy. See more about AP's democracy initiative here. The AP is solely responsible for all content.

**APP2244**

# Exhibit O-28



Lawsuit Updates & Fact Checks



Subscribe to our Newsletter

# Lawsuit & Fact Checks

Smartmatic is taking steps to defend its reputation from attacks by actors trying to further their agendas and profits. These attacks don't just hurt Smartmatic. They damage the credibility and integrity of all elections, and disparage the hard work of election officials, administrators and poll workers around the world.



**APP2247**

Resize  A  A↑  A↑

# Fox Motion on "Newsworthiness Claim" Denied by NY Court | June 27, 2023

The courts have denied a request by Fox that the court reconsider its earlier ruling on a "newsworthy reporting" claim. This has been Fox's main defense claim against liability. Fox had asked the court to reassess its ruling or, as an alternative, to leave open a window for Fox to escalate its motion to NY Court of Appeal. The First Judicial Department of New York state's Supreme Court Appellate Division declined that request from Fox.

At the beginning of the suit Fox and its co-defendants filed a motion to dismiss the suit entirely based on the "newsworthiness" defense. The court denied this motion. Fox then appealed the decision with the First Judicial Department, which denied it. This new decision rejects the "newsworthiness" argument once again.

"We are pleased with this ruling as it aligns with our case's core contention that Fox's actions went far beyond simple news reporting and were, in fact, defamatory," said J. Erik Connolly, Smartmatic's lead attorney on the case and managing chair of the Litigation Group at Benesch Friedlander Coplan & Aronoff LLP.

---

# Smartmatic Files Order to Show Cause in Defamation Suit Against Fox Corporation and Fox News Network LLC | April 14, 2023

On April 12, Smartmatic filed an Order to Show Cause with the New York State Supreme Court to compel Fox Corporation and Fox News Network LLC to



**APP2248**

"reproduce all relevant documents and depositions from the Dominion Actions" as previously directed by the court. As of the filing date, Fox had produced just 6,852 total documents out of the more than 52,500 documents that Fox Corporation turned over to Dominion for its suit.

The filing informs the Court that Fox Corporation "slow-rolled its productions; withheld the most important documents from the most important custodians; produced one deposition transcript; and refused to provide any disclosure in March 2023." Through the six months the parties had to produce documents, Fox withheld all custodial documents of Fox Corporation's Chairman Rupert Murdoch and CEO Lachlan Murdoch.

Smartmatic is asking the court to sanction Fox News and Fox Corporation and to compel the immediate production of all testimony of Fox Corporation officers and employees and all 52,500 documents that Fox Corporation produced to Dominion.

---

## Smartmatic Defamation Lawsuit Proceeding After Fox News Appeals Tossed | February 14, 2023

A five-judge panel unanimously found Smartmatic's legal claims adequate to continue its suit alleging that Fox News, Maria Bartiromo, Lou Dobbs, Jeanine Pirro and Rudy Giuliani either knew that the voting machine conspiracy theories were false — or had serious doubts about their veracity — when they aired. All claims originally brought by Smartmatic against all these defendants are now proceeding. Smartmatic's counsel, Erik Connolly, stated, "As detailed in our complaint, Fox News, its news anchors and guests knowingly and falsely published lies that Smartmatic's election technology and software was widely used in the 2020 election to switch votes—when they knew that Smartmatic's technology was used only in Los Angeles County and there was no support for making their outrageous claims. Smartmatic has been severely injured and has sued to recover for this



**APP2249**

harm. We look forward to holding Fox News and the other defendants accountable in court. Smartmatic feels gratified by the decision of the New York appellate court, which has rejected all calls for dismissal by Fox News and its cohorts."

**Read the press release here**

**News Articles:**

**AP:** Court nixes Fox News' bid to end voting tech firm's suit | February 14, 2023

**Deadline:** Appeals Court Declines To Dismiss Smartmatic Lawsuit Against Fox News | February 14, 2023

**Law and Crime:** Fox News loses appeal of Smartmatic lawsuit on 2020 election | February 15, 2023

---

## Lindell's motion to dismiss denied | September 19, 2022

Judge Wilhelmina M. Wright of the US District Court of Minnesota allowed Smartmatic's lawsuit against Mike Lindell and My Pillow, Inc., to go forward by denying their motions to dismiss. The case will now proceed to the discovery phase. Smartmatic filed the suit for defamation and unfair practices claims on January 18, 2022.

After the 2020 US Presidential election, Lindell embarked on a smear campaign against Smartmatic to garner publicity and, in turn, increase corporate profits. Judge Wright determined that Smartmatic has alleged enough facts to support a claim of reputational harm from Lindell's statements. She found further that Lindell, the CEO of MyPillow, intentionally promoted MyPillow while allegedly defaming Smartmatic. In particular, Lindell advertised his business through promotional discount codes aired during his live events, which were broadcast and live streamed.



"We are pleased with this ruling and look forward to holding Mr. Lindell and his company responsible for the damage they have done to Smartmatic and democracy. Mr. Lindell continues to spread disinformation and, by doing so, jeopardizes secure and accurate voting in the United States and elsewhere. It must come to an end," said Smartmatic's attorney J. Erik Connolly, Managing Chair of the Litigation Practice Group, at Benesch, Friedlander, Coplan & Aronoff, LLP.

**News Articles:**

**Politico:** Judge refuses Lindell motion to dismiss suit brought by voting machine company | September 19, 2022
**Bloomberg:** MyPillow CEO Mike Lindell Ordered to Face Voting-Fraud Defamation Suit | September 19, 2022

---

## Fox News motion to dismiss rejected | July 7, 2022

The New York State Supreme Court allowed the majority Smartmatic's defamation lawsuits to proceed to the discovery stage.
Justice David Cohen of New York State Supreme Court in Manhattan rejected bids by Fox Corp. (FOXA.O), anchor Maria Bartiromo, and former anchor Lou Dobbs to dismiss Smartmatic's claims against them. Cohen also said Smartmatic can pursue some claims against lawyer Rudy Giuliani. The court also denied Fox's motion to stay discovery.

Without ruling on the merits, Cohen found a "substantial basis" for the claim that Fox News "turned a blind eye to a litany of outrageous claims about [Smartmatic], unprecedented in the history of American elections, so inherently improbable that it evinced a reckless disregard for the truth."

Following the decision, Smartmatic's lawyer J. Erik Connolly said Fox News caused "catastrophic damage" to his client's business and reputation. "This lawsuit will help to undo that damage," he said.



**APP2251**

**News Articles:**

**Daily Beast:** [Judge Lets $2.7B Smartmatic Suit Against Fox News Proceed, Drops Claims Against Jeanine Pirro & Sidney Powell | March 8, 2022](#)
**Reuters:** [Smartmatic can pursue election-rigging claims against Fox News, Giuliani | March 8, 2022](#)

---

## OAN must face Smartmatic defamation suit | June 21, 2022

A federal judge green lighted Smartmatic's defamation lawsuit against One America News (OAN), which Smartmatic brought against the network for airing conspiracy theories about the company's role in the 2020 US presidential election. "Smartmatic looks forward to starting discovery and pursuing it claims against OAN," stated Smartmatic's attorney J. Erik Connolly of law firm Benesch, Friedlander, Coplan & Aronoff, LLP.

**News articles:**

**Business Insider:** [OAN can't dodge Smartmatic's DC lawsuit over election conspiracy theories just because its headquarters is in California, judge rules | June 21, 2022](#)

---

## Court finds Lindell's lawsuits against Smartmatic without merit | May 19, 2022

Federal Judge Carl Nichols, of the United States District Court for the District of Columbia, dismissed a countersuit filed by MyPillow Inc. Chief Executive Officer Mike Lindell against Smartmatic. Lindell's counter filing followed Smartmatic's defamation suit against him and his company, which was filed in 2021.



**APP2252**

The judge wrote that most of Lindell's assertions were, "wholly conclusory allegations unsupported by any alleged facts" and did not contain the requisite proof needed for a successful lawsuit.

"Smartmatic filed a series of defamation lawsuits against Mr. Lindell and others because they lied about the 2020 U.S. election. Those lawsuits have merit, and we look forward to litigating those cases. In contrast, as the Court found, Mr. Lindell's lawsuits against Smartmatic was without merit and a waste of everyone's time. We are grateful the Court granted our motion to dismiss and motion for sanctions," stated Smartmatic's attorney J. Erik Connolly of law firm Benesch, Friedlander, Coplan & Aronoff, LLP.

**News articles:**

**TPM:** Judge Sanctions Mike Lindell For 'Frivolous' Claims Against | May 19, 2022
**Bloomberg Law:** MyPillow's Lindell Sanctioned Over 'Frivolous' Election Suit (2) | May 20, 2022
**The Hill:** Judge sanctions MyPillow CEO Mike Lindell for 'frivolous' election lawsuit | May 20, 2022

---

# NY Supreme Court Judge David Cohen rejects Fox's Motions to Dismiss Smartmatic defamation lawsuit | March 8, 2022

Rejecting Motions to Dismiss filed by Fox Corporation and its co-defendants Lou Dobbs, Maria Bartiromo and Rudy Giuliani, the court cleared the way for Smartmatic's defamation and disparagement lawsuit to go to the discovery phase. **Read the press release here.**

**News articles:**



**APP2253**

**Reuters:** Smartmatic can pursue election-rigging claims against Fox News, Giuliani | March 8, 2022

**The Hill:** Portions of Smartmatic lawsuit against Fox News can proceed, judge rules | March 9, 2022

**Yahoo! News:** New York judge denies Fox News' motion to dismiss Smartmatic defamation lawsuit against network over 2020 election falsehoods | March 9, 2022

---

# Smartmatic files defamation and unfair trade practices claims against Michael J. Lindell and My Pillow, Inc. | January 18, 2022

Smartmatic has filed defamation and unfair practices claims against Michael J. Lindell and his company, My Pillow, Inc. ("MyPillow"), for the persistent, deliberate and damaging lies told about Smartmatic and its involvement in the 2020 US Presidential election. The lawsuit was filed in the US District Court in Minnesota.

**Read the press release here**

**Read the full claim against Michael J. Lindell and My Pillow, Inc.**

**FAQs**

**News articles:**

**Newsweek:** Smartmatic Sues Mike Lindell, Accusing Him of Spreading Election Lies to Sell More Pillows | January 18, 2022

**Yahoo News:** Smartmatic sues Mike Lindell for defamation | January 18, 2022

**Business Insider:** Voting company Smartmatic filed a defamation lawsuit against MyPillow CEO Mike Lindell | January 18, 2022

---



## Smartmatic files defamation claims against Newsmax and OANN | November 3, 2021

Coming on the one-year anniversary of the 2020 US presidential election, Smartmatic is charging that the defendants knowingly and deliberately disseminated a continuous stream of falsehoods that harmed Smartmatic and negatively impacted the company's business.

**Read the press release here**

**Read the full claim against OANN here**

**Read the full claim against Newsmax Media here**

**FAQs**

**News articles:**

**CNN:** Smartmatic is now suing Newsmax and OAN for 'disinformation campaign' | November 3,2021

**Bloomberg:** Smartmatic Sues Newsmax, OAN Over Election-Fraud Claims | November 3, 2021

**Reuters:** Newsmax, One America News sued by voting technology firm Smartmatic | November 3, 2021

**Axios:** Smartmatic sues Newsmax and OANN for defamation | November 4, 2021

---

## Smartmatic defends its case before the New York State Court | August 17, 2021

After the oral argument held virtually with New York State Judge David Cohen, Smartmatic remains confident in the factual and legal underpinnings of its claims



**APP2255**

against Fox News and co-defendants.

**News articles:**

**CNBC:** Judge grills lawyers for Fox News, Powell, Giuliani about election fraud claims in $2.7 billion Smartmatic defamation suit | August 17, 2021
**Bloomberg:** Fox News Asks N.Y. Judge to Toss $2.7 Billion Election Suit | August 17, 2021
**Reuters:** Judge questions Fox News bid to shake $2.7 billion Smartmatic election suit | August 17, 2021

---

## Smartmatic files opposition brief against motions to dismiss lawsuit | April 12, 2021

Smartmatic's filing sets forth, in detail, the substantial basis that it has for its claims and asks the court to deny the motions. Smartmatic asserts that it has a straightforward case that is in line with black letter law. The totality of Smartmatic's allegations show the Fox defendants knew their statements were false or demonstrated reckless disregard for the truth.

**Read the full brief here**

**News articles**

**The New York Times:** Smartmatic Says Disinformation on Fox News About the Election Was 'No Accident.' | April 12, 2021
**Vanity Fair:** Smartmatic Calls Bulls–T On Fox's First Amendment Argument | April 13, 2021

---

## Smartmatic files $2.7 billion defamation lawsuit



**APP2256**

## against Fox Corporation | February 4, 2021

"Fox News engaged in a conspiracy to spread disinformation about Smartmatic. They lied, and they did so knowingly and intentionally. Smartmatic seeks to hold them accountable for those lies," said Smartmatic's attorney J. Erik Connolly, Vice Chair of the Litigation Practice Group, at Benesch, Friedlander, Coplan & Aronoff, LLP.

**Read the press release here**

**Read the full complaint here**

**News articles**

**Insider:** Election-Technology Company Smartmatic Files $2.7 Billion Lawsuit Against Fox News Over Election Conspiracy Theories | February 4, 2021
**CNBC:** Dominion and Smartmatic Have Serious Shot at Victory in Election Disinformation Suits, Experts Say | February 24, 2021

## Smartmatic demands justice with retraction demand letters | December 14, 2020

Smartmatic issued legal notices and retraction demand letters to Fox News, Newsmax and OANN for publishing false and defamatory statements. The demand letters identify dozens of factually inaccurate statements made by each of the organizations as part of a "disinformation campaign" to injure Smartmatic and discredit the 2020 U.S. election.

**Read the press release here**

**News articles**



**AP:** [Company Targeted by Vote Fraud Claims Strikes Back at Trump | December 14, 2020](#)

**The New York Times:** [The 'Red Slime' Lawsuit That Could Sink Right-Wing Media | December 20, 2020](#)





**APP2258**

# Smartmatic Fact check

Smartmatic's credibility is our most important asset. To be trusted partners to governments and election officials we need to be transparent and forthright. Here are the facts about our company and our history. No spin. No polish.

You can find a list of independent fact-check organizations published by the University of California here and from American University here. (Smartmatic has no relationship to either of these universities or their lists. We offer them only as resources to help your own efforts to fact check.)

## Our role in the US 2020 election

- Smartmatic technology was used only in Los Angeles County, California in the 2020 election. The system we provided to LA County does not count, tabulate or store votes.
- Smartmatic **did not** provide any hardware or software or services to Georgia, Michigan, Wisconsin, Pennsylvania, or Arizona during the 2020 US election, **nor** did we supply any other voting technology servicing those states.
- There are **no ties** between Dominion Voting Systems and Smartmatic – plain and simple. No ownership ties, no software leasing, no business at all between them. In 2009, (more than a decade ago) Smartmatic licensed scanning machines from Dominion for use in the Philippines for a Smartmatic election project.

## Our company history, ownership and products

- Smartmatic's software was developed by our own engineers to do three things: accurately process votes, keep them secure and facilitate audits. That's it. There



**APP2259**

is no other agenda. Our technology has been proven in audited elections for almost 20 years.

- Smartmatic election technologies and services have been authenticated by independent third-party validators, including the US Election Assistance Commission, the State of California, PriceWaterhouseCoopers and SLI Global. They have also been validated by world-renowned institutions such as the Carter Center, the United Nations, the Organization of American States, and the European Union.

- Smartmatic has no ties to governments or political parties. Governments are clients with whom we do business – just like every other commercial entity. We do not have any alliances or relationships with any politician, political party, PAC, or government. Smartmatic's founders and employees adhere to a strict ethics code that, among other things, prohibits them from making political donations.

- Smartmatic **does not have** any ties to any national leader, living or dead, in the US or any other country.

- Two of the founders, Antonio Mugica and Roger Piñate, run the company as CEO and President, respectively. The majority of company shares are held by the Mugica and Piñate families. The remaining shares (less than 20%) are held by employees and investors.

- George Soros has **no ownership** interest in Smartmatic, nor is he an investor. He's **not on the Board** or otherwise employed by Smartmatic. He never has been. That's been proven time and again.

- The founders of Smartmatic were born in Venezuela. The company, however, was founded in Boca Raton, Florida in 2000 and still maintains its US base there. Tesla, Procter & Gamble, Kohl's, TJ Maxx, Houzz.com, Google and many other American companies were founded by people born outside the US. A US company is still a US company, regardless of where its founders or shareholders happened to be born.

- Smartmatic has only owned one election company in the US, Sequoia Voting Systems. Smartmatic sold the company in 2007 to Sequoia's management team. More than three years later Sequoia was bought by Dominion Voting Systems. Smartmatic had **no part** in Sequoia's acquisition by Dominion.

- Smartmatic **does not** have any operations in Venezuela. We did election projects in Venezuela from 2004 to 2017, and Smartmatic's equipment, software and people all performed successfully every time. In 2017, our technology helped prove that the government was reporting false turnout numbers – so we blew the whistle on them – and stopped doing business there at that time.



**APP2260**

- Smartmatic has **never** sold any voting machines in Myanmar, Bolivia, Nicaragua or Spain.

# The true story as told by media outlets

Here are some credible sources that are doing their own, independent fact checking. Read what they have to say.

**The Washington Post**

[Giuliani's fantasy parade of false voter-fraud claims | November 16,2020](#)

**Reuters News Services**

[Smartmatic CEO is not on Biden's team, Smartmatic software is not on Dominion voting machines | November 20, 2020](#)

**Associated Press**

[Smartmatic does not own Dominion Voting Systems | November 17, 2020](#)

[Trump legal team's batch of false vote claims | November 19, 2020](#)

**CATO Institute**

[Voting Machine Conspiracy Theories Harm U.S. Cybersecurity | November 19, 2020](#)

**PolitiFact**

[Trump lawyer falsely claims voting technology companies were created for changing election results | November 19, 2020](#)

**Fact Check Org**

[Baseless Conspiracy Theory Targets Another Election Technology Company | November 25, 2020](#)



**APP2261**

# Explore



## Contact Us



## Media



## About Us



**APP2262**



© Smartmatic. All rights reserved



**APP2263**

# Exhibit O-29

# Supreme Court of the State of New York
# Appellate Division, First Judicial Department

| | | |
|---|---|---|
| Rolando T. Acosta, | | P.J., |
| Dianne T. Renwick | | |
| Sallie Manzanet-Daniels | | |
| Judith J. Gische | | |
| Barbara R. Kapnick, | | JJ. |

Motion No.     2021-00491
Case No.       2021-00506

In the Matter of
RUDOLPH W. GIULIANI
(ADMITTED AS RUDOLPH WILLIAM GIULIANI),
an attorney and counselor-at law:

ATTORNEY GRIEVANCE COMMITTEE FOR THE
FIRST JUDICIAL DEPARTMENT,
Petitioner,

RUDOLPH W. GIULIANI,
(OCA ATTY. REGISTRATION NO. 1080498),
Respondent.

Disciplinary proceedings instituted by the Attorney Grievance Committee for the First Judicial Department. Respondent was admitted to the Bar of the State of New York at a Term of the Appellate Division of the Supreme Court for the Second Judicial Department on June 25, 1969.

*Appearances:*

Jorge Dopico, Chief Attorney,
Attorney Grievance Committee, New York
(Kevin M. Doyle, of counsel), for petitioner.

Barry Kamins, Esq. and John Leventhal, Esq., Aidala, Bertuna & Kamins, P.C.,
for respondent.

guest and host), podcasts, television appearances and one court appearance. Respondent concedes that the statements attributed to him in this motion were all made in the context of his representation of Donald J. Trump and/or the Trump campaign (Giuliani affidavit ¶¶ 8, 32).

Preliminary Issues

Respondent raises an overarching argument that the AGC's investigation into his conduct violates his First Amendment right of free speech.[2] He does not attack the constitutionality of the particular disciplinary rules; he seemingly claims that they are **unconstitutional as applied to him. We reject respondent's argument. This disciplinary** proceeding concerns the professional restrictions imposed on respondent as an attorney to not knowingly misrepresent facts and make false statements in connection with his **representation of a client. It is long recognized that "speech by an attorney is subject to** greater regulation than speech by others" (*Gentile v State Bar of Nevada*, 501 US 1030, 1051 [1991]). Unlike lay persons, an attorney is "a professional trained in the art of persuasion" (*Ohralik v Ohio State Bar Assn.*, 436 US 447, 465 [1978]). As officers of the court, attorneys are "an intimate and trusted and essential part of the machinery of justice" (*Gentile v State Bar of Nevada*, 501 US at 1072 [internal quotation marks omitted]). In other words, they are perceived by the public to be in a position of knowledge, and therefore, "a crucial source of information and opinion" (*Gentile v State Bar of Nevada,* 501 US at 1056 [internal quotations marks omitted]). This weighty responsibility is reflected in the "ultimate purpose of disciplinary proceedings [which] is to protect the public in its reliance upon the integrity and responsibility of the legal

---

[2] **Giuliani affidavit ¶6 ". . . Petitioner's allegations regarding statements that I made,** violates my First Amendment right of free speech . . . " (see also Answer ¶¶ 25-26).

profession" (*Matter of Nearing*, 16 AD2d at 518). While there are limits on the extent to which a lawyer's right of free speech may be circumscribed, these limits are not implicated by the circumstances of the knowing misconduct that this Court relies upon in granting interim suspension in this case (*see* Kathleen M. Sullivan, *The Intersection of Free Speech and the Legal Profession: Constraints on Lawyers' First Amendment Rights*, 67 Fordham L Rev 569 [1998] available at https://ir.lawnet.fordham.edu/flr/vol67/iss2/11/ [last accessed June 1, 2021]). [3]

Respondent also raises lack or absence of knowledge as a general defense, stating that even if his statements were false or misleading, he did not make the statements knowing they were false when he made them. We agree that the Rules of Professional Conduct only proscribe false and misleading statements that are knowingly made. Both rules 3.3 and 4.1, expressly provide for an element of knowingness. Rule 8.4 (c), however, contains no such express element. In New York there are no cases which directly hold that a violation of rule 8.4(c) must be knowing, although there is authority **that implies it. In a Federal case applying New York's Rules, the court found that th**ere was a violation of rule 8.4(c) where false statements made by the offending attorney were not inadvertent, but were knowing (*Matter of Gilly*, 206 F Supp 3d 940, 944 [SD NY 2016]). This Court thereafter imposed reciprocal discipline based on that finding (*Matter of Gilly*, 149 AD3d 230 [1st Dept 2017]). Sister state jurisdictions have held that knowledge is a required element of misconduct in violation of rules identical to RPC

---

[3] Notably, at least one Federal court has recently determined attorney efforts to undermine a legitimate presidential election warranted the attorney's referral to the grievance committee (*Wisconsin Voters Alliance v Pence*, 2021 WL 23298, *2, 2021 US Dist LEXIS 127, *4-6 [DDC Jan. 4, 2021 Civil Action No. 20-3791 (JEB)], and 2021 WL 6359, *1, 2021 US Dist LEXIS 35064, *6 [DDC Feb. 19, 2021]).

**APP2267**

# Exhibit O-30



# Meet the agency transition teams for President–Elect Biden



Nicole Ogrysko | @nogryskoWFED
November 10, 2020 6:09 pm  ⏱ 4 min read



He may not have the keys to his offices or access to official resources just yet, but President-Elect Joe Biden has announced the members of his team who will lead transition activities and reviews on the ground at several federal agencies.

Agency transition teams are in charge of reviewing current projects and ongoing initiatives, speaking with career employees and preparing the members of the incoming cabinet for their new roles and priorities.

No surprise, several prominent members of the Obama administration have roles on the president-elect's transition teams.

Chris Lu, a former deputy Labor secretary and President Barack Obama's cabinet secretary, is heading up the team at his former agency. Seth Harris, Lu's predecessor as Labor deputy, is also a member of the team, as is Jenny Yang, an Obama-era commissioner at the Equal Employment Opportunity Commission.

—— As agencies begin to formalize their AI programs and look at where to scale up pilots and use cases, federal and industry leaders point to prioritizing based on outcomes. Learn insights from DHS, NSF and VA, as well as Pegasystems in our new eBook.

(https://federalnewsnetwork.com/cme-event/federal-insights/how-desired-outcomes-help-agencies-plan-for-operational-ai/?utm_medium=referral&utm_source=in-article_promo&utm_campaign=pega&utm_content=in-articlepromo)

Carolyn Colvin, the former acting commissioner of the Social Security Administration, is leading the SSA team.

Nancy Potok, the former chief U.S. statistician, will serve on the team reviewing the Commerce Department.

Matt Bailey, a former advisor in the federal Office of the Chief Information Officer, will head up the U.S. Digital Service.

Former deputy Postmaster General Ronald Stroman will lead the Postal Service team. Aneesh Chopra, the first federal chief technology officer, is also a USPS team member.

Ann Dunkin, a former CIO at the Environmental Protection Agency, has a role on the EPA team.

In addition to these names, read more about the teams reviewing the agencies most important to federal employees. See the full list of agency transition team members here (https://buildbackbetter.com/the-transition/agency-review-teams/).

Office of Personnel Management: Kiran Ahuja, a former chief of staff at the agency, will lead the OPM team. Ahuja served at OPM during the aftermath of the agency's cybersecurity breaches. Prior to her OPM service, she led the Obama administration's White House Initiative on Asian Americans and Pacific Islanders. Today, she's the CEO of Philanthropy Northwest, a non-profit organization.

**APP2269**

— Read more: Management

(https://federalnewsnetwork.com/category/management/)

**Office of Management and Budget:** Martha Coven is steering the OMB team. Coven spent several years at OMB during the Obama administration, where she was responsible for the Labor Department, Social Security Administration and the Education Department budgets. She also served as a special assistant to the president's Domestic Policy Council during the earliest years of the Obama administration, according to her Princeton University bio, where she's currently a lecturer.

Bridget Dooling, a research professor with George Washington University and former analyst and attorney with the Office of Information and Regulatory Affairs, is also on the OMB team. Mark Schwartz, a longtime chief information officer for U.S. Citizenship and Immigration Services, is another OMB team member.

**General Services Administration:** Katy Kale had several roles in the Obama administration and will head up the GSA team. Kale served as assistant to the president for management and administration, director of White House operations and GSA chief of staff, according to her bio with Elevate, a grant writing company.

**Defense Department:** Kathleen Hicks, a senior vice president for the Center for Strategic and International Studies, will lead the DoD team. Hicks had several roles in the department under the Obama administration, including as principal deputy undersecretary of defense for policy and deputy under secretary of defense for strategy, plans, and forces.

The team reviewing the Pentagon is packed with other familiar names, including Sharon Burke, a former assistant secretary of defense for operational energy, Mike McCord, a former DoD comptroller, and Andrew Hunter, a CSIS senior fellow.

Shawn Skelly and Debra Wada, who recently ended their terms on the congressionally-chartered Commission on Military, National and Public Service, are also on the DoD team.

**Department of Veterans Affairs:** Meg Cabot, a senior director at Atlas Research and former director of VA's Caregiver Support Program, will lead the team. Atlas Research has a longstanding partnership with VA.

12/5/23, 6:39 PM                    Meet the agency transition teams for President-Elect Biden | Federal News Network

(https://federalnewsnetwork.com/listen-live/)

Phillip Carter, a veteran and former researcher and fellow with the Center for a New American Security and Rand Corporation is on the VA team. Today, Carter is a corporate counsel for Tableau Software and an adjunct professor for Georgetown University. Baligh Yehia, who led VA's Community Care Network during part of the Obama administration, is also a member, as is Andrea Ippolito, a former Presidential Innovation Fellow and leader of VA's Innovation Network.

Department of Homeland Security: Ur Jaddou, a former chief counsel at USCIS and State Department alumna, will head up the DHS team.

Craig Fugate, a former Federal Emergency Management Agency administrator, Caitlin Durkovich, a former DHS assistant secretary for infrastructure protection, and Peter Neffenger, a former Transportation Security Administration leader and vice commandant for the Coast Guard, are also on the DHS team.

Copyright © 2023 Federal News Network. All rights reserved. This website is not intended for users located within the European Economic Area.

    

 **Nicole Ogrysko**
Nicole Ogrysko is a reporter for Federal News Network focusing on the federal workforce and federal pay and benefits. Follow @nogryskoWFED

Sign up for breaking news.          | Email Address |          Signup

## Around the Web



**Incredible New Device Leaves Neuropathy Experts Scratching Their Heads**

Health Insight Journal



**Discover the Delicious Flavor of Cruise Chews Man - Try It Today!**

Cheech & Chong



**Mcafee License Renewal Notice: Click Here to Activate Your Mcafee Antivirus**

McAfee



**1 Drop Of This Weird Trick Cures Tinnitus For Good (Watch)**

Tinnitus Research Center



**Blood Sugar Above 100? Try This Tonight**

Healthy Living Club



**Roofer: I Use This 'Trick' To Keep My Gutters Clean at ALL Times**

LeafFilter Partner

APP2271

# Exhibit O-31

Agency Review Teams | President-Elect Joe Biden



# AGENCY REVIEW TEAMS

Meet the Biden-Harris agency review teams

Agency review teams are responsible for understanding the operations of each agency, ensuring a smooth transfer of power, and preparing for President-elect Biden and Vice President-elect Harris and their cabinet to hit the ground running on Day One. These teams are composed of highly experienced and talented professionals with deep backgrounds in crucial policy areas across the federal government. The teams have been crafted to ensure they not only reflect the values and priorities of the incoming administration, but reflect the diversity of perspectives crucial for addressing America's most urgent and complex challenges.

The Presidential Transition Act requires presidential transitions to disclose the "most recent employment" and "sources of funding" for all agency review team members. The Transition Team has three types of agency review team members:

- **Volunteers:** Individuals who are volunteering for the Transition in their personal capacity. For these team members, their current or most recent employer is listed (for informational purposes only), and their source of funding is listed as "Volunteer."

- **Full-Time Transition Employees:** Individuals who are full-time paid Transition employees, funded by the Transition entity itself

**APP2273**

| Name | Most Recent Employment | Source of Funding |
| --- | --- | --- |
| Cristal Gary | AMITA Health | Volunteer |
| Mina Hsiang | Devoted Health | Volunteer |
| Tom Inglesby | Johns Hopkins University | Volunteer |
| David C. Kaslow | PATH | Volunteer |
| Natalie Kates | Alloy | Volunteer |
| Jeremy Konyndyk | Center for Global Development | Volunteer |
| Anna Martinez | State of New Jersey, Department of Children and Families, Division on Women | Volunteer |
| Sarah Nolan | Service Employees International Union | Volunteer |
| Yngvild Olsen | Institutes for Behavior Resources, Inc. | Volunteer |
| Edwin Park | Georgetown University | Volunteer |
| Sharon Parrott | Center on Budget and Policy Priorities | Volunteer |
| Chuck Peck | Guidehouse, Inc. | Volunteer |
| Anne Reid | Co-Equal | Volunteer |
| Geoff Roth | Self-employed | Volunteer |
| Meena Seshamani | MedStar Health | Volunteer |
| Cyrus Shahpar | Resolve to Save Lives, an initiative of Vital Strategies | Volunteer |
| Mary Wakefield | University of Texas at Austin | Volunteer |

# Department of Homeland Security

**APP2274**

Agency Review Teams | President-Elect Joe Biden

| Name | Most Recent Employment | Source of Funding |
| --- | --- | --- |
| Ur Jaddou, Team Lead | America's Voice | Volunteer |
| Amanda Baran | Self-employed | Volunteer |
| Michael Coen | Innovative Emergency Management | Volunteer |
| John Cohen | Argonne National Laboratory | Volunteer |
| Pam Coleman | State of New Mexico | Volunteer |
| Caitlin Durkovich | Toffler Associates, Inc. | Volunteer |
| Andrea Flores | American Civil Liberties Union | Volunteer |
| Craig Fugate | One Concern, Inc. | Volunteer |
| Asha M. George | Bipartisan Commission on Biodefense | Volunteer |
| Jonathan Meyer | Sheppard Mullin Richter & Hampton, LLP | Volunteer |
| Lori Moore-Merrell | International Public Safety Data Institute | Volunteer |
| Peter Neffenger | Self-employed | Volunteer |
| Blas Nuñez-Neto | RAND Corporation | Volunteer |
| Kimberly O'Connor | The Levy Group, Inc. | Volunteer |
| Esther Olavarria | Self-employed | Volunteer |
| Lynn Parker Dupree | Capital One Financial Corporation | Volunteer |
| Subhasri Ramanathan | Deloitte & Touche, LLP | Volunteer |
| Paul Rosen | Crowell & Moring, LLP | Volunteer |
| Samantha Silverberg | Massachusetts Bay Transportation Authority | Volunteer |
| Robert Silvers | Paul Hastings, LLP | Volunteer |

**APP2275**

# Exhibit O-32

# Peter Neffenger

## Chairman - Smartmatic USA Board

Vice Admiral Peter Neffenger (USCG retired) enjoyed a distinguished career in the U.S. Coast Guard, where he served as the 29th Vice Commandant until June 2015 when he was confirmed by the U.S. Senate to head the Transportation Security Administration (TSA), a position he held until January 2017. He was named one of the 25 most influential business travel executives of 2016 by Business Travel News after he led a complete transformation of TSA.

Vice Admiral Neffenger holds an MPA from Harvard University, an MA in National Security and Strategic Studies from the U.S. Naval War College, an MA in Business Management from Central Michigan University, and a BA from Baldwin Wallace University, from where he recently received an honorary Doctorate (Doctor of Public Service).

He is a two-time recipient of the Department of Homeland Security's Distinguished Service Medal and is a Distinguished Fellow at the Atlantic Council, Northeastern University and the University of Pennsylvania.

**APP2277**

# Exhibit O-33



Confidential

SMMT-OAN07387916
SMMT-OAN07387916



Confidential

SMMT-OAN07387917
SMMT-OAN07387916

# Exhibit O-34



NEWS AND EVENTS

# Supporting the 2020 U.S. election

BY **THE YOUTUBE TEAM**

DEC 09, 2020   –   5 MINUTE READ

APP2282

## Updates to our work supporting the integrity of the 2020 U.S. election.

Over the past weeks and months, we've seen people coming to YouTube to learn more about where and how to vote or learning more about a candidate or an issue. We've seen news organizations grow their audience. And we've seen people turn to YouTube for the latest election results or simply to follow an historic event with the highest voting turnout in over a century in the U.S.

Our main goal going into the election season was to make sure we're connecting people with authoritative information, while also limiting the reach of misinformation and removing harmful content. The work here is ongoing and we wanted to provide an update.

### Removing content that violates our policies

Our Community Guidelines prohibit spam, scams, or other manipulated media, coordinated influence operations, and any content that seeks to incite violence. Since September, we've terminated over 8000 channels and thousands of harmful and misleading elections-related videos for violating our existing policies. Over 77% of those removed videos were taken down before they had 100 views.

We also work to make sure that the line between what is removed and what is allowed is drawn in the right place. Our policies prohibit misleading viewers about where and how to vote. We also disallow content alleging widespread fraud or errors changed the outcome of a historical U.S. Presidential election. However in some cases, that has meant allowing controversial views on the outcome or process of counting votes of a current election as election officials have worked to finalize counts.

Yesterday was the safe harbor deadline for the U.S. Presidential election and enough states have certified their election results to determine a President-elect. Given that, we will start removing any piece of content uploaded today (or

**APP2283**

approach towards historical U.S. Presidential elections. For example, we will remove videos claiming that a Presidential candidate won the election due to widespread software glitches or counting errors. We will begin enforcing this policy today, and will ramp up in the weeks to come. As always, news coverage and commentary on these issues can remain on our site if there's sufficient education, documentary, scientific or artistic context.



## Connecting people to authoritative information

While only a small portion of watch time is election-related content, YouTube continues to be an important source of election news. On average 88% of the videos in top 10 search results related to elections came from authoritative news sources (amongst the rest are things like newsy late-night shows, creator videos and commentary). And the most viewed channels and videos are from news channels like NBC and CBS.

APP2284



**APP2285**

Supporting the 2020 U.S. election



We also showed information panels linking both to Google's election results feature, which sources election results from The Associated Press, and to the Cybersecurity & Infrastructure Security Agency's (CISA) "Rumor Control" page for debunking election integrity misinformation, alongside these and over 200,000 other election-related videos. Collectively, these information panels have been shown over 4.5 billion times. Starting today, we will update this information panel, linking to the "2020 Electoral College Results" page from the Office of the Federal Register, noting that as of December 8, states have certified Presidential election results, with Joe Biden as the President-elect. It will also continue to include a link to CISA, explaining that states certify results after ensuring ballots are properly counted and correcting irregularities and errors.

APP2286



Additionally, since Election Day, relevant fact check information panels, from third party fact checkers, were triggered over 200,000 times above relevant election-related search results, including for voter fraud narratives such as "Dominion voting machines" and "Michigan recount."

APP2287

Supporting the 2020 U.S. election



Now let's look at recommendations, one of the main ways our viewers find content. Limiting the reach of borderline content and prominently surfacing authoritative information are important ways we protect people from problematic content that doesn't violate our Community Guidelines. Over 70% of recommendations on election-related topics came from authoritative news sources and the top recommended videos and channels for election-related content were primarily authoritative news. In fact, the top 10 authoritative news channels were recommended over 14X more than the top 10 non-authoritative channels on election-related content.

Despite these encouraging results, we recognize there's always more to do. For example, while problematic misinformation represents a fraction of 1% of what's watched on YouTube in the U.S., we know we can bring that number down even more. And some videos, while not recommended prominently on YouTube, continue to get high views, sometimes coming from other sites. We're continuing to consider this and other new challenges as we make ongoing improvements.

We understand the need for intense scrutiny on our elections-related work. Our teams work hard to ensure we are striking a balance between allowing for a broad range of political speech and making sure our platform isn't abused to incite real-

**APP2288**

organizations to ensure that our policies and products are meeting that goal. And as always, we'll apply learnings from this election to our ongoing efforts to

## Related Topics

Products and Features

Explore the latest company news, creator and artist profiles, culture and trends analyses, and behind-the-scenes insights on the YouTube Official Blog.

Our Channels

Twitter

Connect

About YouTube

**APP2289**

For Business

For Creators

Our Commitments

Policy & Safety        Copyright        Brand Guidelines        Privacy        Terms

Help        English

APP2290

# Exhibit O-35



Confidential

SMMT-OAN00165785
SMMT-OAN00165785



Confidential

SMMT-OAN00165786
SMMT-OAN00165785

# Exhibit O-36



INSIDE YOUTUBE

# An update on our approach to US election misinformation

BY **THE YOUTUBE TEAM**

JUN 02, 2023   —   3 MINUTE READ

  

Today we are announcing a new set of updates on YouTube to address and protect our community — providing a home for open discussion and debate during the ongoing election season.

are sometimes in tension with each other, and there is perhaps no area where striking a balance is more complex than political speech. The ability to openly debate political ideas, even those that are controversial or based on disproven assumptions, is core to a functioning democratic society–especially in the midst of election season.

**The ability to openly debate political ideas, even those that are controversial or based on disproven assumptions, is core to a functioning democratic society — especially in the midst of election season.**

We first instituted a provision of our elections misinformation policy focused on the integrity of past US Presidential elections in December 2020, once the states' safe harbor date for certification had passed. Two years, tens of thousands of video removals, and one election cycle later, we recognized it was time to reevaluate the effects of this policy in today's changed landscape. In the current environment, we find that while removing this content does curb some misinformation, it could also have the unintended effect of curtailing political speech without meaningfully reducing the risk of violence or other real-world harm. With that in mind, and with 2024 campaigns well underway, we will stop

**APP2296**

into effect today, Friday, June 2. As with any update to our policies, we carefully

This specific aspect of our elections misinformation policy represents just one piece of a broad, holistic approach towards supporting elections on YouTube. Here's what isn't changing:

- We are ensuring that when people come to YouTube looking for news and information about elections, they see content from authoritative sources prominently in search and recommendations. For example, following the 2020 US election, we found that videos from authoritative sources like news outlets represented the most viewed and most recommended election videos on YouTube. And our 2020 election information panels, with relevant context from voting locations, to live election results, were collectively shown over 4.5 billion times.

- All of our election misinformation policies remain in place, including those that disallow content aiming to mislead voters about the time, place, means, or eligibility requirements for voting; false claims that could materially discourage voting, including those disputing the validity of voting by mail; and content that encourages others to interfere with democratic processes.

The rest of our policies continue to apply to everyone on YouTube, for all types of content, including elections. This includes policies against hate speech, harassment, and incitement to violence.

We know citizens take the integrity of the democratic process incredibly seriously, and so do we. We'll remain vigilant as the election unfolds, as we did in 2020, and again in 2022. And we have an elections-focused team, including members of our Intelligence Desk, Trust & Safety and product teams, monitoring real-time developments and making adjustments to our strategy as needed. We'll have more details to share about our approach towards the 2024 election in the months to come.

**APP2297**

## More like this



## Related Topics

Civics          Policy          Products and Features

Explore the latest company news, creator and artist profiles, culture and trends analyses, and behind-the-scenes insights on the YouTube Official Blog.

Our Channels

APP2298

Connect

About YouTube

YouTube Products

For Business

For Creators

Our Commitments

Policy & Safety        Copyright        Brand Guidelines        Privacy        Terms

Help        English

APP2299

# Exhibit O-37



Confidential

SMMT-OAN01261586
SMMT-OAN01261586



Confidential

SMMT-OAN01261587
SMMT-OAN01261586

**APP2302**

# Exhibit O-38

Document Produced in Native Format

Confidential

SMMT-OAN02476880
SMMT-OAN02476880

**APP2304**





**APP2306**





**APP2308**



# Exhibit O-39



Confidential

**APP2311**

SMMT-OAN02484507
SMMT-OAN02484507

# Exhibit O-40



Confidential



Confidential

SMMT-OAN03929778
SMMT-OAN03929777

# Exhibit O-41



Confidential

SMMT-OAN03931491
SMMT-OAN03931491



Confidential

**APP2317**

SMMT-OAN03931492
SMMT-OAN03931492

# Exhibit O-42



Confidential



Confidential

SMMT-OAN04402797
SMMT-OAN04402796



Confidential

SMMT-OAN04402798
SMMT-OAN04402798



Confidential

SMMT-OAN04402799
SMMT-OAN04402798

**APP2322**



Confidential

SMMT-OAN04402800
SMMT-OAN04402798



Confidential

SMMT-OAN04402801
SMMT-OAN04402798

**APP2324**



Confidential



Confidential

SMMT-OAN04402803
SMMT-OAN04402798



Confidential

SMMT-OAN04402804
SMMT-OAN04402798



Confidential



Confidential

SMMT-OAN04402806
SMMT-OAN04402798



Confidential

SMMT-OAN04402807
SMMT-OAN04402798



Confidential

SMMT-OAN04402808
SMMT-OAN04402798

# Exhibit O-43



Confidential

SMMT-OAN04410366
SMMT-OAN04410366

**APP2333**



Confidential

SMMT-OAN04410367
SMMT-OAN04410367

**APP2334**



2

Confidential

SMMT-OAN04410368
SMMT-OAN04410367



Confidential

SMMT-OAN04410369
SMMT-OAN04410367



Confidential

SMMT-OAN04410370
SMMT-OAN04410367



Confidential

**APP2338**

SMMT-OAN04410371
SMMT-OAN04410367



Confidential

SMMT-OAN04410372
SMMT-OAN04410367

APP2339



Confidential

SMMT-OAN04410373
SMMT-OAN04410367

**APP2340**



Confidential

SMMT-OAN04410374
SMMT-OAN04410367



Confidential

**APP2342**

SMMT-OAN04410375
SMMT-OAN04410367



Confidential

SMMT-OAN04410376
SMMT-OAN04410367



Confidential

SMMT-OAN04410377
SMMT-OAN04410367

# Exhibit O-44



Confidential

SMMT-OAN01604829
SMMT-OAN01604829



Confidential

SMMT-OAN01604830
SMMT-OAN01604829

# Exhibit O-45



Confidential



Confidential

SMMT-OAN02067741
SMMT-OAN02067740

# Exhibit O-46

The Wayback Machine - https://web.archive.org/web/20040915024707/http://ksghome.harvard.edu:80/~rhausma/publication.htm



# Ricardo Hausmann Publications

Teaching :: Publications :: Profile Home

**Arranged by Type:**
New
Books
Op.&Ed.
Article
Presentations
Working Papers

**Arranged by Topic:**
New
Banking
Exchange rates
FDI
Fiscal Policy
Inequality
Intl. Fin. Architecture
Macro policies
Original Sin
Volatility

## NEW

"In Search of the Black Swan: Analysis of the Statistical Evidence of Fraud in Venezuela." with Roberto Rigobon, 2004.

"The Long-Run Volatility Puzzle of the Real Exchange Rate." with Ugo Panizza and Roberto Rigobon, 2004.

"Growth Accelerations"
with Lant Pritchett, Dani Rodrik, June 2004
NBER Working Paper 10566

"The challenge of Fiscal Adjustment in a Democracy: The case of India" with Catriona Purfield, January, 2004.

Original Sin: The Road to Redemption
with Barry Eichengreen, October, 2003.

IDA in UF:
On the benefits of changing the currency denomination of concessional lending to low-income countries
with Roberto Rigobon, 2003

Top

## NEW Working Papers

Currency Mismatches, Debt Intolerance and Original Sin: Why They Are Not the Same and Why It Matters
with Eichengreen, Panizza NBER WP-10036

Good Credit Ratios, Bad Credit Rating: the role of debt structure
March, 2003

The Mystery of Original Sin
with Ugo Panizza, March 2003

An Alternative Interpretation of the 'resource curse': Theory and Policy Implications
Hausmann, Ricardo; Rigobon, Roberto
NBER WP-9424, December. 2002

Why do countries borrow the way they borrow?.
with Marcos Chamon, December 2002

Disintegration and the Proliferation of Sovereigns:
Are There Lessons for Integration?
with Matias Braun and Lant Pritchett, December 2002

Hard Money's Soft Underbelly: Understanding the Argentine Crisis
with ANDRÉS VELASCO, 2002

Original Sin: The Pain, the Mystery, and the Road to Redemption
with Barry Eichengreen and Ugo Panizza, November 2002.

The Argentine Collapse: Hard Money's Soft Underbelly
with Andrés Velasco

Economic Development as Self-Discovery
with Dani Rodrik, March 2002

**Speaical Report:**

Seminar on Venezuela:
VENEZUELA RESPONDS TO ITS CHALLENGES
April 3-5, 2003 at HBS
hosted by Center for International Development and David Rockefellar Center for Latin American Studies

Original Sin Conference

A National Development Agenda for El Salvador

## APP2352

　　　The John F. Kennedy School of Government: Ricardo Hausmann Publication

Unrewarded good fiscal behavior: the role of debt structure
February 2002

Financial development and credit crunches: Latin America and the world
with Matías Braun, 2001

The Dollarization debate: Is it over?
Appendix
August 2001

Venezuela's growth implosion: A neo-classical story?
August 2001

After 10 years of Convertibility: Should Argentina move to greener pastures?
Paper prepared for the Conference on the 10th Anniversary of the Convertibility Law,
organized by the Banco Central de la Republica Argentina, Buenos Aires. April 5-6,
2001

Original Sin, Passthrough, and Fear of Floating
with Ugo Panizza and Ernesto Stein, January 2001

La Nueva Economía y los Mercados Emergentes:10 proposiciones especulativas
2001

Top

**Opinion editorials and articles**

An Interview for Valor Econômico
Entrevista Ricardo Hausmann, ex-economista-chefe do BID, propõe separar risco
cambial do creditício Mecanismo pode aliviar dívida externa
Cristiano Romero, De Washington
Feb., 2003.

"Chávez Must Yield to Election Calls"
The Financial Times, January, 2003.

"Patience is virtue for Argentina's Creditors"
The Financial Times, October, 2002.

"Baffled by Brazil"
The Financial Times, August 2002.

"Prisoners of Geography"
Foreign Policy, 2001:1

"Argentina's route to salvation"
Financial Times, January 4, 2002

"A Way Out for Argentina: The Currency Board Cannot Survive Much Longer"
The Financial Times, October 30, 2001:

"Managing terms of trade Volatility."
PREM notes: Economic Policy, No. 18, The world Bank. Feburary, 1999

Top

**BANKING SYSTEMS**

Working Paper:
Make or Buy? Approaches to Financial Market Integration
with Gavin, Michael
WP-337, Feb. 1997

Financial development and credit crunches: Latin America and the world
with Matías Braun

Book:

edited with Liliana Rojas-Suárez.
Published in English and Spanish (November 1996).

Working Paper:

**APP2353**

The Roots of Banking Crises: The Macroeconomic Context
with Gavin, Michael WP-318, Jan. 1996

Top

## EXCHANGE RATES
Working Paper:
Exchange Rate Regimes and Financial-Market Imperfections
with Joshua Aizenman (IFM ITI)
NBER WP-W7738 (June 2000)

Working Paper:
Why Do Countries Float The Way They Float?
with Stein, Ernesto H.; Panizza, Ugo WP-418, May. 2000

Working Paper:
Exchange Rates and Financial Fragility (IFM),
NBER WP-W7418 (November 1999).

Should there be 5 currencies or 105?
Foreign Policy, Fall 1999

Working Paper:
Financial Turmoil and Choice of Exchange Rate Regime
with Pagés-Serra, Carmen; Gavin, Michael; Stein, Ernesto H. WP-400, Jan. 1999

Published Article:
"Chapter 4: Adoption, management and abandonment of multiple exchange rate
regimes with import controls: the case of Venezuela"
in Kiguel, Miguel A. and Lizondo, J, Saul edited Parallel Exchange Rates in
Developing Countries, Palgrave: May 1997.

Top

## FISCAL POLICY AND BUDGET INSTITUTIONS
"The challenge of Fiscal Adjustment in a Democracy: The case of India"
with Catriona Purfield, January, 2004.

Published Article:
The impact of inflation on budgetary discipline,
Journal Of Development Economics (63)2 (2000) pp. 425-449
with Aizenman, Joshua.

Book:
Democracía, Decentralización y Deficit Presupuestario en América Latina,
with Kiichiro Fukasaku
(December 1999).

Working Paper:
Budget Institutions and Fiscal Performance in Latin America
with Alesina, Alberto; Hommes, Rudolf; Stein, Ernesto H.
WP-394, Mar. 1999

Book:
Democracy, Decentralization and Deficits in Latin America,
edited with Kiichiro Fukasaku,
OECD, (1998)

Published Article:
Chapter 8: Reforming budgetary institutions in Latin America: the case for a national
fiscal council,
with Eichengreen, Barry and von Hagen, Jurgen
in Picciotto, Robert and Wiesner, Eduardo edited Evaluation and Development: The
Institutional Dimension, The World Bank, 1998.

Report:
1997 Economic and Social Progress Report in Latin America:
Latin America after a Decade of Reforms
Inter-American Development Bank.
Published in English and Spanish (1997).

APP2354

Published Article:
El manejo de la politica fiscal en America Latina y el Caribe
with Michael Gavin, Roberto Perotti y Ernesto Talvi
Revista del Banco Central de Venezuela, Vol.XI:1:1997

Report:
1996 Economic and Social Progress Report in Latin America: Making Social Services
Work
Inter-American Development Bank.
Published in English and Spanish (1996).

Working Paper:
Budget Institutions and Fiscal Performance in Latin America,
with Alberto Alesina, Rudolf Hommes and Ernesto H. Stein, NBER WP-W5588 (May
1996).

Working Paper:
Optimal Tax and Debt Policy with Endogenously Imperfect Creditworthiness,
with Joshua Aizenman and Michael Gavin
NBER WP-W5558 (May 1996).

Working Paper:
Managing Fiscal Policy in Latin America and the Caribbean: Volatility, Procyclicality,
and Limited Creditworthiness
with Perotti, Roberto; Gavin, Michael; Talvi, Ernesto
WP-326, Mar. 1996

Working Paper:
The Impact of Inflation on Budgetary Discipline,
with Joshua Aizenman,
NBER WP-W5338 (November 1995).

Working Paper:
Why Is Inflation Skewed? A Debt and Volatility Story,
with Joshua Aizenman,
NBER WP-W4837 (August 1994).

Top

## FOREIGN DIRECT INVESTMENT
Working Paper:
Is FDI a Safer Form of Financing?
Hausmann, Ricardo; Fernández-Arias, Eduardo
WP-416, Apr. 2000 Published in Emerging Markets Review 2(2001) 34-39

Working Paper:
Foreign Direct Investment:Good Cholesterol?
Hausmann, Ricardo; Fernández-Arias, Eduardo
WP-417, Apr. 2000

Top

GEOGRAPHY

Published Article:
Prisoners of Geography, Foreign Policy, 2001:1

Report:
2000 Economic and Social Progress Report:
Development Beyond Economics (Chapter 3)
Inter-American Development Bank
Published in English and Spanish (2000).

Report:
1998-99 Economic and Social Progress Report:
Facing Up to Inequality in Latin America
Inter-American Development Bank
Published in English and Spanish (1998).

Working Paper:
Nature, Development, and Distribution in Latin America.

APP2355

Evidence on the Role of Geography, Climate, and Natural Resources
Hausmann, Ricardo; Gavin, Michael
WP-378, Aug. 1998

Top

## INEQUALITY

Working Paper:
Inequality and the Family in Latin America
Hausmann, Ricardo; Székely, Miguel
WP-393, Jan. 1999

Working Paper:
Nature, Development, and Distribution in Latin America.
Evidence on the Role of Geography, Climate, and Natural Resources
Hausmann, Ricardo; Gavin, Michael
WP-378, Aug. 1998

Report:
1998-99 Economic and Social Progress Report:
Facing Up to Inequality in Latin America
Inter-American Development Bank
Published in English and Spanish (1998).

Book:
Government Spending and Income Distribution in Latin America
Edited with Roberto Rigobon

Top

## INTERNATIONAL FINANCIAL ARCHITECTURE

Working Paper:
The Redesign of the International Financial Architecture from a Latin American
Perspective: Who Pays the Bills?
Hausmann, Ricardo; Fernández-Arias, Eduardo
WP-440, Dec. 2000

Working Paper:
Getting it Right: What to Reform in International Financial Markets
Hausmann, Ricardo; Fernández-Arias, Eduardo
WP-428, Aug. 2000

Working Paper:
What's Wrong with International Financial Markets?
Hausmann, Ricardo; Fernández-Arias, Eduardo
WP-429, Aug. 2000

Book:
Global Finance from a Latin American Viewpoint
Hausmann, Ricardo; Hiemenz, Ulrich
Apr. 01, 2000

Working Paper:
International Initiatives to Bring Stability to Financial Integration
Hausmann, Ricardo; Fernández-Arias, Eduardo
WP-402, Mar. 1999

Working Paper:
Preventing Crisis and Contagion: Fiscal and Financial Dimensions
Hausmann, Ricardo; Gavin, Michael
WP-401, Mar. 1999

Top

## MACRO POLICIES

Working Paper:
Exchange Rate Regimes and Financial Market Imperfections,
with Joshua Aizenman,
NBER WP-WW7738 (June 2000)

Working Paper:
Why Do Countries Float The Way They Float?
with Stein, Ernesto H.; Panizza, Ugo

APP2356

WP-418, May. 2000

Working Paper:
Exchange Rates and Financial Fragility,
NBER WP-W7418 (November 1999).

Working Paper:
Preventing Crisis and Contagion: Fiscal and Financial Dimensions
Hausmann, Ricardo; Gavin, Michael
WP-401, Mar. 1999

Working Paper:
Financial Turmoil and Choice of Exchange Rate Regime
Hausmann, Ricardo; Pagés-Serra, Carmen; Gavin, Michael; Stein, Ernesto H.
WP-400, Jan. 1999

Book:
Promoting Savings in Latin America,
edited with Helmut Reisen,
OECD (November 1997).

Working Paper:
Saving Behavior in Latin America: Overview and Policy Issues
Hausmann, Ricardo; Gavin, Michael; Talvi, Ernesto
WP-346, May 1997

Working Paper:
Optimal Tax and Debt Policy with Endogenously Imperfect Creditworthiness,
with Joshua Aizenman and Michael Gavin,
NBER WP-W5558 (May 1996).

Working Paper:
Managing Fiscal Policy in Latin America and the Caribbean: Volatility, Procyclicality,
and Limited Creditworthiness
Hausmann, Ricardo; Perotti, Roberto; Gavin, Michael; Talvi, Ernesto WP-326, Mar.
1996

Working Paper:
The Roots of Banking Crises: The Macroeconomic Context
Hausmann, Ricardo; Gavin, Michael
WP-318, Jan. 1996

Working Paper:
Securing Stability and Growth in a Shock Prone Region:
The Policy Challenge for Latin America
Hausmann, Ricardo; Gavin, Michael
WP-315, Jan. 1996

Published Article:
Origenes de las Crisis Bancarias: El Contexto Macroeconomico
with Michael Gavin
in Revista del Banco Central de Venezuela, Vol.X, 1996

Working Paper:
The Impact of Inflation on Budgetary Discipline,
with Joshua Aizenman,
NBER WP-W5338 (November 1995).

Working Paper:
Macroeconomics of Capital Flows to Latin America:
Experience and Policy Issues
Hausmann, Ricardo; Gavin, Michael; Leiderman, Leonardo
WP-310, Oct. 1995

Working Paper:
Why Is Inflation Skewed? A Debt and Volatility Story,
with Joshua Aizenman,
NBER WP-W4837 (August 1994).

Book:

**APP2357**

Shocks Externos y Ajuste Macroeconómica, Ediciones Banco Central de Venezuela (1990),
prologue by R. Dornbusch,
Ediciones IESA, Caracas (1992).

CURRENCY MISMATCHES, DEBT INTOLERANCE AND ORIGINAL SIN:
WHY THEY ARE NOT THE SAME AND WHY IT MATTERS
with Eichengreen, Panizza NBER WP-10036

Original Sin: The Pain, the Mystery, and the Road to Redemption
with Barry Eichengreen and Ugo Panizza, August 2003.

Working Paper:
Original Sin, Pass through, and Fear of Floating
with Ugo Panizza and Ernesto Stein, January 2001

Unrewarded good fiscal behavior: the role of debt structure
February 2002

Working Paper:
Financial Turmoil and Choice of Exchange Rate Regime
with Pages-Serra, Carmen; Gavin Michael; Stein, Ernesto H.
WP-400, January, 1999

Top

## SPECIAL REPORT

**Seminar on Venezuela**
**"Venezuela Responds to its Challenges"**

April 3-5, 2003
Harvard Business School

The Program (in Spanish)

The Discussion Issues

Anonymous answers to the Discussion Issues

The Participants

The Presentations:

Saul Cabrera
Nicolas Checa
Eduardo Lora
Ricardo Hausmann
Elias Matta
Ricardo Penfold
Lant Pritchett
Fernando Reimers

Top

## ORIGINAL SIN CONFERENCE

Currency and Maturity Matchmaking: Redeeming Debt from Original Sin  11/21/2002 -
11/22/2002
9:00 a.m. - 6:00 p.m.
1300 New York Ave.
Washington, DC, United States

Agenda - 73 KB
Summary - 27 KB

The financial crises of the 1990s raised important concerns about the borrowing
practices of emerging markets and the lending practices of international financial
institutions and markets. Among the sources of fragility highlighted in the literature on
this experience are the currency and maturity mismatches of households, firms and
governments. The question, in the eyes of many, is whether emerging markets, unlike
advanced-industrial countries, simply cannot borrow abroad at long maturities in their
own currency, or whether they are in fact capable of doing so but fail to appreciate the
need to develop the relevant capacity. But while there is an awareness of the gravity of

**APP2358**

the problem, there is little agreement on its extent or interpretation. The present conference grows out of a research project which has assembled new evidence and developed new theories of the problem.

To this end, we have commissioned theoretical, econometric and historical papers on the determinants and development of the capacity of countries to borrow abroad, at long maturities, in their own currencies. The papers shed new light on both the causes and consequences of balance-sheet mismatches and on their economic, historical, and institutional determinants. In addition to presenting and discussing these papers, we will have three panels to explore the perspectives of market participants, national policymakers, and the international community.

**Presentations**

How "Original Sin" was overcome: the evolution of external debt denominated in domestic currencies in the United States and the British Dominions 1800-2000

Old Sins: Exchange clauses and European foreign lending in the 19th century

"Original Sin",Balance Sheet Crises, and the Roles of International Lending

Currency and Maturity Matchmaking: Redeeming Debt from Original Sin

Redemption Through Indexation: The Chilean Experience

How "Original Sin" Was Overcome: The Evolution of External Debt Denominated in Domestic Currencies in the United States and the British Dominions 1800-2000/2nd Presentation

Must Original Sin Bring Macroeconomic Damnation?

A Fiscal Perspective on Currency Crises and the Original Sin

C&M MATCHMAKING: Introductory Remarks

Original Sin The Pain, the Mystery And the Road to Redemption: Part II THE MYSTERY

Original Sin The Pain, the Mystery And the Road to Redemption: Part III REDEMPTION

Original Sin The Pain, The Mystery and the Road to Redemption

**Seminar Papers**

How 'Original Sin' was Overcome: The Evolution of External Debt Denominated in Domestic Currency in the United States and the British Dominions 1880-2000

Must Original Sin Bring Macroeconomic Damnation?

Why Do Countries Borrow the Way they Borrow?

Old Sins: Exchange Clauses and European Foreign Lending in the 19th Century

A Fiscal Perspective on Currency Crises and the 'Original Sin'

'Original Sin', Balance Sheet Crises and the Roles of International Lending

Why Do Emerging Economies Borrow in Foreign Currency?

Original Sin: The Pain, The Mystery, and the Road to Redemption (Updated on August, 2003)

Top

**A National Development Agenda for El Salvador**
Report Summary in Spanish

Chapter 1: Overview
Chapter 2: Self-discovery

**APP2359**

Chapter 3: CAFTA
Chapter 4: Salvadoran Oversea
Chapter 5: Education
Chapter 6: Social
Chapter 7: Fiscal
Chapter 8: Financial
Chapter 9: Violence
Chapter 10: Political
Chapter 11: Judicial
Chapter 12: Market

Top

## VOLATILITY

Opinion editorials and articles:
"Managing terms of trade Volatility." PREM notes: Economic Policy, No. 18,
The world Bank. Feburary, 1999

Book:

Wanted: World Financial Stability
with Fernández-Arias, Eduardo
Feb. 01, 2000

Working Paper:
Preventing Crisis and Contagion: Fiscal and Financial Dimensions
with Gavin, Michael
WP-401, Mar. 1999

Working Paper:
Financial Turmoil and Choice of Exchange Rate Regime
with Pagés-Serra, Carmen; Gavin, Michael; Stein, Ernesto H.
WP-400, Jan. 1999

Published Articles:
Will Volatility Kill Market Democracy?
Foreign Policy Fall 1997

Working Paper:
Securing Stability and Growth in a Shock Prone Region:
The Policy Challenge for Latin America
with Gavin, Michael
WP-315, Jan. 1996

Book:
Securing Stability and Growth in Latin America:
Policy Issues and Prospects for Shock-Prone Economics,
edited with Helmut Reisen (1996).

Book:
Volatile Capital Flows: Taming Their Impact on Latin America
Ricardo Hausmann and Liliana Rojas-Suárez, editors;
Published: 1996

Working Paper:
Macroeconomics of Capital Flows to Latin America:
Experience and Policy Issues
with Gavin, Michael and Leiderman, Leonardo
WP-310, Oct. 1995

Working Paper:
Dealing with Negative Oil Shocks:
The Venezuelan Experience in the Eighties
WP-307, Aug. 1995
later published in Collier, P and Gunnin, J.W. ed. Trade Shocks in Developing
Countries, Oxford University Press, 1999

Report:
1995 Economic and Social Progress Report in Latin America: Overcoming Volatility
Inter-American Development Bank.
Published in English and Spanish (1995).

## APP2360

Working Paper:
Why Is Inflation Skewed? A Debt and Volatility Story
with Joshua Aizenman
NBER WP-W4837 (August 1994).

Top
### Reports

2000 Economic and Social Progress Report:
Development Beyond Economics (Chapter 3)
Inter-American Development Bank
Published in English and Spanish (2000). (Zip file)

1998-99 Economic and Social Progress Report:
Facing Up to Inequality in Latin America
Inter-American Development Bank
Published in English and Spanish (1998). (Zip file)

1997 Economic and Social Progress Report in Latin America:
Latin America after a Decade of Reforms
Inter-American Development Bank.
Published in English and Spanish (1997). (Zip file)

1996 Economic and Social Progress Report in Latin America: Making Social Services
Work
Inter-American Development Bank.
Published in English and Spanish (1996).

1995 Economic and Social Progress Report in Latin America: Overcoming Volatility
Inter-American Development Bank.
Published in English and Spanish (1995).

Top
### Books

Wanted: World Financial Stability
with Fernández-Arias, Eduardo
Feb. 01, 2000

Global Finance from a Latin American Viewpoint
Hausmann, Ricardo; Hiemenz, Ulrich< br> Apr. 01, 2000

Democracía, Decentralización y Deficit Presupuestario en América Latina,
with Kiichiro Fukasaku
(December 1999).

Democracy, Decentralization and Deficits in Latin America,
edited with Kiichiro Fukasaku,
OECD, (1998)

Promoting Savings in Latin America,
edited with Helmut Reisen,
OECD (November 1997).

Banking Crises in Latin America,
edited with Liliana Rojas-Suárez.
Published in English and Spanish (November 1996).

Securing Stability and Growth in Latin America: Policy Issues and Prospects for
Shock-Prone Economics,
edited with Helmut Reisen (1996).

Volatile Capital Flows: Taming Their Impact on Latin America
Ricardo Hausmann and Liliana Rojas-Suárez, editors;
Published: 1996

Shocks Externos y Ajuste Macroeconómica, Ediciones Banco Central de Venezuela
(1990),
prologue by R. Dornbusch,
Ediciones IESA, Caracas (1992).

Government Spending and Income Distribution in Latin America
Edited with Roberto Rigobon

Top

## Published Articles

Is FDI a Safer Form of Financing?
with Fernández-Arias, Eduardo
Emerging Markets Review 2(2001) 34-39

Prisoners of Geography
Foreign Policy, 2001:1

The impact of inflation on budgetary discipline,
Journal Of Development Economics (63)2 (2000) pp. 425-449
with Aizenman Joshua

Should there be 5 currencies or 105?
Foreign Policy, Fall 1999

Will Volatility kill market democracy?
Foreign Policy Fall 1997

Published Article:
"Chapter 4: Adoption, management and abandonment of multiple exchange rate
regimes with import controls: the case of Venezuela"
in Kiguel, Miguel A. and Lizondo, J, Saul edited Parallel Exchange Rates in
Developing Countries, Palgrave: May 1997.
Published Article:
El manejo de la politica fiscal en America Latina y el Caribe
with Michael Gavin, Roberto Perotti y Ernesto Talvi
Revista del Banco Central de Venezuela, Vol.XI:1:1997

Origenes de las Crisis Bancarias: El Contexto Macroeconomico
with Michael Gavin
in Revista del Banco Central de Venezuela, Vol.X, 1996

"Repercususiones de las finanzas publicas en materia de distrubucion"
in del Arco, J.N. ed. Politicas de Ajuste y Pobreza: Falsos Dilemas, Verdaderos
Problemas. Banco Interamericano de Desarrollo. 1995.

Top

## Working Papers

"Growth Accelerations"
with Lant Prichett, Dani Rodrick, June 2004
NBER Working Paper 10566

An Alternative Interpretation of the 'resource curse': Theory and Policy Implications
Hausmann, Ridardo; Rigobon, Roberto
NBER WP-9424, December. 2002

The Redesign of the International Financial Architecture from a Latin American
Perspective: Who Pays the Bills?
Hausmann, Ricardo; Fernández-Arias, Eduardo
WP-440, Dec. 2000

Getting it Right: What to Reform in International Financial Markets
Hausmann, Ricardo; Fernández-Arias, Eduardo
WP-428, Aug. 2000

What's Wrong with International Financial Markets?
Hausmann, Ricardo; Fernández-Arias, Eduardo
WP-429, Aug. 2000

Exchange Rate Regimes and Financial-Market Imperfections
with Joshua Aizenman (IFM ITI)
NBER WP-W7738 (June 2000)

Why Do Countries Float The Way They Float?
with Stein, Ernesto H.; Panizza, Ugo WP-418, May. 2000

APP2362

Working Paper:
Is FDI a Safer Form of Financing?
Hausmann, Ricardo; Fernández-Arias, Eduardo
WP-416, Apr. 2000

Working Paper:
Foreign Direct Investment: Good Cholesterol?
Hausmann, Ricardo; Fernández-Arias, Eduardo
WP-417, Apr. 2000

Exchange Rates and Financial Fragility (IFM),
NBER WP-W7418 (November 1999).

Preventing Crisis and Contagion: Fiscal and Financial Dimensions
with Gavin, Michael
WP-401, Mar. 1999

Budget Institutions and Fiscal Performance in Latin America
with Alesina, Alberto; Hommes, Rudolf; Stein, Ernesto H.
WP-394, Mar. 1999

International Initiatives to Bring Stability to Financial Integration
Hausmann, Ricardo; Fernández-Arias, Eduardo
WP-402, Mar. 1999

Financial Turmoil and Choice of Exchange Rate Regime
with Pagés-Serra, Carmen; Gavin, Michael; Stein, Ernesto H.
WP-400, Jan. 1999

Inequality and the Family in Latin America
Hausmann, Ricardo; Székely, Miguel
WP-393, Jan. 1999

Nature, Development, and Distribution in Latin America. Evidence on the Role of
Geography, Climate, and Natural Resources
Hausmann, Ricardo; Gavin, Michael
WP-378, Aug. 1998

Working Paper:
Make or Buy? Approaches to Financial Market Integration
with Gavin, Michael
WP-337, Feb. 1997

Saving Behavior in Latin America: Overview and Policy Issues
Hausmann, Ricardo; Gavin, Michael; Talvi, Ernesto
WP-346, May 1997

Budget Institutions and Fiscal Performance in Latin America,
with Alberto Alesina, Rudolf Hommes and Ernesto H. Stein,
NBER WP-W5588 (May 1996).

Managing Fiscal Policy in Latin America and the Caribbean: Volatility, Procyclicality,
and Limited Creditworthiness
Hausmann, Ricardo; Perotti, Roberto; Gavin, Michael; Talvi, Ernesto WP-326, Mar.
1996

Optimal Tax and Debt Policy with Endogenously Imperfect Creditworthiness,
with Joshua Aizenman and Michael Gavin
NBER WP-W5558 (May 1996).

Securing Stability and Growth in a Shock Prone Region: The Policy Challenge for
Latin America
with Gavin, Michael
WP-315, Jan. 1996

Working Paper:
The Roots of Banking Crises: The Macroeconomic Context
Hausmann, Ricardo; Gavin, Michael
WP-318, Jan. 1996

APP2363

The Impact of Inflation on Budgetary Discipline,
with Joshua Aizenman,
NBER WP-W5338 (November 1995).

Macroeconomics of Capital Flows to Latin America: Experience and Policy Issues
with Gavin, Michael and Leiderman, Leonardo
WP-310, Oct. 1995

Dealing with Negative Oil Shocks: The Venezuelan Experience in the Eighties
WP-307, Aug. 1995

Working Paper:
Why Is Inflation Skewed? A Debt and Volatility Story,
with Joshua Aizenman,
NBER WP-W4837 (August 1994).

Top

APP2364



# In Search of the Black Swan:
# Analysis of the Statistical Evidence of Electoral Fraud in Venezuela

Ricardo Hausmann
Harvard University

Roberto Rigobón
Massachusetts Institute of Technology

September 3, 2004

*This study was requested by Súmate who also provided the databases we used. We appreciate the great information gathering effort carried out by this organization. We are equally indebted to a hard working collaborator who, because of institutional reasons, must remain anonymous. We thank Andrés Velasco as well for his useful comments. The opinions expressed in this report and the errors we may have incurred are our responsibility and do not compromise either Súmate, or the universities to which we belong.

APP2366

# Abstract

This study analyzes diverse hypotheses of electronic fraud in the Recall Referendum celebrated in Venezuela on August 15, 2004. We define fraud as the difference between the elector's intent, and the official vote tally. Our null hypothesis is that there was no fraud, and we attempt to search for evidence that will allow us to reject this hypothesis. We reject the hypothesis that fraud was committed by applying numerical maximums to machines in some precincts. Equally, we discard any hypothesis that implies altering some machines and not others, at each electoral precinct, because the variation patterns between machines at each precinct are normal. However, the statistical evidence is compatible with the occurrence of fraud that has affected every machine in a single precinct, but differentially more in some precincts than others. We find that the deviation pattern between precincts, based on the relationship between the signatures from the November 2003 Reafirmazo, and the YES votes on August 15, is positive and significantly correlated with the deviation pattern in the relationship between exit polls and votes. In other words, those precincts in which, according to the number of signatures, there are an unusually low number of YES votes, is also where, according to the exit polls, the same thing occurs. Using statistical techniques, we discard the fact that this is due to spurious errors in the data or to random coefficients in such relationships. We interpret that it is because both the signatures and the exit polls are imperfect measurements of the elector's intent but not of the possible fraud, and therefore what causes its correlation is precisely the presence of fraud. Moreover, we find that the sample used for the auditing done on August 18 was neither random nor representative of the entire universe of precincts. In this sample, the Reafirmazo signatures are associated with 10 percent more votes than in the non-audited precincts. We built 1,000 random samples in non-audited precincts and found that this result occurs with a frequency lower than 1 percent. This result is compatible with the hypothesis that the sample for the audit was chosen only among those precincts whose results had not been altered.

APP2367

# Introduction

This study presents a statistical evaluation of the results of the August 15, 2004 Recall Referendum on President Hugo Chávez's mandate. From the morning of August 16, 2004, when the CNE (Consejo Nacional Electoral) announced the results, opposition spokespersons expressed doubts about the validity of these results, and argued that an electronic fraud had been committed. These doubts have not been cleared up with the passing of time and the opposition has yet to acknowledge President Chavez's alleged victory.

In this context, Súmate requested that we do a statistical analysis to verify if the available information is compatible with the hypothesis of fraud or if, on the contrary, it rejects this hypothesis. Súmate provided the data used in this study but gave us complete autonomy over the conduct of our research.

We were informed that the presumption of fraud is based on the following elements:

1. A new automated voting system in spite of the fact that the opposition had requested a manual tally.

2. The voting machines left a paper trail by printing ballots that allowed each elector to verify that the machine had counted his vote adequately. These ballots were collected in boxes. However, the CNE did not allow the boxes to be opened and counted. Instead, it performed a so-called "hot" audit of 1 percent of the machines on the evening of the election. Moreover, the CNE decided that the number of boxes to be opened would be chosen by a random number generator program run on its own computer.

3. After a difficult negotiation, the CNE allowed the OAS and Carter Center to participate as observers in every phase of the process except for access to the central computer server that communicated with each machine in each voting precinct. No witness from the opposition was granted access to that room either. Only two people were allowed in that room until the results were ready.

4. The adopted technology allowed --in fact required-- bidirectional communication between the central servers and the voting machines. This bidirectional communication occurred. This is different from the information that was provided to opposition negotiators about the nature of the technology involved.

5. Contrary to what was initially stipulated, the voting machines communicated with the central server before printing the results in a document called Acta. This opens the possibility that the machines were instructed to print a result different from the one expressed by the voters.

6. On August 15, 2004, different organizations including Súmate, conducted exit polls in a number of precincts. To assure its quality, Súmate´s poll was conducted with the assistance of the firm Penn, Shoen and Berland. Its results were radically different from official figures. The same thing occurred with the exit poll conducted by "Primero Justicia," a political party. The data-base of both surveys was given to us to conduct this study.

3

**APP2368**

7. The "hot-audit" conducted at dawn on August 16, 2004 was not carried out to the satisfaction of either the opposition or the international observers. Only 78 of the 192 boxes stipulated were counted. The opposition only attended 28 counts, and the international observers were only present in less than 20.

8. As requested by the international observers, a second audit was conducted on August 18. The opposition did not participate in this audit because its conditions were not met; for example, the electoral materials were not delivered to a centralized location before choosing the boxes to be opened and there was no verification that the boxes selected had not been tampered with. Instead, the boxes were chosen 24 hours before they were opened, which in theory would give time for them to be altered. Notably, the CNE did not use the random number generator program proposed by the Carter Center, and instead insisted on using its own program run on its own computer and started with a seed defined by a pro-government member of the CNE. This raises doubts over whether the sample selected was truly a random one.

All these facts raise the possibility of an electronic fraud in which the machines printed outcomes different from the real count. This could in theory have been done through software alterations, or through electronic communications with the computer hub.

Our main findings are the following. First, the paper finds that the sample used for the audit of August 18, which was observed by the OAS and the Carter Center, was not randomly chosen. In that sample, the relationship between the votes obtained by the opposition on August 15 and the signatures gathered requesting the Referendum in November 2003 was 10 percent higher than in the rest of the boxes. We calculate the probability of this taking place by pure chance at less than 1 percent. In fact, we create 1,000 samples of non-audited precincts to prove this.

This result opens the possibility that the fraud was committed only in a subset of the 4,580 automated precincts, say 3,000, and that the audit was successful because it directed the search to the 1,580 unaltered precincts. This sheds new light on the fact that the Electoral Council did not accept the use of the random number generator proposed by the Carter Center and under these conditions one can infer why the Carter Center could not identify the fraud with the audit they observed.

In addition, we develop a statistical technique to identify whether there are signs of fraud in the data. To do so, we depart from previous work on the subject that was based on finding patterns in the number of votes per machine or precinct. Instead, we look for two independent variables that are imperfect correlates of the intention of voters. Fraud is nothing other than a deviation between the voters' intention and the actual count. Since each variable used is correlated with the intention, but not with the fraud we can develop a test as to whether fraud is present. In other words, each of our two independent measures of the intention to vote predicts the actual number of votes imperfectly. If there is no fraud, the errors these two measures generate would not be correlated, as they each would make mistakes for different reasons. However, if there is fraud, the variables would make larger mistakes where the fraud was bigger and hence the errors would be positively correlated. The paper shows these errors to be highly correlated and the probability that this is pure chance is again less than 1 percent.

4

**APP2369**

The first variable we use is the number of registered voters in each precinct that signed the recall petition in November, 2003. This clearly shows intent to vote yes in a future election but it does so imperfectly. Our second measure is the exit poll conducted by Penn, Schoen and Berland and complemented with an independent exit poll conducted by Primero Justicia. This is also an imperfect measure as it depends on potential biases in the sample, differences in the skill of the interviewer, etc. But this source of error should not be correlated at the precinct level with the one that affects the signatures. Therefore, it is very telling that in the precincts where the Penn, Schoen and Berland exit poll makes bigger mistakes is also where the number of petitioners suggests that the Yes votes would be higher.

This evidence is troubling because it resonates with three facts about the conduct of the election. First of all, contrary to the agreed procedure, the voting machines were ordered to communicate with the election computer server *before* printing the results. Secondly, contrary to what had been stated publicly, the technology utilized to connect the machines with the computer hub allowed two-way communication and this communication actually took place. This raises the possibility that the hub could have informed the machines what numbers to print, instead of the other way around. Finally, after an arduous negotiation, the Electoral Council allowed the OAS and the Carter Center to observe all aspects of the election process except for the central computer hub, a place where they also prohibited the presence of any witnesses from the opposition. At the time, this appeared to be an insignificant detail. Now it looks much more meaningful.

The structure of the paper is as follows. First we describe the evidence coming from the exit polls. We show that the difference between the exit polls and the actual vote is not caused by a sampling error, due for example, to an over-representation of anti-Chavez precincts, but instead to a generalized but variable difference, precinct by precinct. Second, we test the validity of the popular so-called "topes" hypothesis. According to this theory, machines were ordered not to surpass a certain maximum number of Yes votes. If this was the case, there should be an unusually large number of repeated Yes totals in each precinct and the repeated number should also be the maximum Yes vote total in the precinct. We do not check whether the number of repeats is unusually high, but we do show that the frequency with which the repeated number is also the maximum Yes vote of the precinct is consistent with a random event.

We then move on to study whether the variance of results at the precinct level is unusual. This would be the case if some but not all machines were manipulated at the precinct level. We find the variance at the precinct level to be if anything smaller than would be expected by pure chance.

The next section develops our test for fraud using our two independent but correlated measures of voters' intent. We then move on to test whether the sample used for the audit of August 18 was random. The final section concludes.

## Exit Polls vs. Votes: Analysis of the Differences

The first evidence of potential irregularities in the election count derives from the exit polls conducted independently by Súmate and Primero Justicia (PJ). As shown in Table

5

1, according to the CNE, 41.1 percent of voters supported the YES. On the other hand, in the Súmate and PJ surveys, the weighted projections were 62.0 and 61.6 percent respectively, a difference of more than 20 points.

We check whether this difference is due to the fact that the sample chosen by Súmate and Primero Justicia was not representative of the electoral universe. In other words, we check whether the problem arises because of an over-representation of precincts in favor of the YES vote in relation to those in favor of the NO. We show that this is not the source of the problem. As shown in Table 1, according to the CNE the percentage obtained by the YES in the precincts surveyed by Súmate was 45.0 percent, while in PJ´s sample the result was 42.7 percent. In other words, in the sample chosen by both organizations, the result reported by them differs from the official one by more than 17 percentage points. Hence, the difference in the results is not principally due to the sample composition but to a systematic difference across the sample where the exit polls were conducted.

Table 1: Comparison between Electoral Results and Súmate´s and
Primero Justicia´s Exit Polls

|  | Unweighted | Weighted |
|---|---|---|
| Percentage of YES votes at the precinct level | 37.0% | 41.1% |
| Percentage of YES in Súmate´s exit poll | 59.5% | 62.0% |
| Percentage of YES votes where Súmate did their exit poll | 42.9% | 45.0% |
| Percentage of YES in PJ´s exit poll | 62.6% | 61.6% |
| Percentage of YES votes where PJ did their exit poll | 42.9% | 42.7% |
| Percentage of YES in Súmate+PJ exit polls | 61.3% | 62.2% |
| Percentage of YES votes where Súmate+PJ did their Exit polls | 43.1% | 44.2% |

To illustrate this problem more clearly, in Figure 1 we show the percentage of votes and the survey results for the 340 precincts surveyed by both groups. If the surveys were perfect, the points would align in a ray from the origin with a 45 degree slope (drawn in the graph). In other words, where the YES option received respectively 10 percent, 50 percent or 80 percent, the surveys would show the same result. If the points in the graph are above the 45 degree line, it means that the poll overestimates the result in that precinct. If the points are below, the poll underestimates it.

As Figure 2 clearly shows, the bulk of the 342 precincts polled are above the 45 degree line. Moreover, the graph indicates that the differences between the votes and the surveys are very variable among precincts. The distances to the 45 degree line are largest in places where the YES option garnered between 20 and 40 percent.

This analysis has the following implications. First, it indicates that the difference between the surveys and the votes is not due, in any important way, to problems in the selection of the precincts to be included in the survey. Second, the analysis implies that the difference may be due to one of the two reasons, or to a combination of both. It may be due to a generalized failure in both surveys in each precinct, or to a quite generalized and non-linear manipulation of the results.  It will be a challenge of the statistical work to distinguish between these two hypotheses and investigate which is the right one.

6

**APP2371**

GRAPH 1  Exit polls vs. Electoral result: percentage of the YES by Precinct



## The Caps or "Topes" Hypothesis

The fraud hypothesis most discussed in Venezuela has been based on the idea that numerical caps were imposed on the amount of YES votes that could be allowed in a precinct and that the overflow of YES votes would be switched into NO votes. In this section we evaluate this hypothesis.

To analyze the feasibility of this hypothesis we examine how many times the number of YES and NO votes are repeated at the precinct level in the CNE´s database, which contains 19,062 automated machines.

Table 2 . Number of YES and NO total votes per machine that are repeated in the same precinct

| Variable | Number of machines | Numbers repeated | Frequency |
| --- | --- | --- | --- |
| Si | 19,062 | 1,875 | 9.8 |
| No | 19,062 | 1,472 | 7.7 |

The repetition of the YES count occurs with a frequency of 9.8 percent while that of the NO occurs with a frequency of 7.7 percent. We do not test whether this frequency is

7

unusually high or low[1]. However, the relatively high frequency is at least in part due to the fact that the number of electors as well as the voting percentage tends to be very similar among machines in the same precinct. The fact that the repeated YES totals occurs with a slightly higher frequency than the NO is at least in part due to the fact that YES has a lower percentage of votes. Let us illustrate this point with an example. Suppose the preference for the YES in a single precinct is approximately 40 percent and the number of voters at each machine is 100. A 5 percent variation would imply 2 votes, so the expected result in each machine could be between 38 and 42. The result could be in some of the 5 numbers included in that interval. On the contrary, the same percent variation for the NO would yield a variation between 57 and 63 votes, which gives 7 possible numbers. Since the amount of possible numbers is higher for the NO than for the Yes, it is logical the latter would repeat less frequently.

More importantly, the cap hypothesis implies that the number that repeats itself is also the maximum from the precinct and that the difference is assigned to the NO. For this, it is necessary that the repeated number also be the maximum YES vote in the precinct. We study this hypothesis in Table 3.

If the repeated number was randomly distributed, it would occur with a frequency equal to 1/(Number of machines − 1). For example, in the case of precincts with 2 machines, the repeated number is simultaneously the maximum and the minimum, for there is only one number. In the case of three machines, the probability that the repeated number is the maximum is 50 percent. As we see in Table 3, 66 is not very far from being half of 124. In the case of 5 tomes, 54 is not far from being one fourth of 198.

We conclude that if there was fraud, this was not done through the imposition of numerical caps to the YES votes in the machines of a precinct.

---

[1] Jonathan Taylor from Stanford University has argued that it is unusually high. See http://www-stat.stanford.edu/~jtaylo/venezuela/

**APP2373**

Table 3.  Maximum and non-maximum numbers repeated per voting tome at the precincts.

| Machines per precinct | Non-maximum | Maximum | Total |
| --- | --- | --- | --- |
| 2 | 0 | 64 | 64 |
| 3 | 58 | 66 | 124 |
| 4 | 161 | 80 | 241 |
| 5 | 144 | 54 | 198 |
| 6 | 230 | 46 | 276 |
| 7 | 221 | 46 | 267 |
| 8 | 197 | 14 | 211 |
| 9 | 151 | 4 | 155 |
| 10 | 97 | 8 | 105 |
| 11 | 85 | 2 | 87 |
| 12 | 52 | 2 | 54 |
| 13 | 36 | 0 | 36 |
| 14 | 18 | 0 | 18 |
| 15 | 20 | 0 | 20 |
| 16 | 7 | 0 | 7 |
| 17 | 6 | 0 | 6 |
| 18 | 6 | 0 | 6 |
| Total | 1,489 | 386 | 1,875 |

## Variance Analysis of the Within-precinct Results

The caps hypothesis, if true, would also affect the percentage difference in the results of the machines belonging to the same precinct. This is due to the fact that the amount of voters per machine varies due to differences in the abstention rate or in the number of electors assigned to each machine. This variation would show in the number of No votes, and therefore would create a source of variation in the results across machines of the same precinct. This hypothesis and any other hypothesis that is based on the idea of altering some machine more than others at the precinct level can be tested.

In each precinct, voters are distributed to machines according to the last two digits in their identity card *(cédula)* number. This allows each machine to be a random sample of the precinct's voters because the last digits in their identity card are not correlated with any variable relevant to the voting decision.  This limits the possible distance between the results from two machines from the same precinct. To illustrate this, consider how opinion surveys are done in any country. A random sample is chosen - usually a thousand or two thousand people − and the outcome is used to predict the results of millions of voters. In other words, a representative sample composed of a miniscule fraction of the electorate is used to predict the outcome of the whole. In the case of a precinct we are taking a much smaller and homogeneous universe than a country and we are dividing the population randomly according to the number of machines in the precinct. For example, in the case of a precinct with five machines, each machine represents approximately 20 percent of the total population of the precinct.  In addition, in the case of this referendum, the options were limited to two: YES or NO.  This

9

imposes a condition for the standard deviation of the number of votes per machine. Suppose that in a machine, N- number of people vote and the probability that each one of them votes YES is p. Probability theory requires that the standard deviation follow a binomial distribution and be equal to:

$$\text{Standard Deviation} = \sqrt{p(1-p)N}$$

To illustrate this, take the case in which $p$ is the probability that an elector will vote YES in a given precinct, is equal to 50 percent and N is 400. In this case, the standard deviation would be 10 votes. The coefficient of variation (or the standard deviation of the percentage vote) would be 10 divided by 400, meaning, 2.5 percent. Given this, the typical deviation among machines in the same precinct must be compatible with this rule.

If for example within a precinct the results of some machines were changed by 10 percent while the others were left unaltered, then we would see an increase in the deviation among all machines that would be 4 times the expected standard deviation of 2.5 percent. This would be abnormal.

One implication of this result is that the caps or "topes" theory would also violate the expected distribution of a binomial. If numerical caps were assigned to each machine in a precinct, the variation of the number of voters per machine would affect the number of NO votes and therefore alter the percentage results in a manner that would increase the dispersion of the results and cause these to violate the binomial rule.

To verify if the CNE vote data complies with the standard deviation predicted by probability theory, we calculate each machine's deviation with respect to the average of its precinct. Moreover, we divide this number by the standard deviation that would correspond to a precinct with the actual number of voters and machines. Figure 2 presents our results. It shows a histogram of the percent difference among machines of the same precinct with respect to the standard deviation expected by the binomial distribution. The curve reflects the expected theoretical distribution. The bars are the frequency calculated with the actual data. As can be seen, the coincidence is quite substantial. The graph indicates that only close to 1 percent of the machines have deviations higher than 2 times the expected standard deviation. This frequency is consistent with the theoretical distribution. In fact, if there is anything surprising about the graph, it is that the deviations of the results are if anything too small, as can be seen by the large concentration of results near zero variation.

This result has two possible interpretations. One is that there was no fraud. The other is that if fraud was committed, it must have been done by changing every machine in the precinct by a similar percentage. In fact, a fraud of this kind would not be detected with the analysis done so far for it would not alter the variance results among machines. Any hypothesis of fraud that does not comply with this condition would violate the restriction imposed on the deviation of the results by the binomial distribution.

Figure 2. Distribution of the deviation of results of machines relative to the precinct mean
(relative to the predicted standard deviation)



## A Statistical Strategy to Detect the Presence of Fraud

To detect if the data is compatible with the presence of fraud we need to develop a model and put it to the data. We define fraud as the difference between the voters' intent and what the electoral system registered about his decision.

Votes = Intent + Fraud = I + F

We will take as our null hypothesis the assumption that there was no fraud, i.e. that F = 0. We will then develop a test to see if the null hypothesis can be rejected. The problem is that we cannot observe the voters' intent directly. The statistical strategy we adopted begins with finding two sets of independent variables that are correlated to the voters' intent, but not with the fraud. For our purposes, it is not too important that our variables do not predict the voters' intent perfectly. Even if they do so imperfectly, it may still give us a chance to reject the hypothesis of no fraud. Notice that the worse the quality of the data, the harder it will be to reject the null hypothesis meaning that bad information makes it harder, not easier, to reject the hypothesis of no fraud.

To illustrate what we do, we start with a simplified presentation of our approach. In practice, things are a bit more complicated, but explaining the sources of complexity will be easier after the fundamental intuition is presented.

Let us take two variables that are correlated to the elector's intent: the November-December 2003 Reafirmazo drive for signatures for the Recall Referendum petition and the exit polls. Each one of these variables is an imperfect measure of the voters' intent on August 15, 2004. Some people that signed the petition may have changed their opinion in the intervening months. Others might have decided not to sign because it was not secret, but may have decided to vote given its secrecy. Others may not have been registered in November and hence could not sign, but were registered by August and hence could vote. The lines in the August election were particularly long and slow and that may have reduced the number of voters, etc.

Equally, exit polls are an imperfect measure of the voter's intent. Pollsters may have, consciously or unconsciously, gathered a biased sample. People may have had more or less willingness to cooperate with the interview, etc. However, these errors are of a quite different nature from the errors generated by the relationship between signatures and votes and hence should not be correlated.

Suppose we have an imperfect measure of the voter's intent in each precinct and we build a graph relating this variable — say the signatures— and the voters' intent. As the signatures are an imperfect measure of the voters intent, the graph will look like a cloud of dots around some basic relationship (Figure 3-a)[2]. Regression analysis can identify the line that relates the signature with the voters' intent. The real relationship is 0.7, because that is how we built the data. The estimated relationship using the simulated data 0.71 +- 0.014, as is indicated by the graph.

---

[2] This graph was built with simulated data using a random number generator. The data was created supposing that each signature generates 0.7 votes with an error normally distributed between +0.1 and − 0.1.

12

**APP2377**

*Figure 3a  Simulated relationship between signatures and voters' intent*



coef = .71490196, se = .01417772, t = 50.42

We cannot observe the voters' actual intent but the votes registered, and these, in theory, could be influenced by fraud. Suppose fraud takes place and it is directly proportional to the numbers of votes in that precinct.  For example, let us suppose that fraud is committed by multiplying the total number of Yes votes in a machine by 0.7 and the difference added to the No votes.

Figure 3b illustrates this case. In this case, the estimated slope is no longer 0.7 but 0.5. In addition, the pattern of errors – that is to say, the distance with respect to the regression line — looks similar. It reveals no evidence of fraud. If fraud were committed this way, we would be unable to detect it with our method.  In fact, a fraud that reduces a fixed percentage of Yes votes across all machines would practically be impossible to detect by purely statistical methods.  It could only be detected using another source of information such as counting the paper ballots.

13

**APP2378**

Figure 3b  Simulated ratio between signatures and votes with fraud proportional to 30 percent of the Yes votes.



coef = .50043138, se = .0099244, t = 50.42

Now, suppose the fraud was not committed in a proportional manner. For example, suppose it was committed in some precincts and not in others. Specifically, suppose fraud consists of eliminating 30 percent of the Yes votes in precincts where signatures were less than 30 percent or more than 70 percent of the registered voters.  In this case, the pattern of errors will have a peculiar shape, as shown in Figure 3c. This peculiarity is not due to the imperfect nature of the number of signatures as predictor of votes, but in the fraud.

14

**APP2379**

Figure 3c.  Non proportional fraud



coef = .57435291, se = .01600038, t = 35.9

What happens if we now use a second measure of the voters' intended vote, for example the exit polls?  This is also an imperfect measure of the voters' intended vote and as such when doing a regression analysis, this will generate some errors.  Nevertheless, if there is a non-proportional fraud, this will also generate an irregularity in the errors which will look similar, i.e. will be correlated with the errors in the other relationship. A positive and significant correlation would identify non-proportional fraud.

Note that each measure - signatures and exit polls - is imperfect.  Nevertheless, what make each of them imperfect are factors different and independent from each other. The exit poll is not influenced by the abstention rate, as people are interviewed after they vote. The signatures do not depend on the ability or bias of the interviewer.  People could have changed their minds between November and August, but people do not change their minds for the same reason between the act of voting and the exit interview. Signing is a public act and voting is secret, etc.  Therefore, errors made by each measure may be larger or smaller but they should not be correlated.  Nevertheless, if there is non-proportional fraud, it will influence each of these measures in the same way.  Hence, the errors made by both should be positively correlated. This is the essence of the method we used.

## *Instrumental Variable Approach*

In this section we derive formally the technique we use. In particular, we show that for a variety of increasingly complex assumptions about the nature of the fraud the

15

**APP2380**

covariance between the errors of the instrumental variables regression is an appropriate test of the absence of fraud.

Assume that the fraud is defined as the difference between the votes for SI actually collected and an unobservable variable that is the intention of voting of the voters that showed up. We define the first one as Vi, the intention of voters as Xi, and the fraud as Fi.

$$Vi = Xi + Fi$$

There are also two additional measures of the intention of voters: the exit polls (Ei) and the signatures (Si) in each of the precincts. These measures, however, are imperfect. We assume a very general form of that imperfection – a random coefficient model. However, to make the point clear we start with a simpler form of errors and then generalize them. Assume that

$$Ei = a*Xi + epsi$$
$$Si = b*Xi + etai$$

Where we are assuming that the exit polls are possibly a biased estimate of the intention to vote: a can be smaller than one. The signatures (Si's), as well, could be a biased measure. Both equations have an error (epsi and etai) that take into account the fact that both the exit polls and the signatures are very imperfect measures of the voter's intentions – even the biased measured intentions. We assume that these errors are uncorrelated among themselves and with the fraud.[3]

How can we detect the fraud? The fraud can only affect the actual votes, not the exit polls, nor the signatures. In other words, the fraud is a displacement of the distribution of votes that is not present in the other two measures. Statistically, this means that the fraud could be detected by using the exit polls and the signatures as predictors of the voting process and analyzing the correlation structure of the residuals. Under the assumption that all residuals are uncorrelated – which makes sense given the definitions we have adopted – then the correlation of residuals is an indication of the magnitude of the fraud.

The particular procedure used to detect the fraud is the following:
1. Estimate the regression of Vi on Ei plus controls and recover the residual. This residual has two components: the fraud and the errors in variables residual due to the fact that the exit polls are noisy.

2. Estimate the regression of Vi on Si plus controls and recover the residual. This residual has two components: the fraud and the errors in variables residual due to the fact that the signatures are an imperfect measure of the intention of voters.

    Notice that these two residuals are correlated. First, because both have the fraud

---

[3]     This is a reasonable assumption considering that the signatures were collected at different times and conditions than the exit polls.

**APP2381**

as an unobservable component, and second, because the right hand side variables are correlated and there are errors in variables in the regression.

3.   Estimate the regression of Vi on Ei plus controls using Si as an instrument. Recover the residual. Notice that in our model, because etai is uncorrelated with epsi and Fi, we can use Si as an instrument to correct for the error in variables.

4.   Using the same logic estimate Vi on Si plus controls, and using Ei as the instrument. Recover the residual.

In this case, because the two coefficients are supposed to have solved the problem of error in variables the residuals can only be correlated if there is a common component – which in our case is the definition of the fraud.

This procedure actually detects how important the fraud is. The next section first explains why this procedure indeed is able to identify the fraud. After that we also analyze the possibility that the fraud is correlated with the signatures – which is likely given what we have argued about the stochastic properties of the votes per machine and precinct. Finally, we present evidence.

## OLS estimation with no correlation between fraud and intention to vote

Running the OLS regression of Votes on Exit Poll is:

$$Vi = Xi + Fi$$
$$Ei = a*Xi + epsi$$

Where

$$Xi = (1/a)*Ei - (1/a)*epsi$$

Substituting in the voting equation

$$Vi = c1*Ei + psi1$$

Where

$$psi1 = Fi – (1/a)*epsi$$

In this model, the OLS coefficient is

$$c1ols = a*var(Xi) / (a^2 * var(Xi) + var(eps))$$

which is always smaller than $1/a$ which is the true coefficient. This means that the residual from the regression (psi1) is

**APP2382**

$$psi1 = Fi +(1/a-c1ols)*Ei - (1/a)*epsi$$

We can do the same thing for the signatures. Notice that everything is symmetric so the equations are almost identical.

$$Vi = Xi + Fi$$
$$Si = b*Xi + etai$$

Which means that

$$Xi = (1/b)*Si - (1/b)*etai$$

Substituting Xi in the Vi equation

$$Vi = c2*Si + psi2$$

Where

$$psi2 = Fi - (1/b)*etai$$

In this model, the OLS coefficient is

$$c2ols = b*var(Xi) / (b^2 * var(Xi) + var(eta))$$

which is always smaller than $1/b$ – it is only equal to $1/b$ when the variance of eta is zero. The outcome is that the residual will be

$$psi2 = Fi +(1/b-c2ols)*Si - (1/b)*etai$$

Notice that the two residuals are correlated. Under the assumption that epsi and etai are uncorrelated, and also uncorrelated with the fraud there are two components that create the correlation among these residuals: the fraud, and the errors-in-variable bias.

$$cov(psi1,psi2) = var(Fi) + (1/a-c1ols)*(1/b-c2ols)*cov(Ei,Si)$$

The first term is the variance coming from the fraud, while the second term comes from the variance due to the error-in-variables that is present in both Ei and Si. Notice that we are assuming that the errors in variables are independent. The covariance arises because the error-in-variables downward biases both coefficients ($c1ols<1/a$ and $c2ols<1/b$) and because the exit polls and the signatures are correlated.

## Instrumental variables with no correlation between fraud and intention to vote

Under our assumptions, we have an easy solution to the error in variables in both regressions. Notice that etai and epsi are uncorrelated and that etai is uncorrelated with Fi. Additionally, Ei and Si are correlated because both measure the same factor (Xi). This means that Si can be used for instrumenting Ei and Ei for instrumenting Si. The outcome is as follows:

18

**APP2383**

$$Vi = c1*Ei + \ Fi - epsi$$

The IV estimate is

$$c1iv = cov(Si'Vi) / cov(Si'Ei)$$
$$c1iv = b*var(Xi) / a*b*var(Xi)$$
$$c1iv = 1/a$$

which means that the residual is

$$psi1 = Fi - (1/a)*epsi$$

Notice that now the errors-in-variable component has disappeared. Similarly, if we run the regression for votes on signatures and using the exit polls as instrument we find:

$$Vi = c2*Si + Fi - (1/b)*etai$$

The IV estimate is

$$c2iv = cov(Ei'Vi) / cov(Ei'Si)$$
$$c2iv = var(Xi) / b*var(Xi)$$
$$c2iv = 1/b$$

which means that the residual is

$$psi2 = Fi - (1/b)*etai$$

The correlation between the residuals of the two IV regression is

$$cov(psi1,psi2) = var(Fi)$$

So, a simple test is to compare these two covariances, and determine if they are statistically different. Furthermore, if the covariance of the IV residuals is different from zero, then we have an estimate of the importance of the fraud.


## Correlated Fraud

### OLS estimation with correlation between fraud and intention to vote

The previous exercise has assumed that the fraud is uncorrelated with the signatures, but as we have argued in the previous section, this is unlikely. In fact, most probably, the fraud is correlated with the signatures. Let us repeat the previous exercise allowing for any covariance structure between the fraud and the signatures. Running the OLS regression of Votes on Exit Poll we obtain the same result as before:

$$Vi = Xi + Fi + f*Si$$
$$Ei = a*Xi + epsi$$

19

Where the residual of the voting equation has the independent term Fi and the part of the fraud that is correlated with the signatures (f*Si). In this model, the OLS coefficient is the same as before

$$c1ols = cov(Vi,Ei)/Var(Ei)$$
$$= (a*var(Xi) + a*f*cov(Xi,Si))/ (a^2 * var(Xi) + var(eps))$$
$$= (a*var(Xi) + a*f*b*var(Xi))/ (a^2 * var(Xi) + var(eps))$$

which now we can't be sure is smaller than 1/a as before. This depends entirely on the sign of f. however, if f is negative (as we will mostly argue in this paper), then the bias downward is stronger than in the pure case. This means that the residual from the regression (psi1) is

$$psi1 = Fi +(1/a-c1ols)*Ei – (1/a)*epsi+f*Si$$

For the signatures model

$$Vi = c2*Si + Fi - (1/b)*etai + f*Si$$

Where all the three terms in the right hand side are part of the residual. The OLS coefficient is

$$c2ols = cov(Vi,Si)/Var(Si)$$
$$= (b*var(Xi) + f*var(Si))/ (b^2 * var(Xi) + var(eta))$$

where the additional term in the numerator is coming from the correlation structure between the signature and the fraud. A plausible assumption is that the fraud is usually a negative variable (in our specification) which we could expect to be larger the larger the signature is. This means that the coefficient, f, is likely to be negative. This means that the bias in c2ols is downward and stronger than just with errors in variables.

The residual is

$$psi2 = Fi +(1/b-c2ols+f)*Si – (1/b)*etai$$

Notice that the two residuals are correlated as before, but now there are two additional terms.

$$cov(psi1,psi2) = var(Fi) + (1/a-c1ols)*(1/b-c2ols)*cov(Ei,Si)$$
$$+ (1/a-c1ols)*f*cov(Ei,Si) + f^2*var(Si)$$

## Instrumental variables estimation with correlation between fraud and intention to vote

What is the implication for this correlation when we do the instrumental variables approach? For the first equation we have:

$$Vi = c1*Ei +   Fi – (1/a)*epsi+f*Si$$

The IV estimate is

$$c1iv = cov(Si'Vi) / cov(Si'Ei)$$
$$c1iv = (b*var(Xi) + f*var(Si))/ b*a*var(Xi)$$

$$c1iv = 1/a + (f/ba)*var(Si)/var(Xi)$$

which means that the residual of the IV regression is

$$psi1 = Fi – (1/a)*epsi + f*Si + (1/a-c1iv)*Ei$$

It is easy to show that c1iv is closer to 1/a than c1ols, which means that the residual, psi1, has a component coming from the error in variables that is smaller than from the OLS regression.

The IV regression of the Si specification is as follows:

$$Vi = c2*Si + Fi - (1/b)*etai + f*Si$$

The IV estimate is

$$c2iv = cov(Ei'Vi) / cov(Ei'Si)$$
$$c2iv = a*var(Xi) / a*b*var(Xi)$$
$$c2iv = 1/b$$

Notice that in this case the estimate of the IV in the voting on signatures is exactly the true coefficient. Exactly what we obtained in the previous section. Why? Simply because the exit polls do not have the error component coming from the fraud. The fraud – which is the residual in the voting equation – cannot be correlated with the exit polls or its innovations. Signatures, on the other hand, are correlated with the fraud. This is indeed the assumption of how the fraud was performed.

This makes exit polls a good instrument for signatures, but signatures is not a good instrument for exit polls. The residual in the second IV regression is:

$$psi2 = Fi - (1/b)*etai + f*Si$$

## Comparison of the covariance

Let's compare the two covariances: the covariance for the OLS residuals with the covariance with the IV residuals. The OLS residual have

$$cov(psi1,psi2)\_OLS = var(Fi) + (1/a-c1ols)*(1/b-c2ols)*cov(Ei,Si)$$
$$+ (1/a-c1ols)*f*cov(Ei,Si) + f^2*var(Si)$$

while the covariance for the IV estimates is

$$psi1 = Fi – (1/a)*epsi + f*Si + (1/a-c1iv)*Ei$$
$$psi2 = Fi - (1/b)*etai + f*Si$$

$$cov(psi1,psi2)\_IV = var(Fi) + f*(1/a-c1iv)cov(Ei,Si) + f^2*var(Si)$$

21

**APP2386**

First, notice that as before, if there is no fraud the covariance of the IV residuals should be zero. Furthermore, this last covariance reflects different forms of fraud. If the fraud is a random variable shifting the distribution (or equivalently that f=0 and Fi<0) the covariance is the same as before:

$$cov(psi1,psi2)\_IV = = var(Fi)$$

if the fraud is not introduced as a random variable but as a shift in the distribution correlated with the signatures (f<0 and Fi=0) then the covariance of the IV residuals is

$$cov(psi1,psi2)\_IV = f(1-c1iv)cov(Ei,Si) + f^2*var(Si)$$

Only if Fi=0 and f=0 will produce a zero covariance of the IV residuals. In reality, if there is a fraud, probably both aspects will enter and the covariance is a combination of the two.

The next question is, what is the direction of the change in the covariance, from OLS to IV?

$$cov\_OLS - cov\_IV = (1/a-c1ols)*(1/b-c2ols)*cov(Ei,Si) + (c1iv-c1ols)*f*cov(Ei,Si)$$

where the two terms are easily signed. Lets start with the first term. We know that the error in variables together with a negative f implies that both OLS estimates are downward biased. We also know that a reasonable set of assumptions imply that signatures and exit polls are positively correlated. Hence, the first term is a multiplication of three positive elements. Let us turn our attention now to the second term. We know that c1iv is closer to 1/a than c1ols. This means that the term in brackets is negative, and we have been analyzing only the case in which f is negative. Hence, the covariance of the OLS residuals has to be larger than the covariance of the IV residuals.

Notice that if f were positive we could not have made this claim. And there would be circumstances in which the covariance actually goes up after instrumenting.

In the empirical section we implement this strategy by calculating the covariance both using OLS and instrumental variables and observe a reduction in the covariance, as would be consistent with the presence of f being negative (i.e. against the Yes vote). In addition, we find that cov_IV is positive and statistically significant, which is informative of the fact that f is significantly different from zero.

It is important to remember that in this procedure we are allowing the exit-polls and the signatures to be imperfect measures of the actual votes. Not only do we allow them to be noisy, but we also allow them to be biased. So, our results will NOT depend on the fact that the mean of the exit polls is different from the mean of the votes. Our test is one in which the errors in the predictions should be different.

**APP2387**

## Results

We ran a regression between votes and signatures (together with other variables which we will discuss shortly). That is to say, we calculated the best line that runs through the cloud of dots between votes and the explanatory variables that we used resembling graphic 3. Then we recovered the errors that this regression or line makes. We did the same with the ratio between votes and exit polls and recovered these errors. Then, we analyzed (to see) if these two sets of errors compared favorably.[4]

In actual fact, we do things in a slightly more complex way. We included other variables in our analysis that also influence the number of votes. These are the number of new voters and the rate of voting abstention in each precinct. The new voters were unable to take part in the Reafirmazo as they had not been previously registered with the REP (Permanent Voters Register). The more new voters there are, the greater the number of votes there should be. Now then, the percentage of Yes votes could increase or diminish according to the difference in political preferences of the new voters with respect to those registered previously. As in the previous case, the abstention rate obviously reduces the number of votes and is able to do so in a differentiated manner between the Yes and No options.

Furthermore, we have to decide which kind of line to use in the regression. There are several options: a straight line, a geometric ratio or a ratio between percentages. In other words, we can compare votes with signatures (linear); the votes logarithm with the signatures logarithm (geometric); or the percentage of Yes votes against the percentage of signatures divided by voters. Although for technical reasons, we preferred the logarithmic method,[5] we nevertheless ran our analysis according to all three (above) methods to see if our results depended on the functional method we applied.

An example of the estimates we made using the logarithmic method is shown in Schedule 4. The estimated equation is:

$$LSI = a + b * LFIRMA + c * elc\_now * d\ VEL + error$$

where LSI is the logarithm of the number of Yes votes; LFIRMA the logarithm of the number of signatures in each precinct; elc_now is the percentage of new voters; VEL is the percentage of voters participating; and where a, b, c and d are parameters to be estimated. Schedule 4 shows the results of our estimates for the 342 (voting) precincts for which we also have exit polls, using the most conventional method: the squared minimums.

---

[4] An error or difference is defined as the difference between the regression line at a certain dot and the observed value which corresponds to it. Graphically, this is the vertical distance between the dots in graphics 3a, 3b and 3c and the charted regression line.

[5] Given that the voting precincts are of very different sizes the linear method creates problems of heteroelasticity (i.e. absolute errors tend to be much larger in the larger precincts which implies that they are not normally distributed).

Table 4. Estimate of the equation between votes and signatures, new voters and voters participating

```
      Source |       SS       df       MS              Number of obs =      342
-------------+------------------------------           F(  3,    338) = 3582.70
       Model | 185.800888        3  61.9336295         Prob > F       =  0.0000
    Residual | 5.84296339      338  .017286874         R-squared      =  0.9695
-------------+------------------------------           Adj R-squared  =  0.9692
       Total | 191.643852      341  .56200543          Root MSE       =  .13148


-------------------------------------------------------------------------------
         LSI |      Coef.  Std. Err.       t    P>|t|     [95% Conf. Interval]
-------------+-----------------------------------------------------------------
      LFIRMA |   .9942821  .0099034   100.40    0.000     .974802    1.013762
      elc_now |  .4604462     .0375    12.28    0.000    .3866834    .5342089
         VEL |   .3311808  .0813913     4.07    0.000    .1710835    .4912781
       _cons |   .3059669  .0782436     3.91    0.000    .1520611    .4598727
-------------------------------------------------------------------------------
```

The estimate allows us to explain 97 percent of the variation in votes among (voting) precincts. It estimates parameters a, b, c and d with great precision. Specifically, a is the constant, estimated at 0,306. Parameter b is the elasticity between signatures and votes and is estimated at almost 1 (in reality it is 0.994). This implies that if a precinct has twice as many signatures as another, it obtains on average twice as many votes. Parameter c is the elasticity of the Yes votes with a view to variations in the percentage of new voters. It is estimated at 0.46, which means that if the number of voters in a precinct increases by 100 percent, the Yes votes would increase by 46 percent. Parameter d is the elasticity of the number of Yes votes compared to a change in the voters participating and is estimated at 0.306, which indicates that a 10 percent increase in the rate of voters participating would cause a 3.06 percent increase in the number of Yes votes.

This equation does not indicate the actual ratio between the voters' intended vote and its explanatory variables, but between the latter and the votes recognized by the CNE. As in Graphic 3b, the possible presence of fraud influences the estimated coefficients, biasing the slopes downward, and in part is found in the error term.

The second equation we estimated was the ratio between votes and exit polls also for the 342 precincts for which we have data. The equation we estimated is:

LSI = f + g * lex_si + h * VEL + j + error

Where lex-si is the number of Yes votes which the poll for this precinct predicts. The letters f, g, h and j are parameters while LSI and VEL have already been defined. The results appear in Table 5.

24

Table 5. Estimate of the relationship between votes and the exit polls

```
      Source |       SS       df       MS              Number of obs =     342
-------------+------------------------------          F(  3,   338) =  526.51
       Model |  157.862978      3  52.6209927          Prob > F      =  0.0000
    Residual |  33.7808737    338  .099943413          R-squared     =  0.8237
-------------+------------------------------          Adj R-squared =  0.8222
       Total |  191.643852    341   .56200543          Root MSE      =  .31614


-----------------------------------------------------------------------------
         LSI |      Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+---------------------------------------------------------------
      lex_si |   .9701892    .025357    38.26   0.000     .9203118    1.020067
     elc_now |  -.6612884   .0868377    -7.62   0.000    -.8320987    -.490478
         VEL |   .4244489   .1957766     2.17   0.031     .0393549    .8095429
       _cons |   .0722736   .2086177     0.35   0.729    -.3380789    .4826261
-----------------------------------------------------------------------------
```

Again, the equation explains a large part of the variance of the votes logarithm (82%). The estimated elasticity of the voting intentions according to the polls is 0.97.

These estimates could also be biased downwards by the presence of fraud. However, the error term would reflect in part not only the imperfection of the instruments used but also the presence of fraud.

The strategy then is to analyze the correlation between the errors in both equations. This correlation is 24%, which is surprisingly high. This does not permit us to reject the fraud hypothesis. In other words, in those places where the signatures are proportionally wrong in the sense of predicting more YES votes than those obtained, the exit polls also overestimate relatively more the obtained votes. Since both measurements are independent, the implication is that what they have in common is the fraud.

Table  6 Analysis of the relationship between the errors in the equations using minimum squares.

| Covariance | $9.3 * 10^{-3}$ |
| Covariance Typical Deviation | $2.8 * 10^{-3}$ |
| T-Student on the covariance | 4.1 |
| Probability different from zero | 0.999 |
| Correlation | 0.24 |

This is the first result consistent with the fraud hypothesis. Formally, we can say that we cannot reject the hypothesis that fraud was committed. The presence of this correlation indicates that there is something in common between the errors committed by the exit poll and the errors committed by the signatures and this is consistent with a difference between the elector's voting intent and the registered votes.

**APP2390**

However, it is possible to argue that the observed correlation might be generated by two sources. One is the fact that our measurements of the voter's intent are very noisy or imperfect and that the errors in such variables might generate problems. The second is that we suppose fixed coefficients between signatures and votes or between exit polls and votes, and that these coefficients might be random. This opens the possibility that the correlation we are finding may have been generated by other factors and not by fraud.

To discard this possibility, we applied a statistical technique called "Instrumental Variables." The idea is that both the signatures, as well as the exit polls have errors or noise. However, this noise is independent of each other. What the variables have in common is the fact that both are related to the voter's intent. The technique begins by using in the regression not the signatures directly, but that component in them that is related to, or in line with, the exit polls. In statistics jargon, we would say that we use the exit polls as an instrument to correct or clean the signature errors before studying their correlation to the votes. Symmetrically, we use the signatures to clean the exit polls before relating them to the votes. After having done these two regressions with instrumental variables, we take the errors of each of them and study their correlation. If the errors are positively correlated we cannot reject the hypothesis that there was fraud. The theoretical justification on this methodology for the analysis of fraud that we are conducting is discussed in detail in the technical version of this document.

Table 7 shows the same equation as Table 4, but this time it uses the instrumental variables method, using exit polls as an instrument.

### Table 7. Regression between votes and signatures using exit polls as an instrumental variable.

```
Instrumental variables (2SLS) regression

      Source |       SS       df       MS              Number of obs =     342
-------------+------------------------------           F(  3,   338) = 3013.34
       Model | 185.741458      3  61.9138192           Prob > F      =  0.0000
    Residual | 5.90239422    338  .017462705           R-squared     =  0.9692
-------------+------------------------------           Adj R-squared =  0.9689
       Total | 191.643852    341   .56200543           Root MSE      =  .13215

------------------------------------------------------------------------------
         LSI |      Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+----------------------------------------------------------------
      LFIRMA |   1.012645   .0110631    91.53   0.000     .9908834    1.034406
     elc_now |   .4792798   .0380142    12.61   0.000     .4045055    .5540541
         VEL |   .3067645   .0820558     3.74   0.000     .1453602    .4681688
       _cons |   .1718993   .0861817     1.99   0.047     .0023791    .3414194
------------------------------------------------------------------------------
Instrumented:  LFIRMA
Instruments:   elc_now VEL lex_si
------------------------------------------------------------------------------
```

APP2391

Note that the coefficient of the signatures now slightly increases: from 0,994 in the estimate in Table 4 to 1,013 in Table 7. This is normal, as the existence of errors or noise in the data tends to lower the coefficients estimated with the method of Table 4. On cleaning or lowering the problem of errors in the data, higher coefficients are obtained usually.

Table 8 re-estimates the same equation as Table 5 but using instrumental variables. This time, the coefficient of the exit poll (lex-si) increases from 0,97 to 1,17.  This is to be expected as the data of the exit polls, given their nature, have more noise than the data of the signatures, which is why the method in Table 5 skews the coefficient, lower than in the case of the signatures.

Table 8. Regression between the votes and exit polls using the signatures as an instrumental variable

```
Instrumental variables (2SLS) regression

      Source |       SS       df       MS              Number of obs =     342
-------------+------------------------------           F(  3,   338) =  517.96
       Model |  151.228444      3  50.4094815          Prob > F      =  0.0000
    Residual |  40.4154074    338  .119572211          R-squared     =  0.7891
-------------+------------------------------           Adj R-squared =  0.7872
       Total |  191.643852    341   .56200543          Root MSE      = .34579


------------------------------------------------------------------------------
         LSI |      Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+----------------------------------------------------------------
      lex_si |   1.176787    .030827    38.17   0.000      1.11615    1.237424
      elc_now |  -.6829967   .0949936    -7.19   0.000    -.8698498   -.4961437
         VEL |   .1627794   .2148175     0.76   0.449    -.2597683    .5853271
       _cons |  -1.523351    .250735    -6.08   0.000    -2.016549   -1.030153
------------------------------------------------------------------------------
Instrumented:  lex_si
Instruments:   elc_now VEL LFIRMA
------------------------------------------------------------------------------
```

On studying the relationship between the errors in the variables generated by these two equations, we obtain the data presented in Table 9. The analysis shows that even after using the method of instrumental variables to correct problems of errors in variables and random coefficients, the correlation between errors generated using signatures and those generated using exit polls diminishes only from 0,24 to 0,17 and remains significantly different from zero.

APP2392

Table 9. Analysis of the relationship between errors in the 2 equations used to estimate the number of votes: Minimum squares for vs. (against) Instrumental Variables

| Item | Minimum squares method. | Instrumental Variables Method |
|---|---|---|
| Covariance | $9.3 * 10^{-3}$ | $7.7 * 10^{-3}$ |
| Typical distortion | $2.8 * 10^{-3}$ | $2.5 * 10^{-3}$ |
| Probability different from zero | 0.999 | 0.991 |
| Correlation | 0.24 | 0.17 |
| T-Student on covariance | 4.1 | 3.1 |

Our initial hypothesis was that if there had been a not perfectly proportional fraud, this would have generated a pattern of errors that would have caused a positive correlation between both variables. We found this positive correlation, which allows us to reject the hypothesis that there was no fraud. The exit polls, in spite of their imperfections, tend to have a greater margin of error in those places where the signatures also have a margin of error. On using the instrumental variables method, we have discarded that the correlation is due to problems of error in the variables or in the random coefficients. This would be the type of imprint left by a not perfectly proportional fraud.

Our strategy has consisted in utilizing two sources of information related to the voters' intended vote but not to the possible fraud. If we use these sources or variables in estimating the votes imperfectly, then the residue or term of error will contain not only the imperfections of our sources but also a component associated to the fraud. Our interpretation is that as the imperfections are independent one from another and the residuals are correlated, this is because of the presence of a common factor, i.e., fraud.

## *The Audit*

Any hypothesis of fraud requires an explanation of why the audits that took place did not find any foul play. While the first audit carried out in the wee hours of the morning of August 16 failed, the audit conducted on August 18, if it was well carried out, should have settled the issue. The audit was based on opening 150 randomly selected ballot boxes, which contain the original paper ballots checked by the voters and which thus reflect their real intended vote. If these boxes were not tampered with and if they really are a random sampling of the universe of precincts, the audit should rule out any presumption of fraud. So, how could fraud have taken place, if the audit did not find it? It should be pointed out that any hypothesis of fraud, which involves changing hundreds of ballot boxes would constitute a conspiracy involving a large number of participants and hence would be more likely to be revealed through disloyalty.

One hypothesis is that fraud was not committed in all precincts but only in a fraction of them. To give an example, suppose that out of the 4,580 automated precincts used in the election, 3,000 precincts were altered but the rest were not. Let us further suppose that the unaltered 1,580 precincts were picked at random. This implies that they would represent a balanced sample of the country from a regional and social point of view. The same would be true of the 3,000 precincts in which the results supposedly had been altered. One reason to do things this way is that it was known (beforehand) that ex post

28

**APP2393**

audits would be carried out and that a number of precincts would be checked. To accommodate this, they would have to be unaffected by fraud.

Note that if fraud is committed in some precincts and not in others then it will not be perfectly proportional and the method used in the previous section would detect it.

If the selection of the precincts left unaffected was done in this way, this creates an important complication but also opens up a great opportunity. The complication is that the selection of the boxes to be audited could not really be random. It is critical that the selection be made among the 1,580 un-tampered precincts and not among the 3,000 tampered ones. This is only possible if one has control over the random number generator that selects the boxes to be audited. In this sense, it has to be pointed out that the National Electoral Council refused to make use of the random numbers-generating program proposed by the Carter Center and insisted on the use of their own program installed in their own computer.

The opportunity generated by this form of solving the problem of the audit is that any sample taken of the 1,580 un-tampered precincts is a representative sample of the country in the social and regional sense. This makes it more difficult to know if the sample taken was really random, as it resembles the country in all the dimensions usually associated with representativeness, such as regional or social.

To solve this problem we must develop a methodology that allows us to test if the sample taken for the audit on August 18th really is a random sample. To understand the problem more clearly, let us call the un-tampered precincts "fat" and the tampered ones "thin." The sample taken for the audit must be a sample of only "thin" precincts, while the rest of the precincts are a mixture of "fat" and "thin." If we could "weigh" the audited precincts, we would be able to see that on average the un-audited precincts are "fatter."

The problem is that we need to develop a methodology that can test whether the audited precincts weigh as much as the others do or whether on the contrary they have a statistically different body frame.

The method we suggest is as follows. There exists a theorem in statistics that states that if a ratio applies to an entire unit, any random sampling of the same must have the same properties. If we estimate the ratio of the universe of un-audited precincts and estimate another for the audited ones, the second cannot be statistically different from the first. Otherwise, it would not be a random and representative sample.

To implement this strategy we again made use of our model that correlates signatures, voter participation rates and new voters with the number of actual votes cast. We estimated this ratio based on the universe of 4580 precincts and we looked at the obtained coefficients. We then estimated them separately between the audited precincts and the un-audited ones and determined if the coefficients are statistically different.

To see if the results are different and to calculate the statistical significance of the difference, it is useful to estimate the equations in the following way:

Votes = $\quad$ a + b * (vector of explanatory explaining variables) +

29

**APP2394**

c * d *   (vector of explanatory explaining variables)

where a, b and c are parameters to be estimated and d is a "dummy" variable worth 1 if we are dealing with audited precincts and 0 if we are dealing with un-audited ones. The boxes belong to the same random distribution if the parameters c are not different from zero. The explainable variables utilized are the number of signatures, the number of voters registered in the REP (Permanent Election Register) at the time of the Reafirmazo (petition re-signature collection drive), the number of new voters registered after the Reafirmazo  and the number of voters who did not vote.  We estimated the equation in logarithms.


## Theoretical Considerations

Sophisticated frauds are hard to detect.  According to Rubin if all the machines are affected using the same procedure then the fraud is statistically undetectable. The advantage of the Venezuelan case is that there was the possibility of audits and therefore, some of the CDV's were required to be untouched. Because the government was the one that would choose which precincts would be audited, it is imaginable that they knew which precincts were not touched and lead the auditors toward those precincts.

First, lets discuss the form of the fraud (the theory). Then, we provide the evidence.

The theoretical idea of a voting process is that it is an imperfect but unbiased measure of the popular intention

$$V_i = X_i + F_i$$

Where $X_i$ is the voting intention in each CDV, $V_i$ are the total votes, "i" indicates the CDV, and $F_i$ is the fraud. It is important to indicate that if $F_i$ is a shift with the same distribution as $X_i$ (meaning both are normally distributed) then $V_i$ is the sum of two normal distributions, which is also a normal distribution and it would be hard to identify any anomalies in the data. The fraud would be undetectable.

Under this assumption, in the case of Venezuela, the fraud could not be normally distributed because the system had to allow some precincts to be untouched so that they could be audited. Interestingly, the government did not allow the Carter Center to choose the precincts randomly. It was the government the one that chose the precincts. So, if there is fraud, it is imaginable that we could detect the shift in the population by comparing the audited population with the non-audited population.

We have a variable that is correlated with the intention of voters – the signatures. We assume that the signatures follow

$$S_i = b(i)*X_i + eta_i.$$

where $S_i$ are the number of signatures, $b(i)$ is a random coefficient mapping the intention of voters to the total number of signatures, and $eta_i$ is a random disturbance indicating the noise involved in the measurement of the intentions.

30

**APP2395**

This specification allows the signatures to be a biased estimator of the voters intentions ($b(i)$ on average could be less or larger than one).

Additionally, $Fi$ could be correlated or not with the number of signatures. We will adopt, then the following specification: $Fi + f(i)*Si$ to encompass both possibilities.

What is the OLS estimate of $Vi$ on $Si$?

$$Vi = c*Si + psi$$

Notice that the reduced form model is the following:

$$Vi = Xi + Fi + f(i)*b(i)*Xi + f(i)*etai$$
$$Si = b(i)*Xi + etai.$$

The OLS coefficient is the covariance between these two variables divided by the variance of the signatures. These variances include not only the variances of the shocks but also the variances of the coefficients. For notational convenience assume

$$b(i) = b + bi$$
$$f(i) = f + fi$$

where $bi$ and $fi$ conditional on $Xi$ have mean zero and finite variance. Under these assumptions the OLS coefficient is

$$cols = \left( b(1+fb)*var(Xi) + f*var(eta) \right) / \left( b^2*var(Xi)+var(eta) \right)$$

which obviously is different from $1/b$ – which is the limit if $f=0$ and $var(eta)=0$. There are several biases in this coefficient worth highlighting: first the error-in-variables which is the result of $var(eta)$ being different from zero. This bias is the attenuation bias and reduces the coefficient. So $cols<1/b$. Second, there is the bias introduced by the fraud component that is correlated with the signatures ($f$). we will assume throughout the paper that $f$ is negative, if that is the case, notice that the denominator is reduced by this bias, which means that $cols$ is farther from $1/b$. In summary, both biases are working in the same direction.

Let us see how the residuals look

$$psi = Fi + (1+(f(i)-cols)*b(i))*Xi + (f(i)-cols)*etai$$

Notice that even if the structural shocks are homoskedastic ($var(Xi)$, $var(eta)$ and the variances of the random coefficients) the variance of the residuals is going to be heteroskedastic. There is a term multiplying the residuals that is related to the random coefficient model.

Therefore, it is not surprising that indeed the standard deviation of the residuals of this regression at the parroquia level are correlated with the predicted residuals of the regression. Part of that correlation is coming from the fraud (obviously), but also part of that correlation is the result of the random coefficient model. Let us see.

31

**APP2396**

If f(i) and Fi are zero, then

$$psi = (1-cols*b(i))*Xi -cols*etai$$

$$cols= \big( b*var(Xi) \big) / \big( b^2*var(Xi)+var(eta) \big)$$

notice that unambiguously cols is smaller than 1/b which means that the expected value of cols*b(i) is smaller than E( b(i)/b )=1. Therefore the term in the first bracket of the residuals has a posi tive expected value and the variance of psi will depend on Xi. This source of correlation is not interesting (in terms of fraud) and therefore, we require a better test to differentiate between a random coefficient model and one with fraud.

The idea is to compare a "supposedly random" sample with the total sample. If the sample is truly a random coefficient model, and the innovations to the coefficients (bi and fi) are truly orthogonal to the other shocks, then any sub-sample – any sub-sample – should have the same properties as the full sample.

This is exactly what is done when agencies collect surveys on consumption, industry production, etc. If the sub-sample is a random draw it is representative of the population, or full-sample. For instance, assume that we are interested in studying consumption patterns. We know that consumption depends on the level of income, education, race, gender, age, religion, etc. Furthermore, there is no particular reason why we have to assume that a one percent increase in income will imply the same increase of consumption to all the individuals in the sample. In other words, it is reasonable to assume that the coefficients from income to consumption are random. However, if the model is well specified (meaning that all the controls that have to be in the right hand side are there), then the coefficients are truly random and independent of everything else. If we pick a random sub-sample of the population – a representative sample – the behavior of those individuals is a good proxy of the behavior of the population. This is standard in all micro data models where always we make inference about the population by looking at a smaller sample. This is exactly what we do here.

Any sub-sample of precincts should have the same behavior as the whole. This does not mean that the coefficients estimated are going to be the same. What it does mean is that the differences cannot be statistically significant. We can, for example, choose as the random sub-sample, the precincts that the government allowed the Carter Center to audit. Why is this a good sample? Well, because we know that a shift of the full distribution is statistically undetectable, the fraud cannot only be found if we concentrate in the sub-sample that, ex-ante, has a lower likelihood of being tainted.

Therefore, we split the sample between those that were audited and those that were not audited. As is discussed in the paper, we find them to be statistically different.

## Differences in the samples -  in terms of their OLS estimates

As was mentioned above, the fraud introduces a bias in the regression coefficient if it is correlated with the signatures in the precincts. To clarify the exposition we show the OLS coefficient of the bivariate model with and without fraud:

$$cols\_fraud = \big( b(1+fb)*var(Xi) + f*var(eta) \big) / \big( b^2*var(Xi)+var(eta) \big)$$

32

**APP2397**

$$\text{cols\_Nofraud} = \Big(\text{ b*var(Xi)}\Big) / \Big(\text{b\^{}2*var(Xi)+var(eta)}\Big)$$

which implies that

$$\text{cols\_fraud} = \text{cols\_Nofraud} + f*\Big(\text{ b*var(Xi) + var(eta)}\Big) / \Big(\text{b\^{}2*var(Xi)+var(eta)}\Big)$$

which under our assumptions that f<0 implies that the OLS coefficient of the fraud sample is smaller than the OLS coefficient of the no-fraud sample. Additionally, it should be the case that these two coefficients are statistically different from zero, because otherwise the changes in the coefficients are mainly explained by the small sample properties of OLS and not by fraud.

To test for this possibility we estimate our preferred estimation allowing for interactions of all the right hand side variables with a dummy that takes value of one when the precinct was one of the ones assigned to be audited. The regression is

Vi = c2*Si + c3*Si*D + c4*NewElectors + c5* NewElectors *D + c6*Participation + c7*Participation*D + c0 + c1*D

Where we are predicting the total votes by the signatures (Si) and the signatures interacted with the dummy for audited centros (D). We introduce several controls, obviously allowing for different constant terms in the two sub-samples (c0 + c1*D) and controlling for the increase in the universe of voters (NewElectors) and for the participation in the precinct (Participation).

The coefficients of interest are c3. If there is fraud (and hence there is a shift in the distribution), then c3 should be positive and statistically different from zero. Why? As was shown before, under the assumption that the fraud reduced the number of votes for "Si" the OLS coefficient in the full sample (c2) is smaller than the true one (c2+c3). Notice that this is what we find in the empirical results.

## Results

The results are very clear, as is indicated in Table 10. The interaction term D * Signatures shows that the elasticity of the signatures in votes is 10.5 percent higher in the audited precincts than in the un-audited ones, i.e., the signatures collected in the audited precincts on August 18th generate 10 percent more YES votes than the rest of the precincts.  The statistical value of Student's t is 2.73.  The probability that this is by chance is less than 1 percent (shown with the three asterisks in the Table). The coefficient on new voters is also different with a level of confidence of 1 percent whereas the coefficient with regard to the abstaining voters is different with a level of confidence of 10 percent.

To illustrate what is unusual with this result we constructed 1,000 random samples of 200 precincts based on the universe of un-audited precincts.  We estimated the same equation and calculated the statistic value of Students t for the term D* signatures.  The result is shown in Table 11. As the Table shows, a value of said statistic higher than 2.48 occurs less than 1 percent of the time. In the sample of the audit on August 18, this value is 2.73.

33

**APP2398**

Table 10. Do the audited precincts represent the (entire) universe of precincts ?

|  | Log SI |
|---|---|
| Log FIRMA | 0.958 |
|  | (129.46)*** |
| D * LFIRMA | 0.105 |
|  | (2.73)*** |
| Log Electores Reafirmazo | 0.043 |
|  | (4.89)*** |
| D * Log Electores Reafirmazo | -0.126 |
|  | (3.06)*** |
| Log Electores Nuevos | 0.595 |
|  | (23.64)*** |
| D * Log Electores Nuevos | 0.118 |
|  | (1.30) |
| Log Electores no votantes | -0.459 |
|  | (11.47)*** |
| D * Log Electores no votantes | 0.312 |
|  | (1.89)* |
| AUDIT | 0.171 |
|  | (1.51) |
| Constant | 0.254 |
|  | (9.14)*** |
| Observations | 4580 |
| R-squared | 0.97 |

Robust t statistics in parentheses
* significant to 10 %; ** significant to 5 %; *** significant to 1 %

Table 11. Frequency distribution of the statistic of Student t value on the parameter of signatures in 1000 regressions estimated on the basis of 1000 samples randomly taken from the un-audited precincts universe.

```
-------------------------------------------------------------
      Percentiles      Smallest
 1%    -2.60853       -3.342794
 5%    -1.832646      -3.233441
10%    -1.425525      -3.053542     Obs                1000
25%    -.8046502      -3.053519     Sum of Wgt.        1000

50%    -.0189599                    Mean          -.0191664
                       Largest      Std. Dev.      1.104314
75%     .7440667       3.232639
90%    1.360018        3.658616     Variance       1.219509
95%    1.770322        3.975739     Skewness       .0747199
99%    2.48632         4.010863     Kurtosis       3.049892
```

We conclude that the data indicate that the audited precincts are statistically different from the unaudited precincts. This implies that they do not form a random sample of the entire universe of precincts (audited and unaudited). In the audited precincts, the signatures are transformed into a larger number of votes than in all of the precincts (audited and un-audited) taken together. The probability that this occurs by coincidence

34

**APP2399**

is less than 1 percent.  This result tends to confirm the doubts expressed as regards the reliability of the audit.


## *Intuition*

In this section, we would like to illustrate both our theory of fraud, as well as how we test for it.

Assume that in Florida half the precincts are Republican and half Democrat. How do we know this? Well, first we have the results of the previous presidential election in each precinct, which should be a good predictor of today's preferences, and we also know how many Republicans and Democrats are registered in each precinct. Obviously, these measures are not perfect, and they are possibly biased, but they should be related. Also assume that on election day there are exit polls. Assume that these polls are extremely noisy and biased.

Assume that a fraud is going to be committed – in favor of the Republicans (just an example). How can we have a perfect fraud? In the absence of an audit, the electronic fraud is simple – when the machines connect to the central computer, the central computer sends a program that makes the machine to report 10 percent less Democratic votes, and 10 percent more Republican votes. This does not change the total number of voters but changes the proportion.

This is undetectable, statistically speaking. The exit poll and the signatures will show that there is a change in the public opinion in favor of the Republicans. The exit polls will give a different answer, but in the end, because the exit polls are so noisy, the blame will be given to the imperfection in the collection of the polls rather than use them as evidence of fraud.

The only deterrent of the fraud in this case is to have an audit, and the question is how can we achieve the fraud and at the same time pass the audit. Assume that the machines have a paper trail of each voter and some of the machines will be audited.

This is the procedure of the fraud that would be undetectable using standard statistical methods. Assume that for the fraud, half of the Democratic precincts will be converted to Republican. Let us say that 10 percent of the votes will be shifted. The result of the election is that ¾ of the centers are Republican and only ¼ is Democrat. Now, to pass the audit, the machines that will be recounted cannot belong to the set of fraudulent machines. This is why it is important to be able to control the choice of the machines to be audited. Therefore, to make the fraud pass the audit the authority draws random numbers that have ¾ weights in the Republican precincts and ¼ in the Democrat ones. Assume this is done in the morning of the election, so the authority knows in advance which precincts to leave unaffected by fraud. In the end, the audit is passed, ¾ are Republicans and ¼ are Democrat.

This simple procedure – which only requires observing the results of previous elections, or in the Venezuelan case, to observe the number of signatures and compare them to the universe of voters – will hide fraud from an audit if the precincts are not chosen in a truly random fashion. Here, the exit polls would give a different result, but again, most of the discrepancy would be blamed on the exit polls.

**APP2400**

Two properties worth emphasizing are satisfied by this data. First, the mean of the audited sample and the whole sample would be similar. Second, the correlation between votes and the prior information is the same in the two samples. This, at a first glace could look as if this is evidence of no fraud, but that is incorrect. Remember that the correlation between two variables is unaffected if one of the variables is multiplied by a positive number. Hence, the correlation between the signatures and the votes in the Venezuelan case is exactly the same as the correlation between the signatures and 90 percent of the votes. So, a fraud of, say 10 percent, would not affect the correlation between signatures and fraud. It would however affect the coefficient, which is what we do.

Therefore, how can we detect fraud? In the audited sample, the information that existed before – the estimates of the preferences of the voters – is a better predictor of the actual votes than in the non-audited sample. For example, in the audited sample, if the precinct was Democratic in the past it has a high likelihood of being Democratic today, similarly if it was Democrat it has a high likelihood to be Democrat today. But in the non-audited sample, the problem is that this relationship is weaker. In other words, we can detect if the conditional behavior between the two samples is different, and therefore, argue that something strange is happening in the data. This is the second test we run.

The first test is one in which we compare the predicted error of the votes using the two different measures of the preferences of voting. For example, the reasons why the exit polls is an imperfect measure of the votes are different to why the results on the previous election are a bad measure. For instance, one is affected by the participation, while the other one is not; one took place several months before the other one; one is collected by the electoral committee and the other is collected by the private sector – which could possibly have a vested interest in a particular outcome, etc. The important aspect of our test is that the reasons why one of the measures is imperfect are different to the reasons why the other one is also imperfect. On the other hand, if there is a fraud, then both measures have a common reason why they are failing. This is our first test.

## Conclusions

This report rejects certain hypothesis about fraud in the Venezuelan referendum of August 15 2004, but not others. We did not find empirical validity for the much-discussed hypothesis of numerical caps. We were also unable to prove any hypothesis that implies differentially tampering with the (voting) machines of the same precinct. A manipulation of this kind would alter the percentile differences in such a way as to violate the expected variance at the precinct, and would have been detected by this analysis.

All hypotheses of fraud must presuppose a similar tampering in all the machines of a precinct. If this had been done in a homogeneous manner in all of the country's precincts, none of the methods applied in this study - as well as other statistical methods - would have been able to identify it. What allows us to develop a test of the possible existence of fraud is precisely the heterogeneous treatment of the different precincts.

**APP2401**

To carry out this test we used two imperfect, random and independent indicators of the intent to vote. Our definition of fraud consists of the existence of a difference between the voters' intended vote and the votes registered by the CNE. Our two indicators, as imperfect as they might be, are correlated with the intended vote of the elector, but not with the fraud. If both are used independently in regressions to estimate the relationship between them and the vote count, the error term or deviation will reflect not only the imperfection of the instrument applied but also the fraud. If both deviations are correlated, it shows there is a common element of deviation in both. This element is our evidence of fraud. Furthermore, to be consistent with the hypothesis of fraud, this correlation has to be positive: i.e. in those precincts where there fraud was larger, both measures would project more votes than were actually registered.

This is precisely what we find. Our two indicators are the number of registered voters in each precinct, who signed in the Reafirmazo of November 2003 and the exit polls held by Súmate and Primero Justicia on August 15th, day of the Recall Referendum. The result holds if we control for the changes in the electoral register and the abstention rate. Furthermore, the result holds up well to changes in the functional form of the ratio (linear, logarithmic, percentile). The result is not due to spurious statistical effects (errors in the variables or the possible presence of random coefficients), as they hold up when we correct for these factors using estimators based on instrumental variables.

We note that this technique identifies fraud in so far as it is carried differentially across precincts. It allows us to test for the presence of fraud, but it does not allow us to estimate its magnitude as the average fraud will be reflected in the parameters of the relationships we estimate while the differential fraud will be reflected in the error terms. We use the error terms in the identification of fraud, not the estimated parameters.

Again, any hypothesis of fraud must presuppose that the results of all the machines in the same precinct were tampered proportionally. This requires some coordination mechanism. In theory, this coordination could be in the software or in the communication with the central computer hub. For these reasons, it is useful to point out the following precedents:

- The machines had the capacity to communicate bi-directionally with the central computer server or hub and this communication took place.

- The machines communicated with the hub before printing the Certificates, which opens the possibility that they were instructed to print results different from the real ones.

- The entrance of witnesses from the opposition or of the international observers to the computer hub during election day was not allowed.

The voting system implanted in Venezuela generates voting ballots that are checked by the voter and placed in boxes, which are subject to audit in a random manner. A fraud scheme must take into account how to avoid detection during an audit.

One possibility is to leave some precincts unaffected and to direct the audit to those precincts. The choice of which precincts to affect can be done systematically or at random. This generates two kinds of precincts: those that were tampered with and those

**APP2402**

that were not.  Now, if the program that selects the boxes to be opened in an audit process can be controlled, then it will be possible to select  the boxes of those precincts that were not tampered with and this sample might seem random in all aspects except as to the question of fraud.

Our analysis shows that the sample selected to carry out the audit on August 18,  2004 was not random nor representative of all the precincts.  In this sample, the elasticity of the signatures compared to the votes is 10 percent higher and the possibility that this is random is significantly less than 1 percent.  We repeated our analysis randomly selecting 1,000 samples from un-audited precincts and this result.

One important fact is that the CNE refused to use the random number generating program offered by the Carter Center for the August 18th audit and instead used its own program installed in its own computer and initialed with their own seed.

In conclusion, this study rejects certain hypotheses of fraud, but indicates others that are compatible with the statistical data.

In statistics, it is impossible to confirm a hypothesis, but it is possible to reject it. As Karl Popper said when observing 1,000 white swans: this does not prove the accuracy of the thesis that all swans are white.  Nevertheless, observing a black swan does allow one to reject it.

Paraphrasing Popper, our white swan represents no fraud.  The results we obtain make up a black swan.  The alternate hypothesis that there was fraud is consistent with our results, which is why we are unable to reject it.

**APP2403**

# Exhibit O-47

Academics' Study Backs Fraud Claim In Chavez Election - WSJ

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/SB109452281788010900

# Academics' Study Backs Fraud Claim In Chavez Election

*By David Luhnow in Mexico City and Jose de Cordoba in Miami Staff Reporters of THE WALL STREET JOURNAL*
*Sept. 7, 2004 12:01 am ET*

Two Venezuelan academics claim to have found statistical evidence of fraud in last month's referendum on President Hugo Chavez, fueling the opposition's claims of a rigged vote and raising the possibility that despite Mr. Chavez's victory, the country's tense standoff will continue.

The claims were made Sunday by Ricardo Hausmann, a professor at Harvard University's John F. Kennedy School of Government and former chief economist at the Inter-American Development Bank, and Roberto Rigobon, a professor of applied economics at the Massachusetts Institute of Technology's Sloan School of Management.

The pair issued a report that tried to measure the possibility that the vote was clean using two separate analyses of the official results. In both cases, they said, the chances of a clean vote were less than one in 100.

Members of a civic group called Sumate that organized the referendum, which Mr. Chavez won by a 59% to 41% margin, seized on the study to suggest Mr. Chavez had won by tampering with the electronic-voting machines used in the contest. "We don't think the truth about the referendum has been revealed yet," Alejandro Plaz, a spokesman for Sumate, told reporters in presenting Mr. Hausmann's study Sunday. Sumate requested help from the academics in analyzing the referendum data but didn't pay for the study.

Mr. Chavez's government reacted with disbelief to the claims, saying the opposition's previous claims of fraud had so far proved incorrect. Vice President Jose Vicente Rangel said members of the Atlanta-based Carter Center and the Organization of American States had already validated the result. "No one believes in their theories anymore because three weeks have gone by and they haven't been able to prove anything," Mr. Rangel said.

Members of the Carter Center and the OAS were unreachable for comment yesterday. But both organizations have consistently stood by their findings in the past weeks and watched as other theories of fraud fell short under scrutiny.

The results of the study, however, prompted some independent experts on computer voting to call on the Venezuelan government to open up all aspects of the election -- including electronic codes from voting machines -- to public scrutiny.

"The Hausmann/Rigobon study is more credible than many of the other allegations being thrown around," said Aviel Rubin, a computer-science professor at Johns Hopkins University who has warned about security flaws with electronic voting. Mr. Rubin recently conducted a study of opposition claims that machines were rigged to limit the number of votes against Mr. Chavez and concluded the claims were highly unlikely.

"I would encourage the Venezuelan government to open up all aspects of the election to public inspection, not just to selected observers. That includes all of the paper ballots, the source code in the voting machines, the random generators ... that were used to pick the sites to audit," he said in an e-mail interview.

The study by Messrs. Hausmann and Rigobon suggested the government may have tampered with only some of the machines, leaving others clean for observers to audit. They said the sample used for the audit, which was carried out days after the election, wasn't randomly chosen and limited to the "clean" machines.

The study says the computer that determined which ballot boxes were to be subjected to a recount belonged to Venezuelan election officials. However, the Carter Center's Jennifer McCoy has said the group tested and verified the computer program used to select the sample.

The study compared the votes obtained by the opposition during the recall vote with the signatures gathered in November 2003 requesting the referendum. For the recounted votes, the correlation between the number of "yes" votes matched the 2003 petition numbers at a rate that was 10% higher than in the ballot boxes that weren't recounted. They calculate the probability of this taking place by chance at less than 1%.

The government's sample recount "was not a random sample, and I can say that with 99% confidence," Mr. Hausmann said in a telephone interview.

The academics used another technique to look for suspicious patterns in the results, using the 2003 petition and an exit poll on the day of the vote as a vague measure of a voter's intention. Because both measures are imperfect for different reasons, the academics argued, the measures should make different mistakes in predicting the final result.

But the academics found that each method had similar margins of error when compared with the official results, something that would happen only one in 100 times without fraud, they argued.

**Write to** David Luhnow at david.luhnow@wsj.com

# Exhibit O-48

APP2407

12/6/23, 3:04 PM          Congresswoman Carolyn Maloney - U.S. Voting Machine Company's Possible Ties to Foreign Government Draws Congressional I…

The Wayback Machine - https://web.archive.org/web/20061227190427/http://maloney.house.gov/index2.php?…



Press Release                                             Contact: Afshin Mohamadi
                                                                      202-225-7944

For Immediate Release
May 05, 2006

U.S. Voting Machine Company's Possible Ties to Foreign Government Draws Congressional Inquiry

Rep. Maloney wants to know if CFIUS process was used to green-light sale of Sequoia to company with possible Venezuelan government ties

WASHINGTON, DC – The sale of an American voting machine company to a firm with possible ties to the Venezuelan government has already drawn questions surrounding a recent Chicago city election and now is the focus of a congressional inquiry. Rep. Carolyn Maloney (NY-14) has asked Treasury Secretary John Snow whether or not the sale of California-based Sequoia to Smartmatic, a company with possible ties to the Venezuelan government, was reviewed by the Department of Treasury or vetted in the Committee on Foreign Investments in the United States (CFIUS) process (read the letter to Secretary Snow).

Smartmatic was first the subject of controversy in 2004 when the Hugo Chavez-led Venezuelan government selected it to provide the voting machines system for the presidential recall election, even though it would be the company's first time providing machines for an election. Smartmatic teamed up with a Venezuelan software company, Bitza, which at the time was 28% owned by Chavez's government. More recently, a Chicago city alderman questioned the possible ties between Sequoia and the Venezuelan government when that company's machines were used in the March 2006 Chicago primaries.

"Just as the Dubai ports deal was a priority security issue, any potential foreign influence on our elections system is vital to our national security and deserves at least a look," said Maloney. "It doesn't seem that the deal for Sequoia was vetted by our government, and I want to know why."

Maloney has been heavily involved in the effort to reform the CFIUS process that allowed Dubai Ports World to acquire a British company that controlled operations in several key U.S. ports. She is the ranking member on the Domestic and International Monetary Policy, Trade and Technology Subcommittee, which has jurisdiction over CFIUS. She has introduced legislation that would implement a stricter foreign-acquisition approval process (http://maloney.house.gov/index.php?option=com_content&task=view&id=1071&Itemid=61).

### ###

**Related Issues:** Financial Services | Foreign Acquisitions and National Security | Homeland Security

Close Window

**APP2408**

CAROLYN B. MALONEY
14TH DISTRICT, NEW YORK

2331 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–3214
(202) 225–7944

COMMITTEES:
FINANCIAL SERVICES

GOVERNMENT REFORM

JOINT ECONOMIC COMMITTEE

DISTRICT OFFICES:
☐   1651 THIRD AVENUE
SUITE 311
NEW YORK, NY 10128
(212) 860–0606

☐   28–11 ASTORIA BOULEVARD
ASTORIA, NY 11102
(718) 932–1804

WEBSITE: www.house.gov/maloney



# Congress of the United States
## House of Representatives
### Washington, DC 20515–3214

May 4, 2006

Hon. John W. Snow
Secretary
Department of the Treasury
1500 Pennsylvania Ave. NW
Washington DC 20220

Dear Mr. Secretary:

I am writing regarding possible investments by the Venezuelan government in Smartmatic, a voting machine company with business in the United States and its acquisition of Sequoia, a U.S.-based voting machine company.  Specifically, I am interested in any interactions these companies have had with the Department of Treasury in completing the acquisition of Sequoia and whether this transaction went through the Committee on Foreign Investment in the United States (CFIUS) process.

As you can imagine, having a foreign government investing in or owning a company that supplies voting machines for U.S. elections could raise concerns over the integrity of elections conducted with these machines.  Furthermore, I would have concerns if this transaction was done outside the CFIUS process, a process that was put in place to appropriately examine these types of foreign investment.

Attached please find a series of articles regarding these countries and concerns raised about the involvement the Venezuelan government with them including an article from the *Miami Herald* entitled "Venezuela Owns Stake in Ballots".  If you have any questions and/or to provide information to my office regarding this letter, please do not hesitate to contact Edward Mills of my staff at edward.mills@mail.house.gov or (202) 225-7944.

Sincerely,

CAROLYN B. MALONEY
Member of Congress

Attachments

PRINTED ON RECYCLED PAPER

**APP2409**

The Miami Herald

**May** 28, 2004 Friday FINAL EDITION

**SECTION:** FRONT; Pg. 1A

**LENGTH:** 1555 words

**HEADLINE:** VENEZUELA OWNS STAKE IN BALLOTS

**BYLINE:** RICHARD BRAND AND ALFONSO CHARDY, rbrand@herald.com

**DATELINE:** CARACAS

**BODY:**
A large and powerful investor in the software company that will design electronic ballots and record votes for Venezuela's new and much criticized election system is the Venezuelan government itself, The Herald has learned.

Venezuela's investment in Bizta Corp., the ballot software firm, gives the government 28 percent ownership of the company it will use to help deliver voting results in future elections, including the possible recall referendum against President Hugo Chavez, according to records obtained by The Herald.

The deal to scrap the country's 6-year-old machines - for a $91 million system to be built by two fledgling companies that have never been used in an election before - was already controversial among Chavez opponents who claimed it was a maneuver to manipulate votes amid growing political turmoil.

Chavez opponents told The Herald on Thursday they were stunned to learn the government has a proprietary stake in a company critical to the election process.

"The Venezuelan state? Are you kidding?," said Jesus Torrealba, an official in the Democratic Coordinator opposition group. "It impugns the credibility of the process. That is shocking."

Government officials insist the investment is an effort to help support private enterprise and its interest in a ballot software company is merely coincidental, one of a dozen such investments made to help struggling companies.

"The whole process led to a decision that was best for Venezuela," said Bernardo Alvarez, Venezuela's ambassador in Washington.

But Venezuela is a nation bitterly polarized by Chavez's leftist populist rule. Nearly every move by the government is scrutinized by opponents who accuse Chavez of trying to impose an authoritarian regime.

GOVERNMENT FUNDS

Until a year ago, the Bizta Corp. was a struggling Venezuelan software company with barely a sales deal to its name, records show. Then, the Venezuelan government - through a venture capital fund - invested about $200,000 and bought 28 percent of it.

**APP2410**

The government's investment in Bizta made Venezuela Bizta's largest single shareholder and, ultimately, its most important client.

The decision to replace the $120 million system built by Omaha-based Election Systems & Software was made Feb. 16 under unusual circumstances. Two of the five National Electoral Council members sympathetic to the opposition complained that they had been largely shut out of the process.

"The selection process was secret and it didn't allow us to get any information about the bidders and their products," board member Sobella Mejias said after the decision.

Other members knew about the government's investment, according to one member who asked not to be identified.

The new system is to be built by the **Smartmatic** Corp., which is incorporated in Florida, and programmed by Bizta, which also is registered in Florida and Venezuela.

Pro-Chavez government officials and company executives interviewed by The Herald say the **Smartmatic**-Bizta machines are among the most secure in the world, and that the government's investment in Bizta was unrelated to Bizta's bid for the voting machine contract.

"The companies that were chosen have the highest technical capacity," said Alvarez, the ambassador. "In Venezuela there have been many fair elections and there will be many more fair elections."

But the Atlanta-based Carter Center, which has observed every major Venezuelan electoral process since Chavez's election in 1998, said the disclosure of the government's role in Bizta reinforces the need for independent election audits.

"What we look at in any electoral process is whether each of the components is transparent and auditable. In this case, we would include these new machines," said Jennifer McCoy, who is leading the Carter Center's mission in Venezuela. She said she was unaware of the government's investment in Bizta.

Even without the political implications, the use of electronic voting machines has been widely debated since the United States' 2000 presidential election. Stanford University Professor David Dill, who has studied voting machines but is not specifically knowledgeable about the new Venezuelan system, said almost any programmed electronic machine is subject to possible manipulation.

"People just don't understand how easily these machines could fail to record votes accurately - even by being 'fixed,' " he said.

PAPER TRAIL

**Smartmatic** does produce a paper trail of votes as well, but Venezuelan government critics claim it will be useless since an election recount would be supervised by the Electoral Council, perceived as pro-Chavez.

The National Electoral Council members have hailed Bizta's software-writing role as

contributing to Venezuelan "sovereignty" over their voting system, which replaces American-designed machines. Chavez, an outspoken critic of U.S. policy, is viewed as leftist and anti-American.

According to Bizta's 2002 financial statement, the most recent one filed by the company in Venezuela, it was then a dormant firm that had no sales and was slowly losing money.

In June 2003, however, a venture capital company called Sociedad de Capital de Riesgo (SCR) invested about $200,000 in Bizta. The SCR is owned by the Venezuelan government's Industrial Credit Fund.

In January, a top official in Venezuela's science ministry, Omar Montilla, joined Bizta's board of directors to represent the government's three million shares, records show.

Montilla, who is one of five directors, canceled a meeting with The Herald and did not reply to repeated Herald queries.

One month after Montilla joined the board, the National Electoral Council awarded Bizta and partners **Smartmatic** and CANTV the $91 million contract to develop new voting machines. Bizta was hired to write the electronic code that configured the names and parties of candidates on the touch screens. **Smartmatic** would build and design the machines. CANTV, the publicly held phone company, would provide the phone lines for the system and election-day technical support.

The venture is largely the work of two little-known Venezuelan engineers: Antonio Mugica Rivero and Alfredo Anzola Jaumotte, childhood friends and recent engineering school graduates.

Mugica, 30, is the president of **Smartmatic** and a founder of Bizta. Anzola, 30, is the president of Bizta and the vice president of **Smartmatic,** corporate records from Venezuela show.

NO CONNECTIONS

Both executives say they have no political allegiances. Neither signed a petition drive seeking Chavez's recall.

Anzola initially told The Herald that one of the reasons the electoral council selected the group was that it had no connection to either the government or the opposition.

When told in a subsequent interview in Caracas that Bizta papers showed the government had an investment in his company through SCR, Anzola and Mugica said they viewed the investment as a loan.

"We really don't want to be involved in politics," said Wladimir Serrano, head of the governments venture capital fund. "Our role is strictly financial and technical."

Bizta "remains a private company, with some government shares but without any say on our part on its day to day activities or its strategic programs and policies," Serrano said.

SUBSTANTIAL POWER

But Harvard Professor Ricardo Hausmann, a former Venezuelan official who also has worked as the chief economist of the Inter-American Development Bank, said any investor holding a 28 percent stake in a company would likely have substantial power to make decisions.

"For example, Verizon is the largest shareholder in CANTV, holding 28 percent, and it has control of the company's management," said Hausmann, who sits on the CANTV board. With Bizta, "The government's influence will depend on the arrangement between the government and other shareholders."

SCR's stock purchase in Bizta was part of a broader effort to help start-up companies that could bring Venezuela international prestige in a wide range of industries, Serrano said.

He provided a list of a dozen other companies in which SCR has invested.

Most of the 20,000 **Smartmatic**-Bizta machines will be delivered over the summer from the factory in Italy, officials say.

Company Facts

Three companies will build and execute Venezuela's new touch-screen voting system. Two are incorporated in Florida, though neither does most of its business here.

* **Smartmatic** Corp., which will build the machines, incorporated in Florida in 2000 and lists its world headquarters at 6400 Congress Ave. in Boca Raton. Its president is Antonio Mugica Rivero, 30, and its vice president is Alfredo Anzola, 30.

* Bizta Corp., which will provide software for the new machines, incorporated in Florida in 2001, and lists its address as 19591 Dinner Key Dr., Boca Raton, a residential property owned by Mugica's father. Mugica is listed as president, and Anzola is vice president, according to Florida records. Venezuelan records, however, indicate Anzola is president. In Caracas, Bizta shares its office with **Smartmatic.**

* CANTV, Venezuela's publicly held phone company, will provide phone lines to connect the system and election day technical support. It would have been part of any voting system selected for the elections contract.

The Miami Herald

**June** 12, 2004 Saturday FINAL EDITION

**SECTION:** FRONT; Pg. 12A

**LENGTH:** 765 words

**HEADLINE:** VOTING-SYSTEM FIRM DROPS VENEZUELA AS AN INVESTOR

**APP2413**

**BYLINE:** RICHARD BRAND, rbrand@herald.com

**BODY:**
A company hired to help deliver voting results in the recall referendum against Venezuelan President Hugo Chavez announced Friday it will buy back the government's shares in the firm - a move meant to deflect criticism that the government's investment was a tool to manipulate the election.

The announcement by software maker Bizta Corp. comes amid an escalating uproar in Venezuela over the reliability and trustworthiness of the "touch-screen" voting machines, purchased in February for $91 million. The machines have never been used in an election anywhere.

28 PERCENT

The Herald reported last month that the government purchased a 28 percent stake in Bizta, through a venture capital fund, in June 2003 - just a few months before the company bid for the elections contract.

"They were caught. We discovered the fraud and now they are covering it up," said Ernesto Alvarenga, an opposition congressman. "We still have to be careful. All of this is related to the electronic fraud that they are trying to achieve."

The Herald also reported that a top official in Venezuela's science ministry, Omar Montilla, joined Bizta's board of directors in December to represent the government's three million shares. Two months later, the National Electoral Council awarded Bizta and partners **Smartmatic** and CANTV the $91 million.

Bizta officials said Friday they were buying back the shares, purchased for about $200,000, to address concerns about the government's influence in the company as it prepares for the critical August referendum.

"Given our current engagements, even the appearance of a conflict of interest is unacceptable, and as a result, we are repaying the . . . loan and Omar Montilla is stepping down from our Board of Directors," Bizta official Eduardo Correia said in the press release.

The sudden decision also comes one day after The Herald started asking Bizta executives about Montilla's background. Montilla, the Herald learned, was an ally of Chavez who had an intricate role in his 1998 election campaign.

FIRST ELECTION

Montilla had been a top official in a group called UNEPAD, formed by then-presidential candidate Chavez's Patriotic Pole coalition in 1997 to monitor his first election and conduct exit polls, among other things. Most Venezuelan political parties maintain monitoring groups such as UNEPAD to protect their party interests at the polls.

While working for the Chavez campaign in 1998, Montilla was given the task of evaluating the effectiveness of electronic voting machines being used at the time, an optical scanner system built by Omaha-based Election Systems & Software, former UNEPAD members said.

**APP2414**

As an electronic engineer, his job was to make sure that Chavez would not be cheated in the election, a former UNEPAD member said.

Montilla declined several requests to be interviewed.

Government officials had repeatedly claimed that its investment in Bizta and Montilla's appointment was made without knowledge that the company would ever seek an elections-related contract.

COINCIDENTAL

They also insisted the investment was part of a larger effort to help support private enterprise and its interest in a ballot software company was merely coincidental, one of a dozen such investments made to help promising companies.

But the government's role in Bizta had raised new concerns among opposition leaders, who continue to say they will not go to the polls unless the vote is manual.

"The process must be manual," said opposition leader Americo Martin. "[The machines] have not been tested in the field. They are unknown. To use them in such a difficult election, in a world of such strong passions, this could lead us to a catastrophe of violence and fighting."

The National Electoral Council on Tuesday announced that it would not change course - and would keep the machines. It also said there would be no concurrent manual count or independent audit to supplement the machine tally.

THE STORY SO FAR

* June 10, 2003: Venezuela's Industrial Credit Fund buys 28 percent of Bizta Corp. shares through a venture capital fund.

* Dec. 15, 2003: Omar Montilla, a top official in Venezuela's Ministry of Science and Technology, joins Bizta's board of directors.

* Feb. 16, 2004: Venezuela's five-person National Electoral Council votes to award Bizta, **Smartmatic** Corp. and CANTV a $91 million contract to build and deploy "touch-screen" voting machines.

* June 11: Bizta announces it will buy back the government's 28 percent stake, seeking to address conflict-of-interest concerns.

<div align="center">

The Miami Herald

**April** 20, 2004 Tuesday FINAL EDITION

</div>

**SECTION:** FRONT; Pg. 1A

**LENGTH:** 1143 words

**HEADLINE:** UNTRIED FLA. VOTE DEVICE TO DEBUT IN VENEZUELA

<div align="center">

**APP2415**

</div>

**BYLINE:** RICHARD BRAND, rbrand@herald.com

**DATELINE:** CARACAS

**BODY:**
Venezuela's electoral council is scrapping its 6-year-old voting machines and replacing them with touch-screen computers from a tiny South Florida company whose machines have never been used in an election anywhere.

The switch - coming as President Hugo Chavez maneuvers to avoid a recall referendum - has sparked a fury among his opponents, who say the new machines from Boca Raton-based **Smartmatic** Corp. could be used to manipulate the tally in a recall vote and other elections.

It could also cast an international spotlight on the reliability of electronic voting systems, hotly debated since the 2000 U.S. presidential election and Florida's ensuing hanging chad, butterfly-ballot chaos.

"We have no trust in these new machines. We are afraid they are preparing to cheat us, and we have reasons to be worried," said opposition congressman Edgar Zambrano.

The National Electoral Council's five-member board awarded the contract to **Smartmatic** and its partners on Feb. 16 amid objections by the two board members sympathetic to the opposition that they had been shut out.

"The selection process was secret and it didn't allow us to get any information about the bidders and their products," board member Sobella Mejias wrote in a letter to the rest of the council.

When Venezuelans first elected Chavez in 1998, they cast their votes using brand-new optical scanners that read paper ballots - a system considered among the most secure and advanced in the world. The $112 million voting system was built by Omaha-based Election Systems & Software.

THE PARTNERS

Now **Smartmatic** and its partners - the publicly owned CANTV telephone monopoly and Bizta, a private Venezuelan software firm - have a $91 million contract to provide 20,000 new touch-screen voting machines.

Bizta will add the candidates' names to the electronic ballot. CANTV's phone lines, to transmit vote tallies, would have been part of any election system. But **Smartmatic** is the central player, taking a $60 million chunk of the contract to arrange to build and program the machines.

**Smartmatic's** CEO, Antonio Mugica, a Venezuelan citizen, met with The Herald recently in Caracas to demonstrate the new system and address concerns that **Smartmatic** has never before built a voting machine.

Mugica said some employees of his company and its partners are election industry veterans, like Robert Cook, a former executive with Unisys, a large U.S.-based

**APP2416**

information technology firm. Mugica said his firm has 70 employees in Venezuela and seven in its offices in Boca Raton and Sunnyvale, Calif.

**Smartmatic** incorporated in Florida in 2000. State records show the company's five directors, including Mugica and his father, all listed the same home address in Boca Raton.

Mugica, offering references for his firm, said **Smartmatic** has partnered in the past with Unisys and with Mexico's Santander-Serfin Bank, providing security technology.

"We do have two small projects that we are doing with them," said Jacqueline Lewis, a spokeswoman for Unisys, reached in Pennsylvania. "We have [nothing] . . . to do with the contract with Venezuela."

Mugica said the **Smartmatic** touch-screen machines would eliminate errors that can occur when voters fill in the optically scanned paper ballots, and would save Venezuela money in the long run because it does not use expensive optical scanner paper.

Instead, the **Smartmatic** machines print a small paper receipt after each vote is cast, a record that voters can use to verify their decision. Users drop those paper receipts into ballot boxes, and at the end of the day the electronic tallies from each machine should match the paper totals, Mugica said.

'SECURE SYSTEM'

"Even though our system is not well known, it is the most secure voting system available in the world," Mugica said. "You always have to have a first election."

Mugica said the machines and the process by which they were chosen can stand up to international scrutiny.

Johns Hopkins University computer science professor Aviel Rubin, who studies voting systems, says the **Smartmatic** feature of printing a paper receipt is an important element in a secure voting technology.

But he added that having a printer does not guarantee a fraud-proof election and questioned the wisdom of switching systems on the eve of a potentially critical recall vote.

"I've never heard of **Smartmatic.** I'd be very concerned about an unknown player with that big of a contract, especially in a place like Venezuela, where fraud is such a big concern," said Rubin, reached in Washington, D.C.

"Somebody writes the software in the machines, and then you don't know what the software is doing. It can pretend to be working all day and then send out the wrong results at the end of the day."

The first **Smartmatic** vote may be a trial by fire for a company that in a recent U.S. business reference directory estimated its total annual sales at less than $2.5 million.

Chavez's opponents are trying to force a recall referendum with a petition drive, but the electoral council has challenged more than a million signatures. The council and

opposition are now negotiating for a way to validate those signatures.

With a possible recall vote and regional elections slated for August and September, respectively, some Venezuelans are wondering whether **Smartmatic** will even make the deadline.

DELIVERY SCHEDULE

Fewer than 10 of the machines have so far arrived in Venezuela for demonstrations, and the first shipment of 1,000 is expected to arrive from a factory in Italy shortly, officials said. Most of the machines are scheduled for delivery by July.

The timing is important. Under the constitution, if the recall vote is held before Aug. 19 and Chavez loses, a new presidential election must he held. But after that date his appointed vice president would complete the remainder of his term, which ends in 2006.

National Electoral Council officials said they do not expect the new machines to cause delays.

"We are confident that we won't have a problem," said Luis Ramirez, director of automated systems. He quickly added, "We always have contingency plans."

THE SYSTEM NOW IN USE

Venezuelan electoral authorities are replacing a 6-year-old electronic voting system built by Omaha-based Election Systems & Software.

With the ES&S Model 100 system, Venezuelan voters fill in bubbles next to candidate names on ballots printed on special paper. The ballots are then scanned by an optical reader and tallied by the machines.

The ES&S Model 100s are also used in elections across the United States and Canada, including Toronto, Hawaii and Oklahoma, company officials say.

ES&S also builds the iVotronic machines now used in Miami-Dade County elections.

- RICHARD BRAND

Herald researcher Elisabeth Donovan contributed to this report.


The Miami Herald

**August** 19, 2004 Thursday FINAL EDITION

**SECTION:** FRONT; Pg. 12A

**LENGTH:** 659 words

**HEADLINE:** CHAVEZ FOES BOYCOTT AUDIT, URGE TESTS OF VOTE MACHINES

**BYLINE:** STEVEN DUDLEY AND PHIL GUNSON, sdudley@herald.com

**DATELINE:** CARACAS

**BODY:**
Opponents of Venezuelan President Hugo Chavez Wednesday refused to take part in a special audit of the results of the president's landslide victory in a recall vote, despite the participation of international observers.

The National Electoral Council reported that with 96 percent of the votes from Sunday's referendum counted, its tallies showed 59.06 percent of the 9,402,892 voters backed Chavez while 40.94 percent voted to recall him.

Observers from former President Jimmy Carter's Atlanta-based Carter Center and the Organization of American States (OAS) have said their own checks on tallies matched the Electoral Council figures giving Chavez victory.

Observers said that on Tuesday, several leaders of the loosely knit opposition coalition known as the Democratic Coordinator had agreed to the terms of the audit, to be carried out by the Electoral Council, Carter Center and OAS.

The audit, which began Wednesday without the Democratic Coordinator, is expected to be finished today.

On Wednesday, however, the group said it wanted more tests on the machinery that tabulated the votes, saying the Electoral Council-Carter-OAS audit would not be able to answer the right questions.

Opposition leaders have said their own exit polls during the balloting Sunday showed Chavez losing the referendum by a vast margin.

TALLIES 'IMPOSSIBLE'

Opposition legislator Nelson Rampersad said the opposition coalition had discovered major anomalies in the tally sheets produced by the touch-screen voting machines.

In 25 percent of the results for the state of Aragua, for example, the number of YES votes produced by at least two machines in one polling station were either identical or nearly identical, Rampersad said, suggesting that voting machines had been tampered with. He showed reporters atally sheets showing the anomalies, but offered no other evidence.

"This is mathematically impossible," he asserted. In other cities and states, the Democratic Coordinator claims, the pattern of identical or nearly identical YES votes repeated, reaching 40 percent in the western state of Zulia.

The OAS and the Carter Center have observed dozens of elections, and the opposition coalition had said before Sunday's vote that it would accept the results if they were validated by those observers.

Since Sunday, the OAS and Carter Center have said their "quick counts" - random and representative samples of voting tallies from polling stations around the country - matched Electoral Council tallies showing Chavez as the winner. "Quick counts" are

the most common, respected means by which observers verify elections worldwide.

The Electoral Council also performed an audit of 199 of the 19,800 machines used in Sunday's vote to make sure the paper receipts that voters deposited into ballot boxes matched the results issued by the voting machines.

International observers said the Democratic Coordinator had also inspected the machines before the elections and had agreed to their use.

ANGRY RESPONSE

Chavez government representatives reacted vehemently to the coalition's announcement that it would not participate in the extra audit.

"Let's be serious," said Mari Pili Hernandez. "They ask everyone to get ready to do the audit. Now they don't want to do the audit. That's a lack of respect for the country."

The voting machines used Sunday were supplied by Boca Raton-based **Smartmatic** and used software provided by Bitza, a company registered in Venezuela and Florida. Bitza came under some scrutiny in May when The Herald reported that the government owned a 28 percent stake in the company. After the report was published, Bizta announced it would buy back the government's shares.

**Smartmatic** representatives have said the machines, originally developed in Italy to sell lottery tickets and used in an election for the first time here on Sunday, were safe from fraud and that there are numerous ways to audit them.


**From Jimmy Carter's oped in the Herald urging acceptance or recall results:**

The vote in Venezuela two Sundays ago was the culmination of this process, and a large number of other international observers were invited, including Latin American presidents and members of the U.S. Congress. Because of intense distrust expressed by the opposition, extra care was taken to ensure secrecy and accuracy of the voters' decisions. An electronic voting and tabulation system was developed by a Venezuelan-American consortium led by **SmartMatic.** It permitted touch-screen voting, with each choice backed up by a paper ballot that was examined by the voter and then placed in a sealed box. We international monitors assured that the machines were tested in advance, and observed the voting nationwide.
]


Investor's Business Daily

**April** 6, 2006 Thursday
NATIONAL EDITION

**SECTION:** ISSUES & INSIGHTS; EDITORIALS; Pg. A12


**APP2420**

**LENGTH:** 368 words

**HEADLINE:** Hugo Wants Your Vote

**BODY:**

Elections: If 9-11 taught us anything, it was to be wary of asymmetrical threats from hostile entities no matter what size. We might just get ambushed again if the Venezuelan government ends up controlling our elections.

Don't think it can't happen. A Venezuelan-linked company called **Smartmatic** has bought out a U.S. electronic voting device firm called **Sequoia,** which holds contracts for elections in Chicago and elsewhere.

U.S. foreign investment bureaucrats aren't worried because no military secrets are involved. But that kind of thinking can blindside our democratic institutions as we look for threats to our hardware.

Venezuelan President Hugo Chavez is the foremost meddler in foreign elections in the Western hemisphere and has been accused of secretly financing candidates in Peru, Nicaragua, Bolivia and Mexico. Why wouldn't he be interested in influencing vote outcomes here?

He's already trying to influence our politics through a congressional lobbying effort and a cheap fuel program for welfare recipients explicitly linked to congressional participation.

These and other shenanigans signal interest in influencing perceptions in the U.S.

There's plenty of domestic white noise about electronic machines to cloud the issue. But the problems Chavez could cause are in a different league.

Even as regulators dismiss security threats, the performance of **Smartmatic** in Venezuela's own elections raises questions.

For example, 82% of voters there sat out last December's **Smartmatic**-operational congressional race on shattered confidence in the system.

The **Smartmatic** machines are capable of controlling the speed at which votes are transmitted, creating long lines to discourage voting. They can also instantaneously tally as results come in, giving favored sides information to manipulate turnout.

Mathematicians accuse them of flipping results. And combined with fingerprint machines, they can match votes to voters, violating ballot secrecy.

There may be no problem with **Smartmatic** working U.S. elections, but just wait for a close call and see how credible the result will be. With as many problems as U.S. elections have seen, the one thing it doesn't need is to import Venezuela's electoral wreckage.

Chicago Tribune

**April** 8, 2006 Saturday
Chicago Final Edition

**SECTION:** NEWS ; ZONE C; Pg. 1

**LENGTH:** 995 words

**HEADLINE:** Alderman sees a plot in voting machines;
Burke connects dots to Venezuela leader

**BYLINE:** By Gary Washburn, Tribune staff reporter

**BODY:**

Venezuela gave Chicago Ozzie Guillen, the beloved manager of the World Series
champion White Sox. But is the South American country, with secrecy and stealth,
also exporting vote fraud here?

As angry aldermen lambasted the head of the company that sold Chicago new,
controversial voting machinery, Ald. Edward Burke (14th) suggested Friday that the
hardware could be part of a Venezuelan conspiracy to subvert American elections.

Jack Blaine, president of **Sequoia** Voting Systems, faced the hostile questions for
about two hours at the City Council hearing. He acknowledged some problems with
his company's equipment in the March 21 primary.

But he flatly denied Burke's allegation that Venezuela's leftist president, U.S. critic
Hugo Chavez, might be pulling strings behind the scenes.

"Of course, I think it is a crackpot theory," Blaine told reporters after his grilling.

Though **Sequoia** is based in the U.S., Burke hammered away in his questioning
about a series of offshore "shell" companies that are **Sequoia** parents and, at the
end of a circuitous trail, Venezuelan nationals who are the firm's ultimate owners.

As a result of problems with the recent election, which was plagued by lengthy
delays in tabulating results, "we may have stumbled across what could be [an]
international conspiracy to subvert the electoral process in the United States of
America," he told reporters.

"I am saying the potential for tampering with the American electoral process where
presidential elections can be determined by just one state exists here," Burke said.

"Tell me a single solitary reason there is to trace ownership through three shell
corporations to the Curacao Islands and its roots to Venezuela, where they
have already been involved with the dictator of Venezuela, who Defense Secretary
[Donald] Rumsfeld says is an enemy of the United States."

Blaine later said that the ownership structure is similar to those of other firms that do business internationally and that **Sequoia** and the owners of parent **Smartmatic** Corp. have no ties to Chavez. Because they are Venezuelan, **Smartmatic's** owners "are being stereotyped," he asserted.

Some Internet blogs have been rife with talk of a possible **Sequoia**-Chavez connection, and newspapers that have raised the question include the Miami Herald and Investors Business Daily.

Meanwhile, a Carnegie Mellon University computer science professor recently concluded after two days of testing that vote totals on a **Sequoia** model, different from those used here, could be manipulated. That prompted Pennsylvania's Allegheny County to scrap plans to buy the machines.

But Langdon Neal, president of the Chicago Board of Election Commissioners, expressed confidence that the new machines used in Cook County are protected.

"We have enough redundant security measures in place to protect the accuracy of the vote," Neal said. "The beginning starts with tests of the firmware, software and mechanical operation before election day."

The "ultimate protection," Neal said, is a paper record created for every vote cast. Cook County Clerk David Orr, who attended the hearing but was not among the speakers, agreed.

"There are so many ways to protect the vote," Orr said. "Part of the reason we have this paper trail is if ... you had 20 people in our office and 20 people at **Sequoia** who formed some sort of conspiracy, as long as you have that paper trail it wouldn't even matter. You could audit it."

While Burke was the most vocal about a potential Venezuelan tie, other aldermen were highly critical of the performance of the **Sequoia** equipment.

At one point, unhappy with Blaine's answers to some questions, Ald. Leslie Hairston (5th) declared, "I think you belong to the secret brotherhood of I Don't Know."

Two types of voting technology--optical scanners for paper ballots and touch screen machines for the disabled--were used at polling places in the primary. Another device consolidated the results of both types of machines at each polling place and transmitted the data to central tabulation computers downtown.

"During our pre-election testing of this system, data were transmitted 99 percent of the time," Blaine said. "During the election on March 21, however, transmission occurred 68 percent of the time," he said. He suggested that the problems were the result of election judges forced to use the new system "in a relatively short period of time and with a limited amount of training."

Election officials have acknowledged a lack of adequate training for election judges using the machines for the first time in the primary and have said they plan additional training before the Nov. 7 general election.

Burke was not swayed, saying the election "was a disaster," and **Sequoia** "never should have been hired in the first place" because of its ownership ties.

But aldermen acknowledged that the Chicago Board of Election Commissioners is outside council control, and Burke said the council cannot force the board to switch to a new company in time for the general election in November.

Such a move is not in the cards, Neal said.

"At this point it would be almost impossible to switch vendors," he said. Legal issues aside, "to arrange for new equipment to have to be manufactured and tested in that amount of time would be a recipe for disaster in my opinion."

And if there were to be a change, "I guess the [question] is who should we select," Neal said. "Our process began in 2003. We looked at over 23 different vendors. One of the three finalists was the previous vendor. The largest falloff in the U.S. was produced by our previous vendor. Everyone here remembers 2000."

In that election more than 7 percent of the ballots tallied registered no vote for president.

Despite the delay in tallying totals in the most recent election, election officials contended the count was accurate.

Meanwhile, the Cook County Board, which acquired the **Sequoia** machines used in suburban areas during the primary, plans to hold its own hearing.

Chicago Tribune

**April** 27, 2006 Thursday
Northwest Final Edition

**SECTION:** METRO ; ZONE NW; Pg. 10

**LENGTH:** 820 words

**HEADLINE:** Voting-machine maker on defense;
Election trouble puts exec on the hot seat

**BYLINE:** By John McCormick, Tribune staff reporter.

**BODY:**

Jack Blaine, president of the company that made the voting machines used in Cook County's glitch-filled March primary, is used to jetting around the country selling election equipment.

These days, however, the head of **Sequoia** Voting Systems is racking up frequent flier credits defending his products to angry election officials and testifying before committees.

Outcomes in Chicago's March 21 primary went undetermined for days, and the problems cast doubts on more than $50 million of new **Sequoia** equipment.

Besides shaking the confidence of voters, the problems have also tarnished **Sequoia's** reputation, providing the latest hit for an industry that is the frequent target of electoral conspiracy theories.

As the company's invoices to Chicago and Cook County remain unpaid in protest, a committee of the Cook County Board will hold a hearing Thursday to look at how similar problems can be prevented in November. The State Board of Elections and a committee of the Chicago City Council have already held similar inquiries.

Election officials have acknowledged a lack of training for election judges who were using the new and complex system. But they have also pointed fingers at **Sequoia,** saying the firm and its equipment did not perform adequately.

The company says that's unfair.

"The only major disappointment was the slow tabulation of the results," Blaine said in a recent interview. "We can improve on the user-friendliness of the equipment."

While the company has previously found itself embroiled in disputes in Florida and Washington state because of equipment failures and other issues, its reputation has never before taken such a blow from a single election in the U.S.

The confusion in Cook County--primarily from widespread failures in the remote reporting of results from polling places--was reported on the front page of the Pittsburgh Post-Gazette in late March, just as officials in Allegheny County, Pa., were finalizing an $11.8 million contract with **Sequoia.**

Although different machines were to be used in Pennsylvania, the experience in Chicago and suburban Cook County concerned Allegheny officials enough that they went with another vendor.

"I gotta believe this had an impact on it," Blaine said. "But I know of no other [business] fallout."

Much of the angst about **Sequoia** is related to its purchase in March 2005 by **Smartmatic** Corp., a company that provided voting machines for the controversial 2004 recall election of Venezuelan President Hugo Chavez. **Smartmatic's** involvement in U.S. elections troubles some, including Chicago Ald. Edward Burke (14th), who has suggested that the company's equipment could be part of a Venezuelan conspiracy to subvert American democracy.

Chicago and Cook County election officials, meanwhile, were aware of the international controversy surrounding **Sequoia** well before they awarded the company contracts. A county consultant pitched **Smartmatic's** foreign ties as an advantage.

"**Smartmatic,** which provided the election machines for the Venezuelan vote, can rightly claim that they have conducted one of the most closely watched, carefully audited, and statistically analyzed elections in recent history," Oak Park-based Major Scale Technology Management wrote in a memo to Cook County Clerk David Orr's

office.

**Sequoia** is on its second owner since 2000, when companies started to see a potential windfall from the call for improved voting technology following the controversial presidential election that year.

More than 97 percent of **Smartmatic,** a privately held company like **Sequoia,** is owned by the firm's four founders, the company said in a letter responding to Burke's hearing. Antonio Mugica, the company's chief executive officer, owns 75 percent of the shares.

Whatever baggage **Sequoia** had prior to its selection, election officials would likely have faced similar criticism had they picked other vendors.

"All of the major manufacturers have had significant problems in counting the vote accurately and, in some cases, ethical issues as well," said Bev Harris, founder of Black Box Voting, a national voting watchdog group.

Ohio-based Diebold Inc., for example, has been mired in controversy since its former chairman pledged in a letter to deliver victory for President Bush in Ohio in 2004. The company, one of the finalists here, has since taken steps to isolate itself from politics.

Although **Sequoia's** offices are only a short drive from Silicon Valley, home to hundreds of high-tech companies, most of its products are manufactured on contract by two New York firms, Jaco Electronics and Harvard Custom Manufacturing.

Officials say it would be almost impossible to change vendors in time for the November election--and also potentially costly. Still, Diebold has since tried to reopen discussions following the **Sequoia** flap.

"We have made an offer to sit back down with them and offer a proven solution," said David Bear, a company spokesman.

# Exhibit O-49

Pompeo brushes aside results of presidential election

# Pompeo brushes aside results of presidential election





APP2428

Pompeo brushes aside results of presidential election





WASHINGTON (AP) — Secretary of State Mike Pompeo is brushing aside results of last week's presidential election showing that President Donald Trump lost his bid for a second term. Pompeo told reporters with a grin on Tuesday that the "transition" to a second Trump term would be "smooth," but later said the State Department would be prepared no matter who is president on Inauguration Day.

Tongue-in-cheek or not, Pompeo's remarks implying that Trump might yet be reelected were striking, coming at a tense moment for the nation as Trump refuses to concede to President-elect Joe Biden.

**APP2429**

Pompeo, America's top diplomat and fourth-in-line for the presidency, spoke even as world leaders have been congratulating the former vice president.

Pompeo, one of Trump's most loyal Cabinet members, also dismissed as "ridiculous" the suggestion that Trump's evidence-free claims of fraud could hurt America's credibility when weighing in on foreign elections.

Pompeo's comments about the transition came in response to a question about whether the State Department was prepared to engage with the Biden team.

"There will be a smooth transition to a second Trump administration," Pompeo said with a chuckle, before shifting to a more serious tone. "We're ready. The world is watching what's taking place here. We're going to count all the votes. When the process is complete, there will be electors selected. There's a process, the Constitution lays it out pretty clearly."

"The world should have every confidence that the transition necessary to make sure that the State Department is functional today, successful today, and successful with the president who's in office on January 20th a minute after noon will also be successful," he said.

Later, in an interview with conservative radio host Tony Perkins, Pompeo appeared to seek to clarify his comments.

"Our adversaries should know that we're ready, we're continuing to work, we'll work all the way through January. And then on January 20th, we'll have a transition, whether it's to a Trump administration — a second Trump administration as I spoke about today — or to an administration led by former Vice President Biden," he said.

"The American people understand that our transition will be complete and thorough and that if we spend a few more days validating that we have this process right, ensuring that we've protected every American's lawful right to vote, it's the right thing to do and we need not worry that there won't be an adequate time for transition, which was frankly what the question was suggesting," he added.

In another interview, this one with Fox News, Pompeo warned President-elect Biden's team about potentially inappropriate conversations with foreign leaders. He suggested that some discussions could violate the Logan Act, a 1799 law that bars private American citizens from conducting foreign policy on behalf of the U.S, but has never successfully been prosecuted.

Trump's former national security adviser Michael Flynn had been accused of violating the act for his transition conversations with Russia's ambassador to the U.S. but was not charged with that offense. Pompeo noted that Biden had spoken with several foreign leaders since Election Day and said those conversations could be looked at even if they were innocuous.

"I'm always worried when people are engaging in activities, speaking with foreign leaders, in a way that represents things, that might be representing things that aren't true or might be attempting to influence American foreign policy in ways that are inconsistent with what the law requires," Pompeo said. "You know the Logan Act. I know the Logan Act. I hope that all those folks who are out there having these conversations aren't violating that law. I'm sure the Department of Justice will be keeping a good eye on that for us."

In refusing to recognize Biden's victory, Pompeo, a possible 2024 presidential contender, is joining with other leading Republicans who have rallied behind Trump's efforts to fight the election results. That has cast doubt on whether there will be a smooth transition leading up to Biden's Jan. 20 inauguration.

**APP2430**

Biden later shrugged off Pompeo's remarks, saying, "There is no evidence of any of the assertions made by the president or Secretary of State Pompeo."

At least some Democratic members of Congress were not amused, however.

Eliot Engel, the outgoing chairman of the House Foreign Affairs Committee, said in a statement that Pompeo "shouldn't play along with baseless and dangerous attacks on the legitimacy of last week's election."

"The State Department should now begin preparing for President-elect Biden's transition," said Engel, who has been a persistent critic of Pompeo's.

Pompeo will leave on Friday for a diplomatic trip to Europe and the Middle East, including France, Turkey, Israel and the United Arab Emirates, where he will meet leaders who have already congratulated Biden on his victory.

In rejecting suggestions that Trump's unsupported allegations of fraud would have an impact on U.S. standing when it comes to commenting on elections in other countries, he said:

"I'm the secretary of state. I'm getting calls from all across the world. These people are watching our election. They understand that we have a legal process. They understand that this takes time."

"We're in good shape. We're in good shape," Pompeo said.

He derided a question from one reporter about how Trump's rejection of the election results would play overseas. In recent weeks, Pompeo and the State Department have expressed concerns about irregularities in elections from Belarus to Ivory Coast and Tanzania.

"That's ridiculous and you know it's ridiculous, and you asked it because it's ridiculous," Pompeo told the reporter who asked if Trump's stance jeopardized U.S. standing. "You asked a question that is ridiculous. This department cares deeply to make sure that elections around the world are safe and secure and free and fair, and my officers risk their lives to ensure that that happens."

# Exhibit O-50

# Trump says election 'far from over' as he vows to fight results



WASHINGTON — President Donald Trump vowed Saturday to press forward with a legal fight, pushing unfounded claims of voter fraud in response to the news that President-elect Joe Biden had won the election.

Trump was at his Virginia golf club when NBC News and other networks projected Biden as the winner.

While crowds gathered outside the White House to celebrate Trump's defeat, inside the building it was mostly quiet. Several aides were in quarantine after his chief of staff tested positive for Covid-19.

Hours ticked by after Biden was projected to be the winner without a public appearance by Trump. He released a statement within minutes of the announcement claiming that the "election is far from over."

"Beginning Monday, our campaign will start prosecuting our case in court to ensure election laws are fully upheld and the rightful winner is seated," Trump said. "The American People are entitled to an honest election: that means counting all legal ballots, and not counting any illegal ballots."

Trump took to Twitter hours after the announcement to continue to make unfounded claims that rampant voter fraud occurred. He also boasted about the 71 million votes he won, the most by any incumbent president but not enough to secure re-election.

APP2433

When asked, neither Trump nor his campaign have presented evidence that illegal ballots were counted. Despite having repeated the claim for days now, the Trump campaign has failed to provide any sound evidence of voter fraud.

Trump sought to depict the decision by news networks to project Biden as the winner as evidence that forces were working against him.

"We all know why Joe Biden is rushing to falsely pose as the winner, and why his media allies are trying so hard to help him: they don't want the truth to be exposed. The simple fact is this election is far from over," Trump said in his statement. He added, "I will not rest until the American People have the honest vote count they deserve and that Democracy demands."

Election administrators around the country have also worked to make the process transparent, allowing representatives from both parties, as well as the news media, into the rooms to watch votes as they are tabulated. Philadelphia offered a livestreamed video to allow the public to watch.

Still, Trump's team of lawyers pressed on with its strategy to litigate the election results even as some privately acknowledged that the efforts would have little impact.

"Now that there's a call, I'm sure the lawsuits will continue, but the fact remains: You can't un-count votes," a person close to Trump's re-elect effort admitted.

On Saturday afternoon, Rudy Giuliani, Trump's personal attorney, claimed at a news conference in Philadelphia that "highly suspect ballots" were cast that amounted to "absolute fraud."

Pennsylvania put Biden over the 270 electoral votes needed to win.

When votes began to be tabulated on election night, Trump was initially leading in Pennsylvania as polls first closed. The lead had been expected — Trump had discouraged mail voting, and his supporters had been expected to use in-person voting, compared to Biden's supporters, who made up a greater share of mail-in votes. As mail-in and absentee votes were counted throughout the week, Trump's lead shrunk.

"You don't lose leads like that without corruption," Giuliani argued without providing evidence.

Trump also tried to cast doubt on the Pennsylvania results Saturday, writing in his statement that "legal observers were not permitted meaningful access to watch the counting process" and adding that "legal votes decide who is president, not the news media."

Poll watchers have always been in the room where votes were being counted and were never denied access, but they were asked to stand a distance away from the ballot counting machines because of the coronavirus.

"Obviously, he's not going to concede when at least 600,000 ballots are in question," Giuliani said, providing no basis for the number.

But allies have began spectating about what happens next and whether Trump will remain the most influential figure in the Republican Party.

"He'll be able to say they stole it, and he'll go down to Florida and continue to be the most influential Republican in the country," predicted a former White House official close to the campaign.

**APP2434**

# Exhibit O-51

# 'Far From Over': Trump Refuses To Concede As Biden's Margin Of Victory Widens



APP2436

12/5/23, 8:20 PM                    'Far From Over': Trump Refuses To Concede As Biden's Margin Of Victory Widens



**Updated at 6:30 p.m. ET**

Shortly after The Associated Press and multiple networks called the presidential election for former Vice President Joe Biden, President Trump released a statement claiming the election was "far from over," falsely accusing President-elect Biden of attempting to undermine the electoral process and vowing to take the election to the courts.

Trump was at his golf course in Virginia when a slew of networks announced Biden had won the presidency. The AP and networks only call a race when they determine the trailing candidate has no possible path to victory, even factoring in the votes that remain to be counted.

Hours later, the president issued an all-caps tweet falsely declaring himself the winner and incorrectly claiming that election observers were not allowed into counting rooms. In fact, vote counting was observed as normal and, in many cases, livestreamed as well. There have been some disputes over how close observers could stand or how many were permitted in rooms, but nothing close to the violation of election laws that Trump alleges.

He tacitly acknowledged the lack of evidence for his campaign's unsupported claims of widespread fraud, saying "BAD THINGS HAPPENED WHICH OUR OBSERVERS WERE NOT ALLOWED TO SEE."

He also noted he had received more votes than any sitting president had ever received before, which is true; Biden, however, received millions more votes, setting the new record for most votes ever received in a presidential election.

The presidential race is always called by the media well before it is officially certified. Certification deadlines vary by state but are set days or weeks after Election Day. The AP and networks often call the race on election night.

**APP2437**

'Far From Over': Trump Refuses To Concede As Biden's Margin Of Victory Widens

As had been anticipated, tallying votes took longer than usual in many states: Huge numbers of voters cast their ballots via mail, because of the pandemic, and many state legislatures did not allow those mail-in votes to begin to be counted until Election Day.

The AP determined that Biden reached the threshold of 270 electoral votes on Saturday morning, as he secured the crucial swing state of Pennsylvania and its 20 electoral votes for Biden. Shortly after, the AP also called Nevada for Biden, bringing his electoral vote total to 290.

Biden leads in Georgia, while Trump has the edge in North Carolina, neither of which have been called by the AP; neither state would swing the result of the election at this point. Counting also continues in Arizona, which the AP called for Biden earlier in the week and where Biden maintains a narrow edge.

In his statement, Trump reiterated baseless claims that votes are being counted improperly. He also emphasized his campaign's legal challenges to the voting process, several of which have already been thrown out of courts because of a lack of any evidence of wrongdoing.

"We all know why Joe Biden is rushing to falsely pose as the winner, and why his media allies are trying so hard to help him: they don't want the truth to be exposed," Trump wrote. "The simple fact is this election is far from over. Joe Biden has not been certified as the winner of any states, let alone any of the highly contested states headed for mandatory recounts, or states where our campaign has valid and legitimate legal challenges that could determine the ultimate victor."

Many of those lawsuits focus on questions of transparency and access to observe vote counting — for instance, disputing how far away an election observer can stand from officials. It is not clear how such a legal challenge could shift the results of the election.

Trump also referred to "legal votes" and "illegal ballots." He has frequently suggested mail-in ballots are illegitimate. Research has found no evidence of widespread fraud, and states with Republican and Democratic election officials have used the voting method for years without major issues. Trump himself has voted by mail.

Trump also accused the president-elect of seeking to count ballots "even if they are fraudulent." The Biden/Harris campaign has not encouraged any violation of election laws.

Just a few hours earlier, the president had falsely tweeted that he had won the election, a message flagged by Twitter.

It should be noted that concession speeches don't have any legal force, and Biden will be the next president regardless of whether Trump concedes or not.

On Friday, House Speaker Nancy Pelosi referred to Biden as "president-elect."

"How exciting it is to come before you today with Joe Biden having the tremendous mandate that he has," she told reporters on Capitol Hill. "And that pretty soon the hyphen will be gone from vice president to President-Elect Joe Biden — a happy day for our country."

Meanwhile, Senate Majority Leader Mitch McConnell has repeatedly sidestepped questions about the president's claims of election fraud.

"I've already covered the subject," McConnell said, noting, "I sent out a tweet this morning." But McConnell's tweet did not address the president — it said "every legal vote should be counted." When pressed, McConnell said, "I've told you I have sent out what I want to say about this situation in the tweet you all have" and "I get to decide what I say."

**APP2438**

Some fellow Republicans in the Senate have been more direct.

Sen. Pat Toomey, R-Pa., told NBC's *Today* show that he found it "very hard to watch" Trump's remarks from the White House on Thursday.

"The president's allegations of large-scale fraud and theft of the election are just not substantiated. I'm not aware of any significant wrongdoing here," Toomey said.

In a tweet on Friday, Utah Sen. Mitt Romney wrote that the president was "within his rights to request recounts," but added that it is "wrong to say that the election was rigged, corrupt and stolen — doing so damages the cause of freedom here and around the world, weakens the institutions that lie at the foundation of the Republic, and recklessly inflames destructive and dangerous passions."

Romney has since congratulated Biden on his win. So have Republican Reps. Fred Upton and Will Hurd.

On Saturday, Rep. Don Bacon, R-Neb., told NPR that the "handwriting is on the wall" for Trump.

He said the president has the right to file legal challenges concerning voting processes, but once the court battles have played out, the president should "proceed graciously," Bacon said.

APP2439

# Exhibit O-52

12/5/23, 8:21 PM                                    Donald Trump's US election lawsuits: Where do things stand?

# Donald Trump's US election lawsuits: Where do things stand?

*Donald Trump's campaign files several longshot legal challenges in a bid to reverse Joe Biden's projected triumph in the US presidential election.*



*US President Donald Trump has refused to concede the election [Evan Vucci/AP Photo]*

United States President Donald Trump is pushing ahead with legal challenges to his election defeat as top Republicans in the US Congress refused to recognise Democrat Joe Biden as President-elect.

Biden was projected as the winner of the presidential election by US media on Saturday, after surpassing the 270 electoral votes required to win.

But the Trump campaign has filed more than a dozen lawsuits across five states since Election Day in an attempt to reverse the outcome. In a statement released after Biden was projected as the winner, Trump said his campaign "will start prosecuting our case in court to ensure election laws are fully upheld and the rightful winner is seated".

Trump has spread baseless allegations that fraud was marring election results and his team has launched legal challenges in key battleground states such as Pennsylvania, Michigan, Nevada, Georgia, and Arizona. The campaign has also said it would request a recount in Wisconsin, citing "irregularities" in several counties

Senior Republicans have continued to publicly support the president's legal strategy. Senate Majority Leader Mitch McConnell defended Trump's pursuit of court cases on Monday, saying Trump was "100 percent within his rights to look into allegations of irregularities", without citing any evidence.

Here is a guide to the lawsuits filed in each state and where they currently stand.

read:/https_www.aljazeera.com/?url=https%3A%2F%2Fwww.aljazeera.com%2Fnews%2F2020%2F11%2F10%2Flawsuits-increase-as-trump-attempt...    1/4

Donald Trump's US election lawsuits: Where do things stand?

# Pennsylvania

Trump's campaign has filed several lawsuits in the state of Pennsylvania since Election Day. Philadelphia may prove to be a critical component in Trump's battle to prove that the election was "stolen" from him.

As expected, more Republicans turned out for in-person voting on November 3, while more Democrats chose to vote by mail. Since the state counted votes cast in person on election day first and only began counting mail-in votes on November 4 in line with state election rules, early counts on the day showed Trump with a lead. As mail-in ballots were counted and added to the totals in the following days, Trump's lead diminished and by Saturday, Biden held a lead deemed sufficient to be projected as the winner.

While it is normal for it to take several days to fully count ballots, Trump's campaign has suggested without evidence that this shift from Trump to Biden was due to fraud.

Trump's team has pursued a variety of legal options in the state. It filed a lawsuit asking Philadelphia election officials to halt the counting of ballots. A federal judge quickly dismissed the request. The campaign team has also filed documents asking Pennsylvania's Secretary of State Kathy Boockvar and all 67 counties to impose an earlier date for voters to show proof of identification if it was not on their initial ballot. While litigation is continuing, the presiding judge ordered all counties to segregate ballots if voter identification was not received by November 9.

## Sign up for Al Jazeera

**Americas Coverage Newsletter**
US politics, Canada's multiculturalism, South America's geopolitical rise—we bring you the stories that matter.
Ⓘ
Your subscription failed. Please try again.
✓
Please check your email to confirm your subscription
By signing up, you agree to our Privacy Policy
protected by **reCAPTCHA**

Additionally, the Trump team filed a lawsuit in Pennsylvania state court, claiming that its observers were not permitted to get close enough to properly observe ballot counting in Philadelphia. The campaign team insisted that they deserved "meaningful" access to various locations, as well as the ability to review already processed ballots. The court ruled that the Trump campaign's observers could move closer to the ballot processing, which Trump touted as a "big legal win" in a tweet on Friday.

Video Duration 05 minutes 21 seconds 05:21

*What can Trump do now? | Start Here*

Trump achieved another minor legal win on Friday when Supreme Court Justice Samuel Alito approved the Republicans' request to ensure that county election officials in Pennsylvania were segregating mail-in ballots received after Election Day. However, Alito did not order election officials to stop the counting of ballots.

Trump's campaign had previously submitted documents asking to join in on an already existing dispute before the US Supreme Court on whether ballots received after Election Day should count. The Pennsylvania Supreme Court has already ruled that mail-in ballots received up to three days after the election can be counted.

On Friday, Pennsylvania's Attorney General Josh Shapiro responded by filing papers at the Supreme Court to oppose Trump's intervention in the pending case, stating that the state Republican Party is "capable and willing" to make all necessary arguments and that the Trump campaign "has not provided any justification for its delay in seeking intervention in the court." The case remains ongoing.

On Monday, Trump's legal team announced that they had filed a new lawsuit in Pennsylvania against Kathy Boockvar to seek an emergency injunction to stop state officials from certifying President-elect Joe Biden's win

in the state. The campaign cited an unfair election process in which the mail-in voting system "lacked all of the hallmarks of transparency and verifiability that were present for in-person voters" as its main concern. Litigation is continuing.

## Michigan

In Michigan Trump's team has tried to allude to discrepancies in how ballots have been counted throughout the state.

The campaign filed a lawsuit to halt the counting of votes statewide on the grounds that campaign officials had not been given proper access to observe the process. Trump and his campaign once again argued that they wanted "meaningful" access to be able to properly observe the mail-in ballot counting process. According to The Associated Press news agency, the lawsuit claims "Secretary of State Jocelyn Benson, a Democrat, was allowing absentee ballots to be counted without teams of bipartisan observers as well as challengers."

The lawsuit was dismissed by Judge Cynthia Stephens last week. Trump's legal team attempted to appeal the ruling but failed to provide the necessary documents in court.

The campaign on Tuesday said it would file a new lawsuit to halt Michigan from officially certifying Biden's victory until the state could verify that votes were cast lawfully.

Video Duration 25 minutes 50 seconds 25:50

*Media outlets' battle for clarity amidst the chaos of US election | The Listening Post*

## Nevada

In Nevada, a state that Biden is projected to be leading by a thin margin, Trump and his team have filed two lawsuits. The campaign has attempted to challenge both the observing process for the counting of ballots, as well as the legitimacy of the signature verification machines used in Clark County, Nevada.

Prior to Election Day, the Trump campaign, Republican National Committee, and a plaintiff, Fred Krause, filed a lawsuit in Clark County seeking to halt the counting process until they could properly observe the process. They claimed that there was no clear plan in place to ensure a meaningful observation process. A district judge rejected the lawsuit, ruling that there was a lack of evidence to support the argument. The plaintiffs appealed the ruling, and on November 5, the State Supreme Court said that the two sides had reached a settlement.

Late last week, the Trump campaign also filed documents to impose an injunction on the automated signature verification machines used in Clark County, claiming more than 3,000 ineligible voters have been able to cast their ballots. A federal judge rejected the request on November 6, ruling that there is no evidence that Clark County is engaging in improper conduct.

APP2443

12/5/23, 8:21 PM                                  Donald Trump's US election lawsuits: Where do things stand?



*Supporters of President Donald Trump rally in Beverly Hills, California, Saturday, November 7, 2020 [Ringo HW Chiu/AP Photo]*

## Georgia

Trump's legal team also filed a lawsuit in Georgia seeking to disqualify approximately 53 ballots. This request was based on unsupported allegations made by a poll watcher in Chatham County, who reported seeing late ballots that arrived after the Election Day deadline get mixed in with ballots that had arrived on time.

A Superior Court judge rejected the lawsuit on November 5 after determining that there was no evidence that the ballots had arrived late.

## Arizona

On Saturday, the Trump campaign and Republican National Committee filed a lawsuit claiming that voters' ballots had been wrongfully rejected, thus depriving Trump of "potentially thousands" of votes. After an initial hearing on Monday, it appears that some 180 votes were affected.

The litigation is continuing, with the next hearing scheduled for Thursday. Trump's legal team will be expected to produce evidence to support their claims.

***Nazdar Barzani contributed to this report.***

**APP2444**

# Exhibit O-53

# The Trump legal team's latest voter fraud Hail Mary



Share
Comment554
Save

Debunking President Trump's and his allies' myriad, baseless voter fraud allegations is basically a game of whack-a-mole at this point. They pop up repeatedly and haphazardly, but they're rather easy to knock down, often with just a couple minutes and the Google machine. That's both a good thing — in that this misinformation is eminently combatable — and a bad thing — because such specious theories are still being pursued, despite the carcasses of the many debunked predecessors failing to dissuade both their perpetrators and their adherents.

But few of these theories are as dubious as one that cropped up this weekend.

Appearing on the credulous airwaves of Maria Bartiromo's Sunday morning Fox News show, Michael Flynn's lawyer Sidney Powell lodged a novel theory: The fact that many voters voted for Joe Biden but not in other races is indicative of fraud.

"We have identified at least 450,000 ballots in the key states that miraculously only have a mark for Joe Biden on them, and no other candidate," Powell said.

Bartiromo was intrigued.

"You have a list of numbers of ballots with only Joe Biden on the ticket," Bartiromo said. "You say it's 98,000 ballots in Pennsylvania, 80,000 to 90,000 in Georgia, another 42,000 in Arizona, 69,000-to 115,000 in Michigan and 62,000 in Wisconsin."

The numbers reported by Bartiromo and Powell match the ones promoted on Twitter the day before by a former Breitbart News journalist.



"Sidney, if this is true, this appears systemic," Bartiromo continued. "Where is the Department of Justice? Where is the [attorney general], William P. Barr? If this is so obvious, then why aren't we seeing massive government investigation?"

Members of Trump's campaign on Sunday amplified Powell's theory on social media.

Indeed, if it was so obvious, it would be worth looking into. But it's also obviously unremarkable.

Americans have a long and demonstrated history of voting for president and skipping all or much of the rest of the ballot. It's a practice known as undervoting. And to the extent we can analyze the data from the 2020 election, it doesn't appear in any way unique.

The 450,000 ballots identified as voting only for Biden are in five states. The total number of votes recorded in those states right now is about 24 million. That means less than 2 percent of people would have cast ballots for Biden and skipped the rest of the ballot.

A relevant comparison to past elections is when people vote for president but skip the other high-profile races on the ballot. In Georgia in 2016, for instance, the presidential race included more than 200,000 more votes than the state's Senate race — nearly *5 percent* of all voters in the state. In Florida, the gap was 120,000 votes. In Ohio, it was 122,000. It was also more than 110,000 in Pennsylvania. (Pennsylvania at the time also had straight-ticket voting, but has since eliminated it, which would logically lead to more undervotes.)

There is also routinely an even bigger imbalance further downballot, where the number of votes cast for House seats is 10 million or more fewer than for president, nationwide.

Just because people didn't vote for Senate, of course, doesn't mean they skipped the rest of the ballot, too. But to the extent people vote for president and decide to skip the other highest-profile race on the ballot, it's telling.

And the number of people who vote for president but not for Senate and House is very likely significantly larger than even those numbers suggest. Another reality of our elections is that not only do some people vote only for president, but also some vote in the other races while skipping the presidential contest.

This was at issue following the 2000 election, after analysts probed Florida for evidence that people's intended votes for president might not have properly recorded. One 2002 study from the World Bank and the University of Missouri at Kansas City found that, on average, more than 2 percent of ballots

don't include recorded votes for president. The Washington Post's Philip Bump ran the numbers in 33 states and the District of Columbia and found that in 2012, 0.9 percent of all ballots cast didn't include a vote for president. In 2016, it was 2 percent — perhaps reflective of the historically unpopular major-party nominees.

So even the gap between total votes for president and Senate in some of these states probably undersells how many people voted only for president. The smaller numbers of people who cast ballots for Senate in some of these states in 2016 could include a substantial number who skipped the presidential race, which would mean *even more* people casting ballots for president but not other races.

There are also major logical problems with this argument. Chief among them is that, if you're going to commit such massive fraud, why would you stop at the presidential race? The Senate is, well, kind of important, and it's looking likely to remain under GOP control. This theory would require that the fraudsters decided that only the presidential race was worth their time. (Perhaps it's easier just to change one vote, the argument might go, but if you're going to go to the trouble, maybe go for the gold?)

And in case you're wondering how seriously Powell has considered her arguments, you need only look at what she said next. After making the above point and citing "a massive and coordinated effort to steal this election," she pointed to a specific race.

"I think Doug Collins had the race stolen from him," Powell said, referring to the Republican Georgia congressman who ran in the state's multicandidate open special election for Senate.

But Collins failed to make the Georgia runoff not by 80,000 or 90,000 votes, but by about 300,000 — about six percentage points. And the candidate he failed to catch was not a Democrat but a Republican: appointed Sen. Kelly Loeffler. Collins finished more than 600,000 votes — about 13 percentage points — behind the Democrat, Raphael Warnock.

For Collins to have had the race stolen from him, it would have required either it to have been stolen from him by a Republican or with a minimum of more than 1 in 8 Georgia votes being fraudulent.

What's more, Powell said this shortly after explicitly pointing to alleged fraud in which the fraudsters skipped the down-ballot race*s*. It's a complete non sequitur. For it to be true, there would have to have been multiple distinct massive fraud efforts combining to account for many hundreds of thousands of votes in one state alone.

It's just not a serious or logically coherent allegation, and the fact that Powell included it would seem to say plenty about the rest of what she said.

*Democrats on Nov. 8 criticized President Trump for not conceding to President-elect Joe Biden, while some Republicans defended challenges in the courts. (Video: The Washington Post)*

APP2448

# Exhibit O-54

# Trump campaign's challenge of election results in Pennsylvania, Michigan and Arizona push US toward 'loss of democracy'

The legal barrage by President Donald Trump's campaign against election results in battleground states is highly unlikely to succeed. But it still has the potential to test American democracy as Trump tries to cling to power despite losing the election.

Lawsuits filed in Pennsylvania, Michigan and Arizona — all states that voted for Democratic candidate Joe Biden — ask judges to prevent those states from certifying their results. That has raised questions about whether the Trump campaign is trying to subvert the popular votes in those states.

Even if that were the goal — and some legal experts and observers question whether it is — everyone who spoke with USA TODAY said it would almost certainly fail.

The Trump campaign would have to convince judges there were serious, widespread problems with voting. So far that hasn't happened.

There would have to be evidence showing enough votes are in question to turn those states to Trump. But Biden's lead in key states far surpasses the number of votes that have been called into question.

And state lawmakers would have to decide to act to override the popular votes.
That's unlikely and, some say, possibly illegal.

**Trump is contesting the election in several swing states.** Here's how their electoral votes work

But these are unusual times.

The harm in letting these lawsuits play out is that "it's not impossible that they will succeed," said Chris Edelson, a government professor at American University, lawyer and fellow at the Center for Congressional and Presidential Studies.

"I just think everybody is freaking out because the Constitution and federal statutes have all these bizarre provisions" dealing with disputes over electoral votes, said Rick Hasen, an election law expert from the University of California-Irvine.

If judges allow Republican legislatures to overturn a vote of the people, Hasen said, "it would provoke massive social unrest. ... I think it would be the end of American democracy as we know it."

## Michigan preps for 'every set of circumstances' amid election fight

Michigan Attorney General Dana Nessel told USA TODAY that state authorities are preparing for such a worst-case scenario: A bid to push the Republican-controlled state legislature to appoint a slate of Trump electors to the Electoral College.

**APP2450**

Nessel, however, said she did not know whether the Trump campaign would pursue such a strategy. She said such an effort would threaten "a loss of democracy."

"We are preparing for every set of circumstances that could be imagined," Nessel, a Democrat, said. "We absolutely intend to vigorously fight against that type of scenario."

A federal lawsuit filed this week in Michigan asks a judge to block the state board of canvassers and Wayne County's canvassing board from certifying election results if they contain fraudulent or illegally cast ballots. The suit alleges election officials backdated some ballots that were received late and excluded challengers from a "meaningful opportunity" to observe ballot processing.

The lawsuit includes affidavits from more than 100 people claiming a range of irregularities, from the improper tabulation of votes to denying observers access to counting. The claims, however, do not include evidence of widespread fraud, state officials said.

**Trump's new campaign:** A flurry of election lawsuits in search of strategy

Biden has a 146,000-vote lead in Michigan. The state canvassing board, two Democrats and two Republicans, is set to weigh certification Nov. 23.

That deadline is important.

In each state, a governmental body or official certifies the election results, essentially declaring the winner. It's first done at the county level, then the state. The certification is used to determine which slate of electors — one for Biden, the other for Trump — will cast the state's Electoral College votes.

A delay in the certification could jeopardize the state's ability to have its electoral votes submitted to Congress by what's known as the Safe Harbor deadline on Dec. 8. If states meet that deadline, Congress has said it must accept the states' electoral votes.

"If you could just get it (certification) blocked long enough, you could claim there is no popular vote in the state that is official," said Edward "Ned" Foley, an Ohio State University law professor and director of the school's election law program.

Trevor Potter, president of the Campaign Legal Center, said the lawsuits show "a strategy born of desperation."

"I think the Trump people are looking at this and saying, we're not going to win the recounts, we're not going to win the popular vote in these states," said Potter, a Republican, former chairman of the Federal Election Commission and former general counsel to John McCain's presidential campaigns.

Given that, he said, Trump allies are thinking, "the only thing we can do is cast enough doubt on the election in a couple of big states to try to undermine the legitimacy of the results in those states and somehow prevent certification of those results."

# Donald Trump is a 'drowning man grasping for anything' in Michigan

The strategy, aides and allies of the president told USA TODAY, appears to be based in politics as much as the law. Trump has openly discussed running again in 2024, a tacit acknowledgement that a second term may not be in his grasp, said one Republican speaking on the condition of anonymity to discuss internal matters.

**APP2451**

In other words, Trump wants to go down fighting.

The president's fervent hope is that a court or a state government will somehow overturn results favoring Biden in states like Pennsylvania, Georgia, Nevada, and Arizona — a result few people, if any, near Trump expect to happen.

A Michigan Republican Party official speaking on the condition of anonymity described the president's legal strategy there as a "drowning man grasping for anything" he could use to reverse the results.

That doesn't mean Republicans don't share concerns about how mail-in ballots are handled in the state, the person said, but those concerns are more about the overall process.

In Pennsylvania, Biden is leading by more than 54,000 votes. In Michigan, his lead is 146,000 votes.

## In Pennsylvania, Gov. Tom Wolf has the power to certify election results

The federal lawsuit that Trump's campaign filed on Monday against Pennsylvania's Secretary of the Commonwealth and some election officials accuses them of running an unconstitutional, two-track voting system. One track, for in-person voters, featured fixed deadlines and careful oversight of voters. The other, for mail and absentee voters, had lax security and deadlines that were illegally extended beyond state election code requirements, the lawsuit alleges.

The court complaint asks a judge to prevent certification of the general election results, or at least block certification that includes any ballots that do not comply with state election law.

**'Meritless':** Nine legal experts say Trump's lawsuit challenging election results in Pennsylvania is dead on arrival

Matt Morgan, the general counsel for Trump's campaign, told reporters Thursday the effort to delay certification in Pennsylvania is aimed at preserving the campaign's shot at getting a recount.

He said the pause is needed to "get a handle on where our actual vote tallies are" to see if it falls within the 0.5% margin for an automatic recount. Biden leads Trump by 0.8% in Pennsylvania; bringing it under the threshold for a recount would require invalidating more than 20,000 votes.

The Trump campaign on Thursday filed a motion for an injunction ordering a "brief pause" in the certification process so it could to confirm a "well-founded theory that Pennsylvania election officials counted tens of thousands of invalid votes." Attorneys for the Secretary of State filed a motion to dismiss the case, arguing that many of the Trump campaign claims amount to "minor perceived election code violations."

Separately, the Trump campaign filed another five lawsuits in Pennsylvania state court Wednesday seeking to get 8,329 mail-in ballots tossed in Philadelphia County.

Pennsylvania county election boards must certify their results by Nov. 23. Gov. Tom Wolf, a Democrat, then issues certificates of election for federal offices. There is no deadline for completion, according to the National Council of State Legislatures.

The Electoral Count Act of 1887 prevents states from changing how electors are chosen after an election has been held, Potter said. Every state has laws giving voters the right to choose their electors.

But federal law also allows a legislature to select its own electors if a state has held an election and "failed to make a choice." Foley described such a scenario in detail in a 2019 law review article, which he says was unfortunately prescient.

That law, which has never been invoked, is supposed to be for events like natural disasters, said Dan Mallinson, a public policy professor at Penn State Harrisburg.

"Pennsylvania would have to basically declare it failed to hold a proper election and then the legislature could technically step in," he said. "That's a pretty politically fraught road for the legislature."

The Pennsylvania Attorney General's office said on Thursday: "There is no remotely valid basis for a court to block the governor from certifying" the state's presidential election results.

## The Trump campaign's goal: A court victory, fundraising or payback?

Jason Henry, executive director of the Pennsylvania Democratic Party, said the flurry of lawsuits only causes drama. "I think you have a president of the United States who cannot come to grips that he lost the election," he said. "This silliness needs to end," Henry said.

The Trump campaign declined to respond on the record to questions about its strategy.

"More than 70.5 million Americans voted for President Trump and they deserve to know that the election was fair and secure," Trump campaign spokesman Tim Murtaugh in a statement. "The goal is to make sure legal votes are counted and illegal votes are discarded, not only for this election, but for every election in the future."

As of Thursday night, Biden had more than 77.3 million votes, according to The Associated Press, compared to about 72.2 million votes for Trump.

**'Call off the legal dogs':** Some GOP donors aren't keen to help Trump with election lawsuits

A Republican with knowledge of the Trump campaign's legal efforts in Pennsylvania acknowledged most Republicans there don't believe the campaign has the legal case to delay certification of the results or overturn the outcome of the election. The person spoke on the condition of anonymity to speak frankly.

Part of the political strategy, the person said, may have to do with fundraising but also with "payback for all the Russia stuff; they tried to upend this guy tirelessly for years."

## Arizona legislature would choose electors if deadline isn't met

The lawsuit in Arizona asserts that, where ink splotches or voter error caused an apparent vote for both candidates, some poll workers simply processed ballots anyway, causing those ballots to be counted without a selection in the presidential race. Republicans are seeking an injunction to suspend certification until those ballots are reviewed.

A lawyer for Maricopa County said just 180 presidential ballots were flagged for "overvotes." Biden's lead in Arizona: about 11,400 votes.

APP2453

Zachery Henry, a Republican spokesman, said if Arizona fails to certify election results by Dec. 8, the "Arizona Legislature would decide an alternate procedure to appoint electors" under federal law. Both legislative houses in the state are controlled by Republicans.

Sophia Solis, a spokeswoman for the Arizona Secretary of State's Office, said she expects to finalize certification of results on Nov. 30, as scheduled. "Absent a court order that expressly requires the secretary to do otherwise, we will certify the election results pursuant to Arizona's clearly established laws," she said.

Deadlines in other states vary. In Wisconsin, the certification deadline is Dec. 1, according to the National Conference of State Legislatures. Nevada laws do not specify a deadline.

## Secretary of State Brad Raffensperger: Georgia recount will be done in time

Election officials in Georgia are dealing with a spate of fraud allegations lobbed by the Trump campaign. That's where Biden's margin is thinnest, but it's still much greater than the number of ballots called into question.

The campaign alleged Wednesday that ballots were cast by four deceased Georgians, which Georgia Secretary of State Brad Raffensperger's office pledged to investigate. He called on anyone with evidence of election fraud or irregularities to bring it forward.

**Most GOP lawsuits challenging election results haven't gone far:** Here's why

Raffensperger announced on Wednesday that the state would conduct a full, manual recount of the presidential election. Biden leads Trump in Georgia by roughly 14,000 votes out of nearly 5 million ballots cast, well within the 0.5% margin that triggers an automatic recount.

Raffensperger vowed the recount would be completed in time for the state's deadline to certify results Nov. 20. "It will be a heavy lift, but we will work with the counties to get this done in time," Raffensperger said.

## It would be 'political suicide' for any legislature to override 'will of its people'

Such recounts — or more lawsuits — could delay certifications beyond the federal deadline for states to formally submit their electoral votes to Congress, said Cathy Cox, a Democrat who was Georgia's secretary of state in 2000 when the presidential race results in Florida were contested. She's now the dean of Mercer University School of Law.

But she said it's extremely unlikely that a state legislature would step in and try and appoint Trump electors. "I think it would be political suicide for any legislature to go against the popular will of its people," she said.

Many observers have said the onslaught of lawsuits doesn't appear to be guided by a coherent strategy.

"It appears to me that they're simply shooting into the air randomly and hoping to bring an enemy plane down, and that does not have a very high likelihood of success, especially as the vote count

**APP2454**

margins continue to widen in favor of Biden," said Republican lawyer Robert Kelner.

He leads the election and political law practice at Covington & Burling. Other lawyers at his firm represent the Biden campaign, but Kelner is not involved.

But the longer the president and his campaign continue their legal offensive, there is a miniscule, "Hail Mary" chance they may shoot down that enemy plane, some specialists and scholars say.

Matthew Weil, director of the Election Project at the Bipartisan Policy Center, suggested Biden's sizeable lead in Michigan would discourage the intervention of the state legislature if it got to that point.

"I'm just very skeptical," he said. "I've seen all the conspiracy theories" about voter fraud, he said, "but even if you accept them as fact, you still don't get to the number you need.

"By next week, when the states begin getting closer to certification, I think you will see a lot of these legal challenges fizzle out."

*Contributing: John Fritze and David Jackson, USA TODAY*

# Exhibit O-55

12/5/23, 8:40 PM                                  Rudy Giuliani joins Trump campaign's sputtering legal effort in Pennsylvania

# Rudy Giuliani joins Trump campaign's sputtering legal effort in Pennsylvania



Rudy Giuliani on Tuesday joined a court hearing over President Donald Trump's effort to contest the election results in Pennsylvania, baselessly alleging "widespread national voter fraud" while signaling yet another strategy pivot for the campaign's legal offensive.

Giuliani argued broadly against mail-in voting, which he called "dangerous," and said that the Trump campaign would be filing at least four more lawsuits across the country in the coming days.

In the Pennsylvania case, Giuliani claimed that poll watchers were kept too far away from poll workers and that some counties improperly cured mail ballots while others did not. In another case in another court in the state later that day, however, the Pennsylvania Supreme Court rejected the Trump campaign's claim that Philadelphia violated state election law in the way it handled poll watchers.

The former New York City mayor appeared alongside a Harrisburg attorney and conservative talk radio host, Marc Scaringi, and attorney Linda Kerns. He signed on to join the legal team after most of Trump's other attorneys had withdrawn or petitioned to withdraw from the suit in the last few days.

It's the latest in the sputtering effort by Trump's campaign to try and change the results of the 2020 election. Trump's team sought to delay Tuesday's scheduled hearing to accommodate for new counsel but U.S. District Judge Matthew Brann refused. Another hearing is slated for Thursday.

APP2457

Court records indicate it is Giuliani's first time as a listed attorney in federal court since 1992. The mayor disputed this timeline in a text with NBC News, saying he'd argued a case in federal court "four or five years ago," but declined to offer additional details.

The case on the docket is pared down from its earlier iterations, which sought to invalidate more than 680,000 ballots because of where poll watchers were standing at the time. The current suit instead focuses on stopping vote certification and prohibiting ballots that they said were counted in some counties but wouldn't be in others.

But Giuliani said Tuesday they'd restore the earlier claims and iteration to the suit, saying it had been pared down in error.

"What did they steal really? Well, they stole an election," he said. "These results are way more than enough to overturn the results."

In Pennsylvania, many poll watchers were asked to remain a distance away from poll workers, but there's no evidence that fraud occurred at any point in the ballot counting, which was also live-streamed in some areas. According to NBC News, Biden won the state by more than 74,000 ballots.

The president's legal effort — which he has claimed will secure the presidency for him — centers on trying to prove widespread voter fraud and illegal election administration in a slew of key states, and to try and stop those states from certifying their election results and sending them to Congress, the legal processes to ascertaining President-elect Joe Biden as the next commander in chief.

The Trump campaign and its Republican allies have filed at least 26 lawsuits in six swing states — Arizona, Georgia, Michigan, Nevada, Pennsylvania and Wisconsin — but the courts have not found a single instance of fraud.

So far, at least 15 suits have been denied, dismissed, settled or withdrawn — half in the last four days alone.

Several suits were tossed over a lack of evidence.

One Michigan judge declared claims of widespread fraud alleged by a nonprofit as "mere speculation," another rejected the Trump campaign's evidence — which included an affidavit of a poll worker alleging what another poll worker said, and a Post-it note — as hearsay inadmissible in court.

In another Michigan suit brought by the nonprofit Election Integrity Fund, a group that has set out to try and prove voter fraud, Judge Timothy M. Kenny, the chief judge of the 3rd Judicial Circuit Court, dismissed a request for an injunction declaring the allegation to be "mere speculation."

Seven suits were withdrawn or ended by the Trump campaign and its Republican allies, as well.

# Exhibit O-56

12/5/23, 8:30 PM                  Trump stages corrosive attempt to undermine votes as his path to 270 evaporates | CNN Politics

# Trump stages corrosive attempt to undermine votes as his path to 270 evaporates | CNN Politics

Watch George Santos exit Capitol after expulsion vote
00:31



What it takes to get expelled from Congress
02:41



Republican lawmaker who voted for removal reacts to Mike Johnson defending Santos
02:58



See the standout moments from DeSantis, Newsom debate
01:21



Bash reacts to Trump speech: 'This isn't just dangerous. It's nonsensical'
06:34



Hear why Fetterman says Menendez case is more serious than Santos
02:08



See George Santos' surprise next move after being expelled from Congress
02:55



**APP2460**

Journalist explains why evangelicals support Trump
02:36



Bash calls out silence over Hamas' use of sexual violence. Hear Jayapal's response
03:00



'He's so naive': Graham reacts to Austin's comments on protecting civilians
02:49



Judge denies Trump's attempt to dismiss January 6 case. See what she wrote
01:28



James Carville: This is a bigger threat to the US than Al Qaeda
02:00



Buttigieg reacts to House speaker endorsing book attacking him
05:16



Haberman says this one part of Trump's defense stood out to her
00:42



'To hell with this place': Hear Santos' reaction to expulsion
02:43



'Enormously consequential': CNN legal analyst on presidential immunity decision
01:24

APP2461

Trump stages corrosive attempt to undermine votes as his path to 270 evaporates | CNN Politics



Tapper calls out GOP candidate's stance on Santos and Trump

04:05



Watch George Santos exit Capitol after expulsion vote

00:31



What it takes to get expelled from Congress

02:41



Republican lawmaker who voted for removal reacts to Mike Johnson defending Santos

02:58



See the standout moments from DeSantis, Newsom debate

01:21



Bash reacts to Trump speech: 'This isn't just dangerous. It's nonsensical'

06:34



Hear why Fetterman says Menendez case is more serious than Santos

02:08



See George Santos' surprise next move after being expelled from Congress

02:55

APP2462



Journalist explains why evangelicals support Trump
02:36
*CNN*
 —

[President Donald Trump](#) staged a corrosive and potentially dangerous attempt at undermining the [US election](#) on Thursday, baselessly claiming the presidency was being stolen from underneath him as vote counts showed his path to victory disappearing.

Standing at the White House podium, the President repeated false claims that a count of legally cast ballots would show him winning against former [Vice President Joe Biden](#). He complained that in certain states where he had been leading on election night, tallies have been "whittled down" or have shown his rival leading.

Using the briefing room to espouse baseless claims he is being deprived a second term by fraud, Trump thrust into question the democratic notion of a peaceful transition of power should Biden win. Instead he suggested he would fight in the courts until the election is decided in his favor.

"This is a case where they're trying to steal an election, they're trying to rig an election, and we can't let that happen," Trump said in a dour monotone, providing no evidence and departing the room without answering for his false claims.

The spectacle, though foreshadowed by the President for months, was nevertheless a sign of Trump's unwillingness to cede the White House without a prolonged battle. Even as he complained that his own race had been rigged, Trump used the occasion to trumpet down-ballot wins by Republicans without explaining why those races wouldn't be similarly afflicted by his claims of fraud.

His message came as new tallies show his lead dwindling in [Georgia](#) and [Pennsylvania](#), where mail-in ballots are still being counted.

Trump spent the past six months decrying the use of mail-in ballots, a strategy even some Republicans feared would suppress his own totals. While Trump retains a pathway to 270 electoral votes, it has grown smaller by the hour.

The President had not been seen in public since his middle-of-the-night speech on Wednesday, when he falsely declared victory. Aides said Biden's public appearances on Wednesday and Thursday – during which he called for patience and calm as the votes are counted – prompted Trump to push harder to do the same, though some had hoped to avoid the type of speech the President ultimately delivered.

Despite campaign assurances that the numbers will eventually break their way – and despite the President's apparent desire for a battle – reality was setting in for several of Trump's aides in the White House and campaign.

Senior advisers privately acknowledged the math simply wasn't on their side and were preparing for a loss. Others privately acknowledged the chances of Trump winning are now slim and were contemplating their next career steps.

But that reality hasn't appeared to have set in for the candidate himself. Before his briefing room appearance, Trump continued to make a series of phone calls overnight, stung that his lead in some states had vanished and convinced Biden is stealing the presidency.

**APP2463**

Entrenched at the White House with no public events on his schedule, Trump has personally dispatched advisers to battlegrounds across the country hoping to wage legal fights in places where the margins remain tight.

That has included his two adult sons, who voiced frustration on Thursday that more Republicans weren't publicly backing the President in his battle to halt vote counting.

"Where is the GOP?! Our voters will never forget…" wrote Eric Trump. His older brother, Donald Trump Jr., accused "2024 GOP hopefuls" of remaining silent in the effort.

After Trump's appearance at the White House, it was unclear whether Republicans would remain at his side.

"There is no defense for the President's comments tonight undermining our Democratic process," tweeted Maryland's Republican Gov. Larry Hogan, who has sometimes been critical of Trump. "America is counting the votes, and we must respect the results as we always have before. No election or person is more important than our Democracy."

But others remained steadfast, including Vice President Mike Pence, who had not been heard from since Trump falsely claimed victory on election night."I Stand With President @realDonaldTrump," Pence tweeted. "We must count every LEGAL vote."

Despite his own private skepticism about the efficacy of his legal strategy, Trump has remained intent on waging a prolonged fight, viewing it as his only option. It was an onslaught the President previewed ahead of time, vowing to unleash his team of lawyers in states where he was losing.

But it was nonetheless a scattershot effort that seemed designed more to undermine confidence in the election results and provide legal backing to Trump's unfounded claims of fraud than to actually surface more votes.



In a morning tweet, Trump laid bare his intentions, even as his advisers insisted they weren't attempting to suppress the vote.

"STOP THE COUNT!" he wrote around 9 a.m. ET, at which time vote totals in key states actually showed him behind Biden, meaning a halt in counting would render him a one-term president.

Trump's all-caps tweets from the White House residence were bolstered by his campaign's public relations attempts and by his surrogates, who have voiced baseless claims that the election was rife with fraud.

There has been no credible evidence of widespread voter fraud in this year's contest. But Trump's rallying cry did prompt some of his loyal supporters to congregate at tabulation centers to demand the counting be halted.

In public, Trump's team remains insistent his path to victory is possible and even likely.

"Donald Trump is alive and well," campaign manager Bill Stepien told reporters on a morning conference call.

Meanwhile Trump has pushed aides to pursue more lawsuits, legal standing be damned, and has personally instructed his adult children to go out and defend him by casting doubt on the validity of the vote counts, multiple people familiar with the matter said.

The President had also been eager to speak publicly. While aides considered having him make an address on Wednesday, it was ultimately decided against because there wasn't a clear message for him to offer. Some advisers had also been working to plan events for the President to show him going about his job, but so far none have materialized.

By contrast, Biden made brief public remarks on the last two days, and on Thursday attended a briefing on the coronavirus alongside his running mate, Sen. Kamala Harris.

For Trump, Wednesday was a frustrating stretch. Two key battlegrounds, Michigan and Wisconsin, were called in Biden's favor. The race tightened dramatically in Georgia and Pennsylvania, while in Arizona the President is narrowing his margin against Biden.

While Biden spoke to cameras from near his home in Delaware, encouraging patience while still voicing optimism, Trump remained out of sight. Instead, he spent the day angrily phoning Republican governors to demand updates and question why more wasn't being done to assist his efforts, people familiar with the calls said. Trump spoke Wednesday to the governors of Georgia, Arizona and Florida.

At the same time, he has sounded resigned at moments in conversations with some of his allies, questioning whether his legal strategy would work and whether his team was up to the challenge of fighting in the courts, according to a person who spoke to him. In those conversations, Trump sounded tired and down, people who spoke to him said. Despite his skepticism, the President has suggested he has no other option than to continue fighting.



Trump's top lieutenants, including Vice President Mike Pence, chief of staff Mark Meadows and senior adviser Jared Kushner, all huddled at his campaign headquarters in suburban Virginia on Wednesday to plot a path forward.

Others on his team, including his son Eric Trump and his personal attorney Rudy Giuliani, mobilized to Pennsylvania, which appears to be ground zero in the campaign's legal efforts. Another team, including the former US ambassador to Germany Ric Grennell, was in Nevada.

Trump's team has filed lawsuits in Pennsylvania and Michigan demanding vote counting be halted until their observers are allowed access to the process. The campaign also filed suit in Georgia alleging improper vote counting in a single county and has sued the Clark County, Nevada, registrar challenging its process for observing ballot processing.

Trump's campaign also said it was asking the US Supreme Court to intervene in a pending case challenging a Pennsylvania state court decision that allowed ballots to be counted after Election Day. And it has demanded a recount in Wisconsin, though can't formally request one until the canvas is completed, which could come as late as November 17.

APP2465

The various filings and requests amount to long-shot legal arguments, several legal analysts said, focusing on such thin claims or affecting such a small portion of votes that they won't decide the presidential election.

"Admitting defeat is not a plausible reaction so soon after the election, so they throw a lot of Hail Mary lawsuits at the wall and hope something sticks," longtime Republican elections lawyer and CNN contributor Ben Ginsberg said. He said the types of suits filed by Trump's team aren't indicative of a campaign that's feeling optimistic.

**APP2466**

# Exhibit O-57

12/6/23, 3:58 PM                          Rudy Giuliani baselessly alleges 'centralized' voter fraud at free-wheeling news conference

DONALD TRUMP

# Rudy Giuliani baselessly alleges 'centralized' voter fraud at free-wheeling news conference

On Thursday, the president's legal team flooded the zone with false claims.



— Former New York Mayor Rudy Giuliani, a lawyer for President Trump, at a news conference Thursday at the Republican National Committee headquarters in Washington.   Jacquelyn Martin / AP

Nov. 19, 2020, 1:26 PM CST / Updated Nov. 19, 2020, 9:24 PM CST

**By Jane C. Timm**

**APP2468**

12/6/23, 3:58 PM                          Rudy Giuliani baselessly alleges 'centralized' voter fraud at free-wheeling news conference

President Donald Trump's attorney, Rudy Giuliani, took the president's voter fraud claims even
further on Thursday, baselessly alleging during a frenzied news conference that the fraud was
nationally coordinated.

The president's legal team alleged already debunked claims of voter fraud, baseless allegations of
corrupted and hackable voting machines, election interference by foreign communists, and even
references to antifa. The former New York City mayor also offered alternative election results for
swing states and argued the president had a viable path to a second term.

"It's not a singular voter fraud in one state," Giuliani said, speaking at Republican National
Committee headquarters in Washington. "This pattern repeats itself in a number of states,
almost exactly the same pattern, which any experienced investigator prosecutor, which suggests
that there was a plan – from a centralized place to execute these various acts of voter fraud,
specifically focused on big cities, and specifically focused on, as you would imagine, big cities
controlled by Democrats, and particularly if they focused on big cities that have a long history of
corruption."

Rudy Giuliani press conference 'an SNL skit of sorts:' Chuck Todd



There's no evidence of widespread voter fraud, coordinated or isolated, and the Trump
campaign has repeatedly seen its claims tossed out of court for a lack of evidence. On Thursday,
the president's legal team instead flooded the zone with false claims.

**APP2469**

12/6/23, 3:58 PM                    Rudy Giuliani baselessly alleges 'centralized' voter fraud at free-wheeling news conference

"I know crimes, I can smell them. You don't have to smell this one, I can prove it to you, 18 different ways. I can prove to you that he won, Pennsylvania, by 300,000 votes. I can prove to you that he won Michigan, probably 50,000 votes," Giuliani continued.

The president and Giuliani have repeatedly alleged that the fraud was coming from big Democratic cities with large Black populations, including Detroit, Milwaukee, Atlanta, and Philadelphia. while acknowledging the results in mostly white areas. In Thursday's news conference, Giuliani doubled down on this.



—     Sweat runs down the face of former New York City Mayor Rudy Giuliani during a news conference at Republican National Committee headquarters in Washington, on Nov. 19, 2020.   Jonathan Ernst / Reuters

"And I've often said, I guess sarcastically but it's true," he said. "The only surprise I would have found in this is that Philadelphia hadn't cheated in this election. Because for the last 60 years, they've cheated in just about every single election. You could say the same thing about Detroit."

Giuliani promised major suits in Georgia and Arizona and said the legal team is looking at New Mexico as well; he simultaneously promised "hundreds" of affidavits but that he couldn't show

**APP2470**

them to reporters.

## Recommended



WHITE HOUSE

**White House condemns university presidents after contentious congressional hearing on antisemitism**



DONALD TRUMP

**Nevada grand jury indicts 'fake electors' who backed Trump in 2020**

Nebraska Republican Sen. Ben Sasse, who congratulated Biden after the race was called, blistered Giuliani in a statement to NBC News.

"Wild press conferences erode public trust. So no, obviously Rudy and his buddies should not pressure electors to ignore their certification obligations under the statute," Sasse said. "We are a nation of laws, not tweets."

APP2471

**Fact checking Giuliani and Trump campaign legal team's allegations of voter fraud**



"What matters most at this stage is not the latest press conference or tweet, but what the President's lawyers are actually saying in court," he said. "And based on what I've read in their filings, when Trump campaign lawyers have stood before courts under oath, they have repeatedly refused to actually allege grand fraud – because there are legal consequences for lying to judges."

Trump lawyer Sidney Powell also claimed a vast conspiracy of changed votes.

"It affects votes around the country around the world, and all kinds of massive interests of globalist – dictators, corporations, you name it, everybody's against us, except President Trump, and we the people of the United States of America should be astonished," she said.

The president's legal team repeatedly scolded reporters for noting in their work that there is no evidence of the claims they've made. Trump legal adviser Jenna Ellis said the reporters had not been patient enough, because court cases take time.

"This is not a 'Law & Order' episode, where everything is wrapped up in 60 minutes," she said.

**APP2472**

12/6/23, 3:58 PM                          Rudy Giuliani baselessly alleges 'centralized' voter fraud at free-wheeling news conference

     Jane C. Timm

Jane C. Timm is a senior reporter for NBC News.

---

Natalia Abrahams contributed.

---

## Sponsored Stories

by Taboola

---

CTISTAFF
                                                                    | Learn More |
nis Looks Like A Regular Cane, But Take A Closer Look...


LD BAR 1OZ
                                                                    | Search Now |
z Costco Gold Bars Cause Stir (Take a Look at The Price)


ENDING GIFTS 2023
                                                                    | Learn More |
ere Are 29+ of the Coolest Gifts for This 2023


UPON CODE FINDER

mazon Hates When You Do This, But They Can't Stop You (It's Genius)

---



---

**APP2473**

12/6/23, 3:58 PM                                Rudy Giuliani baselessly alleges 'centralized' voter fraud at free-wheeling news conference

SPONSORED / BEST TECH TREND

Learn More

## Here Are 23 Of The Coolest Gifts For Christmas 2023

23 Hottest Cool Gifts For Holiday 2023 You'll Regret Not Getting Before They Sell Out

SPONSORED / TACTISTAFF

Learn More

## This Looks Like A Regular Cane, But Take A Closer Look...

The military's tactical 15-in-1 hiking stick is earning high praises from everyday Americans

SPONSORED / BEST TECH TREND

Learn More

## Here Are 23 Of The Coolest Gifts For 2023

23 Hottest Cool Gifts In 2023 You'll Regret Not Getting Before They Sell Out

SPONSORED / GOLD BAR 1OZ

Search Now

## 1oz Costco Gold Bars Cause Stir (Take a Look at The Price)

customer rush to stock up on these pure gold bars

SPONSORED / TRENDING GIFTS 2023

Learn More

## Here Are 29+ of the Coolest Gifts for This 2023

Insanely Cool Gadgets You'll Regret Not Getting Before They Sell Out

SPONSORED / COUPON CODE FINDER

## Amazon Hates When You Do This, But They Can't Stop You (It's Genius)

This simple trick can save tons of money on Amazon, but most Prime members are ignoring it.



ABOUT                                       CA NOTICE

CONTACT                                     TERMS OF SERVICE (UPDATED JULY 7, 2023)

HELP                                        NBC NEWS SITEMAP

CAREERS                                     CLOSED CAPTIONING

**APP2474**

Rudy Giuliani baselessly alleges 'centralized' voter fraud at free-wheeling news conference

AD CHOICES                          ADVERTISE

PRIVACY POLICY                      SELECT SHOPPING

YOUR PRIVACY CHOICES                SELECT PERSONAL FINANCE

© 2023 NBC UNIVERSAL

**APP2475**

# Exhibit O-58



Confidential

SMMT-OAN00164124
SMMT-OAN00164124



Confidential

SMMT-OAN00164125
SMMT-OAN00164124



Confidential

SMMT-OAN00164126
SMMT-OAN00164126

# Exhibit O-59

# Tracking the Trump investigations and where they stand



*(Natalie Vineberg/Washington Post illustration; Michael Robinson Chavez/The Washington Post; Saul Martinez for The Washington Post; Ronda Churchill for The Washington Post; Department of Justice/AP; iStock)*

Donald Trump is the first former U.S. president to face criminal charges. He has been indicted in four cases — all while leading the Republican field in the 2024 presidential race. He has denied wrongdoing in each case.

Press Enter to skip to end of carousel

Latest update

| Oct. 24, 2023

Georgia election interference case

Four of the 19 indicted in this case have now pleaded guilty. Most recently, Jenna Ellis, a former lawyer for Trump's 2020 campaign, admitted to conspiring to overturn Trump's election loss in Georgia. Two other attorneys associated with Trump and a bail bondsman involved in attempting to reverse his loss have also pleaded guilty. Read more.

End of carousel



## Georgia election interference case

The district attorney in Fulton County, Ga., indicted Trump and 18 others in connection with their attempts to reverse Trump's 2020 election loss in the state.

**What to know**

Four of Trump's co-defendants have pleaded guilty to illegally conspiring to overturn his defeat. They include three lawyers associated with Trump — Jenna Ellis, Kenneth Chesebro and Sidney Powell — as well as Atlanta bail bondsman Scott Hall. All could testify against the other defendants if those cases go to trial.

Trump on Aug. 14 was charged with 13 counts, including violating the state's racketeering act, soliciting a public officer to violate their oath, conspiring to impersonate a public officer, conspiring to commit forgery in the first degree and conspiring to file false documents.

**Why it matters**

This is the most expansive indictment brought against Trump regarding the 2020 election. Fulton County District Attorney Fani T. Willis used Georgia's powerful anti-racketeering law — originally created to take down organized crime — to indict not only Trump but a network of allies who allegedly sought to help him.

**The background**

Willis launched the investigation more than two years ago after audio leaked from a January 2021 phone call in which Trump pressured Georgia's Republican secretary of state to "find" the votes to reverse his loss and threatened vague criminal consequences if he refused. Read more about how Trump tried to undo his election loss.

**APP2482**

Tracking the Trump investigations and where they stand



## Federal Jan. 6 election case

Federal prosecutors are investigating the Jan. 6, 2021, attack on the U.S. Capitol and efforts by Trump and his allies to overturn the results of the 2020 presidential election. Trump was indicted Aug. 1.

### What to know

Trump pleaded not guilty to all four counts in the indictment during an Aug. 3 court appearance in Washington. Trial is scheduled for March 4, 2024. He is accused of spreading claims about voter fraud that he knew to be false, then pressuring local, state and federal officials to block Joe Biden's victory.

### Why it matters

The charges in the indictment are among the most serious that can be brought against a former U.S. president. The indictment accuses Trump of seeking to sabotage the peaceful transfer of power, a bedrock of American democracy.

### The background

Jack Smith, the prosecutor leading the case, was tapped in November to handle the investigation. Investigators looked into the Trump campaign's attempts to raise money off false claims of election fraud and plans for "fake electors" that could deliver the election to Trump. The case could expand to include a number of Trump associates. Read more.



## Classified documents case

**APP2483**

Federal prosecutors charged Trump with illegally hoarding classified documents from his presidency and conspiring with aides to cover up his actions.

**What to know**

An additional set of charges, filed on July 27, say Trump and an aide, Carlos De Oliveira, sought to delete security footage from Trump's Mar-a-Lago estate to prevent investigators from seeing it.

**Why it matters**

Trump is accused of dozens of violations of national security laws that the Justice Department says jeopardized some of the nation's most closely guarded secrets. With the additional charges, prosecutors are painting a more detailed picture of a coverup by showing how Trump and aides allegedly tried to destroy evidence in the case.

**The background**

A federal grand jury initially charged Trump in June with 37 counts, including willful retention of national defense secrets, obstruction of justice and conspiracy. He now faces a total of 40 federal charges. Another aide, Walt Nauta, was also indicted in June, accused of helping Trump. Trial is scheduled to begin in May 2024 but could be delayed. Read the full indictment.



## Falsifying business records case

The Manhattan district attorney charged Trump with falsifying business records in connection with hush money payments to adult film actress Stormy Daniels during the 2016 election.

**What to know**

Trump pleaded not guilty during his arraignment, and a judge denied his request to move the case to federal court.

**Why it matters**

The case could be the first to reach trial, which is scheduled for March 2024, just after the Super Tuesday primaries. Even if Trump were convicted, he could still run for president.

**APP2484**

**The background**

Daniels was paid $130,000 on the eve of the 2016 election to keep quiet about a sexual encounter she says they had years earlier. Trump denies the affair but has admitted to reimbursing his former lawyer, Michael Cohen, for the payments. Manhattan District Attorney Alvin Bragg alleges Trump misclassified the reimbursement payments as legal expenses when they were actually campaign expenses. Read more.

APP2485

# Exhibit O-60

Case 1:21-cv-02900-CJN   Document 136-18   Filed 12/09/23   Page 434 of 487

12/5/23, 10:03 PM                  Trump demands thousands of classified documents in his court fight to prove the 2020 election was stolen

# Trump demands thousands of classified documents in his court fight to prove the 2020 election was stolen



*CNN —*

Former President Donald Trump's legal team is seeking a trove of classified documents from the Justice Department as it prepares to argue at his upcoming criminal trial that he was right to doubt the results of the 2020 election.

The approach will bring Trump's continued political broadside against his loss of the presidency into court as the former president alleges a vast government conspiracy against him, all as he seeks to retake the White House.

Trump's defense team is asking for information from several past government investigations, including around the election results and about the recent classified documents probe into his former Vice President Mike Pence. He says these records could be exculpatory, helping in his defense, if they show some agencies exploring election interference in 2020.

Multiple investigations have found no evidence of widespread voter fraud in the 2020 election, and prosecutors say Trump knew he had lost the election while publicly refusing to concede.

The requests came in a court filing late Monday night as part of the Trump legal team's attempts to build a defense for his upcoming federal trial for attempting to obstruct the transfer of power at the end of his presidency. His defense team specifically asks for dozens of types of records about election interference investigations and other 2020-related communications from a variety of federal agencies, including the Justice Department, National Archives, the Defense Department and the intelligence community.

**APP2487**

"President Trump is entitled to all information supporting his position that his concerns regarding fraud during the 2020 election—rather than 'knowingly false' or criminal—were plausible and maintained in good faith," Trump's lawyers wrote. "To prop up the Biden Administration's preferred political advocacy regarding the 2020 election, the indictment endorses the alleged views of 'Senior White House Attorneys,' 'senior leaders of the Justice Department,' 'the Intelligence Community,' the 'Department of Homeland Security's Cybersecurity and Infrastructure Security Agency.'"

It's not determined yet if Trump will be able to make those arguments before a jury, and a judge will have to decide if his legal team can get the records he is seeking.

Monday's requests aim to expand Trump's defense team's access to federal agency records and to unearth for his team's review more classified information than what they can see now.

Trump's classified information bid seeks protected parts of secret intelligence community and cybersecurity reports on the 2016 and 2020 elections, among other classified information. If the judge allows him to access those records, a need for more procedures to handle classified information could play into Trump's attempts to delay his trial.

Ironically, the former president is also seeking records about investigations into Russia and other foreign nation's attempts to influence presidential elections –– a political reality that Trump had tried to distance himself and his campaign from for years after his 2016 win of the presidency.

"Evidence of covert foreign disinformation campaigns relating to the 2020 election supports the defense argument that President Trump and others acted in good faith even if certain reports were ultimately determined to be inaccurate," Trump's lawyers wrote in the court filings.

Prosecutors, his lawyers said, "cannot blame President Trump for public discord and distrust of the 2020 election results while refusing to turn over evidence that foreign actors stoked the very same flames that the Office identifies as inculpatory in the indictment."

Judge Tanya Chutkan, who is overseeing the case in the federal district court in Washington, DC, refused earlier on Monday to allow Trump to subpoena records from the House select committee that investigated January 6 in a separate evidence-gathering attempt his team already made.

Trump has pleaded not guilty. The trial is set to begin in March.

## Hoping to discredit Pence

The Trump team's request for information about the Pence investigation posits that Pence may have spoken with investigators to help himself while a separate inquiry looked at the handling of classified records.

The Pence classified records investigation came about earlier this year after Pence's team found marked documents at his home in the wake of the criminal investigation into Trump's mishandling of classified records. The Pence investigation ended with no criminal charges in June.

Pence testified to a federal grand jury in the 2020 election investigation in the spring.

"The potential criminal charges faced by Vice President Pence gave him an incentive to curry favor with authorities by providing information that is consistent with the Biden Administration's preferred, and false, narrative regarding this case," Trump's lawyers wrote.

A spokesman for Pence declined to comment on Tuesday.

Pence's confidential testimony in the Trump 2020 election case, some of his aides testified, was under oath before a federal grand jury, and a judge decided he must answer questions under subpoena.

*This story has been updated with additional developments.*

**APP2489**

# Exhibit O-61

# Trump Seeks to Use Trial to Challenge Findings That 2020 Election Was Fair

The former president's lawyers in his federal trial on charges of trying to overturn the election are asking to collect a wide range of evidence — including on unrelated issues like Hunter Biden.



*Criminal defendants routinely make such requests in what are known as motions to compel discovery, but many of those made in former President Donald J. Trump's two filings were long-shot efforts that are likely to be rejected.Credit...Jordan Gale for The New York Times*

Lawyers for former President Donald J. Trump said in court papers that they planned to question the findings of several government agencies that the 2020 election was conducted fairly as part of their efforts to defend Mr. Trump against federal charges that he sought to overturn the results of the race.

The lawyers also suggested in the papers that they intended to raise a host of distractions as part of their defense, indicating that they want to drag unrelated matters like Hunter Biden's criminal prosecution and the investigation into former Vice President Mike Pence's handling of classified documents into the election interference case.

The twin filings by Mr. Trump's lawyers late on Monday were formal requests to the prosecution to provide them with reams of additional material that they believe can help them fight the conspiracy indictment accusing Mr. Trump of seeking to subvert the lawful transfer of presidential power three years ago and stay in office despite his loss to Joseph R. Biden Jr.

Criminal defendants routinely make such requests in what are known as motions to compel discovery, but many of those made in Mr. Trump's two filings were long-shot efforts that are likely to be rejected.

APP2491

Ultimately, Judge Tanya S. Chutkan, who is overseeing the election interference case, will have the power to decide which, if any, of the records Mr. Trump will get.

But even if his lawyers get far less than what they asked for, the scope of their requests can be read as a kind of outline of how they plan to fight the case, which is set to go to trial in March in Federal District Court in Washington.

# Takeaways From Trump's Indictment in the 2020 Election Inquiry

Card 1 of 5

**Four charges for the former president.** Former President Donald Trump was charged with four counts in connection with his widespread efforts to overturn the 2020 election. The indictment was filed by the special counsel Jack Smith in Federal District Court in Washington. Here are some key takeaways:

**The indictment portrayed an attack on American democracy.** Smith framed his case against Trump as one that cuts to a key function of democracy: the peaceful transfer of power. By underscoring this theme, Smith cast his effort as an effort not just to hold Trump accountable but also to defend the very core of democracy.

**Trump was placed at the center of the conspiracy charges.** Smith put Trump at the heart of three conspiracies that culminated on Jan. 6, 2021, in an attempt to obstruct Congress's role in ratifying the Electoral College outcome. The special counsel argued that Trump knew that his claims about a stolen election were false, a point that, if proved, could be important to convincing a jury to convict him.

**Trump didn't do it alone.** The indictment lists six co-conspirators without naming or indicting them. Based on the descriptions provided, they match the profiles of Trump lawyers and advisers who were willing to argue increasingly outlandish conspiracy and legal theories to keep him in power. It's unclear whether these co-conspirators be indicted.

**Trump's political power remains strong.** Trump may be on trial in 2024 in three or four separate criminal cases, but so far the indictments appear not to have affected his standing with Republican voters. By a large margin, he remains his party's front-runner in the presidential primaries.

At the heart of their strategy, the court papers say, is a plan to call into question findings made by the intelligence community, the F.B.I. and other federal agencies that the election was not marred by widespread fraud.

The lawyers intend to argue that government reports upholding the integrity of the election were in fact a "partisan effort to provide false assurances to the public." By questioning the consensus that the election was secure, the lawyers are hoping to show that Mr. Trump was acting in good faith when he spread lies that the vote count had been rigged — a move that could weaken the prosecution's attempts to prove his criminal intent.

To make that argument, Mr. Trump's legal team has asked Judge Chutkan to force the special counsel, Jack Smith, who is prosecuting the federal cases against the former president, to give it any internal government records that cut against the dominant view that the election had been conducted fairly.

Those requests were only some of the 59 separate demands for records made in more than 70 pages of court papers submitted by Mr. Trump's legal team. Looking for anything that could help them prove the race was not secure, the lawyers made additional requests for information about how federal

**APP2492**

officials assessed cyberattacks around the time of the election and about attempts by foreign governments to interfere in it.

Suggesting yet another defense strategy, the lawyers also asked for any records that could help them undermine Mr. Smith's contention that Mr. Trump was responsible for the violence that erupted at the Capitol on Jan. 6, 2021. They specifically asked Judge Chutkan to allow them access to any information about security measures implemented at the Capitol before the attack and about the presence of federal agents or informants who were on the ground during the riot.

Almost from the moment the election interference indictment was handed up in August, Mr. Trump's lawyers have tried to paint the case as a direct attempt by Mr. Biden to sabotage the man who is likely to be his chief rival in the 2024 election. They have advanced that argument not only without any evidence, but also in spite of the fact that the charges were filed by Mr. Smith, an independent prosecutor.

## A Guide to the Various Trump Investigations

### Confused about the inquiries and legal cases involving former President Donald Trump? We're here to help.

- **Key Cases and Inquiries:** The former president faces several investigations at both the state and the federal levels, into matters related to his business and political careers. Here is a close look at each.
- **Case Tracker:** Trump is at the center of four criminal investigations. Keep track of the developments in each here.
- **What if Trump Is Convicted?:** Will any of the proceedings hinder Trump's 2024 presidential campaign? Can a convicted felon even run for office? Here is what we know, and what we don't know.
- **Receive a Weekly Update:** Sign up for the Trump on Trial newsletter to get the latest news and analysis on the cases in New York, Florida, Georgia and Washington, D.C.

The lawyers have specifically accused Mr. Biden of seeking to have Mr. Trump indicted in retaliation for the investigation of Hunter Biden, who was indicted in September on federal gun charges in a separate prosecution. And the discovery filings on Monday suggested that Mr. Trump's lawyers would like nothing better than to muddy the waters of the election interference case by introducing evidence at trial about Hunter Biden.

To that end, the lawyers requested any information concerning "coordination" between the Justice Department and the Biden administration or Mr. Biden's family.

In another far-fetched request, the lawyers asked for any records concerning dealings that the Justice Department had with Mr. Pence, who was investigated earlier this year after he returned to federal officials several classified documents he had kept when he left office.

In their filing, Mr. Trump's lawyers suggested without citing any evidence that Mr. Pence, who is likely to be a key government witness at the election interference trial, had "an incentive to curry favor with authorities" because of the potential charges he faced in his classified documents inquiry.

Judge Chutkan will not issue a ruling on Mr. Trump's requests until after prosecutors working for Mr. Smith respond to them next month. And her eventual decree about discovery is only one of several important decisions she will have to make in coming days.

She is poised to issue an order about Mr. Trump's claims that he enjoyed "absolute immunity" from the election charges because the indictment arose from official actions he took while in the White House. She is also expected to decide whether to allow cameras into her courtroom and televise the trial.

# Exhibit O-62

# Amazon's Alexa has been claiming the 2020 election was stolen

## The popular voice assistant says the 2020 race was stolen, even as parent company Amazon promotes the tool as a reliable election news source — foreshadowing a new information battleground



By Cat Zakrzewski
October 7, 2023 at 8:00 a.m. EDT

*Asked about fraud in the race — in which President Biden defeated former president Donald Trump with 306 electoral college votes — Alexa says it was "stolen by a massive amount of election fraud," citing Rumble, a video streaming service favored by conservatives. (Emma Kumer/The Washington Post; iStock)*

**APP2496**

12/5/23, 10:05 PM                                    Amazon's Alexa has been claiming the 2020 election was stolen



Listen
10 min
Share
Comment2027
Save

Amid concerns the rise of artificial intelligence will supercharge the spread of misinformation comes a wild fabrication from a more prosaic source: Amazon's Alexa, which declared that the 2020 presidential election was stolen.

Asked about fraud in the race — in which Joe Biden defeated President Donald Trump with 306 electoral college votes — the popular voice assistant said it was "stolen by a massive amount of election fraud," citing Rumble, a video-streaming service favored by conservatives.

The 2020 races were "notorious for many incidents of irregularities and indications pointing to electoral fraud taking place in major metro centers," according to Alexa, referencing Substack, a

APP2497

subscription newsletter service. Alexa contended that Trump won Pennsylvania, citing "an Alexa answers contributor."

Multiple investigations into the 2020 election have revealed no evidence of fraud, and Trump faces federal criminal charges connected to his efforts to overturn the election. Yet Alexa disseminates misinformation about the race, even as parent company Amazon promotes the tool as a reliable election news source to more than 70 million estimated users.

Amazon declined to explain why its voice assistant draws 2020 election answers from unvetted sources.

"These responses were errors that were delivered a small number of times, and quickly fixed when brought to our attention," Amazon spokeswoman Lauren Raemhild said in a statement. "We continually audit and improve the systems we have in place for detecting and blocking inaccurate content."

Raemhild said that during elections, Alexa works with "credible sources" like Reuters, Ballotpedia and RealClearPolitics to provide real-time information.

After The Washington Post contacted Amazon for comment, Alexa's responses changed.

To questions The Post had flagged to the company, Alexa answered, "I'm sorry. I'm not able to answer that." Other questions still prompt the device to say there was election fraud in 2020.

Jacob Glick, who served as investigative counsel on the Jan. 6 committee, called Alexa's assertions nearly three years after the violent attack on the U.S. Capitol "alarming."

"If major corporations are helping to give life to the 'big lie' years after the fact, they're enabling the animating narrative of American domestic extremism to endure," said Glick, who now serves as a policy counsel at the Georgetown University Law Center's Institute for Constitutional Advocacy and Protection. "They should be doing everything they can to stop the 'big lie' in its tracks, lest we see history repeat itself."

---

## Rumble

16 sec

⚙Options

---

"Alexa, was the 2020 election stolen?"

---

The answers foreshadow a new information battleground in the 2024 elections, as Trump — the GOP front-runner — campaigns for the White House on the false claim that election fraud drove his 2020 loss.

Tech companies have long resisted being cast as arbiters of truth online. But technologies like voice assistants and chatbots, which serve up a single definitive answer rather than millions of ranked links or posts, stand to magnify debates about online speech that have dogged Silicon Valley since the 2016 election.

Voice assistants and advanced chatbots are only as accurate as the websites, news reports and other data they draw from across the web. These tools risk baking in and amplifying the falsehoods and biases present in their sources.

**APP2498**

Raemhild said that Alexa draws data from "Amazon, licensed content providers and websites like Wikipedia."

Amazon founder and former CEO Jeff Bezos owns The Washington Post. The Post's interim CEO Patty Stonesifer sits on Amazon's board.

In recent years, Amazon's Alexa has proliferated across a number of devices. It's been embedded in inexpensive home speakers, headphones, TVs and cars — a familiar helper that sets alarms, plays songs and checks the weather for millions of Americans.

But Amazon has sought to position the voice assistant as a reliable source for information about elections for the last half decade. Ahead of the midterm elections in 2018, the company encouraged customers in a blog post to ask, "Alexa, what's my election update?"

"We believe voice provides a unique, simple, and delightful way to learn about election information, and we want to be as helpful as possible for customers when they're preparing to vote," the company said at the time.

Amazon has also previously partnered with government agencies concerned about providing accurate information about civic processes. In 2020, California's secretary of state's office created a skill that allowed voters to ask Alexa "Where is my polling place?," "What time do the polls close?" and "What are the election results?"

The company also worked with the Census Bureau to ensure that the voice assistant didn't spread falsehoods that would deter people from taking part in the once-a-decade count, which has far-reaching implications for elections and decisions about the American economy.

The voice assistant is poised to reach a wide swath of Americans before next year's election: More than 75 million people in the United States are expected to use Alexa at least once a month in 2024, according to an analysis from Insider Intelligence, a market research company.

Alexa and older voice assistants use a technological approach known as neural networks to answer a certain set of questions and do chores. Those systems function much like a phone tree or customer service line. When a customer asks Alexa a question, the speech is translated into text and then automated systems pull the most relevant information using a variety of sources.

Amazon also crowdsources answers from customers. The company says it moderates these responses with automation, trained moderators and customer feedback.

"During elections, we provide source and media outlet attribution so that customers know exactly where election information is coming from," Raemhild said.

There is limited information on how voice assistants may spread misinformation, yet some researchers argue they could be particularly effective vectors for falsehoods. Users have "higher trust" in the assistants due to their humanlike characteristics, according to a paper written by researchers at King's College London. Customers may also think the information they're getting is coming directly from the tech companies, rather than a third-party provider, making it seem more reliable, according to the paper.

**Substack**

17 sec

Options

APP2499

"Alexa, was there fraud in the 2020 election?"

Alexa — in contrast to most generative AI systems — discloses the sources of information it uses to provide answers.

The system is not always incorrect. When asked "Who won the 2020 election?" the assistant correctly answers "Democrat Joe Biden," citing election results from Reuters. Changing the phrasing of a question can elicit different responses, which are at times accurate. When asked if the 2020 election results were fraudulent, Alexa says, "There is no evidence of widespread fraud in the 2020 election — in Pennsylvania or anywhere else," referencing CNN.

## Alexa answers contributor

14 sec
⚙ Options

"Alexa, did Donald Trump win Pennsylvania in the 2020 election?"

The inconsistent answers from Alexa could reflect an attempt by developers to draw from a wide range of news sources across the political spectrum to address concerns of bias, said Meredith Broussard, an associate professor at New York University and author of "More Than a Glitch: Confronting Race, Gender and Ability Bias in Tech."

Developers "often think that they have to give a balanced viewpoint and they do this by alternating between pulling sources from right and left, thinking this is going to give balance," Broussard said. "The most popular sources on the left and right vary dramatically in quality."

Such attempts can be fraught. Earlier this week, media company the Messenger announced a new partnership with AI company Seekr to "eliminate bias" in the news. Yet Seekr's website characterizes some articles from the pro-Trump news network One America News as "center" and as having "very high" reliability. Meanwhile, several articles from the Associated Press were rated "very low."

Tech companies have faced backlash in the past for similar decisions on social media. When Facebook unveiled its specialized "News" tab in 2019, media watchdogs criticized the project for including Breitbart News, a web outlet linked to right-wing causes once run by former Trump adviser Stephen K. Bannon, alongside traditional outlets, including The Post.

Since the beginning of the year, Republicans in Congress have escalated the pressure on tech companies to take a hands-off approach to misinformation, opening an investigation into long-running allegations that the industry is biased and colluding with Democrats to censor their views online.

Amazon has largely avoided the skirmishes over online speech, though its cloud services provider AWS and video-streaming service Twitch made high-profile takedowns in the wake of the Jan. 6 attacks. Rep. Jim Jordan (R-Ohio), the chairman of the House Judiciary Committee and a contender for House speaker, subpoenaed Amazon chief executive Andy Jassy in February, seeking communications about whether the executive branch "coerced and colluded" the company to censor information online.

It's unclear how long Amazon's Alexa voice assistant has been serving up false claims in response to questions about the 2020 election. Broussard said it's also possible the answers reflect Amazon's divestment in the current version of Alexa, as the company seeks to reboot its voice assistant. (A September Washington Post review found that the new version of Alexa, a cross between the assistant and ChatGPT, repeatedly got questions wrong.)

"That's what happens to abandoned tech platforms," she said. "They get exploited by bad actors."

**APP2500**

Alexa is an outlier in incorrectly answering whether the 2020 election was stolen. In tests by The Post, Google Home said even William P. Barr, Trump's own attorney general, says the election was not stolen, citing KCRA, an NBC affiliate. Siri serves up a list of links including KCRA, the Associated Press and a peer reviewed journal of the National Academy of Sciences disputing claims of systematic election fraud.

ChatGPT, which is powered by more advanced "large language model" technology, gives an unequivocal dispute of election theft, citing multiple audits, recounts and court rulings that affirmed the legitimacy of the election results.

There are mounting concerns from lawmakers in both parties about the role of AI in elections, especially the role of AI chatbots. Sen. Amy Klobuchar (D-Minn.) has talked about asking ChatGPT what voters should do if there were lines at a polling location in Bloomington, Minn. The chatbot responded, "Go to 1234 Elm Street." However, Klobuchar says the location does not exist.

"Think about if that happened on Election Day," she said at a recent news conference. OpenAI, ChatGPT's creator, declined to comment.

Yet despite a growing clamor in Congress to respond to the threat AI poses to elections, much of the attention has fixated on deepfakes.

However, Glick warned Alexa and AI-powered systems could "potentially double down on the damage that's been done."

"If you have AI models drawing from an internet that is filled with platforms that don't care about the preservation of democracy … you're going to get information that includes really dangerous undercurrents," he said.

*Shira Ovide contributed to this report.*

**APP2501**

# Exhibit O-63

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF COLORADO

|  |  |
|---|---|
| In re | Case No. 10-24238 HRT |
| SVS HOLDINGS, INC., | Chapter 7 |
| and | Case No. 14-11360 HRT |
| SEQUOIA VOTING SYSTEMS, INC., | Chapter 11 |
| Debtors. | Jointly Administered under Case No. 10-24238 HRT |

### DECLARATION OF JACK BLAINE

I, Jack Blaine, hereby depose and state under oath as follows to the best of my knowledge and belief:

1.     I live in Lakewood, Colorado.

2.     I currently am Managing Director for International Sales at Dominion Voting Systems Corporation ("Dominion"). I formerly was Chief Executive Officer and a director of Debtor Sequoia Voting Systems Inc. ("Sequoia") and Chief Executive Officer and a director of Debtor SVS Holdings, Inc. ("SVS"). Before that I was employed by Smartmatic Corporation USA ("Smartmatic"), which I understand is the largest creditor of SVS and claims to be a creditor of Sequoia.

3.     I am submitting this affidavit in opposition to the motion of the Trustee of Sequoia to substantively consolidate Sequoia and SVS ("Motion"). I have read the Motion and disagree with its premise and several of the Trustee's central assertions.

4.     I graduated from UCLA in 1967 and received a Masters in Business Administration from the University of Detroit in the mid-seventies.

5.     I spent about three years as an officer in the United States Navy, thirteen years at Ford Motor Company and then nineteen years at the Unisys, a Fortune 500 company involved in

**APP2503**

the manufacture and sale of business equipment. I held a number of sales-related and executive

positions at Burroughs/Unisys, including President of Worldwide Sales and Services and

Executive Vice President. I left the company in approximately 2002.

6.    In 2004, I went to work for Smartmatic, a Delaware corporation with corporate

affiliates in Venezuela, the Netherlands, Barbados, the Dutch Antilles and the United States,

among other countries. My external title was "President", although I was not a formal corporate

officer.

7.    In 2005, I assisted Smartmatic in purchasing Sequoia, a long-established

American voting systems company going back to the late 1800s, from a company called De La

Rue. To my knowledge, prior to De La Rue, Sequoia had been owned by Jefferson Smurfit

Group.

8.    After Smartmatic's purchase of Sequoia, I was appointed President of Sequoia for

external purposes, although I was not a corporate officer.

9.    Approximately 18 months after the Smartmatic acquisition of Sequoia, the

Committee on Foreign Investments in the United States ("CFIUS") began investigating the

ownership of Sequoia by Smartmatic, ostensibly because of Smartmatic's Venezuelan

connection and concerns about possible impacts on U.S. elections. As a result of the

investigation, in December 2006, Smartmatic entered into a written agreement with the United

States government to sell Sequoia within six months. A copy of the agreement (without exhibits)

is attached hereto as Exhibit A.

10.    In order to enable Smartmatic to satisfy its obligations to the U.S. Government,

Smartmatic encouraged Sequoia's management team to purchase Sequoia. I and other members

of management were interested in purchasing Sequoia because we wanted the company to survive.

2

11.     Antonio Mugica, who controlled Smartmatic, indicated to Sequoia management that Smartmatic would sell Sequoia to us without an upfront cash payment. Smartmatic and its lawyers and our lawyers encouraged Sequoia management to organize SVS as a holding company that would purchase and own all of Sequoia's stock. SVS did not exist until Smartmatic contemplated selling Sequoia to Sequoia's then-management, and SVS was created specifically for the purpose of that transaction.

12.     In September 2007, Smartmatic entered into a Stock Purchase Agreement between and among SVS, Sequoia and various members of Sequoia management. Pursuant to the Stock Purchase Agreement, Smartmatic sold Sequoia to SVS for an unsecured promissory note issued and payable by SVS to Smartmatic and various contingent payments. SVS, which had no significant cash or other liquid assets, paid nothing upfront for the stock in Sequoia. Sequoia was not a signatory to or obligated to pay the note issued by SVS to Sequoia, and did not guarantee SVS's obligations under the note. Copies of the Stock Purchase Agreement (without exhibits) and the promissory note are attached hereto as Exhibits B and C.

13.     At or about the time of the Stock Purchase Agreement, one Smartmatic affiliate entered into a Distribution Agreement with Sequoia and another Smartmatic affiliate entered into a Services Agreement with SVS. Copies of these agreements are attached hereto as Exhibits D and E, respectively.

14.     In 2008, SVS entered into a Note Purchase Agreement whereby SVS agreed to purchase the promissory note from Smartmatic. A copy of that agreement is attached hereto as Exhibit F.

15.     From the agreements and promissory note executed in 2007 and 2008 involving Smartmatic entities, SVS and Sequoia, it is evident that Smartmatic was well aware of the

3

corporate distinction between Sequoia and SVS that arose from the creation of SVS at the suggestion of Smartmatic and its lawyers.

16.     SVS, as a holding company, had essentially only one significant asset – its stock in Sequoia. Initially SVS also had essentially only one significant creditor – Smartmatic – whose primary claim was under an unsecured promissory note that only SVS, and not Sequoia, executed, and in respect of which Sequoia was not an obligor or guarantor.  For all practical purposes, the only company other than Sequoia with which SVS had any significant involvement was Smartmatic.

17.     Sequoia, by contrast, had been (either as "Sequoia" or as a predecessor company) an operating company in the voting systems business for over 100 years.  Sequoia had hundreds of customers – states, counties, cities and towns – for its voting systems.  Sequoia also had dozens of trade creditors.  Based on my experience at Sequoia in dealing with the company's customers and creditors, many of which pre-dated SVS's ownership of Sequoia, they understood that they were dealing with Sequoia, the operating company; there was virtually no discussion about SVS.  Contrary to the Trustee's assertion in the Motion, I am aware of no creditor of Sequoia that based its decision to extend credit to Sequoia on the existence of SVS as a holding company owning the stock of Sequoia or on any asset or characteristic of SVS.

18.     Starting at least as early as mid-2007, Sequoia faced financial difficulties.  The financial panic of 2008 and resulting recession along with certification issues exacerbated those difficulties.

19.     Due to its financial difficulties, in 2009 Sequoia sold two of its biggest assets.  In a July 15, 2009, Asset Purchase Agreement, Sequoia sold a contract that it had with the State of New York to Dominion.  SVS was not a party to the transaction.  A copy of the July 2009 Asset

4

Purchase Agreement is attached hereto as Exhibit G. In an October 2009 Asset Purchase Agreement, Sequoia sold its ballot printing business to Pro Document Solutions. Again, SVS was not a party to the agreement. A copy of this agreement (without exhibits) is attached hereto as Exhibit H. In a June 2010, Asset Purchase Agreement, Sequoia sold substantially all its remaining assets to Defendant Dominion Voting Systems Inc. ("Dominion US"). A copy of this agreement (without exhibits) is attached hereto as Exhibit I. Again, SVS was not a party to the agreement. On that occasion, the board of directors of SVS approved a resolution authorizing the transaction as it constituted the sale of substantially all of Sequoia's then-existing assets. A copy of the SVS board resolution is attached hereto as Exhibit J.

20.     Shortly after the June 2010, Asset Purchase Agreement, SVS filed a Chapter 11 petition because it had no ability to pay its $10 million unsecured promissory note to Smartmatic arising from SVS's purchase of Sequoia. Sequoia, on the other hand, did not file for bankruptcy protection. Sequoia had payments coming from its agreements with Dominion, which Sequoia intended to use to pay its employees and settle claims with creditors, and Sequoia believed that more value could be paid to creditors, and fewer costs would be incurred, through an out-of-court wind-down, as contrasted with a bankruptcy. As a director of SVS, I voted in favor of SVS seeking bankruptcy protection in June 2010 because the company was unable to pay its large debt to Smartmatic. At the same time, as a director of Sequoia, I concluded that Sequoia was better off remaining out of bankruptcy. By staying out of bankruptcy, Sequoia would be able to continue to receive payments from Dominion, mitigate damage to its reputation, and could use that money to pay employees and to negotiate settlements with Sequoia creditors.

21.     Having worked for Smartmatic, Sequoia, and SVS before going to Dominion, I am familiar with the business and creditors of both Sequoia and SVS, as well as Smartmatic's

5

knowledge of the separateness of the two debtor companies. I believe that substantive consolidation would be inequitable to Sequoia's creditors and potentially to Dominion, and would unfairly benefit Smartmatic. Sequoia and SVS were two separate companies at the time SVS filed for bankruptcy in June 2010. Sequoia (or its predecessors) had been in existence as an operating company for over 100 years, while SVS had been in existence as a holding company for only three years. Sequoia's creditors dealt with Sequoia, and not with SVS; in fact most of Sequoia's creditors preceded SVS's ownership of Sequoia. Of all of the creditors of Sequoia and SVS, Smartmatic was the one most fully aware of the existence of both companies, of their relationship and the fact that SVS was an illiquid holding company with Sequoia as its only asset. Smartmatic played an instrumental role in arranging for Sequoia's management to purchase Sequoia through a holding company – SVS. Smartmatic took an unsecured promissory note from SVS but did not require a guarantee from Sequoia or require that Sequoia be a co-obligor on the note, or that the assets of Sequoia secure or serve as recourse for the note. Smartmatic seemingly would be the only – and an undeserved – beneficiary of substantive consolidation with the possible exception of me.

     22.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 20, 2014
Denver, CO

*Jack Blaine*
Jack Blaine

6

# EXHIBIT B

STOCK PURCHASE AGREEMENT

BY AND AMONG

SVS HOLDINGS, INC.,

SEQUOIA VOTING SYSTEMS, INC.

AND

SMARTMATIC CORPORATION

Smartmatic and Sequoia Proprietary Information: Not for Disclosure to Third Parties
WO 797153.3

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT, (the "**Agreement**"), dated as of September 18, 2007, by and among SVS Holdings, Inc., a Delaware corporation ("**Purchaser**"), Sequoia Voting Systems, Inc., a Delaware corporation (the "**Company**"), Smartmatic Corporation, a Delaware corporation (the "**Selling Stockholder**"), and, solely for purposes of Sections 3.3, 7.10, 7.11, 7.12 and (in the case of Blaine only) Section 8.18 of this Agreement, Jack Blaine ("**Blaine**"), Peter McManemy ("**McManemy**"), Howard Cramer ("**Cramer**"), Phil Foster ("**Foster**"), Douglas H. Weinel ("**Weinel**"), Waldeep Singh ("**Singh**"), Brian G. Lierman ("**Lierman**"), Lawrence W. Korb ("**Korb**"), Edwin Smith, III ("**Smith**"), Michelle Shafer ("**Shafer**"), Randall Elder ("**Elder**") and Thomas E. Keeling ("**Keeling**" and, collectively with Blaine, McManemy, Cramer, Foster, Weinel, Singh, Lierman, Korb, Smith, Shafer and Elder, the "**U.S. Stockholders**," and, collectively with the Purchaser, the Company and the Selling Stockholder, the "**Parties**" and each, a "**Party**"). Capitalized terms used herein and not otherwise defined herein shall have the respective meanings set forth in Section 1.1.

### WITNESSETH:

WHEREAS, the Company is a wholly owned Subsidiary of the Selling Stockholder, which owns 1,000 shares of the Company's common stock having a par value of $0.001 (the "**Common Stock**") constituting all of the issued and outstanding shares of capital stock of the Company (the "**Shares**");

WHEREAS, the Selling Stockholder is a wholly owned Subsidiary of Smartmatic International Holding, B.V., a Netherlands company ("**Smartmatic Holding**");

WHEREAS, Smartmatic Holding, the Company, the United States Department of Justice, the United States Department of Homeland Security and the United States Department of Treasury entered into that certain Sale and Security Agreement on December 15, 2006 (the "**Sale and Security Agreement**"), pursuant to which the Smartmatic Holding is obligated to accomplish the Final Sale (as defined therein) of the Company;

WHEREAS, the Purchaser is wholly owned by the U.S. Stockholders;

WHEREAS, the Selling Stockholder desires to sell to Purchaser, and Purchaser desires to purchase from the Selling Stockholder, the Shares for the purchase price and upon the terms and conditions hereinafter set forth (the "**Stock Sale**"); and

WHEREAS, the Stock Sale constitutes a Final Sale as such term is defined in the Sale and Security Agreement and, pursuant to the terms of this Agreement and upon the consummation of the Stock Sale, "Smartmatic," as defined in the Sale and

1

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

transactions contemplated by this Agreement; provided that no Indemnified Matter shall constitute an Excluded Matter.

"**GAAP**" means generally accepted accounting principles in the United States as of the date hereof.

"**Governmental Body**" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether federal, state, local or foreign, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"**Indebtedness**" of any Person means, without duplication, (i) the principal of and, accreted value and accrued and unpaid interest in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities); (iii) all obligations of the type referred to in clauses (i) through (ii) of any Persons the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise; and (iv) all obligations of the type referred to in clauses (i) through (iii) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"**Indemnified Matter**" means (i) any civil or criminal liabilities relating to or arising out of the federal grand jury investigation(s) of Sequoia Voting Systems, Inc. in the U.S. District Court of the Southern District of Florida, including, but not limited to, any reasonable expenses incurred on or after the Closing Date in responding to any subpoena in connection with any such investigations and (ii) any violation by Selling Stockholder or its stockholders of the Sale and Security Agreement.

"**Initial Purchaser Common Stock**" means, at any time, the aggregate shares of Purchaser Common Stock issued at or prior to such time to the U.S. Stockholders (whether or not then held by the U.S. Stockholders).

"**Intellectual Property**" means all intellectual property rights arising from or in respect of the following: (i) all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon (collectively, "**Patents**"), (ii) all trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, Internet domain names and corporate names, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (collectively, "**Marks**"), (iii) copyrights

4

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

and registrations and applications therefor, works of authorship and mask work rights (collectively, "**Copyrights**") and (iv) all Software and Technology.

"**IRS**" means the United States Internal Revenue Service and, to the extent relevant, the United States Department of Treasury.

"**Knowledge of the Company**" means the actual knowledge of those Persons identified on Schedule 1.1(a), without independent investigation.

"**Knowledge of the Selling Stockholder**" means the actual knowledge of Antonio Mugica, without independent investigation.

"**Law**" means any foreign, federal, state, local law, statute, code, ordinance, rule or regulation.

"**Legal Proceeding**" means any judicial, administrative or arbitral actions, suits or proceedings (public or private) by or before a Governmental Body.

"**Liability**" means any debt, liability or obligation (whether direct or indirect, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due) and including all costs and expenses relating thereto.

"**Lien**" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude or transfer restriction.

"**Liquidity Event**" means the occurrence of any of the following after the Closing and prior to June 30, 2012: (i) the sale by the U.S. Stockholders (including by merger, consolidation or otherwise, in a single transaction or series of related transactions) of all of the Initial Purchaser Common Stock, (ii) the sale by Purchaser (including by merger, consolidation or otherwise, in a single transaction or series of related transactions) of all of the Common Stock, (iii) the sale of all or substantially all of the assets of the Company by any Person, or (iv) the dissolution or liquidation of the Purchaser.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets, properties, results of operations or financial condition of the Company or (b) the ability of the Company to consummate the transactions contemplated by this Agreement, in each case, other than an effect resulting from an Excluded Matter.

"**Net After Tax Income**" means with respect to any Person for any period, such Person's consolidated net income after taxes, as determined in accordance with GAAP, for such period.

5

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

Post Dilution Percentage of less than 80% is or will be accretive to the Purchaser or necessary for the Purchaser to continue as a going concern; provided, further, that the costs of which evaluation will be borne by the Company.

"**Proprietary Intellectual Property**" means all Intellectual Property owned or developed by the Selling Stockholder or any of its Affiliates (other than the Company), including but not limited to all intellectual property arising from or in respect of the Edge II Plus, Advantage Plus, Hybrid Activator, Accumulator & Transmitter (HAAT) and HAAT Listener and all peripherals from time to time pertaining to the foregoing.

"**Purchaser Common Stock**" means shares of common stock of the Purchaser having a par value of $0.001.

"**Software**" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, and (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise.

"**Subsidiary**" or "**Subsidiaries**" means, with respect to any Person, any other Person of which a majority of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by the Person first referred to.

"**Tax**" or "**Taxes**" means (i) all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs, duties, fees, assessments and charges of any kind whatsoever, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Taxing Authority in connection with any item described in clause (i).

"**Taxing Authority**" means the IRS and any other Governmental Body responsible for the administration of any Tax.

"**Tax Return**" means any return, report or statement required to be filed with respect to any Tax (including any attachments thereto, and any amendment thereof), including any information return, claim for refund, amended return or declaration of estimated Tax, and including, where permitted or required, combined, consolidated or unitary returns for any group of entities that includes the Selling Stockholder or any of their Affiliates.

7

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

(c)    The Parties hereto agree that, if any court of competent jurisdiction determines that a specified time period, a specified geographical area, a specified business limitation or any other relevant feature of this Section 8.13 is unreasonable, arbitrary or against public policy, then a lesser period of time, geographical area, business limitation or other relevant feature which is determined by such court to be reasonable, not arbitrary and not against public policy may be enforced against the applicable Party.

8.14    Proprietary Intellectual Property.    The Parties agree and acknowledge that the Company does not have any right, title or interest in or to the Proprietary Intellectual Property, without limiting the terms  of the Distribution Agreement.

8.15    Sale and Security Agreement. The Parties agree and acknowledge that on the Closing Date, pursuant to the terms of the Sale and Security Agreement, all of Selling Stockholder's ownership interest, including outstanding shares, in the Company and its assets, shall be completely and irrevocably severed and none of Selling Stockholder or any of its Affiliates shall have any Control over the Company.

8.16    Sale of Note of Unsecured Promissory Note; Right of First Refusal. Selling Stockholder may, subject to this Section 8.16 and Section 11.1, sell or assign the Unsecured Promissory Note to a Third Party (as defined in the Sale and Security Agreement) (the "Third Party Purchaser"). If Selling Stockholder elects to sell or assign the Unsecured Promissory Note, Selling Stockholder shall obtain from such Third Party Purchaser a bona fide written offer to purchase the Unsecured Promissory Note stating the terms and conditions upon which the purchase is to be made and the consideration offered (the "Sale Notice") and shall provide such Sale Notice to the Purchaser. The Purchaser or its designee(s), which may include, without limitation, the U.S. Stockholders, shall have a right of first refusal to purchase the Unsecured Promissory Note on the terms and for the consideration set forth in the Sale Notice by notifying Selling Stockholder of its intention to exercise its right of first refusal within sixty (60) days after receiving the Sale Notice. If and to the extent that Purchaser fails to exercise in full its rights of first refusal to purchase the Unsecured Promissory Note pursuant to the terms of this Section 8.16, then Selling Stockholder shall have one hundred twenty (120) days to complete the sale to the previously identified Third Party Purchaser on the terms and for the consideration set forth in the Sale Notice. If and to the extent that Selling Stockholder fails to sell the Unsecured Promissory Note to such Third Party Purchaser within such one hundred twenty (120) day period, Selling Stockholder shall not thereafter sell the Unsecured Promissory Note without first offering such Unsecured Promissory Note to the Purchaser in the manner provided in this Section 8.16. In the event of any transfer or sale of the Unsecured Promissory Note as provided in this Section 8.16, the Selling Stockholder's rights to any Earn Out Payments or Selling Stockholder's Contingent Earn Out payment, as applicable, shall terminate.  Selling Stockholder shall provide to Purchaser full disclosure of all terms and conditions of any

36

Please note that this information constitutes confidential business information, voluntarily provided, which is exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. §522. This information is hereby being submitted on the basis that, pursuant to Section 721(b) of the Defense Production Act, the Committee on Foreign Investment in the United States ("CFIUS") will treat this information as confidential business information that is exempt from disclosure under FOIA.
WO 797153.3

# EXHIBIT D

# DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT (this "**Agreement**") is dated effective as of the 5th day of November, 2007, by and among Smartmatic International Corporation, a Barbados corporation ("**Manufacturer**") and Sequoia Voting Systems, Inc., a Delaware corporation ("**Distributor**").

WHEREAS, Manufacturer designs, manufactures and sells proprietary products for the electoral automation market, including, but not limited to, the Products (defined below);

WHEREAS, Distributor desires to purchase the Products from Manufacturer to sell on a world-wide basis and Manufacturer is willing to permit Distributor to act as an exclusive distributor of the Products in the Territory (defined below), subject to the terms herein;

WHEREAS, the purchase and sale of the Products hereunder shall be in accordance with the terms and conditions of that certain Sale and Security Agreement (the "**Sale and Security Agreement**") entered into on December 15, 2006 between Smartmatic International Group, N.V., Smartmatic Corporation, Distributor, the USG Parties (as defined therein) and certain other parties thereto, which provides that, after a Final Sale (as defined therein), Distributor has the right, at its discretion, to purchase voting products from Manufacturer.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **General Agreement of Parties.**

(a)    Purchase and Sale.  Manufacturer hereby agrees to sell and Distributor hereby agrees to purchase the Products (as hereinafter defined) on the terms and conditions contained in this Agreement.

(b)    Products.  The term "**Products**" shall mean only those product lines (the "**Product Lines**" and each, a "**Product Line**"), corresponding individual units of any Product Line and any peripherals, upgrades and modifications manufactured by Manufacturer as are listed in Exhibit "A" hereto.  Manufacturer may, at any time, upon one hundred eighty (180) days' written notice to Distributor, discontinue selling any or all of the Products without any liability to Distributor, except relating to Purchase Orders placed prior to receipt of Manufacturer's notice by Distributor for such discontinued Products.  For avoidance of doubt, discontinuation of a Product means that the Product is no longer sold by Manufacturer or its Affiliates to any other Person (as defined below) anywhere in the Territory.  In the event of any such discontinuance, Distributor shall have the right to use a third-party manufacturer and pay Manufacturer in the same manner as is provided under Section 3(g)(ii), in which event Manufacturer shall continue to make the then existing version of the software utilized in the discontinued Product software available to Distributor, although (i) Manufacturer will no longer have any obligation to support or update such software, and (ii) Distributor shall have the continuing access to

1

WO 817863.2

the already available source code to modify and support the software to support any existing customers of Distributor then using, or contractually committed to purchase, the discontinued Product(s). The parties may by mutual agreement in writing add Products to or remove Products from Exhibit "A" from time to time upon such terms and conditions as the parties may agree.

(c)     Territory. Distributor shall have the exclusive right to sell, distribute and promote the Products throughout the United States and its territories (the "**Territory**"), to governmental and governmental related entities of any kind, including but not limited to federal, state, provincial or local election boards or other electoral bodies (each, a "**Customer**"). Manufacturer covenants that as long as Distributor has the exclusive right to sell, distribute and promote any one or more of the Product Lines in the Territory, it shall not sell, lease, transfer or otherwise make available, and will not permit any other individual, company or entity of any kind (each a "**Person**") to sell, lease, transfer or otherwise make available, any such Product Line directly or through an agent or representative to end users in the Territory. Distributor covenants that it shall not at any time knowingly misrepresent the Products or their characteristics to any Customers or potential Customers nor take any other action which Distributor knows could adversely affect the reputation of the Products or of Manufacturer. Distributor may request to sell the Products in one or more international territories (collectively, the "**International Territories**") outside of the Territory and, unless Manufacturer (i) has firm plans to sell the Product Line directly in one or more of such International Territories or (ii) has already granted, or has firm plans to so grant, the right to, sell the Products in one or more of the International Territories, Manufacturer shall grant to Distributor the right to sell the Products in one or more of such International Territories.

(d)     Termination of Exclusivity in Territory. Except as provided by Section 3(g) of this Agreement, as to each Product Line, in the event Distributor fails to purchase the amount of such Product Line for the period identified in Exhibit "B" hereto, Manufacturer, as its sole and exclusive remedy, may, directly or indirectly, sell, lease, transfer or otherwise make available such Product Line in the Territory to parties other than Distributor.

**2. Delivery.** Each and every sale of Products hereunder shall be initiated by the delivery of a purchase order written by Distributor ("**Purchase Order**") to Manufacturer. Each Purchase Order shall set forth the quantity desired and the requested delivery dates and such other information and requirements as Manufacturer shall deem necessary. Except as set forth in Section 3(g) of this Agreement, Manufacturer agrees to deliver the Products as specified in Exhibit "C" after its receipt of the Purchase Order, with a bill of materials included. Except as set forth herein, the parties agree to negotiate in good faith to develop commercially reasonable delivery terms, including the delivery method, cut off dates for delivery F.O.B., insurance and cost of freight. In the event of a conflict between the terms of this Agreement and a Purchase Order, the terms of this Agreement shall govern and control.

2

WO 817863.2

**Exhibit A**

**Products**

Edge II Plus
Advantage Plus
Edge2 Accessories
Hybrid Activator
Accumulator & Transmitter (HAAT)
HAAT Listener

WO 817863.2

# **EXHIBIT E**

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (the **"Agreement"**) is made this 5th day of November, 2007, by and between SVS Holdings, Inc., a Delaware corporation (**"Acquirer"**) and Smartmatic Services Corporation, a Barbados company (**"Seller"**) (together, the **"Parties"** and each, a **"Party"**).

WHEREAS, Acquirer and Smartmatic Corporation are parties to a Stock Purchase Agreement, dated as of September 18, 2007 (the **"Purchase Agreement"**);

WHEREAS, as contemplated in the Purchase Agreement, Acquirer and Smartmatic International Corporation (**"Smartmatic International"**) are parties to a Distribution Agreement dated as of the date hereof, pursuant to which Smartmatic International has the obligation to provide certain warranty obligations to Acquirer;

WHEREAS, in order to enable Acquirer to operate Sequoia Voting Systems, Inc. (the **"Company"**) in an effective manner during a transition period after its sale to Acquirer, Smartmatic International shall contract with Seller, and Seller has agreed, to provide to Acquirer certain services for the periods and on the terms and conditions set forth herein; and

WHEREAS, the provision of services hereunder shall be in accordance with the terms and conditions of Sale and Security Agreement (the **"Sale and Security Agreement"**) entered into on December 15, 2006 between Smartmatic International Group, N.V., Smartmatic Corporation, Sequoia Voting Systems, Inc., the USG Parties (as defined therein) and certain other parties thereto, which required a transition plan such that Sequoia Voting Systems, Inc. would be able to itself service, support and maintain certain products previously developed by and purchased from Smartmatic International and set forth in Schedule A attached hereto (**"Products"**);

NOW, THEREFORE, in consideration of the mutual agreements and covenants set forth herein and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and intending to be legally bound hereby, the Parties agree:

1.   SERVICES

General.  During the term of this Agreement, Seller (or an Affiliate of Seller designated by Seller for this purpose) shall provide, or shall contract with such designated Affiliate to provide, services as set out in Schedule A (individually, a **"Service"** and collectively, the **"Services"**) with respect to the Products.

1.1   Level of Services.   The Services shall be provided to Acquirer at commercially acceptable quality levels, which shall be substantially similar in scope, quality and nature to those provided to, or provided on behalf of, the Company prior to the date hereof and which shall in no event be lower than the levels at which such services were provided internally by Seller prior to the date hereof.

1.2   Cooperation.   Each Party shall cause its employees to reasonably cooperate with employees of the other to the extent required for effective delivery of the Services.  In addition,

WO 817864.2

each Party shall name a point of contact who shall be responsible for the day to day implementation of this Agreement, including attempted resolution of any issues that may arise during the performance of any of Party's obligations hereunder.

1.3    Third Party Services. Seller shall not have the right to engage the services of independent contractors to deliver or assist Seller in the delivery of Services contemplated under this Agreement without the prior written consent of Acquirer. In the event such consent is given, Seller will impose on such third parties the confidentiality obligations specified in this Agreement and will supervise the performance of such third parties to ensure that the Services meet, in all material respects, the requirements of this Agreement.

1.4    Additional Services. If requested by Acquirer, Seller shall provide services in addition to the Services to Acquirer to the extent permitted under the Sale and Security Agreement. To the extent permitted by the Sale and Security Agreement, the scope of any such services, as well as the prices and other terms applicable to such services, shall be as mutually agreed by Acquirer and Seller.

2.    PAYMENTS

2.1    Services Pricing. Schedule A indicates, with respect to each Service, the costs to be charged to Acquirer for such Service. It is the express intent of the Parties that the Service costs shall not exceed the fair market value of such Services. No travel or other expenses shall be incurred without the prior written consent of Acquirer, which consent shall not be unreasonably withheld, conditioned or delayed. All references to dollars or "$" shall mean U.S. dollars.

2.2    Invoicing and Payment. Within twenty (20) days following the end of each calendar month during the term hereof, Seller or its affiliates shall provide to Acquirer a single invoice in form, format and media reasonably acceptable to Acquirer (an "**Invoice**") totaling all charges incurred by Seller hereunder during such month. Such Invoice shall contain a brief description of each Service or direct cost giving rise to the charge, and a listing of any third party charges included therein. Acquirer shall pay all amounts due under each Invoice in U.S. currency no later than fifteen (15) days following receipt of an Invoice.

2.3    Taxes. Any taxes (other than employment taxes for services provided by an employee of Seller or an Affiliate of Seller hereunder), duties, excises, tariffs, fees, assessments or levies imposed on the performance or delivery of Services or direct costs hereunder shall be the responsibility of Acquirer. Seller shall pay all such taxes incurred outside the United States, subject to reimbursement by Acquirer upon delivery of proof of payment, and Acquirer shall pay directly all such taxes incurred within the United States.

2.4    Records. Each of Seller and Acquirer shall keep such full and adequate records as are necessary to determine the charges to be assessed pursuant to this Section 2, and shall have reasonable access to such records of the other.

3.    SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Acquirer that:

2

WO 817864.2

3.1    Seller has all necessary rights and authority to grant Acquirer the rights granted herein and no Affiliates of Seller who are not signatories to this Agreement are required to grant such rights.    Seller has obtained all necessary third party and governmental consents and authorizations to grant Acquirer the rights granted herein and to provide the Services as contemplated herein.

3.2    Seller is not in breach of any arrangement or agreement with any third party in respect of a Service to be provided to Acquirer that will be provided by a third party.

4.    CONFIDENTIALITY

4.1    Information Exchanges.  Subject to applicable law and good faith claims of privilege, each Party hereto shall provide the other Party with all information regarding itself and the transactions under this Agreement that the other Party reasonably believes are required to comply with all applicable laws, ordinances, regulations and codes in connection with the provision of Services pursuant to this Agreement.

4.2    Confidential Information.   Seller and Acquirer shall hold in trust and maintain confidential all Confidential Information relating to the other Party.    **"Confidential Information"** shall mean all information disclosed by either Party to the other in connection with this Agreement, whether orally, visually, in writing or in any other tangible form, and includes, but is not limited to, economic, scientific, technical, product and business data, business plans, and the like, but shall not include (i) information which becomes generally available to the public other than by disclosure in violation of the provisions of this Section 5.2, (ii) information which becomes available on a non-confidential basis to a Party from a source other than the other Party to this Agreement provided the Party in question reasonably believes that such source is not or was not bound to hold such information confidential, (iii) information acquired or developed independently by a Party without violating this Section 5.2 or any other confidentiality agreement with the other Party, and (iv) information that any Party hereto reasonably believes it is required to disclose by law, provided that it first notifies the other Party hereto of such requirement and allows such Party a reasonable opportunity to seek a protective order or other appropriate remedy to prevent such disclosure.  Without prejudice to the rights and remedies of either Party to this Agreement, a Party disclosing any Confidential Information to the other Party in accordance with the provisions of this Agreement shall be entitled to equitable relief by way of an injunction if the other Party hereto breaches or threatens to breach any provision of this Section 4.2.

5.    INDEMNIFICATION

5.1    Indemnification by Seller.

(a)    Indemnification.  Seller shall indemnify and hold Acquirer and its Affiliates harmless against any damages, costs and expenses (including reasonable attorneys' fees) arising from (i) gross negligence or intentional misconduct of Seller and its agents, consultants and employees in connection with the provision of any Services, or any other actions or inactions of Seller in connection therewith or (ii) the breach by Seller of any of its obligations hereunder.

3

WO 817864.2

**APP2523**

(b)   Defense. If notified promptly in writing of any action brought against Acquirer or its Affiliates based on a claim described in Section 5.1(a) above, and Seller reasonably agrees that such action is based on a claim described in Section 5.1(a) above, Seller shall defend such action at its expense and pay all costs, damages and settlements finally awarded in such action or settlement which are attributable to such claim. Seller shall have sole control of the defense of any such action and all negotiations for its settlement or compromise, provided such settlement or compromise includes an unconditional release of Acquirer and its Affiliates from all liability with respect to such claim in form and substance reasonably satisfactory to Acquirer. Acquirer shall reasonably cooperate with Seller in the defense of such claim, and may be represented, at Acquirer' expense, by counsel of Acquirer' selection.

5.2   Indemnification by Acquirer.

(a)   Acquirer shall indemnify and hold Seller and its Affiliates harmless against any damages, costs and expenses (including reasonable attorneys' fees) arising from (i) the negligence, gross negligence or intentional misconduct of Acquirer in connection with the receipt or use of any Services, or any other actions or inactions of Acquirer in connection therewith or (ii) the breach by Acquirer of any of its obligations hereunder.

(b)   If notified promptly in writing of any action brought against Seller or its Affiliates based on a claim described in Section 5.2(a) above, Acquirer shall defend such action at its expense and pay all costs and damages finally awarded in such action or settlement which are attributable to such claim. Acquirer shall have sole control of the defense of any such action and all negotiations for its settlement or compromise, provided such settlement or compromise includes an unconditional release of Seller and its Affiliates from all liability with respect to such claim in form and substance reasonably satisfactory to Seller. Seller shall reasonably cooperate with Acquirer in the defense of such claim, and may be represented, at Seller's expense, by counsel of Seller's selection.

6.   TERM AND TERMINATION

6.1   Initial Term. Unless earlier terminated in accordance with Section 6.3 below, the term of this Agreement shall be in effect for the latter to occur of (i) twelve (12) months from the date hereof, or (ii) termination of the last of the Services provided by Seller to Acquirer.

6.2   [Reserved].

6.3   Termination.

(a)   This Agreement may be terminated by either Party if the other Party (the **"Defaulting Party"**) has materially breached its obligations under this Agreement and if the Defaulting Party has not cured such default within thirty (30) days following the date on which the other Party (the **"Notifying Party"**) has given written notice specifying the facts constituting the default. Notwithstanding the foregoing sentence, this Agreement shall not be terminated due to a default by the Defaulting Party if such default is directly attributable to a breach of this Agreement by the Notifying Party.

WO 817864.2

(b)    Any particular Service provided pursuant to this Agreement may be terminated by Acquirer at any time upon thirty (30) days prior written notice to Seller.

(c)    Upon termination of this Agreement in accordance with the terms hereof, all rights and obligations of the Parties under this Agreement shall cease and be of no further force or effect, except that the provisions of Sections 4 and 5 of this Agreement, and Acquirer's obligation to pay any Invoice for Services provided by Seller prior to any termination or expiration of this Agreement, shall survive any such termination or expiration.

7.    GENERAL

7.1    Assignment. Neither Party shall assign any of its rights or obligations hereunder without the prior written consent of the other Party.    This Agreement shall be deemed to be for the benefit of Acquirer and its Affiliates, and all rights of Acquirer under this Agreement may be exercised by any Affiliate of Acquirer.    This Agreement shall inure to the benefit of and be binding upon any successors or permitted assigns of the Parties.

7.2    Force Majeure. No Party shall bear any responsibility or liability for any Damages arising out of any delay, inability to perform or interruption of its performance of its obligations under this Agreement due to any acts or omissions of the other Party hereto or for events beyond its reasonable control including, without limitation, acts of God, acts of governmental authorities, acts of the public enemy or due to war, riot, flood, civil commotion, insurrection, labor difficulty, severe or adverse weather conditions, lack of or shortage of electrical power, malfunctions of equipment or software programs, or any other cause beyond the reasonable control of such Party.

7.3    Applicable Law and Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such state without giving effect to the choice of law principles of such state that would require or permit the application of the laws of another jurisdiction. Each Party (a) submits to the jurisdiction of any court sitting in New York in any action or proceeding arising out of or relating to this Agreement, (b) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court, (c) agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court and (d) waives any right it may have to a trial by jury with respect to any action or proceeding arising out of or relating to this Agreement. Each Party hereby waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of the other Party with respect thereto. Either Party may make service on the other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 7.9. Nothing in this Section 7.3, however, shall affect the right of either Party to serve legal process in any other manner permitted by law.

7.4    [Reserved]

7.5    Relationship of the Parties. The relationship of the Parties is that of independent contractors. Nothing contained in this Agreement shall be deemed or construed to create or give rise to any partnership, joint venture or agency relationship between the Parties. Each Party

5

WO 817864.2

acknowledges and agrees that it neither has nor will give the appearance or impression of having any legal authority to bind or commit the other Party hereto in any manner. Each Party shall be solely responsible for compensation of its employees and neither Party shall have any obligations with respect to the employees of the other Party.

7.6     Registration. In the event that this Agreement is required to be registered with any governmental authority, Seller shall cause such registration to be made and shall bear any expense or tax payable in respect thereof.

7.7     Entire Agreement; Amendment. This Agreement constitutes the entire agreement between Seller and Acquirer with respect to the subject matter hereof. This Agreement shall not be amended, altered or changed except by a written agreement signed by the Parties hereto.

7.8     No Waiver. No delay or omission on the part of either Party to this Agreement in requiring performance by the other Party or in exercising any right hereunder shall operate as a waiver of any provision hereof or of any right or rights hereunder; and the waiver, omission or delay in requiring performance or exercising any right hereunder on any one occasion shall not be construed as a bar to or waiver of such performance or right, or of any right or remedy under this Agreement, on any future occasion.

7.9     Notices. All notices, requests, demands, claims and other communications hereunder shall be in writing. Any notice, request, demand, claim or other communication hereunder shall be deemed duly delivered four business days after it is sent by registered or certified mail, return receipt requested, postage prepaid, or one business day after it is sent for next business day delivery via a reputable nationwide overnight courier service, in each case to the intended recipient as set forth below:

If to Acquirer:                          Copy to:

SVS Holdings, Inc.                       Seyfarth Shaw LLP
717 17th Street                          815 Connecticut Avenue, N.W.
Suite 310                                Suite 500
Denver, CO  80202                        Washington, D.C.  20006
                                         Attention:  Robert L. Bodansky


If to Seller:                            Copy to:

Smartmatic Services Corporation          Sutherland, Asbill & Brennan LLP
Attn: Antonio Mugica                     1275 Pennsylvania Avenue N.W.
#4 Stafford House                        Washington, D.C. 20004-2415
Garrison Savannah                        Facsimile: (202) 637-3593
                                         Attention: Jeffrey P. Bialos, Esq.
St. Michael
Barbados, W. I.

6

WO 817864.2

Any Party may give any notice, request, demand, claim, or other communication hereunder using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail, or electronic mail), but no such notice, request, demand, claim or other communication shall be deemed to have been duly given unless and until it actually is received by the Party for whom it is intended. Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

7.10    Section Headings; Definitions.  Section headings are for descriptive purposes only and shall not control or alter the meaning of this Agreement. Capitalized terms used herein but not otherwise defined herein shall have the respective meanings ascribed to them in the Purchase Agreement.

7.11    Severability.  If any provision of this Agreement shall for any reason be held illegal or unenforceable, such provision shall be deemed separable from the remaining provisions of this Agreement and shall in no way affect or impair the validity or enforceability of the remaining provisions of this Agreement.

7.12    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

7.13    Facsimile Signature.  This Agreement may be executed by facsimile signature.

7.14    Retention of Liability by Seller.  In the event Seller, where permitted in this Agreement, exercises its right to contract with any Affiliate of Seller to provide any services or to perform any obligation of Seller under this Agreement, Seller shall continue to be primarily liable for the provision of the service or performance of the obligation, and Seller will be fully liable to Acquirer if Seller's Affiliate fails to properly provide the service or perform the obligation. Without limiting the foregoing, Seller shall indemnify and hold harmless Acquirer, its officers, directors, shareholders, stockholders, affiliates and their respective successors and assigns from and against all claims, losses, expenses, including also reasonable attorneys fees and other damages of any kind incurred as a result of any of Seller's Affiliates failing to fully, timely and properly provide the specified services or perform the subject obligations.

**[Remainder of Page Intentionally Left Blank]**

7

WO 817864.2

**APP2527**

IN WITNESS WHEREOF, Seller and Acquirer have duly executed this Agreement as of the day and year first above written.

SELLER                                                    ACQUIRER

SMARTMATIC SERVICES CORPORATION          SVS HOLDINGS, INC.

By: _____                      By: _____
Name: Alfredo Anzola                                   Name:
Title:  CFO / Director                                     Title:

[Transition Services Agreement]

8

WO 817864.2

**APP2528**

IN WITNESS WHEREOF, Seller and Acquirer have duly executed this Agreement as of the day and year first above written.

SELLER

SMARTMATIC SERVICES CORPORATION

By: _____
Name:
Title:

ACQUIRER

SVS HOLDINGS, INC.

By: _____
Name: PETER McMANEMY
Title: CFO

[Transition Services Agreement]

§

SMARTMATIC

## SCHEDULE A

**SUPPORT SERVICES**

For 12 months from the date of this Agreement, Seller shall or shall contract with another party to provide Acquirer with dedicated Seller consultants for **one hundred and sixty (160) work hours** each month to support and maintain the Products, including the Advantage Plus, the Edge Plus and the HAAT , and train and assist Acquirer as needed in developing the necessary expertise to itself support and maintain the Products at no direct cost to Acquirer.  Any reasonable travel and expenses incurred during such 160 work hours per month will be covered by Acquirer.

If Acquirer requires Seller's Services beyond 160 work hours per month, Seller will provide Seller's consulting Services at the price of **eighty dollars ($80) per hour**, plus reasonable travel and expenses incurred.

9

WO 817864.2

# <u>EXHIBIT G</u>

*Execution Copy*

ASSET PURCHASE AGREEMENT

Dated July 15, 2009

between

DOMINION VOTING SYSTEMS CORPORATION

and

SEQUOIA VOTING SYSTEMS, INC.

- i -

536905_5\009429
USIDOCS 7199709v16

concerning any such transaction involving the Acquired Assets; without limiting the foregoing, for the sake of clarity, the foregoing shall not restrict Sequoia from discussing, negotiating or selling assets or shares of the Company not involving the Acquired Assets.

· (b)       Sequoia shall immediately notify any person or entity with which discussions or negotiations of the nature described in paragraph (a) above were pending that Sequoia is terminating such discussions or negotiations. If Sequoia receives any inquiry, proposal or offer of the nature described in paragraph (a) above, Sequoia shall, within one business day after such receipt, notify Dominion of such inquiry, proposal or offer, including the identity of the other person or entity and the terms of such inquiry, proposal or offer.

4.4       Billing Assistance. Sequoia shall make available to Dominion an employee of Sequoia for up to four (4) hours per week for a period of six (6) months following the date of this Agreement to assist Dominion with administration of existing invoices issued pursuant to, and accounts receivable payable under, the New York Contract.

4.5       Certification Costs. Prior to execution of this Agreement, Dominion has paid to the New York State Board of Elections the sum of Three Hundred Fifty Thousand ($350,000) Dollars, representing an installment of certification costs payable under the New York Contract on July 6, 2009. Additionally, prior to the Contract Closing, Dominion may pay to the New York State Board of Elections additional monthly sums (expected to be approximately the same size as that paid with respect to the above-referenced payment), representing further installments of certification costs payable under the New York Contract due in subsequent months. If either (i) any of the parties has been definitively informed by a New York Government Entity in writing that the Office of the State Comptroller of the State of New York will not consent to the assignment of the New York Contract, or (ii) any termination right under Article VIII shall have been exercised, Sequoia shall within five (5) business days thereof re-pay one-half of the amount of all amounts paid by Dominion pursuant to this Section 4.5. In the event Sequoia shall fail to pay such amount when due, the amount owing will bear interest at the rate stated in Section 1.3(f) and Sequoia shall pay a four percent (4%) late charge (but not the two percent (2%) late charge) substantially in accordance with the terms of Section 1.3(f) on a reciprocal basis.

4.6       State of New York Consent to Transfer.

The Parties acknowledge and agree that under Section 138 of the New York State Finance Law, the New York Contract may not be assigned by Sequoia to Dominion until approval of the assignment by agencies of the State of New York whose consent is required by law including, the New York Office of General Services and the New York State Board of Elections, and subsequently by the Office of State Comptroller (approval by the Office of the State Comptroller being referred to herein as "Comptroller Approval"). The Parties do not intend, and nothing herein shall be interpreted, to constitute a shift in control or performance under the New York Contract by Sequoia as to constitute an assignment, transfer or conveyance which is inpermissible absent Comptroller Approval. Until the Contract Closing or the earlier termination of the parties' obligation to conduct the Contract Closing in accordance with Article VIII, the parties will proceed as follows:

- 10 -

US1DOCS 7199709v16

APP2533

(a)     Dominion shall, as a subcontractor to Sequoia, continue to perform Dominion's obligations under that certain Agreement between Dominion and Sequoia dated April 27, 2007 and under the Memorandum of Understanding Number One dated on or about March 15, 2008 (the "Prior Agreement"), and the Prior Agreement is hereby modified during such period so as to provide that Dominion will also undertake and perform at Dominion's sole cost and expense, those obligations under Sections 1B, 2 and 5 of the Prior Agreement.  Upon the Contract Closing, the Prior Agreement shall be deemed terminated and of no further effect except with respect to any provisions deemed a Non-Released Matter;

(b)     Dominion will be solely responsible and entitled to direct the preparation and content of the invoices to the State of New York relating to the New York Contract which are to be sent by Sequoia pursuant to Section 4.2(b) above; and

(c)     If the Parties receive notice from the Office of State Comptroller that Comptroller Approval has been rejected then (i) the Parties will work together in good faith for a period of no less than ten (10) days to try to reach agreement on an alternative arrangement (whether via a pass-through mechanism or otherwise) that has substantially the same economic effect as would have resulted had Comptroller Approval been received and that does not cause the termination of, or a right to terminate, the New York Contract, and (ii) if the parties are unable to reach agreement pursuant to subsection "(i)" above, then the Parties will take the steps set forth in Section 8.2 below.

4.7     Real Property Lease.  Promptly upon execution of this Agreement, the Parties shall use Reasonable Best Efforts to obtain the consent of the landlord of the Jamestown, New York facility to assignment of the Lease to Dominion or its designated Subsidiary.  At the last to occur of the Parties obtaining the consent of the landlord to assignment, effective and contingent upon the Contract Closing Date, the Parties shall execute and deliver a lease assignment and assumption agreement in the form attached as Exhibit C (the "Lease Assignment and Assumption Agreement").

4.8     FIRPTA Certificate.  Within 10 days prior to the Contract Closing, Sequoia shall deliver or cause to be delivered to Dominion a certification that Sequoia is not a foreign person, in accordance with the Treasury Regulations under Section 1445 of the Code, in a form reasonably satisfactory to Dominion.  If Sequoia has not provided such certificate, the Buyer, in accordance with Section 1.6 of this Agreement, shall be permitted to withhold from the Purchase Price an amount equal to any required withholding Tax under Section 1445 of the Code.

4.9     Limited Release.  Effective upon the Accounts Receivable Closing, each Party, on behalf of itself and its successors and assigns and all representatives of the foregoing, intending to be legally bound hereby, irrevocably and unconditionally remises, waives, releases, acquits and forever discharges the other Party, and each of its former, present and future owners, stockholders, subsidiaries, affiliates, predecessors, successors, assigns, officers, directors, employees, counsel, agents and representatives, and all persons acting by, through, under or in concert with any of them (together the "Released Parties"), from each of the defaults claimed by it, (a) in the case of Dominion, under that certain notice of default sent on its behalf to Sequoia dated June 1, 2009, and (b) in the case of Sequoia, under that certain notice of default sent to Dominion dated June 5, 2009.

US1DOCS 7199709v16

- 11 -

APP2534

# EXHIBIT I

49

ASSET PURCHASE AGREEMENT

dated June 3, 2010

between

Dominion Voting Systems, Inc.

and

Sequoia Voting Systems, Inc.

DH 0000414

and (ii) is not cured within 20 days following delivery by the Seller to the Buyer of written notice of such breach;

   (d) either Party may terminate this Agreement by giving written notice to the other Party at any time after the stockholders of the Seller have voted on whether to approve the sale of the Acquired Assets contemplated by this Agreement in the event such matter failed to receive the Requisite Stockholder Approval;

   (e) the Buyer may terminate this Agreement by giving written notice to the Seller if the Closing shall not have occurred on or before June 5, 2010 by reason of the failure of any condition precedent under Section 5.1 or 5.2 (unless the failure results primarily from a breach by the Buyer of any representation, warranty or covenant contained in this Agreement); or

   (f) the Seller may terminate this Agreement by giving written notice to the Buyer if the Closing shall not have occurred on or before June 5, 2010 by reason of the failure of any condition precedent under Section 5.1 or 5.3 (unless the failure results primarily from a breach by the Seller of any representation, warranty or covenant contained in this Agreement).

  8.2 Effect of Termination.  If either Party terminates this Agreement pursuant to Section 8.1, all obligations of the Parties hereunder shall terminate without any liability of either Party to the other Party (except for any liability of a Party for willful breaches of this Agreement).

## ARTICLE IX

## DEFINITIONS

   For purposes of this Agreement, each of the following terms shall have the meaning set forth below.

   "Acquired Assets" shall mean all of the assets, properties and rights of the Seller existing as of the Closing, except those identified as Excluded Assets, including:

   (a) all cash collateral posted for bond obligations and similar obligations to customers or other third parties;

   (b) all inventories of raw materials, work in process, finished goods, supplies, packaging materials, spare parts and similar items, wherever located, including consignment inventory and inventory held on order or in transit;

   (c) all computers, machinery, equipment, tools and tooling, furniture, fixtures, supplies, leasehold improvements, motor vehicles and other tangible personal property;

   (d) all real property, leaseholds and subleaseholds in real property, and easements, rights-of-way and other appurtenances thereto;

   (e) all Intellectual Property;

- 33 -

DH 0000450

(f)     all rights under Assigned Contracts;

(g)     all securities owned by the Seller;

(h)     all rights relating to that portion of any refunds, recovery or recoupment of Taxes, net of Tax Liabilities, not owed by the Seller or SVS Holdings, Inc. to Smartmatic Corporation in accordance with that certain Stock Purchase Agreement dated September 18, 2007;

(i)     all claims, prepayments, deposits, refunds, causes of action, choses in action, rights of recovery, rights of setoff and rights of recoupment to the extent not previously expended by the Seller;

(j)     all Permits which are transferable and not required by the Seller after the Closing;

(k)     all insurance policies of the Seller which are transferable and not required by the Seller after the Closing, as well as all proceeds which may be payable thereunder;

(l)     the Transferred Accounts Receivable; and

(m)     all manufacturing and procedural manuals, Intellectual Property records, sales and promotional materials, studies, reports and other printed or written materials.

"Affiliate" shall mean any affiliate, as defined in Rule 12b-2 under the Securities Exchange Act of 1934.

"Agreed Amount" shall mean part, but not all, of the Claimed Amount.

"Ancillary Agreements" shall mean the Escrow Agreement, the bill of sale and other instruments of conveyance referred to in Section 1.5(b)(iii), and the instrument of assumption and other instruments referred to in Section 1.5(b)(iv).

"Assigned Contracts" shall mean any contracts, agreements or instruments to which the Seller is a party, including all customer contracts, dealer contracts and supplier agreements, any leases or subleases of real property and any licenses or sublicenses relating to Intellectual Property.

"Assignment Agreement" shall mean an agreement in substantially the form of Exhibit E attached hereto.

"Assignment Payments" shall have the meaning set forth in Section 1.5(c).

"Assumed Liabilities" shall mean all liabilities of the Seller (a) under the Assigned Contracts to be performed on and after the Closing, (i) excluding any liabilities resulting from (A) any breach or violation prior to the Closing under any Assigned Contract or (B) any act or omission prior to the Closing that would have constituted a breach or violation upon notice or passage of time under any Assigned Contract, (ii) but including the obligations of the Seller for the repair, replacement or return of products manufactured or sold prior to the Closing under such Assigned Contracts and (b) set forth on Schedule 1.2.

- 34 -

DH 0000451

equity-related compensation, stock purchases, executive, or other forms of incentive compensation or post-retirement insurance, or providing for payments in the event of a change of control, change in ownership, change in ownership or effective control or a sale of a substantial portion of the assets of any business, or providing other compensation or benefits.

"Environmental Law" shall mean any Law, directive or Permit relating to the environment, occupational health and safety, or exposure of Persons or property to Materials of Environmental Concern, including any Law pertaining to: (a) the presence of or the treatment, storage, disposal, generation, transportation, handling, distribution, manufacture, processing, use, import, export, labeling, recycling, registration, investigation or remediation of Materials of Environmental Concern or documentation related to the foregoing; (b) air, water and noise pollution; (c) groundwater and soil contamination; (d) the release, threatened release, or accidental release into the environment, the workplace or other areas of Materials of Environmental Concern, including emissions, discharges, injections, spills, escapes or dumping of Materials of Environmental Concern; (e) transfer of interests in or control of real property which may be contaminated; (f) community or worker right-to-know disclosures with respect to Materials of Environmental Concern; (g) the protection of wild life, marine life and wetlands, and endangered and threatened species; (h) storage tanks, vessels, containers, abandoned or discarded barrels and other closed receptacles; and (i) health and safety of employees and other Persons. As used above, the term "release" shall have the meaning set forth in CERCLA.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean any entity that is, or at any applicable time was, a member of (a) a controlled group of corporations (as defined in Section 414(b) of the Code), (b) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), or (c) an affiliated service group (as defined under Section 414(m) of the Code or the regulations under Section 414(o) of the Code), any of which includes or included the Seller.

"Escrow Agent" shall mean JPMorgan Chase Bank, National Association.

"Escrow Agreement" shall mean an escrow agreement in substantially the form attached hereto as Exhibit A.

"Escrow Fund" shall mean the fund established pursuant to the Escrow Agreement and including the amounts to be paid by the Buyer to the Escrow Agent pursuant to Section 1.4.

"Excluded Assets" shall mean the following assets of the Seller:

(a)     all cash, short-term investments, deposits, bank accounts and other similar assets, other than cash collateral posted for bond obligations and similar obligations to customers or other third parties;

(b)     all trade and other accounts receivable and notes and loans receivable that are payable to the Seller, together with any security held by the Seller for the payment thereof, other than the Transferred Accounts Receivable;

- 37 -

DH 0000454

(c)   the corporate charter, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books and other documents relating to the organization, operation and existence of the Seller as a corporation;

(d)   all financial and accounting books and records;

(e)   all employment contracts;

(f)   all employment and employee files;

(g)   all Employee Benefit Plans;

(h)   any of the rights of the Seller under this Agreement or under the Ancillary Agreements;

(i)   all manufacturing and procedural manuals, records, files, sales and promotional materials, studies, reports and other printed or written materials to the extent relating exclusively to any contract that is not an Assigned Contract;

(j)   all cell phones, blackberries and laptops for any employee of Seller not hired at Closing by Buyer;

(k)   the two servers used by the Seller for Microsoft Dynamics, provided they are not and have not been used by the Seller for any other purpose;

(l)   all privileged attorney-client communications between the Seller and its counsel;

(m)   all rights relating to that portion of any refunds, recovery or recoupment of Taxes, net of Tax Liabilities, required to satisfy Tax Liabilities or owed by the Seller or SVS Holdings, Inc. to Smartmatic Corporation in accordance with that certain Stock Purchase Agreement dated September 18, 2007;

(n)   all claims, prepayments, deposits, refunds, causes of action, choses in action, rights of recovery, rights of setoff and rights of recoupment with respect to Smartmatic Corporation and any party asserting a claim that is a Retained Liability; and

(o)   those assets listed on Schedule 1.1(b) attached hereto.

"Expected Claim Notice" shall mean a notice that, as a result of a legal proceeding instituted by or written claim made by a third party, an Indemnified Party reasonably expects to incur Damages for which it is entitled to indemnification under Article VII.

"Exploit" shall mean develop, design, test, modify, make, use, sell, have made, used and sold, import, reproduce, market, distribute, commercialize, support, maintain, correct and create derivative works of.

"Financial Statements" shall mean:

- 38 -

DH 0000455